**Nos. 08-50531, 08-50570, 09-50115, 09-50125, 09-50128, 09-50159, 10-50434, 10-50462, 10-50464 & 10-50472**

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

            v.

TERRY CHRISTENSEN et al.,

     Defendants-Appellants.

---

**GOVERNMENT'S CONSOLIDATED ANSWERING BRIEF**

APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

---

**ANDRÉ BIROTTE JR.**
**United States Attorney**

**ROBERT E. DUGDALE**
**Assistant United States Attorney**
**Chief, Criminal Division**

**KEVIN M. LALLY**
**JOSHUA A. KLEIN**
**Assistant United States Attorneys**

  1200 United States Courthouse
  312 North Spring Street
  Los Angeles, California 90012
  Telephone: (213) 894-2434
  Facsimile: (213) 894-0141

**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

**TABLE OF CONTENTS**

                                                                    PAGE

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . xxi

**I.   ISSUES PRESENTED** . . . . . . . . . . . . . . . . . . . 1

**II.  STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . 4

     A.   NATURE OF THE CASE, COURSE OF THE PROCEEDINGS,
          AND DISPOSITION BELOW . . . . . . . . . . . . . . . . 4

     B.   JURISDICTION, TIMELINESS, AND BAIL STATUS . . . . . . 8

**III. FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . 8

     A.   THE RICO AND WIRETAPPING TRIAL . . . . . . . . . . . 8

          1.   RICO/Computer Information Counts . . . . . . . . 9

               a.   Anthony Pellicano . . . . . . . . . . . . . 9

               b.   Mark Arneson . . . . . . . . . . . . . . . 10

                    (1)  The Government's Case . . . . . . . . 10

                    (2)  Arneson's Testimony and Cross-
                         examination . . . . . . . . . . . . . 16

               c.   Rayford Turner . . . . . . . . . . . . . . 25

          2.   Wiretapping Counts . . . . . . . . . . . . . . 29

               a.   Anthony Pellicano . . . . . . . . . . . . 29

               b.   Rayford Turner . . . . . . . . . . . . . . 35

               c.   Kevin Kachikian . . . . . . . . . . . . . 38

               d.   Abner Nicherie . . . . . . . . . . . . . . 40

          3.   The Pellicano Enterprise in Action -
               Anita Busch . . . . . . . . . . . . . . . . . . 41

     B.   THE CHRISTENSEN WIRETAPPING TRIAL . . . . . . . . . 44

          1.   The Government's Case . . . . . . . . . . . . . 46

i

**TABLE OF CONTENTS**

PAGE

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . .  51

    A.  THE CHALLENGES TO THE SEARCHES FAIL . . . . . . . .  51

        1.  Facts . . . . . . . . . . . . . . . . . . . . .  52

            a.  Warrants and Searches . . . . . . . . . .  53

                (1)  The November 2002 Warrant and
                     Search . . . . . . . . . . . . .  53

                (2)  The January 2003 Warrant . . . . . .  54

                (3)  The July 2003 Warrant . . . . . . .  55

            b.  This Court Upholds the November 2002
               Warrant in Pellicano's 2002
               Explosives Case . . . . . . . . . . . . .  57

            c.  The Court Rejects Defendants'
               Challenges to the November 2002
               Warrant in This Case . . . . . . . . .  60

            d.  The Rejection of Defendants'
               Challenges to the July 2003 Warrant . . .  63

            e.  Pellicano's State-Court Conviction
               for Threatening Busch . . . . . . . . . .  65

        2.  Defendants' Challenges to the Warrants Are
           Meritless . . . . . . . . . . . . . . . . . .  65

            a.  Christensen Lacks Standing to Protest
               the Search of PIA . . . . . . . . . . .  66

                (1)  Standard of Review . . . . . . . .  66

                (2)  Christensen Failed To Meet His
                     Burden . . . . . . . . . . . . .  66

                (3)  Christensen Cannot Turn His Ethical
                     Duties Toward Kerkorian Into a
                     Shield for His Own Misconduct . . .  69

**TABLE OF CONTENTS**

PAGE

b.  Pellicano Cannot Relitigate the
    November 2002 Warrant After Losing
    His Prior Appeal . . . . . . . . . . . 76

c.  The November 2002 Warrant and Search
    Were Constitutional . . . . . . . . . 83

    (1) *Scheidler* Does Not Affect the
        Agents' Earlier Good-Faith
        Reliance on the Magistrate's
        Probable-Cause Finding . . . . . . . 83

        (a) Standard of Review . . . . . . 83

        (b) The Agents Reasonably Relied
            on the Magistrate's
            Probable-Cause Finding . . . . 83

            (i)  The Law on the Hobbs
                 Act's "Obtaining"
                 Element Was Unclear
                 Before *Scheidler* . . . . . 85

            (ii) Christensen's Contrary
                 Arguments Fail . . . . . . 91

            (iii)Any Error Was Harmless . . 93

    (2) The Court Properly Denied
        Defendants' Request for a
        *Franks* Hearing . . . . . . . . . . 94

        (a) Standard for *Franks* Hearing
            and Standard of Review . . . . 94

        (b) None of Defendants' Complaints
            Establishes Intentional or
            Reckless Dishonesty, and None
            Was Material to Probable
            Cause . . . . . . . . . . . . 95

iii

**TABLE OF CONTENTS**

                                                              **PAGE**

      (i)  The Court Did Not Clearly
          Err in Determining that
          the Challenged Statements
          Would Not Have Altered
          Probable Cause . . . . . .  95

      (ii)  The Court Did Not Clearly
          Err in Finding No
          Intentional or Reckless
          Misstatements . . . . . . 102

      (iii)Defendants' Claims of Miss-
          tatements and Omissions
          Are Unsubstantiated . . . 105

    d.  The July 2003 Warrant Was Neither
      Overbroad Nor Unparticular . . . . . . . 111

      (1)  Standard of Review . . . . . . . . 111

      (2)  The Warrant Defined and Narrowed
          the Seizable Items' Scope . . . . . 113

      (3)  The Warrant Was Sufficiently
          Particular . . . . . . . . . . . . 115

      (4)  The Warrant Was Not Overbroad . . . 117

      (5)  Agents Relied on the Magistrate's
          Judgment in Good Faith, and Any
          Overbreadth Was Harmless . . . . . . 122

      (6)  Any Overbreadth Was Harmless . . . . 126

B.  THE COURT NEITHER CLEARLY ERRED IN DECLINING TO
    SUPPRESS PELLICANO'S RECORDINGS OF HIS
    CONVERSATIONS WITH CHRISTENSEN NOR ABUSED ITS
    DISCRETION IN DENYING AN EVIDENTIARY HEARING
    ABOUT THEM . . . . . . . . . . . . . . . . . 129

    1.  Standard of Review . . . . . . . . . . . 131

    2.  The Court Properly Required Christensen to
      Establish Pellicano's Purpose by a
      Preponderance of the Evidence . . . . . . . 132

iv

**TABLE OF CONTENTS**

PAGE

3.   *McTiernan*'s Rejection of Christensen's
     Record-Keeping Theory Requires Affirmance  . . 132

4.   *McTiernan* Requires Rejection of
     Christensen's Evidentiary-Hearing Request  . . 134

C.   THE COURT CORRECTLY FOUND THE CHRISTENSEN-
     PELLICANO CONVERSATIONS TO BE UNPRIVILEGED  . . . . 135

     1.   Factual Background . . . . . . . . . . . 136

          a.   The Government's Original Motion  . . . . 136

          b.   Court Orders and Litigation  . . . . . . . 142

     2.   Christensen Failed To Claim Privilege
          with Specificity . . . . . . . . . . . . . . 145

          a.   Christensen's Blanket Assertion of
               Privilege Was Insufficient  . . . . . . . 146

          b.   Christensen Failed to Establish the
               Elements of Attorney-Client Privilege . . 147

          c.   Christensen Failed To Establish the
               Elements of Work-Product Privilege
               and Did Not Defeat the Government's
               Showing of Overwhelming Need  . . . . . . 152

     3.   The Court Correctly Found that the
          Crime-Fraud Exception Applied  . . . . . . . 157

          a.   Standard of Review  . . . . . . . . . . 158

          b.   The Court's Step-One Ruling Correctly
               Found that the Crime-Fraud Exception
               *Could* Apply . . . . . . . . . . . . . . 160

          c.   The Court, After Reviewing the
               Recordings *In Camera*, Correctly
               Found that the Crime-Fraud Exception
               Applied . . . . . . . . . . . . . . . . 165

v

**TABLE OF CONTENTS**

**PAGE**

d.    The Court's *Zolin* Analysis Was Not
Irrevocably Tainted . . . . . . . . . . . 179

D.    NO BASIS EXISTS FOR DISMISSING THE INDICTMENT . . . 186

1.    Standard of Review . . . . . . . . . . . . 187

2.    Dismissal Requires Extraordinary
Misconduct and a Lack of Other Remedies . . . 187

3.    Pellicano's *Massiah* Claim Is Waived
and Meritless . . . . . . . . . . . . . . 190

a.    Pellicano Waived All *Massiah* Claims . . . 190

b.    Pellicano's *Massiah* Claim Is Meritless . 192

(1)    Facts . . . . . . . . . . . . . 192

(2)    There Was No Violation . . . . . . 193

4.    Unsubstantiated Smears Against Ornellas
Provide No Basis for Dismissal . . . . . . . 197

5.    Pellicano Does Not Show Vindictive
Prosecution . . . . . . . . . . . . . . . 199

6.    Pellicano's *Brady* Allegations Do Not
Support Dismissal . . . . . . . . . . . . 203

E.    THE COURT DID NOT ERR IN DECLINING TO DISMISS
THE IDENTITY-THEFT COUNTS BECAUSE "MEANS OF
IDENTIFICATION" IS STATUTORILY DEFINED TO
INCLUDE NAMES AND TELEPHONE NUMBERS . . . . . . . 204

1.    Standard of Review . . . . . . . . . . . . 205

2.    The Statutory Definition of "Means of
Identification" Includes Names and
Telephone Numbers . . . . . . . . . . . . 205

F.    THE COURT ABUSED NO DISCRETION IN DENYING THE
RICO DEFENDANTS' SEVERANCE MOTION . . . . . . . 210

1.    Standard of Review . . . . . . . . . . . . 211

vi

**TABLE OF CONTENTS**

PAGE

2.    The Court Abused No Discretion By
Jointly Trying Defendants . . . . . . . . . . 212

G.    THE RACKETEERING ACTS ALLEGING BRIBERY IN
VIOLATION OF CALIFORNIA PENAL CODE §§ 67 AND 68
WERE TIMELY . . . . . . . . . . . . . . . . . . . 216

1.    Standard of Review . . . . . . . . . . 218

2.    Bribery as Charged in the Indictments . . . . 220

3.    The Fifth Superseding Indictment
Was Timely . . . . . . . . . . . . . . . . 225

a.    The Applicable Limitations Period . . . . 225

b.    The Fifth Superseding Indictment
Was Brought Within 18 U.S.C. § 3288's
Six-Month Savings Period . . . . . . . . 226

c.    The Fifth Superseding Indictment
Also Was Timely Under the
Relation-Back Doctrine . . . . . . . . 231

4.    The Verdict Moots the Statute-of-
Limitations Claim . . . . . . . . . . . . 238

H.    THE EVIDENCE WAS SUFFICIENT . . . . . . . . . . 240

1.    Standard of Review . . . . . . . . . . 241

2.    The Evidence Sufficiently Established
RICO's Enterprise Element . . . . . . . . . 241

a.    Section 1962(c) . . . . . . . . . . 242

(1)    The Enterprise Element . . . . . . . 242

b.    Section 1962(d) . . . . . . . . . . 245

c.    The Enterprise Was Proved . . . . . . . 248

3.    The Evidence Established that Pellicano
Paid, and Arneson Accepted, the Charged
Bribes . . . . . . . . . . . . . . . . 267

vii

**TABLE OF CONTENTS**

                                                          **PAGE**

    a.   California Law Governs the
         Sufficiency Determination . . . . . . . . 268

    b.   Penal Code §§ 67 and 68 . . . . . . . . . 269

    c.   Restrictions to Protect the
         Confidentiality of Information
         in Law-Enforcement Databases . . . . . . 273

         (1)  Statutory Framework . . . . . . . . 273

         (2)  LAPD-imposed Restrictions . . . . . 276

    d.   Trial Evidence . . . . . . . . . . . . . 278

    e.   The Evidence Was Sufficient To
         Support Racketeering Acts 70-79 . . . . . 285

    f.   The Evidence Was Sufficient To
         Support Racketeering Acts 80-89 . . . . . 295

4.  The Findings on the Racketeering Acts
    and Substantive Counts Alleging Honest-
    Services Fraud Should Be Affirmed . . . . . . 307

    a.   The Evidence Was Sufficient . . . . . . . 307

         (1)  *Skilling* Does Not Alter the
              Sufficiency Determination . . . . . 310

         (2)  Arneson's Conduct Constitutes
              Bribery Within § 1346's Scope
              Post-*Skilling* . . . . . . . . . . 312

              iii. Pellicano's Fictional
                   Sufficiency Challenge . . 326

    b.   The Jury Instructions Do Not Affect
         the Validity of the Jury's § 1346
         Findings . . . . . . . . . . . . . . . . 327

         (1)  Standard of Review . . . . . . . . 329

viii

## TABLE OF CONTENTS

**PAGE**

(2) Pellicano's and Arneson's
Substantial Rights Were Not
Affected Because the Skilling
Error Was Not Prejudicial . . . . . 330

    (a) *Skilling* Instructional
       Error   . . . . . . . . . . 330

    (b) The Jury's Bribery Findings
       Establish the *Skilling* Error's
       Harmlessness  . . . . . . . . 332

    (c) The Record Confirms the Lack
       of Prejudice  . . . . . . . 333

    (d) Arneson Waived Any Claim to
       a Good-Faith Instruction,
       Which Was Unwarranted
       Anyway  . . . . . . . . . . 339

5.   The RICO Counts Should Stand Even If Select
Racketeering Acts Are Insufficient . . . . . 344

  a.   Standard of Review  . . . . . . . . . 344

  b.   The Requisite Pattern of
Racketeering Exists . . . . . . . . . 345

    (1)  Substantive RICO charge  . . . . . 345

    (2)  RICO conspiracy  . . . . . . . . 346

  c.   Defendants Have Failed To Show
Spillover Prejudice From Any
Dismissed Racketeering Acts . . . . . . 347

I.   THE RICO COUNTS WERE NOT CONSTRUCTIVELY AMENDED
OR SUBJECT TO A FATAL VARIANCE  . . . . . . . . . 350

  1.   The RICO Charges . . . . . . . . . . . . 350

  2.   Jury Instructions  . . . . . . . . . . . 353

  3.   Standard of Review . . . . . . . . . . . 357

ix

**TABLE OF CONTENTS**

PAGE

      a.   Defendants' Constructive Amendment
            Claim Is Waived . . . . . . . . . . . . 357

      b.   If Not Waived, the Claim Is Reviewed
            for Plain Error Only . . . . . . . . . 357

   4.   The Instruction Did Not Constructively
       Amend the Indictment -- Let Alone Plainly
       Do So . . . . . . . . . . . . . . . . . 358

      a.   There Was No Plain or Obvious Error . . 359

      b.   Defendants Have Not Shown an Effect on
            Substantial Rights . . . . . . . . . 364

   5.   Defendants' Claim of a Fatal Variance in
       Closing Does Not Withstand Plain Error
       Review . . . . . . . . . . . . . . . . . 364

J.   THE COURT DID NOT ABUSE ITS DISCRETION OR
   PLAINLY ABUSE ITS DISCRETION IN ADMITTING
   THE EVIDENCE CHALLENGED ON APPEAL, MOST OF
   WHICH RECEIVED NO OBJECTION . . . . . . . . . . . 368

   1.   Standard of Review . . . . . . . . . . . . 369

   2.   Applicable Law . . . . . . . . . . . . . . 369

   3.   Defendants' Flawed Premise . . . . . . . . 371

   4.   The Court Did Not Plainly Abuse Its
       Discretion in Admitting Photographs
       from the November 2002 Search . . . . . . . 376

      a.   Photograph and Summary Testimony
            Regarding the Explosives Found
            During the November 2002 Search . . . . . 376

      b.   Photograph Depicting Items from
            Pellicano's Office Drawer . . . . . . . 379

   5.   The Court Did Not Abuse Its Discretion
       or Plainly Abuse Its Discretion in
       Admitting Evidence of the Enterprise's
       Use Of Threats . . . . . . . . . . . . . . 381

## TABLE OF CONTENTS

**PAGE**

a.  <u>Jude Green</u> . . . . . . . . . . . . . 382

b.  <u>Anita Busch</u> . . . . . . . . . . . . 383

c.  <u>Patrick Theohar (Heidi Gregg)</u> . . . . . . 384

d.  <u>George Mueller</u> . . . . . . . . . . . 384

e.  <u>Linda Doucett</u> . . . . . . . . . . . 385

f.  <u>Keith Carradine</u> . . . . . . . . . . . 386

g.  <u>Virtue</u> . . . . . . . . . . . . . . 386

6.  <u>The Court Did Not Plainly Abuse Its</u>
    <u>Discretion in Admitting Evidence of</u>
    <u>Standard Client Matters</u> . . . . . . . . . 387

    a.  <u>Taylor Thompson/Pamela Miller</u> . . . . . . 387

    b.  <u>Sarit Shafrir/Nicherie</u> . . . . . . . . 388

    c.  <u>Timea Zsibrita</u> . . . . . . . . . . 389

7.  <u>The Sender/Russo Matter Was Resolved</u>
    <u>by Curative Instruction</u> . . . . . . . . . 390

8.  <u>The Court Did Not Plainly Abuse Its</u>
    <u>Discretion in Admitting Evidence of</u>
    <u>Prosecutions Where Arneson Was Adverse</u>
    <u>to Law Enforcement</u> . . . . . . . . . . . 391

    a.  <u>PIA Retention by Kami Hoss</u> . . . . . . . 392

    b.  <u>PIA Retention by John Gordon Jones</u> . . . 395

9.  <u>None of the Evidence at Issue Affected the Trial</u>
    <u>Outcome</u> . . . . . . . . . . . . . . 398

K.  THE COURT APPROPRIATELY DENIED PELLICANO'S
    REQUEST FOR <u>JENCKS</u> MATERIAL FOR A DEFENSE
    WITNESS . . . . . . . . . . . . . . . . 399

**TABLE OF CONTENTS**

**PAGE**

L.   PELLICANO'S COMPLAINT THAT HE RECEIVED
     INADEQUATE NOTICE ABOUT OTHER-ACTS EVIDENCE
     IS MERITLESS . . . . . . . . . . . . . . . . . 404

M.   THE COURT ABUSED NO DISCRETION IN REJECTING
     ARNESON'S BASELESS PROSECUTORIAL-MISCONDUCT
     CLAIMS OR IN DENYING HIS REPEATED AND UNTIMELY
     MISTRIAL MOTIONS . . . . . . . . . . . . . . . 407

     1.   Standards of Review . . . . . . . . . . . 407

     2.   Detective Lim's Testimony Regarding
          Arneson's Retirement Did Not Violate
          Arneson's Fifth Amendment Rights . . . . . . 408

     3.   The Government's Brief Questioning of
          Arneson Regarding a Prior Internal
          Affairs Investigation Did Not "Use" Any
          Compelled Statements Against Him . . . . . . 414

     4.   The Government's Failure to Produce
          Arneson's Recorded Statement, Which It
          Knew Was Already in His Counsel's
          Possession, Did Not Violate Rule 16 . . . . . 417

     5.   Questioning of Arneson Regarding a
          Fraudulent Bankruptcy Petition Was
          Wholly Proper and Did Not Involve Any
          Rule 16 Violation . . . . . . . . . . . . . 421

          a.   The Bankruptcy Questioning . . . . . . . 421

          b.   The Government Had a Good-faith
               Basis to Cross-Examine Arneson
               Regarding His Knowledge of the
               Bankruptcy Filing . . . . . . . . . . . 426

          c.   The Government Did Not Violate
               Rule 16 by Failing to Disclose
               Documents Used Solely for
               Impeachment . . . . . . . . . . . . . 429

     6.   A Single Word Accidentally Overheard
          by a Single Juror Was Not Vouching . . . . . 432

# TABLE OF CONTENTS

**PAGE**

7. Even If Arneson Has Demonstrated Any Acts of Misconduct, Such Acts Were Harmless in Light of the Overwhelming Evidence of Arneson's Guilt . . . . . . . . . 435

N. THE GOVERNMENT'S CLOSING ARGUMENT WAS PROPER AND CERTAINLY NOT PLAINLY IMPROPER . . . . . . . . . . 436

1. Standard of Review . . . . . . . . . . . . . 436

2. The Government Did Not Improperly Malign Arneson's Counsel or Express Personal Opinions of Arneson's Credibility . . 437

3. The Government Did Not Improperly Argue "Other Acts" Evidence or Vouch For Its Witnesses . . . . . . . . . . . . . . . . 444

O. THE EVIDENCE WAS SUFFICIENT TO SUPPORT NICHERIE'S CONVICTION FOR AIDING AND ABETTING THE INTERCEPTION OF WIRE COMMUNICATIONS . . . . . . . . . . . . . . . 447

1. Nicherie Waived His Statute-of-Limitations Argument . . . . . . . . . . . . 448

2. The Evidence Was Sufficient To Support Nicherie's Conviction . . . . . . . . 449

P. THE JURY INSTRUCTIONS WERE NOT ERRONEOUS, AND ANY ERROR WAS HARMLESS . . . . . . . . . . 452

1. Standard of Review . . . . . . . . . . . . . 452

2. The Computer-Fraud Instructions Were Not Plainly Erroneous, And the Evidence Was Sufficient for Conviction . . . . 452

a. Background . . . . . . . . . . . . 453

b. Any Errors Were Invited and Waived by Defendants . . . . . . . . . . . . . 457

xiii

**TABLE OF CONTENTS**

                                                               **PAGE**

    c.   It Was Not Plain Error To Use
         Congress' Definition of "Exceeds
         Authorized Access" . . . . . . . . . . . . 458

         i.   Arneson's Claim Further Fails
              Because State and Federal Law
              Made His Access Illegal . . . . . . 469

    d.   Error in the Computer-Fraud
         Instruction Would Not Require
         Reversal of Other Convictions . . . . . . 472

         (1)  Background . . . . . . . . . 472

         (2)  Any Error Was Invited and Waived . . 475

         (3)  The § 502 Instructions Were Not
              Plainly Erroneous . . . . . . . . 475

3.  Kachikian's Challenges to the Wiretapping
    Instructions Fail . . . . . . . . . . . . . . 486

    a.   Trial Evidence . . . . . . . . . . 486

    b.   The Statute and Jury Instructions . . . . 490

    c.   The Court's Instructions Were
         Correct . . . . . . . . . . . . . . 493

         (1)  The Court Correctly Refused
              Kachikian's Legally Erroneous
              Good-Faith Instruction . . . . . . 493

         (2)  Kachikian's Other *Mens Rea*
              Arguments Are Reviewed for
              Plain Error, and Fail . . . . . . 498

         (3)  The § 2512 Instructions
              Were Proper . . . . . . . . . 505

         (4)  Kachikian's Miscellaneous
              Arguments Fail . . . . . . . . 508

xiv

**TABLE OF CONTENTS**

PAGE

Q.   THE COURT ABUSED NO DISCRETION IN DENYING A
NEW TRIAL BASED ON ALLEGATIONS OF JUROR
MISCONDUCT OR IN DECLINING TO HOLD AN
EVIDENTIARY HEARING ON THOSE ALLEGATIONS . . . . . 515

   1.   Standard of Review . . . . . . . . . . . . . 515

   2.   Several of Defendants' Challenges
to the Jury's Conduct and Deliberations
Are Prohibited by Federal Rule of
Evidence 606(b) . . . . . . . . . . . . . . 516

   3.   The Court Abused No Discretion in
Finding That Defendants' Remaining
Claims Did Not Warrant a New Trial . . . . . . 520

   4.   The Court Abused No Discretion in
Denying an Evidentiary Hearing . . . . . . . . 524

R.   THE COURT ABUSED NO DISCRETION IN ADMITTING
WIRETAPPING-RELATED EVIDENCE IN THE CHRISTENSEN-
PELLICANO WIRETAPPING TRIAL . . . . . . . . . . . 526

   1.   Facts . . . . . . . . . . . . . . . . . . . 528

   2.   The Evidentiary Rulings Abused No
Discretion . . . . . . . . . . . . . . . . . 532

      a.   The Evidence Was Admissible to
Rebut Christensen's Defenses . . . . . . 532

      b.   The Evidence Was Inextricably
Intertwined with Direct Evidence
of the Wiretapping Conspiracy . . . . . . 535

      c.   The Evidence Would Be Admissible
under Rule 404(b) . . . . . . . . . . . 541

      d.   The Evidence Was Admissible
under Rule 403 . . . . . . . . . . . 543

      e.   Any Error in Admitting this
Evidence Was Harmless . . . . . . . . . 546

**TABLE OF CONTENTS**

                                                              **PAGE**

S.   THE COURT ABUSED NO DISCRETION IN DENYING
     CHRISTENSEN'S SEVERANCE MOTION . . . . . . . . . 548

T.   THE GOVERNMENT DID NOT COMMIT MISCONDUCT AT
     THE CHRISTENSEN-PELLICANO TRIAL BY POINTING
     OUT IN REBUTTAL CHRISTENSEN'S FAILURE TO
     PRESENT EVIDENCE HE PROMISED IN HIS OPENING . . . 551

     1.   Standard of Review . . . . . . . . . . . . . 551

     2.   The Government's Argument Was
          Wholly Proper . . . . . . . . . . . . . . . 551

U.   THE COURT ABUSED NO DISCRETION IN DISMISSING
     A JUROR DURING DELIBERATIONS AFTER THE JUROR
     REPEATEDLY LIED TO THE COURT . . . . . . . . . . 555

     1.   Standard of Review . . . . . . . . . . . . . 555

     2.   Factual Background . . . . . . . . . . . . . 556

     3.   Defendants' Juror Declarations Were
          Barred by Rule 606(b) . . . . . . . . . . 562

     4.   The Court Appropriately Questioned
          Jurors in Response to the Notes . . . . . . 565

     5.   The Court's Finding That Juror #7 Lied
          to the Court Was Not Clearly Erroneous,
          and Dismissal of the Juror Was No Abuse
          of Discretion . . . . . . . . . . . . . . . 568

          a.   The Finding That Juror #7 Lied Is
               Not Clearly Erroneous . . . . . . . . 569

          b.   The Court's Finding That Juror #7
               Was Unwilling to and Would Not Follow
               the Law Is Not Clearly Erroneous . . . 572

V.   THE COURT PROPERLY FOUND NO BRADY VIOLATIONS . . . 574

     1.   Standard of Review . . . . . . . . . . . . . 575

     2.   Factual Background . . . . . . . . . . . . . 576

xvi

**TABLE OF CONTENTS**

PAGE

a.  Wright's Trial Testimony . . . . . . . . 576

b.  Wright's PSR . . . . . . . . . . . . . 578

3.  The Court Properly Found No *Brady*
    Violation . . . . . . . . . . . . . . . 580

4.  The Claim That the Government Failed
    To Disclose Wright's Employment Was Not
    Properly Preserved and Is Not Properly
    Raised Now . . . . . . . . . . . . . . . 585

5.  Proctor's Grand Jury Testimony Was Not
    Brady Material . . . . . . . . . . . . . 587

W.  PELLICANO'S, ARNESON'S, TURNER'S, AND
    CHRISTENSEN'S SENTENCES SHOULD BE AFFIRMED . . . . 589

    1.  Standards of Review . . . . . . . . . . . 589

    2.  Pellicano's Within-Guidelines
        Sentence Was Procedurally Proper
        and Substantively Reasonable . . . . . . . . 591

        a.  USSG § 3B1.1's Four-Level Role
            Enhancement Properly Applied to
            Pellicano's RICO Convictions . . . . . . 592

            i.   The Court Correctly Applied
                 § 3B1.1 Based on Pellicano's
                 Role in the Enterprise . . . . . . . 592

            ii.  The Court Did Not Clearly Err
                 in Applying § 3B1.1(a) to
                 Pellicano's RICO Calculations . . . 594

        b.  The Court Did Not Clearly Err in
            Applying § 3C1.1's Obstruction
            Enhancement . . . . . . . . . . . . . 599

        c.  USSG § 3B1.3's Special-Skill
            Enhancement Applied to Pellicano's
            Wiretapping Convictions . . . . . . . . 606

## TABLE OF CONTENTS

PAGE

d.   The Court Did Not Fail To Consider
     the § 3553(a) Factors . . . . . . . . . . 610

e.   Any Procedural Error Was Not
     Prejudicial . . . . . . . . . . . . . . . 611

f.   Pellicano's Within-Guidelines
     Sentence Was Substantively
     Reasonable . . . . . . . . . . . . . . . 613

     (1)  Pellicano Was Not Entitled
          to a Downward Variance Based
          on His Explosives Sentence . . . . . 614

     (2)  The Court Was Not Required To
          Accept the USPO's Sentence
          Recommendation . . . . . . . . . . 618

     (3)  Pellicano Shows No Unwarranted
          Sentencing Disparity . . . . . . . . 621

     (4)  Pellicano's Within-Guidelines
          Sentence Was Reasonable . . . . . . 624

g.   No Resentencing Is Required if the
     RICO Conviction and Bribery
     Racketeering Act Verdicts Are
     Upheld . . . . . . . . . . . . . . . . . 626

h.   No Basis Exists To Assigning
     Resentencing to a Different Judge . . . 628

3.   Arneson's Sentence Was Substantively
     Reasonable . . . . . . . . . . . . . . . . . 629

a.   Arneson's Sentence Was Reasonable . . . . 631

     i.   There Is No Unwarranted Disparity . 631

     ii.  The Upward Variance Does Not
          Render the Sentence Unreasonable . . 635

b.   This Court Need Not Remand for
     Resentencing . . . . . . . . . . . . . . 639

**TABLE OF CONTENTS**

PAGE

4.   Turner's Sentence Was Procedurally
     Sound and Substantively Reasonable . . . . . . 640

     a.   Turner's "Procedural Error" Claims
          Are Properly Evaluated for Substantive
          Reasonableness . . . . . . . . . . . . . 641

     b.   Turner's Sentence Was Reasonable . . . . 642

5.   Christensen's Sentence Was Procedurally
     Sound and Substantively Reasonable . . . . . . 647

     a.   USSG § 3B1.1(c)'s Two-level Role
          Enhancement Properly Applied to
          Christensen's Wiretapping Convictions . . 648

     b.   USSG § 3B1.3's Two-level Enhancement
          for Occupying a Position of Trust
          Properly Applied . . . . . . . . . . . . 653

     c.   USSG § 2H3.1's Three-level Enhancement
          for Seeking Financial Gain Properly
          Applied . . . . . . . . . . . . . . . . 655

     d.   The Court Had Discretion to Vary
          Upward . . . . . . . . . . . . . . . . . 657

     e.   Christensen's Sentence Was
          Substantively Reasonable . . . . . . . . 658

X.   THE COURT'S FORFEITURE ORDER WAS PROPER . . . . . . 664

     1.   Standard of Review . . . . . . . . . . . . . 665

     2.   Defendants Were Not Entitled to Have
          a Jury Determine the Amount of the Money
          Judgment . . . . . . . . . . . . . . . . . 665

     3.   Preponderance of the Evidence Is the
          Proper Standard for Forfeiture
          Determinations . . . . . . . . . . . . . . 669

     4.   The Forfeiture Money Judgments Were
          Properly Ordered Joint-and-Several . . . . . 670

xix

**TABLE OF CONTENTS**

PAGE

5.   The District Court's Calculation of the
     Money Judgment Was Proper  . . . . . . . . . . 673

IV.  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . 679

**TABLE OF AUTHORITIES**

**FEDERAL CASES**                                               **PAGE(S)**

Ackermann v. United States,
    340 U.S. 193 (1950) ...................................... 79

Admiral Insurance Co. v. U.S. District Court,
    881 F.2d 1486 (9th Cir. 1989) ........................... 75

Agency Holding Corp. v. Malley-Duff,
    483 U.S. 143 (1987) ..................................... 225

Aquilar v. Texas,
    378 U.S. 108 (1964) ..................................... 98

Alderman v. United States,
    394 U.S. 165 (1969) ..................................... 72

Alexander v. United States,
    509 U.S. 544 (1993) ..................................... 674

Allen v. McCurry,
    449 U.S. 90 (1980) .................................. 77, 82

Andresen v. Maryland,
    427 U.S. 463 (1976) ..................................... 127

In re Antitrust Grand Jury,
    805 F.2d 155 (6th Cir. 1986) ................. 166, 167, 179

Ashe v. Swenson,
    397 U.S. 436 (1970) ..................................... 77

Ayers v. City of Richmond,
    895 F.2d 1267 (9th Cir. 1990) ........................... 77

Bailey v. Rae,
    339 F.3d 1107 (9th Cir. 2003) .......................... 581

Barber v. Thomas,
    130 S. Ct. 2499 (2010) ................................. 505

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

<u>Beir v. City of Lewiston</u>,
    354 F.3d 1058 (9th Cir. 2004) ........................... 92

<u>Benson v. Hightower</u>,
    633 F.2d 869 (9th Cir. 1980) ........................... 91

<u>Berghuis v. Thompkins</u>,
    130 S. Ct. 2250 (2010) ................................. 411

<u>Bordenkircher v. Hayes</u>,
    434 U.S. 357 (1977) ................................... 200

<u>Boyle v. United States</u>,
    556 U.S. 938 (2009) ................................. passim

<u>Brady v. Maryland</u>,
    373 U.S. 83 (1963) .................................. passim

<u>Brennan v. United States</u>,
    867 F.2d 111 (2d Cir. 1989) ........................... 345

<u>Briceno v. Scribner</u>,
    555 F.3d 1069 (9th Cir. 2009) ......................... 478

<u>Caldera v. Northrop Worldwide Aircraft Services, Inc.</u>,
    192 F.3d 962 (Fed. Cir. 1999) ......................... 81

<u>Caliendo v. Warden of California Men's Colony</u>,
    365 F.3d 691 (9th Cir. 2004) ......................... 522

<u>California Banker's Association v. Shultz</u>,
    416 U.S. 21 (1974) ................................... 287

<u>Campanale v. Harris</u>,
    724 F.2d 276 (2d Cir. 1983) ........................... 413

<u>Case of Tweed</u>,
    83 U.S. 504 (1872) ................................... 468

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                              **PAGE(S)**

Center Art Galleries-Hawaii v. United States,
 875 F.2d 747 (9th Cir. 1989) ........................... 124

Chan v. Wodnicki,
 123 F.3d 1005 (7th Cir. 1997) ......................... 410

In re Chevron Corp.,
 650 F.3d 276 (3d Cir. 2011) ........................... 149

Clark v. Bear Stearns & Co.,
 966 F.2d 1318 (9th Cir. 1992) ......................... 78

Clements v. Airport Authority of Washoe County,
 69 F.3d 321 (9th Cir. 1995) ........................ 81, 82

Conn v. Gabbert,
 526 U.S. 286 (1999) ................................... 73

Couch v. United States,
 409 U.S. 322 (1973) ................................... 75

Craigslist v. Naturemarket, Inc.,
 694 F. Supp. 2d 1039 (N.D. Cal. 2010) ................. 479

Damron v. Herzog,
 67 F.3d 211 (9th Cir. 1995) .......................... 654

Davis v. United States,
 131 S. Ct. 2419 (2011) ................................ 91

DeMassa v. Nunez,
 770 F.2d 1505 (9th Cir. 1985) ......................... 73

Devenpeck v. Alford,
 543 U.S. 146 (2004) ................................ 92, 93

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                          **PAGE(S)**

Dimidowich v. Bell & Howell,
     803 F.2d 1473 (9th Cir. 1986) .......................... 478

Dixon v. United States,
     548 U.S. 1 (2006) ...................................... 495

In re Doe,
     662 F.2d 1073 (4th Cir. 1981) .................... 172, 173

Doyle v. Ohio,
     426 U.S. 610 (1976) ................................... 413

Dyer v. Calderon,
     151 F.3d 970 (9th Cir. 1998) ....................... passim

FTC v. TRW, Inc.,
     628 F.2d 207 (D.C. Cir. 1980) ......................... 148

Facebook, Inc. v. ConnectU LLC,
     489 F. Supp. 2d 1087 (N.D. Cal. 2007) ................. 479

Faretta v. California,
     422 U.S. 806 (1975) ................................... 191

Febres v. Challenger,
     214 F.3d 57 (1st Cir. 2000) ........................... 496

Fleischauer v. Feltner,
     879 F.2d 1290 (6th Cir. 1989) ......................... 671

Fowle v. United States,
     410 F.2d 48 (9th Cir. 1969) ........................... 413

Franks v. Delaware,
     438 U.S. 154 (1978) ................................ passim

Gardner v. Broderick,
     392 U.S. 273 (1968) ................................... 409

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                          **PAGE(S)**

<u>Garrity v. New Jersey</u>,
    385 U.S. 493 (1967) ................................. passim

<u>Giglio v. United States</u>,
    405 U.S. 150 (1972) ................................... 575

<u>In re Grand Jury Empaneled Oct. 18, 1979</u>,
    663 F.2d 282 (3d Cir. 1980) .......................... 174

<u>In re Grand Jury Investigation</u>,
    974 F.2d 1068 (9th Cir. 1992) ..................... passim

<u>In re Grand Jury Proc.</u>,
    727 F.2d 941 (10th Cir. 1984) ..................... 75, 76

<u>In re Grand Jury Proceedings</u>,
    417 F.3d 18 (1st Cir. 2005) .......................... 173

<u>In re Grand Jury Proceedings</u>,
    867 F.2d 539 (9th Cir. 1989) ......................... 166

<u>In re Grand Jury Subpoena 92-I</u>,
    31 F.3d 826 (9th Cir. 1994) ..................... 160, 163

<u>In re Grand Jury Subpoena</u>,
    561 F.3d 408 (5th Cir. 2009) .................... 174, 177

<u>In re Grand Jury Subpoena Dated July 6, 2005</u>,
    510 F.3d 180 (2d Cir. 2007) ................ 153, 155, 156

<u>In re Grand Jury Subpoena (Torf)</u>,
    357 F.3d 900 (9th Cir. 2004) .................... 153, 155

<u>In re Grand Jury Subpoenas</u>,
    803 F.2d 493 (9th Cir. 1986) ......................... 145

<u>In re Grand Jury Subpoenas</u>,
    926 F.2d 847 (9th Cir. 1991) ................ 111, 112, 128

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

Green v. Hall,
     8 F.3d 695 (9th Cir. 1993) ............................... 112

Green v. White,
     232 F.3d 671 (9th Cir. 2000) ..................... 523, 569

Greene v. United States,
     454 F.2d 783 (9th Cir. 1971) ........................... 189

Griffin v. California,
     380 U.S. 609 (1965) .................................... 312

Griffin v. United States,
     502 U.S. 46 (1991) ................................. passim

Hagan v. Caspari,
     50 F.3d 542 (8th Cir. 1995) ........................... 479

Harris v. New York,
     401 U.S. 222 (1971) .................................... 430

Hedgepeth v. Pulido,
     555 U.S. 57 (2008) .................................... 330

Henderson v. Kibbe,
     431 U.S. 145 (1977) ........................ 461, 471, 472

Henderson v. United States,
     133 S. Ct. 1121 (2013) ............................ passim

Herring v. United States,
     555 U.S. 135 (2009) .................................... 84

Hickman v. Taylor,
     329 U.S. 495 (1947) ................................ passim

Holmgren v. State Farm Mutual Automobile Insurance Co.,
     976 F.2d 573 (9th Cir. 1992) ................. 152, 155, 157

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                          **PAGE(S)**

Howard v. Daggett,
     526 F.2d 1388 (9th Cir. 1975) ...................... 364, 365

Husain v. Olympic Airways,
     316 F.3d 829 (9th Cir. 2002) .......................... 101

Iannelli v. United States,
     420 U.S. 770 (1975) .............................. 223, 224

Illinois v. Gates,
     462 U.S. 213 (1983) .................................... 98

In re Impounded Case (Law Firm),
     879 F.2d 1211 (3d Cir. 1989) .......................... 172

International Airport Ctrs., LLC v. Citrin,
     440 F.3d 418 (7th Cir. 2006) .......................... 469

Jackson v. Virginia,
     443 U.S. 307 (1979) .................................... 240

Jeffries v. Wood,
     114 F.3d 1484 (9th Cir. 1997) ......................... 522

Jencks v. United States,
     353 U.S. 657 (1957) ............................... passim

Jenkins v. Anderson,
     447 U.S. 231 (1980) .................................... 413

In re John Doe Corp.,
     675 F.2d 482 (2d Cir. 1982) .......................... 179

Johnson v. United States,
     520 U.S. 461 (1997) ............................... passim

Kastigar v. United States,
     406 U.S. 441 (1972) .................................... 416

xxvii

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                                    **PAGE(S)**

<u>Kowalski v. Tesmer</u>,
    543 U.S. 125 (2004) ...................................... 73

<u>Kuhlmann v. Wilson</u>,
    477 U.S. 436 (1986) ..................................... 194

<u>Kushner Promotions v. King</u>,
    533 U.S. 158 (2001) ................................ 259, 260

<u>Kyles v. Whitley</u>,
    514 U.S. 419 (1995) ...................... 580, 585, 586

<u>LVRC Holdings LLC v. Brekka</u>,
    581 F.3d 1127 (9th Cir. 2009) ............... 453, 459, 464

<u>Leocal v. Ashcroft</u>,
    543 U.S. 1 (2004) ....................................... 462

<u>Libertad v. Welch</u>,
    53 F.3d 428 (1st Cir. 1995) ............................. 86

<u>Liparota v. United States</u>,
    471 U.S. 419 (1985) ................................. passim

<u>Liteky v. United States</u>,
    510 U.S. 540 (1994) ............................... 184, 185

<u>Lockett v. Ericson</u>,
    656 F.3d 892 (9th Cir. 2011) ........................... 78

<u>Lombardi v. El Cajon</u>,
    117 F.3d 1117 (9th Cir. 1997) ..................... passim

<u>Lowry v. Barnhart</u>,
    329 F.3d 1019 (9th Cir. 2003) .......................... 73

<u>Lyng v. Northwest Indian Cemetery Protective Association</u>,
    485 U.S. 439 (1988) .................................... 82

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                         **PAGE(S)**

Malley v. Briggs,
    475 U.S. 335 (1986) .................................... 122

Massey v. Wheeler,
    221 F.3d 1030 (7th Cir. 2000) ........................... 73

Massiah v. United States,
    377 U.S. 201 (1964) ................................. passim

Mattox v. United States,
    146 U.S. 140 (1892) .................................... 521

Maynard v. Cartwright,
    486 U.S. 356 (1988) .................................... 209

McCleskey v. Kemp,
    481 U.S. 279 (1986) .................................... 200

McNally v. United States,
    483 U.S. 350 (1987) ................................. passim

Meredith v. Gavin,
    446 F.2d 794 (8th Cir. 1971) ........................... 129

Messerschmidt v. Millender,
    132 S. Ct. 1235 (2012) ............................. passim

Mills v. Graves,
    930 F.2d 729 (9th Cir. 1991) ........................... 101

Miranda B. v. Kitzhaber,
    328 F.3d 1181 (9th Cir. 2003) ........................... 89

Moody v. IRS,
    654 F.2d 795 (D.C. Cir. 1981) ............... 152, 176, 177

Morales v. TWA, Inc.,
    504 U.S. 374 (1992) .................................... 506

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                                    **PAGE(S)**

<u>In re Napster, Inc. Copyright Litigation</u>,
        479 F.3d 1078 (9th Cir. 2007) .......................... 159

<u>Neder v. United States</u>,
        527 U.S. 1 (1999) ........................... 329, 331, 452

<u>Nix v. Williams</u>,
        467 U.S. 431 (1984) ...................................... 94

<u>Noel v. Hall</u>,
        568 F.3d 743 (9th Cir. 2009) .......................... 450

<u>Northeast Women's Ctr. v. McMonagle</u>,
        868 F.2d 1342 (3d Cir. 1989) ........................... 86

<u>Nunes v. Ramirez-Palmer</u>,
        485 F.3d 441 (9th Cir. 2007) .......................... 200

<u>Odom v. Microsoft Corp.</u>,
        486 F.3d 541 (9th Cir. 2007) ..................... 243, 244

<u>Olano v. United States</u>,
        507 U.S. 725 (1993) ................................... 466

<u>Olson v. Morris</u>,
        188 F.3d 1083 (9th Cir. 1999) .......................... 79

<u>In re Oracle Corp. Sec. Litigation</u>,
        627 F.3d 376 (9th Cir. 2010) ........................... 80

<u>In re Palmer</u>,
        207 F.3d 566 (9th Cir. 2000) ........................... 78

<u>Paradis v. Arave</u>,
        130 F.3d 385 (9th Cir. 1997) .......................... 580

<u>Parks v. United States</u>,
        355 F.2d 167 (5th Cir. 1965) .......................... 317

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

Parrott v. Wilson,
    707 F.2d 1262 (11th Cir. 1983) .......................... 174

Patton v. Yount,
    467 U.S. 1025 (1984) .................................... 571

Peavy v. WFAA-TV, Inc.,
    221 F.3d 158 (5th Cir. 2000) ........................... 500

Pepper v. United States,
    131 S. Ct. 1229 (2011) ........................... 622, 634

Puckett v. United States,
    556 U.S. 129 (2009) .................................... 466

Rawlings v. Kentucky,
    448 U.S. 98 (1980) ................................. 72, 75

Richardson v. Marsh,
    481 U.S. 200 (1987) .................................... 212

Richey v. IRS,
    9 F.3d 1407 (9th Cir. 1993) ........................... 213

Ristaino v. Ross,
    424 U.S. 589 (1976) .................................... 571

Rita v. United States,
    551 U.S. 338 (2008) .................................... 624

Rosales-Lopez v. United States,
    451 U.S. 182 (1981) .................................... 406

Roth v. Reyes,
    567 F.3d 1077 (9th Cir. 2009) ......................... 507

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                        **PAGE(S)**

Salinas v. United States,
    522 U.S. 52 (1997) ................................... passim

Sanchez v. Mukasey,
    521 F.3d 1106 (9th Cir. 2008) .......................... 88

Schall v. Martin,
    467 U.S. 253 (1984) .................................... 208

Scheidler v. NOW, Inc.,
    537 U.S. 393 (2003) ................................ passim

In re Seagate Technology, LLC,
    497 F.3d 1360 (Fed. Cir. 2007) ........................ 155

In re Sealed Case,
    676 F.2d 793 (D.C. Cir. 1982) .................... 166, 173

Sessoms v. Runnels,
    691 F.3d 1054 (9th Cir. 2012) ......................... 411

Shushan v. United States,
    117 F.2d 110 (5th Cir. 1941) .......................... 313

Skilling v. United States,
    130 S. Ct. 2896 (2010) ............................ passim

Smith v. Maryland,
    442 U.S. 735 (1979) .................................... 72

In re Special Sept. 1978 Grand Jury II,
    640 F.2d 49 (7th Cir. 1980) .......................... 166

Steele v. United States,
    267 U.S. 505 (1925) .................................... 78

Stirone v. United States,
    361 U.S. 212 (1960) ................................... 363

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                           **PAGE(S)**

In re Subpoena Addressed to Murphy,
    560 F.2d 326 (8th Cir. 1977) ............................ 174

Tanner v. United States,
    483 U.S. 107 (1987) .............................. 518, 519

Taylor v. Kincheloe,
    920 F.2d 599 (9th Cir. 1990) ........................... 581

Texas v. Cobb,
    532 U.S. 162 (2001) .................................... 194

Towery v. Ryan,
    673 F.3d 933 (9th Cir. 2012) ........................... 662

Uniformed Sanitation Men Association v. Commissioner of
Sanitation,
    392 U.S. 280 (1968) .............................. 409, 412

United States ex rel. LaCorte v. SmithKline Beecham Clinical
Laboratories, Inc.,
    149 F.3d 227 (3d Cir. 1998) ........................... 453

United States ex rel. Powell v. Pennsylvania,
    294 F. Supp. 849 (E.D. Pa. 1968) ...................... 412

United States v. $40,955.00 in U.S. Currency,
    554 F.3d 752 (9th Cir. 2009) ........................... 66

United States v. Abell,
    271 F.3d 1286 (11th Cir. 2001) ....................... 247

United States v. Acker,
    52 F.3d 509 (4th Cir. 1995) ........................... 564

United States v. Adamson,
    291 F.3d 606 (9th Cir. 2002) ........................... 358

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                              **PAGE(S)**

United States v. Adjani,
    452 F.3d 1140 (9th Cir. 2006) ................ 121, 127, 128

United States v. Agurs,
    427 U.S. 97 (1976) ..................................... 581

United States v. Ali,
    620 F.3d 1062 (9th Cir. 2010) .................... 589, 613

United States v. Alvarez,
    358 F.3d 1194 (9th Cir. 2004) ......................... 399

United States v. Amlani,
    111 F.3d 705 (9th Cir. 1997) ......................... 575

United States v. Amodeo,
    71 F.3d 1044 (2d Cir. 1995) .......................... 149

United States v. Anderson,
    154 F.3d 1225 (10th Cir. 1998) ........................ 67

United States v. Anderson,
    201 F.3d 1145 (9th Cir. 2000) ........................ 466

United States v. Anderson,
    782 F.2d 908 (11th Cir. 1986) ........................ 676

United States v. Arena,
    180 F.3d 380 (2d Cir. 1999) ........................... 86

United States v. Armstrong,
    517 U.S. 456 (1996) .................................. 430

United States v. Arnett,
    628 F.2d 1162 (9th Cir. 1979) ........................ 628

United States v. Arnett,
    327 F.3d 845 (9th Cir. 2003) ...................... 77, 78

United States v. Atcheson,
    94 F.3d 1237 (9th Cir. 1996) ..................... 211, 213

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                               **PAGE(S)**

United States v. Autery,
    555 F.3d 864 (9th Cir. 2009) ................. 591, 623, 632

United States v. Awad,
    551 F.3d 930 (9th Cir. 2009) ........................... 335

United States v. Bae,
    250 F.3d 774 (D.C. Cir. 2001) ......................... 469

United States v. Bagley,
    473 U.S. 667 (1985) ................................... 580

United States v. Bagnariol,
    665 F.2d 877 (9th Cir. 1981) ....................... passim

United States v. Bahel,
    662 F.3d 610 (2d Cir. 2011) .......................... 311

United States v. Bailleaux,
    685 F.2d 1105 (9th Cir. 1982) ........................ 380

United States v. Baldrich,
    471 F.3d 1110 (9th Cir. 2006) ........................ 619

United States v. Baldwin,
    987 F.2d 1432 (9th Cir. 1993) ........................ 435

United States v. Barrera-Moreno,
    951 F.2d 1089 (9th Cir. 1991) ..................... passim

United States v. Barrett,
    703 F.2d 1076 (9th Cir. 1982) ........................ 519

United States v. Baskes,
    442 F. Supp. 322 (N.D. Ill. 1977) ..................... 73

United States v. Bast,
    495 F.2d 138 (D.C. Cir. 1974) ........................ 507

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                               **PAGE(S)**

<u>United States v. Bauer</u>,
    132 F.3d 504 (9th Cir. 1997) ...................... 159, 175

<u>United States v. Bear</u>,
    439 F.3d 565 (9th Cir. 2006) ...................... 466, 467

<u>United States v. Beard</u>,
    161 F.3d 1190 (9th Cir. 1998) .................... 555, 567

<u>United States v. Beckman</u>,
    298 F.3d 788 (9th Cir. 2002) ......................... 374

<u>United States v. Begay</u>,
    673 F.3d 1038 (9th Cir. 2011) .................... 405, 406

<u>United States v. Bennett</u>,
    363 F.3d 947 (9th Cir. 2004) ......................... 627

<u>United States v. Bergrin</u>,
    650 F.3d 257 (3rd Cir. 2011) ......................... 266

<u>United States v. Birdsall</u>,
    233 U.S. 223 (1914) .................................. 321

<u>United States v. Bingham</u>,
    653 F.3d 983 (9th Cir. 2011) ......................... 359

<u>United States v. Birges</u>,
    723 F.2d 666 (9th Cir. 1984) ......................... 439

<u>United States v. Biro</u>,
    143 F.3d 1421 (11th Cir. 1998) ....................... 508
<u>United States v. Black</u>,
    767 F.2d 1334 (9th Cir. 1985) .................... 428, 539

<u>United States v. Blixt</u>,
    548 F.3d 882 (9th Cir. 2008) ................. 498, 510, 511

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Bonanno,
      467 F.2d 14 (9th Cir. 1972) ........................... 375

United States v. Boone,
      458 F.3d 321 (3d Cir. 2006) .......................... 565

United States v. Boone,
      951 F.2d 1526 (9th Cir. 1991) ........................ 543

United States v. Booth,
      309 F.3d 566 (9th Cir. 2002) ......................... 595

United States v. Boren,
      278 F.3d 911 (9th Cir. 2002) ......................... 287

United States v. Boyd,
      86 F.3d 719 (7th Cir. 1996) .......................... 468

United States v. Bradley,
      644 F.3d 1213 (11th Cir. 2011) ....................... 125

United States v. Brobst,
      558 F.3d 982 (9th Cir. 2009) ............... 112, 113, 120

United States v. Brooks,
      508 F.3d 1205 (9th Cir. 2007) ........................ 446

United States v. Brown,
      628 F.2d 471 (5th Cir. 1980) ......................... 419

United States v. Brown,
      951 F.2d 999 (9th Cir. 1991) ................... 83, 89, 92

United States v. Browne,
      505 F.3d 1229 (11th Cir. 2007) ................. 671, 672

United States v. Buckland,
      289 F.3d 558 (9th Cir. 2002) ......................... 466

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                              PAGE(S)

United States v. Budziak,
    697 F.3d 1105 (9th Cir. 2012) ..................... 341, 457

United States v. Busher,
    817 F.2d 1409 (9th Cir. 1987) ............... 671, 673, 675

United States v. Bushyhead,
    270 F.3d 905 (9th Cir. 2001) .......................... 407

United States v. Bussell,
    483 F.3d 639 (9th Cir. 2005) .......................... 515

United States v. Cagnina,
    697 F.2d 915 (11th Cir. 1983) ............... 243, 244, 266

United States v. Cain,
    130 F.3d 381 (9th Cir. 1997) .......................... 458

United States v. Candoli,
    870 F.2d 496 (9th Cir. 1989) .......................... 247

United States v. Caporale,
    806 F.2d 1487 (11th Cir. 1986) ................... 671, 673

United States v. Carona,
    660 F.3d 360 (9th Cir. 2011) .......................... 207

United States v. Carty,
    520 F.3d 984 (9th Cir. 2008) ....................... passim

United States v. Casas,
    425 F.3d 23 (1st Cir. 2005) ..................... 453, 455

United States v. Casey,
    444 F.3d 1071 (9th Cir. 2006) ................... 666, 668

United States v. Cassiere,
    4 F.3d 1006 (1st Cir. 1993) .......................... 131

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                                    PAGE(S)

United States v. Castillo,
      181 F.3d 1129 (9th Cir. 1999) .......................... 422

United States v. Castro,
      89 F.3d 1443 (11th Cir. 1996) ..................... 260, 367

United States v. Cauble,
      706 F.2d 1322 (5th Cir. 1983) .......................... 669

United States v. Caymen,
      404 F.3d 1196 (9th Cir. 2005) .................. 68, 70, 76

United States v. Chapman,
      528 F.3d 1215 (9th Cir. 2008) .......................... 240

United States v. Charnay,
      537 F.2d 341 (9th Cir. 1976) ................. 227, 228, 237

United States v. Chase,
      503 F.2d 571 (9th Cir. 1974) ..................... 300, 301

United States v. Chavez-Miranda,
      306 F.3d 973 (9th Cir. 2002) ....................... 94, 95

United States v. Chen,
      99 F.3d 1495 (9th Cir. 1996) ....................... passim

United States v. Chu Kong Yin,
      935 F.2d 990 (9th Cir. 1991) .......................... 539

United States v. Cianci,
      378 F.3d 71 (1st Cir. 2004) .......................... 361

United States v. Clawson,
      104 F.3d 250 (9th Cir. 1996) ..................... 227, 229

United States v. Clemente,
      22 F.3d 477 (2d Cir. 1994) .......................... 443

United States v. Colkley,
      899 F.2d 297 (4th Cir. 1990) .......................... 104

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                                          **PAGE(S)**

United States v. Collins,
    90 F.3d 1420 (9th Cir. 1996) ........................... 603

United States v. Comprehensive Drug Testing,
    621 F.3d 1162 (9th Cir. 2010) ................. 77, 79, 121

United States v. Connolly,
    341 F.3d 16 (1st Cir. 2003) ...................... 265, 350

United States v. Contreras,
    950 F.2d 232 (5th Cir. 1991) ........................... 208

United States v. Coon,
    187 F.3d 888 (8th Cir. 1999) ........................... 593

United States v. Coonan,
    938 F.2d 1553 (2d Cir. 1991) ........................... 345

United States v. Cordova-Barajas,
    360 F.3d 1037 (9th Cir. 2004) ......................... 605

United States v. Cormier,
    220 F.3d 1103 (9th Cir. 2000) .......................... 71

United States v. Corrado,
    227 F.3d 543 (6th Cir. 2000) ........................... 671

United States v. Crawford,
    372 F.3d 1048 (9th Cir. 2004) ......................... 111

United States v. Crespo de Llano,
    838 F.2d 1006 (9th Cir. 1987) ......................... 549

United States v. Cruz,
    554 F.3d 840 (9th Cir. 2009) ........................... 466

United States v. Culbert,
    435 U.S. 371 (1978) .................................... 85

United States v. Curtin,
    489 F.3d 935 (9th Cir. 2007) ................. 370, 542, 543

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                          PAGE(S)

United States v. Czubinski,
      106 F.3d 1069 (1st Cir. 1997) ........................... 469

United States v. Dale,
      991 F.2d 819 (D.C. Cir. 1993) ........................... 131

United States v. Damico,
      99 F.3d 1431 (7th Cir. 1996) ........................ passim

United States v. Danielson,
      325 F.3d 1054 (9th Cir. 2003) ........................... 407

United States v. Davis,
      960 F.2d 820 (9th Cir. 1992) ............................ 517

United States v. Davis,
      953 F.2d 1482 (10th Cir. 1992) .................... 233, 235

United States v. de Cruz,
      82 F.3d 856 (9th Cir. 1996) ............................. 408

United States v. DeFries,
      129 F.3d 1293 (D.C. Cir. 1997) .......................... 669

United States v. de la Jara,
      973 F.2d 746 (9th Cir. 1992) ................. 150, 151, 181

United States v. Decoud,
      456 F.3d 996 (9th Cir. 2006) ........................ passim

United States v. Delano,
      55 F.3d 720 (2d Cir. 1995) .............................. 348

United States v. Delgado,
      357 F.3d 1061 (9th Cir. 2004) ........................... 499

United States v. Dewey,
      599 F.3d 1010 (9th Cir. 2010) ........................... 633

United States v. Dipentino,
      242 F.3d 1090 (9th Cir. 2001) ........................... 363

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Disston,
        612 F.2d 1035 (7th Cir. 1980) ........................... 431

United States v. Dixon,
        201 F.3d 1223 (9th Cir. 2000) ........................... 452

United States v. Doe,
        125 F.3d 1249 (9th Cir. 1997) ........................... 190

United States v. Doe,
        655 F.2d 920 (9th Cir. 1980) ............................ 213

United States v. Dorsey,
        677 F.3d 944 (9th Cir. 2012) ................. 374, 536, 538

United States v. Driggers,
        559 F.3d 1021 (9th Cir. 2009) ........................... 358

United States v. Duncan,
        712 F. Supp. 124 (S.D. Ohio 1988) ........... 400, 401, 402

United States v. Duran,
        59 F.3d 938 (9th Cir. 1995) ............................. 497

United States v. Edwards,
        154 F.3d 915 (9th Cir. 1998) ..................... 395, 396

United States v. Edwards,
        303 F.3d 606 (5th Cir. 2002) ........................... 670

United States v. Edwards,
        595 F.3d 1004 (9th Cir. 2010) ........................... 590

United States v. Egbuniwe,
        969 F.2d 757 (9th Cir. 1992) ........................... 567

United States v. Elias,
        269 F.3d 1003 (9th Cir. 2001) ........................... 499

United States v. Elliott,
        571 F.2d 880 (5th Cir. 1978) ........................ passim

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                               **PAGE(S)**

United States v. Ellis,
     641 F.3d 411 (9th Cir. 2011) ........................ passim

United States v. Endicott,
     803 F.2d 506 (9th Cir. 1986) ...................... 575, 579

United States v. Erickson,
     75 F.3d 470 (9th Cir. 1996) ........................... 405

United States v. Eufrasio,
     935 F.2d 553 (3d Cir. 1991) ........................... 244

United States v. Evans-Martinez,
     611 F.3d 635 (9th Cir. 2010) ...................... 627, 640

United States v. Evers,
     669 F.3d 645 (6th Cir. 2012) .......................... 112

United States v. Fannin,
     817 F.2d 1379 (9th  Cir. 1987) ........................ 116

United States v. Fernandez,
     388 F.3d 1199 (9th Cir. 2004) ...................... passim

United States v. Fiander
     547 F.3d 1036 (9th Cir. 2008) ......................... 515

United States v. Figueroa-Lopez,
     125 F.3d 1241 (9th Cir. 1997) ............... 420, 432, 433

United States v. Fitch,
     659 F.3d 788 (9th Cir. 2011) .......................... 606

United States v. Flores,
     753 F.2d 1499 (9th Cir. 1985) ......................... 503

United States v. Foppe,
     993 F.2d 1444 (9th Cir. 1993) ......................... 512

United States v. Foreman,
     926 F.2d 792 (9th Cir. 1990) .......................... 654

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                                    PAGE(S)

United States v. Fortna,
    796 F.2d 724 (5th Cir. 1986) ........................... 73

United States v. Fowler,
    535 F.3d 408 (6th Cir. 2008) .......................... 104

United States v. Franklin,
    837 F. Supp. 916 (N.D. Ill. 1993) ..................... 654

United States v. Frederick,
    78 F.3d 1370 (9th Cir. 1996) .......................... 441

United States v. Frederick,
    182 F.3d 496 (7th Cir. 1999) .......................... 159

United States v. Freeman,
    6 F.3d 586 (9th Cir. 1993) ....................... 213, 306

United States v. Fruchter,
    411 F.3d 377 (2d Cir. 2005) ..................... 670, 672

United States v. Gaines,
    563 F.2d 1352 (9th Cir. 1977) ......................... 212

United States v. Gamboa-Cardenas,
    508 F.3d 491 (9th Cir. 2007) ..................... 205, 494

United States v. Ganoe,
    538 F.3d 1117 (9th Cir. 2008) ......................... 380

United States v. Garro,
    517 F.3d 1163 (9th Cir. 2008) ......................... 606

United States v. Garza-Juarez,
    992 F.2d 896 (9th Cir. 1993) ...................... passim

United States v. Gaskins,
    849 F.2d 454 (9th Cir. 1988) .......................... 512

United States v. Gee,
    695 F.2d 1165 (9th Cir. 1983) ......................... 418

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Genova,
    333 F.3d 750 (7th Cir. 2003) ........................... 677

United States v. George,
    420 F.3d 991 (9th Cir. 2005) ................. 493, 494, 496

United States v. Giberson,
    527 F.3d 882 (9th Cir. 2008) ........................... 121

United States v. Giese,
    597 F.2d 1170 (9th Cir. 1979) ......................... 381

United States v. Gigante,
    982 F. Supp. 140 (E.D.N.Y. 1997) ...................... 239

United States v. Giordano,
    442 F.3d 30 (2d Cir. 2006) ............................ 184

United States v. Gleason,
    616 F.2d 2 (2d Cir. 1979) ........................ 429, 431

United States v. Goldman,
    447 F.3d 1094 (8th Cir. 2006) ......................... 653

United States v. Gomez-Norena,
    908 F.2d 497 (9th Cir. 1990) ................. 358, 369, 383

United States v. Gomez-Soto,
    723 F.2d 649 (9th Cir. 1984) .......................... 118

United States v. Gonzales,
    520 U.S. 1 (1997) ..................................... 206

United States v. Gonzalez-Rincon,
    36 F.3d 859 (9th Cir. 1974) ........................... 429

United States v. Goodwin,
    457 U.S. 368 (1982) ................................... 200

United States v. Gordon-Nikkar,
    518 F.2d 972 (5th Cir. 1975) .......................... 174

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                          PAGE(S)

United States v. Govan,
     152 F.3d 1088 (9th Cir. 1998) ........................... 595

United States v. Graf,
     610 F.3d 1148 (9th Cir. 2010) ....................... passim

United States v. Green,
     350 U.S. 415 (1956) ..................................... 85

United States v. Green,
     648 F.2d 587 (9th Cir. 1981) ........................... 542

United States v. Griffin,
     660 F.2d 996 (4th Cir. 1992) ........................... 243

United States v. Griffth,
     85 F.3d 284 (7th Cir. 1996) ............................ 315

United States v. Gurolla,
     333 F.3d 944 (9th Cir. 2003) ...................... 187, 197

United States v. Hankey,
     203 F.3d 1160 (9th Cir. 2000) ..................... 369, 370

United States v. Harrington,
     114 F.3d 517 (5th Cir. 1997) ........................... 653

United States v. Harris,
     185 F.3d 999 (9th Cir. 1999) ........................... 459

United States v. Harris,
     932 F.2d 1529 (5th Cir. 1991) .......................... 453

United States v. Harvill,
     501 F.2d 295 (9th Cir. 1974) ........................... 512

United States v. Hasting,
     461 U.S. 499 (1983) ................................... 189

# TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                **PAGE(S)**

United States v. Hay,
    231 F.3d 630 (9th Cir. 2000) ...................... 118, 124

United States v. Hayat,
    710 F.3d 875 (9th Cir. 2013) .......................... 477

United States v. Hayes,
    794 F.2d 1348 (9th Cir. 1986) ....................... passim

United States v. Haynes,
    398 F.2d 980 (2d Cir. 1968) ........................... 564

United States v. Hemmingson,
    157 F.3d 347 (5th Cir. 1998) .......................... 653

United States v. Henry,
    447 U.S. 264 (1980) ................................... 194

United States v. Hernandez,
    952 F.2d 1110 (9th Cir. 1991) ......................... 212

United States v. Hernandez-Escarsega,
    886 F.2d 1560 (9th Cir. 1989) ............... 116, 517, 564

United States v. Hernandez-Herrera,
    273 F.3d 1213 (9th Cir. 2001) ......................... 201

United States v. Hernandez-Muniz,
    170 F.3d 1007 (10th Cir. 1999) ........................ 418

United States v. Hernandez-Ramirez,
    254 F.3d 841 (9th Cir. 2001) .......................... 605

United States v. Hicks,
    217 F.3d 1038 (9th Cir. 2000) ............... 452, 460, 461

United States v. Hieng,
    679 F.3d 1131 (9th Cir. 2012) ......................... 406

United States v. Higuera-Llamos,
574 F.3d 1206 (9th Cir. 2009) ......................... 641, 642

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                                    PAGE(S)


United States v. Hill,
      459 F.3d 966 (9th Cir. 2006) ...................... 115, 121


United States v. Hinkson,
      585 F.3d 1247 (9th Cir. 2009) ......................... 131


United States v. Hoac,
      990 F.2d 1099 (9th Cir. 1993) ..................... 648, 651


United States v. Hoelker,
      765 F.2d 1422 (9th Cir. 1985) .......................... 86


United States v. Holzman,
      871 F.2d 1496 (9th Cir. 1989) ......................... 116


United States v. Horn,
      976 F.2d 1314 (9th Cir. 1992) ......................... 147


United States v. Hugs,
      109 F.3d 1375 (9th Cir. 1997) ..................... 189, 199


United States v. Hugs,
      384 F.3d 762 (9th Cir. 2004) .......................... 366


United States v. Hunt,
      505 F.2d 931 (5th Cir. 1974) ....................... 69, 70


United States v. Hurley,
      63 F.3d 1 (1st Cir. 1995) ............................. 672


United States v. Isabel,
      945 F.2d 1193 (1st Cir. 1991) ......................... 453


United States v. Issacs,
      708 F.2d 1365 (9th Cir. 1983) .......................... 69


United States v. Italiano,
      894 F.2d 1280 (11th Cir. 1990) ................... 229, 231


United States v. Ivezaj,
      568 F.3d 88 (2d Cir. 2009) ............................ 593

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                          PAGE(S)

United States v. Jacobs,
    855 F.2d 652 (9th Cir. 1988) ....................... 188, 190

United States v. Jefferson,
    674 F.3d 332 (4th Cir. 2012) ....................... 320, 332

United States v. Jenkins,
    633 F.3d 788 (9th Cir. 2011) ........................... 219

United States v. Jennen,
    596 F.3d 594 (9th Cir. 2010) ........................... 83

United States v. Jimenez,
    300 F.3d 1166 (9th Cir. 2002) .......................... 600

United States v. Johnson,
    297 F.3d 845 (9th Cir. 2002) ...................... 211, 215

United States v. Jones,
    713 F.2d 1316 (9th Cir. 1983) .......................... 199

United States v. Kearns,
    5 F.3d 1251 (9th Cir. 1993) ........................... 203

United States v. Kearns,
    61 F.3d 1422 (9th Cir. 1995) .......................... 532

United States v. Keiser,
    57 F.3d 847 (9th Cir. 1995) ........................... 495

United States v. Kelm,
    827 F.2d 1319 (9th Cir. 1987) ......................... 564

United States v. Kent,
    649 F.3d 906 (9th Cir. 2011) .......................... 201

United States v. Kerr,
    981 F.2d 1050 (9th Cir. 1992) ......................... 442

United States v. Keys,
    133 F.3d 1282 (9th Cir. 1998) ............... 467, 502, 503

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                               PAGE(S)

United States v. Kimbrew,
      406 F.3d 1149 (9th Cir. 2005) ........................... 607

United States v. Kincaid-Chauncey,
      556 F.3d 923 (9th Cir. 2009) ........................ passim

United States v. Knight,
      659 F.3d 1285 (10th Cir. 2011) .......................... 266

United States v. Kohring,
      637 F.3d 895 (9th Cir. 2011) ............................ 203

United States v. Kovel,
      296 F.2d 918 (2d Cir. 1961) ............................. 148

United States v. Kow,
      58 F.3d 423 (9th Cir. 1995) ............................. 125

United States v. Krupa,
      658 F.3d 1174 (9th Cir. 2011) ........................... 83

United States v. Kubick,
      205 F.3d 1117 (9th Cir. 1999) ........................... 595

United States v. Kyllo,
      37 F.3d 526 (9th Cir. 1994) ............................. 101

United States v. Labonte,
      520 U.S. 751 (1997) .................................... 622

United States v. Lacy,
      119 F.3d 742 (9th Cir. 1997) ........................... 466

United States v. Lam,
      271 F. Supp. 2d 1182 (N.D. Cal. 2003) .................. 133

United States v. Lanci,
      669 F.2d 391 (6th Cir. 1982) ........................... 317

United States v. Lande,
      968 F.2d 907 (9th Cir. 1992) ........................... 507

1

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                          PAGE(S)

United States v. Laurienti,
     611 F.3d 520 (9th Cir. 2010) .................. 342, 357, 475

United States v. Laurins,
     857 F.2d 529 (9th Cir. 1988) ................. 163, 440, 441

United States v. Lazarenko,
     564 F.3d 1026 (9th Cir. 2009) ....................... passim

United States v. Ledee,
     549 F.2d 990 (5th Cir. 1977) .......................... 406

United States v. Leon,
     468 U.S. 897 (1984) ................................ passim

United States v. Leung,
     351 F. Supp. 2d 992 (C.D. Cal. 2005) .................. 193

United States v. Leyva,
     282 F.3d 623 (9th Cir. 2002) .......................... 317

United States v. Liang,
     362 F.3d 1200 (9th Cir. 2004) ......................... 606

United States v. Libby,
     429 F. Supp. 2d 1 (D.D.C. 2006) ....................... 430

United States v. Libretti,
     516 U.S. 29 (1995) ............................... 666, 667

United States v. Ligenfelter,
     997 F.2d 632 (9th Cir. 1993) ........................... 66

United States v. Lindsey,
     634 F.3d 541 (9th Cir. 2011) ..................... 300, 301

United States v. Lo,
     231 F.3d 471 (9th Cir. 2000) ................. 219, 220, 221

United States v. Logan,
     250 F.3d 350 (6th Cir. 2001) .......................... 519

TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Lopez-Alvarez,
    970 F.2d 583 (9th Cir. 1992) ........................... 443

United States v. Lovett,
    811 F.2d 979 (7th Cir. 1987) ........................... 313

United States v. Luk,
    859 F.2d 667 (9th Cir. 1988) ................. 112, 114, 122

United States v. Macklin,
    535 F.2d 191 (2d Cir. 1976) ...................... 227, 228

United States v. Marashi,
    913 F.2d 724 (9th Cir. 1990) ..................... 162, 581

United States v. Marcial-Santiago,
    447 F.3d 715 (9th Cir. 2006) ........................... 621

United States v. Marcus,
    130 S. Ct. 2159 (2010) ........................... 209, 359

United States v. Mares-Molina,
    913 F.2d 770 (9th Cir. 1990) ........................... 651

United States v. Marino,
    277 F.3d 11 (1st Cir. 2002) ........................... 243

United States v. Martin,
    278 F.3d 988 (9th Cir. 2002) ...................... passim

United States v. Matera,
    489 F.3d 115 (2d Cir. 2007) ...................... 236, 371

United States v. Mausali,
    590 F.3d 1077 (9th Cir. 2010) ..................... passim

United States v. Mayans,
    17 F.3d 1174 (9th Cir. 1994) ........................... 542

United States v. Mazurie,
    419 U.S. 544 (1975) ................................... 209

lii

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                                    PAGE(S)

United States v. McHan,
    101 F.3d 1027 (4th Cir. 1996) ........................... 672

United States v. McIntyre,
    582 F.2d 1221 (9th Cir. 1978) ..................... 501, 502

United States v. McKoy,
    771 F.2d 1207 (9th Cir. 1985) ..................... 442, 542

United States v. McManaman,
    673 F.3d 841 (8th Cir. 2012) ........................... 77

United States v. McNeal,
    77 F.3d 938 (7th Cir. 1996) ........................... 458

United States v. McTiernan,
    695 F.3d 882 (9th Cir. 2012) ....................... passim

United States v. Meek,
    366 F.3d 705 (9th Cir. 2004) ....................... 95, 104

United States v. Mende,
    43 F.3d 1298 (9th Cir. 1995) ................. 215, 216, 370

United States v. Mendoza,
    438 F.3d 792 (7th Cir. 2006) ........................... 67

United States v. Mendoza,
    464 U.S. 154 (1984) ................................... 92

United States v. Michaelian,
    803 F.2d 1042 (9th Cir. 1986) ..................... 116, 120

United States v. Mikos,
    539 F.3d 706 (7th Cir. 2008) .......................... 411

United States v. Miller,
    116 F.3d 641 (2d Cir. 1997) .......................... 373

United States v. Miller,
    425 U.S. 435 (1976) ................................... 72

liii

TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Mitchell,
    624 F.3d 1023 (9th Cir. 2010) ........................... 657

United States v. Mohammed,
    459 F.3d 979 (9th Cir. 2006) ....................... 634, 641

United States v. Mohsen,
    587 F.3d 1028 (9th Cir. 2009) ........................... 358

United States v. Molina,
    934 F.2d 1440 (9th Cir. 1991) ..................... 439, 440

United States v. Moncini,
    882 F.2d 401 (9th Cir. 1989) ........................... 504

United States v. Monsanto,
    491 U.S. 600 (1989) .................................... 675

United States v. Montes,
    628 F.3d 1183 (9th Cir. 2011) ..................... 525, 527

United States v. Montgomery,
    384 F.3d 1050 (9th Cir. 2004) ........................... 499

United States v. Moore,
    525 F.3d 1033 (11th Cir. 2008) ........................ 320

United States v. Moreland,
    622 F.3d 1147 (9th Cir. 2010) ........................... 439

United States v. Morris,
    928 F.2d 504 (2d Cir. 1991) ........................... 459

United States v. Morrison,
    449 U.S. 361 (1981) .................................... 204

United States v. Morrow,
914 F.2d 608 (4th Cir. 1990) ............................... 247

United States v. Mullins,
    922 F.2d 1472 (9th Cir. 1993) ........................... 596

liv

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                              PAGE(S)

United States v. Munoz-Camarena,
    631 F.3d 1028 (9th Cir. 2011) ........................... 613

United States v. Musacchio,
    968 F.2d 782 (9th Cir. 1991) ........................... 471

United States v. Najjar,
    300 F.3d 466 (4th Cir. 2002) ........................... 669

United States v. Navarro-Garcia,
    926 F.2d 818 (9th Cir. 1991) ........................... 525

United States v. Necoechea,
    986 F.2d 1273 (9th Cir. 1993) ............... 434, 441, 446

United States v. Nevils,
    598 F.3d 1158 (9th Cir. 2010) ...................... passim

United States v. Newman,
    659 F.3d 1235 (9th Cir. 2011) ......................... 665

United States v. Nguyen,
    255 F.3d 1355 (11th Cir. 2001) ........................ 593

United States v. Nichols,
    464 F.3d 1117 (9th Cir. 2006) ..................... 81, 156

United States v. Nixon,
    418 U.S. 683 (1974) ................................... 200

United States v. Nobari,
    574 F.3d 1065 (9th Cir. 2009) ......................... 188

United States v. Nobles,
    422 U.S. 225 (1975) ................................... 152

United States v. Norton,
    867 F.2d 1354 (11th Cir. 1989) ........................ 562

United States v. Nosal,
    676 F.3d 854 (9th Cir. 2012) ...................... passim

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Noushfar,
    78 F.3d 1442 (9th Cir. 1996) .......................... 125

United States v. Olano,
    62 F.3d 1180 (9th Cir. 1995) .......................... 524

United States v. One 56-Foot Yacht,
    702 F.2d 1276 (9th Cir. 1983) .......................... 98

United States v. Ortiz,
    362 F.3d 1274 (9th Cir. 2004) ..................... 594, 638

United States v. Pacheco,
    912 F.2d 297 (9th Cir. 1990) ..................... 231, 232

United States v. Packwood,
    848 F.2d 1009 (9th Cir. 1988) .......................... 521

United States v. Padilla,
    508 U.S. 77 (1993) ................................. 67, 72

United States v. Panaro,
    241 F.3d 1104 (9th Cir. 2001) .......................... 88

United States v. Panaro,
    266 F.3d 939 (9th Cir. 2001) ..................... 87, 88

United States v. Parker,
    549 F.3d 5 (1st Cir. 2008) ........................... 128

United States v. Patterson,
    819 F.2d 1495 (9th Cir. 1987) ................... 213, 551

United States v. Pearson,
    274 F.3d 1225 (9th Cir. 2001) ................... 481, 495

United States v. Pelisamen,
    641 F.3d 399 (9th Cir. 2011) ...................... passim

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                            PAGE(S)

United States v. Pelullo,
     14 F.3d 881 (3d Cir. 1994) ............................ 669

United States v. Pemberton,
     853 F.2d 730 (9th Cir. 1988) ......................... 513

United States v. Pena,
     897 F.2d  1075 (11th Cir. 1990) ...................... 510

United States v. Perdomo-Espana,
     522 F.3d 983 (9th Cir. 2008) ......................... 497

United States v. Perholtz,
     842 F.2d  343 (D.C. Cir. 1988) .............. 360, 362, 363

United States v. Perlaza,
     439 F.3d 1149 (9th Cir. 2006) ........................ 405

United States v. Persico,
     832 F.2d 705 (2d Cir. 1987) ..................... 225, 238

United States v. Peterson,
     98 F.3d 502 (9th Cir. 1996) .......................... 607

United States v. Phillips,
     540 F.2d 319 (8th Cir. 1976) ......................... 132

United States v. Phillips,
     704 F.3d 754 (9th Cir. 2012) ............... 465, 669, 668

United States v. Pimentel,
     654 F.2d 538 (9th Cir. 1981) ...................... passim

United States v. Pineda-Doval,
     692 F.3d 942 (9th Cir. 2012) .................... 131, 590

United States v. Pisello,
     877 F.2d 762 (9th Cir. 1989) .................... 402, 403

United States v. Pizzichiello,
     272 F.3d 1232 (9th Cir. 2002) ........................ 602

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                              PAGE(S)

United States v. Polizzi,
     801 F.2d 1543 (9th Cir. 1986) ........................... 212

United States v. Porcelli,
     865 F.2d 1352 (2d Cir. 1989) ........................... 676

United States v. Prantil,
     764 F.2d 548 (9th Cir. 1985) ...................... 437, 551

United States v. Ramos-Paulino,
     488 F.3d 459 (1st Cir. 2007) ...................... passim

United States v. Rastelli,
     870 F.2d 822 (2d Cir. 1989) ........................... 261

United States v. Reese,
     2 F.3d 870 (9th Cir. 1993) ............................ 609

United States v. Reivich,
     793 F.2d 957 (8th Cir. 1986) ........................... 104

United States v. Reporters Committee for Freedom of the Press,
     489 U.S. 749 (1989) .................................... 274

United States v. Ressam,
     679 F.3d 1069 (9th Cir. 2012) ...................... passim

United States v. Restrepo,
     930 F.2d 705 (9th Cir. 1991) ........................... 186

United States v. Restrepo-Rua,
     815 F.2d 1327 (9th Cir. 1987) ......................... 130

United States v. Rewald,
     889 F.2d 836 (9th Cir. 1989) ........................... 80

United States v. Reyes,
     577 F.3d 1069 (9th Cir. 2009) ......................... 554

United States v. Reyes-Bosque,
     596 F.3d 1017 (9th Cir. 2010) .......................... 66

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                                      **PAGE(S)**

United States v. Rizk,
      660 F.3d 1125 (9th Cir. 2011) ................. 369, 370, 375

United States v. Roberts,
      660 F.3d 149 (2d Cir. 2011) ........................... 670

United States v. Rodrigues,
      678 F.3d 693 (9th Cir. 2012) ..................... 323, 332

United States v. Rodriquez,
      360 F.3d 949 (9th Cir. 2004) ................. 205, 209, 484

United States v. Rodriquez,
      630 F.3d 39 (9th Cir. 2010) ...................... 637, 660

United States v. Rogers,
      722 F.2d 557 (9th Cir. 1983) ......................... 416

United States v. Rohrer,
      708 F.2d 429 (9th Cir. 1983) ..................... 518, 562

United States v. Romero-Avila,
      210 F.3d 1017 (9th Cir. 2000) ........................ 524

United States v. Rose,
      20 F.3d 367 (9th Cir. 1994) .......................... 595

United States v. Rosenberger,
      872 F.2d 240 (8th Cir. 1989) .......................... 78

United States v. Rosenthal,
      454 F.3d 943 (9th Cir. 2006) ......................... 522

United States v. Rousseau,
      257 F.3d 925 (9th Cir. 2001) ..................... 391, 550

United States v. Rude,
      88 F.3d 1538 ..................................... 440, 444

United States v. Ruehle,
      583 F.3d 600 (9th Cir. 2009) ................. 146, 158, 162

TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                     **PAGE(S)**

United States v. Ruggiero,
        928 F.2d 1289 (2d Cir. 1991) ...................... 572

United States v. Russell,
        411 U.S. 423 (1973) ............................. 187, 189

United States v. Ryan,
        548 F.2d 782 (9th Cir. 1976) ........................ 188

United States v. SDI Future Health, Inc.,
        568 F.3d 684 (9th Cir. 2009) ........................ 120

United States v. Sablan,
        92 F.3d 865 (9th Cir. 1996) ......................... 469

United States v. Sacco,
        563 F.2d 552 (2d Cir. 1977) ......................... 214

United States v. Sadolsky,
        234 F.3d 938 (6th Cir. 2000) ........................ 469

United States v. Saechao,
        418 F.3d 1073 (9th Cir. 2005) ....................... 410

United States v. Saeteurn,
        504 F.3d 1175 (9th Cir. 2007) ................... 621, 635

United States v. Salazar-Mojica,
        634 F.3d 1070 (9th Cir. 2011) ....................... 483

United States v. Salcido,
        506 F.3d 729 (9th Cir. 2007) ........................ 539

United States v. Salcido-Corrales,
        249 F.3d 1151 (9th Cir. 2001) ....................... 596

United States v. Salmonese,
        352 F.3d 608 (2d Cir. 2003) ..................... 225, 232

United States v. Salvucci,
        448 U.S. 83 (1980) ................................... 72

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                          PAGE(S)

United States v. Santoni,
    585 F.2d 667 (4th Cir. 1978) ........................... 86

United States v. Santos,
    553 U.S. 507 (2008) ................................. passim

United States v. Sarkisian,
    197 F.3d 966 (9th Cir. 1999) ....................... 70, 407

United States v. Sarno,
    73 F.3d 1470 (9th Cir. 1995) ....................... passim

United States v. Schmick,
    904 F.2d 936 (5th Cir. 1990) .......................... 232

United States v. Scialabba,
    282 F.3d 475 (7th Cir. 2002) .......................... 677

United States v. Scott,
    642 F.3d 791 (9th Cir. 2011) .......................... 513

United States v. Sears, Roebuck & Co.,
    785 F.2d 777 (9th Cir. 1986) ............... 232, 233, 237

United States v. Segal,
    495 F.3d 826 (7th Cir. 2007) .......................... 676

United States v. Shaffer,
    789 F.2d 682 (9th Cir. 1986) .......................... 556

United States v. Shipsey,
    363 F.3d 962 (9th Cir. 2004) ....................... passim

United States v. Silva,
    247 F.3d 1051 (9th Cir. 2001) .......................... 69

United States v. Simmons,
    154 F.3d 765 (8th Cir. 1998) .......................... 671

United States v. Sitton,
    968 F.2d 947 (9th Cir. 1992) .......................... 212

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Skilling,
    638 F.3d 480 (5th Cir. 2011) ........................... 330

United States v. Skillman,
    442 F.2d 542 (8th Cir. 1971) ........................... 430

United States v. Smith,
    424 F.3d 992 (9th Cir. 2005) ........................ passim

United States v. Smith,
    924 F.2d 889 (9th Cir. 1991) ........................... 188

United States v. Smith-Baltiher,
    424 F.3d 913 (9th Cir. 2005) ........................... 79

United States v. Soliman,
    813 F.2d 277 (9th Cir. 1987) ..................... 374, 443

United States v. Spilotro,
    680 F.2d 612 (9th Cir. 1982) ........................... 669

United States v. Spilotro,
    800 F.2d 959 (9th Cir. 1986) ................. 112, 115, 117

United States v. Springfield,
    829 F.2d 860 (9th Cir. 1987) ........................... 519

United States v. Stapleton,
    293 F.3d 1111 (9th Cir. 2002) ......................... 452

United States v. Staves,
    383 F.3d 977 (9th Cir. 2004) ........................ 95, 96

United States v. Stevenson,
    396 F.3d 538 (4th Cir. 2005) ........................... 112

United States v. Still,
    857 F.2d 671 (9th Cir. 1988) ........................... 461

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                                    PAGE(S)

United States v. Stinson,
    647 F.3d 1196 (9th Cir. 2011) ................ 187, 188, 199

United States v. Strifler,
    851 F.2d 1197 (9th Cir. 1988) .......................... 100

United States v. Stringer,
    535 F.3d 929 (9th Cir. 2008) ........................... 196

United States v. Stubbs,
    873 F.2d 210 (9th Cir. 1989) ........................... 124

United States v. Sun-Diamond Growers,
    526 U.S. 398 (1999) ............................... 319, 320

United States v. Sutcliffe,
    505 F.3d 944 (9th Cir. 2007) ........................... 476

United States v. Svete,
    556 F.3d 1157 (11th Cir. 2009) ......................... 207

United States v. Sykes,
    648 F.3d 1140 (9th Cir. 2011) ......................... 657

United States v. Symington,
    195 F.3d 1080 (9th Cir. 1999) ...................... passim

United States v. Taketa,
    923 F.2d 665 (9th Cir. 1991) ............................ 67

United States v. Talao,
    222 F.3d 1133 (9th Cir. 2000) ......................... 177

United States v. Tallman,
    952 F.2d 164 (8th Cir. 1991) .......................... 562

United States v. Tam,
    240 F.3d 797 (9th Cir. 2001) ...................... 436, 551

United States v. Tamura,
    694 F.2d 591 (9th Cir. 1982) .......................... 395

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                                    PAGE(S)

United States v. Tankersley,
      537 F.3d 1100 (9th Cir. 2008) ...................... 594, 616

United States v. Tedder,
      403 F.3d 836 (7th Cir. 2005) ........................... 668

United States v. Teel,
      691 F.3d 578 (5th Cir. 2012) ........................... 313

United States v. Tekle,
      329 F.3d 1108 (9th Cir. 2003) .......................... 581

United States v. Tham,
      960 F.2d 1391 (9th Cir. 1991) .......................... 511

United States v. Throckmorton,
      87 F.3d 1069 (9th Cir. 1996) ...................... 212, 549

United States v. Tille,
      729 F.2d 615 (9th Cir. 1984) ...................... 260, 346

United States v. Tirouda,
      394 F.3d 683 (9th Cir. 2005) ........................... 459

United States v. Tocco,
      306 F.3d 279 (6th Cir. 2002) ........................... 639

United States v. Torres-Flores,
      502 F.3d 885 (9th Cir. 2007) ........................... 505

United States v. Towne,
      997  F.2d 537 (9th Cir. 1993) .......................... 114

United States v. Townsend,
      987 F.2d 927 (2d Cir. 1993) ............................ 500

United States v. Townsley,
      843 F.2d 1070 (8th Cir. 1988) .......................... 174

United States v. Treadwell,
      593 F.3d 990 (9th Cir. 2010) ........................ passim

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                              PAGE(S)

United States v. Trice,
    245 F.3d 1041 (8th Cir. 2001) ...................... 653, 654

United States v. Truglio,
    731 F.2d 1123 (4th Cir. 1984) ......................... 131

United States v. Tucker,
    8 F.3d 673 (9th Cir. 1993) ............................ 189

United States v. Turkette,
    452 U.S. 576 (1981) ............................... passim

United States v. Unruh,
    855 F.2d 1363 (9th Cir. 1987) ..................... passim

United States v. Vaccaro,
    816 F.2d 443 (9th Cir. 1987) .......................... 213

United States v. Valencia,
    24 F.3d 1106 (9th Cir. 1994) ........................ 94, 99

United States v. Valencia-Barragan,
    608 F.3d 1103 (9th Cir. 2010) ..................... 590, 611

United States v. Van Alstyne,
    584 F.3d 803 (9th Cir. 2009) .......................... 676

United States v. Varela,
    993 F.2d 686 (9th Cir. 1993) ...................... 651, 652

United States v. Vartanian,
    476 F.3d 1095 (9th Cir. 2007) ............... 555, 569, 572

United States v. Vasquez,
    597 F.2d 192 (9th Cir. 1979) .......................... 516

United States v. Vebeliunas,
    76 F.3d 1283 (2d Cir. 1996) ........................... 345

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                                    PAGE(S)

United States v. Vest,
    639 F. Supp. 899 (D. Mass. 1986) ....................... 133

United States v. Veteto,
    701 F.2d 136 (11th Cir. 1983) ......................... 214

United States v. Vincent,
    758 F.2d 379 (9th Cir. 1985) .......................... 330

United States v. Vizcarra-Martinez,
    66 F.3d 1006 (9th Cir. 1995) .......................... 535

United States v. Vonn,
    535 U.S. 55 (2002) .................................... 611

United States v. W.R. Grace,
    526 F.3d 499 (9th Cir. 2008) ....................... passim

United States v. Wahchumwah,
    710 F.3d 862 (9th Cir. 2013) ..................... 151, 656

United States v. Waknine,
    543 F.3d 546 (9th Cir. 2008) .......................... 590

United States v. Wardlow,
    951 F.2d 1115 (9th Cir. 1991) .......................... 68

United States v. Washington,
    797 F.2d 1461 (9th Cir. 1986) .................... 116, 117

United States v. Waters,
    627 F.3d 345 (9th Cir. 2010) ..................... 380, 381

United States v. Weatherspoon,
    410 F.3d 1142 (9th Cir. 2005) ......................... 441

United States v. Webster,
    162 F.3d 308 (5th Cir. 1998) .......................... 569

United States v. Weiner,
    578 F.2d 757 (9th Cir. 1978) ..................... 518, 562

**TABLE OF AUTHORITIES (Cont'd)**

FEDERAL CASES                                          PAGE(S)

United States v. Weissman,
      899 F.2d 1111 (11th Cir. 1990) ..................... 362, 363

United States v. White,
      401 U.S. 745 (1971) ................................... 71

United States v. White Horse,
      316 F.3d 769 (8th Cir. 2003) ......................... 420

United States v. Whitehead,
      532 F.3d 991 (9th Cir. 2008) ......................... 591

United States v. Whitfield,
      590 F.3d 325 (5th Cir. 2009) ......................... 313

United States v. Wilbur,
      674 F.3d 1160 (9th Cir. 2012) ........................ 360

United States v. Wiley,
      794 F.2d 514 (9th Cir. 1986) ......................... 189

United States v. Wilkes,
      662 F.3d 524 (9th Cir. 2011) ...................... passim

United States v. Williams,
      504 U.S. 36 (1992) ................................... 459

United States v. Williams,
      693 F.3d 1067 (9th Cir. 2012) ........................ 609

United States v. Williams,
      791 F.2d 1383 (9th Cir. 1986) ........................ 189

United States v. Williams,
      989 F.2d 1061 (9th Cir. 1993) ..................... passim

United States v. Williamson,
      439 F.3d 1125 (9th Cir. 2006) ........................ 484

United States v. Wilsey,
      458 F.2d 11 (9th Cir. 1972) .......................... 227

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Wong,
       40 F.3d 1347 (2d Cir. 1994) ......................... passim

United States v. Wong,
       334 F.3d 831 (9th Cir. 2003) ......................... 115

United States v. Working,
       224 F.3d 1093 (9th Cir. 2000) ......................... 98

United States v. Wright,
       625 F.3d 583 (9th Cir. 2010) ......................... 436

United States v. Yeager,
       210 F.3d 1315 (11th Cir. 2000) ......................... 593

United States v. Younger,
       398 F.3d 1179 (9th Cir. 2005) ......................... 435

United States v. Zambito,
       315 F.2d 266 (9th Cir. 1963) ......................... 569

United States v. Zanabria,
       74 F.3d 590 (5th Cir. 1996) ......................... 553

United States v. Zemek,
       634 F.2d 1159 (9th Cir. 1980) ...................... passim

United States v. Ziesman,
       409 F.3d 941 (8th Cir. 2005) ......................... 553

United States v. Zolin,
       491 U.S. 554 (1989) ................................. passim

Valdes v. United States,
       475 F.3d 1319 (D.C. Cir. 2007) ..................... passim

Walton v. Wild Goose Mining & Trading Co.,
       123 F. 209 (9th Cir. 1903) ......................... 515

In re Watts,
       298 F.3d 1077 (9th Cir. 2002) ......................... 478

lxviii

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

Wiley v. Doory,
    14 F.3d 993 (4th Cir. 1994) ............................ 409

Williams v. Poulos,
    11 F.3d 271 (1st Cir. 1993) ........................... 500

Zamani v. Carnes,
    491 F.3d 990 (9th Cir. 2007) .......................... 586

**STATE CASES**

Chrisman v. Los Angeles,
    65 Cal. Rptr. 3d 701 (Ct. App. 2007) ............... passim

Gilbert v. Sunnyvale,
    31 Cal. Rptr. 3d 297 (Ct. App. 2006) .................. 479

Hobbs v. Municipal Court,
    284 Cal. Rptr. 655 (Ct. App. 1991) ..................... 75

Kallen v. Delug,
    203 Cal. Rptr. 879 (Ct. App. 1984) ..................... 74

Lybarger v. City of Los Angeles,
    40 Cal. 3d 822 (1985) ................................. 410

Mahru v. Superior Court,
    237 Cal. Rptr. 298 (Ct. App. 1987) .................... 480

McGlothen v. DMV,
    140 Cal. Rptr. 168 (Ct. App. 1977) .................... 478

People v. Anderson,
    216 P. 401 (Cal. Ct. App. 1923) ...................... 300

People v. Brigham,
    163 P.2d 891 (Cal. Ct. App. 1945) ................ 270, 288

People v. Diedrich,
    31 Cal. 3d 263 (1982) ................................ 301

## TABLE OF AUTHORITIES (Cont'd)

**STATE CASES**                                                 **PAGE(S)**

People v. Finklestein,
    220 P.2d 934 (Cal. Ct. App. 1950) ..................... 270

People v. Gaio,
    97 Cal. Rptr. 2d 392 (Ct. App. 2000) ............... passim

People v. Hallner,
    277 P.2d 393 (Cal. 1954) ......................... 269, 302

People v. Keyes,
    284 P. 1096 (Ct. App. 1930) .......................... 223

People v. Laiwala,
    2012 WL 3834895 (Cal. Ct. App. Sept. 5, 2012) .......... 480

People v. Lips,
    211 P. 22 (Cal. Ct. App. 1922) ..................... passim

People v. Markham,
    30 P. 620 (Cal. 1883) .............................. passim

People v. Megladdery,
    106 P.2d 84 (Cal. Ct. App. 1940) ..................... 272

People v. Oliveira,
    2006 WL 775645 (Cal Ct. App. Mar. 28, 2006) ........... 480

People v. Pacheco,
    69 Cal. Rptr. 822 (Ct. App. 1968) ..................... 269

People v. Strohl,
    129 Cal. Rptr. 224 (Ct. App. 1976) ................... 302

Perry v. County of  Fresno,
    155 Cal. Rptr. 3d 219 (Ct. App. 2013) ................. 479

State v. McCrory,
    87 P.3d 275 (Haw. 2004) .............................. 413

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL STATUTES**                                          **PAGE(S)**

18 U.S.C. § 201(a)(3) ........................................ 318

18 U.S.C. § 201(b)(1)(A) ......................... 317, 318, 319

18 U.S.C. § 201(c) ........................................... 318

18 U.S.C. § 371 ........................................... passim

18 U.S.C. § 542 .............................................. 233

18 U.S.C. § 578 .............................................. 227

18 U.S.C. § 982(b)(2) ........................................ 672

18 U.S.C. § 1001(a)(2) ......................................... 7

18 U.S.C. § 1001 ........................................ 233, 248

18 U.S.C. § 1028(a)(7) .................................... passim

18 U.S.C. § 1030 ......................................... passim

18 U.S.C. § 1030(a)(2)(B) ...................................... 6

18 U.S.C. § 1030(a)(4) ................................... passim

18 U.S.C. § 1030(e)(6) .................................. 456, 462

18 U.S.C. § 1343 ............................................... 6

18 U.S.C. § 1346 ............................................... 6

18 U.S.C. § 1512(c)(1) ...................................... 605

18 U.S.C. § 1951 ......................................... passim

18 U.S.C. § 1956(a)(1) .............................. 674, 675, 677

18 U.S.C. § 1961(4) ................................. 242, 353, 354

# TABLE OF AUTHORITIES (Cont'd)

**FEDERAL STATUTES**                                              **PAGE(S)**

18 U.S.C. § 1961(5) ......................................... 238

18 U.S.C. § 1962(c) ..................................... passim

18 U.S.C. § 1962(d) ..................................... passim

18 U.S.C. § 1963 ..................................... 634, 665

18 U.S.C. § 2511 ....................................... passim

18 U.S.C. § 2511(1)(a) ................................. passim

18 U.S.C. § 2512(1)(b) .................................... 6, 7

18 U.S.C. § 2515 ........................................... 129

18 U.S.C. § 3231 ............................................. 8

18 U.S.C. § 3288 ....................................... passim

18 U.S.C. § 3289 ....................................... passim

18 U.S.C. § 3553(a) .................................... passim

18 U.S.C. § 3553(b) ....................................... 657

18 U.S.C. § 3661 .......................................... 662

18 U.S.C. § 3742(a) ......................................... 8

28 U.S.C. § 534 .......................................... 273

28 U.S.C. § 534(a)(4) .................................... 471

28 U.S.C. § 534(b) ....................................... 274

28 U.S.C. § 1291 ........................................... 8

28 U.S.C. § 2074(a) ...................................... 666

**TABLE OF AUTHORITIES (Cont'd)**

| FEDERAL RULES | PAGE(S) |
|---|---|
| Fed. R. App. P. 28(i) | 453 |
| Fed. R. Crim. P. 12(b)(3) | 287 |
| Fed. R. Crim. P. 16(a)(1)(E)(ii) | 430 |
| Fed. R. Crim. P. 26(a) | 400 |
| Fed. R. Crim. P. 26.2 | passim |
| Fed. R. Crim. P. 26.2(a) | 404 |
| Fed. R. Crim. P. 30(a) | passim |
| Fed. R. Crim. P. 32(c)(A)(ii) | 619 |
| Fed. R. Evid. 104(a) | 162 |
| Fed. R. Evid. 104(b) | 428 |
| Fed. R. Evid. 401 | 370 |
| Fed. R. Evid. 402 | 369 |
| Fed. R. Evid. 404(b) | passim |
| Fed. R. Evid. 606(b) | passim |
| Fed. R. Evid. 803(1) | 163 |
| Fed. R. Evid. 1101(d)(1) | 163 |
| Fed. R. Evid. 1101(d)(3) | 163 |

**STATE STATUTES**

| | |
|---|---|
| Cal. Bus. & Prof. Code § 6001.1 | 654 |
| Cal. Bus. & Prof. Code § 6106 | 154 |
| Cal. Civ. Proc. Code § 2018.030 | 75 |

lxxiii

**TABLE OF AUTHORITIES (Cont'd)**

| STATE STATUTES | PAGE(S) |
|---|---|
| Cal. Gov't Code § 15153 | 470 |
| Cal. Penal Code § 7(6) | 269 |
| Cal. Penal Code § 67 | passim |
| Cal. Penal Code § 68 | passim |
| Cal. Penal Code § 422 | passim |
| Cal. Penal Code § 502 | passim |
| Cal. Penal Code § 502(b)(8) | 482 |
| Cal. Penal Code § 11105(b) | 470 |
| Cal. Penal Code § 11077 | 273 |
| Cal. Veh. Code § 1808.45 | 276, 470 |

**Nos. 08-50531, 08-50570, 09-50115, 09-50125, 09-50128,
09-50159, 10-50434, 10-50462, 10-50464 & 10-50472**

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

   Plaintiff-Appellee,

                v.

TERRY CHRISTENSEN et al.,

   Defendants-Appellants.

─────────────────────────────

**GOVERNMENT'S CONSOLIDATED ANSWERING BRIEF**

**I**

**ISSUES PRESENTED**

A.   Whether Pellicano's and Christensen's challenges to the
November 2002 and July 2003 search warrants (1) are barred by
collateral estoppel as to Pellicano and by lack of standing as to
Christensen, or (2) if not so barred, were properly rejected on
their merits.

B.   Whether the court (1) clearly erred in determining
Christensen failed to show Pellicano recorded their telephone
conversations for a "criminal or tortious" purpose, as required
for suppression under Title III, or (2) abused its discretion in
denying an evidentiary hearing.

C.   Whether the court correctly found Christensen's
recorded conversations with Pellicano to be unprivileged.

D.    Whether Pellicano waived his claims for the indictment's dismissal or, if not waived, whether the court should have dismissed for outrageous government conduct or under its supervisory powers.

E.    Whether the court properly denied Turner's motion to dismiss the identity-theft charges.

F.    Whether the court abused its discretion in denying the RICO defendants' severance requests.

G.    Whether the racketeering acts alleging bribery under California Penal Code §§ 67 and 68 were timely.

H.    Whether the evidence was sufficient to sustain Pellicano's, Arneson's, and Turner's convictions.

I.    Whether the RICO charges were constructively amended or subject to a fatal variance.

J.    Whether the court abused its discretion -- or plainly did so -- in admitting evidence at the RICO trial under Federal Rule of Evidence 403.

K.    Whether the court abused its discretion in denying Pellicano's request for <u>Jencks</u> material for a defense witness.

L.    Whether Pellicano was entitled to, and did not receive, notice of other-acts evidence.

M.    Whether the court abused its discretion in rejecting Arneson's untimely and unsupported prosecutorial-misconduct claims, and whether any alleged misconduct was prejudicial.

2

N.   Whether the court plainly erred by not sua sponte striking unobjected-to statements in the government's closing argument.

O.   Whether the evidence was sufficient to support Nicherie's aiding-and-abetting conviction.

P.   Whether the court's instructions correctly stated the applicable law, and whether any claimed error was prejudicial.

Q.   Whether the court abused its discretion in denying a new trial and declining to hold a post-verdict evidentiary hearing on alleged jury misconduct.

R.   Whether the court abused its discretion in admitting wiretapping-related evidence in the Christensen-Pellicano wiretapping trial.

S.   Whether the court abused its discretion in denying Christensen's severance motion.

T.   Whether the government committed misconduct in the Christensen-Pellicano wiretapping trial by noting in rebuttal Christensen's failure to present evidence he promised in his opening.

U.   Whether the court abused its discretion in dismissing a juror during deliberations after finding the juror repeatedly lied to the court.

V.   Whether the court properly denied defendants' new-trial motion based on alleged <u>Brady</u> violations.

3

W.    Whether defendants' sentences were procedurally sound and substantively reasonable.

X.    Whether Arneson's and Turner's joint-and-several money judgment of forfeiture was proper.

## II

## STATEMENT OF THE CASE

A.  NATURE OF THE CASE, COURSE OF THE PROCEEDINGS, AND DISPOSITION BELOW

Defendant-appellants Terry Christensen, Anthony Pellicano, Mark Arneson, Rayford Earl Turner, Abner Nicherie, and Kevin Kachikian (collectively, "defendants") appeal their convictions and sentences, following their trial convictions on various counts stemming from their involvement in a widespread and longstanding criminal enterprise that, among other things, actively and corruptly subverted the judicial process through the illegal accessing and distribution of confidential database information and the wiretapping of privileged attorney-client communications.

The grand jury returned the 111-count fifth superseding indictment (the "indictment") on December 6, 2007.[1]  (JER 923-

---

[1]  Pellicano, Turner, Kachikian, and Nicherie were charged in the initial and first superseding indictments.  (JER 535-39, GER 1-8).  Arneson was added in the second (GER 9-68), and Christensen was added in the third (GER 69-136).  The fourth omitted two defendants who had pleaded guilty and added new racketeering acts to the RICO counts and new overt acts to the conspiracy counts.  (GER 137-203).

4

86).[2]  The district court (the Honorable Dale S. Fischer) initially severed Christensen's trial on counts 106 and 107, which charged him and Pellicano with conspiracy and the wiretapping of Lisa Bonder-Kerkorian, from the trial of his co-defendants on the remaining counts.  (JER 1138-41).  In response to a subsequent motion by Arneson, Turner, Kachikian and Nicherie (GER 2773-82), the court severed counts 106 and 107 in their entirety, leaving them to be tried jointly against Pellicano and Christensen after the first trial against Pellicano, Arneson, Turner, Kachikian, and Nicherie.  (JER 1353-54).

Near the end of its case-in-chief at the first trial, the government dismissed (without objection) a number of counts, racketeering acts and overt acts due to witness unavailability and evidentiary issues and to simplify the case for argument and deliberation.  (GERT 5064-66).  The government prepared and filed

---

[2]  "CR" refers to the Clerk's Record and is followed by the applicable document control number.  "JOB" refers to Appellants' Joint Opening Brief, individual opening briefs are referred to by the first letter of the defendant's last name followed by OB (for example, "AOB" refers to Arneson's opening brief), individual defendant's supplemental excerpts of record are similarly referenced (for example, "AER" for Arneson's excerpts of record), as are their PSRs (for example, "APSR" for Arneson's PSR).  "GEX" refers to the Government's Trial Exhibits, "GER" to the Government's Excerpts of Record, "GSER" to the Government's Sealed Excerpts of Record, "GERT" to the Government's Excerpts of Reporter's Transcripts, and RJN to the Government's Request for Judicial Notice.  All transcript, brief, excerpt, and notice-request references are followed by applicable page references.  All PSR references are followed by applicable paragraph references.

a redacted fifth superseding indictment renumbering the remaining counts, which became the operative indictment for purposes of the verdicts in the first trial.[3]  (JER 3955-4003; GERT 5066-68).

Pellicano was convicted of RICO (18 U.S.C. § 1962(c) -- count 1); RICO conspiracy (18 U.S.C. § 1962(d) -- count 2); honest-services wire fraud (18 U.S.C. §§ 1343, 1346 -- counts 3-19, 47-48); unauthorized computer access of United States agency information (18 U.S.C. §§ 1030(a)(2)(B), (c)(2)(B)(i) -- counts 20-36, 49); identity theft (18 U.S.C. § 1028(a)(7) -- counts 37-41, 51-54, 59-62); computer fraud (18 U.S.C. § 1030(a)(4) -- counts 42-46, 55-58, 63-66); conspiracy to intercept and use wire communications (18 U.S.C. § 371 -- count 67); interception of wire communications (18 U.S.C. § 2511(1)(a), (d) -- counts 68-76); and possession of a wiretapping device (18 U.S.C. § 2512(1)(b) -- count 77).  The jury acquitted Pellicano on one count of unauthorized computer access (count 50).  (GSER 109-29).

Arneson was convicted of RICO (18 U.S.C. § 1962(c) -- count 1); RICO conspiracy (18 U.S.C. § 1962(d) -- count 2); honest-services wire fraud (18 U.S.C. §§ 1343, 1346 -- counts 3-19); unauthorized computer access of United States agency information (18 U.S.C. § § 1030(a)(2)(B), (c)(2)(B)(i) -- counts 20-36); identity theft (18 U.S.C. § 1028(a)(7) -- counts 37-41); and

---

[3]  Unless otherwise specified, all references to counts tried in the first trial will use the count numbers in the redacted indictment.

6

computer fraud (18 U.S.C. § 1030(a)(4) -- counts 42-46).  (GSER 130-43).

Turner was convicted of RICO (18 U.S.C. § 1962(c) -- count 1); RICO conspiracy (18 U.S.C. § 1962(d) -- count 2); identity theft (18 U.S.C. § 1028(a)(7) -- counts 59-62); computer fraud (18 U.S.C. § 1030(a)(4) -- counts 63-66); conspiracy to intercept and use wire communications (18 U.S.C. § 371 -- count 67); interception of wire communications (18 U.S.C. § 2511(1)(a), (d) -- counts 68, 72, 73, 75, 76); and false statements (18 U.S.C. § 1001(a)(2) -- count 78).  The jury acquitted Turner on four counts of interception of wire communications (counts 69-71, 74). (GSER 144-50).

Kachikian was convicted of conspiracy to intercept and use wire communications (18 U.S.C. § 371 -- count 67), and possession of a wiretapping device (18 U.S.C. § 2512(1)(b) -- count 77). The jury acquitted Kachikian on nine counts of interception of wire communications (counts 68-76).  (CR 1610).

Nicherie was convicted of aiding and abetting the interception of wire communications (18 U.S.C. § 2511(a), (d) -- count 69).  (GSER 151).

On August 29, 2008, the jury in Pellicano and Christensen's severed trial returned verdicts finding both guilty of conspiracy to intercept and use wire communications (18 U.S.C. § 371 --

7

count 106), and interception of wire communications (18 U.S.C. § 2511(1)(a), (d) -- count 107).

Christensen was sentenced to 36 months (CR 2012), Pellicano to 180 months (CR 2048), Arneson and Turner to 121 months (CR 2179, 2180), Nicherie to 21 months (CR 2182), and Kachikian to 27 months (JER 4928-31). Each received three years' supervised release and applicable special assessments. Additionally, the court ordered $2,008,250 in RICO forfeiture against Pellicano, Arneson and Turner, jointly and severally. (JER 4780-92).

B.   JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. Each defendant timely appealed, as stated in defendants' joint opening brief. (JOB 3).

Pellicano and Turner are in federal custody. Nicherie has served the custodial portion of his sentence and is on supervised release. Christensen, Arneson, and Kachikian remain on bond.

### III

### FACTS

A.   THE RICO AND WIRETAPPING TRIAL

The indictment, as argued to the jury, consisted principally of two related groups of counts, both involving the acquisition of confidential information through illegal means. (GERT 7614). The first group, counts 1-66, charged Pellicano, Arneson, and

8

Turner with obtaining confidential information from protected law-enforcement and telephone-company databases, which formed the basis for the racketeering acts underlying the RICO counts (which also included acts of bribery under state law), as well as separate counts of honest-services wire fraud, unauthorized computer access of United States agency information, identity theft, and computer access fraud.  The second group, counts 67-77, charged Pellicano, Turner, Kachikian and Nicherie with the illegal acquisition of confidential information through wiretapping.[4]  Although there was substantial factual and evidentiary overlap between the two groups (as they often involved the same investigative matters and victims), this factual statement will follow the same conceptual framework.

    1.   RICO/Computer Information Counts

        a.   Anthony Pellicano

Pellicano was the owner and president of Pellicano Investigative Agency ("PIA").  (GERT 940, 2148).  PIA charged clients a non-refundable $25,000 retainer, and its fees often escalated into the hundreds of thousands of dollars.  (GERT 2669-70, 2694-95, 2824-26, 3637, 4362-63, 4397-98).  PIA commanded premium fees because it served as the hub of a carefully structured and efficiently operating criminal enterprise that

---

[4]  The final count (78) charged Turner with false statements to the FBI.

9

trafficked in confidential information illegally acquired largely from paid sources in local police departments and phone companies that PIA's wealthy clients found immensely valuable.  (GERT 4673-75).

    b.   <u>Mark Arneson</u>

    (1)   <u>The Government's Case</u>

Sergeant Mark Arneson was a 29-year LAPD veteran who, during the period set forth in the indictment, was assigned to the Pacific Division's vice unit as an assistant watch commander. (GERT 1869, 1885, 1874, 5352, 5434-35).  Starting no later than 1996, Arneson served as PIA's LAPD source, whom Pellicano paid handsomely for providing PIA with confidential information compiled and maintained by federal and state governments in restricted law-enforcement databases (<u>e.g.</u>, NCIC and CLETS).[5] (GERT 2177-78, 2193-94).  Arneson received monthly $2,500 bribes totaling over $190,000 from 1997 through 2002, plus frequent additional cash payments.  (GERT 981, 2915-16, GEX 2113-91, 2966-68).

---

[5]  Another PIA source was Beverly Hills Police Department ("BHPD") Officer Craig Stevens, who cooperated and pled guilty to seven felony counts, including honest-services fraud, computer fraud, and false statements.  (GERT 4567-68, 4584-85, 4588). Pellicano paid Stevens to provide confidential criminal-history and DMV records from access-restricted law-enforcement databases. (GERT 4569-77, 4586, 4596).  Lily LeMasters, Pellicano's longtime executive assistant, testified PIA obtained approximately 80% of its law-enforcement information from Arneson and 20% from Stevens. (GERT 2161, 2195).

In return for these payments, Pellicano, as often as several times a day, paged Arneson using a prearranged code and provided Arneson with the names, addresses, dates of birth, or license-plate numbers of PIA investigative targets.  (GERT 973, 1680, 2159-61, 2178-82, 3432, 3438).  Arneson, in violation of the law and his sworn duties, accessed restricted law-enforcement and DMV databases to obtain confidential reports on the targets, then provided that information to PIA.  (GERT 972-79, 2185, 3433, 4030-32).

The jury heard recordings, recovered from Pellicano's computer, of conversations between Pellicano and Arneson.  In one recording, Pellicano asked Arneson to run a driver's license; Arneson agreed, saying he was off duty but would swing by the station to conduct the inquiry, which he did.  (GERT 2778-89). In another, Arneson provided Pellicano with an individual's residence and criminal-history information, then said he would "tap into" FBI records to obtain more information, which he did. (GERT 3935-36).  In yet another, Arneson provided Pellicano with criminal-history and DMV information regarding decedent Sandra Rodriguez, the victim in a manslaughter case involving PIA client Kami Hoss, who was accused of drugging Rodriguez before her fall from a hotel's upper floor.  That recording established Arneson knew what the case was about: he referred to Rodriguez as the

"victim" and opined that her DUI conviction was "pretty consistent."[6]  (GERT 5197, 5220-28, GEX 12-18).

To conceal Arneson as the source of this information, PIA employees, per Pellicano's instructions, digitally modified the background of DMV photographs and reformatted the criminal-history and DMV reports into PIA computer files, deleting all references to Arneson.  The original documents were then shredded.  (GERT 972-75, 979, 2162-67, 3434-35, 4032-33). Arneson similarly sought PIA office manager Tarita Virtue's assurance that his faxes were being handled discretely, and she assured him the materials he provided regularly were shredded.[7] (GERT 1162-63).  PIA employees also were instructed not to include Arneson's calls in PIA's phone log.  (GERT 971, 2174, 3432-33).

The government introduced LAPD Internal Affairs' audits of Arneson's database inquiries for 1999 through early 2003, showing inquiries performed using Arneson's unique LAPD serial number and password.  (GERT 1835-41, 4750, GEX 871-2028).  The audits identified the date and time of each query, the computer terminal

---

[6]  Pellicano then provided Arneson with names and license-plate numbers of three prosecution witnesses, all of whom became subjects of Arneson's confidential-database inquiries later that day.  (GERT 5209-11, 5225-28).

[7]  Notwithstanding these precautions, an employee scanned several criminal-history and DMV reports bearing Arneson's name, which agents found on PIA's computers.  (GERT 975-76, 3436-38, 4845, 6082, GEX 790-99, 841-53).

12

from which the query was made, the user's serial number (all
queries bore Arneson's number), and the particular law-
enforcement databases accessed.[8]  (GERT 1841-46, 4751-58, GEX
2028-33).  By comparing the audit with reformatted criminal-
history and DMV information recovered from PIA's computers,[9]
PIA's investigative files, and witness interviews, the FBI
identified 345 PIA investigative targets on whom Arneson
performed over 2,500 individual database inquiries.  (GERT 6034,
6080, 6204-05, 6232).  Those numbers unquestionably understate
the scope of Arneson's conduct, as Internal Affairs could not
audit inquiries conducted before 1999, and the FBI could not
identify every PIA investigation, target, or witness whose
confidential information Arneson accessed during the audited
period.  (GERT 1834-35, 6081).

The audit, witness testimony, and materials seized from PIA
showed Arneson repeatedly providing PIA with confidential
information on investigative targets (and their spouses, parents,
children, siblings, in-laws, friends, boyfriends, ex-boyfriends,
boyfriends' parents, neighbors, roommates, employees,

---

[8]  Detailed informational reports (e.g., rap sheets) are
sent in response to each specific request.  (GERT 1846-49, 1853-
54, 1902-04, 1945-46).

[9]  GERT 1781-85, 2399-2401, 2378-83, 2410-12, 2479-82, 2583-
84, 2922, 3402-03, 3743-45, 3941-44, 4172-73, 4321-22, 4340-44,
4345-46, 4402-07, 4658-61, 4845, 4912-15, 5025-28, 5211-12; GEX
354-62, 382-415, 419, 495-507, 519-26, 583-626, 733-41, 743-47,
759-71, 786-99, 817-21, 2593-2625, 2650-2700, 2821-31.

accountants, clients, witnesses, and lawyers) involved in ongoing criminal matters.

For example, PIA client John Gordon Jones, the defendant in a case investigated by the LAPD and prosecuted by the Los Angeles District Attorney's Office ("LADA"), was charged with raping nine women, referred to as Jane Does #1-9.  (GERT 1751-52, 1756).  Arneson accessed restricted law-enforcement databases to acquire confidential information on seven of the Jane Does, their friends and relatives, and numerous prosecution witnesses.  (GERT 1761-81).  The subjects of those inquiries faced harassment, including a threat to arrest a victim's boyfriend on an outstanding traffic warrant,[10] that the prosecuting attorney, Karla Kerlin, testified weakened the victims' resolve to proceed with the case.  (GERT 1759-62).  Information obtained from Arneson's inquiries on the Jane Does also was used in an unsuccessful effort to influence the LADA's charging decision and to cross-examine a prosecution witness at trial.[11]  (GERT 1757-59, 2403-04).

---

[10]  This was no idle threat.  In PIA's representation of Adam Sender, Arneson, after speaking with Pellicano, sought to execute a four-year-old probation warrant against Patrick Theohar, a witness who had signed a declaration adverse to Sender's litigation position.  (GERT 3813-19, 6708-09).  Theohar promptly changed his declaration, modifying the section to which Pellicano objected.  (GERT 3834; GEX 2636-38).  Similarly, Pellicano had Stevens file a complaint against another target's son, gleefully advising the client the charge would forever be on the victim's record.  (GERT 3657, 3661-62).

[11]  Documents obtained from Jones' defense file show
(continued...)

14

Two years later, Arneson conducted inquiries on the minor complainant (as well as her parents, boyfriend, and employer) in an LAPD-investigated and LADA-prosecuted sexual assault case against PIA client George Kalta. (GERT 4166-67, 4289-90, 4332-39). And Arneson conducted over 200 criminal-history and DMV database inquiries over two days on the co-defendants and victims in PIA client Mark Cohn's Baltimore fraud indictment. (GERT 4793-94, 4844-46, 4852-53, 4856-58, 8077; GEX 1647-1994). Pellicano, in a recorded call, can be heard providing Cohn with criminal-history information obtained from Arneson, telling Cohn that he was not supposed to have the records, that he could not let anyone know he was accessing the information, and that the information had been "extremely expensive." (GERT 4825-51).

Arneson also conducted hundreds of inquiries seeking similar confidential information on parties and witnesses to PIA-related civil litigation. (GERT 1071-72). For example, in separate lawsuits brought against Pellicano client Brad Grey by Garry Shandling and Vincent "Bo" Zenga, Arneson conducted extensive inquiries on the individuals Grey's attorneys planned to depose -- with one inquiry conducted the morning of the deposition. (GERT 1858-61, 2353-56, 2577-79). In a recorded conversation

---

[11](...continued)
Pellicano was also tasked with gathering compromising information and photographs on Kerlin to "take [her] out." (GERT 1286-87, 1306-07; GEX 2627-29).

15

pertaining to another civil case, Pellicano provided his client with information, obtained minutes before from Arneson, regarding a witness who was about to testify adversely to the client in a child-custody dispute.  (GERT 4382-89).

Numerous witnesses -- many of whom were victims or witnesses in PIA clients' criminal matters, or who opposed PIA clients in civil litigation -- reviewed the audits and identified Arneson's computer inquiries targeting them.  None had interaction with Arneson or the Pacific Division during the relevant period. Likewise, none had given Arneson permission to obtain, or to provide to PIA, government-compiled records documenting their confidential personal information.[12]

(2)  Arneson's Testimony and Cross-examination

Arneson, who the court found "lied almost from the moment he took the stand and throughout his testimony," testified in his defense.  (JER 4903).  Arneson advanced a series of lies designed to absolve him of criminal liability.  His testimony was uncorroborated by a single witness or document on any material point and was contradicted by the rest of the trial's evidence. Somewhat remarkably, Arneson's statement of "facts" on appeal

---

[12]  GERT 619-22, 1552-59, 1764-80, 2372-77, 2396-2409, 2412, 2416-20, 2474-79, 2507-08, 2524-29, 2573-83, 2714-20, 2896-2901; JER 2002, 2107-08; GERT 3346-56, 3400-04, 3738-42, 4170-71, 4289-91, 4320-21, 4333-39, 4344-45, 4386-89, 4400-02, 4656-58, 4909-12, 5019-24, 5208-11.

16

continues to advance the very testimony the court found perjurious.[13] (JOB 14-18).

Arneson claimed the Internal Affairs audit contained inquiries he could not have conducted, which could only be explained by another officer coopting his serial number and password. (GERT 5380-81, 5544). As an example, Arneson (in testimony the court found willfully false, JER 4903-04) claimed he was "30,000 feet in the air coming back from Mexico" when a query of his wife's license plate was made.[14] (GERT 5380).

To defeat the bribery charges, Arneson (in testimony the court found "spurious" (JER 4910-11)) asserted that he never received money in exchange for these inquiries, that Pellicano never paid him in cash, and that the $2,500 monthly checks he received were for security, bodyguard, surveillance, and civil "case analysis" services provided to Pellicano, as well as for being "on call 24 hours a day" to "discuss" with Pellicano all

---

[13] This was not the first time a court commented adversely on Arneson's credibility. In one civil rights suit while Arneson was still with LAPD, District Judge Edward Rafeedi raised concerns that Arneson had fabricated a warrant verification in "whole cloth." APSR ¶ 127(a); John Johnson, Charges of Police Lying Haunt Cases, L.A. Times, Dec. 6, 1996, available at 1996 WLNR 5139091 (discussing that case and others).

[14] Arneson's counsel laid the groundwork for this claim by questioning Internal Affairs Detective Helen Lim whether she determined if runs shown on the audit were done while Arneson was out of the country and whether the audit reflected instances when others used Arneson's serial number and password. (GERT 1890-91, 1895-96).

issues other than the furnishing of law-enforcement information. (GERT 5359-61, 5366-74, 5386, 5396-98, 5440-54).  To defeat the honest-services and computer-fraud charges, Arneson (in testimony the court called "incredible," JER 4911) alleged good faith: Arneson testified that he had a "quid pro quo" relationship in which he provided Pellicano with this information and Pellicano provided him not with money, but valuable tips Arneson used to further vice investigations.  (GERT 5354, 5398-5401, 5488). Arneson further testified that while he now recognizes that he "crossed the line," he believed at the time his actions were "for the good of a greater cause."  (GERT 5353, 5492).

What little of Arneson's credibility remained after his incredible direct-examination testimony was stripped away during his two-day cross-examination, when Arneson repeatedly: (1) was forced to admit that he had, in his preferred euphemistic words, "misrepresented" facts and told "falsehoods" and "mistruths" (GERT 5408-09, 5516, 5662); and (2) had the falsity of other testimony established through admitted evidence or obvious inferences.  Arneson basically admitted telling lies to his employers, the FBI, and most notably, the jury.  For example:

● When informed that immigration records showed he was not "30,000 feet in the air" but had cleared customs two-and-a-half hours before the inquiry was made on his wife's license

18

plate, Arneson responded that his earlier testimony on this issue had been "facetious."  (GERT 5599-5603).

●    Although Arneson testified that Pellicano was a valuable law-enforcement source, Arneson conceded that before being charged in this case, he twice represented the exact opposite to be true.  First, Arneson wrote LAPD Lieutenant Donald Hooper, who was facilitating Arneson's transfer to the Organized Crime and Vice Division ("OCVD"), that "Pellicano at no time provided insight on any case involving criminal activity" and "[n]o criminal cases or issues involving law enforcement were reviewed or discussed."[15] (GERT 5497-98, 5504-05).  Later Arneson told the FBI in a July 2003 proffer session that: (1) no LAPD cases were initiated on information provided by Pellicano; (2) no information attributable to Pellicano ever appeared in any LAPD affidavit (GERT 5501-03, 5664, 6086); and (3) the PIA-directed database inquiries were unrelated to any identifiable law-enforcement purpose.  (GERT 5607-08).

---

[15]  Arneson admitted that the Hooper letter contained "a series of lies," including his representation that his contact with Pellicano was "sporadic" and that his listing in Pellicano's address book was solely to facilitate pickups of LAPD audio evidence that Arneson submitted to PIA for forensic analysis. (GERT 5498-5500, 5508, 5661-62, 5731-34, 7634-37, 7641, 7643). On this latter point, Arneson's testimony that he brought LAPD audiotapes to PIA over 50 times for free analysis, enhancement, or duplication (GERT 5357, 5413-14) was flatly contradicted by Virtue, LeMasters, and Reynolds (the lab's manager), who worked at PIA for a combined seven years and could recall only one such instance.  (GERT 940, 1138-39, 1181, 2147, 2363-64, 3990-91, 4039-40).

● Arneson admitted telling the FBI a "mistruth" when he claimed he could not recall going into an LAPD station on a day off to conduct PIA-directed inquiries, and when he claimed he conducted only 50-100 database inquiries for Pellicano in total. (GERT 5516-19).[16]

● Although Arneson testified that he had a "ground rule" against providing Pellicano with "any information dealing with an active law enforcement or LAPD case" (GERT 5362), the documents (GEX 567-79, 583-610, 786, 821, 2560-2626), recordings (GEX 13-18, 146-70, 252-77), and witness testimony (GERT 1765-81, 5538-41, 4333-39, 5207-12) established he routinely did, including in the Cohn, Hoss, Jones, and Kalta matters.

● Although Arneson testified that a document recovered from PIA's computers showed the inquiries on reporter Anita Busch were conducted on May 29, 2002 (which did not correspond to the inquiries on his audit), he conceded on cross-examination that it actually showed that the inquiries were conducted on May 16, 2002 (which matched his audit).  (GERT 5455, 5638-47).

● Although Arneson testified that an example of Pellicano's significant law-enforcement contributions was his efforts in attempting to secure fugitive "Leo" Portocarrero's return to the United States, recorded conversations played during

---

[16]  Evidence established Arneson conducted over 100 inquiries for Pellicano in a single day.  (GERT 8077).

cross-examination included Pellicano: (1) advising Portocarrero, a PIA client, to remain abroad (GERT 5462-70, 5679);[17] (2) instructing Portocarrero that Pellicano needed $100,000 to access government databases and find out "who the rats are" (GERT 5690); (3) passing information to Portocarrero about LAPD's and FBI's criminal investigation, including the identity of a possible "rat" who was the subject of Arneson's inquiries the previous day (GERT 5673-85, 5688-94); and (4) informing Portocarrero that he was "gonna get a copy of all the stuff that they seized . . . in the computers" (which Arneson's direct testimony claimed was

---

[17]   This testimony led to one of Arneson's most transparent lies.  Arneson's testimony apparently irked Pellicano, who regularly boasted about his Italian organized crime connections and his contempt for "rats."  (GERT 2075-76, 3004-06, 3809, 4516-17, 5462-79, 5678, 5682-83, 5712).  Immediately following the next recess, Arneson's counsel sought to "clear up" a "misperception" by eliciting that Portocarrero was not an Italian surname, that Pellicano had a rule that he would never tell Arneson anything about people with Italian surnames, and that Pellicano never acted as "an informant or a source with respect to any Italian-based organized crime."  (GERT 5481-83, 5796).  Arneson's testimony was directly contradicted by his own prior testimony, including testimony that Pellicano provided him with source information on Paolo Rossi and Lenny Passafaro, whom Arneson identified as Italian organized crime associates.  (GERT 5459-60, 5476-79, 6209-11).  The jury also heard a recorded conversation involving Rossi's and Passafaro's associate, Mike Sportelli, in which Pellicano informed Sportelli that the case (to which Arneson was assigned) had "already gone to the DA [and] FBI," that Pellicano needed $25,000, and that he had an "insurance policy" so that "anytime your names come up, they tell me, and I can warn you."  (GERT 5701-02, 5707-13).

provided to PIA for legitimate forensic analysis).  (GERT 5462-64, 5837-42).[18]

• Although Arneson claimed never to have known Pellicano's clients' identities or why Pellicano wanted particular individuals investigated, he was forced to concede on cross-examination that he knew the clients' identities in the three instances where his conversations with Pellicano were recorded.  (GERT 5362, 5394, 5520-27, 5593).

• Arneson testified unequivocally on direct examination (in direct contradiction to other witnesses' testimony) that he told Pellicano he could never accept money to access confidential information from restricted law-enforcement databases and that the $2,500 monthly payments from Pellicano were used to pay off-duty officers Arneson hired for specific security or bodyguarding

---

[18]  Arneson conceded that he also disclosed to Pellicano the existence of LAPD's ongoing undercover operation and the identities of the undercover officers involved.  (GERT 5806-08). Arneson called two of the undercover officers as character witnesses; both testified they were unaware Arneson disclosed their operation to Portocarrero's investigator and that such a disclosure would have endangered them.  (GERT 6159-60, 6178). These two officers, as well as a third who also was supervised by Arneson, testified Arneson never identified Pellicano as a source and that they were unaware of any vice investigation involving information from Pellicano.  (GERT 6160-62, 6181-85, 6198-6200). Arneson conceded he never documented in any LAPD report or memo any information that he supposedly received from Pellicano and never told any of his supervisors, partners, or squad members Pellicano was a source.  Arneson therefore acknowledged that the jury had nothing but his word that Pellicano was a source.  (GERT 5501, 5503-04, 5663-64).

22

details at $25/hour.  But the government introduced additional
checks representing itemized payment for specified hours on the
very security jobs Arneson claimed were paid for by the $2,500
checks.  (GERT 5371-73, 5397-98, 5717-23).  Arneson claimed he
subcontracted the work through his business "Mark Enterprises,"
and kept payroll, paid taxes, and issued 1099s.  But Arneson
admitted having no records to verify any work done for Pellicano
in exchange for any of the $2,500 checks.  (GERT 5359-60, 5723-
24, 5728-29).  In fact, Arneson admitted he could not identify
legitimate work done in exchange for any of the ten $2,500 checks
charged as bribery acts in the RICO count.  (GERT 5727-30).

- Although Arneson testified he believed the work he did
for PIA served Los Angeles' greater good, he admitted on cross-
examination that he had not believed at the time that his actions
benefitted those citizens whose confidential information he
accessed and provided to Pellicano, and that he further knew at
the time his conduct violated LAPD policy and state law.  (GERT
5540-41, 5772-78).

- Arneson, who conducted his countless database inquiries
(including those in the Cohn and Hoss criminal cases) while on
duty, falsely accounted on his Sergeant's Daily Reports for hours
spent on PIA-directed inquiries with entries like "administrative
duties."  (GERT 5527-29, 5538-45, GERT 5603-07, 5609-18, 5656-
57).

23

Cross-examination also highlighted how Arneson's story repeatedly changed as he saw the evidence against him.

- To bolster his claim that he never was paid to access-restricted law-enforcement databases, Arneson denied having acknowledged in his 2003 proffer that, in hindsight, at least a portion of the $2,500 monthly payments he received from Pellicano covered the inquiries he conducted. (GERT 5725, 6074-76). (Nonetheless, Arneson's counsel cited Arneson's 2003 "hindsight" admission at sentencing as evidence that Arneson accepted responsibility. (GSER 748)).

- In advance of his July 2003 proffer session, Arneson (through his attorneys) advised the government that his inquiries of Busch were based on having obtained her name through a legitimate license-plate inquiry. After being informed that he had not run Busch's license plate, Arneson claimed at the proffer that he ran her name because he saw her frequenting two restaurants associated with a gambling investigation. When Busch testified she not had been to those restaurants, Arneson changed his story again, testifying that it was "very possible" he had done the inquiry for Pellicano. (GERT 4912, 5647-54, 5656-60). Arneson's testimony regarding his inquiries of Theohar[19] and the

---

[19] Arneson told the FBI pre-indictment that he did not recognize Theohar's name, did not remember making any database inquiries on that name, and did not recall anything about the

(continued...)

Jones victims[20] similarly evolved to meet damaging facts introduced against Arneson at trial.

Arneson's lies were such that, cumulatively, the court, which then had eleven years experience as a trial judge, stated: "as much testimony as I have seen from the stand, Mr. Arneson really took me aback in the nature and scope of his perjurious testimony." (JER 4903).

    c.   <u>Rayford Turner</u>

Ray Turner was an SBC field technician for over 20 years.[21] (JER 1933, 2007, 2354). Before his December 2001 retirement,

---

[19](...continued)
attempted arrest of Theohar. At trial, Arneson provided detailed testimony about how the Theohar inquiries and his attendant response adhered to legitimate law-enforcement policy. (GERT 5460, 5747-48, 5619).

[20] According to Arneson, he was "irritated" that Pellicano sought information on a pending LAPD case, reminded Pellicano of his "ground rule" that he would not provide information on LAPD cases, and demanded that Pellicano get rid of the information. (GERT 5386-89). By this story, Arneson sought to provide a counter-explanation for an incident, to which several PIA employees testified, in which Pellicano directed his employees to remove and shred from PIA's files anything with Arneson's name on it. The employees testified that the shredding extended to all case files with information attributable to Arneson, and that it was ordered because of Pellicano's heated telephone call with the LADA and his resulting concern that a search was imminent. (GERT 2187-89, 2329-32, 3440-01, 3534-35, 4034-36). Arneson made no mention of this incident in his pre-indictment proffer, only conceding that he "probably" was the source of the Jones-related reports recovered from PIA. (GERT 5583-84).

[21] SBC, formerly Pacific Bell, later merged with AT&T. While the names sometimes were used interchangeably at trial (JER 2080), this brief calls it SBC.

25

Turner was assigned to SBC's Beverly Hills Central Office. (GERT 3268, 3270, 3292). Turner was PIA's primary telephone-company source. (GERT 969-71).

Like Arneson, Pellicano paged Turner using a prearranged code at least several times a week, dating back to 1996. (GERT 968-70, 2199, 2215, 3416-20, 4682-83). Like Arneson, Turner would then fax or hand-deliver to PIA confidential SBC information -- including telephone records and handwritten lists of names, addresses and telephone numbers -- that PIA employees reformatted into PIA computers. (GERT 941-42, 969-71, 1428-30, 1452, 2176-77, 2204, 2326, 3421-22, 4685). As with Arneson, PIA employees were instructed not to enter Turner's calls into PIA's phone log. (GERT 971, 2174, 3432-33). And like Arneson, Turner was paid by Pellicano in checks and cash for the information he provided. (GERT 982, 1719-20, 2214, 2591-92, 4679-80, 4727).

As Turner lacked access to SBC's databases, he recruited SBC employees, including Michele Malkin and Teresa Wright, to assist him. Malkin, an SBC maintenance administrator for approximately 20 years, was terminated from SBC for improperly providing account information to Turner. (GERT 2353). Malkin testified that, before and after Turner's SBC retirement, Turner tasked her with acquiring from SBC databases customer and cable-pair

26

information, which she provided out of friendship.[22]  (JER 1913, 2351, 2355-56).  Malkin further testified that, after Turner's December 2001 retirement, he called Malkin only to obtain customer and cable-pair information.  (JER 2356).

Wright, who also was terminated from her 23-year SBC employment and pled guilty to computer fraud in connection with having aided Turner, admitted to accessing confidential SBC databases, including the Billing Operations Support System (BOSS), on Turner's behalf.[23]  (JER 1913, 1963, 2004, 2021-22, 2055).  Wright testified that on hundreds of occasions, both before and after Turner's retirement, Turner tasked her with accessing SBC databases to acquire subscriber names, telephone numbers, addresses, and toll records unrelated to SBC business. (JER 2007-12).  To conceal her illicit reason for accessing an account, Wright systematically entered the code "ERR" (for Error)

---

[22]  SBC Asset Protection Manager David Lopes testified that a retired phone company employee would have no legitimate need to access to cable-pair information, but that such information would be necessary to implement wiretaps.  (GERT 3257-58, 3288-89). Because the database that Malkin accessed for this information did not record employee access, SBC was unable to audit the subjects and dates of Malkin's admittedly unauthorized inquiries. (GERT 3263-66; JER 2351).

[23]  BOSS contains customers' names, addresses, telephone numbers, social security numbers, credit information, and current and archived toll records (i.e., records of calls made and received).  (GERT 3260-61, JER 2007).  Employees access BOSS with a unique user identification code and password and are required to enter a code reflecting the reason for accessing a customer's account.  (GERT 3262-63).

or "CHK" (for Check).  (JER 1978, 1983-92, 2013-21, 2088-89).
Turner paid Wright in checks and cash for this information.  (JER
2046-54; GEX 2364-85, 2974).  Customer information corresponding
to Wright's inquiries was recovered from PIA's computers.  (GERT
2584-85; GEX 527).

As part of her cooperation, Wright made a series of
consensually recorded telephone calls to Turner.  In the first,
Turner suggested that Wright falsely tell the FBI that the checks
he gave her were for her mother.[25]  (JER 2058-60).  In other
recorded calls admitted at trial, Turner: (1) told Wright that he
had not discussed the Pellicano investigation with her because he
thought she was "safe"; (2) asked Wright if the FBI identified
the date she accessed the Anita Busch account, which Turner
recalled was "close to two years ago"; (3) noted that Wright
previously told him that she had to enter a reason for accessing
a client account; (4) explained to Wright how wiretaps could be
conducted through a connection made at the SBC frame; and (5)
told Wright that he "would've been fired, too, no doubt about it"
had he not already retired from SBC.  (JER 2061-69).

---

[25]  Although the recording device malfunctioned, Wright
prepared contemporaneous notes of this conversation.  (JER 2058).

28

## 2. Wiretapping Counts[26]

### a. Anthony Pellicano

Pellicano supplemented the confidential law-enforcement and telephone-company information with the gold standard of confidential information: the real time, often privileged, communications of PIA's investigative targets. Pellicano did so through wiretaps. (GERT 2176-77). Pellicano's wiretapping activities were systemic: when offering a client wiretapping services in 2001, Pellicano said he "had been doing this for thirty years and never had a problem." (GERT 629) Pellicano openly discussed with other clients his use of phone company contacts to conduct wiretaps.[27] (GERT 4284, 4288).

To facilitate wiretapping, Pellicano, along with computer programmer Kachikian, designed, developed, and maintained

---

[26] While defendants challenge select jury instructions relating to the wiretapping charges, only Nicherie challenges the sufficiency of the numerous wiretapping convictions returned by the jury.

[27] Lopes explained that dial tones are generated at electronic switches within SBC central offices, where a pair of numbered wires for each individual telephone line (a "cable pair") connects to a main frame. From the frame, the wires travel underground until they resurface at street-side "B-boxes", where individual cable pairs attach to pairs of screws within the boxes. From the B-box, the wires run underground or across telephone poles until they reach a designated landline. (GERT 3279-87). Without access to cable-pair information, there would be no way to identify and tap into the particular pair on the frame or in a B-box that corresponded to a particular telephone line. (GERT 3282-83, 3287).

Telesleuth, a wiretapping program.[28]  To conceal Telesleuth's
illegally intercepted recordings, its recordings had multiple
levels of password protection.  Pellicano's Telesleuth passwords
commonly incorporated the word "omerta" -- the organized crime
code of silence.  (GERT 953-54, 4516-17).

Much of PIA's wiretapping occurred in PIA's locked "war
room," where computers running Telesleuth intercepted five or
more landlines at a time, all serviced by the Beverly Hills
central office that also serviced PIA.[29]  (GERT 957-61, 964,
1020-21, 1081, 1222, 1224-26, 1233-34, 3994-4000, 6745-46).
Every day, Pellicano would take removable hard drives storing
encrypted, intercepted calls from the war room and listen to them
in his office.  (GERT 4011-13, 4135-37).  Virtue said Pellicano

---

[28]  It was undisputed that Telesleuth was a wiretapping
program.  Kachikian's defense centered on his claim that
Telesleuth had been designed for sale to law enforcement (GERT
6629, 6639) -- a claim disproved by multiple PIA employees.
(GERT 968, 1265, 1683-84, 2223-24, 4038, 7041-42, 7045, 7065).

[29]  SBC employees use "jumper wires" or "half-taps" to
duplicate dial tone from one line to another.  (GERT 3290-32).
Lopes testified that an SBC employee with access to a central
office's frame could install a half-tap connecting one landline
to another landline on the frame, thereby creating an unknown
extension, or tap, on which all conversations could be monitored.
(GERT 3292-93).  When Lopes accompanied the FBI on its January
2003 search of PIA, Lopes found two "vacant pairs" of wires
connecting the Beverly Hills central office to PIA.  (GERT 3303-
06; JER 1895, 1976-77, 1979-81).  Lopes testified that a person
with access to cable pair information and the Beverly Hills frame
could run a jumper from any line serviced by that central office
to either of PIA's vacant pairs, thereby creating a tap.  (GERT
3306).

was "the only private investigator I have ever known who never left his office."[30]  (GERT 1159).

When Pellicano needed to wiretap a landline serviced by a different central office, he would have an employee identify the telephone junction boxes and rentable property in the target's neighborhood, so he could rent a location and install a Telesleuth-equipped computer to intercept and record calls[31] sent from a tap at the B-Box or central office servicing the targeted landline.  (GERT 960-63, 3856-62).  Multiple PIA employees testified that Pellicano implemented the Pasadana-based wiretap of real estate mogul Robert Maguire in this manner.  (GERT 2210, 4016-18).

While Pellicano personally listened to the wiretaps done for his most important clients, he tasked Virtue (and occasionally

---

[30]  None of the war room computers was searched or seized during the November 2002 search, based on agents' belief that they did not fall within the scope of the limited warrant.  (GERT 648-49, 945).  When agents searched PIA for evidence of wiretapping in January 2003, these computers were no longer present.  (GERT 745-50).  However, agents found in Pellicano's office a proprietary SBC document identifying the central office and frame for every telephone number in Southern California.  (GERT 3307-11; GEX 2524-59).  Lopes testified that there was no legitimate reason for a private investigator to have this information.  (GERT 3311).

[31]  To illegally wiretap a phone serviced by another central office, Lopes testified that a person possessing cable pair information could find a location serviced by the same B-box as the victim's landline and install a half-tap at the B-box.  (GERT 3294).

31

other PIA employees) with listening to and reporting on the other
wiretapped calls. (GERT 941, 949-50, 2212-13, 2220, 2227-37,
3426-27, 4692-94). Virtue identified multiple PIA investigative
matters in which she reviewed wiretapped conversations, sometimes
numbering in the thousands for a single matter. (GERT 1012,
1016-18, 1048-49, 1075-76, 1080-82). Corroborating Virtue's
testimony were wiretap summaries, prepared by Virtue and
recovered from PIA computers, detailing PIA targets' private
telephone conversations -- including privileged attorney-client
conversations. (GERT 1014-16, 1023-47, 1050-71, 1085-1110).
Wiretap victims testified that Virtue's summaries accurately
reflected their private telephone conversations. (GERT 2586-2606,
2893-95, 2911-22, 3359-60, 3710-19).

The jury also heard recordings, recovered from Pellicano's
computers, in which Pellicano offered wiretapping services to
clients, and told them what had been heard on the wiretaps they
had purchased. (GERT 626-30, 3554-58, 3560-62, 3566-69, 3647-49,
3661, 5129-49, 5154-81; JER 2393-95). Numerous PIA clients
confirmed that Pellicano offered to conduct, and did conduct,
wiretaps on their behalf and that he played for them wiretapped
calls involving their adversaries, many of which were attorney-
client or doctor-patient privileged communications. (GERT 634,
2677-87, 2814-16, 2818-24, 3552-54, 3559, 3576-77, 3596, 3614-17,
4167-68, 4180-81, 4258-59, 4264-65, 4287-88, 4367-69; JER 2000-

32

02, 2098-2102, 2390-92, 2395).[32]  As with the written summaries, victims of the wiretaps confirmed that the information relayed by Pellicano in these recordings accurately reflected the contents of their intercepted private telephone conversations.  (GERT 2790, 3404-05, 5154-81).

As with the historical law-enforcement records and phone company data, Pellicano frequently utilized wiretaps to influence litigation and subvert the judicial process on behalf of PIA's clients.  For example, client Robert Pfeifer, who pleaded guilty to aiding and abetting an illegal wiretap, testified that he hired Pellicano to wiretap ex-girlfriend Erin Finn to obtain information to discredit Finn and thereby, pressure Finn into recanting harmful deposition testimony she provided against Pfeifer in a business lawsuit.  (GERT 2802-03, 2812-16).  Through the wiretap, Pellicano acquired extensive information regarding

---

[32]  One actual wiretap recording was introduced at trial:  a recording of an intercepted telephone conversation between Lisa Gores and Tom Gores, the wife and brother of PIA client Alec Gores.  (GEX 46-70).  Alec testified that his retention of Pellicano included wiretapping Lisa (GERT 4367-68); both Lisa and Tom testified that the recording was an intercepted call between the two and Lisa further testified that Pellicano admitted to having wiretapped her in a failed effort to secure her reconciliation with Alec.  (GERT 3734-35, 3749-51; 3754-55).  No other wiretap calls were recovered, likely because Pellicano's standard practice was to wipe and reuse the removable hard drives containing intercepted conversations (GERT 1654-55), Pellicano frequently kept such recordings offsite (GEX 3381) and/or because Pellicano had two-months to "clean house" between search warrants, which Arneson noted in his 2003 proffer Pellicano had admitted doing.  (GERT 648-49, 745-50, 945; GSER 749).

Finn's prostitution business, which he and Pfeifer successfully exploited to secure Finn's recantation of her truthful testimony, which then led to a fraudulently obtained settlement. (GERT 2826-28, 2904-07; JER 2148-49).

Susan Maguire testified to Pellicano's glee after he intercepted her estranged husband's call to his therapist -- Pellicano believed he could exploit her husband's fragile mental state to secure a more favorable divorce settlement. (GERT 2673-78). Adam Sender, Andrew Stevens, Sandra Carradine and others likewise testified that Pellicano wiretapped their adversaries with the intent of influencing the outcome of ongoing litigation, and in doing so, intercepted privileged communications. (GERT 3617-18, 3652-53, 3546-63).

Wiretap victims, including attorneys Lawrence Nagler, Greg Dovel and Kissandra Cohen, testified that recordings and documents recovered from PIA documented intercepted attorney-client communications discussing fundamental aspects of their litigation strategy. (GERT 1050-61, 1069-71, GERT 3363-75). For example, Nagler testified that a recorded conversation between Pellicano and PIA client Kenneth Starr (who was adverse in a lawsuit to Nagler's client Sylvester Stallone) -- in which Pellicano relayed what witnesses Nagler planned to depose, what witnesses he was trying to locate, what the witnesses would testify to, the substance of declarations Nagler was preparing,

34

the difficulties Nagler was having in locating certain documents, Nagler's fee arrangement, and Stallone's "Achilles' heel" – accurately reflected Nagler's confidential telephone communications with Stallone.  (GERT 5129-49, 5154-81).

        b.  <u>Rayford Turner</u>

Turner not only obtained wiretap-supporting phone company information for Pellicano, but also implemented wiretaps.  (GERT 969, 1743, 2175-2216, 7215).  Employees observed Turner and Pellicano at the war room computers where many of the wiretaps were conducted, and in the hallway closet containing the building's phone lines and the "vacant pairs" linking PIA to the Beverly Hills central office.  (GERT 2201-02, 2301, 3303-06, 3417-19, 3462, 3479, 4688-89; JER 1895, 1976-80).  Pellicano and Turner were overheard discussing their concern that this phone closet had been accessed by an outsider.  (GERT 3422).  When Pellicano learned someone had been in this closet, he immediately

called Turner to PIA to inspect the closet.[33]  (GERT 3422-23, 3464-66).

Among the wiretaps Turner implemented was the Maguire wiretap.  (GERT 2205-09, 2345-46, 2685).  LeMasters testified that Pellicano brought her to a rented Pasadena apartment to check on the Telesleuth-equipped computer being used for this wiretap.  (GERT 2210).  While there, Pellicano called Turner, and following up on an earlier conversation, instructed Turner to come to the apartment.  (GERT 2211, 2594).  Reynolds testified that, at the end of the Maguire wiretap, he and Pellicano went to the apartment to retrieve the computer and Telesleuth interface box.  (GERT 4016-18, 4021-22).  When leaving, Pellicano called Turner, saying "You know that girl you have up for me?  Can you go ahead and take her down?"  (GERT 4019-20).  Pellicano used similar coded language with Turner on other occasions to refer to wiretaps.  (GERT 4020-21).

---

[33]  Turner's friend, Alphonse Arnold, testified that he assisted Turner with telephone work at PIA and observed Turner sweeping PIA for wiretaps.  (GERT 6487-90).  On cross-examination, Arnold acknowledged that he told the FBI nine months earlier that he had no idea what Turner did for Pellicano and had no association with Pellicano other than having once picked Turner up at PIA.  (GERT 7273-75).  PIA employees testified that they never saw Turner conducting repairs or sweeping for bugs, and that when phone repairs were needed, Pellicano secured an outside company to perform the work.  (GERT 1685-86, 1744-48, 2202).

A series of recorded phone conversations between Pellicano and Turner was played at trial.  In several of them, Turner discusses being assisted by a female SBC employee (code-named "Fannie Mae") with access to the frame to facilitate wiretaps.[34] (GERT 4152-65, 6321).  For example, in one call, Pellicano asked Turner to check if "Fannie Mae" could "hook up" a guy on Franklin Avenue in Hollywood.  (GERT 4153).  In another, Pellicano gave Turner a telephone number, instructing him to "[s]ee if she can get that . . . on 5 immediately."  (GERT 4164-65).

The jury also heard a recorded telephone conversation dated April 11, 2002, in which Pellicano told Turner that he learned (apparently from intercepting a telephone conversation of PIA employee Laura Sanchez) that PIA employee Gaye Lynn Palazzo "documented everything that she did for [Pellicano] and even the illegal stuff she did with Ray and all the stuff that Ray did for [Pellicano]."  (GERT 1635-38).  Pellicano told Turner he was "concerned," and that "if any of this is true, we gotta do something about this immediately."  (GERT 1639-40).  Turner replied, "I . . . doubt that she would rat on us.  She . . . told me . . . she would never mess with you cause she's . . . afraid of you."  (GERT 1640).  Turner assured Pellicano that he "never told [Sanchez] what I did."  (GERT 1641).  After directing Turner

---

[34]  While not addressed in this trial, evidence reflects that "Fannie Mae" was SBC facilities technician Joann Wiggan.

37

to determine whether Palazzo was talking, Pellicano concluded by saying, "I got some other things for Fannie."  (GERT 1641-42).

      c.  <u>Kevin Kachikian</u>

Kachikian was instrumental in every aspect of Telesleuth's creation, refinement, use, and concealment.  Kachikian, assisted by Pellicano, designed Telesleuth and Telesleuth Player (which was required to decrypt and play back the heavily encrypted audio files recorded with Telesleuth).  He also designed the interface boxes that connected telephone lines to Telesleuth-equipped computers, converted the telephone signal into recordable audio, and detected when the telephone was off-hook so wiretapping could take place automatically.[35]  (GERT 957, 2947-52, 2955-59 6742-46, 6998).  In the seven years between when he first manufactured Telesleuth and when Pellicano was arrested, Kachikian worked regularly with Pellicano updating and refining Telesleuth's code. (GERT 6635).  He conferred with Pellicano and Virtue regarding proposed modifications to ensure Telesleuth best served PIA's needs.[36]  (GERT 950-53, 956-57, 964-66, 1186-89, 4016-19).

---

[35]  Kachikian created a modified version of Telesleuth, Telesleuth Jr., that Pellicano used to record his own telephone calls, which was the source of the Pellicano-based calls recovered from PIA.  (GERT 6922, 7020-21).

[36]  For example, a document providing instructions for creating various Telesleuth versions said to call Kachikian with any problems.  (GERT 7022-23, GEX 2920-25).

38

Kachikian and Pellicano went to extensive lengths to ensure that Telesleuth could not be accessed by law enforcement. Kachikian embedded Telesleuth with numerous defense mechanisms: (1) a sophisticated "code wipe" feature that erased all recorded audio files (i.e., wiretapped calls) and the Telesleuth program itself and overwrote them with random data, thereby making the deleted data permanently unrecoverable, if a user made too many incorrect key presses or mouse clicks or pulled the plug as would be likely during and after execution of a search warrant (GERT 3029-39, 3042); (2) a detection program that identified when forensic tools were being used to probe or analyze Telesleuth and which shut down the program if such tools were detected (GERT 3043-44); (3) a code requiring a unique user-created passphrase for each recording, thus allowing only one person to access the encrypted wiretap recordings. (GERT 2998-3000, 3012-13, 3019, 3029).

Kachikian embedded Telesleuth Player with similar defenses. When the program was launched, the user saw only a blank screen, with the legend "System locked" and no prompt for a log-in or password. (GERT 3026-27). The program could be accessed only by holding down three specific keys and typing "LUCA" -- the name of Pellicano's son -- within a short time.[37] (GERT 3027-29, 7153).

---

[37] In a transparent lie, Kachikian attempted to support his
(continued...)

Kachikian's efforts to keep Telesleuth from law enforcement extended into this investigation.  Kachikian testified that when Pellicano asked him after the November 2002 search of PIA to return his copies of Telesleuth and to remove it from his computer, Kachikian immediately believed this request was related to Pellicano's arrest and the federal investigation.  (GERT 6975-76).  Kachikian deleted all Telesleuth-related files from his computer, destroyed his backup CD, and wiped the computer's hard drive to render the data permanently unrecoverable.  (GERT 6928-29, 6972-74, 6982-85).

d.  Abner Nicherie

In the summer of 2000, Abner and Daniel Nicherie aligned with Sarit Shafrir in a series of lawsuits against Sarit's husband Ami ("Shafrir").  (GERT 4416-18).  In August 2000, Abner told Sarit, with whom he was romantically involved, that he and Daniel hired Pellicano to wiretap Shafrir.  (GERT 4421-22).  Sarit drove Abner to PIA some 20 times from August 2000 through December 2000 so Abner could listen to and transcribe Shafrir's intercepted telephone conversations, which were in Hebrew.  (GERT 4427-28, 4434-36).  Abner, in turn, called Sarit from PIA and played her portions of intercepted conversations, including

---

[37](...continued)
contention that Telesleuth was intended for law enforcement use by testifying that "LUCA" was an acronym for "Law Enforcement Undercover Computer Application."  (GERT 7021-22).

Shafrir's strategy discussions with his attorneys.  (GERT 4436-40).  Abner made similar admissions to the FBI and DEA, in separate interviews.  (GERT 4519-23; JER 2707-08).

Other testimony corroborated these accounts.  Virtue testified that Pellicano advised her the Nicherie brothers hired PIA to wiretap a competitor and that he needed them to translate the intercepted calls from Hebrew.  (GERT 1074-75, 1359-60).  Thereafter, Virtue saw the Nicherie brothers listening to wiretaps at PIA several times a week through 2001.  (GERT 1007, 1075-78).  LeMasters and Reynolds likewise testified that the Nicheries would come to PIA and spend their time in the war room.  (GERT 2237-38, 2275-78, 4428-30).  Pfeifer, who befriended Pellicano after retaining him to wiretap Finn, testified that Pellicano complained how the Nicherie wiretap involved conversations in Hebrew that he needed the Nicherie brothers to translate for him.  (GERT 2832-33).

3.   The Pellicano Enterprise in Action - Anita Busch

Although much of the evidence regarding particular Pellicano investigations was necessarily presented at trial in a fragmented manner, it fit together to demonstrate a well-coordinated and ongoing criminal business.  A clear example is PIA's investigation and targeting of reporter Anita Busch, which led to the initial PIA search warrant and ultimately unraveled Pellicano's entire enterprise.

41

In April or May 2002, Michael Ovitz retained PIA to obtain embarrassing information about reporters Busch and Bernard Weinraub, who were writing negative articles about Ovitz in the New York Times. (GERT 4870-86). On May 15, 2002, Pellicano sent PIA employee Denise Ward to surveil Busch's residence and photograph the nearby B-boxes. (GERT 3876-78, 4918). The following day, May 16, 2002, Arneson conducted a series of database inquiries on Busch and Weinraub (including Busch's vehicle information) and requested their DMV photographs.[38] (GERT 1862-68, 1939-43, 4909-11, 4914-15, 5023-25, 6088-90, GEX 743-47, 2038). Also on May 16, Wright accessed the SBC BOSS database on Turner's behalf, obtaining information on Busch's two home telephone lines. (GERT 3325-27, JER 2020-21).

On the morning of June 20, 2002, Busch went to her car on the street outside her home and found the windshield punctured, a handwritten sign reading "STOP" facing into the driver's compartment, and a dead fish and a rose left on the windshield.[39]

---

[38] At the same time, Arneson conducted database inquiries and requested DMV photographs of James Casey (another individual whom Ovitz had hired PIA to investigate) and the parents, sister-in-law, and brother of Pamela Miller (the target of a separate PIA investigation). (GERT 1862-68, 1939-43, 4400-02, 4405-07, 4865-66).

[39] In a series of consensually recorded conversations with a cooperating witness over the ensuing weeks, an individual named Alex Proctor admitted that he committed the threat against Busch on Pellicano's behalf. (GERT 6065-66, 6073-74, 6220). In
(continued...)

42

(GERT 4920-23).  In August 2002, just days after returning to her home, Busch was threatened on this same street by two men in a plateless vehicle, one of whom held his finger to his lips as if to demand Busch's silence.  (GERT 4924-29).

Busch first noticed problems with her home telephone line shortly after Wright accessed her account on Turner's behalf. (GERT 4938-41).  When she reported the problem to SBC, the responding technician discovered an unauthorized half-tap connected to Busch's line on the frame at the central office; there were no SBC records of the half-tap, as would have existed if the half-tap were legitimate.  (GERT 3327-31, 4941-45, 5099-5100; JER 3049-53, 3056-58).  The half-tap found on Busch's line permitted the interception of Busch's telephone calls.  (JER 3066).  The half-tap was removed from that line, but a similar one was discovered -- also without any record or authorization -- on Busch's second line two weeks later.[40]  (GERT 3329, 3333-35, 4945-46; JER 3066-70).

---

[39](...continued)
October 2009, in Los Angeles Superior Court, Pellicano and Proctor pleaded to perpetrating the criminal threat against Busch, and were sentenced to three years imprisonment.

[40]  Government's Exhibit 101, a document recovered from Pellicano's computer, listed a number of phrases (the majority containing the word "omerta") that Virtue identified as his passphrases to access Telesleuth recordings for various wiretaps. (GERT 839-840, 954-56, GEX 333-34).  One entry, with the initials "AB" appeared next to the passphrase "Catholic Girl Reporter," which accurately described Busch.  (GERT 956, 5008).

B.    THE CHRISTENSEN WIRETAPPING TRIAL

The Christensen-Pellicano wiretapping trial began approximately two months after verdicts were returned in the RICO trial.  At the end of the roughly two-month trial, Christensen and Pellicano were convicted of both charged counts.  (GSER 153-56).

Christensen, who at the time of his conviction was the founding partner of a prominent Los Angeles law firm, does not challenge the sufficiency of the evidence in support of the jury's verdicts that he conspired to wiretap, and aided and abetted the wiretapping of, his litigative adversary Lisa Bonder-Kerkorian.  That evidence established that Christensen retained Pellicano to intercept Bonder-Kerkorian's most confidential communications, including privileged communications with her attorneys.  Pellicano, likewise, does not raise a sufficiency challenge.  As claim-specific facts are addressed in this brief's corresponding argument sections, the factual statement here will be brief.

In early 2002, Christensen was litigating a child support dispute between Bonder-Kerkorian and Christensen's longtime client, billionaire Kirk Kerkorian.  The dispute arose from Bonder-Kerkorian's request for a substantial increase in Kerkorian's monthly child support payments for four-year-old Kira Kerkorian.  (GERT 9570-71).  The matter was bitterly contested,

44

and eventually led to DNA results showing that Kira's biological father was Steve Bing.[41]  Christensen, who considered the proceedings a "war," was determined to so completely defeat Bonder-Kerkorian that she would never again seek money from Kerkorian.  (GEX 3212, 3066).

A central part of Christensen's strategy was identifying Kira's biological father to defeat Bonder-Kerkorian's request for increase child-support, obtain financial contribution from the biological father, and support criminal or civil fraud charges against Bonder-Kerkorian.  (GERT 9618-20, 11269-73, 10317). Pellicano was hired to obtain this information for Christensen by, inter alia, wiretapping Bonder-Kerkorian.  (GERT 13351-52). While unsuccessful in this task,[42] Pellicano did intercept conversation after conversation in which Bonder-Kerkorian discussed sensitive information with her attorneys, family, and friends -- information Pellicano funneled to Christensen for Christensen's use.

---

[41]  Though Bonder-Kerkorian submitted a DNA sample of Kerkorian's natural born child under Kira's name, the Kerkorian team eventually linked Kira to Bing, and served those testing results on Bonder-Kerkorian over Mother's Day weekend.  (GERT 9581-83, 12130-32).

[42]  A private investigator retained by Kerkorian's security officer determined paternity by pilfering Bing's dental floss from his trash.  (GERT 9653-55).  That person was paid just $25,000 to $30,000, while Pellicano received $100,000 for the Bonder-Kerkorian wiretap.  (GERT 12793; GEX 3662).

45

1.  <u>The Government's Case</u>

The case focused on 35 recorded conversations spanning the life of the Christensen-Pellicano conspiracy.[43]  The first call, from March 15, 2008, was a conversation between Pellicano and Dennis Wasser, Christensen's co-counsel in the Bonder-Kerkorian litigation.  Wasser told Pellicano that he had discussed hiring Pellicano with Christensen, and expected to discuss it with Kerkorian soon.  (<u>Id.</u>).  Wasser suggested that Pellicano contact Christensen directly to get hired, because the job would include targeting Bonder-Kerkorian's attorney, Stephen Kolodny, whom Christensen "hate[d]" for "report[ing Christensen] to the state bar."  (GEX 3387-88).

Pellicano spoke with Christensen three days later, at which time they agreed to wiretap Bonder-Kerkorian and the conspiracy began.  Christensen made clear that he knew the nature of Pellicano's intended services and that he had discussed the matter with Kerkorian.  (GEX 3014 ("Kirk and I were talking . . . [a]nd we were thinking about this situation[,] and um, he's out of it, right?")).[44]  Christensen worried that his co-counsel

---

[43]  These recordings were played at trial in their entirety both as direct evidence of the conspiracy and to rebut Christensen's claims of alteration.  Although interspersed throughout the trial transcript, the recordings' transcripts are also at GEX 3014-3384.

[44]  Christensen said he would pay Pellicano's standard
(continued...)

"don't want to do this," and told Pellicano that he would not talk "to Wasser or anybody about this." (GEX 3015-16). Pellicano promised that "I'm gonna be feeding you information . . . you'd never get in a million years." (Id.). The conversation concluded with Pellicano informing Christensen that, besides obtaining information on Kira's biological father, he also would give Christensen "other information [to] help you in this case," to which Christensen responded "I'll take it." (GEX 3020-21).

For the next two months, until agreeing to "shut" the "switch" on May 16 (GERT 3382-83), Christensen and Pellicano spoke regularly about the Bonder-Kerkorian wiretap. In call after call, Pellicano gave Christensen detailed summaries of Bonder-Kerkorian's telephone conversations, frequently quoting them directly (e.g., GERT 9958-59; GEX 3157-58); referencing the conversants' tone, inflection, and emotional state (e.g., GEX 3061, 3080); noting the exact order of her calls (GEX 3159); and expressing frustration at her phone manner and contradictions (GEX 3110). See generally Part IV.C.3.c, infra.

---

[44](...continued)
$25,000 retainer, but implied Kerkorian might pay Pellicano a potential $100,000 bonus. (GEX 3109-3023). In future calls, Christensen made clear he was sharing the results of Pellicano's wiretapping with Kerkorian. (GEX 3308, 3348).

Christensen responded in kind, affirmatively seeking
information on Bonder-Kerkorian's conversations with her lawyers:
"What do they think about getting their ass kicked on Friday";
"Who's going to represent [Bonder-Kerkorian] in Santa Monica?"
(GEX 3055, 3059).  When Pellicano was ready to end the wiretap,
Christensen decided to keep it going one more day, so he could
intercept Bonder-Kerkorian's communications with her lawyers on
one last subject: "it will be interesting to see what [Kolodny]
told her about what went on in chambers cause this time I was
there . . ."  (GEX 3305-06).  Pellicano agreed to undertake "one
more adventure" that night.[45]  (GEX 3374).

Pellicano did indeed provide Christensen "with information
that he would never get in a million years," to "help in
[Christensen's] case."  (GEX 3015-16, 3020-21).  By wiretapping
Bonder-Kerkorian's privileged communications with her attorneys,
Christensen learned of discord within Bonder-Kerkorian's legal
team, efforts to retain appellate counsel, a plan to seek
appointment of a guardian ad litem, Bonder-Kerkorian's
expectations and emotional state before and after significant
court proceedings, her settlement position for mediation, her
deposition strategy, the motions being prepared, the use of
professional writer to spruce up declarations, and Bonder-

---

[45]  As Pellicano referenced, the wiretaps were housed at an
offsite location.  (GEX 3381).

Kerkorian's statement that Bing was "another candidate" for
Kira's biological father.  See Part IV.C.3.c, infra; (GEX 3157).
Through Bonder-Kerkorian's privileged doctor-patient
communications, Christensen learned about her psychiatric
medications.  (GEX 3116).[46]

Pellicano and Christensen also discussed potential pitfalls
inherent in using illegally intercepted communications.  Though
Pellicano bragged there was "no way but for my unique techniques
that you would know this" (GEX 3119), he cautioned Christensen
not to expose their illegal techniques: "be very careful . . .
because there is only one way for me to know this."  (GEX 3055-
56).

Christensen likewise acknowledged that some information was
difficult to use because of its illegal source.  (GEX 3067
(noting need for "useable proof" of facts Bonder-Kerkorian had
admitted on a call with her lawyers' employee)).  Upon learning
from a wiretapped call about the other side's breach of a
protective order, Christensen (apparently without irony)
complained "I don't know how to bust 'em for it . . . ."  (GEX
3284-85).

---

[46]  The Christensen-Pellicano recordings also reflect that
Pellicano broke into Bonder-Kerkorian's physician's office and
stole her medical file, which included reports addressing a
miscarriage.  (GEX 3212-14).

49

Six attorneys, a physician, and several others testified
that the content of the Christensen-Pellicano recordings
documented the interception of Bonder-Kerkorian's telephone
calls.  For instance, Kolodny confirmed that the "another
candidate" conversation described by Pellicano accurately
described a call Kolodny had during that time-frame with Bonder-
Kerkorian.  (GERT 9630-31, 9645-46, 12059-63).  Mediator Debra
Simon testified that Pellicano's summary of her role in the
mediation and her personal plans while in Los Angeles matched her
confidential telephone calls with Bonder-Kerkorian or her calls
to others on Bonder-Kerkorian's landline.  (GERT 10296-302).
Kolodny's partners, Harlee Gasmer and Jeff Sturman, confirmed
that the recordings contained accurate summaries of their
attorney-client phone communications with Bonder-Kerkorian on
issues ranging from their assessment of the judge's view on
Bonder-Kerkorian's credibility to discussions regarding motion
practice, appointing a <u>guardian</u> <u>ad</u> <u>litem</u>, and settlement
strategy.[47]  (GERT 10889-900, 12091-01, 12224-26).  Robert Rein
testified that the recordings accurately portrayed his phone
conversation with Bonder-Kerkorian regarding his research on
attorney-client privilege.  (GERT 10591).  Kelli Sager testified
that the recordings addressing an appellate matter and her

---

[47]  Billing records corroborated those calls' timing and the
subject matter discussed.  (GEX 180-81).

potential role in the mediation involved her private, privileged phone communications with Bonder-Kerkorian.  (GERT 9857-69, 9983-84).  Psychiatrist David Chase testified that the call in which Pellicano told Christensen about Bonder-Kerkorian's medications summarized Dr. Chase's and Bonder-Kerkorian's privileged phone communication.  (GERT 10809-13).

As in the RICO trial, the government also introduced employee, agent, and expert testimony about Telesleuth and the PIA seizures.  This included recordings, documentary evidence, and testimony establishing Pellicano's capacity to wiretap and the execution of the Bonder-Kerkorian wiretap.  The government introduced evidence of wiretaps that occurred through and after Turner's retirement from SBC, to rebut Christensen's claim (already disproven in the RICO trial) that Pellicano lost the capacity to wiretap when Turner retired.

## IV

## ARGUMENT

A.   THE CHALLENGES TO THE SEARCHES FAIL

Pellicano and Christensen challenge two search warrants and searches of PIA's offices and computer data.  With respect to the November 2002 warrant and search, Pellicano and Christensen argue the warrant lacked probable cause because the affidavit failed to establish a Hobbs Act element deemed necessary by Scheidler v.

51

NOW, Inc., 537 U.S. 393 (2003), and they claim they were wrongly denied a hearing under Franks v. Delaware, 438 U.S. 154 (1978). With respect to the July 2003 warrant and search, Christensen and Pellicano argue the warrant and search were overbroad and unparticular.

Christensen cannot challenge either warrant, because he lacks standing in PIA's premises and computer data.  Pellicano's challenge to the November 2002 warrant is barred by collateral estoppel, because he unsuccessfully challenged the same warrant before this Court in his 2002 explosives case.

The challenges also fail on the merits.  The probable-cause challenge to the November 2002 warrant fails because the law at the time of the search was sufficiently unclear that agents relied reasonably on the Chief Magistrate Judge's probable-cause finding, as this Court previously found.  The denial of a Franks hearing must also be upheld, because the affidavit contained no intentional or reckless misrepresentations and the challenged statements were immaterial to probable cause.  The July 2003 warrant and search, in turn, properly targeted PIA's known crimes, and agents reasonably relied on the judge's assessment of the warrant's specificity.

1.  Facts

The facts, stated accurately, paint a far different picture than the portrayal in defendants' briefs.

52

a.    <u>Warrants and Searches</u>

(1)    <u>The November 2002 Warrant and Search</u>

In November 2002, FBI Special Agent Stanley Ornellas applied to Chief Magistrate Judge Robert Block, requesting a warrant to search PIA's offices for evidence of violations of 18 U.S.C. §§ 1951 (the "Hobbs Act") and 371 (Conspiracy), arising from the June 2002 attack on Busch's car.  (JER 14-53).  Ornellas' affidavit was based largely on recorded conversations between Alex Proctor and a cooperating witness ("CW"), in which Proctor, who provided details "that a secondhand source was unlikely to know," told the CW Pellicano hired him to threaten Busch.  (JER 168).  The affidavit included summaries of the recorded conversations and of telephone records showing contact between Pellicano and Proctor leading up to the Busch threat.  (JER 29-33).  The affidavit also contained information about separate threats against a person named Ned Zeman.  (JER 33-36).

The judge found probable cause and issued a warrant (the "November 2002 warrant") to search PIA and seize evidence of the statutory violations.  The warrant and attachments included a computer-search protocol and procedures for handling potentially privileged material.  (JER 16-18, 44-51).

The warrant was executed that week; computers, hard drives, and other data-storage devices were seized.  The search team also found hand grenades and plastic explosives, which they seized

53

under a follow-up warrant.  (JER 55).  Pellicano was prosecuted and convicted on explosives charges in United States v. Anthony Pellicano, Case No. CR 02-1278-DT (the "2002 Explosives Case"), while investigation continued into his other crimes.

(2)  The January 2003 Warrant

The continued investigation uncovered far broader criminal activity, including wiretapping.  A confidential informant described PIA's Telesleuth wiretapping software; a witness described hearing conversations Pellicano had wiretapped; and technicians discovered a "half-tap" on Busch's line.  (JER 109-14).  Ornellas applied for a new warrant based on a new affidavit.

Magistrate Judge Suzanne Segal found probable cause and issued a warrant in January 2003 (the "January 2003 Warrant"), authorizing agents to search computer media previously copied in the November 2002 search, and to search PIA for additional items not previously taken.  (JER 77-82).  The warrant authorized seizing documents reflecting the interception of or ability to intercept telephonic communications; audio recordings of telephonic conversations involving Busch, Ami Shafir, and Dale Walker; and certain telephone equipment.  (JER 80).  In a handwritten emendation, the warrant authorized seizing client files "only pertaining to . . . Julius Nasso; Steven Seagal; [the Nicherie brothers]; . . . Busch; [and] . . . Shafrir."  (Id.).

54

When agents executed the January 2003 warrant, they found PIA's computer and storage equipment were mostly removed or destroyed.

(3)  <u>The July 2003 Warrant</u>

Continued investigation showed Pellicano wiretapped and purchased confidential law-enforcement records as a matter of course.  In July 2003, based on an affidavit by Agent R.T. Ballard, III (JSER 315-79), the government applied for another warrant (the "July 2003 Warrant").

Ballard's affidavit contained copious evidence of PIA's crimes.  PIA employees detailed PIA's wiretapping of multiple targets.  (JSER 351-54, 356, 360, 363-64).  PIA clients confirmed listening to adversaries' calls intercepted by PIA.  (JSER 361-63, 367-68).  PIA's victims reported facts causing them to believe they were being wiretapped, including the discovery of the half-tap on Busch's line.  (JSER 334-43, 350, 354-57).  Kachikian confessed to creating Telesleuth for intercepting phone calls.  (JSER 348-50).  Arneson said Pellicano spoke of his "ability to conduct wiretaps" and "demonstrated the system" "by playing a [wiretapped] conversation."  (JSER 349).  PIA employees said Pellicano obtained confidential law-enforcement records from Arneson "as a matter of course when opening new files" (JSER 324, 329-30, 323-30), and used phone-company employees to get confidential telephone records (JSER 344-47, 366).  Based on all

55

this, the affidavit concluded, PIA's "basic operations . . . were permeated by criminal conduct." (JSER 315).

The affidavit also explained Pellicano's efforts to conceal evidence. Pellicano said he knew wiretapping was illegal, and had encrypted his program. (JSER 349-50). He also knew PIA might be searched by police, so took steps to conceal his sources and destroy records. (JSER 324-25, 327-29, 331).

Magistrate Judge Andrew J. Wistrich found probable cause and issued a new warrant authorizing agents to search specific computer items copied previously under the November 2002 and January 2003 Warrants. The warrant authorized seizing "[e]vidence of violations of [18 U.S.C. §§] 2511 (Interception . . . of Wire . . . Communications); 1030 (Unauthorized Use of Computer Information); 1343 (Wire Fraud); and 371 (Conspiracy)," falling into two categories: "documents and electronic records reflecting the interception of, or . . . capability of intercepting telephonic communications, or the unauthorized use of, or access to, confidential law-enforcement databases or confidential databases for personal financial information, wire fraud and conspiracy," and "audio recordings of telephonic conversations." (JSER 313-6). Given the systemic nature of the crimes, the July 2003 Warrant, unlike the January 2003 Warrant, was not limited to files of specific clients. (Id.)

56

It was pursuant to the July 2003 warrant that the 34 recordings of Pellicano and Christensen discussing the implementation, results, and termination of their illegal wiretap of Lisa Bonder-Kerkorian were examined, on a hard drive previously seized and imaged under the November 2002 Warrant.

    b.   <u>This Court Upholds the November 2002 Warrant in Pellicano's 2002 Explosives Case</u>

While still investigating Pellicano's other crimes, the government prosecuted the 2002 Explosives Case, charging Pellicano for the plastic explosives and grenades found at PIA. Pellicano was assisted by three prominent lawyers, Donald Ré, Victor Sherman, and Alan Weil. (RJN 1). Pellicano maintains they knew of the government's wiretapping and RICO investigation and were working to globally resolve all charges. (JER 921).

Pellicano moved to suppress the November 2002 Warrant. As relevant here, Pellicano argued the warrant lacked probable cause for the Hobbs Act offense in light of <u>Scheidler</u>; requested a <u>Franks</u> hearing based on alleged misstatements in the affidavit; and claimed the good-faith exception did not apply. (RJN 38, 46-51, 114-25).

The district court (Hon. Dickran M. Tevrizian) rejected each challenge. (RJN 17-32). The court found the warrant "supported by probable cause." (RJN 21). The court alternatively found that "agents' reliance on the apparently valid search warrant was

57

objectively reasonable."  (RJN 22-23).  The warrant and Hobbs Act
theory had been approved by multiple lawyers,[48] and <u>Scheidler</u>'s
rule was not "so obvious that . . . agents could not reasonably
have relied on the experienced magistrate judge's issuance of the
warrant."  The court found "Ornellas was not dishonest or
reckless in preparing the affidavit" and found no basis for a
<u>Franks</u> hearing (RJN 22, 29).  Concluding that "the initial search
was conducted in good faith" (RJN 25), the court denied
Pellicano's challenge.

Pellicano, who pleaded guilty during trial (RJN 12),
appealed the suppression denial to this Court.  Represented by
counsel, Pellicano contended the warrant affidavit had not
established probable cause under <u>Scheidler</u> and the warrant could
not be saved by the agents' good-faith reliance on the issuing
magistrate.  (RJN 128, 132).  Pellicano chose not to appeal the
denial of his <u>Franks</u>-hearing request.  (RJN 132).

---

[48]  RJN 19 (affidavit was approved by an AUSA, the Deputy
Chief of the Terrorism & Organized Crime Section, and the Chief
of the U.S. Attorney's Office's Criminal Division); <u>id.</u> (the
"Hobbs Act theory . . . [was] approved" by a Senior Litigation
Counsel and Deputy Chief in the Department of Justice's Organized
Crime and Racketeering Section); <u>id.</u> ("the warrant application
and . . . procedures . . . were approved" by the office's
Criminal Division Chief, by the U.S. Attorney herself, and by an
attorney at the Department of Justice's Office of Enforcement
Operations); RJN 20 ("the computer search language . . . was
reviewed by the Department of Justice's Computer Crimes Section
in Washington, D.C.").

This Court upheld the warrant.  United States v. Pellicano, 135 Fed. Appx. 44 (9th Cir. 2005) ("Pellicano I").  Without deciding whether there was probable cause under Scheidler, this Court found the agents' good-faith reliance on the magistrate's determination sufficient under United States v. Leon, 468 U.S. 897 (1984), based on a survey of pre-Scheidler law.  Pellicano I, 135 Fed. Appx. at 45-47.  There were conflicting Ninth Circuit precedents on the receipt-of-property issue before Scheidler: Two cases "could fairly be read to support the proposition that the destruction of an intangible right was the legal equivalent of appropriating control of the right, thereby satisfying the . . . obtaining element under § 1951," id. at 47 n.2, while one case implied the opposite.  Because "thoughtful and competent lawyers and judges could have disagreed on whether . . . the misconduct [discussed in the affidavit] constituted a violation of the Hobbs Act," agents "were allowed to rely upon the warrant."  Id. at 46. The agents "manifested objective good faith," qualifying for "the good faith exception to the exclusionary rule."  Id. at 46-47. This Court also found the November 2002 Warrant's scope "supported by probable cause" and found the warrant "sufficiently specific under the circumstances to protect Pellicano's right to be free from unbounded searches."  Id. at 47-48.  Pellicano's conviction in the 2008 Explosives Case was affirmed.

59

c.   The Court Rejects Defendants' Challenges to the
     November 2002 Warrant in This Case

After indictment in this case, Pellicano and Christensen
challenged the November 2002 Warrant by seeking a Franks hearing
to challenge the affidavit, and again attacking probable cause
under Scheidler.  Although the government challenged
Christensen's standing (GER 927, 2746-72), Christensen and
Pellicano submitted no evidence about their arrangements.  The
court denied suppression and denied the Franks-hearing request.
(JER 165-76).

Because "Ornellas 'could not be required to anticipate the
Court's decision in Scheidler,'" the court rejected defendants'
argument that the warrant failed to state a Hobbs Act violation.
(JER 175) (quoting Pellicano I).

The court also held defendants did not meet either
requirement for a Franks hearing: they had shown neither
intentional or reckless dishonesty, nor that the challenged
statements affected probable cause.

"Most of the supposedly erroneous details given by Proctor
and omitted by Ornellas are of little consequence," the court
found.  (JER 168).  The defendants had not met their burdens even
with respect to the "most significant" purported discrepancies.
(JER 168-69).  The court found "no evidence that Ornellas
recklessly or intentionally withheld . . . information"
suggesting Busch's windshield had been damaged by something other

60

than a bullet.  (JER 169).  Moreover, the court found, whether or
not Busch's windshield was shot or a bullet was found would have
made no difference to the magistrate's probable-cause finding --
something the court reiterated later in the case.  (Id.; see also
JER 528; GER 1726-27).  Nor did Proctor's purportedly inaccurate
recollection of the layout of Busch's street require a Franks
hearing.  There was "no evidence that Ornellas intentionally or
recklessly withheld the information," and adding the information
to the warrant have would "not defeat probable cause."  (JER
170).

    Reviewing alleged omissions in the affidavit's description
of threats against Ned Zeman, the court found that "entire
discussion . . . virtually irrelevant to the finding of probable
cause," because probable cause was "established by Proctor's
statements regarding the Busch threat."  (JER 170-71).  While the
court found one error in the affidavit's account,[49] there was "no
evidence" that error was intentional or reckless.  (JER 170).
The court found defendants' other complaints about the Zeman
incident factually unsupported, "minor" and "irrelevant to . . .
probable cause," concerned statements that were not misleading,
and were not the result of intentional or reckless disregard for
the truth.  (JER 171).  The court found "no evidence" of Ornellas

---

        [49]  Ornellas' affidavit confused John Rottger with John
Rottger, Jr.  (JER 170).

pressuring Zeman to change his identification of Rottger, Jr., and "no evidence that the result of the photospread presentation was any different than [the affidavit] described."  (JER 171).

Rejecting defendants' claim that the warrant should have described Seagal and Pellicano as antagonists, the court found "no evidence" Ornellas knew details "about Seagal and Pellicano's relationship."  (JER 172).  Regardless, the court reasoned, such information "would not undermine probable cause" because "[w]hether Seagal had hired Pellicano or someone else had hired Pellicano was . . . secondary" to "Pellicano's connection to the crime," which was "the main determinant of probable cause to search [PIA]."  (Id.).  The court also rejected a variety of other defense claims.[50]

"[D]efendants' attempt to portray Ornellas as intentionally or recklessly deceptive," the court found, "rests entirely on conjecture and innuendo."  (JER 175).  In contrast to defendants' portrayal of Ornellas as a man out to get Pellicano by hiding

---

[50]  The court rejected defendants' claim that the PIA search was pretextual.  (JER 173-74).  The court found immaterial Pellicano's complaint that the affidavit should have discussed his work for government agencies.  (JER 172).  The court found no reason why allegations of other "threats [against Busch] has anything to do with probable cause when there was ample support for probable cause to believe that Pellicano was involved in the June 2002 threat."  (Id.).  The court found defendants failed to "present[] . . . evidence . . . contradict[ing] Proctor's account of the conversation" in which Pellicano had said that Busch "'was back at it again'."  (JER 174).  And the court rejected Christensen's arguments that Ornellas should have investigated other potential suspects or spoken to Seagal.  (JER 172-73).

unfavorable facts, the court found Ornellas' affidavit included information favorable to Pellicano -- something that "strongly undercuts any inference that Ornellas omitted facts in order to skew the affidavit" against Pellicano.  (JER 170-71).[51]

Even considering "cumulatively" the effect of any "arguable" misrepresentations or omissions, the affidavit still "established probable cause," because "Proctor's accurate account of most of the major details of the Busch threat (as documented by tape recordings), and his implication of Pellicano in the threat was sufficient to establish probable cause [to] search [PIA]."  (JER 175).

d.  <u>The Rejection of Defendants' Challenges to the July 2003 Warrant</u>

The court separately denied defendants' particularity and overbreadth challenges to the July 2003 Warrant.  (JER 155).

"This is not a case where the government sought to seize vaguely described materials with no further explanation."  (JER 158).  The court found the list of items to be seized was not "vague."  (<u>Id.</u>).  The list, moreover, was limited by a preamble stating the crimes to which the seized evidence should pertain.

---

[51]  (JER 170-71 (noting affidavit's inclusion of "Proctor's remarks that [he] did <u>not</u> think that Pellicano was involved in the Zeman incident")).  Ornellas also left out facts that would have further incriminated Pellicano.  (JER 168).  Indeed, the court found, some facts that defendants said should have been added to the affidavit could actually have strengthened probable cause rather than weakened it.  (JER 171).

That gave "[l]ittle discretion" to the seizing agents: "They [were] to seize items from the list . . . if they constitute evidence of the crimes enunciated in the preamble." (<u>Id.</u>). "[T]he warrant contain[ed] the reference to specific illegal activity" recommended by case law. (<u>Id.</u>).

The court also found the warrant was not overbroad. The court rejected Christensen's argument that the warrant should have been limited to evidence of specific enumerated victims, or should only have allowed searching for evidence from 1999 to July 2002. In fact, the affidavit both described "specific wrongful conduct" from 1995 forward and provided "probable cause that Pellicano's illegal activities surpassed the limited cases that the government was aware of." (JER 159). Because the affidavit established "probable cause to search all of Pellicano's computer records for evidence of wiretapping," the court rejected Christensen's argument that the government should only have searched directories bearing the names of known victims and clients. (<u>Id.</u>). "[T]he common sense fact that a computer user can use an innocuous or misleading filename to conceal incriminating evidence" meant agents did not have to desist from searching folders based on the name alone. (<u>Id.</u>).

Finally, the court found <u>Leon</u>'s good-faith rule applicable to any warrant defects. (JER 159-61). The warrant, "read as a whole, conveys that . . . agents were allowed to seize particular

64

types of items that constituted evidence of a narrow and fairly
well-defined set of crimes." (JER 160). "[T]he agents and AUSA
tasked with applying for the July 25, 2003 warrant were trying to
particularize the warrant and to limit its scope to the probable
cause described in the affidavit," and the agents' reliance on
the magistrate's approval was proper. (JER 161). Nor did any
error cause defendants harm: even if a better-drafted warrant
could be hypothesized, "the items that Christensen is seeking to
suppress would have fallen easily within the scope" of such a
warrant. (JER 161).

Having rejected defendants' arguments on the merits, the
court did not address Christensen's standing. (JER 161).

### e. Pellicano's State-Court Conviction for Threatening Busch

Pellicano and Proctor were prosecuted in state court for the
threats against Busch. (RJN 150-68). Pellicano pleaded nolo
contendere in 2009, was convicted of violating California Penal
Code § 422 (threats), and was sentenced to three years'
imprisonment. (RJN 162-63). Proctor was convicted of the same
charge the same day. (RJN 166).

### 2. Defendants' Challenges to the Warrants Are Meritless

This Court should begin with the doctrines of standing and
collateral estoppel, which resolve all claims on the November
2002 Warrant and resolve Christensen's claims on the July 2003

65

Warrant.  If it remains necessary to consider the merits, both warrants must be upheld.

> a.  Christensen Lacks Standing to Protest the Search of PIA

A "'person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." United States v. Ligenfelter, 997 F.2d 632, 636 (9th Cir. 1993).  To establish standing, Christensen must show he "had a legitimate expectation of privacy in the place searched," id. -- something he cannot do.  Christensen's challenges to both warrants therefore fail.

> (1)  Standard of Review

A party seeking suppression "bears the burden of demonstrating [his] legitimate expectation of privacy in the place searched." Id.  Standing is a "mixed question of fact and law," for which the "'ultimate legal conclusion is reviewed de novo, and the [underlying] findings of fact . . . are reviewed for clear error.'" United States v. $40,955.00 in U.S. Currency, 554 F.3d 752, 755-56 (9th Cir. 2009).

> (2)  Christensen Failed To Meet His Burden

As the party seeking suppression, Christensen had the burden to prove his standing. United States v. Reyes-Bosque, 596 F.3d 1017, 1026 (9th Cir. 2010).  Generally speaking, a person has no

66

standing in another person's office.  United States v. Taketa, 923 F.2d 665, 671 (9th Cir. 1991) (defendant's expectation of privacy in coworker's office was not reasonable, notwithstanding defendant's access to and use of the office).  Courts are especially unlikely to find standing for someone who has no right to access the office and no assigned workspace there.  See United States v. Anderson, 154 F.3d 1225, 1230 (10th Cir. 1998) (discussing cases).  That was Christensen's situation here.

Given Christensen's claim of standing contradicts these general principles, it was especially incumbent on him to establish standing by producing competent, specific evidence. "'[W]ithout an affidavit or testimony from the defendant, it is almost impossible to find a privacy interest'" supporting standing.  United States v. Mendoza, 438 F.3d 792, 795 (7th Cir. 2006).  Christensen never submitted competent evidence explaining his subjective privacy expectations or steps taken to maintain privacy.  Although Christensen submitted an attorney's affidavit attaching things the government had provided in discovery, there was no written agreement between Christensen and Pellicano.  And Christensen submitted no affidavit setting forth his personal understanding of his arrangement with Pellicano.[52]

_____

[52]  It is not enough that Christensen, in the recordings, discussed the need for secrecy with his coconspirator.  Every conspirator asks secrecy of his cohorts; yet under United States
(continued...)

This failure was particularly inexcusable because it violated a specific rule.  <u>See</u> C.D. Cal. Local Crim. R. 12-1.1 ("A motion to suppress shall be supported by a declaration on behalf of the defendant, setting forth all facts then known upon which it is contended the motion should be granted.  The declaration shall contain only such facts as would be admissible in evidence and shall show affirmatively that the declarant is competent to testify to the matters stated therein.").  In <u>United States v. Wardlow</u>, 951 F.2d 1115, 1116 (9th Cir. 1991), this Court held that noncompliance with a nearly identical local rule justified denying a hearing on a motion to suppress.  <u>Id.</u> (denial of suppression hearing was proper where defendant's assertions were supported only by a "declaration signed by counsel rather than an individual competent to testify" as the rule required).  In <u>United States v. Caymen</u>, 404 F.3d 1196, 1200 (9th Cir. 2005), this Court found a defendant did not met his burden to show standing where he did not "submit an affidavit or other evidence" showing his reasonable expectation of privacy.  Since Christensen similarly failed to meet his burden, this Court should follow <u>Wardlow</u> and <u>Caymen</u> and reject Christensen's claims.[53]

_____

(...continued)
<u>v. Padilla</u>, 508 U.S. 77, 81-82 (1993), being a coconspirator does not establish standing.

[53]  Christensen cannot rely on the government's theory of
(continued...)

(3)  <u>Christensen Cannot Turn His Ethical Duties
     Toward Kerkorian Into a Shield for His Own
     Misconduct</u>

Instead of concrete evidence to meet his evidentiary burden, Christensen presents abstract arguments.  All fail.

Christensen's attempt (COB 38-40) to ground Fourth Amendment standing on the attorney-client and work-product privileges adds nothing to his case, because, as the court found, Christensen's fraudulent, criminal scheme vitiated any such privilege.  <u>See</u> Part IV.C.3, <u>infra</u>.  Once this Court determines those findings were not clearly erroneous, it need go no further: Christensen's standing arguments based on those privileges must be ruled meritless.

In any case, Christensen could not have expected privacy in recordings he did not think existed.  Christensen's contention that he "was unaware" Pellicano was recording their phone calls (COB 2) therefore dooms Christensen's claim.  In <u>United States v. Hunt</u>, 505 F.2d 931, 933-34 (5th Cir. 1974), the defendants, who

---

(...continued)
the case to establish standing in lieu of a competent witness' affidavit.  <u>United States v. Silva</u>, 247 F.3d 1051, 1057 (9th Cir. 2001) ("[T]he government's position . . . cannot discharge Defendants' factual burden of establishing standing.").  Nothing about the government's theory of the case necessarily entailed facts proving standing -- the government proved Christensen's crimes without alleging or proving Christensen's ownership or possession of the recordings Pellicano made of their conversations.  <u>Cf.</u> <u>United States v. Issacs</u>, 708 F.2d 1365 (9th Cir. 1983).  Nor were such facts necessary for conviction.

hired a private investigator to conduct illegal wiretapping but remained unaware of the investigator's methods, sought to suppress wiretapping equipment and tapes police had found in the investigator's car.  The court denied standing, ruling defendants could not expect privacy in "objects which they have never seen and of whose particular existence they were unaware until after the disputed search and seizure."  Id. at 941.  Christensen, like the Hunt defendants, asks this Court to find that he expected privacy in another person's property he never knew existed.  Following Hunt, this Court should reject the claim.[54]

The people with privacy rights in Pellicano's statements recounting wiretapped conversations were the wiretapping victims -- not the wiretappers.  This Court has denied standing in stolen items, because "[w]hatever possessory interest a thief may have, that interest is subordinate to the rights of the owner."  Caymen, 404 F.3d at 1200.  Pellicano and Christensen stole the contents of others' private conversations.  Under Caymen, Christensen had no expectation of privacy in Pellicano's statements repeating that stolen information, because the

---

[54]  That Christensen never accessed Pellicano's recordings or records also forecloses standing.  Under United States v. Sarkisian, 197 F.3d 966, 987 (9th Cir. 1999), "a defendant who merely possesses the authority to access a storage rental room but does not use it, without more, lacks . . . standing to challenge the . . . search of that area."  Christensen's situation is even more extreme than Sarkisian, since Christensen never entered PIA and had no authority to do so.

information belonged to the victims.  See also United States v. Cormier, 220 F.3d 1103, 1108 (9th Cir. 2000) (a person "does not possess a reasonable expectation of privacy in an item in which he has no possessory or ownership interest").

To the extent Christensen seeks to suppress his own words, that contradicts the principle that "a person does not have a privacy interest in information revealed to a third party and subsequently conveyed to governmental authorities." Cormier, 220 F.3d at 1108.  Christensen argues (COB 38) the Christensen-Pellicano conversations were part of Pellicano's legal-investigator work.  Because illegal wiretapping is not legitimate investigative work, however, the conversations should be treated no differently than any other conversation between coconspirators.  Christensen necessarily accepted the risk that Pellicano would expose the contents of their conversation. United States v. White, 401 U.S. 745, 749 (1971) (Fourth Amendment "affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it'").  That Pellicano recorded Christensen's statements gives Christensen no more standing than if Pellicano had summarized them in a diary or publicized them.

Having made the statements to another, any expectation of privacy is defeated by the third-party doctrine.[55]

Nor can Christensen manufacture standing through his bare assertion that he had a duty as a lawyer to maintain confidentiality. <u>First</u>, the jury's verdict -- which was fully supported by the trial evidence, and which Christensen does not directly challenge -- shows the folly of Christensen's claim that he follows his ethical duties.[56] <u>Second</u>, standing is fact-intensive, and the Supreme Court has prohibited rules of automatic standing. <u>E.g.</u>, <u>United States v. Salvucci</u>, 448 U.S. 83, 85 (1980); <u>Padilla</u>, 508 U.S. at 81-82. Rather than ask the court to assume that he expected privacy, Christensen had to prove that he took positive steps to ensure privacy. <u>Rawlings v.</u>

---

[55] <u>E.g.</u>, <u>Smith v. Maryland</u>, 442 U.S. 735 (1979) (no reasonable expectation of privacy in record of phone numbers dialed; when defendant "voluntarily conveyed numerical information to the telephone company," he "assumed the risk that the company would reveal to the police the numbers he dialed"); <u>United States v. Miller</u>, 425 U.S. 435, 440-42 (1976) (no reasonable expectation of privacy in bank records). <u>Alderman v. United States</u>, 394 U.S. 165, 176 (1969), is not to the contrary. <u>Alderman</u> held participants in a conversation have standing to protest the <u>government</u>'s unlawful eavesdropping. Given <u>White</u>, however, <u>Alderman</u> does not apply when the eavesdropping is done by a participant in the conversation. Pellicano's recording was not state action, and was by a person Christensen voluntarily made part of the conversation.

[56] In addition to the violations of legal ethics proven by the jury verdict, Christensen's contention that Kerkorian was unaware of Christensen's use of Pellicano to wiretap -- though not credited by the court (JER 191) -- admits violating California Rule of Professional Conduct 3-500 (Communication).

Kentucky, 448 U.S. 98, 1980 (1980) (no standing where defendant did not show "precautions to maintain his privacy").

Third, a lawyer generally "ha[s] no standing to raise the alleged infringement of [his client's] rights." Conn v. Gabbert, 526 U.S. 286, 292 (1999).[57]  Illustrating this principle, United States v. Baskes, 442 F. Supp. 322, 327 (N.D. Ill. 1977), held that because "the attorney-client privilege is for the benefit of the client and not the attorney," it "does not establish a new basis for vicarious standing under the Fourth Amendment."  The same rule dictates that Christensen cannot derive standing from his client's rights.[58]

_____

[57]  See also Kowalski v. Tesmer, 543 U.S. 125, 130 (2004) (no attorney-standing to raise future clients' Sixth Amendment rights); Lowry v. Barnhart, 329 F.3d 1019, 1023 n.2 (9th Cir. 2003) (lawyer may not sue based on client's right to unbiased decisionmaker); United States v. Fortna, 796 F.2d 724, 732 (5th Cir. 1986) (Fourth, Fifth, and Sixth Amendment rights "are personal and cannot be asserted vicariously"; therefore, defendant cannot assert violation of codefendant's attorney-client privilege).

[58]  By contrast, clients have standing to protest the search of their lawyers' files under DeMassa v. Nunez, 770 F.2d 1505 (9th Cir. 1985).  That makes sense: because the attorney-client privilege exists to benefit the client, clients may reasonably expect privacy in client files held by the lawyer.  But standing is personal, and no rule or case allows the lawyer to vicariously benefit from his client's privacy rights.  Conn, 526 U.S. at 292; Kowalski, 543 U.S. at 130.  Here there was especially no need for vicarious standing, since the client, one of the world's wealthiest men, could have filed a Rule 41 motion himself. Compare Massey v. Wheeler, 221 F.3d 1030, 1035 (7th Cir. 2000) (denying attorney-standing to vicariously raise client's rights, because procedure existed for client to vindicate his own

(continued...)

Fourth, Christensen's attempt to piggyback on Kerkorian's client-rights is especially inappropriate because Christensen maintains that creating the evidence at issue -- Pellicano's recordings of Christensen -- was not part of Pellicano's assignment.  (COB 2 ("Christensen was unaware" that Pellicano recorded their calls)).  Expectations of privacy based on an investigators' activities to assist lawyers therefore cannot apply given Christensen's theory of Pellicano's activities.

Fifth, because assigning an investigator to wiretap one's litigation adversaries' attorney-client conversations is not something lawyers may do, it is not cognizable as part of the attorney-client or attorney-investigator relationships.  Because Christensen was not acting as a lawyer in any way that society recognizes as reasonable, any expectation of privacy he may have had was also socially unreasonable.

Sixth, even if the recordings could be described as client files or work-product, Christensen had no reasonable expectation of privacy because he had no legal rights over the files. Kerkorian had rights to control the files and communications.[59]

---

[58](...continued)
rights).

[59]  Kallen v. Delug, 203 Cal. Rptr. 879, 950 (Ct. App. 1984) ("an attorney's work product belongs absolutely to the client"); 24 Wright, Graham et al., Federal Practice & Procedure § 5487, at 406-07 (1st ed. 1986) (attorney-client privilege belongs to
(continued...)

74

Bonder also had rights, including the right to obtain witness statements and factual work-product on a showing of substantial need.[60]  Because Christensen could not legally control either PIA or the recordings, any expectation of privacy was unreasonable.  Rawlings, 448 U.S. at 105 (no standing in purse where no right to exclude others); Couch v. United States, 409 U.S. 322, 335 (1973) (no standing in records given to accountant who had discretion to disclose the information without conveyor's consent).[61]

---

[59] (...continued)
client, who can waive it over the lawyer's objection).

[60]  Hobbs v. Municipal Court, 284 Cal. Rptr. 655, 669 (Ct. App. 1991) ("To the extent that witnesses' statements and reports of witness interviews reflect merely what the witnesses said they are not work product" because the core of "'the work-product doctrine shelters the mental processes of the attorney'"); Cal. Civ. Proc. Code § 2018.030 (permitting discovery of attorney work-product if "denial of discovery will unfairly prejudice the party seeking discovery . . . or will result in an injustice," unless the work-product is a "writing that reflects an attorney's impressions, conclusions, opinions, or legal research"); Admiral Ins. Co. v. U.S. Dist. Court, 881 F.2d 1486, 1494 (9th Cir. 1989) ("Although the [work product] rule affords special protections for work-product that reveals an attorney's mental impressions and opinions, other work-product . . . may be ordered produced upon an adverse party's demonstration of substantial need or inability to obtain the equivalent without undue hardship.").
Attorney mental impressions were but a small part of the Christensen-Pellicano conversations.  What mattered most -- the instructions from Christensen to Pellicano, and Pellicano's factual reports about what he had heard on the wiretap -- were merely factual work product, if they were work product at all.

[61]  Christensen's citation (COB 39) of In re Grand Jury Proc., 727 F.2d 941, 942 (10th Cir. 1984) is off-point.  That case concerned Fifth Amendment testimonial privileges, and said nothing about Fourth Amendment standing.  Id. at 943.  With
(continued...)

Finally, as the jury found beyond a reasonable doubt, Christensen used Pellicano to obtain other lawyers' confidential communications with their clients. Given that, Christensen can hardly claim an expectation that Pellicano would keep their own conversations inviolate. Whatever Christensen's subjective beliefs, society should not recognize as reasonable an expectation of privacy in conversations where Pellicano, at Christensen's command, disclosed privileged communications stolen from other litigants. "A legitimate expectation of privacy means more than a subjective expectation of not being discovered." Caymen, 404 F.3d at 1200. Christensen's misuse of the attorney-investigator relationship to invade other lawyer-client relationships should preclude him from relying on his status as a lawyer to establish standing. Since Christensen has no standing, his challenges to both warrants fail.

b.  Pellicano Cannot Relitigate the November 2002 Warrant After Losing His Prior Appeal

"[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be

---

(...continued)
respect to privacy more generally, the case's main lesson is that an attorney's interest in client-files is "not an interest of ownership, nor privacy," and that "whatever privacy interests an attorney may have" in a client's files are "limited" to work-product protections for "the lawyer's mental processes." Id. at 945 (emphasis added). That does not help Christensen, since most of the Christensen-Pellicano calls contain factual rather than mental-process information.

litigated between the same parties in any future lawsuit." <u>Ashe</u>
<u>v. Swenson</u>, 397 U.S. 436, 443 (1970).  The November 2002 Warrant
Pellicano now challenges is the same one he challenged in his
prior criminal case, where the district court and this Court
upheld the warrant's validity.  He raised substantially similar
challenges then.  He was assisted by experienced counsel.  And
Pellicano (who knew better than anyone else what evidence was on
PIA's computers) knew the same warrants and searches could lead
to this subsequent prosecution.  His repetitious challenge is
therefore barred.

   "[C]ollateral estoppel has been an established rule of
federal criminal law [for decades]." <u>Ashe</u>, 397 U.S. at 443; <u>see,</u>
<u>e.g.</u>, <u>United States v. Arnett</u>, 327 F.3d 845, 848-49 (9th Cir.
2003).  Where the government or defense loses a Fourth Amendment
issue in one criminal case, that party may not relitigate the
issue in a subsequent criminal case.  <u>United States v. McManaman</u>,
673 F.3d 841, 847-48 (8th Cir. 2012); <u>United States v.</u>
<u>Comprehensive Drug Testing</u>, 621 F.3d 1162, 1170 (9th Cir. 2010);
<u>United States v. Quiroz</u>, 137 Fed. Appx. 667, 672-73 (5th Cir.
2005).[62]

---

   [62]  Fourth Amendment decisions in criminal cases also
preclude relitigation in subsequent civil cases, <u>Allen v.</u>
<u>McCurry</u>, 449 U.S. 90 (1980) (finding of warrant's validity in
criminal case estoped party from claiming same warrant's
invalidity in subsequent civil case); <u>Ayers v. City of Richmond</u>,
                                                (continued...)

The decisions in the 2002 Explosives Case and Pellicano I met all four conditions for federal estoppel identified in In re Palmer, 207 F.3d 566, 568 (9th Cir. 2000).  Pellicano had "a full and fair opportunity to litigate the issue[s] in the previous action."  Id.  The probable cause and Franks issues were "actually litigated in [the prior] action."  Id.  Pellicano's loss resulted in "a final judgment in that action."  Id.  And Pellicano was "a party in the previous action."  Id.[63]

Although there are exceptions to estoppel, none applies here.  Pellicano's 2002 Explosives Case concerned a serious felony, not a misdemeanor.  Cf. Lockett v. Ericson, 656 F.3d 892, 897-98 (9th Cir. 2011).  The warrant's validity was not conceded. Cf. United States v. Duarte-Aldana, 364 Fed. Appx. 360, 362 (9th Cir. 2010).  The same burden of proof applied.  Cf. Clark v. Bear Stearns & Co., 966 F.2d 1318, 1322 (9th Cir. 1992).  Pellicano had the opportunity to appeal.  Cf. Lombardi v. El Cajon, 117

---

[62] (...continued)
895 F.2d 1267, 1271-72 (9th Cir. 1990) -- and vice versa, Steele v. United States, 267 U.S. 505, 506-07 (1925) (defendant's civil suit for return of seized property barred relitigating warrant's validity in subsequent criminal trial); United States v. Rosenberger, 872 F.2d 240, 241-42 (8th Cir. 1989).

[63]   The decisions likewise deserve estoppel under the alternative three-step process announced in Arnett, 327 F.3d at 848.  The issues in both actions were "sufficiently similar and sufficiently material"; the issues were actually "litigated" in the first case; and the issues were "necessarily decided in the first case," in that Pellicano's 2002 Explosives Case conviction depended on evidence obtained under the challenged warrant.  Id.

F.3d 1117, 1122 (9th Cir. 1997).[64]  And the government seeks
preclusion not as to an element of the offense, but rather as to
a preliminary issue, suppression.  Cf. United States v. Smith-
Baltiher, 424 F.3d 913, 920 (9th Cir. 2005).  Finally, Pellicano
had incentive to litigate the issues vigorously in the 2002
Explosives Case -- not only because suppression would have
resulted in dismissal of those serious charges, but also because
Pellicano knew his computer equipment held incriminating
information, and (he contends) he and his attorneys were aware of
the investigation into his RICO and wiretapping enterprise.  (JER
835-36, 921).

     Pellicano's claims of newly discovered evidence do not
exempt him from collateral estoppel.  Rather than meet his burden
to establish material new evidence, Pellicano submits an argument
that is long on accusations but nearly devoid of citations to the
record.  (POB 24-31).  Purported quotations are uncited.  (E.g.,

---

     [64]  Pellicano's choice to drop his appeal of the Franks
issue in Pellicano I does not insulate him from collateral
estoppel.  A defendant's "considered choice not to appeal" is "a
risk, but calculated and deliberate," and he "cannot be relieved
of such a choice."  Ackermann v. United States, 340 U.S. 193, 198
(1950).  So long as the party had the ability to appeal, the
prior decision has preclusive effect.  Comprehensive Drug
Testing, 621 F.3d at 1170 (applying Fourth Amendment collateral
estoppel where government did not appeal its loss in prior case);
Jacobs v. Arizona, 491 Fed. Appx. 837 (9th Cir. 2012) (res
judicata barred Fourth Amendment suit where party did not appeal
prior decision); Olson v. Morris, 188 F.3d 1083, 1086-87 (9th
Cir. 1999) (barring relitigation after litigant did not appeal
administrative finding).

POB 27).  His claim of new information from a state-court hearing includes no citation.  (POB 28-29).  Citations he does provide are unacceptably unspecific.  (See, e.g., POB 27 (citing "ER5044-5305" for a six-line quote); POB 25 (citing "ER987-1085" for two-line quote)).

This Court requires that "[e]very assertion in briefs regarding matters in the record shall be supported by a reference to the location in the excerpts of record where the matter is to be found."  Ninth Cir. R. 28-2.8.  By "treat[ing] judges as if they were pigs sniffing for truffles" in a "case with a record of this magnitude," In re Oracle Corp. Sec. Litig., 627 F.3d 376, 386 (9th Cir. 2010), Pellicano has forfeited his argument.  Such behavior would justify denying his appeal even if this were Pellicano's first challenge to the warrant.  United States v. Rewald, 889 F.2d 836, 861 n.24 (9th Cir. 1989) (declining to consider defendant's arguments because he did not "afford[] us the benefit of citation to the record").  Given that Pellicano's challenges to the warrant have been previously evaluated by multiple courts including this one, this Court should conclude that Pellicano has both waived his arguments and failed to present new evidence to justify relitigation.

80

Finally, while the government did not directly raise
collateral estoppel below,[65] that is no reason to deny its
application now.  Regardless of the parties' arguments, this
Court "'may affirm on any ground supported by the record.'"
United States v. Nichols, 464 F.3d 1117, 1122 (9th Cir. 2006).
This Court has applied collateral estoppel on appeal despite "a
complete absence of any discussion of [preclusion] . . . in the
proceedings below."  Clements v. Airport Auth. of Washoe County,
69 F.3d 321, 327 (9th Cir. 1995).  This Court not only may
"overlook waiver," but may even raise collateral estoppel "sua
sponte."  Id. at 329; Caldera v. Northrop Worldwide Aircraft
Servs., Inc., 192 F.3d 962, 970-71 (Fed. Cir. 1999) (following
Clements and applying collateral estoppel "for the first time on
appeal").  That is because, unlike claim preclusion (which could
leave some issues forever unadjudicated), collateral estoppel
bars only "re-litigation of an issue that has been actually

_____

[65]  The government maintained that "the issues raised and
decided [in Pellicano I], to the extent they were based on
particular factual findings on the record before it, are
binding."  (GERT 75)  The government acknowledged that "if the
[d]efense wants to come forward with new evidence that supports .
. . a Franks hearing" then the court would not be bound by the
Franks ruling from the 2002 Explosives Case, but that "where
there are claims that were litigated based on the factual record
that remains the same, we don't believe there is a cause or basis
to reopen those matters here."  (GERT 75)  The government further
agreed that "[i]f there is new evidence . . . [or] new challenges
to the warrant that weren't raised or considered by Judge
Tevrizian or the Ninth Circuit," then those would be "fair game."
(GERT 75-76).

81

litigated and <u>necessarily</u> decided." <u>Clements</u>, 69 F.3d at 330.
That reduces any private interest in the litigation, whereas "the
public interest would be greatly advanced by the application of
issue preclusion . . . [to] conserv[e] . . . judicial resources."
<u>Id.</u>

    That reasoning applies here.  Pellicano already expended
this Court's resources once in his previous challenge to this
warrant.  His challenges have also been rejected by two federal
district judges plus one state court.  (RJN 170).  Pellicano's
private interest in relitigation must yield to the public
interest in "conserv[ing] judicial resources," <u>Allen</u>, 449 U.S. at
94, reducing the issues in this complex case, and avoiding
unnecessary constitutional litigation.[66]  "<u>Clements</u> supports that
[a party] must . . . have suffered some prejudice" for a waiver
argument to defeat <u>res judicata</u>.  <u>McGinest v. GTE Serv. Corp.</u>,
247 Fed. Appx. 72 (9th Cir. 2007).  Pellicano suffered no
prejudice, since there is nothing he would have done differently
had estoppel been raised earlier.  This Court should decline to
hear his repetitive claim.

---

[66]  Because Christensen lacks standing to challenge the
November 2002 Warrant, the application of collateral estoppel to
Pellicano's challenge over that warrant will eliminate the need
to decide Fourth Amendment issues regarding that warrant.  <u>Lynq
v. Nw. Indian Cemetery Protective Ass'n</u>, 485 U.S. 439, 445 (1988)
(a "fundamental . . . principle of judicial restraint requires
that courts avoid reaching constitutional questions in advance of
the necessity of deciding them").

c.   The November 2002 Warrant and Search Were
     Constitutional

Even without the procedural bars, defendants' challenges

fail on the merits.

(1)  *Scheidler* Does Not Affect the Agents' Earlier
     Good-Faith Reliance on the Magistrate's
     Probable-Cause Finding

Defendants contend the November 2002 Warrant lacked probable

cause for a Hobbs Act violation because it failed to establish

that "Pellicano . . . obtained or sought to obtain another's

property." (COB 22).  These claims fail, because, as this Court

previously found, the agents relied in good faith on the

magistrate's probable-cause finding.

(a)  Standard of Review

This Court "review[s] for clear error a magistrate's finding

of probable cause to issue a search warrant, and give[s] 'great

deference' to such findings." United States v. Krupa, 658 F.3d

1174, 1177 (9th Cir. 2011).  The finding of good-faith reliance

is reviewed de novo.  United States v. Brown, 951 F.2d 999, 1004

(9th Cir. 1991).

(b)  The Agents Reasonably Relied on the
     Magistrate's Probable-Cause Finding

Given the "great deference" owed to a magistrate's finding

of probable cause and the clear-error review that applies, Krupa,

658 F.3d at 1177, probable cause for the November 2002 Warrant

should be upheld on its own terms.  See United States v. Jennen,

83

596 F.3d 594, 598 (9th Cir. 2010) ("To uphold the . . . warrant, we 'need only find that the issuing magistrate had a substantial basis for finding probable cause.'").

But even a shortcoming in probable cause would "not necessarily mean that the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 140 (2009). "[W]hen law enforcement officers . . . act[] in objective good faith or their transgressions [are] minor," excluding evidence "offends basic concepts of the criminal justice system." Leon, 468 U.S. at 907. "This is particularly true" where officers "obtained a search warrant from a judge or magistrate and acted within its scope." Id. at 920. "It is the magistrate's responsibility to determine whether . . . allegations establish probable cause," and in the "ordinary case, an officer cannot be expected to question the magistrate's . . . determination." Id. at 921. There is no value in "[p]enalizing the officer for the magistrate's error." Id. Thus, without "an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." Id. at 926.

That rule defeats defendants' claim. The warrant was issued by the Chief Magistrate Judge after review by multiple attorneys.

84

The agents relied on the warrant in good faith, as this Court previously held.

> (i) The Law on the Hobbs Act's "Obtaining" Element Was Unclear Before *Scheidler*

Scheidler established that, for extortion under the Hobbs Act to occur, there must be not only interference with the victim's property rights, but also the defendant's attempt to acquire that property for himself. But Scheidler was decided months after the November 2002 Warrant's execution. Before that, significant authority promoted the opposite view. United States v. Green, 350 U.S. 415, 420 (1956), had held that "extortion [under the Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property."[67] The Supreme Court had instructed that the Hobbs Act's words "do not lend themselves to restrictive interpretation," but rather "'manifest . . . a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion . . . or physical violence.'" United States v. Culbert, 435 U.S. 371, 373 (1978).[68] Scheidler reversed the

---

[67] Green stands for the proposition that the person who "obtains" property may be different from the person on whom a benefit is conferred -- thus indicating that the word "obtain" under the Act meant something different than receiving the benefit of the extortion.

[68] Scheidler, 537 U.S. at 408, narrowed Culbert by limiting
(continued...)

85

Seventh Circuit and overturned four other circuits' precedents.[69]
Until Scheidler, there was ample precedent for finding probable
cause on the November 2002 Warrant.

Nor did Ninth Circuit law compel prediction of Scheidler's
result.  This Court had approved Hobbs Act prosecutions of
extortionists who obtained no property from their victims.  E.g.,
United States v. Hoelker, 765 F.2d 1422, 1425 (9th Cir. 1985)
(prosecution upheld for forcing victim to give up intangible
right "to make personal and business decisions about the purchase
of life insurance . . . free of threats and coercion").  Under
United States v. Zemek, 634 F.2d 1159, 1174 (9th Cir. 1980), the
"right to solicit business free from threatened destruction and
physical harm falls within the scope of protected property rights

---

[68] (...continued)
Culbert's broad-reading principle to questions of the law's
commerce-clause scope.  But that gloss was not available to
agents executing the pre-Scheidler warrant.

[69]    United States v. Arena, 180 F.3d 380, 394 (2d Cir. 1999)
("[W]here the property . . . is the victim's right to conduct a
business free from threats of violence . . . , a person who . . .
committed or threatened . . . physical harm . . . to induce
abandonment of that right has obtained, or attempted to obtain,
property within the meaning of the Hobbs Act."); Libertad v.
Welch, 53 F.3d 428, 438 n.6 (1st Cir. 1995); Northeast Women's
Ctr. v. McMonagle, 868 F.2d 1342, 1350 (3d Cir. 1989); United
States v. Santoni, 585 F.2d 667, 673 (4th Cir. 1978) ("the
gravamen of the offense is loss to the victim" rather than
"benefit to the extortionist").  Indeed, Scheidler's rule is more
narrow than any prior federal court interpretation of the Act.
See Scheidler, 537 U.S. at 412 (Stevens, J., dissenting) ("[n]o
other federal court has ever construed this statute so
narrowly").

86

under the Hobbs Act" -- a rule with obvious application to Pellicano's attempt to extort Busch from having newspapers print articles the papers deemed appropriate. As this Court previously held, because "the right to solicit business free from threatened destruction and physical harm," id., cannot be obtained by another, "both Hoelker and Zemek could fairly be read to support the proposition that the destruction of an intangible right was the legal equivalent of appropriating control of the right, thereby satisfying the requisite obtaining element under § 1951." Pellicano I, 135 Fed. Appx. at 46 n.2. Given Hoelker and Zemek, agents had reason to believe that the November 2002 Warrant's Hobbs Act theory was valid in this Circuit.

Without even citing Hoelker and Zemek, defendants rely on statements in United States v. Panaro, 266 F.3d 939 (9th Cir. 2001), to claim this Court foreclosed such theories before Scheidler. (COB 21-22); see Panaro, 266 F.3d at 948 ("extortion . . . does not occur when a victim is merely forced to part with property. Rather, there must be an 'obtaining': someone . . . must receive the property of which the victim is deprived"). But what it means to "obtain" was not at issue in Panaro: Panaro's defendants raised no challenges based on the "obtaining" element,[70] and there was no doubt they appropriated the victim's

---

[70]  Defendants contended only that no threat was

(continued...)

property for themselves.  Id. at 946-47.  According to this
Court, Panaro "did not address" Hoelker or Zemek.  Pellicano I,
135 Fed. Appx. at 46.  Nor could it have overruled them, since
Panaro was not decided en banc.  Id. at 47.  This Court has
recognized that Scheidler's rule (which defendants claim is in
Panaro) is in "considerable tension" with Zemek.  United States
v. McFall, 558 F.3d 951, 956 (9th Cir. 2009).  To expect agents
to resolve this "tension" more accurately than the Chief
Magistrate is expecting too much under Leon.

That is particularly so given how Panaro's brief dicta on
the interpretation of "obtain" arose -- inserted sua sponte, in
an amended opinion issued months after the original opinion and
mandate, without adversarial briefing.[71]  The obtaining element
was not "central to [Panaro's] decision."  Sanchez v. Mukasey,

---

[70] (...continued)
communicated and there was no nexus to interstate-commerce.  Id.
at 947; see also Br. of Appellant, United States v. Panaro, Case
No. 99-10446 (9th Cir.), available at 2000 WL 33977159, at *5.

[71]  Compare United States v. Panaro, 241 F.3d 1104 (9th Cir.
2001) (original opinion), with Panaro 266 F.3d at 943 (amended
opinion).  See United States v. Panaro, Case No. 99-10446 (9th
Cir.), Dkt. Entry 58 (rehearing petition's issues, not including
meaning of "obtain" element).  It is not surprising that
California agents were unaware of dicta belatedly added to an
opinion in a case from Nevada, where the text at issue was not
necessary to the opinion, was not litigated by the parties, had
not yet been cited by another Ninth Circuit decision, and was not
referenced in model jury instructions, see Ninth Cir. Model Jury
Instr. 8.117 (2003 ed.) (repeating Zemek's holding for the
definition of "property," and not citing Panaro).

88

521 F.3d 1106, 1110 (9th Cir. 2008).  This Court's law on the
authority of such dicta was unsettled in November 2002.[72]  Just
as agents were not required to predict <u>Scheidler</u>, they cannot be
faulted for failing to predict that this Court would later change
its rules on dicta.

The many attorneys who approved the warrant's Hobbs Act
theory[73] also shows reasonable reliance, since "an officer's
consultation with a government attorney is of significant
importance to a finding of good faith." <u>Brown</u>, 951 F.2d at 1005;
<u>see, e.g.</u>, <u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235, 1249
(2012).

This case's history proves the agents' reasonable reliance.
Judge Tevrizian, in the 2002 Explosives Case, said that "the
issue of what it means to 'obtain' property under the Hobbs Act

---

[72]  Not until 2003 did this Court hold that Ninth Circuit
dicta is binding on an issue that "was not before" the prior
panel but was "germane to the eventual resolution of the case"
and resolved "after reasoned consideration in a published
opinion." <u>Miranda B. v. Kitzhaber</u>, 328 F.3d 1181, 1186 (9th Cir.
2003).  (Although <u>Miranda B.</u> cites <u>United States v. Johnson</u>, 256
F.3d 895, 914 (2001), for that point, the portion of <u>Johnson</u> that
<u>Miranda</u> cites received only four votes from <u>Johnson</u>'s <u>en banc</u>
panel.  <u>Johnson</u>, 256 F.3d at 898.  The rule therefore was not
established until <u>Miranda B</u>.)

[73]  RJN 19-20; <u>Pellicano I</u>, 135 Fed. Appx. at 51 (Reinhardt,
J., dissenting) (the warrant and affidavit were reviewed by "an
Assistant U.S. Attorney, a Section Deputy Chief, a Section Chief,
and the Chief of the Criminal Division" in the U.S. Attorney's
Office, plus a "Senior Litigation Counsel and a Deputy Chief with
the [Department's] Organized Crime and Racketeering Section").

89

. . . was and is one 'sufficient to create disagreement among thoughtful and competent judges.'" (RJN 23). This Court agreed in <u>Pellicano I</u>. 135 Fed. Appx. at 46. The court here also agreed. (JER 175).[74] Judge after judge has been unable to find the clarity in pre-<u>Scheidler</u> law that defendants say Ornellas should have found. The law does not require agents to scrutinize the magistrate's judgment so extraordinarily -- indeed, even reviewing <u>courts</u> "accord[] 'great deference' to a magistrate's determination." <u>Leon</u>, 468 U.S. at 914.

Because "thoughtful and competent lawyers and judges could have disagreed on whether, after <u>Panaro</u>, the misconduct that was the subject of this investigation constituted a violation of the Hobbs Act," this Court held, agents "manifested objective good faith in relying on the [November 2002] warrant." <u>Pellicano I</u>, 135 Fed. Appx. at 47.[75] <u>McFall</u>'s subsequent recognition of the

---

[74] Pellicano's request for a <u>Leon</u> hearing also was denied in his state case. (RJN 171).

[75] Christensen claims that <u>United States v. McFall</u>, 558 F.3d 951, 957 n.7 (9th Cir. 2009) says that "<u>Scheidler</u> . . . simply clarified <u>Panaro</u>, and did not make new law." (COB 23). But the footnote Christensen cites does not discuss <u>Panaro</u> at all. <u>McFall</u>, 558 F.3d at 957 n.7 (cited at COB 23). <u>McFall</u> elsewhere says that <u>Scheidler</u> agreed with <u>Parano</u>'s conclusion on the necessity of obtaining property to state a Hobbs Act offense. <u>Id.</u> at 956. But <u>McFall</u> also stated that <u>Scheidler</u>'s rule created "considerable tension" with <u>Zemek</u>. <u>Id.</u> at 957 n.7. <u>McFall</u> therefore reinforces that <u>Panaro</u> was in tension with <u>Zemek</u>. Since <u>Panaro</u> (unlike <u>Scheidler</u>) could not have overruled <u>Zemek</u>, <u>McFall</u> therefore bolsters the proposition that, whatever clarity
(continued...)

tension between <u>Panaro</u> and <u>Zemek</u> strengthens that conclusion, as do recent Supreme Court decisions underscoring the good-faith rule's importance: <u>Davis v. United States</u>, 131 S. Ct. 2419 (2011); <u>Herring</u>, <u>supra</u>; <u>Messerschmidt</u>, <u>supra</u>. Defendants' claim must fail.

(ii) <u>Christensen's Contrary Arguments Fail</u>

Christensen claims that <u>Leon</u> "does not extend to legal error as to whether the supporting affidavit alleged the elements of a crime." (COB 22). That novel assertion is barred by precedent. In <u>Benson v. Hightower</u>, 633 F.2d 869, 869-70 (9th Cir. 1980), agents executed a search warrant and made an arrest because they mistakenly believed that the federal currency-smuggling statute applied to South African Krugerrands. Although charges were later dropped because the statute did not cover Krugerrands, <u>id.</u> at 871, this Court applied qualified immunity to the agents' actions nonetheless. In so doing, <u>Benson</u> specifically rejected the argument Christensen makes here, ruling instead that the officers' misunderstanding of what constituted currency-smuggling under the law "does not, per se, vitiate the qualified immunity defense." <u>Id.</u> Because the standards for qualified immunity and <u>Leon</u> good faith are the same, <u>Messerschmidt</u>, 132 S. Ct. at 1245

---

[75](...continued)
<u>Scheidler</u> creates now, the law in November 2002 was unclear.

n.1, <u>Benson</u>'s holding applies to <u>Leon</u> good-faith as well.[76]  That
makes sense, since the purely legal issue of defining federal
offense elements is an area where magistrates' expertise will
typically exceed the agents'.  Since "'[p]enalizing the officer
for the magistrate's error . . . cannot logically contribute to
the deterrence of Fourth Amendment violations,'" <u>Brown</u>, 951 F.2d
at 1004, the good-faith doctrine applies.[77]

---

[76]  Christensen (COB 22) cites <u>Beir v. City of Lewiston</u>, 354
F.3d 1058, 1065 (9th Cir. 2004), to support his argument.  But
<u>Beir</u> had nothing to do with good-faith reliance on a warrant.
Rather, <u>Beir</u> stated officers cannot justify <u>warrantless</u> arrests
based on mistakes of law.  <u>Id.</u> at 1062.  That is a far different
question from whether an agent may rely on the magistrate's legal
determination.  Good-faith reliance on warrants under <u>Leon</u> by
definition involves a legal mistake -- whether the facts legally
amount to probable cause.  And Christensen's attempt to require
inquiry into agents' subjective understandings of offense
elements would violate the general rule that Fourth Amendment
questions do not depend on subjective intent.  <u>Devenpeck v.
Alford</u>, 543 U.S. 146, 153-54 (2004).

[77]  Christensen has wisely abandoned any argument that the
government cannot benefit from good-faith reliance because a
separate Department of Justice unit had filed an amicus brief in
<u>Scheidler</u>.  Given the size of the federal government, the number
of cases it participates in, and its nationwide breadth of
practice, positions taken in one case cannot bind the government
as to cases in other courts.  <u>United States v. Mendoza</u>, 464 U.S.
154, 159-60 (1984) (explaining why nonmutual estoppel does not
operate against the government).  Even if it could, the
advocating one position as the best reading of the Hobbs Act is
far different from saying that the statute or case law compels
that reading.  Indeed, the very granting of certiorari generally
indicates unclarity or conflicting precedent.

(iii)<u>Any Error Was Harmless</u>

Whether or not the affidavit presented probable cause for a Hobbs Act violation, it presented probable cause for state-law violations.  <u>See, e.g.</u>, Cal. Penal Code § 422 (threats); <u>id.</u> § 594 (vandalism).  Indeed, in Pellicano's state-court case, he was prosecuted, convicted, and sentenced to three years for the threats against Busch.  (RJN 162-63).[78]  If the federal application had been denied, law enforcement would not simply have given up on protecting a reporter under threat for her First Amendment activities.  Nor would they have ignored Proctor's tape-recorded statements about the crime's inception.  Rather, if a federal warrant had been denied, there would have been a <u>state</u> warrant permitting the same search and leading to the same results -- meaning that the evidence inevitably would have been found.

Because no Fourth Amendment violation occurs where an officer merely misunderstands which statute was violated, <u>Devenpeck</u>, 543 U.S. at 153-54, and because suppression is inappropriate for matters that would have been discovered even

---

[78]  Pellicano (POB 25 n.8) asserts without citation that there could not have been a § 422 offense without evidence of an actual bullet hole.  His § 422 conviction disproves that claim. (RJN 162-63, 158).  That conviction happened after the preliminary hearing (RJN 170) that Pellicano maintains (POB 28-29) proved the bullet's absence.

without the violation, <u>Nix v. Williams</u>, 467 U.S. 431 (1984), any
error was harmless and suppression should not lie.

> (2)    <u>The Court Properly Denied Defendants' Request
> for a *Franks* Hearing</u>

Under <u>Franks</u>, defendants may obtain a hearing to test an
affidavit's veracity only after making a "substantial and
preliminary showing" that the affidavit contained "knowingly" or
"recklessly" untrue statements that were "necessary to the
finding of probable cause."  438 U.S. at 155-56.  Defendants here
sought such a hearing based on purported misstatements in Agent
Ornellas' application for the November 2002 Warrant.  Because
their showing fell short of the <u>Franks</u> standard, their request
was properly denied.

> (a)    <u>Standard for *Franks* Hearing and Standard
> of Review</u>

Because warrant affidavits are presumed valid, <u>United States
v. Chavez-Miranda</u>, 306 F.3d 973, 979 (9th Cir. 2002), a party
moving for a <u>Franks</u> hearing must make two showings.  First, he
must "submit 'allegations of deliberate falsehood or of reckless
disregard for the truth," accompanied by an offer of proof.  <u>Id.</u>
Second, he must show materiality -- <u>i.e.</u>, that "the affidavit
cannot support a finding of probable cause without the allegedly
false information."  <u>United States v. Valencia</u>, 24 F.3d 1106,
1109 (9th Cir. 1994).  On both elements, "[t]he movant bears the

94

burden of proof and must make a substantial showing." <u>Chavez-Miranda</u>, 306 F.3d at 979.

The court's "finding[] . . . regarding materiality" is reviewed for clear error, <u>United States v. Fernandez</u>, 388 F.3d 1199, 1237 (9th Cir. 2004), as is its "finding that the government did not intentionally or recklessly make false statements," <u>United States v. Meek</u>, 366 F.3d 705, 716 (9th Cir. 2004). The ultimate decision whether to grant a <u>Franks</u> hearing is reviewed <u>de novo</u>, once all "underlying factual findings" are reviewed for clear error. <u>United States v. Staves</u>, 383 F.3d 977, 980 (9th Cir. 2004).

        (b)   <u>None of Defendants' Complaints Establishes Intentional or Reckless Dishonesty, and None Was Material to Probable Cause</u>

In a carefully reasoned decision, the court examined defendants' claims of misstatements and omissions, and found each claim wanting. Defendants do not show those decisions to be wrong, let alone clear error.

        (i)   <u>The Court Did Not Clearly Err in Determining that the Challenged Statements Would Not Have Altered Probable Cause</u>

Defendants fail to show clear error in the court's finding that the alleged errors and omissions would not have altered probable cause.

95

Defendants cannot defeat probable cause by exaggerating the minor inconsistencies in Proctor's account of his attack on Busch's car.  As the court found, "[m]ost of the supposedly erroneous details given by Proctor and omitted by Ornellas are of little consequence."  (JER 168).  "Proctor's use of the word 'pasted,' rather than 'taped,'" to describe how he affixed a sign to Bush's car "is not significant" given the more telling fact that he "knew the sign was affixed in some way to the windshield."  (Id.).  The minor discrepancy between the plastic container Proctor mentioned putting the fish in and the aluminum one noted in police reports was of no consequence, compared to Proctor's knowing "that a container was used at all."  (Id.).  And it would not have altered probable cause if the affidavit had said Busch's street was not narrow and had an egress, because "in the eyes of . . . a judge reviewing the warrant," the "weight of [any] inconsistency" with Proctor's passing description would have been "lessen[ed]" by the commonsense possibilities that Proctor could have "perceived or remembered the street incorrectly," or that "poorly parked cars" or some other temporary condition when Proctor was there could have "narrowed the street" for his purposes.  (JER 170).[79]

---

[79] (See also JER 170 (possibility that discrepancy could mean Proctor committed the crime but exaggerated the "risk of discovery or capture")); Part IV.A.2.c.(2)(b)(iii), infra (noting
(continued...)

Similarly, the purported discrepancy between defendants'
claim that the damage to Busch's windshield was caused by
something other than a bullet, and defendants' interpretation
that Proctor said he shot the windshield, makes no difference.
As the court found, even "[h]ad Ornellas added that no bullet had
been found, the probable cause determination would have been the
same." (JER 169).  If Proctor overstated the way the windshield
was damaged, that did not mean that he had not committed the
attack.  To the contrary, his knowledge of other details --
"including the precise location of the hole in the windshield" --
made clear his involvement.  (Id.).  Since the point was to
threaten Busch, it was irrelevant whether Proctor shot a hole in
the windshield or "used a tool to simulate a bullet hole."
(Id.).  A claim to have done the former when he really did the
latter could just be trying to "sound[] like more of a 'tough
guy.'"  (Id.).  That the purported "contradiction" between
Proctor's recorded statement and the physical evidence is likely
due to defendants' misinterpretation of Proctor's ambiguous
phrase about "put[ting] a bullet hole" in the window, see Part
IV.A.2.c.(2)(b)(iii), infra, is another reason why "it would not
have changed the probable cause determination" if the affidavit

---

[79](...continued)
evidence that Busch's street was not especially wide, and that it
restricted how drivers could turn when exiting).

had contained further facts showing that Busch's window was not shot.  (GER 1726-27).

Under the clear-error standard, the court's findings on materiality cannot be reversed unless they were not even "'plausible.'"  United States v. Working, 224 F.3d 1093, 1102 (9th Cir. 2000).  The finding that minor consistencies would not change probable cause was not just plausible -- it was highly reasonable.  Proctor incriminated Pellicano along with himself. "It is well-settled" that such "declaration[s] against penal interest meet[] the reliability" requirements for probable cause. United States v. One 56-Foot Yacht, 702 F.2d 1276, 1284 (9th Cir. 1983).[80]  As the court found, moreover, Proctor's account was corroborated by non-public details of the crime.  (JER 168-69). The court did not commit clear error.

Defendants' other arguments also fail the materiality test. Defendants (COB 30) accuse Ornellas of exaggerating when he said his experience as a licensed private investigator led him to believe certain records would be found at PIA's offices.  But the information ascribed to Ornellas' experience was independently provided on the same page from another source whose veracity

_____

[80]  One 56-Foot Yacht concerned informant-reliability requirements under Aguilar v. Texas, 378 U.S. 108 (1964).  Its reasoning applies a fortiori now that Aguilar's absolute requirement to prove reliability in every case has been superseded by the "totality of the circumstances" test of Illinois v. Gates, 462 U.S. 213, 230 (1983).

98

defendants do not challenge.  (JER 36).[81]  Deleting Ornellas'

statement would leave the same facts established through another

unchallenged part of the affidavit -- the very definition of

immateriality.  <u>Valencia</u>, 24 F.3d at 1109.[82]

Defendants also attack the affidavit's discussion of the

threat against Zeman.  (COB 27-28).  But as the court found, "the

<u>entire</u> discussion of Zeman is virtually irrelevant to the finding

of probable cause," because the basis for searching PIA was

"Proctor's statements regarding the Busch threat."  (JER 170

(emphasis added)).  That assessment was not clearly erroneous.

Defendants' other complaints -- that Ornellas should have

said the informant was paid,[83] or should have investigated other

---

[81]  Michael Wacks, a former FBI agent who was a licensed
private investigator for approximately three years, said that
"client files" maintained "at [private investigators'] places of
business" typically "contain . . . information indicating the
[client's] identity . . . and the purpose for which the
investigator has been retained, [plus] records of client
contacts, work performed for clients, and billing/payment
information."  (JER 36).

[82]  Similarly, defendants' continuing effort (COB 29) to
attack the consensual search of Proctor's home is immaterial.
How Proctor's home was searched (the court found no reason to
doubt Ornellas' account (JER 174)) was irrelevant, because
Pellicano had no Fourth Amendment standing in Proctor's
residence.  The only thing that could possibly matter was the
description of items found in Proctor's home -- and defendants
claim no misstatement as to those.

[83]  Whether the informant was paid would not affect his
credibility as a conduit for Proctor's statements, because
Proctor's statements were recorded.  Moreover, the affidavit
(continued...)

99

leads[84] -- likewise fail the materiality test, and certainly fail to establish clear error.

Unable to refute the court's findings, Christensen claims he does not need to show materiality. (COB 31-32). He is wrong. To get a hearing, Franks requires defendants to show that probable cause would not exist if the purported errors had been corrected. Franks, 438 U.S. at 171-72. Contrary to

---

[83] (...continued)
disclosed that the informant was "under indictment for conspiracy, mail and wire fraud" in a pending case in the same district. (JER 30). The court did not clearly err in finding that information about payments would not have altered probable cause, given these other disclosures. (JER 173); see United States v. Strifler, 851 F.2d 1197, 1201 (9th Cir. 1988) (only "a very naive magistrate" would "suppose that a confidential informant would drop in off the street with such detailed evidence [without] an ulterior motive. The magistrate would naturally have assumed . . . the informant was not a disinterested citizen.").

[84] Defendants claim that Ornellas should have waited to interview Seagal before getting the warrant, and claim that Ornellas believed Seagal to be unconnected to Proctor's attack on Busch. (COB 27). But the warrant was for permission to search Pellicano's business -- not Seagal's. Exactly who hired Pellicano was not relevant to probable cause -- if Proctor was wrong about who had hired Pellicano, that only meant that Pellicano had lied to Proctor, not that Proctor had lied to the CW. Proctor's connection to Pellicano was proven through "phone records showing numerous phone calls between Proctor and Pellicano during the relevant time period" (JER 174), as well as by Proctor's knowledge of attack details that were corroborated by physical evidence (JER 168-69). There thus was no clear error in the court's finding that "whether Seagal or someone else hired Pellicano was 'at best a secondary issue' with regard to the finding of probable cause to search Pellicano's offices given the ample evidence that Pellicano had hired Proctor to threaten Busch." (GER 1726).

Christensen's claim, <u>Mills v. Graves</u>, 930 F.2d 729, 733 (9th Cir. 1991), does not hold that the materiality requirement can be excused.  (COB 31).  <u>Mills</u> held the opposite, reaffirming that "no <u>Franks</u> hearing need be held if there is sufficient content in the affidavit apart from the challenged material to support a finding of probable cause."  <u>Mills</u>, 930 F.2d at 733.  Indeed, <u>Mills</u> upheld the denial of a <u>Franks</u> hearing precisely because "[w]ith or without the challenged statements, there [was] a sufficient basis for a finding of probable cause."  <u>Id.</u>[85]

Nor can defendants meet the standard of review by simply <u>asserting</u> that statements were material (COB 32), without <u>explaining</u> how the court misjudged the matter.  This Court reviews findings of non-materiality for clear error.  <u>Fernandez</u>, 388 F.3d at 1237.  Under that standard, "if the court's findings are "plausible . . . , the appellate court cannot reverse even if it is convinced it would have found differently."  <u>Husain v. Olympic Airways</u>, 316 F.3d 829, 835 (9th Cir. 2002).  Defendants cannot meet that burden, and effectively have not even tried.  Because defendants fail to demonstrate clear error in the

---

[85]  Christensen also misdescribes <u>United States v. Kyllo</u>, 37 F.3d 526, 530 (9th Cir. 1994), as saying that, "where a defendant establishes even a single falsehood made with the requisite mental state, all facts based on falsehoods in the affidavit must be disregarded."  (COB 32).  <u>Kyllo</u> contains no such statement or implication.

101

rejection of an element required for their <u>Franks</u> claim, their claim must be denied.

> (ii) <u>The Court Did Not Clearly Err in Finding No Intentional or Reckless Misstatements</u>

Defendants' <u>Franks</u> challenge must be rejected for an independent reason: The court did not clearly err in finding that none of the alleged errors involved intentional or reckless deception.

Reviewing the record as a whole, the court found that defendants' "attempt to portray Ornellas as intentionally or recklessly deceptive rests entirely on conjecture and innuendo." (JER 175).  For each alleged misstatement, the court found that Ornellas did not act recklessly or intentionally.[86]  Defendants do not show this to be clear error.[87]

---

[86]  (<u>See</u> JER 169 ("there is no evidence that Ornellas recklessly or intentionally withheld" information that Busch's windshield could have been damaged by something other than a gunshot); JER 170 ("[t]here is . . . no evidence . . . Ornellas intentionally or recklessly withheld" information about the layout of Busch's street); JER 170 ("no evidence . . . Ornellas intended to mislead or was reckless" in confusing John Rottger with John Rottger, Jr.); JER 171 (contrary to defendants' claim about the Zeman annotation on the Rottger photo-spread, "[t]here is no evidence of any pressure by Ornellas" for Zeman to change his mind); JER 171 (the possibility that Nasso could have had a motive to smear Seagal was "minor," and "there is no evidence . . . Ornellas intentionally or recklessly left this information out")).

[87]  Noting that an earlier application for a warrant to search Proctor's residence had been rejected, Pellicano implies
(continued...)

The court found significant that Ornellas' affidavit
included statements that were favorable to Pellicano – showing
that Ornellas was trying to discharge his duties honestly, rather
than mislead the court.  For instance, in discussing the Zeman
incident, "Ornellas specifically included in his affidavit
Proctor's remarks that Proctor did not think that Pellicano was
involved" -- a fact that "strongly undercuts any inference that
Ornellas omitted facts in order to skew the affidavit towards a
conclusion that Pellicano was involved in the Zeman threats."
(JER 170-71; see also JER 173 ("that Ornellas included CW's

---

(...continued)
that Ornellas reacted by adding misstatements in his later
application to search PIA.  (POB 16-17).  But comparison of the
rejected application to the successful one proves Pellicano's
claim false.  The rejection of the earlier application did not
relate to probable cause.  Rather, it apparently stemmed from the
magistrate's insistence on adding a computer-search protocol,
disallowing seizures of financial records and other documents,
and narrowing the seizure's scope to documents evincing
connections between Pellicano, Segal, Busch, and specified drugs.
Compare GER 2685-86 ("ITEMS TO BE SEIZED" list, with handwritten
instruction to "repeat ¶ 6 here[] and reference procedures in
¶ 7-8"), with id. at 13-15 (computer search protocol in
paragraphs 6-8).  The magistrate also apparently criticized the
Proctor search application for not providing for the return of
seized computers within 60 days.  (GER 2695).  In response, the
application to search PIA included the necessary provisions.
(JER 16-18; see GERT 83-84 (AUSA's "best recollection" was that
the Chief Magistrate Judge who reviewed the earlier application
required "minor changes in terms of an attachment that was in the
wrong place or modifications to the computer search language at
some point, which I know Judge Block often has some concerns
about.  I don't remember the specifics.  I do have a very firm
belief that it in no way bore on the probable cause statement")).

103

indictment for . . . fraud, undercuts any inference that Ornellas was trying to misrepresent CW's credibility")).[88]

These findings cannot be reversed unless clearly erroneous. Meek, 366 F.3d at 716. They were not. Moreover, most of defendants' claims concern alleged omissions, and "there is a higher bar for obtaining a Franks hearing on the basis of an . . . omission as opposed to a[] . . . false affirmative statement." United States v. Fowler, 535 F.3d 408, 415 (6th Cir. 2008).[89] The trial confirmed the emptiness of defendants' allegations against Ornellas: when given the chance to examine Ornellas about the affidavit, defendants elicited nothing that undermined it.[90] Because defendants do not show clear error in

---

[88] (See also JER 171 (finding that Ornellas' omission of Proctor's prior convictions did not lead to inference of reckless or intentional deception; inclusion of the convictions would have bolstered probable cause by confirming the likelihood that Proctor, a criminal, was someone "likely to be engaged in illegal activity" like the crime against Busch)).

[89] See also United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990) (failure to include a fact is less likely to present a question of impermissible official conduct); United States v. Reivich, 793 F.2d 957, 961 (8th Cir. 1986) (recklessness may be inferred from omission only where the omitted fact "would have been 'clearly critical' to the finding of probable cause"); Lombardi v. City of El Cajon, 117 F.3d 1117, 1124 (9th Cir. 1997) ("embrac[ing] the . . . reasoning" of Reivich and Colkley).

[90] Arneson, examining Ornellas, confirmed that Ornellas' affidavit was "truthful and accurate to the best of [his] ability." (GERT 5821). No defendant undercut that answer. In contrast to defendants' current argument attacking Ornellas'
(continued...)

the court's determination as to this essential element of their
Franks claim, the decision must be affirmed.[91]

> (iii) Defendants' Claims of
>        Misstatements and Omissions
>        Are Unsubstantiated

Finally, defendants' main claims turn out not to concern
misstatements or omissions at all.

---

[90] (...continued)
description of his private-investigator experience, Pellicano at
trial tried to build up that experience, in an attempt to have
Ornellas agree that private investigators value DMV information
and criminal records.  (GERT 6246-47).  Given that position at
trial, Pellicano cannot take the contrary position now.

[91]  Rather than prove intentional falsehoods in the
affidavit, defendants attempt to smear Ornellas' reputation by
pointing to a later, unsubstantiated accusation that Ornellas
once misremembered a detail in an unconnected case.  (COB 30).
Defendants refer to a disagreement between Ornellas and a Special
Assistant United States Attorney (SAUSA) as to Ornellas'
recollection in 2003 of whether he had provided a particular tape
to a prosecutor in 1998.  (GER 2541).  But that does not
constitute an omission for Franks purposes -- the government
could not have informed the magistrate in 2002 of an accusation
that arose the next year.  Moreover, no judge made a finding that
Ornellas was not credible.  Rather, the SAUSA submitted proposed
findings asking the court to credit another AUSA's recollection
of the five-year-old event over Ornellas' (GER 2621-33), and the
judge rejected the proposed finding (GER 2637, 2641 ("I haven't
got [a] basis to enter all these findings.")).
     Defendants' attack based on this incident therefore fails.
There was no adverse credibility finding.  Any discrepancy
between Ornellas' memory and the AUSA's was consistent with
recollection issues due to the passage of time, not intentional
deceit.  More importantly, defendants must show their entitlement
to a Franks hearing by showing that the warrant affidavit's
material assertions were intentionally or recklessly wrong and
that those assertions caused the warrant to issue improperly.
They cannot use unsubstantiated subsequent disputes to simply
label the agent a liar and be done.

The Bullet-Hole.  Defendants expend great energy asserting that Ornellas lied by not finding and reporting evidence that supposedly contradicted Proctor's claim to have shot Busch's window.

But the Proctor transcripts show that Proctor did not necessarily make such a claim -- meaning that defendants' supposed trump card, the absence of a bullet in the car, did not contradict Proctor at all.  Proctor told the informant he "put a bullet hole right in the . . . window," saying his intent was for Busch to "see it's a bullet right there."  (JSER 409 (emphasis added); see also id. ("I put a bullet hole so that, you know, so the bullet shot the car up, you know.  So she'd see it's a bullet right there.")).  Although defendants read this as Proctor saying he shot the car, he could have meant instead that he made something that looked like a bullet hole so Busch would think the car was shot -- something entirely consistent with the plot to scare Busch.[92]  Ornellas' affidavit faithfully reproduced Proctor's actual words, reporting that Proctor said he "put a bullet hole" in the windshield.  (JER 31).  The affidavit also

---

[92]  The court (which examined the crime-scene photos) found that "[t]he hole in the windshield appears as if it might have been caused by a bullet, at least to the Court's untrained eye." (JER 168-69; see GSER 5-10 (crime-scene photos)).  Busch, in testimony, described it as a "round hole."  (GERT 4921).  Both observations are consistent with Proctor's saying he purposefully left a hole that would look like a bullet hole.

106

included Busch's report that her window had a "shatter mark," and that a neighbor described it as "punctured" (JER 28), which nobody disputes.  Ornellas' statements were accurate.

Defendants' claim of new evidence is thus irrelevant.[93] Given that Proctor may simply have said he made it <u>look</u> like the window was shot, defendants' attempt to further prove the absence of a bullet is just more tilting at windmills.  It fails to establish an omission in the affidavit, fails to establish intentional or reckless disregard for the truth (especially under the heightened standard for claims of omission), and is irrelevant to probable cause.  When the court reviewed Pellicano's new evidence post-trial, it found the existence <u>vel non</u> of a bullet hole immaterial: it "would not have changed the outcome -- the warrant would still have been issued."  (JER 528). The court likewise found that Christensen's new evidence failed to establish either the <u>mens rea</u> or materiality prongs of the

---

[93]  Moreover, the expert report about the windshield hole on which Christensen relies was not submitted until his motion for reconsideration.  Because no governmental hindrance prevented Christensen from hiring the expert earlier, the court was not obliged to consider it, and neither is this Court.  Pellicano, in turn, has forfeited his new-evidence arguments through deficient citations violating Ninth Circuit Rule 28-2.8.  <u>See</u> POB 27-30 (no record citations for numerous factual assertions); POB 27 (citing "ER5044-5305" for a six-line quote); POB 25 (citing "ER987-1085" for two-line quote).

Franks test.[94]  Since defendants do not show these findings to be
clear error, their claims based on new evidence fail.[95]

    The Proctor-Residence Search.  Defendants claim (COB 29)
Ornellas lied in saying that Proctor's landlord "signed a written
consent form authorizing a search of [Proctor's] room, to which
she had access."  (JER 33).  But the consent form is in the
record (GSER 30), and Christensen admits the landlord signed it
(COB 29 n.11).  Though Christensen claims that consent was
motivated by subjective feelings of fear, that would not make
Ornellas' statement false.  Regardless, the landlord's
motivations were immaterial to the warrant to search PIA, because
Pellicano and Christensen had no Fourth Amendment standing in
Proctor's house.  Defendants' allegation about the Proctor search

---

    [94]  (GER 1726-27 (assuming, for argument's sake, that
"Ornellas knew, or had reason to know, that Proctor had not fired
a gun into Busch's windshield," there was "no reason to believe
. . . Ornellas recklessly or intentionally withheld this
information," and "had the information been included in the
affidavit it would not have changed the probable cause
determination")).

    [95]  Pellicano also implies that Proctor's tape recorded
statements were not credible because no drugs were found at
Proctor's house despite comments about drug-dealing.  (POB 17).
Pellicano fails to advise this Court that Proctor was convicted
of multiple drug charges stemming from his comments to this
informant.  (RJN 174-78).
    Christensen cites his lawyer's affidavit reporting on a 2008
interview in which the informant described his meetings with
Ornellas.  (COB 26).  But it was not clear error for the court to
determine that Ornellas' contemporary account from 2002 was more
credible than the informant's six-years-stale account from 2008.

is either a backdoor attempt to litigate a search where they have

no standing, or is just another gratuitous slur.  Neither

suffices to get a <u>Franks</u> hearing.

    <u>Busch's Street</u>.  Defendants claim Ornellas should have said

that Proctor inaccurately described Busch's street as a narrow

one that left him no way out.  But it is not even clear there was

any contradiction to report.  Defendants cite not to Proctor's

recorded statements, but to an FBI report on the informant's

retelling of Proctor's statements.  (COB 26).  The report says

"Proctor . . . indicated . . . [Busch's] street was narrow and

there was no way out."  (JSER 416).  To say a city street has "no

way out" is nonsensical, since even a dead-end street must

connect to another street somewhere.  Clearly, Proctor's precise

nuance was lost when his statement was conveyed first through the

informant, then by the report writer.  In context, the statement

is reasonably understood as meaning Proctor believed that the

street's features would make it risky to "torch" Busch's car.

(<u>Id.</u>).  Photos show a standard residential street, which is

indeed narrow compared to a highway or boulevard.  (GSER 5-10).

Busch testified that although her street did not dead-end, it

allowed only a right-hand turn (GERT 4990) -- a restriction on

egress making Proctor's statement reasonable in context.

Ornellas would not necessarily have focused on that single

sentence from the report, nor would he have understood it as

109

defendants do.  The court also found no evidence that Ornellas recklessly or intentionally omitted the purported contradiction. (JER 170).  That finding was not clear error, especially given the heightened standard for claims of omission.  Nor do defendants undercut the court's judgment that Proctor could simply "have perceived or remembered the street incorrectly" in the heat of carrying out his attack, or that "conditions could have been different when Proctor was there," with "poorly parked cars narrow[ing] the street."  (Id.).  The court did not clearly err in determining that, "[h]ad Ornellas added that there seemed to be easy egress from Busch's street, the probable cause determination would have been the same."  (JER 170).  Defendants' claim fails the Franks requirements at every step.

The Zeman photo-spread.  Defendants' claim that agents altered Zeman's identification statement is frivolous.  Zeman's self-corrections to the photo-spread (JSER 530 ("This looks closest.  Like him but not ~~him~~ sure.") track his written statement, which likewise recognized a close similarity but expressed a lack of certainty: "Number one looks like him, but not him exactly.  Not sure."  (JSER 531).  As the court found, "[t]here is no evidence of any pressure by Ornellas -- no declaration from Zeman has been submitted -- and no evidence that the result of the photospread was any different than . . . described in the affidavit."  (JER 171).  Defendants do not show

110

that this judgment was so implausible as to be clear error; nor do they undercut the court's finding that the Zeman discussion was collateral to probable cause.

   d.   The July 2003 Warrant Was Neither Overbroad Nor Unparticular

Christensen and Pellicano also complain that the July 2003 Warrant was overbroad and insufficiently particular.  The claims fail, because the warrants were appropriately targeted, and agents relied on them in good faith.[96]

   (1)   Standard of Review

In determining a warrant's facial validity, the court considers both particularity and breadth.  In re Grand Jury Subpoenas, 926 F.2d 847, 856 (9th Cir. 1991).  Particularity is the requirement that the warrant clearly state what is sought; breadth concerns the requirement that the warrant's scope be limited by the scope of probable cause.  Id. at 856-57.  Search warrants are read "'in a common sense fashion,'" with reviewing courts giving "deference" to the issuing magistrate's determination.  Id. at 855-56.  "[U]nderlying factual findings are reviewed for clear error."  United States v. Crawford, 372

---

[96]  Because the November 2002 Warrant was constitutional, defendants' attempt to suppress the July 2003 Warrant as fruit of the earlier warrant fails.

F.3d 1048, 1053 (9th Cir. 2004).[97]  Because Leon's good-faith-reliance doctrine applies to assertions that a warrant was overbroad, United States v. Luk, 859 F.2d 667, 676-78 (9th Cir. 1988), or insufficiently particular, United States v. Evers, 669 F.3d 645, 654 (6th Cir. 2012), a facially invalid warrant does not result in suppression unless the affidavit was "so lacking . . . as to render official belief" in the warrant's propriety "entirely unreasonable," Leon, 468 U.S. at 923.

Although Christensen claims questions of particularity and overbreadth are reviewed de novo (COB 34), his cited case mandates de novo review only for particularity.  See United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986).

Review of overbreadth is more complicated.  Overbreadth depends on the scope of probable cause, In re Grand Jury Subpoenas, 926 F.2d at 587, and this Court "review[s the] magistrate's finding of probable cause to issue a search warrant for clear error, [giving] 'great deference' to [the magistrate's] finding," United States v. Brobst, 558 F.3d 982, 993 (9th Cir. 2009).  Thus, although the ultimate overbreadth determination is

---

[97]  Clear-error review applies whether the findings were based on written records or live testimony.  See United States v. Stevenson, 396 F.3d 538, 543 (4th Cir. 2005) (in suppression case: "even when findings of fact are not based on observations of credibility, but rather . . . on entirely documentary evidence, appellate courts must nonetheless defer to the trial court's factfinding function"); Green v. Hall, 8 F.3d 695, 698 n.1 (9th Cir. 1993) (civil case).

reviewed <u>de novo</u>, <u>Brobst</u>, 558 F.3d at 991, the magistrate's underlying judgment as to the scope of probable cause receives deferential clear-error review.

> (2)   The Warrant Defined and Narrowed the Seizable Items' Scope

The July 2003 Warrant authorized further search of imaged copies of a list of precisely specified storage devices, each of which were seized and copied previously pursuant to warrants whose specificity and breadth defendants do not challenge.  (JSER 316-20).[98]  It set forth a computer search protocol, and a procedure for reviewing searched items to determine whether they were within the warrant's scope and whether they were privileged. (JSER 381-88).

The warrant listed "ITEMS TO BE SEIZED" as follows: "[e]vidence of violations of [18 U.S.C. §§] 2511 (Interception and Disclosure of Wire, Oral, or Electronic Communications)[,] . . . 1030 (Unauthorized Use of Computer Information)[,] . . . 1343 (Wire Fraud)[,] and . . . 371 (Conspiracy)," falling into two categories: (a) enumerated types of "documents and electronic records reflecting the interception of, or the capability of intercepting telephonic communications, or the unauthorized use of, or access to, confidential law-enforcement databases or

---

[98]   Christensen mistakenly points the Court to the January 2003 Warrant.  (COB 34 (citing JER 101)).

confidential databases for personal financial information, wire fraud and conspiracy"; and (b) "[a]ll audio recordings of telephonic conversations, whether contained on disc, tape, computer file, or other media format."  (JSER 313-6).

Defendants do not contest the court's "[c]ommon sense" finding that the preamble to the ITEMS TO BE SEIZED list functioned as a limitation on the list of seizable items.  (JER 157).  To be seized, therefore, documents and records had to (1) be evidence of violations of the specified crimes, (2) fall into the list of enumerated types of records and documents, and (3) "reflect[] the interception of . . . telephonic communications" etc.  Audiorecordings, in turn, could be seized only if they were both (1) "audio recordings of telephonic conversations," and (2) evidence of violations of the specified crimes.[99]

(3)  The Warrant Was Sufficiently Particular

To fulfill the Fourth Amendment's particularity requirement, a warrant "need only be reasonably specific in its description of

---

[99]  The warrant was further narrowed by its incorporation of the affidavit, computer-search protocol, and search-procedure memorandum.  (GSER 601, 609-16); see United States v. Towne, 997 F.2d 537, 547 (9th Cir. 1993) (documents incorporated into or accompanying the warrant are construed as "part of" the warrant); Luk, 859 F.2d at 677 ("possession of the affidavit when the officers conduct their search . . . is evidence of [Leon] good faith").  Here, the executing agents were required to read the affidavit (GSER 601, 616), which provided additional details about the manner in which PIA committed the specified crimes, thus further limiting the search's scope.

114

the objects of the search and need not be elaborately detailed."
United States v. Hayes, 794 F.2d 1348, 1354 (9th Cir. 1986).
While "[t]he level of specificity required 'varies depending on
the circumstances of the case and the type of items involved.'"
United States v. Hill, 459 F.3d 966, 973 (9th Cir. 2006), the
basic requirement is that the warrant's terms must "enable the
person conducting the search reasonably to identify the things
authorized to be seized," Spilotro, 800 F.2d at 963.

The July 2003 Warrant met that test.  Indeed, "[i]t would
have been difficult for the government to have been more
particular."  (JER 158).  Contrary to Christensen's claim, the
warrant did not allow agents "to seize 'all audiorecordings'" or
"every single recording" on Pellicano's computers.  (COB 34-35).
Those assertions rely on Christensen's misleading truncation of
the warrant's language.  The warrant actually allowed seizure
only of "audio recordings of telephonic communications."  (JSER
313-6 (emphasis added)).  The underlined language substantially
narrowed the seizure's scope, focusing on evidence likely related
to wiretapping.  This Court has upheld search warrant provisions
that were far less particular.  E.g., United States v. Wong, 334
F.3d 831, 837-38 (9th Cir. 2003) (warrant allowing agents to
seize any "data as it relates to this case").[100]

---

[100]  Defendants do not challenge the warrant's specificity as
                                                (continued...)

115

The warrant was further limited by prefatory language allowing seizure only of evidence of violations of four specified statutes.  Such warrants limited "as to a particular crime" have "withstood scrutiny under the particularity requirement." United States v. Michaelian, 803 F.2d 1042, 1048 (9th Cir. 1986); see, e.g., United States v. Hernandez-Escarsega, 886 F.2d 1560, 1567-68 (9th Cir. 1989) (warrant authorizing seizure of "records . . . reflecting the possession and/or distribution of controlled substances"); United States v. Fannin, 817 F.2d 1379, 1383 (9th Cir. 1987) (warrant for items "tending to establish illegal trafficking in hashish and other controlled substances," etc.). In United States v. Washington, 797 F.2d 1461, 1472 (9th Cir. 1986), this Court held that the portion of a warrant authorizing seizure of "records, notes, [and] documents indicating Ralph Washington's involvement and control of prostitution activity" was "narrow enough to satisfy the particularity requirement of

---

[100](...continued)
to the other category of seizable items -- documents and records. (See COB 32-36).  As the court found (JER 161), even if the audiorecording category was unparticular, any error would therefore be harmless, since the Christensen-Pellicano recordings were also seizable under the other category, as "documents and electronic records reflecting the interception of, or the capability of intercepting telephonic communications" constituting "[e]vidence of violations of [18 U.S.C. §] 2511." (JSER 313-6).  See United States v. Holzman, 871 F.2d 1496, 1509-10 (9th Cir. 1989) (finding one part of warrant's description unparticular, but upholding seizure because items were seizable under another part that was adequately particular).

116

the Fourth Amendment," because it "effectively tells the officers
to seize only items indicating prostitution activity." Id.  The
same reasoning applies here.[101]  At minimum, in light of such
cases, the agents acted in good faith when they relied on this
warrant after its approval by the magistrate and vetting by
attorneys.

(4)   <u>The Warrant Was Not Overbroad</u>

Defendants' overbreadth claim is similarly meritless.

Christensen's complaint that "[p]robable cause did not exist
to seize '<u>all</u> audio recordings,' as the warrant authorized" (COB
35), depends on his misleading truncation of the warrant's
language.  As previously shown, the warrant authorized seizure of
"all audio recordings <u>of telephonic conversations</u>" (JSER 313-6
(emphasis added)).  Because Pellicano was being investigated for

---

[101]   <u>Spilotro</u> is not to the contrary.  That case found a
warrant insufficiently particular where it failed to identify the
alleged criminal activities in connection with which the items
were sought, failed to tailor the list of items to those
typically associated with the suspected crimes, and allowed
seizure of items relating to violations of "any one of <u>thirteen</u>
statutes, some of exceptional scope."  800 F.2d at 960, 964-65.
Here, by contrast, the warrant listed just four statutes, and (as
the court found) the citation of the wire fraud and conspiracy
statutes did "not mean to authorize a broad seizure of anything
that might have to do with a general conspiracy or unspecified
types of wire fraud."  (JER 158).  Rather, in context, "the
particular type of 'wire fraud' at issue was fraud relating to
the more specific crimes [listed] and 'conspiracy' means
conspiracy to commit the other crimes listed."  (<u>Id.</u>; <u>see also</u>
JER 160).

117

wiretapping, this effectively targeted the audiorecording prong to the crime being investigated.

Christensen next argues the warrant was overbroad "because it was unlimited as to time" and was not limited to crimes against the precise victims the government had already identified.  (COB 35).  But the law does not require date specifications where other features of the warrant already restrict the scope of seizure to items with probable cause. United States v. Hay, 231 F.3d 630, 637 (9th Cir. 2000) (although warrant was not "narrowed by specific acts, time frames or persons," it was not overbroad because preface limited scope to violations of specified statutes); United States v. Gomez-Soto, 723 F.2d 649, 652 (9th Cir. 1984) (warrant not overbroad in authorizing record seizure "relating to travel outside the United States" with no date restriction).  Regardless, Christensen's argument is immaterial.  Limiting the warrant to evidence from 1999 to July 2002 as Christensen advocates (COB 35) would not have affected the evidence relevant to Christensen, since the Christensen-Pellicano recordings were from March through May of 2002.  See Part III.B, supra.

Given the showing of probable cause for continuous crimes and multiple victims over an eight-year period,[102] the Fourth

---

[102]  The affidavit described continuous criminal conduct --
(continued...)

Amendment did not require the magistrate to limit the search to victims whose identities were already known.  In Hayes, 794 F.2d at 1348, officers searched the office of a doctor who was suspected of violating controlled substance laws with respect to 58 patients.  The defendant argued "the warrants should have been limited to those 58 patient files."  Id. at 1356.  This Court disagreed, reasoning that "[t]he 58 known cases could fairly be considered as representative of more pervasive violations" of the same statute.  Id.

That reasoning is even stronger here.  Pellicano commissioned an elaborate computer program in 1995 specifically for intercepting telephone calls (JSER 348-50) -- an unlikely investment if the program were to be used for only a few cases. Wiretapping was established by employee and client interviews. (JSER 351-68).  Pellicano "routinely acquired confidential

_____

[102](...continued)
including wiretapping and computer fraud -- from 1994 through 2002.  A PIA employee from 1994-1998 and 2001-2002 explained that "throughout [her] employment" Arneson provided PIA with DMV and criminal-history information.  (JSER 325).  Employees from 1998-2001 and 2000-2002 gave similar information.  (JSER 330, 326). LAPD-database records revealed Arneson's accessing confidential information on PIA-targets from 1999 to 2002.  (JSER 336-37, 339-41, 343-44).  Telesleuth was developed in 1995 (JSER 348), and the half-tap discovered on Busch's line showed Pellicano's wiretapping continued through November 2002.  PIA employees and clients gave information on PIA wiretapping during 1996 (JSER 364-68), 1999-2000 (JSER 360-62), and 2000-2002 (JER 326, 351-54), and a letter referenced in the affidavit established that Pellicano was believed to be wiretapping during the Gordon Jones rape case in 1998-1999 (JSER 368, 334).

119

telephone records from individuals within the phone company"
(JSER 344), and PIA's standard procedure when opening a new case
was to obtain confidential criminal-history and DMV records from
Arneson (JSER 329-30).  The agents and magistrate appropriately
"infer[red] . . . that the scope of the evidence presented
represents the 'tip of the iceberg,'" Michaelian, 803 F.2d at
1045, such that the specific known PIA violations were likely
"representative of more pervasive violations" of the same
statutes, Hayes, 794 F.2d at 1356.  (See JER 159).  The
magistrate's judgment as to the extent of probable cause would
deserve affirmance even if reviewed de novo.  But because
magistrates' judgments of probable cause receive "'great
deference'" and "clear error" review, Brobst, 558 F.3d at 993,
the need to affirm is even clearer.  At minimum, in light of
Hayes, agents were not reckless to rely on the magistrate.[103]

Precedent forecloses defendants' argument that the computer
searches should have been limited to files whose titles

―――――――――――――――

        [103] Christensen's reliance (COB 35-36) on United States v.
SDI Future Health, Inc., 568 F.3d 684 (9th Cir. 2009), is
misplaced.  SDI found overbroad a warrant allowing agents to
seize, without limitation, all banking records (even records
relating to employees rather than the target company), all
"memoranda and E-mail," and all "rolodexes, address books and
calendars."  Id. at 704-05.  Unlike the warrant in SDI, which did
not require seized items to be evidence of specific statutory
crimes, the warrant here specified the statutory violations at
issue, seeking "a limited universe of items that [were] evidence
of a limited number of well-defined crimes."  (JER 159).

referenced previously identified PIA victims and clients.  "There is no way to know what is in a file without examining its contents."  Hill, 459 F.3d at 978 (quoting district court opinion of Kozinski, J.).  Because "[c]omputer files are easy to disguise or rename," the government is "not . . . required to trust the suspect's self-labeling when executing a warrant."  United States v. Adjani, 452 F.3d 1140, 1150 (9th Cir. 2006).  The affidavit here showed that Pellicano knew of the danger of possible searches and tried to disguise his activities through computer encryption and other methods.  (JSER 349-50, 327).  Requiring agents to "limit their searches to files that [Pellicano] . . . labeled in a particular way" would make no more sense than "saying police may not seize a plastic bag containing a powdery white substance if it is labeled 'flour' or 'talcum powder.'"  Hill, 459 F.3d at 978.  The warrant therefore properly allowed agents to examine the entire computer system to find files satisfying the requirements for seizure.  See United States v. Giberson, 527 F.3d 882, 889-90 (9th Cir. 2008).[104]

---

[104]  While some members of this Court have advocated more-restrictive procedures for computer searches, see Comprehensive Drug Testing, 621 F.3d at 1178 (Kozinski, C.J., concurring), this Court has not adopted such a standard.  Regardless, under Leon, evidence cannot be suppressed for agents' failure to anticipate later changes in law.

(5)  Agents Relied on the Magistrate's Judgment in
     Good Faith, and Any Overbreadth Was Harmless

"When officers have acted pursuant to a warrant, the
prosecution should ordinarily be able to establish objective good
faith without a substantial expenditure of judicial time."  Leon,
468 U.S. at 924.

The court properly found that, even if the July 2003 warrant
was defective, suppression was precluded by Agent Ballard's good-
faith reliance on the magistrate judge's judgment in issuing the
warrant.  (JER 159-61).  In issuing the warrant, the magistrate
determined that probable cause existed for the search's scope,
and that the warrant was sufficiently particular.  (JSER 313-3).
Before that, the warrant was reviewed by counsel.  (JSER 160).
Reliance on the magistrate's and prosecutors' judgment was
objectively reasonable.  E.g., Luk, 859 F.2d at 678.

To establish a lack of good-faith reliance, defendants must
establish that the warrant's issuance amounted to such
"professional[] [in]competence" by the magistrate, Malley v.
Briggs, 475 U.S. 335, 346 n.9 (1986), that agents should have
discounted entirely the magistrate's decision.  "[T]he threshold
for establishing" inappropriate reliance is "high."
Messerchmidt, 132 S. Ct. at 1245.  In Messerchmidt, based on
evidence that the suspect had used a particular kind of gun in a
non-gang-related crime, the police executed a warrant authorizing

122

them to search "for all guns and gang-related material." <u>Id.</u> at
1246.  The suspect's family sued, claiming the warrant was
overbroad.  <u>Id.</u> at 1243.  After noting that the standards for
qualified immunity and <u>Leon</u> good-faith are the same, <u>id.</u> at 1245
n.1, the Court ruled that the officers' good-faith reliance on
the warrant shielded them from liability, <u>id.</u> at 1246.  Given
knowledge about one gun and the suspect's gang activities, the
Court held, "a reasonable officer could conclude that there would
be additional illegal guns . . . that [the suspect] owned." <u>Id.</u>
The Court also found good-faith reliance in the search for
evidence of gang affiliation, since officers could reasonably
believe such evidence would be "helpful in prosecuting" the
suspect -- not only by "establish[ing] motive" for the crime, but
also by "support[ing] the bringing of additional, related
charges" and gathering material "helpful in impeaching [the
suspect] or rebutting . . . defenses." <u>Id.</u> at 1247-48.

        <u>Messerschmidt</u> compels affirmance here.  Agents knew of
specific illegal activities -- such as wiretapping specific
targets, acquiring confidential police and phone-company
information, and so forth.  Evidence of additional victims would
help to prove Pellicano's wiretap capabilities, modus operandi,
and "motive," could "support the bringing of additional related
charges," and could provide "impeach[ment" and "rebut[tal]"
material for trial.  <u>Id.</u>  It thus was not unreasonable "to

believe . . . that there was probable cause to search for all
. . . [wiretap]-related materials," id. at 1246-47 -- a
conclusion strengthened by the warrant's prior approval by
government counsel.  Compare id. at 1249, with JER 160.

Christensen's reliance (COB 36) on pre-Messerschmidt cases
is therefore off-point.  Although Messerschmidt acknowledges that
a warrant will not "automatically" make the officer's reliance
reasonable, Messerschmidt also makes clear that any exceptions
are narrow -- such as cases where the warrant was "nonsensical[]"
and "failed to describe the items to be seized at all."  132 S.
Ct at 1249-50.  Because such extraordinary circumstances were not
present here, the good-faith doctrine applies.[105]

---

[105]  In addition to being superseded, the pre-Messerchmidt
cases fail to support defendants' arguments even on their own
terms.  Christensen claims that United States v. Stubbs, 873 F.2d
210, 212 (9th Cir. 1989), "rejected . . . good-faith . . . where
a warrant described broad categories of documents without
reference to criminal activity and failed to describe
specifically the items to be seized."  (COB 36 (emphasis added)).
But here the warrant allowed items to be seized only if they were
evidence of specified crimes (JER 158), making Stubbs
inapplicable even on its own terms.
     Defendants' reliance on Center Art Galleries-Hawaii v.
United States, 875 F.2d 747 (9th Cir. 1989), similarly fails.
The warrant in Center Art Galleries "was overbroad because it
allowed virtually unrestricted seizure of items without
describing the specific crimes suspected."  Hay, 231 F.3d at 637
(emphasis added).  Since the warrant here did describe the
specific crimes suspected, Center Art Galleries has no
applicability.  Moreover, Center Art Galleries involved a
particularly overbroad search: the "defendants were suspected of
mail and wire fraud involving . . . forged Salvador Dali
paintings," but the warrant allowed seizure of "all 'documents,
                                        (continued...)

The agents' good-faith rested on another basis as well. "[E]ven an 'extraordinarily broad' warrant authorizing . . . seizure of essentially all business records may be justified when there is 'probable cause to believe that fraud permeated the entire business operation.'" <u>United States v. Smith</u>, 424 F.3d 992, 1006 (9th Cir. 2005). Such cases also permit "a more flexible reading of the particularity requirement." <u>United States v. Bradley</u>, 644 F.3d 1213, 1259 (11th Cir. 2011).

The leading case is <u>Hayes</u>, 794 F.2d at 1355, where the magistrate's warrant allowed seizure of "all records that related to the procuring, transferring, administering, prescribing, or dispensing of controlled substances." <u>Id.</u> at 1355. This Court rejected overbreadth and particularity challenges, even though

---

[105](...continued)
books, ledgers, records and objects which are evidence of violations of criminal law.'" <u>United States v. Noushfar</u>, 78 F.3d 1442, 1447 n.4 (9th Cir. 1996). A warrant to seize evidence of all violations of <u>any</u> criminal law is obviously different than one to seize evidence of violations of specific statutes. Nor did the seizure's scope here approach the "five truckloads of documents . . . and . . . property" seized in <u>Center Art Galleries</u>. <u>Id.</u>

Christensen also argues <u>Leon</u> cannot apply unless the magistrate specifically told agents that overbreadth was not a problem. (COB 36 n.13 (citing <u>United States v. Kow</u>, 58 F.3d 423 (9th Cir. 1995)). That makes no sense: <u>every</u> time a magistrate signs a warrant, she is representing that the warrant is proper. There is no reason to require specific warnings for overbreadth when none is required for other matters. Regardless, Christensen's position is no longer tenable after <u>Messerschmidt</u>, where a good-faith defense to overbreadth was upheld without any such comments from the magistrate.

agents searched "over 10,000 patient files" to discover the ones bearing on the criminal allegations at issue.  Id.  The Court recognized that "[i]n searches of this nature, 'some innocuous documents will be examined, at least cursorily, . . . to determine whether they are, in fact, among those papers authorized to be seized.'"  Id.  This Court nevertheless upheld the broad search, because the "known [violations] could fairly be considered as representative of more pervasive violations of the Act."  Id.[106]

That rule governs here.  The government had evidence of systemic criminality at PIA.  (JSER 315-16).  The identified victims were "representative of more pervasive violations." Hayes, 794 F.2d at 1356.  The evidence showed a "'pattern of illegal conduct'" infecting the company's business."  Bradley, 644 F.3d at 1259.  The magistrate found this sufficient for the search's scope, and the agent reasonably trusted the magistrate's judgement.

(6)  Any Overbreadth Was Harmless

It would not have changed the outcome in this case if the seizure list been limited, per Christensen's arguments, to evidence regarding previously identified victims.  The recordings

---

[106]  To qualify for permeated-with-fraud treatment, the government's affidavit need not show that all of the business' activities were criminal.  Hayes approved a search of over 10,000 patient files where the government had specific evidence of wrongdoing with respect to just 58.

of Pellicano's dealings with Christensen were relevant to the previously known victims, because "proof of similar acts is admissible to show intent or the absence of mistake." Andresen v. Maryland, 427 U.S. 463, 483 (1976).

Additionally, since the search for information on known victims did not need to be limited by file titles, agents would have heard the Christensen-Pellicano calls during any search for records of previously known victims and clients. At that point, agents would have recognized the recordings' obviously incriminating nature, and would have been entitled to seize them to begin investigating Christensen. In Adjani, 452 F.3d at 1151, one defendant argued that emails showing her involvement in extortion were outside the warrant's scope because she was not previously suspected and the affidavit involved other crimes. This Court disagreed: "There is no rule . . . that evidence turned up while officers are rightfully searching a location under a . . . warrant must be excluded simply because the evidence found . . . support[s] charges for a related crime (or against a suspect) not expressly contemplated in the warrant." Id. If agents searching Pellicano's computers for evidence of specific wiretapping "came across information that was both related to the purposes of their search and implicated [a new target (Christensen)]," the fact "[t]hat the evidence could now support a new charge against a new . . . person [would] not

127

compel . . . suppression." Id.  Since a narrower warrant would have led to permissible seizure of the exact same evidence, any overbreadth was harmless.  United States v. Parker, 549 F.3d 5, 10 (1st Cir. 2008) (rejecting overbreadth challenge, because "had the warrant referred only to a gun and marijuana, the officers would have been entitled to seize other guns and . . . [other] drugs . . . if found in plain view [during] the narrower search").[107]

For the reasons above, Christensen's challenges to both warrants must be denied for lack of standing, Pellicano's challenge to the November 2002 Warrant should be denied because of collateral estoppel, and both warrants must be upheld on the merits.

---

[107]  Where only some parts of a warrant are overbroad, "the valid portions . . . may be severed from the invalid portions and the search made pursuant to the valid portions upheld." In re Grand Jury Subpoenas, 926 F.2d at 858.  Because defendants do not challenge the main portion of the warrant, which applied to documents and records, this is a case where most of the warrant was valid even on defendants' theory.  As a result, the severance doctrine applies because the "valid portion of the warrant" was not just "'a relatively insignificant part' of [the] otherwise invalid search." Id. at 858.  If the audio-recording-portion of the warrant were ruled deficient, therefore, that would not affect the admissibility of evidence seized under the documents-and-records provision.

B.   THE COURT NEITHER CLEARLY ERRED IN DECLINING TO SUPPRESS
     PELLICANO'S RECORDINGS OF HIS CONVERSATIONS WITH CHRISTENSEN
     NOR ABUSED ITS DISCRETION IN DENYING AN EVIDENTIARY HEARING
     ABOUT THEM

     With Title III, Congress comprehensively regulated

wiretapping and electronic surveillance.  Title III provides:

> [w]henever any wire or oral communication has been
> intercepted, no part of the contents of such
> communication and no evidence derived therefrom may be
> received in evidence in any trial . . . before any
> court . . . if the disclosure of that information would
> be in violation of this chapter.

18 U.S.C. § 2515 (emphasis added).  A private-party recording is

not "in violation of" Title III, however, simply because it is

surreptitious.  Section 2511(2)(d) exempts communications

intercepted by "a party to the communication . . . unless such

communication is intercepted for the purpose of committing any

criminal or tortious act."

     Through three rounds of pre-trial requests, Christen sought

suppression of Pellicano's recordings of their inculpatory

conversations discussing their wiretapping of Bonder-Kerkorian on

the ground that Pellicano recorded Christensen for the purpose of

committing a "criminal or tortious act."[108]  (GER 204-29, 282-446,

1317-1485).  The court denied each request, finding that

Christensen "presented no evidence specifically addressing

_____

     [108]  Because this suppression request was based on a
statutory claim, the government did not dispute Christensen's
standing.  Meredith v. Gavin, 446 F.2d 794, 797 & n.3 (8th Cir.
1971) (§ 2511 exceeds the Fourth Amendment's protections).

129

th[ose] Recordings" (JER 5) and that, "[w]hile Christensen makes attractive <u>arguments</u> that Pellicano had a criminal or tortious purpose for taping his conversations with Christensen . . . he lacks <u>evidence</u> to support these arguments" (JER 137).  The court also denied Christensen's evidentiary-hearing request, finding that he "has not shown that he will introduce adequate relevant and admissible evidence at the proposed evidentiary hearing." (JER 136).

Christensen renews his suppression and evidentiary-hearing requests, asserting (1) that the court "improperly revers[ed] the burden of proof by requiring Christensen -- not the government -- to establish Pellicano's purpose," (2) that "a recording made for the purpose of maintaining accurate records of a criminal enterprise is made for a criminal purpose under Title III," and (3) that there purportedly was "ample evidence" that Pellicano surreptitiously recorded Christensen for that purportedly criminal purpose.[109]  (COB 13-20).  Each assertion is meritless -- if not outright foreclosed by this Court's recent rejection of nearly identical suppression and evidentiary-hearing requests by

---

[109]  Christensen suggests that Pellicano also recorded him for the tortious purpose of breaching his fiduciary duty to Christensen by simultaneously representing Steve Bing.  (COB 15-16).  This alleged purpose was not raised below and is, therefore, waived.  <u>United States v. Restrepo-Rua</u>, 815 F.2d 1327, 1329 (9th Cir. 1987) ("Just as a failure to file a timely motion to suppress evidence constitutes a waiver, so too does a failure to raise a particular ground in support of a motion to suppress.").

Pellicano client/coconspirator John McTiernan.  <u>United States v.</u>
<u>McTiernan</u>, 695 F.3d 882 (9th Cir. 2012).

    1.   <u>Standard of Review</u>

    The denial of a suppression motion is reviewed <u>de novo</u>; the
underlying factual findings are reviewed for clear error.  <u>Id.</u> at
887.  Whether a party failed to prove that a recording was made
for a criminal or tortious purpose is a factual finding subject
to clear error review, <u>see, e.g.,</u> <u>United States v. Cassiere</u>, 4
F.3d 1006, 1021 (1st Cir. 1993); <u>United States v. Dale</u>, 991 F.2d
819, 841 (D.C. Cir. 1993); <u>United States v. Truglio</u>, 731 F.2d
1123, 1131-32 (4th Cir. 1984), and will be reversed only "if it
is illogical, implausible, or without support in the record,"
<u>United States v. Pineda-Doval</u>, 692 F.3d 942, 944 (9th Cir. 2012).
So long as "'inferences that may be drawn from the facts in the
record'" support the court's finding, there will be no clear
error.  <u>United States v. Hinkson</u>, 585 F.3d 1247, 1262 (9th Cir.
2009).

    "A district court's decision not to conduct an evidentiary
hearing on a motion to suppress is reviewed under the abuse-of-
discretion standard," <u>McTiernan</u>, 695 F.3d at 891, and therefore
will be reversed only if the decision is "illogical, implausible,
or without support in inferences that may be drawn from facts in
the record," <u>Hinkson</u>, 585 F.3d at 1263.

131

2.    The Court Properly Required Christensen to Establish
      Pellicano's Purpose by a Preponderance of the Evidence

Mis-citing a footnote in United States v. Phillips, 540 F.2d
319, 326 n.3 (8th Cir. 1976), Christensen first attacks the
court's rulings by asserting that the court "improperly
revers[ed] the burden of proof by requiring Christensen -- not
the government -- to establish Pellicano's purpose."  (COB 13).
Christensen waived this claim because he conceded below that,
notwithstanding Phillips, he bore the burden to prove that
Pellicano had a criminal or tortious purpose.  (GERT 179, 185-
86).

Regardless, McTiernan forecloses the claim.  There, this
Court surveyed the law of "every other circuit to consider the
issue," saw "no reason [to] deviate from [their] consensus," and
unequivocally held that "the burden was on McTiernan to prove by
a preponderance of the evidence that the Recording at issue was
made for a criminal or tortious purpose."  695 F.3d at 888.
Notably, McTiernan cited the very Phillips decision that
Christensen mistakenly characterizes as placing a burden on the
government.  Id. (citing Phillips, 540 F.2d at 327).

3.    McTiernan's Rejection of Christensen's Record-Keeping
      Theory Requires Affirmance

Whereas below Christensen offered myriad unsupported
purposes why Pellicano recorded their conversations (including
blackmail and sale to tabloids (JER 5, 137-39)), Christensen

132

abandons all but one of them and renews only his assertion that "a recording made for the purpose of maintaining accurate records of a criminal enterprise is made for a criminal purpose under Title III." (COB 16). Putting aside whether Christensen proved -- or even sufficiently offered to prove -- that Pellicano had that particular purpose, McTiernan rejects Christensen's "enterprise record-keeping" theory.

Like Christensen here (COB 13, 15, 19-20), McTiernan seized on Pellicano's unsworn un-cross-examined pro se opening statement from the RICO trial and argued that Pellicano admitted that he recorded his clients "as part of a recordkeeping process in support of Pellicano's 'far-reaching criminal enterprise.'"[110] 695 F.3d at 888. As Christensen does here (COB 14-17), McTiernan relied most prominently on United States v. Lam, 271 F. Supp. 2d 1182, 1183 (N.D. Cal. 2003), and United States v. Vest, 639 F. Supp. 899 (D. Mass. 1986). See McTiernan, 695 F.3d at 890-91 (discussing Lam and Vest). Despite Pellicano's opening

_____

[110]   In the opening statement, Pellicano stated:

Now, he [Pellicano] decided to record those conversations for -- you know, for inventory; for safekeeping; for, in effect, to remind himself of what he needed to do and what a client professed a need to have, and thought, well, the best way to do that is to have a program to do that, to record those conversations in an encrypted fashion so that no one else but Mr. Pellicano could listen to those recordings ever.

(GERT 609).

statement, McTiernan rejected the "enterprise record-keeping" theory and found "Lam unpersuasive" and Vest "distinguishable." Id. McTiernan explained that "recording a conversation in which an illegal enterprise was discussed" or "to create a reminder list (even a list of illegal acts that are agreed to be done) is not a criminal or tortious purpose" because § 2511(2)(d) "requires that we look to the purpose and not the subject matter of the recording." Id. "[U]nlike a recording of a conversation made for the purpose of blackmailing another person, which directly facilitates the criminal conduct of blackmail" and is the "key distinction between Vest and the present case," "recording a conversation to create a reminder list . . . of illegal acts that are agreed to be done" "is not essential to the actual execution" of the agreed-upon illegal act, which in both McTiernan's and Christensen's cases was to execute "an illegal wiretap." Id. at 890-91.

Because McTiernan specifically rejected Christensen's theory and the authorities on which he relies, McTiernan requires this Court to affirm the court's rejection of Christensen's suppression requests.

4.    *McTiernan* Requires Rejection of Christensen's
      Evidentiary-Hearing Request

Just like Christensen, McTiernan requested and was denied an evidentiary hearing. Id. McTiernan argued, as Christensen argues (COB 19-20), "that he would call witnesses to demonstrate

134

that Pellicano made the Recording for the purpose of having
something to remind himself of the criminal acts he intended to
commit." Id. at 891. After "assum[ing] for the purposes of its
ruling that McTiernan had proven that recordkeeping was indeed
Pellicano's purpose in making the Recording," McTiernan affirmed
the denial of McTiernan's evidentiary hearing request as
"unnecessary" because the Court had already rejected the record-
keeping theory. Id. The same result must follow here too.

## C.   THE COURT CORRECTLY FOUND THE CHRISTENSEN-PELLICANO CONVERSATIONS TO BE UNPRIVILEGED

Christensen claims (COB 40-54) the court violated attorney-
client and work-product privilege in allowing the prosecution to
access and introduce recordings of the phone calls in which
Christensen and Pellicano implemented their scheme to wiretap
Lisa Bonder-Kerkorian. Christensen attacks the court's rulings
that the privileges' prerequisites were not met and that any
privileges were vitiated by Christensen's use of his
communications for criminal purposes. Finally, Christensen
alleges that the court's initial analysis of the crime-fraud
question under an incorrect standard irrevocably tainted its
later reanalysis under the right standard.

The arguments are meritless. Christensen never met his
initial burden, as the privileges' proponent, to establish the
elements of a specific privilege as to each statement.
Regardless, the court's crime-fraud finding was correct: as the

135

jury later confirmed, Christensen's purpose in his conversations with Pellicano was to implement their criminal conspiracy. Finally, Christensen's argument that inadvertent missteps in initially applying privilege-examination procedures barred the judge from eventually reanalyzing the issue correctly is meritless.  Rather, the court's commonsense cure has been explicitly endorsed by this Court.  The decisions should be affirmed.

      1.   <u>Factual Background</u>

          a.   <u>The Government's Original Motion</u>

     Aware that PIA files might include privileged materials, the search warrants for PIA included a protocol to have potentially privileged materials reviewed by privilege attorneys who were separate from the main Pellicano investigative team.  (JSER 43). Two attorneys who were otherwise uninvolved with the case, Special Trial Attorney Robert Tully and AUSA Samantha Jessner, were designated to review those materials and, where appropriate, to file motions seeking findings that exceptions to the privilege applied.  (<u>Id.</u>).

     In November 2005, the privilege attorneys filed a motion identifying 25 recorded telephone conversations as potentially privileged, and requesting that the court conduct an <u>in camera</u> review to determine whether the crime-fraud exception applied. The motion was directed to District Judge George H. King,

"because [the privilege attorneys] believed it was related to a previously filed crime-fraud motion that Judge King had decided." (GSER 691-92).  Judge King, however, forwarded the motion to the clerk's office for assignment to the on-duty judge.  (Id.).  The motion made reference to the prior crime-fraud application. (JSER 44).  Unlike that application by the Pellicano prosecutors (JSER 235), however, the privilege attorneys' application did not cite United States v. Zolin, 491 U.S. 554 (1989), and did not follow the two-step analysis set forth in that case. Accordingly, the application included in its declarations two kinds of facts: extrinsic facts known from outside of the recordings, and summaries of the recordings themselves.

In the first category, which did not rely on the Christensen recordings' contents, the application set forth considerable evidence showing that Pellicano not only was capable of wiretapping, but ran his business around wiretapping.  PIA employees had informed the FBI of the "widespread use of wiretapping in Pellicano's investigations" (JSER 83), and the government had recovered wiretap-related documents, including "written summaries of wiretapped conversations" (JSER 65).  One of Pellicano's wiretap recordings had been found, and agents knew of numerous discussions in which Pellicano and various clients discussed wiretapping plans.  (JSER 65-66).

137

Extrinsic evidence also showed that Christensen was one of the clients who hired Pellicano to wiretap Bonder-Kerkorian. Christensen represented Kirk Kerkorian, Bonder-Kerkorian's husband, in contentious litigation against Bonder-Kerkorian. (JSER 84-85, 87-90). Pellicano's former girlfriend, Sandra Carradine, had observed Pellicano receive a call which he told her was from Kerkorian. (JSER 68, 77-78). During that call, Pellicano told Kerkorian about a conversation he had listened to between Bonder-Kerkorian and her friend -- an obviously wiretapped conversation. (Id.). Bank records showed that Christensen's law firm paid Pellicano $186,000 between March and December 2002. (JSER 110).

In addition to this extrinsic evidence, the motion discussed the recordings' contents -- numerous calls between Christensen and Pellicano in which Pellicano discussed the wiretapping shceme with Christensen, and relayed to Christensen what Bonder-Kerkorian and her lawyers (including Stephen Kolodny) were saying.

- Pellicano and Christensen alluded to the illegality of their scheme, with Pellicano cautioning Christensen to be careful when using the wiretapping results, so as not to show what they were doing. (JSER 93; GEX 3056 ("You have to be real careful with this . . . be very careful about this because there is only one way for me to know this."); JSER 113-14; GEX 3285 (after

138

Pellicano tells Christensen that Kolodny is sharing Kerkorian's tax returns with Bonder-Kerkorian, Christensen says, "that is a violation" of the state judge's order, but "I don't know how to bust them for it."); JSER 118 (Pellicano: "it will be too difficult to do this again . . . It will be too dangerous"); JSER 100; GEX 3119 ("there is no way, except with my unique techniques, that you would know this.")).

- Pellicano assisted Christensen by reporting Bonder-Kerkorian's lawyers' confidential assessment of the case and what Bonder-Kerkorian and her lawyers were saying about their settlement strategy. (JSER 100; GEX 3113 (Christensen asked Pellicano "What kind of money are they talking about?" Pellicano: "125 grand"); JSER 100-01 (discussing Bonder-Kerkorian's description to her lawyers of the settlement terms she wanted); JSER 103 (reporting lawyer's prediction to Bonder-Kerkorian that she could get $320,000 per month); JSER 111-12 (relaying lawyers' statements to Bonder-Kerkorian about settlement positions); JSER 94; GEX 3058 (reporting Bonder-Kerkorian's question to her lawyer "What if I agree to $50,000 and just ask him to . . . forgive the $3 million"); JSER 90-91; GEX 3043 ("The only thing . . . she wants to do is to have this annuity continued.  That's all she wants.  They are telling her they can get her a big pot of money.").

139

- Pellicano advised Christensen how to exploit Bonder-Kerkorian's disagreements with her attorneys.  (JSER 92-93; GEX 3055 (Pellicano: "[s]he tried to fire Kolodny and Kolodny talked her back")); (JSER 94; GEX 3060-61 (Christensen asks if "Kolodny almost got fired again"; Pellicano: "You could hear a sigh of relief in his voice too . . . He said 'I got you back on center again.'  She said 'Yeah, you got me back on center.'")).

- Pellicano told Christensen how to exploit Bonder-Kerkorian's emotional condition.  (JSER 93-94; GEX 3056 (Pellicano says Bonder-Kerkorian "went to fucking pieces" after a recent hearing)); (JSER 94-95; GEX 3064 (Pellicano telling Christensen Bonder-Kerkorian was "bordering on breaking," so Christensen should keep hammering her); GEX 3041 (Pellicano telling Christensen that Bonder-Kerkorian was devastated when Christensen was not disqualified from the case); GEX 3088 ("If I were you now I would open up the fucking battleship.  I would have all guns pointed to her and just blaze the fuck away for her unrelentlessly.")).

- Pellicano relayed what Bonder-Kerkorian's lawyers were telling her about their legal strategy.  (JSER 94; GEX 3057 (Pellicano telling Christensen about Bonder-Kerkorian's lawyers' plans to request guardian ad litem); JSER 95 (Pellicano telling Christensen that Bonder-Kerkorian's lawyer planned to delay the petition until after deposition); JSER 96; GEX 3088 (Pellicano

140

telling Christensen about Kolodny's plan to hire appellate lawyer); (JSER 93; GEX 3056 (Pellicano telling Christensen Kolodny was "having someone research the . . . attorney-client privilege."); JSER 112 (Pellicano telling Christensen that Bonder-Kerkorian was "on the phone" with her attorneys for hours "going over a declaration")).  Pellicano also told Christensen about how Bonder-Kerkorian's lawyers were interpreting the judge's comments. (JSER 91-92; GEX 3078 (Pellicano: "Lisa kept saying '[The judge] thinks I'm a liar, . . . right?' and [her lawyer] said 'No she didn't say you're a liar . . . but she didn't believe you.'")).

•  Pellicano reported on Kololdny's answering-machine messages for Bonder-Kerkorian (JSER 100; GEX 3120), and complained about Bonder-Kerkorian's phone habits (JSER 102; GEX 3136 ("She is on the phone from morning til night.  When she speaks, she speaks in parables").  Pellicano also told Christensen about Bonder-Kerkorian's child's phone conversations. (JSER 95; GEX 3080 (reporting the "kid" gets on the phone five or six times a day)).

•  Pellicano spoke of the practicalities of wiretapping, which required him to visit an off-site location to collect the recordings.  (JSER 120; GEX 3099; <u>see</u> JSER 99; GEX 3106 (Pellicano: "I've been there every fucking night and I'm going to be there again over the weekend").

141

b.  Court Orders and Litigation

Judge Fischer, who was assigned the application after Judge King forwarded it to the clerk's office, granted it, finding first that the recordings were "not protected by the attorney-client privilege or the work-product doctrine," and second that they "come within the crime-fraud exception."  (JSER 211).  The court ruled similarly regarding supplemental applications pertaining to later-discovered Christensen-Pellicano recordings.  (JSER 214-18).

After indictment, the case was assigned to Judge Fischer, who had the previously filed related case of Daniel Nicherie.  (JER 5534).  Christensen challenged the crime-fraud determination in his motion to dismiss the indictment.  The government acknowledged that the privilege attorneys' original application failed to follow Zolin's two-step procedure.  The government therefore urged the court to reexamine the application to see whether the application would have supported a Zolin Step-One finding without reference to the recordings.  Christensen resisted, arguing instead that his motion to dismiss based on the Zolin error should be heard by a different judge.  Christensen's recusal motion was assigned to Judge A. Howard Matz (CR 836), who denied the motion.  (GER 635-37).

With the recusal motion denied, Judge Fischer conducted a Zolin Step-One analysis relying only on the extrinsic material

142

from the government's initial application.  (JER 177).  The court
found that the government's extrinsic evidence was "adequate to
show that in camera review [of the recordings] could reveal
evidence of an ongoing crime on the part of Christensen and
Pellicano."  (Id.).  The court did not reach the government's
arguments that any privilege was waived by Kerkorian's decision
not to assert it in court, or that Christensen lacked standing to
assert Kerkorian's privileges.  (JER 184).[111]  Having found Step
One satisfied, the court ordered the government to supply copies
of the recordings for in camera review "to determine if they are
privileged, or if the crime-fraud exception . . . applies."
(Id.).

Upon review of the recordings,[112] the court found that
"neither the attorney-client privilege nor work-product privilege
applies," and that "the crime-fraud exception" would, in any
event, "vitiate both" privileges.  (JER 187).

"Nearly all . . . the communications appear to be not
protected by the attorney-client privilege, at least in the

_____

[111]  The court found the prosecution team had not committed
misconduct in relying on the privilege attorneys' original
submission.  (Id.).  Indeed, the court noted, the government had
no incentive to avoid Zolin, since "a proper Zolin showing could
easily have been made -- and with substantially less effort."
(JER 184).

[112]  This section generally cites the recordings'
transcriptions for the Court's ease.  (See GEX 3014-3383).
Should the Court wish to review the recordings themselves, they
have been filed in the appellate record.

absence of evidence or argument to the contrary," the court ruled -- indeed, "[n]o more than a few statements in the approximately six hours of tape recordings even arguably reveal what might be confidential information from or concerning Kerkorian." (JER 190-91). Moreover, the recordings provided "reasonable cause to believe" that Kerkorian "was complicit in the alleged illegal conduct." (JER 191).

The court independently found that both privileges were defeated by the crime-fraud exception. (JER 192). The recorded conversations were ones in which Pellicano told Christensen the contents of wiretapped conversations "between Bonder-Kerkorian and numerous other persons." (Id.). Pellicano described not only what the conversants "'say' or 'tell' each other" and "'what they're talking about'" but also their "tone of voice." (Id.). "Some . . . communications make clear that it is Pellicano hearing the conversations" first-hand, rather than relayed through another source . . . ." (Id.). The court concluded that these reports could not have resulted from a non-wiretap "bug" in the home -- as evidenced by Pellicano's statements about listening to messages on Bonder-Kerkorian's answering machine, his complaints about Bonder-Kerkorian's phone mannerisms, and his description of phone conversations between Bonder-Kerkorian and her lawyer. (JER 194).

144

Other portions of the calls confirmed Pellicano's and Christensen's wiretapping conspiracy -- such as the "fictitious name [they created] for billing purposes," Pellicano's description of his "'unique techniques,'" and Pellicano's warnings for Christensen to be careful in using the information since "'there's only one way'" Pellicano could have acquired it. (Id.).  At the end of the defendants' wiretapping of Bonder-Kerkorian, they considered wiretapping another target, although they did not go through with it.  (JER 195).  The court held the crime-fraud exception applicable, finding that "Christensen's services were utilized in furtherance of [an] ongoing unlawful scheme," and "[t]he communications [were] integrally related to this apparent illegality."  (Id.).  The court ordered the recordings released.  (Id.).

    2.   Christensen Failed To Claim Privilege with Specificity

As the person trying to keep valuable information from the trial's truth-seeking process, Christensen had the burden to establish the privileges' applicability.  In re Grand Jury Subpoenas, 803 F.2d 493, 496 (9th Cir. 1986).  He failed to meet that burden below, and fails to meet it now.

    a.   Christensen's Blanket Assertion of Privilege Was Insufficient

"Blanket assertions [of privilege] are 'extremely disfavored.'"  United States v. Martin, 278 F.3d 988, 1000 (9th Cir. 2002).  Since documents often contain both privileged and

145

unprivileged material, a privilege's proponent must, if
necessary, distinguish "the privileged information from the non-
privileged information."  United States v. Ruehle, 583 F.3d 600,
609 (9th Cir. 2009).  The party claiming privilege must identify
"specific communications and the grounds supporting the privilege
as to each piece of evidence over which privilege is asserted."
Martin, 278 F.3d at 1000.  Christensen violated these rules
below, and he violates them here.  Rather than identify specific
portions of specific calls, specifying for each how either the
work-product or attorney-client privilege applied, Christensen
globally claimed both privileges over all statements in all calls
-- a plainly unsupportable position since, for instance, many the
calls discussed no client-communications.

　　　Christensen's dereliction of these duties makes it
impossible to sustain his claims.  The calls were varied.  Some
potentially conveyed Kerkorian's statements, while others clearly
did not; some discussed litigation events, while others gave
gossip.  Christensen had the burden to specify which privilege
applied to which items.  His "failure to define the scope of his
claim of privilege" does not only "weigh[] in favor of
disclosure."  Ruehle, 583 F.3d at 609.  Christensen's failure

should "be the end of the matter." <u>United States v. Horn</u>, 976

F.2d 1314, 1318 (9th Cir. 1992).[113]

          b.   <u>Christensen Failed to Establish the Elements of</u>
              <u>Attorney-Client Privilege</u>

"'Because it impedes full and free discovery of the truth,

the attorney-client privilege is strictly construed.'" <u>Martin</u>,

278 F.3d at 999.  "The burden is on the party asserting the

privilege to establish all [its] elements," and there are eight:

> (1) When legal advice of any kind is sought (2) from a
> professional legal adviser in his or her capacity as
> such, (3) the communications relating to that purpose,
> (4) made in confidence (5) by the client, (6) are, at
> the client's instance, permanently protected (7) from
> disclosure by the client or by the legal adviser (8)
> unless the protection be waived.

<u>Id.</u> at 999-1000.  Christensen's claim was properly denied because

he failed to establish all the elements.  <u>Id.</u> at 999-1000.

Christensen entirely skipped his duty to establish

"communications by the client" to the lawyer or from the lawyer

to the client, in the calls.  <u>Id.</u> at 999.[114]  Kerkorian's voice is

---

[113]  In <u>Horn</u>, an exception to the specificity-rule was
granted for an exceptionally overbroad subpoena that sought "the
widest possible range of privileged information . . . by and
between a large number of entities over [more than] 6 1/2 years"
and made no effort to exclude "clearly privileged" materials from
its scope.  976 F.2d at 1318-19.  But here, the government sought
just six hours of recorded phone calls that occurred during just
three months.  (JER 191).  Since the government's request was
reasonably narrow, Christensen's "refusal to follow the
established procedure for invoking the privilege" is "the end of
the matter" under <u>Horn</u>, 976 F.2d at 1318.

[114]  <u>See</u> <u>United States v. Chen</u>, 99 F.3d 1495, 1501 (9th Cir.
                                 (continued...)

not on the calls.[115]  Christensen gave the court no information
establishing that Kerkorian's communications formed significant
parts of any of Christensen's statements.  The court was right to
deem this insufficient.[116]

   Even now, Christensen barely touches this element, saying
only that the recordings generally "reference privileged
communications from his client, including statements about
Kerkorian's litigation objectives, his desires to identify Kira's
biological father, and other references to the ongoing

_____

(...continued)
1996) (attorney-client privilege covers "'an attorney's advice
[to the client] in response to [the client's] disclosures'").
Although the privilege may be occasionally extended to
communications between a lawyer and a third-party where the
client does not take part, such extensions are subject to
"limitations" to prevent the privilege from "engulf[ing] . . .
services performed for the lawyer that are not now, and should
not be, summarily excluded from the adversary process."  FTC v.
TRW, Inc., 628 F.2d 207, 212 (D.C. Cir. 1980).  Because illegal
wiretapping should not be part of the adversary process,
Christensen's communications with Pellicano should not be covered
by such an extension.

   [115]  Christensen occasionally alluded to Kerkorian's
interests or thought-processes.  But that does not establish that
Christensen was actually relaying Kerkorian's communications, as
opposed to speculating about Kerkorian's thoughts -- an issue
Christensen had the burden to establish by identifying how
specific statements revealed communications with Kerkorian.
Regardless, Christensen's repetition of isolated statements by
Kerkorian cannot insulate the bulk of the recordings, which
contain no such statements.

   [116]  Compare United States v. Kovel, 296 F.2d 918, 924 (2d
Cir. 1961) (Friendly, J.) ("[A] witness claiming the
attorney-client privilege may not refuse to disclose to the judge
the circumstances into which the judge must inquire in order to
rule on the claim").

litigation." (COB 54 n.20). Though this exceedingly general sentence in a single footnote is already fatally late and unspecific,[117] it also fails because Christensen must show that Kerkorian made each communication "in confidence." Martin, 278 F.3d at 999. Such confidence may not be presumed, since, as the court found, much of what Christensen told Pellicano may well "already [have] been conveyed to [Bonder-Kerkorian's] counsel or to the[ir] mediator." (JER 191). If Kerkorian made specific statements to Christensen in confidence, Christensen should have established that by affidavit. His attempt to establish the privilege by ipse dixit rather than evidence must fail.

Christensen also failed to establish that he was invoking privilege at the "'client's instance.'" Martin, 278 F.3d at 999.[118] The attorney-client privilege "belongs to the client," not the lawyer. In re Chevron Corp., 650 F.3d 276, 283 n.8 (3d Cir. 2011); see United States v. Amodeo, 71 F.3d 1044, 1052 (2d Cir. 1995). To say that it operates "at the instance of" the client is to say it operates only "at the solicitation, suit,

---

[117]    See 9th Cir. Rule 28-2.8 ("Every assertion in briefs regarding matters in the record shall be supported by a reference to the location in the excerpts of record where the matter is to be found."); Part IV.A.2.b, supra.

[118]    Rather than supply evidence satisfying this element, Christensen accused the government of attempting to "trick" Kerkorian into waiving his privilege -- an accusation the court found "completely baseless." (JER 183).

instigation, or suggestion of" the client.[119]  Kerkorian did not instigate, solicit, or instantiate the privilege here.  When Christensen invoked the privilege, he could not have acted as Kerkorian's agent, since Kerkorian had separate counsel and conflicting interests.  (GER 982 (Christensen sought to "invoke privileges not to protect his client or to protect the legal system, but instead to protect his own personal interest")).

Moreover, Kerkorian constructively waived any purported privilege by failing to timely assert his claim in the proceedings.  This Court "deem[s] the privilege . . . waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter."  United States v. de la Jara, 973 F.2d 746, 749 (9th Cir. 1992).  In de la Jara, a businessman challenged admission of a purportedly privileged letter from his lawyer.  Id. at 748.  Although the businessman asserted privilege at trial, this Court held he had effectively waived the privilege by doing "nothing to recover the letter or protect its confidentiality during the six month interlude between its seizure and introduction into evidence."  Id. at 749.

---

[119]  Oxford English Dictionary (2d ed. 1989 & March 2012 online version); see American Heritage Dictionary of the English Language 907 (4th ed. 2000) (defining "instance" as "A suggestion or request: called at the instance of his attorney.").

150

Here, the recordings' importance for trial had been public at least since the Third Superseding Indictment, in February 2006, which extensively quoted and summarized the calls.  (GER 124-28).  They were the subject of heavy media coverage.  (GER 982).  And Kerkorian -- a billionaire assisted by independent counsel -- had far more ability than the privilege-claimant in de la Jara to make a timely appearance to assert whatever purported privilege he wanted to protect.  By not moving to assert any purported privilege during the 30 months between the Third Superseding Indictment and the near-conclusion of the Christensen trial, Kerkorian "fail[ed] to pursue all reasonable means" of asserting the privilege, making the privilege "waived."  de la Jara, 973 F.2d at 749.[120]

---

[120]  Christensen cannot establish this element merely by alleging (COB 42 n.16) that Kerkorian, when asked to join others who had explicitly waived privilege, declined to do so.  Under de la Jara, the decision to remain above the fray by neither asserting nor waiving privilege is de facto waiver.
    Christensen has waived any argument that Kerkorian's mid-trial assertion of privilege regarding Kerkorian's own testimony was sufficient to bar the recordings' use against Christensen.  United States v. Wahchumwah, 710 F.3d 862, 868 n.2 (9th Cir. 2013) ("Generally, arguments not raised in a party's opening brief are deemed waived.").  The argument would fail anyways.  Kerkorian's counsel appeared in court mid-trial, on August 7, 2008, after 28 of the recordings had already been played.  The appearance was to discuss the mechanics of Kerkorian's upcoming testimony, including privilege issues. (GERT 10956-65).  Although Kerkorian's counsel contacted the parties shortly before trial instructing them to assert privilege on Kerkorian's behalf (GERT 10965-66), that timing was still insufficient under de la Jara.  A privilege holder does not "pursue all reasonable means of asserting the privilege," 973
                                                              (continued...)

In short, Christensen failed to establish the elements of attorney-client privilege.  His claim fails.

> ### c.    Christensen Failed To Establish the Elements of Work-Product Privilege and Did Not Defeat the Government's Showing of Overwhelming Need

Christensen likewise failed to establish the elements of work-product privilege.  The work-product privilege is "a qualified privilege for certain materials prepared by an attorney 'acting for his client in anticipation of litigation.'"  United States v. Nobles, 422 U.S. 225, 237-38 (1975).  It exists to foster "the orderly prosecution and defense of legal claims," Hickman v. Taylor, 329 U.S. 495, 510 (1947), and its "primary purpose" is "to 'prevent exploitation of a party's efforts in preparing for litigation,'" Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 576 (9th Cir. 1992).  The privilege's purpose "is not to protect any interest of the attorney, who is no more entitled to privacy or protection than any other person, but to protect the adversary trial process itself." Moody v. IRS, 654 F.2d 795, 800 (D.C. Cir. 1981).

---

[120] (...continued)
F.2d at 749, by waiting two and a half years, then writing a letter to the parties just before trial.  The recordings' part at this highly publicized trial was no secret.  At minimum, if Kerkorian wanted to assert privilege, he had to make his assertion known to the court before the recordings were played. At a minimum, if Christensen wanted to communicate an assertion of privilege for Kerkorian, Christensen needed to tell the court he was acting on Kerkorian's specific instructions -- something that could not otherwise be assumed, given Christensen's conflicts of interest.

To qualify, documents "must have two characteristics: (1) they must be 'prepared in anticipation of litigation or for trial,' and (2) they must be prepared 'by or for another party or by or for that other party's representative.'" In re Grand Jury Subpoena (Torf), 357 F.3d 900, 907 (9th Cir. 2004). "The party invoking the privilege bears the heavy burden of establishing its applicability." In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 183 (2d Cir. 2007).

Even where otherwise established, the work-product privilege is not absolute. Where the privilege facially applies, "one who would invade that privacy" may "establish adequate reasons to justify production." Hickman, 329 U.S. at 512. Cases distinguish between work product containing factual information, and that which reveals the attorney's legal opinions and strategy -- with an attorney's legal opinions and strategy (so-called "opinion work-product") gaining more protection than so-called "fact work-product," though neither category is protected absolutely.

Where the arguments and affirmations of the privilege's proponent "are 'mere[ly] conclusory or ipse dixit assertions,' he [does] not carry his 'heavy burden' of demonstrating the applicability of the privilege." In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d at 184. Christensen's work-product claim failed this test. Christensen's generalized privilege claim

153

never specified the scope of his representation, the goals of litigation, and how various portions of the calls were in preparation for that litigation.[121]  The facts establishing the nature of Christensen's representation and the scope of the foreseen litigation were particularly available to Christensen, and he had the burden to establish the privilege.  His failure to produce those facts dooms his claim.

The nature of Pellicano's assignment also argues against recognition of the privilege.  As the calls prove and the jury found beyond a reasonable doubt, Christensen hired Pellicano to illegally wiretap Bonder's conversations with her attorney.  Hiring and supervising a wiretapper to invade an opponent's attorney-client conversations is not part of the legally cognizable activities of a lawyer anymore than the hiring of a forger to forge documents would be.  Cal. Bus. & Prof. Code § 6106 (prescribing disbarment for acts of moral turpitude).  Christensen's retention of Pellicano for illegal wiretapping was "a task that could just as well have been performed by a

---

[121]  One motivation for hiring Pellicano was to give Kerkorian an advantage in the legal dispute with Bonder-Kerkorian.  But Christensen had the burden to establish that motivation for each statement on the calls.  The calls themselves leave open the possibility that part of the Christensen-Pellicano conspiracy was looking after Kerkorian's personal interest rather than litigative interest.  (See JER 193 ("When Christensen was asked by Pellicano why Kerkorian was interested in knowing how Bonder-Kerkorian became pregnant, Christensen responded on several occasions that 'it's just something he wants to know' or that Kerkorian simply 'wanted to know the truth.'").

non-lawyer," Torf, 357 F.3d at 909, and the work-product privilege specific to lawyers' work should not apply.[122]

Lastly, even if Christensen had facially shown the work-product privilege applicable, the government still was entitled to the materials because of overwhelming necessity.  Even where the work-product privilege applies, an opponent may "establish adequate reasons to justify production."  Hickman, 329 U.S. at 512.[123]  Accordingly, "a party may obtain discovery of work product . . . upon a sufficient showing of need and hardship, bearing in mind that a higher burden must be met to obtain that pertaining to mental processes" than that pertaining to fact development.  In re Seagate Tech., LLC, 497 F.3d 1360, 1376 (Fed. Cir. 2007).  Even the lawyer's "opinion work product may be discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling."  Holmgren v. State Farm Mut. Auto Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992).

Christensen's mental impressions were "at issue" in this case.  Id.  The compelling need for the Christensen-Pellicano recordings justified their use here, as shown by In re Grand Jury

---

[122]  Christensen recognized that meetings where Pellicano participated would have "no privilege" because Pellicano was "not on our payroll" under the true identity of the case.  (GEX 3192).

[123]  See id. at 511 ("Where relevant and non-privileged facts remain hidden in an attorney's file and . . . production of those facts is essential to the preparation of one's case, discovery may properly be had.").

Subpoena, 510 F.3d 180 (2d Cir. 2007).  There, a client acting on his lawyer's instruction "surreptitiously recorded conversations."  Id. at 182.  When the grand jury subpoenaed those recordings, the client raised a work-product objection. The doctrine facially applied, since the recordings were conducted at the attorney's instructions and in anticipation of litigation.  Id. at 183-84.  Nevertheless, the Second Circuit granted the grand jury access to the materials. Notwithstanding that the recordings could reveal aspects of the attorney's litigation strategy, "tape recordings are less reflective of an attorney's thought processes than his notes or memoranda would be."  Id. at 184.  Given the unique evidentiary value of the recordings, the court found, the grand jury's compelling need justified invasion of the work-product privilege and accessing the recordings.  Id. at 188.

   Similar reasoning should lead to affirmance here.  See Nichols, 464 F.3d at 1122 (appellate court may "affirm . . . on any ground supported by the record").  Pellicano's recordings are "a unique memorialization of the conversations between [the two defendants] that is not subject to 'fading memories or contradiction.'"  In re Grand Jury Subpoena, 510 F.3d at 188. Because Christensen "did not know that he was being recorded," the recordings "provide insight" into the conspiracy "that cannot be replicated by subsequent interviews."  Id.  Moreover, the

jury's access to the recordings vindicates a crucial societal goal: <u>protecting</u> the social values of attorney-client confidentiality and personal privacy, which Christensen and Pellicano (ironically, given Christensen's arguments now) readily invaded. Even if opinion work product is revealed in the calls, it is justified because Christensen's thought processes were "at issue in [the] case," <u>Holmgren</u>, 976 F.2d at 577, as the court found (GER 1748). The work-product privilege did not bar the recordins' release.

    3.   <u>The Court Correctly Found that the Crime-Fraud Exception Applied</u>

Even if the privileges were otherwise applicable, that still would not be the end of the matter. Because the communications were part of defendants' illegal wiretapping scheme, the court correctly held the communications unprivileged due to the crime-fraud doctrine.

The court's conclusions analyzing the issue under <u>United States v. Zolin</u>, 491 U.S. 554 (1989), were correct and should be affirmed.[124] First, considering all the government's evidence <u>except</u> the challenged recordings, the court correctly found a strong suspicion that the recorded calls were for criminal purposes. That allowed the court next to proceed with a

---

[124] Christensen wrongly begins his analysis by concentrating on the initial decision that did not apply <u>Zolin</u>. As explained below, this mistake was cured by the court's later application of the correct <u>Zolin</u> inquiry, making any initial missteps harmless.

minimally invasive in camera examination of the calls themselves, which revealed conclusive evidence of the criminal conspiracy -- evidence the jury later found sufficient to convict both men beyond a reasonable doubt.

      a.   Standard of Review

Zolin established a two-step process for determining the applicability of the crime-fraud exception.  At Step One, the proponent of review (here, the government) relying on evidence other than the communications at issue, must make "a minimal showing that the crime-fraud exception could apply."  In re Grand Jury Investigation, 974 F.2d 1068, 1071 (9th Cir. 1992). Specifically, the government must establish "'reasonable cause to believe'" that the crime-fraud exception may apply -- with "reasonable cause" defined as "more than suspicion but less than a preponderance of evidence."  Chen, 99 F.3d at 1503.  With that burden met, the court proceeds to Step Two, where "the decision to engage in in camera review rests in the sound discretion of the district court." Zolin, 491 U.S. at 572.  Finally, during in camera review, the court examines all the evidence -- both the putatively privileged material and the background evidence -- to determine whether the crime-fraud exception applies.

In reviewing decisions on the applicability of privileges, the "district court's credibility determinations are given 'special deference.'" Ruehle, 583 F.3d at 606.  This Court has

not settled whether the court's Step-One decision is reviewed for abuse of discretion or reviewed de novo. United States v. Bauer, 132 F.3d 504, 509 (9th Cir. 1997). Given the judgment such a decision entails, the factual conclusions the court is called upon to make, and the minimal intrusion posed by inspecting documents in camera, the proper standard should be abuse of discretion or clear error. Compare United States v. Frederick, 182 F.3d 496, 499 (7th Cir. 1999) ("our review of the judge's ruling on the privilege claims is deferential[, asking] . . . whether the ruling . . . was clearly erroneous"; "[w]hether a particular document is privileged is . . . fact-specific and case-specific . . . , the sort of issue that district judges are particularly experienced in resolving"). Once a sufficient showing has been made at Step One, this Court "review[s] the . . . decision to allow inspection for abuse of discretion and cannot reverse absent a 'definite and firm conviction that the district court committed a clear error of judgment.'" Bauer, 132 F.3d at 509. At the final stage, "'rulings on the scope of the privilege,' including the crime-fraud exception, 'involve mixed questions of law and fact and are reviewable de novo, unless the scope of the privilege is clear and the decision made by the district court is essentially factual; in that case only clear error justifies reversal.'" In re Napster, Inc. Copyright Litig., 479 F.3d 1078, 1089 (9th Cir. 2007).

159

b.    The Court's Step-One Ruling Correctly Found that the Crime-Fraud Exception *Could* Apply

After briefing and argument, the court performed its <u>Zolin</u> Step-One analysis in December 2007.  (JER 180-84).  In that ruling, after considering <u>only</u> "non-privileged pieces of information," the court found them "adequate to show that <u>in camera</u> review could reveal evidence of an ongoing crime on the part of Christensen and Pellicano."  (JER 180).  The order was correct.

In light of the relatively small intrusion posed by <u>in camera</u> review, <u>Zolin</u> set the Step-One threshold as not "a stringent one."  491 U.S. at 572.  This Court has said the Step-One test must be "set sufficiently low to discourage abuse of privilege."  <u>In re Grand Jury Investigation</u>, 974 F.2d at 1072.  Accordingly, under the Step-One standard of review (which Christensen does not mention), the court should "not require a <u>prima facie</u> showing that the exception <u>does</u> apply."  <u>In re Grand Jury Subpoena 92-I</u>, 31 F.3d 826, 829 (9th Cir. 1994) (emphasis in original).  Rather, the government must make only "a <u>minimal</u> showing that the crime-fraud exception <u>could</u> apply."  <u>In re Grand Jury Investigation</u>, 974 F.2d at 1071.  This is "a considerably lower threshold," requiring only enough evidence "to support a reasonable good-faith belief the review of the privileged documents '<u>may</u> reveal evidence to establish the claim that the crime fraud exception applies.'"  <u>Id.</u> at 1073.

160

Christensen understates the evidence the court had when applying this "minimal" and "not . . . stringent" standard.  Id. Christensen claims the court relied on only three facts: the existence of "a connection between Christensen and Kerkorian," evidence that "Pellicano was surreptitiously listening to Bonder-Kerkorian conversations," and a contemporaneous payment of "a large sum of money" from Christensen's firm to Pellicano.  (COB 47-48).

In fact, the court had much more.  Numerous PIA-employees, through interviews and grand jury testimony, established the widespread use of wiretapping at PIA.  (JSER 83). Audiorecordings of various PIA clients showed them discussing wiretaps with Pellicano.  (JSER 66).  A wiretap recording had been found, and the PIA client involved had admitted listening as Pellicano played him wiretapped conversations.  (Id.).  PIA's computer files included "written summaries of wiretapped conversations," as well as "text files referring to" a special wiretapping program.  (JSER 65).

The fact that Pellicano audiorecordings included Pellicano's conversations with other clients discussing wiretapping (JSER 66) made it likely that the Christensen recordings would as well -- especially given evidence connecting Pellicano's general wiretapping practices to his work for Christensen.  Pellicano's girlfriend (Carradine) said she heard Pellicano "discuss[ing] the

161

substance of . . . recorded Bonder-Kerkorian conversations with a
person Pellicano identified as Kirk Kerkorian." (JER 159).
Kerkorian's lawyers (Christensen's firm) had recently paid
Pellicano $186,000. (JSER 110). The course of the litigation
led Bonder-Kerkorian's lawyer to have Bonder-Kerkorian's home
swept for bugs. (JSER 88).[125] Taken together, the facts
"certainly raised the inference that the $186,000 [that
Christensen paid Pellicano] was, at least in part, in exchange
for illegal wiretapping services." (JER 181).

The court found Christensen's attempts to besmirch
Carradine's credibility and explain away the suspicious
background facts meritless.[126] In fact, at Zolin's Step One,

---

[125] The court found no basis for Christensen's allegation
that the FBI case agent listened to privileged materials before
their court-ordered release (JER 182) -- a factual finding
subject to clear-error review. Regardless, the law does not
recognize complaints about derivative use of privileged
materials. United States v. Marashi, 913 F.2d 724, 731 n.11 (9th
Cir. 1990) ("no court has ever applied" the "fruit of the
poisonous tree" doctrine "to any evidentiary privilege, and . . .
we have indicated we would not be the first to do so").

[126] The court found that "Christensen's attacks on
Carradine's credibility are largely without foundation." (JER
181 (finding that Carradine's incentives were no different from
other cooperators', whom courts and juries must at times rely on,
and finding that any prior instances of Carradine's
untruthfulness when attempting to protect her boyfriend Pellicano
did not show that she would lie to harm him)). That credibility
finding receives deference. Ruehle, 583 F.3d at 606.
    Christensen further attacks Carradine's statements by saying
that they were "inadmissible triple hearsay." (COB 52). But
hearsay rules do not apply to "any preliminary question about
whether . . . a privilege exists." Fed. R. Evid. 104(a); see
(continued...)

162

courts are <u>required</u> to credit the government's evidence.  <u>United States v. Laurins</u>, 857 F.2d 529, 541 (9th Cir. 1988) (Step-One question is whether "there was evidence that <u>if believed by the jury</u> would establish the elements of an ongoing violation") (emphasis added); <u>Chen</u>, 99 F.3d at 1503 (similar).  The judge's task at Step One "is not to determine issues of credibility or whether a particular inference should be drawn, but rather to see what conclusions could be reached if the witnesses were credited and the permissible inferences drawn."  24 Wright & Graham, <u>Federal Practice and Procedure: Evidence</u> § 5501, at 525 (1st ed. 1986); <u>see also</u> <u>In re Grand Jury Subpoena 92-1</u>, 31 F.3d at 829 (at Step One, court properly considers "only [the] evidence presented by the party seeking <u>in camera</u> review").  In

_____

(...continued)
Fed. R. Evid. 1101(d)(1) (rules of evidence do not apply to a "preliminary question of fact determining admissibility"); Fed. R. Evid. 1101(d)(3) (rules of evidence do not apply to "miscellaneous proceedings").  Under Rule 104(a), <u>privileges</u> apply to such proceedings -- but that simply means that, for instance, the government could not have forced Kerkorian to testify about his communications with his lawyer in establishing the crime-fraud exception.

    Moreover, Christensen's characterization of the statements as triple-hearsay is exaggerated.  Pellicano's statement about who he was talking to was a present-sense impression and statement of identification; his conversation with Kerkorian was nonhearsay under the coconspirator rule; and his admissions about illegal wiretapping were statements against penal interest.  <u>See</u> Fed. R. Evid. 803(1), 801(d)(2)(B), 804(b)(3).  The fact that Carradine's statements were set forth in an agent's written summary is no different than the way such statements are routinely presented in search warrant affidavits.

considering Christensen's arguments, therefore, the court was being more generous to him than it needed to be.

Just as Christensen's arguments about witness credibility were off-point, so too was his argument about hypothetical innocent explanations of the extrinsic evidence. In complaining that "the court's cited evidence does not support its conclusion that the crime-fraud exception <u>applied</u>," (COB 53 (emphasis added)), Christensen asks this Court to commit the same error for which this Court reversed in <u>In re Grand Jury Investigation</u>, 974 F.2d at 1073; <u>see</u> <u>id.</u> ("The district court . . . required a factual showing that supports a good-faith belief that the crime-fraud exception applies. Such a standard is set too high."). Evaluated instead under the proper standard, the court's Step-One decision easily passes muster.[127] At Step One, the government need only prove that the crime fraud exception <u>may</u> apply, not that it definitely does. "There is an important difference between showing how documents <u>may</u> supply <u>evidence</u> that the crime-fraud exception applies [under <u>Zolin</u>'s Step One] and 'showing

---

[127] This case illustrates why the Step-One standard must be low, so as not to be overprotective of attorney crimes. "'[T]here are many blatant abuses of privilege'" which cannot be proven by extrinsic evidence -- particularly where "'an alleged illegal proposal is made in the context of a relationship which has an apparent legitimate end.'" <u>Zolin</u>, 491 U.S. at 569. Setting too high a standard at Step One would "'result in an overzealous protection of the attorney-client privilege in a context where the rationale for that privilege may be inapplicable.'" <u>In re Grand Jury Investigation</u>, 974 F.2d at 1072.

directly that the exception applies.'" Id. (emphasis added).
"The Zolin threshold is set sufficiently low to discourage abuse
of the privilege and ensure that mere assertions of the attorney-
client privilege will not become sacrosanct." Id. at 1072. "The
Zolin threshold is designed to prevent 'groundless fishing
expeditions,' not to prevent all speculation by the district
court." Id. Here, given the tremendous confluence of suspicious
signals, including Pellicano's own statements, the court's
willingness to proceed to a confidential, in camera examination
of the recorded calls was far from a "'groundless fishing
expedition.'" Id.[128]

      c.   The Court, After Reviewing the Recordings *In
          Camera*, Correctly Found that the Crime-Fraud
          Exception Applied

After determining that the government had satisfied Step
One, the court appropriately exercised its Step-Two discretion to
review the recordings in camera. Christensen does not challenge
that decision. Instead, Christensen meritlessly challenges the
court's ultimate ruling on the applicability of the crime-fraud
exception after its in camera review.

---

[128] Any alleged shortcoming in the Step-One evidence was
also harmless. Pellicano was convicted in his first trial for
widespread wiretapping. If the court had found the Step-One
evidence lacking in Christensen's pretrial motion, then a new
Step-One finding soon would have been made based on Pellicano's
convictions and the additional background evidence the government
had developed, leading to Christensen's reindictment and
conviction.

The crime-fraud exception applies to both the attorney-
client and work-product privileges.[129]  Communications lose their
privileged character if they were "in furtherance of an intended
or present illegality and . . . there is some relationship
between the communications and the illegality."  Chen, 99 F.3d at
1503.  The government bears the burden of showing the exception
applies.  Martin, 278 F.3d at 1001.

For attorney-client communications, the crime-fraud
exception entirely defeats the privilege.  Martin, 278 F.3d at
1001.  For work-product, a more complex analysis applies, with
purely factual work product treated differently than "opinion"
work product "reflect[ing] the attorney's mental impressions,
opinions, conclusions, judgments or legal theories."  In re
Antitrust Grand Jury, 805 F.2d 155, 163 (6th Cir. 1986); see In
re Special Sept. 1978 Grand Jury II, 640 F.2d 49, 63 (7th Cir.
1980).  Where the client is guilty and the attorney blameless,
the crime-fraud exception ordinarily justifies disclosure of fact
work product but not of opinion work product.  In re Antitrust
Grand Jury, 805 F.2d at 163.  However, "when the attorney
knowingly participates" in the crime, even opinion work product
may be disclosable, since "none of the public policies advanced

---

[129]  "Every circuit which has considered the question has
held or assumed that the crime-fraud exception applies to the
work product privilege."  In re Sealed Case, 676 F.2d 793, 811
n.67 (D.C. Cir. 1982); see In re Grand Jury Proceedings, 867 F.2d
539, 541 (9th Cir. 1989).

166

in support of the privilege would be served if an attorney who committed a crime or fraud could shield himself from prosecution or litigation because he asserted the work product doctrine."
Id.

Although the Christensen-Pellicano recordings' contents are intensely relevant at this stage of the analysis, Christensen's argument barely mentions them.  That is unsurprising: the recordings prove that Christensen and Pellicano conspired to, and did, wiretap Bonder-Kerkorian's calls.  Ironically,[130] given Christensen's current arguments, Christensen used Pellicano to intercept Bonder-Kerkorian's privileged communications with her lawyers.  Review of the Christensen-Pellicano calls (GEX 3014-3383) shows how Christensen subverted the justice system and perverted his role as lawyer, by deliberately intercepting his adversary's privileged communications.

For instance, in the Christensen-Pellicano conversation dated April 22, 2002, (GEX 3047-82), Pellicano told Christensen Bonder-Kerkorian's lawyers' timing plans for their motions and the issues they were researching.  (GEX 3055-57 ("they're filing other motions today"; "he's having somebody research the . . .

_____

[130]   The irony continued at trial, when Christensen filed a motion seeking to pierce Bonder-Kerkorian's attorney-client privilege, so he could have access to all her attorney-client communications and attorney's files (GER 1705-22) -- a level of intrusion the government never approached in its limited efforts to receive the few hours of recordings in which Pellicano and Christensen orchestrated their crime.

attorney-client privilege"; "they're going to [request] a
guardian ad litem"); GEX 3078 (Bonder-Kerkorian's lawyers will
"fil[e] something today," but will not request the guardian ad
litem until "after the deposition").  Pellicano recounted Bonder-
Kerkorian's discussions with her lawyers about deposition
strategy (GEX 3063), and how to handle discovery (GEX 3079-80).
He relayed how Bonder-Kerkorian's lawyer was explaining a statute
of limitations issue to her.  (GEX 3065).  He told Christensen
that Christensen should "just keep hammering," because Bonder-
Kerkorian's lawyer could be amenable to a $50,000 settlement and
because Bonder-Kerkorian was "bordering on breaking."  (GEX
3063-64).

　　　Other Christensen-Pellicano conversations fit the same
pattern.  Christensen used Pellicano's wiretap to learn Bonder-
Kerkorian's settlement strategy[131] and hopes for mediation (GEX

---

[131]   (GEX 3157 (Pellicano tells Christensen that Bonder-
Kerkorian's lawyer told her she could get $320,000 per month);
GEX 3112-13, 3115 (after Christensen asks "are they talking about
what they now want out of this" and "[w]hat kind of money are
they talking about now?," Pellicano responds that Bonder-
Kerkorian wants the ability to move, wants a financial settlement
that will not depend on her remaining unmarried, and wants
$125,000 per month); GEX 3112-15 (Pellicano answering
Christensen's question about what Bonder-Kerkorian's team was
saying "they . . . want out of this"); GEX 3118 (Pellicano
reporting Bonder-Kerkorian's "exact words" about "how much money
[she thought Kerkorian would be] willing to pay . . . to get"
visitation rights); GEX 3043 (Pellicano recounting Bonder-
Kerkorian's telling people "she wants to give up"); GEX 3058-59
(sharing how much of Bonder-Kerkorian's legal fees her lawyers
were telling her she might have to pay)).

3104-05, 3124-26); and to find out who Bonder-Kerkorian would bring with her to the mediation (GEX 3109). Pellicano told Christensen about who planned to represent a witness at a deposition, so Christensen could try "to get him excluded somehow." (GEX 3055-56). Pellicano's wiretap gave Christensen information on Bonder-Kerkorian's legal team's personnel and financial arrangements, including when Kolodny hired an appellate specialist, CPA, and professional writer. (GEX 3088, 3079, 3058). Christensen heard about Kolodny's plan for interlocutory appeal. (GEX 3088-89). Christensen learned what Bonder-Kerkorian's lawyers were and were not telling her when she had problems with her case (GEX 3116) or trouble in court hearings (GEX 3240-41; see GEX 3304-06 (Christensen looks forward to hearing what Kolodny "told [Bonder-Kerkorian] about what went on in chambers")). The wiretaps revealed Bonder-Kerkorian's frictions with her lawyers. (GEX 3055 (discussing an almost hour-long conversation where Bonder-Kerkorian attempted to fire Kolodny); GEX 3098 (discussing whether Kolodny "directly" "threatened to resign").

The Christensen-Pellicano conversations leave no doubt that Pellicano's "unique technique[]" (GEX 3119) was wiretapping Bonder-Kerkorian. (See GEX 3118 (reporting Bonder-Kerkorian's call with her father); GEX 3074 (telling Christensen about Bonder-Kerkorian calling to locate Kerkorian in Hawaii); (GEX

3080-81 (telling Christensen about Bonder-Kerkorian's child picking up the phone to cry); GEX 3111 (talking about Kolodny's "call[]" to Bonder-Kerkorian); GEX 3120 (report on three answering machine messages Kolodny left for Bonder-Kerkorian); GEX 3266-67 (explaining how much time Bonder-Kerkorian spends on the phone with her lawyers); GEX 3276-77 ("last night she was on the phone with them almost 'til midnight about a declaration . . . writing and then going over the text"); GEX 3309 (Pellicano describing how he "review[ed]" one "conversation" again); GEX 3157-58 (describing Bonder-Kerkorian's "exact[]" words to her lawyer); GEX 3110 (Bonder-Kerkorian says one thing to one person, "then she'll get on the phone and say" the opposite); GEX 3068 (telling Christensen which of Bonder-Kerkorian's friends were calling and how often)).

From the beginning, Pellicano and Christensen showed consciousness of guilt, discussing the need to "make up some phony case name" for processing Pellicano's payments through Christensen's firm (GEX 3022-23; GEX 3308 (reminding themselves later what the fake name was), as well as consequent practical problems (GEX 3192 (discussing concern about privilege if Pellicano was present at meetings but not on payroll)). They noted how the improper source of their information required the information's oblique use. (GEX 3284-85 (when wiretap shows Bonder-Kerkorian's team divulging protected information,

170

Christensen is upset that "I don't know how to bust 'em for it");
GEX 3067 (Christensen: "To give you a second path . . . to glory,
. . . I also want usable proof")).

Both men knew that invading the other side's strategic
discussions gave Christensen an advantage.  (GEX 3061 (Pellicano:
"if we continue to . . . get this kind of information with their
strategy, . . . we're really killing them"); GEX 3287
(Christensen agrees Pellicano just gave him "great
information").[132]

Trying to immunize himself, Christensen contends the crime-
fraud exception cannot apply where a lawyer commits crimes
without his client's knowledge.  That argument fails, since, as
the court found, the recordings "provide reasonable cause to
believe" that Kerkorian "was complicit in the alleged illegal
conduct."  (JER 191; see GEX 3285-87 (after Pellicano describes
how Debra told Bonder-Kerkorian about a call from Kerkorian,
Christensen says "I will let . . . Kirk know"); GEX 3308-09
(Christensen confirms the "old man" is "happy" with "what's been
done here in the last week"); GEX 3191 (Pellicano believes
Kerkorian does not act on Pellicano's reports about Debra's
double-crossing, because "having it said third hand" (i.e., by

---

[132]  Christensen delighted in this edge, because Bonder-
Kerkorian's lawyer was "an asshole" and "[i]t's so much fun
beating him."  (GEX 3063).  Christensen's may have been angry
because Kolodny had filed a bar disciplinary complaint against
him.  (JSER 88).

171

Christensen) "sometimes . . . is not as meaningful"); GEX 3287-89
(Christensen says he needs to "talk to Kirk" about information
Pellicano gave him); GEX 3347-48 (Christensen joking that he and
Kerkorian could compete with Pellicano, if not for Pellicano's
"better gear"); GEX 3194-96 (attempt to set up meeting at
Kerkorian's office).  Carradine's recollection of Pellicano
describing Bonder-Kerkorian's phone conversations to Kerkorian
(JSER 68) also showed Kerkorian's involvement.

Regardless, Christensen's argument contradicts both the
weight of authority and the reasons for the crime-fraud
exception.  In In re Impounded Case (Law Firm), 879 F.2d 1211,
1213 (3d Cir. 1989), a law firm argued the crime-fraud exception
could not apply "where the . . . alleged criminality is solely
that of the law firm."  Id.  The Third Circuit rejected the
argument, concluding that the values implicated "weigh heavily in
favor of denying" both attorney-client and work-product privilege
in those circumstances.  Id. at 1215.

In In re Doe, 662 F.2d 1073 (4th Cir. 1981), the Fourth
Circuit likewise held that the crime-fraud exception allowed a
grand jury to access work-product to investigate crimes a lawyer
committed while representing a client.  Doe found no precedent
for the proposition that "an attorney committing a crime could,
by invoking the work product doctrine, insulate himself from
criminal prosecution for abusing the system he is sworn to

172

protect." Id. at 1078. To the contrary, Doe reasoned, the
crime-fraud exception "must apply in proceedings against a
suspected lawyer equally or even more readily than in a
proceeding to obtain the information for use against a client."
Id. at 1079 (emphasis added). The court rejected as perverse the
notion that the rule should shield a criminal lawyer more than a
criminal client: the work-product rule "was not designed as a
fringe benefit for protecting lawyers who would, for their
personal advantage, abuse it." Id. In short, the fraud
definitely applied "when an attorney, charged as a fiduciary in
the administration of justice, attempts to use the opinion work
product rule to shield himself from criminal prosecution arising
from his actions in prior litigation." Id. at 1079-80.

While not universal,[133] this approach has been widely
followed. See, e.g., In re Sealed Case, 676 F.2d 793, 815 (D.C.
Cir. 1982) (the violation invoking the crime-fraud exception may

---

[133] See In re Grand Jury Proceedings, 417 F.3d 18, 19, 23
(1st Cir. 2005) (involving the attorney-client privilege alone).
It is unlikely the First Circuit would extend that ruling to
work-product, since its concern focused on fear that a criminal
lawyer's wrongdoing could expose an "innocent client['s]"
communications. Id. at 23 n.5. Regardless, such a concern is
not present here, since the prerequisites for the attorney-client
privilege were never established, and since the record shows
Kerkorian's hands were not clean. Moreover, even if attorney-
client privilege could be established for the handful of
statements in which Christensen purportedly spoke about
Kerkorian's thoughts, that would leave unprotected the majority
of statements, making admission of the few attorney-client
portions harmless.

be the client's or it "may also be the attorney's, since attorney misconduct negates the premise that the adversary system furthers the cause of justice"); In re Subpoena Addressed to Murphy, 560 F.2d 326, 336 n.19 (8th Cir. 1977) (court may conclude that opinion work product "is not immune if it contains inculpatory evidence of the attorney's own illegal . . . activities").[134]

Precedent also establishes that an attorney's use of illegal or surreptitious recordings specifically vitiates work-product privilege. In Parrott v. Wilson, 707 F.2d 1262, 1271 (11th Cir. 1983), the plaintiff's attorney had "clandestinely taped telephone conversations with . . . two of the witnesses" in the lawsuit. Reasoning that disclosure of the recordings would not "traumatize[] the adversary process more than the underlying legal misbehavior,'" the Court held that "whatever work product privilege might have existed was vitiated by counsel's

---

[134] See also In re Grand Jury Subpoena, 561 F.3d 408, 411 (5th Cir. 2009) (the "party intending crime or fraud" -- whether the attorney or client -- "cannot invoke the work product doctrine"); United States v. Townsley, 843 F.2d 1070, 1086 (8th Cir. 1988) ("emphatically reject[ing]" argument that attorney's communications attempting to obstruct grand-jury investigation were shielded by attorney-client privilege); United States v. Gordon-Nikkar, 518 F.2d 972, 974-75 (5th Cir. 1975) (finding unprivileged an attorney's suggestion to non-client that the non-client perjure herself to aid the client's defense). Indeed, Pellicano's criminal purpose by itself satisfied the crime-fraud exception. See In re Grand Jury Empaneled Oct. 18, 1979, 663 F.2d 282, 290 (3d Cir. 1980) (opinion of Gibbons, J.) (where investigator conducted interviews as attorney's agent, government could have overcome work-product protection by showing "the agent was engaged in criminal activity").

174

clandestine recording of conversations with witnesses." Id. at 1271-72. If, as Parrott held, an attorney's unethical but noncriminal taping of others' conversations triggers the crime-fraud exception without proof of the client's wrongful intent, then a fortiori Christensen's employment of Pellicano to conduct a criminal wiretap is sufficient.

In arguing otherwise, Christensen seizes on isolated dicta discussing an entirely different question. This Court has held that, where a client intends to use his lawyer to commit a crime, the lawyer's lack of criminal intent does not prevent application of the crime-fraud exception to the guilty client. In other words, when determining whether the crime-fraud exception applies, the client's criminal intent is a sufficient condition, making the lawyer's criminal intent unnecessary.

That is the meaning of Christensen's cited cases (COB 46), such as Bauer, 132 F.3d at 509 ("The exception applies 'even where the attorney is unaware that his advice may further an illegal purpose.'"). In In re Grand Jury Proceedings, 87 F.3d at 381, clients who used their lawyers to further tax and immigration crimes argued that the crime-fraud exception could not apply because, inter alia, the lawyers "were not aware of" the scheme. Id. at 379-80. In rejecting the argument, this Court stated that "[t]he attorney need know nothing about the client's ongoing or planned illicit activity for the exception to

175

apply." Id. at 382. That is the context in which the court disregarded "the attorney's knowledge, state of mind or actions," and instead "focused, quite properly, on the client." Id. at 381. In applying the crime-fraud exception to a guilty client's communications to lawyers who were "in the dark" about the client's illegal conduct, id. at 382, the Court never considered whether the crime-fraud exception could operate against a culpable lawyer who had an innocent client. Chen, 99 F.3d at 1504, likewise held that, given a guilty client, "the lawyers' innocence does not preserve the attorney-client privilege against the crime-fraud exception."[135] Chen said nothing about the converse situation. This Court therefore has never addressed whether a client's lack of knowledge shields a lawyer from the consequences of the lawyer's criminality. The Court should adopt the overwhelming consensus view of In re Impounded Case and Doe.

Christensen's contrary rule would defy the privileges' rationale. Lawyers are "no more entitled to privacy or protection than any other person," and "[a]n attorney should not be able to exploit the privilege for ends . . . antithetical to the adversary system any more than a client." Moody, 654 F.2d at 800. Indeed, attorneys -- who are schooled in the law and held

---

[135]    While Chen said that "'the client's knowledge and intentions . . . are of paramount concern to the application of the crime-fraud exception," Chen meant simply that "the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply." Id.

to demanding ethical standards -- would be especially undeserving beneficiaries of a rule immunizing their own criminality based on their client's innocence.

Christensen's contrary proposal is especially indefensible for work-product.  A lawyer who uses illegal means without his client's assent is not acting as counselor to a client.  Rather, he is on a particularly reprehensible frolic and detour, and his work-product does not deserve protection.  The privilege's purpose is to protect the adversarial process -- and "the integrity of the adversary process is not furthered by protecting a lawyer who steps outside of his role as an officer of the court."  <u>Id.</u>[136]  Since Christensen sought to "invoke privileges not to protect his client or . . . the legal system, but, instead, to protect his own personal interest," it would not serve the privileges' purposes to apply them here.  (GER 982).  Moreover, basic principles of standing hold that the "party intending crime or fraud cannot invoke the work product doctrine."  <u>In re Grand Jury Subpoena</u>, 561 F.3d at 411.

Christensen's contrary proposal would lead to unacceptable consequences.  Consider the following:

---

[136]  <u>See</u> <u>United States v. Talao</u>, 222 F.3d 1133 (9th Cir. 2000) (refusing lawyer's attempt to use the rule against contact with represented parties to hide lawyer's misdeeds, which came to light when his client contacted opposing counsel: "It would be an anomaly to allow the subornation of perjury to be cloaked by an ethical rule, particularly one manifestly concerned with the administration of justice.").

177

- C1, the defendant in a discrimination case, hires lawyer L1 to defend him by lawful means. Unbeknownst to C1, L1 instructs his paralegal to alter and destroy key documents. On Christensen's theory, L1's instructions to the paralegal could not be used to prosecute L1.

- C2 hires lawyer L2 to minimize his child-support payments by legal means. L2 accomplishes the goal by hiring a hit-man to kill C2's child -- something C2 never asked for or intended. On Christensen's theory, L2's emails to the hitman would be privileged, and the crime-fraud exception would not apply.

- C3 hires L3 to defend her in a civil case. Without C3's permission, L3 leaves a voicemail instructing his investigator to bribe others into framing plaintiff's witness X3 for a serious crime. As a result, X3 is charged with the crime. On Christensen's theory, X3 would not have access to L3's voicemail when attempting to prove his innocence -- even if C3 did not object.

Immunizing lawyers who act against their clients' wishes makes even less sense than immunizing those who accede to client instructions. The government's contrary rule, however, serves both social and judicial goals. "[N]one of the public policies advanced in support of the privilege would be served if an attorney who committed a crime or fraud could shield himself

178

from prosecution or litigation because he asserted the work product doctrine." In re Antitrust Grand Jury, 805 F.2d at 163. Rather, "where so-called work-product is in aid of a criminal scheme, fear of disclosure may serve a useful deterrent purpose and be the kind of rare occasion on which an attorney's mental processes are not immune." In re John Doe Corp., 675 F.2d 482, 492 (2d Cir. 1982). Thus, even if this Court found clear error in the conclusion that there was "reasonable cause to believe" that Kerkorian was a knowing participant in the criminal wiretapping scheme, this Court should follow the Third, Fourth, Fifth, Eighth, and D.C. Circuits in holding that the attorney's criminal intent alone establishes the crime-fraud exception.

> d. The Court's *Zolin* Analysis Was Not Irrevocably Tainted

Christensen argues that, because the government's initial submission and the court's initial ruling failed to cite and apply Zolin, later rulings properly applying Zolin were irrevocably tainted.

Christensen's argument fails. The court acted correctly by reanalyzing the application under correct procedures when it realized its earlier analysis had not adhered to those procedures. Analogous re-analyses are commonplace, and the alternative (getting a new judge every time the first judge learned something she could not consider) would be unworkable.

179

When the court realized that it had erred by not adhering to Zolin's two-step process, it decided to reanalyze the crime-fraud issue under Zolin.  That was the right thing to do under Ninth Circuit precedent.

In Chen, 99 F.3d at 1503, a prosecutor's crime-fraud submission contravened Zolin by including the potentially privileged material in the initial application.  When the judge "recognized that there was an incorrect submission" containing material he should not have had, he did not dismiss the case or recuse.  Id.  Rather, the judge "expressly said he was disregarding" the potentially privileged information, and based his decision purely on the information that would have been acceptable to proffer under Zolin Step One.  Id.

This Court affirmed, finding the government's error in its initial submission "harmless, because the judge disregarded the incorrectly submitted attorney-client communications" and instead relied on "properly submitted materials" that satisfied Zolin's Step One.  Id. at 1504.  Chen shows that the initial misstep here was harmless, and disproves Christensen's proposition that a judge who learns the contents of potentially privileged communications cannot be trusted to follow her judicial oath when she says she will not rely on that material in making Zolin's Step-One decision.

180

The court's procedure is further confirmed by this Court's decision in de la Jara, where the privilege claim involved a letter to the defendant from his lawyer.  The court in de la Jara skipped Zolin's Step One by reviewing the letter as part of its initial crime-fraud analysis.  Although finding the error harmless because of the client's implied waiver, this Court also explained what it would have done had there not been implied waiver:

> Were we not to uphold the . . . decision to admit the letter on other grounds, we would be required to remand the case to the district court "to determine in the first instance[] whether [the government] has presented a sufficient evidentiary basis for in camera review, and whether, if so, it is appropriate for the district court, in its discretion, to grant such review.

973 F.2d at 749 n.1.

Under de la Jara, if the court had never realized its Zolin mistake and the issue was first presented on appeal, this Court's response would be to remand for the same judge to make a Zolin Step-One decision.  Id.  That proves the emptiness of Christensen's complaint.  If it would have been fine for the same judge to undertake a new Zolin inquiry on remand after appeal, then there is no reason she could not do the same thing immediately.[137]

---

[137]  Christensen (COB 45-46) erroneously claims that the court's reanalysis under Zolin Step One must have considered the recordings because the reanalysis made reference to arguments that were not in the government's original motion.  But in

(continued...)

181

Christensen's contrary argument posits that judges are either so incompetent or so untruthful that this Court cannot take them at their word when they commit to disregard improper materials.  But judges routinely hear information that they must disregard.  A judge hearing a Fourth Amendment challenge knows the evidence found in a questioned search; on Christensen's theory, that knowledge would irrevocably taint her decision on whether there was probable cause.  In bench trials, Christensen's theory would require transfer to a new judge whenever the first judge heard evidence that she later deemed inadmissible.  Such an argument not only denigrates judges' integrity and ability; it would be grossly unworkable.[138]

---

(...continued)
undertaking the reanalysis, the court was allowed to consider the government's response to Christensen's arguments.  If Christensen wants to prove that the court's reanalysis was faulty, he must show that the court relied on potentially privileged material -- something he cannot do.

Similarly, Christensen proves nothing by noting that the court cited pages from the record where both extrinsic evidence and summaries of the recordings were contained on the same page.  The court's job was not to rip pages out of the government's submission; instead, Chen told the court to disregard the recordings, which the court did.  (When a witness' testimony contains both admissible and inadmissible portions, the court does not disregard all of the witness' testimony -- it simply refrains from relying on inadmissible parts.)  Christensen points to no portion of the court's Step-One analysis that relied on communications prohibited under Zolin.

[138]  This Court frequently remands cases with the instruction to disregard certain previously relied-on factors.

Indeed, what the court did here -- putting aside its knowledge of the Christensen-Pellicano recordings so it could base its <u>Zolin</u> Step-One analysis only on the extrinsic material -- is what <u>this</u> Court is doing now.  Presentation of this appeal (not to mention Christensen's several interlocutory appeals) required the parties to include the facts underlying both <u>Zolin</u> steps in the same brief to the same panel.  Christensen's theory would require this Court to recuse all judges who participated in Christensen's interlocutory appeals, and require separate panels for each step of the <u>Zolin</u> inquiry.  Such a rule might have attraction for those seeking delay and obfuscation in a merry-go-round of judges; it has no place in a system of fair and efficient adjudication.

There are yet other reasons why the court's initial missteps were harmless.  First, <u>Zolin</u> procedures apply only to analysis of the crime-fraud exception.  But Christensen also failed to demonstrate the privileges' elements and failed to state his privilege claim with specificity.  Therefore, even if the court's reanalysis under <u>Zolin</u> would otherwise have been inadequate, that would still be harmless error, since Christensen never established his entitlement to the privileges in the first place.

Second, <u>Zolin</u>'s Step-One requirement rests on the recognition that "'examination of the evidence, even by the judge alone, in chambers' might in some cases 'jeopardize the security

183

which the privilege is meant to protect.'" 491 U.S. at 570. Because the recorded conversations were not in fact privileged (since they implemented the Christensen-Pellicano conspiracy), premature disclosure to the court did not jeopardize any interest that the privilege was designed to protect. Regardless what Zolin requires in its efforts to protect privileged material, once the material's character is known, no purpose is served by shielding definitively unprivileged material.

Third, Christensen's challenges to the district judge's impartiality have been rejected by an independent authority. When Christensen moved to recuse the trial judge from deciding the Zolin issues in the motion to dismiss, the recusal motion was referred to Judge Matz. (JER 5577). Judge Matz found that having the original judge rule on the validity of her previous crime-fraud determination raised no concerns of bias or the appearance of bias. (GER 635-37). "Judges are frequently" asked "to reconsider a prior ruling" -- such as when deciding post-conviction petitions challenging their own verdicts and sentences, or when deciding "motions to dismiss or suppress wiretapped evidence that they themselves had authorized while functioning as duty judge." (GER 637-38). In those situations, courts have deemed analogous recusal motions unjustified. (Id. (citing United States v. Giordano, 442 F.3d 30, 48 (2d Cir. 2006))). Liteky v. United States, 510 U.S. 540, 544-45 (1994),

184

held that "'judicial rulings alone'" are "'[a]lmost invariably'" not proper grounds for recusal -- nor, do "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" form a basis for recusal unless they "display a deep-seated favoritism or antagonism." (GER 638). Since Christensen's recusal motion made no allegation that the court held "an opinion that derives from an extrajudicial source," and no allegation of "such . . . favoritism or antagonism as to make fair judgment impossible," id., Christensen's request for temporary recusal properly was denied.

Judge Matz' reasoning is convincing. With no statutory basis for recusal, the court was right to reconsider its prior ruling under a proper Zolin process, as this Court encouraged in Chen and de la Jara.[139] Indeed, it is hard to see what else it could have done.

---

[139] Additionally, although Christensen now claims that the proper remedy would have been for the government to submit "a new motion[] devoid of reference to the recordings" to "a different judge untainted by the [previous] improperly submitted materials" (COB 46), that is not what he asked for below. There, Christensen asked for a new judge to hear his motion to dismiss the indictment. (GER 565). Christensen asked for the new judge to be empowered to award a more drastic remedy than merely an order declining to declare the materials unprivileged. Although Christensen may have rethought the matter for appeal, he cannot complain that the court should have sua sponte invented the more limited option for which he now advocates.

Finally, if Christensen's recusal motion had been granted, then Christensen's pleadings in support of his motion to dismiss the indictment would have been forwarded to the new judge to decide that motion.  But that new judge would have had the content of the recorded calls, <u>because Christensen included the declarations quoting and summarizing the calls as exhibits to the sealed declaration accompanying his motion to dismiss</u>.  (<u>See</u> GER 496 (discussing CR 923 at 3)).  In short, if Christensen had gotten what he asked for - his motion to dismiss assigned to a new judge - that judge still would have made a <u>Zolin</u> Step-One decision while already knowing the content of the calls at issue. If that result was acceptable to Christensen, there was nothing different about the court making the Step-One decision itself, and any conceivable error was harmless.

D.   NO BASIS EXISTS FOR DISMISSING THE INDICTMENT

Courts may dismiss an indictment on due process grounds or under the court's supervisory authority only in response to "the most intolerable government conduct." <u>United States v. Restrepo</u>, 930 F.2d 705, 712 (9th Cir. 1991).  Though Pellicano alleges a long list of misconduct (POB 32-37), his claims fail -- not only are they mostly waived, but Pellicano fails to establish misconduct at all, let alone that requiring dismissal.

1.  <u>Standard of Review</u>

"Outrageous government misconduct claims involve . . . 'defects in the institution of the prosecution itself.'" <u>United States v. Mausali</u>, 590 F.3d 1077, 1080-81 (9th Cir. 2010). Failure to raise such claims pre-trial deprives the court of the chance to resolve disputed facts in a hearing, and therefore waives the claim. <u>Id.</u> The same reasoning holds for requests to dismiss under supervisory powers.

Unwaived claims of outrageous governmental misconduct are reviewed <u>de novo</u>. <u>United States v. Stinson</u>, 647 F.3d 1196, 1209 (9th Cir. 2011). However, this Court "view[s] the evidence in the light most favorable to the government and . . . accept[s] the district court's factual findings unless they are clearly erroneous." <u>United States v. Gurolla</u>, 333 F.3d 944, 950 (9th Cir. 2003).

Denial of a motion to dismiss under the court's supervisory powers is reviewed for abuse of discretion, <u>Stinson</u>, 647 F.3d at 1209, with this Court viewing the evidence in the light most favorable to the government, and accepting the court's factual findings unless clearly erroneous, <u>Gurolla</u>, 333 F.3d at 950.

2.  <u>Dismissal Requires Extraordinary Misconduct and a Lack of Other Remedies</u>

Although <u>United States v. Russell</u>, 411 U.S. 423, 431 (1973), left open the possibility of due-process dismissal for governmental misconduct, "the due process channel which <u>Russell</u>

187

kept open" is "most narrow." <u>United States v. Ryan</u>, 548 F.2d 782, 789 (9th Cir. 1976). Such dismissal is a "drastic" and "disfavored" remedy, <u>United States v. Jacobs</u>, 855 F.2d 652, 655 (9th Cir. 1988), appropriate only where misconduct is "so grossly shocking and so outrageous as to violate the universal sense of justice," <u>Stinson</u>, 647 F.3d at 1209.

This is "an extremely high standard." <u>United States v. Nobari</u>, 574 F.3d 1065, 1081 (9th Cir. 2009). This Court recognizes only two types of conduct that qualify: "where the government has 'engineer[ed] and direct[ed] the criminal enterprise from start to finish;'" and the "'slim category'" where "'police have been brutal, employing physical or psychological coercion against the defendant.'" <u>Fernandez</u>, 388 F.3d at 1238. "The Government's involvement must be malum in se or amount to the engineering and direction of the criminal enterprise from start to finish." <u>United States v. Smith</u>, 924 F.2d 889, 897 (9th Cir. 1991).

Such dismissals are extraordinarily rare. See <u>United States v. Simpson</u>, 2010 WL 1611483, *6-8 (D. Ariz. Apr. 20, 2010) (Murguia, J.) (surveying Ninth Circuit cases). This Court has rejected such claims for threatening a witness with the death penalty unless he cooperated, <u>Stinson</u>, 647 F.3d at 1209; encouraging a teenaged drug-treatment patient to distribute drugs, <u>Smith</u>, 924 F.2d at 897; using cocaine with the defendant,

188

United States v. Barrera-Moreno, 951 F.2d 1089, 1092 (9th Cir. 1991); assisting a prison escape, United States v. Williams, 791 F.2d 1383, 1386-87 (9th Cir. 1986); introducing drugs into a prison, for inmates' use, United States v. Wiley, 794 F.2d 514, 515-16 (9th Cir. 1986); illegally shooting animals, United States v. Hugs, 109 F.3d 1375, 1379 (9th Cir. 1997); and using a drug-addicted prostitute informant who had regular sexual intercourse with the defendant, Simpson, 813 F.2d at 1465.  The Supreme Court has never granted such a dismissal, and this Court has done so only once.[140]

Courts' ability to dismiss under their supervisory authority is likewise "substantially limited".  United States v. Tucker, 8 F.3d 673, 674 (9th Cir. 1993).  Under United States v. Hasting, 461 U.S. 499, 505 (1983), courts may dismiss only "[(1)] to remedy the violation of recognized [constitutional or statutory] rights, [(2)] to deter illegal conduct and [(3)] 'to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury.'" United States v. Garza-Juarez, 992 F.2d 896, 905 (9th Cir. 1993). Because "judicial integrity is rarely, if ever, threatened by

---

[140]   In Greene v. United States, 454 F.2d 783 (9th Cir. 1971), this Court found dismissal appropriate where an undercover agent contacted defendants after their bootlegging arrest, set them up in the bootlegging business again, and was their sole customer for years.  Greene, 454 F.2d at 784-87.  Greene, which predated Russell, "of limited application" outside the entrapment context.  Wiley, 794 F.2d at 516.

conduct outside of the courtroom, . . . '[c]ourts do not have the authority to supervise out-of-court executive procedure [without] a constitutional or statutory violation." Id.[141]

Dismissal requires flagrant misconduct causing the defendant substantial prejudice, Jacobs, 855 F.2d at 655, "a high standard, limit[ed] . . . to extreme cases," United States v. Doe, 125 F.3d 1249, 1257 (9th Cir. 1997). "[E]ven in some of the most egregious situations it has not been met." Doe, 125 F.3d at 1257. Dismissal is inappropriate where lesser remedies are available. Id.

### 3.  Pellicano's *Massiah* Claim Is Waived and Meritless

Pellicano claims the case should have been dismissed because the government violated Massiah v. United States, 377 U.S. 201 (1964), by using Pellicano's girlfriend, Sandra Carradine, to learn his "thoughts and strategies" and his "concern[] about the government's threats to file RICO charges." (POB 34). As Pellicano admits, Pellicano filed but then "withdrew his motion for a Massiah hearing." (Id.).

### a.  Pellicano Waived All *Massiah* Claims

Claiming a Massiah violation, Pellicano moved before trial to suppress statements to his girlfriend, Sandra Carradine. (GER

---

[141]  United States v. W.R. Grace, 526 F.3d 499, 511 n.9 (9th Cir. 2008), upheld a court's supervisory power to order pre-trial disclosure of witnesses as a discovery remedy. That hardly justifies Pellicano's request for the tremendously more drastic sanction of dismissal.

447-70).  Subsequently, he moved to dismiss the indictment based on alleged <u>Brady</u> violations and on "the declarations and briefs . . . in support of his [<u>Massiah</u>] motion[]."  (GER 550).  The government contested both motions.  (GER 640-795, GSER 38-105).  The court denied the motion to dismiss the indictment, and scheduled an evidentiary hearing on the <u>Massiah</u> claim.  (JER 162-63, GER 956).

Before that hearing could happen, Pellicano withdrew his <u>Massiah</u> claim, because "<u>I don't have any chance of prevailing, and I don't want to take up the Court's time</u>."  (GERT 210 (emphasis added)).[142]

By withdrawing his <u>Massiah</u> claim, Pellicano waived it. Under Rule 12(e), dismissal requests are waived if not brought before trial so the court can hold an evidentiary hearing. <u>Mausali</u>, 590 F.3d at 1080.

Pellicano's withdrawn <u>Massiah</u> claim cannot be considered as part of his unwithdrawn dismissal motion.  The dismissal motion asserted <u>Massiah</u>-based misconduct only through a single paragraph referring the court to his "detailed <u>Massiah</u> motion."  (GER 550,

---

[142]  The court had told Pellicano it would give him time to prepare for the hearing (GERT 210-11) -- an offer Pellicano refused.  That Pellicano was pro se at the time does not excuse him from the consequences of waiver.  "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"  <u>Faretta v. California</u>, 422 U.S. 806, 834 n.46 (1975).

191

558).  By withdrawing the _Massiah_ motion, Pellicano told the court he did not want _Massiah_ issues resolved and foreclosed a step that would have been necessary for any _Massiah_-based dismissal.

He prevented the court from holding its intended evidentiary hearing (GER 956) on issues Pellicano had the burden to establish: (1) representation by counsel at the relevant time; (2) government knowledge of the representation; (3) "deliberate elicitation" by a government agent; and (4) prejudice. Pellicano thus waived his _Massiah_-based claims with respect to _all_ motions, including the motion to dismiss.

> b.    Pellicano's _Massiah_ Claim Is Meritless
>
>> (1)    Facts

Sandra Carradine, a PIA client, retained Pellicano in her child support dispute against her ex-husband.  (GERT 3542-43). Recordings show that Pellicano wiretapped Carradine's ex-husband and told Carradine information from the wiretaps.  (GERT 3547, 3552-63, 3565-77).  Pellicano and Carradine then dated intermittently from December 2001 through January 2006.  (GERT 3581).

Carradine visited Pellicano in prison many times.  (GER 665 n.19; GSER 78-97).  In 2004, Carradine perjuriously told the grand jury she did not know whether Pellicano had wiretapping capabilities or had wiretapped on her behalf.  (GERT 3581-82,

192

3594, 3597).  After the government played Pellicano's and

Carradine's recorded conversations to her in July 2005 (GER 662),

Carradine confessed her perjury.  (GER 662).  She pleaded guilty

under a cooperation agreement on January 6, 2006.  (GER 663, 665;

GERT 3582-83, 3585-87).

    She continued visiting Pellicano after the original October

26, 2005, indictment charged him with three discrete wiretapping

offenses.  (Id.).  Under a recent case, the government could not

forbid her from contacting him.[143]  The government instead advised

Carradine and her counsel in writing that she had no

authorization to talk with Pellicano on the government's behalf,

that any interaction she had would be on her own account, and

that she would not earn sentencing benefits for future

interactions with Pellicano.  (GER 663-64, 789-90).  Carradine

acknowledged and agreed to those terms.  (Id.).

        (2)   There Was No Violation

    To establish a Massiah violation, Pellicano must prove that

(1) he possessed a Sixth Amendment right to counsel; (2) the

government intentionally created a situation likely to induce him

to make incriminating statements without counsel's presence; and

(3) a government agent induced conversation about the specific

---

[143]   United States v. Leung, 351 F. Supp. 2d 992, 993, 995,
997-98 (C.D. Cal. 2005) (finding misconduct in government
instruction that cooperating witness not communicate with
defendant).

193

charge to which defendant's Sixth Amendment right to counsel had attached. See Kuhlmann v. Wilson, 477 U.S. 436, 458-59 (1986); United States v. Henry, 447 U.S. 264, 270 (1980). Pellicano bore of proof on each element. Kuhlman, 477 U.S. at 458-59.

Pellicano complains that the government "use[d] Carradine as an operative into the Pellicano defense camp from July 29, 2005 to February 6, 2006." (POB 34). But the right to counsel attaches only to offenses for which the defendant has already been formally charged. Texas v. Cobb, 532 U.S. 162. The court correctly found that Pellicano's Sixth Amendment rights did not attach at all until the October 26, 2005, indictment first charged him with wiretapping. (GER 957-58). His claims from before then must be disregarded. Since his initial indictment charged only three discrete wiretapping counts, moreover, even then the right attached only to those three counts. It did not attach to the other, later charges, because those charges would not be deemed the same offense for double jeopardy purposes. Cobb, 532 U.S. at 172-73. Sixth Amendment rights on RICO charges did not arise until Pellicano's RICO indictment.

Pellicano's claim is further foreclosed by the record. Copious evidence, including a letter from Pellicano's former counsel, established that Pellicano was pro se from the October

194

26 indictment through at least December 15, 2005.[144]  (GER 657-59,
841).  The government's instructions to Carradine show that she
was not a government agent, and that the government did not
create the likelihood of incriminating statements.  And any
statements Pellicano made to Carradine were made with the
knowledge that they could reach the government, since he knew
during the time in question that Carradine was a cooperator.[145]
This evidence, which must be construed in the light most
favorable to the government, Barrera-Moreno, 951 F.2d at 1091,
bars Pellicano's claim.

---

[144]  On December 12, 2005, Donald Ré told prosecutors,
"[p]ursuant to your request, I have informed [Pellicano] of your
interest in speaking with him.  [Pellicano] has informed me that
he is representing himself with respect to this investigation,
and . . . that I am not authorized, and no other lawyer is
authorized, to speak on his behalf."  (JER 841 (emphasis added);
GER 685).  When Pellicano met with prosecutors to discuss
cooperation on December 15, 2005 (GER 658-59), he acted as his
own counsel -- a fact he has never disputed.  Pellicano's pro se
status was also confirmed by, inter alia, Pellicano's
communications with attorneys representing civil litigants, and
intercepted communications between Pellicano and mobster Jerry
Scalise.  (GER 657-59; GSER 72-73).

[145]  Pellicano admitted knowing of Carradine's plea and
confronting her about her cooperation.  (GER 461).  Indeed,
Pellicano says he knew of Carradine's cooperation by September
2005, and was purposefully feeding her misinformation.  (GERT
14128 ("There are . . . conversations . . . I had with Ms.
Carradine, who I knew was operating as a government informant
throughout that period of time [September 2005] . . . . [T]o
assume . . . I was telling her the truth during those . . . times
. . . is the government's mistake. . . . [W]hatever I said to Ms.
Carradine during that period . . . , they can take with [a] . . .
grain of salt.").

Even if Pellicano had established a <u>Massiah</u> violation, dismissal would have been inappropriate, because the conduct was not sufficiently flagrant, and because lesser remedies were available.  Sixth Amendment violations typically are remedied through sanctions like suppression.  <u>Morrison</u>, 449 U.S. at 668-69.  Dismissal would require that the government's deliberate intrusion caused Pellicano actual and substantial prejudice.  <u>United States v. Stringer</u>, 535 F.3d 929, 941 (9th Cir. 2008).  Pellicano's claimed prejudice is that RICO charges were filed after he told Carradine he feared them.  (POB 34).[146]  But RICO charges resulted not from Pellicano's subjective fears, but from a multi-year investigation involving hundreds of witnesses interviews, grand-jury testimony, sophisticated computer analysis, and extensive document review.  Nor did Pellicano's statements to Carradine prejudice Pellicano at trial, since Carradine's testimony focused on her observations of Pellicano's wiretapping before she began cooperating.  (GERT 3541-3601).  And there was no flagrant <u>Massiah</u> violation, because no Sixth Amendment rights attached regarding RICO violations until Pellicano was formally charged with RICO.  Because there was no

---

[146]  Pellicano self-contradictorily asserts: (1) in his <u>Massiah</u> claim, that the government had been building toward RICO charges since 2002; (2) in his evidentiary-sufficiency challenge, that RICO charges were brought to add "sizzle" and media attention; and (3) in his vindictive prosecution claim, that RICO charges were brought to punish his refusal to cooperate.  (POB 34, 36-37, 50-51).

flagrant misconduct causing substantial prejudice, Pellicano's claim fails.

> 4.    Unsubstantiated Smears Against Ornellas Provide No Basis for Dismissal

Pellicano passingly claims that the indictment should have been dismissed because "Ornellas once asked Arneson to 'run' his neighbor for information from the LAPD database."  (POB 35).

Ornellas explained that once, when Arneson was a sergeant in LAPD's Pacific Division, Ornellas had given Arneson a license plate that appeared to be connected to apparent drug dealing Ornellas had noticed within that Division, near Ornellas' home. (GERT 6046-48).[147]

Pellicano waived the claim by including it in neither his pre-trial nor post-trial motions to dismiss the indictment.  (GER 549-61, 2967-83).  Cf. Mausali, 590 F.3d at 1080-81.

Regardless, the claim is frivolous.  Though Pellicano contests Ornellas' testimony, this Court must construe the evidence in the light most favorable to the government.  Gurolla, 333 F.3d at 950.[148]  That is particularly so since the jury (and

---

[147]  Ornellas testified that the FBI does not handle low-level drug dealing (GERT 6087-88).  Although Arneson sought to imply that Ornellas could have had the inquiry conducted by LAPD Officer Mike Howard, with whom SA Ornellas often worked (GERT 6202), Howard was stationed in downtown Los Angeles, rather than in the precinct where the drug dealing occured (GERT 6087-88, 6216).

[148]  Arneson disputed Ornellas' testimony, claiming instead
                                                    (continued...)

court) found the only contrary witness, Arneson, not credible. The evidence thus shows no impropriety: Ornellas simply noticed a possible crime and reported it to the agency with jurisdiction.

Even if a contrary version were somehow credited, running a single improper inquiry would not be so outrageous to merit dismissal under either the Due Process clause or supervisory powers. See Part IV.D.2, supra (giving standards). Pellicano's evidence likewise falls short of the high bar needed for dismissal under the court's supervisory powers. And supervisory powers address only misconduct committed before the court, Garza-Juarez, 992 F.2d at 905, whereas Pellicano's allegations concern conduct well before the investigation and prosecution of this case.

---

[148](...continued)
that Ornellas asked Arneson to conduct a database inquiry on a neighbor who Ornellas considered an "asshole." (GERT 5383). But Arneson's version was riddled with contradictions and implausibilities. Though Arneson first said he personally conducted the inquiry, he later claimed to have instructed another officer to conduct a second inquiry. (GERT 5383-85). (While Arneson presented testimony from multiple law-enforcement officers as part of his defense, none testified to assisting Arneson in this regard.) Although Arneson claimed no memory of his 2,500 inquiries for Pellicano, he miraculously recalled the circumstances of his one Ornellas-related inquiry. ("I . . . don't recall what I did for Mr. Pellicano. I recall what I did for . . . Ornellas on duty but not for Pellicano.") (GERT 5381-82, 5411-12). Though Arneson on direct examination admitted that Ornellas had "access to law enforcement databases" through the FBI, on cross-examination Arneson claimed to not "know what [Ornellas] has access to." (GERT 5385, 5412). These contradictions showed Arneson's testimony to be lies. At minimum, the facts construed in the government's favor, do not support Pellicano's contentions.

Nor can Pellicano establish substantial prejudice from the acts alleged.  The entire incident had no relation to Pellicano or this investigation.  Ornellas and Arneson both testified, and the jury was free to credit whichever it believed.  See Hugs, 109 F.3d at 1379 (alleged misconduct must relate to the charged offenses); Owen, 580 F.2d at 367-68 (defendant must incur prejudice from misconduct); Stinson, 647 F.3d at 1209 (no prejudice when matter brought to jury's attention at trial).

### 5.    Pellicano Does Not Show Vindictive Prosecution

Pellicano baselessly claims to have been subjected to a vindictive prosecution punishing him for telling the government, in a December 2005 meeting, that he would not become a cooperating witness.  (POB 36-37).

The claim is waived, because Pellicano did not raise vindictive prosecution as a basis for dismissal in either of his trial-court motions.[149]  (GER 549-61, 2967-83).  Mausali, 590 F.3d at 1080-81; United States v. Jones, 713 F.2d 1316, 1323-24 (9th Cir. 1983) (vindictive prosecution claim is waived unless raised

---

[149]  Pellicano's initial motion to dismiss included a footnote stating that the government charged multiple offenses that were "meaningless under the sentencing guidelines" and "manufactured a 'RICO case' from predicate acts that also carry low guideline offense levels."  (GER 549-61).  That is not a vindictive prosecution claim.  The court found that the government acted within its charging discretion and that "if Pellicano believed that the RICO charges were improperly brought, he was free to move for the charges to be stricken or dismissed." (JER 162-64).  Pellicano, did not do so.

below).  Pellicano's appellate brief, which neither cites
controlling caselaw nor provides record citations for factual
allegations, further waives his claim.  Ninth Cir. R. 28-2.8.

The claim is also meritless.  "[S]o long as the prosecutor
has probable cause to believe that the accused committed an
offense defined by statute, the decision whether . . . to
prosecute, and what charge to . . . bring . . . , generally rests
entirely in his discretion."  Bordenkircher v. Hayes, 434 U.S.
357, 364 (1977); see United States v. Nixon, 418 U.S. 683, 693
(1974) (Executive Branch has "absolute discretion . . . whether
to prosecute a case").  Prosecutors are allowed to add charges as
the case progresses, United States v. Goodwin, 457 U.S. 368, 382
(1982), and "exceptionally clear proof" is required before the
court may infer that charging discretion has been abused,
McCleskey v. Kemp, 481 U.S. 279, 297 (1986); Nunes v. Ramirez-
Palmer, 485 F.3d 441 (9th Cir. 2007).

Defendants claiming vindictive prosecution must establish a
prima facie case "(1) by producing direct evidence of the
prosecutor's punitive motivation or (2) by showing that the
circumstances establish a 'reasonable likelihood of
vindictiveness.'"[150]  United States v. Kent, 649 F.3d 906, 912-13

---

[150]  Because Pellicano cannot establish presumptive
vindictiveness, the government need not show that the RICO
charges "did not stem from a vindictive motive, or [were]
justified by independent reasons or intervening circumstances
                                              (continued...)

200

(9th Cir. 2011).  "[A]s a matter of law, the filing of additional charges to make good on a plea bargaining threat . . . will not establish the requisite punitive motive" to support a claim of vindictive prosecution.  Id. at 914.  Pellicano's claim thus is legally barred.  In Kent, a defendant was willing to plead guilty, but refused to sign a cooperation agreement.  Id. at 909-10.  The government then filed a charging document effectively doubling the applicable mandatory-minimum sentence.  Id.  This Court rejected a vindictive prosecution claim, holding that "a prosecutor, who . . . threatens enhanced charges to induce a defendant's cooperation . . . may carry out that threat if the defendant declines to cooperate."  Id.; see United States v. Hernandez-Herrera, 273 F.3d 1213, 1217 (9th Cir. 2001) ("filing . . . additional charges after a defendant refuses to plead guilty does not raise a presumption of vindictiveness").

Pellicano's claim is also disproven by the record.  Potential RICO charges were long contemplated to capture the full scope of the enterprise's criminal conduct.[151]  Pellicano told the

---

[150] (...continued) that dispel the appearance of vindictiveness."  Garza-Juarez, 992 F.2d at 906.  Nevertheless, as the trial evidence showed, RICO charges were needed against multiple defendants because dozens of people were victimized by defendants' criminal enterprise -- not to punish Pellicano for exercising his rights.

[151]  If the government was really motivated to retaliate after the December 2005 meeting, the retaliation would have been in the First Superseding Indictment, filed in January 2006.  But
(continued...)

201

court he expected RICO charges well before the December 2005 meeting.  (GERT 14128).  Even now, Pellicano postulates a variety of other motivations for the RICO charges besides punishing his non-cooperation.  (POB 34, 36-37, 50-51).

Pellicano also complains about the timing of his arrest, insinuating that the government effectively arranged to increased his total imprisonment by three months by not arresting him in the wiretapping case until his 2002 Explosives Case sentence was nearly through.  (POB 37).

That allegation, however, fails to state a claim: Pellicano had no entitlement to concurrent sentences in his two federal cases, and the timing of his arrest affected none of his rights.  Moreover, Pellicano has things backwards.  The government did not delay bringing charges until Pellicano's explosives sentence had expired; rather, the impending expiration of Pellicano's explosives sentence forced the government to accelerate its RICO indictment so a dangerous felon would not endanger the public.[152]

---

[151](...continued)
that indictment added two wiretapping counts to which Pellicano ascribes no vindictive motive.  (GER 9-68).

[152]  Both the initial indictment (filed October 26, 2005) and the First Superseding Indictment (filed January 4, 2006) alleged wiretapping counts for which the statute of limitations was about to run.  (JER 535-59; GER 1-8).  The Second Superseding Indictment, which added the core charges of this case (including RICO charges) was not filed until February 1, 2006.  (GER 9-68). That was before the government had completed its investigative and charging decisions -- as evidenced by the fact that the Third
(continued...)

The final circumstantial "fact" Pellicano believes shows vindictiveness is that Ornellas served as the affiant for the Los Angeles District Attorney's criminal threats complaint in Superior Court.  But the state charges were filed in June 2005, so could not have punished Pellicano for a December 2005 meeting. Moreover, Pellicano's state-court conviction proves the state charges were warranted.

   6.   Pellicano's *Brady* Allegations Do Not Support Dismissal

   Pellicano claims the indictment should be dismissed for purported Brady violations.  (POB 35).  But the court correctly found no Brady violations occurred.  (JER 162-64).  As shown in Part IV.*V*, infra, those findings are not clearly erroneous and should not be disturbed by this Court.  Barrera-Moreno, 951 F.2d at 1091.

   Moreover, dismissal is appropriate only for extraordinary and intentional Brady violations.  United States v. Kearns, 5 F.3d 1251, 1253-54 (9th Cir. 1993) (flagrant misconduct requires intentional acts, not gross negligence; absent flagrant misconduct causing substantial prejudice, suppression is the appropriate remedy).  Nothing of the sort occurred here.  Since lesser remedies are available, dismissal is barred.  United States v. Kohring, 637 F.3d 895, 913-14 (9th Cir. 2011) ("'the

_____

[152](...continued)
Superseding Indictment was returned two weeks later, adding Christensen and additional wiretapping charges.  (GER 69-136).

appropriate remedy'" for <u>Brady</u> violation "'will usually be a new trial'").[153]

E.    THE COURT DID NOT ERR IN DECLINING TO DISMISS THE IDENTITY-THEFT COUNTS BECAUSE "MEANS OF IDENTIFICATION" IS STATUTORILY DEFINED TO INCLUDE NAMES AND TELEPHONE NUMBERS

Before trial, Turner moved to strike the racketeering acts and dismiss all counts (including the RICO counts) alleging identity theft on the basis that "means of identification" in 18 U.S.C. § 1028(a)(7) does not include names and telephone numbers.[154]  (JER 866-79).  The court denied the motion, finding that "[t]he clear text of the statute" established otherwise. (JER 152).  Turner renews his argument.  (TOB 39-53).

---

[153]  Cumulative consideration of Pellicano's allegations does not change the result.  Pellicano's allegations concern matters that did not affect his ability to defend himself at trial.  They caused him no substantial prejudice, either individually or together.  They thus provide no basis for the "extreme" sanction of dismissal.  <u>See</u> <u>United States v. Morrison</u>, 449 U.S. 361, 365-66 & n.2 (1981) (dismissal for constitutional violation requires prejudice); <u>Barrera-Moreno</u>, 951 F.2d at 1092 (dismissal inappropriate under supervisory powers if a "lesser remedial action is available").

[154]  Count one charged Turner with five racketeering acts of identity theft involving the transfer, possession and use of the names and telephone numbers of Erin Finn, Bo Zenga, Heidi Gregg, Johnny Friendly, and Anita Busch.  (JER 3971-72).  Gregg was the ex-wife of deceased Pellicano target Aaron Russo, and "Johnny Friendly" was the alias under which Sylvester Stallone listed his telephone service.  (GERT 3696-97, 14244).  Counts 59-62 charged the last four of the above racketeering acts as substantive counts of identity theft (the act involving Finn being time-barred).  (JER 3985).  All five individuals named in the identity-theft counts were proven and found to have also been victims of Pellicano's and Turner's illegal wiretaps.

1.  Standard of Review

An indictment's sufficiency is reviewed de novo, United States v. Rodriguez, 360 F.3d 949, 958 (9th Cir. 2004), as is the interpretation of a statute.  United States v. Gamboa-Cardenas, 508 F.3d 491, 495 (9th Cir. 2007).  Where properly preserved, void-for-vagueness challenges are also reviewed de novo. Rodriguez, 360 F.3d at 958.

2.  The Statutory Definition of "Means of Identification" Includes Names and Telephone Numbers

Section 1028(a)(7) makes it a crime to "knowingly transfer[], possess[], or use[], without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." "[M]eans of identification" is defined in § 1028(d)(7) as:

> any name or number that may be used, alone or in conjunction with other information, to identify a specific individual, including any-
>
>     (A) name, social security number, date of birth . . . . [or]
>
>     (D) telecommunication identifying information or access device (as defined in section 1029(e)).

(Emphases added).  Section 1029(e)(11), in turn, defines "telecommunication identifying information" as "electronic serial

205

number or <u>any other number</u> or signal that identifies a specific telecommunications instrument <u>or account</u>."  (Emphases added).

Thus, the statutory language establishes that names and telephone numbers are "means of identification" under the statute.  Turner's contention that "the statute is at best ambiguous whether a means of identification includes a land-based telephone number" (TOB 44) is meritless: § 1029(e)(11) draws no distinction between land-based or mobile numbers, but rather expressly includes "<u>any</u> . . . number  . . . that identifies a specific telecommunications . . . account."  (Emphasis added); <u>see</u> <u>United States v. Gonzales</u>, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'").  Similarly, Turner's claim that "Congress omitted the term 'telephone number'" from the statute is meaningless, as a telephone number is unquestionably a number that identifies a specific telecommunications account and falls directly within Congress's language.  <u>United States v. Geeslin</u>, 236 Fed. Appx. 885, 886 (5th Cir. 2007) (definition of "means of identification" in § 1028(d)(7) "surely . . . includes a personal telephone number").

Turner contends that names and land-based telephone numbers are not "means of identification" because they do not "identify a specific individual" as required by § 1028(d)(7).  (TOB 41-43).

206

But § 1028(d)(7)'s statutory definition of "means of identification" includes "any name or number that may be used, <u>alone or in conjunction with any other information</u>, to identify a specific individual." (Emphasis added). Even if a name or telephone number does not identify a specific individual, such information can be used with other information (like an address, social security number, date of birth, or subscriber information) to identify a specific individual. That is precisely what happened here: the means of identification transferred from Turner to Pellicano were combined with information from other sources (including Arneson's law-enforcement-database inquiries) to identify and obtain information on specific individuals.

Because the statutory language is unambiguous, Turner's reliance on the rule of lenity is misplaced. "[L]enity only applies . . . where there is a grievous ambiguity or uncertainty in the language and structure of the [statute], such that even after a court has seize[d] every thing from which aid can be derived, it is still left with an ambiguous statute." <u>United States v. Carona</u>, 660 F.3d 360, 369 (9th Cir. 2011). The phrases "means of identification" and "telecommunication identifying information" do not contain such "grievous ambiguity or uncertainty." "[L]enity is applied when a broad construction of a criminal statute would 'criminalize a broad range of apparently innocent conduct.'" <u>United States v. Svete</u>, 556 F.3d 1157, 1169

207

(11th Cir. 2009).  That concern is absent here, since the use of
others' names and telephone numbers to commit computer fraud and
wiretapping is not "the sort of arguably innocent behavior the
rule of lenity seeks to protect."  United States v. Contreras,
950 F.2d 232, 244 (5th Cir. 1991).  Turner's statements show that
he knew that his conduct was unlawful;[155] lenity does not apply.

Turner also claims that, if read to include a telephone
number, § 1028(a)(7) is unconstitutionally vague.[156]  (TOB 47-50).
Because Turner raised no constitutional challenge to § 1028(a)(7)
below, his claim is reviewed for plain error.  (JER 152
(acknowledging that the "only issue" he presented was his
statutory-interpretation claim)).  For this Court to find
reversible plain error, a defendant must demonstrate that: "(1)
there is an error; (2) the error is clear or obvious, rather than
subject to reasonable dispute; (3) the error affected the
appellant's substantial rights, which in the ordinary case means
it affected the outcome of the district court proceedings; and

---

[155]  (See, e.g., JER 2058-60 (Turner told Wright to lie to
the FBI and tell them that the checks he gave her were for her
mother); GERT 1635-41 (Turner and Pellicano discussing their
concern that a former FBI employee would "rat [them] out" for
"the illegal stuff" PIA did)).

[156]  Turner also appears to claim that the statute is
unconstitutionally overbroad.  (TOB 45).  Outside the context of
the First Amendment, which Turner does not invoke, a criminal
statute may not be attacked as overbroad.  Schall v. Martin, 467
U.S. 253, 268 n.18 (1984).  The argument must therefore be
rejected.

(4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Marcus, 130 S. Ct. 2159, 2164 (2010).

Furthermore, although Turner attempts to raise a facial challenge to § 1028, vagueness claims not implicating the First Amendment "must be examined in the light of the facts of the case at hand." United States v. Mazurie, 419 U.S. 544, 550 (1975); see Rodriguez, 360 F.3d at 953 (vagueness challenges outside of First Amendment context are on "as applied" basis only). A statute is unconstitutionally vague as applied if it "(1) does not define the conduct it prohibits with sufficient definiteness" to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, and "(2) does not establish minimal guidelines to govern law enforcement." Rodriguez, 360 F.3d at 953; see also Maynard v. Cartwright, 486 U.S. 356, 361 (1988) (vagness claim rests on lack of notice and "may be overcome in any specific case where reasonable persons would know that their conduct is at risk"). As shown above, § 1028 is not ambiguous -- let alone unconstitutionally vague -- as to what constitutes a "means of identification," and a reasonable person would know from § 1028's plain language that names and telephone numbers come within its ambit.

Finally, Turner contends that his conduct "does not constitute identity theft." (TOB 50-53). This argument, which

209

also was not raised below, relies on sweeping assertions about "[t]he clear import of section 1028" (without any reference to legislative history) and the facts of "almost all" identity theft prosecutions (which Turner supports by citation of one case). (TOB 51-52). Section 1028(a)(7)'s plain statutory language makes clear that one who knowingly transfers, possesses, or uses someone's name or telephone number with the intent to commit, or to aid or abet, or in connection with, any federal crime or state felony commits identity theft. That is precisely what Turner did when he possessed, used, and transferred specific individuals' names and telephone numbers to Wright with the intent to commit, or to aid and abet, the federal crime of computer fraud and the state crime of unauthorized access to computer data. (See JER 3971-72, 3985). This is hardly a unique fact pattern for identity theft. See, e.g., United States v. Craig, 383 Fed. Appx. 445, 446 (5th Cir. 2010) (defendant provided names and social-security numbers from Marine Corps computer database in exchange for money); United States v. Suarez, 2010 WL 4384209, *1 (S.D. Fla. Oct. 28, 2010) (defendant paid hospital employee for names, addresses, telephone numbers, and diagnoses of patients).

F.    THE COURT ABUSED NO DISCRETION IN DENYING THE RICO
      DEFENDANTS' SEVERANCE MOTION

Before trial, Arneson moved for severance, claiming that he would be prejudiced by Pellicano's choice to proceed pro se at

210

trial.  (CR 1050).  Turner, Kachikian, and Nicherie joined in
Arneson's motion.[157]  (CR 1086, 1087, 1091).  The court denied
severance.[158]  (JER 196-98).  Various defendants unsuccessfully
renewed severance motions based on particular evidence introduced
during trial.  (See JOB 71).

    1.    Standard of Review

    Severance decisions are reviewed for abuse of discretion.
United States v. Atcheson, 94 F.3d 1237, 1244 (9th Cir. 1996).
The abuse-of-discretion test is whether a joint trial was so
manifestly prejudicial as to require the trial court to exercise
its discretion in but one way, by ordering a separate trial.
United States v. Johnson, 297 F.3d 845, 855 (9th Cir. 2002).  The
defendant must prove that prejudice from the joint trial was so
"clear, manifest or undue" that he was denied a fair trial.

---

[157]  In a three-sentence argument without citation to the
record or case law, Pellicano claims that he too was prejudiced
by a joint trial because the government argued that two of his
co-defendants lied on the stand.  (POB 47).  Pellicano never
sought severance on this basis:  rather, he requested severance
in connection with his opposition to a trial continuance in
October 2006 (GER 2665-80) and joined in Turner's request during
trial based on Kachikian's testimony about how Telesleuth was
"apparently" used.  (GERT 6951-52).  Pellicano's unpreserved and
unsupported argument should be rejected.

[158]  The court granted Christensen's separate motion for
severance of counts 106 and 107 (JER 202), as well as Arneson,
Turner, Kachikian, and Nicherie's subsequent motion to sever
Pellicano as to those two counts (JER 210).

United States v. Throckmorton, 87 F.3d 1069, 1071-72 (9th Cir. 1996).

2.    The Court Abused No Discretion By Jointly Trying Defendants

Codefendants jointly charged normally should be tried jointly given the dominant concern of judicial efficiency. Richardson v. Marsh, 481 U.S. 200, 210 (1987); United States v. Polizzi, 801 F.2d 1543, 1553 (9th Cir. 1986). This presumption in favor of joint trials "expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens to sacrifice time and money to serve on juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once." United States v. Gaines, 563 F.2d 1352, 1355 (9th Cir. 1977).

Accordingly, moving to sever under Federal Rule of Criminal Procedure 14, the defendant bears a "heavy burden" of showing prejudice from a joint trial. United States v. Sitton, 968 F.2d 947, 961 (9th Cir. 1992). Showing that a severed trial would offer a better chance of acquittal is insufficient. United States v. Hernandez, 952 F.2d 1110, 1116 (9th Cir. 1991). Nor is it enough to show that "some prejudice" may result; "[s]ince some prejudice is inherent in any joinder of defendants, if only 'some' prejudice is all that need be shown, few, if any, multiple

212

defendant trials could be held." <u>United States v. Vaccaro</u>, 816 F.2d 443, 448 (9th Cir. 1987). Rather, to justify severance, a defendant "must demonstrate that a joint trial is so manifestly prejudicial that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever." <u>United States v. Doe</u>, 655 F.2d 920, 926 (9th Cir. 1980). "[B]road allegations of prejudice are insufficient to require severance." <u>Richey v. IRS</u>, 9 F.3d 1407, 1409 (9th Cir. 1993).

Where, as here, defendants are charged in an indictment with a conspiracy or joint scheme, the preference for joint trials is even more compelling.[159] <u>See, e.g.,</u> <u>United States v. Freeman</u>, 6 F.3d 586, 598 (9th Cir. 1993). Because evidence of the scheme is directly relevant to all defendants, severance is especially disfavored. <u>United States v. Patterson</u>, 819 F.2d 1495, 1502-03 (9th Cir. 1987).

The court abused no discretion in denying the pretrial severance motion based on Pellicano's <u>pro se</u> status. <u>See</u> <u>Atcheson</u>, 94 F.3d at 1244 (no abuse of discretion in declining to grant severance of <u>pro se</u> defendant absent showing of "manifest and unfair prejudice"). The court concluded that a series of

---

[159] Pellicano, Arneson, and Turner were jointly charged in the RICO and RICO conspiracy counts; Pellicano, Turner, and Kachikian were jointly charged in the wiretapping conspiracy and substantive counts; and Nicherie was jointly charged in his wiretapping count with Pellicano, Turner, and Kachikian.

precautionary measures recommended by the Second Circuit in
United States v. Sacco, 563 F.2d 552, 556-57 (2d Cir. 1977); cf.
United States v. Veteto, 701 F.2d 136, 139 (11th Cir. 1983)
(Sacco's suggestions are "suggestions, not requirements"; failure
to follow each is not an abuse of discretion), effectively would
guard against the speculative prejudice raised in Arneson's
motion (JER 196-97), and it conscientiously implemented those
measures before and throughout the trial.  (See, e.g., GERT
14114, 14118 (warning Pellicano that he would be held to same
rules as lawyers and that pro se status could be terminated if he
did not conduct himself appropriately); GERT 208-09 (offering
Pellicano advisory counsel); GERT 273, 433 (explaining to jurors
that Pellicano would refer to himself in third person when acting
in role as attorney); GERT 433 (instructing jurors that
statements or arguments made by Pellicano when acting as attorney
were not evidence); GERT 7552 (instructing jurors before
summation that nothing lawyers --including Pellicano -- say is
evidence).[160]

---

[160]  The court's confidence in Pellicano's ability to
represent himself without prejudicing his co-defendants was borne
out.  In denying Arneson's new-trial motion, the court noted
that, based on its observations, "Pellicano conducted himself in
a consistently responsible and professional manner" and exercised
his right to self-representation "in the most effective manner
that he could."  (JER 477).

Nor have defendants shown that the court abused its discretion in failing to grant their mid-trial severance requests.  The specific instances of testimony cited in defendants' opening brief (JOB 71-74) were either non-inculpatory of Pellicano's co-defendants, were admissible against them regardless of joinder, or were stricken from the record, and defendants make no showing of manifest prejudice resulting from any of them.[161]  Johnson, 297 F.3d at 855.  The court diligently gave limiting instructions both when requested and sua sponte and reminded the jury to follow those instructions at the end of the case.  (GERT 701, 759, 1653, 2771, 2840, 2947, 3956, 5687-88, 5707, 7553).  See United States v. Mende, 43 F.3d 1298, 1302 (9th Cir. 1995) (jury is presumed to have followed limiting

---

[161] As discussed further below, Adam Sender's brief testimony (without contemporaneous objection) regarding Pellicano's offer to kill Aaron Russo was stricken as to all defendants (GERT 3664-65, 3988-89), and Anita Busch's testimony regarding threats against her was found by the court to be admissible against Pellicano's co-defendants and a fair response to Arneson's line of questioning (GERT 4925-27).  George Kalta's testimony that Pellicano said he had contacts within the phone company was elicited (without objection) not only by Pellicano, but by the government on direct and by Turner's counsel on cross. (GERT 4257, 4284, 4288).  Virtue's testimony about the threat she and her father received from Pellicano was first elicited not by Pellicano, but (without objection) by Kachikian.  (GERT 1219-23). Virtue's testimony about her close personal relationship with Pellicano did not implicate or otherwise prejudice any of the co-defendants.  Finally, the court's admonishment to Pellicano -- on which defendants rely -- not to "tell any further witnesses that you love them" involved events occurring outside the jury's presence.  (GERT 2207-08).

215

instructions).  At defendants' request, the court instructed
jurors that they were not to draw any inference from counsel
communicating with or assisting Pellicano during trial.  (GERT
5767-68, 7555).  The jury was further instructed that it was to
consider each count against each defendant separately.  (GERT
7550-51).

Finally, the verdicts after two weeks of deliberations amply
demonstrate careful evaluation of the evidence as to each
defendant.  Pellicano was acquitted of one count; Turner was
acquitted of four; and Kachikian was acquitted of nine.  (GSER
109-29, 144-50).  As to the RICO charge, the jury found that five
of the racketeering acts alleged against Pellicano and Arneson
had not been proven.  (Id.); see United States v. Unruh, 855 F.2d
1363, 1374 (9th Cir. 1987) ("The best evidence of the jury's
ability to compartmentalize the evidence is its failure to
convict all defendants on all counts.").  Accordingly, the court
abused no discretion in denying severance.

G.   THE RACKETEERING ACTS ALLEGING BRIBERY IN VIOLATION OF
     CALIFORNIA PENAL CODE §§ 67 AND 68 WERE TIMELY

As part of its special verdict on count one (the substantive
RICO count), the jury found that Pellicano, in violation of Penal
Code § 67, paid Arneson the ten bribes charged in racketeering
acts 70-79 and that Arneson, in violation of § 68, accepted the

216

ten bribes charged in racketeering acts 80-89.[162]  (GSER 109-43).

Pellicano, Arneson, and Turner argue that the jury's findings as

to these racketeering acts should be vacated because they

purportedly were brought outside RICO's five-year statute of

limitations and impermissibly broadened the pre-existing

substantive RICO charge.  (POB 57, AOB 24-25).  This claim is

unfounded.

Three separate, equally conclusive, grounds establish that

the Fifth Superseding Indictment was timely.  First, as the court

correctly found, the Fifth Superseding Indictment was returned

approximately one month after the court struck racketeering act

93 of the Fourth Superseding Indictment, was based on

substantially the same facts as the prior indictments, and

therefore fell squarely within 18 U.S.C. §§ 3288 and 3289's six-

month savings period.  (JER 143-50).  Second, the Fifth

Superseding Indictment related back to the Second Superseding

Indictment (as well as the Third and Fourth Superseding

Indictments), which was timely.  Specifically, the Fifth

---

[162]  The Fifth Superseding Indictment listed these bribes as
racketeering acts 93-112.  (JER 923-86).  During trial, the
government dismissed select counts and racketeering acts to allow
for a more efficient presentation of its case.  (GERT 5064-66).
By the parties' agreement, the indictment presented to the jury
was renumbered to remove reference to dismissed counts and
racketeering acts.  (JER 3955-4003; GERT 5066-68).  The verdict
forms reflected the renumbered indictment.  For consistency with
the jury's verdicts, the racketeering acts are identified as
found on the verdict forms.

217

Superseding Indictment charged the same offenses charged in the prior indictments, differing only insofar as (a) count one of the prior indictments alleged a dual-object bribery conspiracy in which Pellicano paid and Arneson accepted bribes in violation of §§ 182, 67, and 68, whereas (b) the Fifth Superseding Indictment alleged ten separate instances -- all of which previously were alleged as overt acts to the bribery conspiracy -- in which Pellicano paid and Arneson accepted bribes in violation of §§ 67 and 68.  Third, the jury's verdict moots the statute-of-limitations claim.  The jury found that Arneson committed 51 racketeering acts involving honest-services fraud and identity theft beyond the ten bribery racketeering acts challenged here. Only one of these acts has to be within RICO's five-year limit. Dozens of these racketeering acts satisfy this requirement. Therefore, the fact that the bribery racketeering acts at issue occurred more than five years before the Fifth Superseding Indictment is immaterial.[163]

1.  Standard of Review

Because Arneson moved (with Turner's joinder) to strike these racketeering acts, their statute-of-limitations claim is

---

[163]  Should this Court vacate all of the honest-services fraud and identity-theft racketeering acts, this analysis obviously would differ.

reviewed <u>de novo</u>.[228]  <u>United States v. Jenkins</u>, 633 F.3d 788, 797

(9th Cir. 2011).  The underlying factual findings are reviewed

for clear error.  <u>Id.</u>  The application of 18 U.S.C. §§ 3288 and

3289 is reviewed <u>de novo</u>.  <u>United States v. W.R. Grace</u>, 504 F.3d

745, 751 (9th Cir. 2007).

Pellicano neither moved to strike these racketeering acts

nor joined in Arneson's motion.[229]  Therefore, he has waived this

claim.[230]  <u>United States v. Lo</u>, 231 F.3d 471, 480-81 (9th Cir.

2000) (statute of limitations is an affirmative defense that must

be raised before trial).

---

[228]  Although Turner did not participate in these specific
bribery-based racketeering acts, they served not just as evidence
of Pellicano and Arneson's pattern of racketeering but also as
evidence of the enterprise and how it conducted its affairs and
were, therefore, also introduced against Turner.  Thus, except as
set forth below, the legal arguments apply equally to Arneson and
Turner.

[229]  To ease the burden on the court reporter, the parties
agreed that a trial objection by one defendant would count as an
objection by all.  Pretrial and post-trial motions were addressed
under the prevailing rules governing joinder.

[230]  Pellicano's <u>pro se</u> status provides no basis for
vitiating his waiver.  The Fifth Superseding Indictment, which
was obtained specifically to add the bribery racketeering acts
that underlie this claim, was returned several weeks before
Pellicano requested, and over one month before he was granted,
<u>pro se</u> status.  (JER 923-86; GER 961-62, 979).  Moreover, the
issue of pending motions was raised at Pellicano's <u>Faretta</u>
hearing where was advised that he would have to address pending
motions and all future litigation on his own and that his failure
to do so could result in waiver.  (GERT 14100-01, 14114-15,
14119).  Should this Court nonetheless find that Pellicano's
claim is not waived, the arguments applicable to Arneson would
apply equally to Pellicano.

2.    Bribery as Charged in the Indictments

The grand jury's February 1, 2006, Second Superseding Indictment was the first to allege RICO and RICO conspiracy violations against Pellicano, Arneson, and Turner.  (GER 9-68). Count one, which charged substantive RICO, expressly alleged that the enterprise used bribery to advance its interests and that the pattern of racketeering activity included bribery.  (Id.).

Specifically, count one alleged that a common purpose of the enterprise was to generate income through an array of criminal activity including bribery, identity theft, wire fraud, and the unauthorized access of protected computer databases.  (Id.).  In discussing the means and manner by which the enterprise members participated in the enterprise's affairs, count one alleged that "Pellicano paid bribes to corrupt public officials, including defendant Arneson, . . . for purposes of obtaining confidential and proprietary information regarding the Enterprise's investigative targets."[231]  (Id.).  It further specified:

> Defendant ARNESON solicited, and defendant PELLICANO provided to defendant ARNESON, payment for obtaining and providing criminal history and other law enforcement information.  In particular, defendant PELLICANO made payments to defendant ARNESON by means of Pellicano Investigative Agency, Ltd. business checks

---

[231]    Stevens also was identified as someone whom Pellicano bribed to further the enterprise's interests: "Stevens solicited, and defendant Pellicano provided to Stevens, payment for obtaining and providing criminal history and other law enforcement information."  (Id.).

in at least the following amounts in return for
obtaining and providing criminal history and other law
enforcement information:

| Year | Minimum Payment |
|------|-----------------|
| 1997 | $8,875 |
| 1998 | $47,915 |
| 1999 | $38,325 |
| 2000 | $34,500 |
| 2001 | $32,250 |
| 2002 | $27,500 |

Defendant ARNESON solicited and received from defendant
PELLICANO additional payments in cash in order to
conceal these additional payments received from
defendant PELLICANO.

(Id.).

Count one further alleged 91 racketeering acts that

comprised the pattern of racketeering activity.[232]   (Id.).

Racketeering act 91 alleged that Pellicano and Arneson

to commit bribery in violation of Penal Code §§ 182, 68, and 67:

a.   knowingly give and offer bribes to an executive
     officer of the City of Los Angeles, with intent to
     influence that officer in respect to an act as
     such officer, to wit, the use of proprietary law
     enforcement databases to obtain criminal history
     and other law enforcement information for non-
     official use, in violation of California Penal
     Code § 67; and

b.   knowingly ask, receive, and agree to receive a
     bribe to an executive officer of the City of Los
     Angeles, upon an agreement and understanding that

---

[232]   Several dozen racketeering acts occurred over five years
before the Second Superseding Indictment.  (GER 9-68).  This was
never challenged.  Nor could a challenge have been successful, as
only one act need occur within the statutory period for the
substantive RICO count to be timely.  United States v. Wong, 40
F.3d 1347, 1366-67 (2d Cir. 1994).

> the officer's action upon matters then pending and
> that might be brought before him in his official
> capacity, to wit, the use of proprietary law
> enforcement databases to obtain criminal history
> and other law enforcement information for non-
> official use, would be influenced thereby, in
> violation of California Penal Code § 68.

(Id.).  Racketeering act 91 also alleged that the bribery

conspiracy's objects would be accomplished by: (1) Pellicano

paying bribes to Arneson, consisting of a $2,500 monthly retainer

supplemented by additional cash and check payments to induce

Arneson to obtain and to provide to Pellicano confidential law-

enforcement information; and (2) Arneson receiving bribes from

Pellicano for using Arneson's official position to obtain

confidential law-enforcement information for Pellicano.  (Id.).

Finally, racketeering act 91 alleged 70 overt acts in furtherance

of the charged bribery conspiracy, each of which represented a

payment made between February 1997 and November 2002 that

constituted "the giving by PELLICANO and receiving by ARNESON of

bribe payments."[233]  (Id.).

    The Third and Fourth Superseding Indictments were returned

on February 15, 2006, and February 14, 2007.  (GER 69-203).  From

---

    [233]  PIA employees and Arneson admitted that Arneson started
working with Pellicano in the mid-1990s.  Bank records, however,
only could be retrieved through 1997.  Payments to Arneson
stopped in November 2002, which coincided with the FBI's
execution of the initial search warrant at PIA and the seizure of
evidence documenting Pellicano and Arneson's illicit
relationship.

the Second through the Fourth Superseding Indictments, count one remained unchanged except the Fourth Superseding Indictment alleged two additional honest-services-fraud racketeering acts which, in turn, caused the racketeering act alleging the bribery conspiracy to be renumbered as racketeering act 93.  (GER 9-203)

On September 17, 2007, just before the limitations date but over 19-months after he first was charged with substantive RICO, Arneson moved to strike racketeering act 93 from count one of the Fourth Superseding Indictment because it violated "Wharton's Rule," which sometimes precludes a conspiracy charge when the target offense can be committed only by the two charged parties. (GER 253-78).  Arneson also moved to strike all references to "bribery" on the basis that continued reference to bribery would be unduly prejudicial if racketeering act 93 was stricken. (Id.).

The court granted Arneson's motion in part,[234] striking racketeering act 93 from the Fourth Superseding Indictment with leave to amend based on its finding that the California courts'

_____

[234]  The court relied on the California Court of Appeal's decision in People v. Keyes, 284 P. 1096, 1100-01 (Ct. App. 1930).  (JER 143-46).  The court acknowledged that Keyes was inconsistent with the United States Supreme Court's more recent analysis of Wharton's Rule in Iannelli v. United States, 420 U.S. 770 (1975), which would not have brought racketeering act 93 within this arcane rule's scope.  (Id.).  Nonetheless, the court followed Keyes because it was not convinced that the California Supreme Court, which is the court whose view controls on this issue, would adopt Iannelli's analysis.  (Id.).

223

interpretation of Wharton's Rule rendered this racketeering act defective. (JER 143-50). The court, however, left intact count one's discussion of the broader role that bribery played within the enterprise, including allegations that Pellicano paid and Arneson accepted almost $200,000 in bribes from 1997 through 2002 so that Pellicano could secure from Arneson "criminal history and other law enforcement information." (Id.).

On December 6, 2007, the government obtained the Fifth Superseding Indictment, which was identical to the Fourth Superseding Indictment except that, in count one, it replaced the stricken bribery-conspiracy racketeering act with racketeering acts 70-79 (charging ten instances when Pellicano paid bribes to Arneson in violation of § 67) and racketeering acts 80-89 (charging the same ten instances when Arneson received bribes from Pellicano in violation of § 68). The bribes alleged in these racketeering acts constituted 10 of the 70 individual instances of giving and receiving bribes that previously had been alleged as overt acts 27, 31, 38, 41, 51, 55, 57, 62 , 63, and 64 to the bribery-conspiracy racketeering act charged in the Second, Third, and Fourth Superseding Indictments. (GER 9-203; JER 923-86).

Arneson then moved to strike racketeering acts 70-89 on statute-of-limitations grounds. (GER 985-1012, 1033-49). The government opposed, citing both 18 U.S.C. §§ 3288 and 3289's

224

sixth-month savings period and the relation-back doctrine. (GER 985-1012).

The court denied Arneson's motion, finding that the Fifth Superseding Indictment was timely because it had been brought within the six-month savings period and "relied on approximately the same facts as the Fourth Superseding Indictment."[235] (ASER 6-10).

> 3.  The Fifth Superseding Indictment Was Timely

>> a.  The Applicable Limitations Period

RICO's statute of limitations is five years.[236] See Agency Holding Corp. v. Malley-Duff, 483 U.S. 143, 155-56 (1987). In determining the limitations date for a RICO defendant, courts traditionally use the date of the most recent racketeering act by that individual. Persico, 832 F.2d at 714. Provided that a

---

[235] The court found it unnecessary to decide whether the Fifth Superseding Indictment related back to the earlier indictments. (ASER 6-10). The court's factual findings, however, are equally supportive of this argument. (Id.).

[236] Arneson does not appear to challenge the RICO-conspiracy charge on statute-of-limitations grounds, which would be meritless in any event. (AOB 23-26). While the statute of limitations for RICO conspiracy also is five years, the limitations period is based not on the last racketeering act committed by a given defendant but rather the date when "the purposes of the conspiracy either have been completed or abandoned." United States v. Persico, 832 F.2d 705, 713 (2d Cir. 1987). Provided that the government established the conspiracy's existence, it is presumed to run into the limitations period "without the jury having to find proved the timely commission of an overt act, alleged or unalleged." United States v. Salmonese, 352 F.3d 608, 620 (2d Cir. 2003).

single racketeering act occurs within the five-year statutory period, the substantive RICO offense is timely.  Wong, 40 F.3d at 1366-67 (because RICO is a continuing offense that remains ongoing until the crime is complete, "jurisdiction over a single RICO predicate act confers jurisdiction over other predicate acts, including some that could not be prosecuted separately").

> b.   The Fifth Superseding Indictment Was Brought
>      Within 18 U.S.C. § 3288's Six-Month Savings Period

Sections 3288 and 3289 establish identical savings provisions permitting the government to obtain a superseding indictment to cure defects in a dismissed indictment.  When an indictment is dismissed "for any reason," the government has six months to obtain a new indictment regardless whether the five-year limitations period already expired, see 18 U.S.C. § 3288 ("after the period prescribed by the applicable statute of limitations has expired"), or will expire within six months of the dismissal, see 18 U.S.C. § 3289 ("before the period prescribed by the applicable statute of limitations has expired, and such period will expire within six calendar months of the date of the dismissal of the indictment or information").[237]  The

---

[237]  In 1988, the statutes were amended to allow reindictment within the six-month savings period where the dismissal was "for any reason."  Pub.L. No. 100-690, Title VII, § 7081(a), (b), 102 Stat. 4407.  Then-Senator Joseph Biden, who was the Chairman of the Senate Judiciary Committee, explained that "[t]he reason a charge is dismissed (unless the reason for the dismissal would
(continued...)

six-month statutory savings period's purpose is to extend the statute of limitations so a defendant does "not escape because the fault[y] [indictment] was discovered too late to indict him again." United States v. Macklin, 535 F.2d 191, 193 (2d Cir. 1976) (discussing § 3288's predecessor, 18 U.S.C. § 578); see United States v. Wilsey, 458 F.2d 11, 12 (9th Cir. 1972) (§ 3288 "assur[es] that the continued running of the statute of limitations will not permit the defendant to escape through technicality before correction can be secured"). To achieve this purpose, this Court has found that, where a valid indictment could have been timely brought absent some legal error in the earlier charging instrument, "the six-month grace period merely allows the government to do what it had a right to do in the first place." Clawson, 104 F.3d at 252; see also Charnay, 537

---

[237](...continued) independently bar further prosecution such as a dismissal on grounds of double jeopardy or a dismissal 'with prejudice' under a statute) should not determine whether the government is given additional time to bring a new prosecution." 134 Cong. Rec. 32,704 (1988). Thus, in their amended forms, §§ 3288 and 3289 apply where dismissal of an indictment is due to a legal defect, as well as where it results from defects or irregularities in the grand jury. United States v. Charnay, 537 F.2d 341, 355 (9th Cir. 1976); see also United States v. Shipsey, 363 F.3d 962, 971 (9th Cir. 2004) (reindictment permissible within six-month savings period where indictment was dismissed without prejudice for Speedy Trial Act violation after statute of limitations' expiration); United States v. Clawson, 104 F.3d 250, 252 (9th Cir. 1996) (reindictment permissible within six-month savings period where conspiracy count was dismissed because charged overt acts all occurred outside limitations period).

227

F.2d at 354 ("Allowing a second indictment to remedy legal deficiencies present in the first is the very purpose for which § 3288 was enacted."); Macklin, 535 F.2d at 193 ("§ 3288 was meant to apply whenever the first charging paper was vacated for any reason whatever, including lack of jurisdiction.  The only statutory requirement is that the prosecutor obtain a new indictment within the six-month time limit.").

An indictment obtained during the savings period need not state precisely the same charges.  In Charnay, this Court expressly rejected the defendant's claim that § 3288 applied to only instances when the same offense is charged in the superseding indictment.  "[F]ind[ing] nothing in the cases cited [. . .] or the language of § 3288 to require this conclusion," this Court held that a superseding indictment is proper under § 3288 when "essentially the same facts were used to charge almost identical offenses."  537 F.2d at 354.  As Charnay further explained, "the correct interpretation of § 3288 . . . is that if the defendant was indicted in time, then approximately the same facts may be used for the basis of any new indictment.'"  Id.

Focusing on the substantial similarity of the underlying factual allegations, this Court and others have thus upheld superseding indictments under § 3288 re-alleging the same overarching offense previously dismissed but revised to include new means of proof.  W.R. Grace, 504 F.3d at 751-754 (§ 3288

228

allowed for superceding indictment brought after the expiration
of the limitations period that added language to overt acts to
cure defect relating to previously stricken object of the
conspiracy);[238] <u>Clawson</u>, 104 F.3d at 251-52 (upholding superseding
indictment curing defect in prior dismissed indictment that
failed to state a claim by alleging the same offense with new
overt acts falling within the statutory period); <u>United States v.
Italiano</u>, 894 F.2d 1280, 1284-86 (11th Cir. 1990) (upholding new
indictment under § 3288 alleging a money-and-property-fraud --
instead of an honest-services-fraud -- object that, post-<u>McNally</u>,
failed to state a claim because "approximately the same facts
were used as the basis of both indictments").

---

[238]  In <u>W.R. Grace</u>, 504 F.3d at 753, this Court, while
addressing "timeliness" under § 3288, cited <u>Clawson</u> for the
proposition that "as long as the original indictment is filed
within the statute of limitations and charges the same crime,
based upon approximately the same facts charged in the
superseding indictment, § 3288 allows the government to file a
superseding indictment within six months."  This does not require
that the new indictment charge the same statute previously found
to contain the defect, nor could it given: (1) the absence of any
such requirement in § 3288's language, which plainly contemplates
the existence of charging defects that would preclude a new
charge under the same statute; (2) prior Circuit precedent
(<u>Charnay</u>) upholding a new indictment under § 3288 that alleged
different offenses, which <u>W.R. Grace</u> cited in the very same
discussion of "timeliness"; and (3) <u>Clawson</u> itself, which, when
rejecting the defendant's prejudice claim, cited <u>Charnay</u>
approvingly and simply noted that the defendant had been charged
with the same offense as before.

The Fifth Superseding Indictment was timely under § 3288.[239] The court struck racketeering act 93 from count one on October 29, 2007.  The Fifth Superseding Indictment was returned on December 6, 2007, approximately one month later.  Therefore, it was brought well within § 3288's six-month savings period.[240] Moreover, the court did not clearly err in finding that the Fifth Superseding Indictment was based on "approximately the same facts as the Fourth Superseding Indictment" because the record establishes that it was brought on <u>precisely</u> the same facts. (ASER 6-10).

Specifically, both the Fourth and Fifth Superseding Indictments charged a substantive RICO count that was identical

---

[239]  Arneson's statute-of-limitations arguments (AOB 23-24) do not mention §§ 3288 or 3289, even though the court based its ruling on these provisions (JER 902-10).

[240]  The last racketeering act alleged against Arneson in the Fourth Superseding Indictment was the bribery conspiracy, which extended through November 21, 2002.  The statute of limitations on this count, therefore, was November 22, 2007.  The court struck racketeering act 93 on October 29, 2007 -- approximately one month before the limitations date.  (JER 143-50). Accordingly, § 3289 applied at the time the court considered this motion.

At the time of verdict, however, the last racketeering act found to have been committed by Arneson was dated September 4, 2002.  (GSER 109-50).  Because the dismissal of racketeering act 93 occurred more than five years after this date, § 3288 takes over to control this Court's analysis.  Regardless which statutory provision is used to calculate the savings period, however, the result is the same because the Fifth Superseding Indictment was brought within six months of the court's striking of racketeering act 93.

in all respects but one: the Fifth Superseding Indictment replaced the legally defective racketeering act of conspiracy to commit bribery with legally valid allegations of giving and receiving bribes.  (GER 137-203; JER 923-88).  Each of the ten instances of giving and receiving bribes alleged in count one of the Fifth Superseding Indictment had been alleged as overt acts in the Fourth Superseding Indictment's stricken bribery conspiracy racketeering act (overt acts 27, 31, 38, 41, 51, 55, 57, 62 , 63, and 64).[241]  (Id.).  Thus, the facts by which the bribery would be proved were identical.

Because count one of the Fifth Superseding Indictment was brought within six months of the court's striking of the racketeering act alleging Pellicano and Arneson's bribery conspiracy and used "essentially the same facts" in charging an "almost identical offense," it was timely under § 3288.  Accordingly, the statute-of-limitations claim fails and should be rejected.

   c.   The Fifth Superseding Indictment Also Was Timely Under the Relation-Back Doctrine

The return of an indictment tolls the statute of limitations of the charges it contains.  United States v. Pacheco, 912 F.2d 297, 305 (9th Cir. 1990).  A superseding indictment replacing a

---

[241]  This also holds true for the Second and Third Superseding Indictments.

pending timely indictment relates back to the original and
inherits its timeliness, so long as the latter does not
substantially amend or broaden the original charges.  United
States v. Sears, Roebuck & Co., 785 F.2d 777, 778 (9th Cir.
1986).  To determine whether a superseding indictment
substantially amends or broadens its timely filed predecessor,
the essential question is whether the two indictments are similar
enough that the original indictment gave the defendant sufficient
notice of the charges in the superseding indictment:

> Notice to the defendant is the central policy
> underlying the statute of limitations.  If the
> allegations and charges are substantially the same in
> the old and new indictments, the assumption is that the
> defendant has been placed on notice of the charges
> against him.  That is, he knows that he will be called
> to account for certain activities and should prepare a
> defense.

Pacheco, 912 F.2d at 305; accord Salmonese, 352 F.3d at 622
("[T]he 'touchstone' of our analysis is notice, i.e., whether the
original indictment fairly alerted the defendant to the
subsequent charges against him and the time period at issue.");
United States v. Schmick, 904 F.2d 936, 940 (5th Cir. 1990)
(similar).

Because the relation-back doctrine's focus is notice, an
indictment that relates back to a prior indictment, like an
indictment brought under § 3288, need not state precisely the
same charges that were alleged in the initial indictment.  For

232

example, in <u>Sears, Roebuck & Co.</u>, 785 F.2d at 778-79, this Court allowed a superseding indictment to relate back even though it (1) replaced twelve 18 U.S.C. § 542 (entry of goods by false statements) counts with twelve 18 U.S.C. § 1001 (false statements) counts, (2) stripped the conspiracy count of all § 542 references, and (3) added new factual allegations to the conspiracy count. In so ruling, this Court found that the superseding indictment did not substantially amend the prior indictment because the substantive charges were sufficiently similar in kind and the factual additions to the indictment were consistent with the government's theory throughout the case's pendency, thereby providing the defendant with adequate notice. <u>Id.</u>

Other courts similarly have found that, when adequate notice is present, an indictment charging new offenses or modifying the manner in which previously charged offenses can be proved will relate back to the prior timely indictment. As the Tenth Circuit noted, an "indictment is not amended impermissibly by a superseding indictment . . . [that] contains a slightly different mix of closely related statutory violations as objects of the conspiracy, provided that the essential nature of the conspiracy alleged in the first indictment remains the same." <u>United States v. Davis</u>, 953 F.2d 1482, 1491 (10th Cir. 1992) (conspiracy charge in superseding indictment related back to prior indictment even

233

though it added new objects based on violations of new statutes because the newly alleged objects fell within the general scope of the prior charge).

Arneson does not dispute that count one of the Second, Third, and Fourth Superseding Indictments was timely. From the moment he first was charged with substantive RICO in the Second Superseding Indictment, Arneson unquestionably has had notice that he would have to defend against allegations that Pellicano paid and he received bribes, including the ten bribes alleged in racketeering acts 70-89 of the Fifth Superseding Indictment. This notice took many forms, each of which independently establishes that count one of the Fifth Superseding Indictment related back to count one of the Second, Third, and Fourth Superseding Indictments.

First, as already discussed, the ten payments charged as overt acts in furtherance of the bribery-conspiracy racketeering act charged in count one of the Second, Third, and Fourth Superseding Indictments (GER 9-203) are the same payments charged as racketeering acts 70-89 of the Fifth Superseding Indictment (JER 923-86). Therefore, long before the Fifth Superseding Indictment's issuance, Arneson had notice that the government intended to use the specific payments comprising racketeering acts 70-89 as evidence of the bribery between him and Pellicano.

234

Second, the order striking racketeering act 93 from the Fourth Superseding Indictment, which simply struck a single racketeering act based on a legal technicality and left intact extensive language broadly describing the role that bribery played within the enterprise, did nothing to affect Arneson's notice. (JER 143-50). For example, the Fourth Superseding Indictment continued to allege that bribery was one of the criminal acts that the enterprise used to achieve its objective of generating income. (GER 137-203). Moreover, the "means and manner" section continued to advise Arneson of bribery's role in the enterprise: (1) "Pellicano paid bribes to corrupt public officials, including defendant Arneson, . . . for purposes of obtaining confidential and proprietary information regarding the Enterprise's investigative targets"; (2) "Arneson solicited, and defendant Pellicano provided to defendant Arneson, payment for obtaining and providing criminal history and other law enforcement information"; (3) Pellicano paid Arneson for this information by checks totaling $8,875 in 1997, $47,915 in 1998, $38,325 in 1999, $34,500 in 2000, $32,250 in 2001, and $27,500 in 2002;[242] and (4) "Arneson solicited and received from defendant Pellicano additional payments in cash in order to conceal these additional payments received from defendant Pellicano." (Id.).

---

[242] The ten payments of $2,500 alleged in racketeering acts 70-89 were selected from this larger quantity of payments.

235

Therefore, even after the court struck the bribery-conspiracy racketeering act, Arneson remained charged with a substantive RICO violation in which Pellicano's bribes to Arneson would continue to be evidence of the enterprise, the manner in which it conducted its affairs, and its pattern of racketeering activity. United States v. Matera, 489 F.3d 115, 120 (2d Cir. 2007) (uncharged murders by other enterprise members properly admitted as enterprise evidence and "consistent with numerous prior rulings of this court in which criminal acts of non-defendants, including killings, were received to prove the existence of the . . . RICO enterprise").

Third, before the statute of limitations' expiration, the government expressly advised Arneson that if his motion to strike succeeded, the government would seek a superseding indictment adding substantive bribery allegations under §§ 67 & 68.  (GER 985-1012; JER 906-08).  Arneson's briefing in support of his motion to strike confirmed his actual notice when his initial brief argued that substantive bribery allegations would be defective because his conduct did not involve an "official act" under §§ 67 & 68 and when his reply characterized the government's opposition as "a last ditch effort to avoid seeking a superseding indictment."  (GER 253-78 522-48).  Because Arneson had actual notice that count one would be superseded to replace the stricken bribery-conspiracy racketeering act with

236

racketeering acts alleging substantive bribery acts, his statute-of-limitations claim fails.  Sears, Roebuck & Co., 785 F.2d at 779 (new allegation that defendant made attempts to avoid dumping duties was not substantial change where government previously advised defendant that it intended to pursue this issue).

Arneson nevertheless asserts that the Fifth Superseding Indictment substantially broadened count one insofar as "the new bribery predicate acts required proof of different elements than the original conspiracy charge and confer RICO liability through mere proof of the acceptance of a bribe."  (AOB 23-24). Arneson's argument is misplaced, however, as neither identical charges nor identical means of establishing liability dictate whether a superseding indictment substantially amended or broadened a prior indictment; it is notice.  Sears, Roebuck & Co., 785 F.2d at 778-79; Charnay, 537 F.2d at 354.[243]  Because Arneson does not, and cannot credibly, claim insufficient notice that he would have to defend against evidence that Pellicano paid and that he accepted the bribes charged in racketeering acts 70-89, his claim fails.

---

[243]  Although Charnay specifically addresses § 3288, its holding effectively read the relation-back doctrine into § 3288, which itself places no limitation on a superseding indictment's scope.

4.    <u>The Verdict Moots the Statute-of-Limitations Claim</u>

Following a conviction at trial, the statute of limitations is calculated in light of the jury's verdict.  The RICO statute requires that only one racketeering act be within the five-year statutory period for the entire count to be timely.  <u>Persico</u>, 832 F.2d at 714.  Provided that there is one racketeering act within statute, conduct contributing to the pattern of racketeering under § 1962(c) can extend back decades with the only time restriction being that the last racketeering act must occur within ten years of the next-to-last racketeering act.  18 U.S.C. § 1961(5); <u>Wong</u>, 40 F.3d at 1366-67 ("[A] defendant may be liable under substantive RICO for predicate acts the separate prosecution of which would be barred by the applicable statute of limitations, so long as that defendant committed one predicate act within the five year limitations period.").

Arneson's verdict form included findings that he committed 61 racketeering acts, consisting of 44 acts of honest-services fraud (racketeering acts 1-44), seven acts of identity theft (racketeering acts 49 and 53-58), and ten acts of bribery (racketeering acts 80-89).  (GSER 130-43).  Arneson does not dispute that the honest-services and identity theft racketeering acts were timely (AOB 23); nor could he, as several dozen of them were committed within five years of February 1, 2001, when the

238

Second Superseding Indictment first charged substantive RICO.[244] Therefore, provided that this Court finds sufficient evidence to support either the honest-services fraud or identity-theft racketeering acts,[245] the substantive RICO count was timely. As such, the fact that the ten specific instances of giving and receiving bribes charged in racketeering acts 70-89 occurred over five years before the Fifth Superseding Indictment is immaterial to the limitations determination; by statute, these acts can be included as part of the pattern of racketeering activity provided they occurred no more than 10 years before the next-to-last racketeering act, which they all did.[246]  United States v. Gigante, 982 F. Supp. 140, 154-55, 159-64 (E.D.N.Y. 1997) (dismissing post-verdict on statute-of-limitations grounds a free-standing murder conspiracy count but upholding an identically charged racketeering act and several other

---

[244]  Should this Court find Pellicano's claim not to be waived, the same analysis would apply insofar as the jury found that he committed several dozen acts of honest-services fraud and identity theft.  (GSER 109-29).

[245]  A fallacy in Arneson's argument is that it presumes that the types of racketeering acts are severable.  The indictment alleges a single pattern of racketeering activity comprised of diverse crimes, of which bribery is one.

[246]  The earliest non-bribery-related racketeering act that the jury found that Arneson committed occurred in January 1999. (GER 1492-1540; GSER 130-43).  The ten racketeering acts involving bribery took place between June 1999 and May 2002. (Id.).

racketeering acts that, like the murder conspiracy count, were not charged until more than five years after the underlying conduct occurred because there were other racketeering acts falling within the five-year statutory period and the remainder occurred within ten years of the next-to-last racketeering act).

H.   THE EVIDENCE WAS SUFFICIENT

    1.   Standard of Review

    The denial of a Rule 29 motion for judgment of acquittal is reviewed de novo.  United States v. Chapman, 528 F.3d 1215, 1218 (9th Cir. 2008).  "A defendant need not state specific grounds to support a Rule 29 motion; however, when a Rule 29 motion is made on a specific ground, other grounds not raised are waived." United States v. Graf, 610 F.3d 1148, 1166 (9th Cir. 2010).  This Court may review a waived ground for acquittal only "'to prevent a manifest miscarriage of justice.'"  Id.

    This Court employs "a two-step inquiry" when reviewing preserved sufficiency challenges under Jackson v. Virginia, 443 U.S. 307 (1979), and United States v. Nevils, 598 F.3d 1158 (9th Cir. 2010).  "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution," with the court "not usurp[ing] the role of the [factfinder] by considering how it would have resolved the conflicts, made the inferences, or considered the evidence." Nevils, 598 F.3d at 1164.

240

"[A]fter viewing the evidence in the light most favorable to the prosecution, the reviewing court . . . [next] determine[s] whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the [crime's] essential elements . . . beyond a reasonable doubt.'"  Id.  "At this second step . . . a reviewing court may not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt,' only whether 'any' rational trier of fact could have made that finding."  Id.

> 2.    The Evidence Sufficiently Established RICO's Enterprise Element

Through special verdicts on the RICO and RICO conspiracy counts (counts one and two), the jury found that the enterprise consisted of Pellicano, Arneson, Turner, and PIA (each of the charged parties), and that it conducted its affairs through a pattern of racketeering activity including honest-services wire fraud, identity theft, and bribery (each type of charged racketeering act).  (GSER 109-50).  Defendants challenge the sufficiency of the evidence in support of the enterprise element, arguing that, at most, it established multiple enterprises.  (JOB 81, 85-86).  This claim is meritless.  The evidence established a single enterprise, and each individual's association with it was overwhelming.

241

a.   Section 1962(c)

18 U.S.C. § 1962(c) "makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Boyle v. United States, 556 U.S. 938, 943 (2009).  A substantive RICO offense requires "proof of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Fernandez, 388 F.3d at 1221.

(1)   The Enterprise Element

Congress defined "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated-in-fact."  18 U.S.C. § 1961(4).  The Supreme Court instructs that this term should be construed broadly to effectuate § 1962's purpose of combating organized crime in its varied forms.  Boyle, 556 U.S. at 944.  In 2009, the Court reiterated that "an associated-in-fact enterprise is simply a continuing unit that functions with a common purpose."  Id. at 948.  For an enterprise to exist, therefore, there must be: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.  Id. at 946.

242

These sub-elements likewise have been construed broadly.  In addressing the parameters of an associated-in-fact enterprise, the inquiry is whether the associating parties have come together to create "a vehicle for the commission of two or more predicate crimes."  Odom v. Microsoft Corp., 486 F.3d 541, 552 (9th Cir. 2007); see United States v. Marino, 277 F.3d 11, 33 (1st Cir. 2002) (approving instruction defining association to include loose, informal relationships and noting that § 1962(c)'s "associated with" requirement is "not strict," because "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise").  Similarly, the common purpose sub-element simply requires that there be a unifying purpose that joins the participants to the enterprise, which can be either legal or illegal.[247]  Turkette, 452 U.S. at 578; Odom, 486 F.3d at 552 (common purpose of increasing the number of people using internet service through fraudulent means); United States v. Cagnina, 697 F.2d 915, 921 (11th Cir.

---

[247]  Citing United States v. Griffin, 660 F.2d 996, 1000 (4th Cir. 1992), defendants say proof of a common purpose is "critical" to the existence of an associate-in-fact enterprise. (JOB 75).  But Griffin also recognizes that, because of acknowledged difficulties in establishing a single agreement or common objective in organized crime groups engaged in "highly diverse crimes by apparently unrelated individuals," Congress defined the term "enterprise" to be broader and thereby easier to prove than a traditional conspiracy.  Griffin, 660 F.2d at 1000. In other words, Griffin holds that the enterprise's common purpose can be established exactly as set forth in United States v. Turkette, U.S. 452 U.S. 576, 583 (1981).  Id.

1983) (common purpose of "making money from repeated criminal activity").

Finally, the requirement that the enterprise function as a continuing unit focuses on whether the associates' behavior consists of ongoing, rather than isolated, activity. Boyle, 556 U.S. at 948. This Court has refused to require that every enterprise associate be involved in each racketeering act, that the predicate acts be interrelated, or that the organization's membership remain constant over time. Odom, 486 F.3d at 551-52; see also United States v. Eufrasio, 935 F.2d 553, 577 (3d Cir. 1991) ("[I]t is not necessary that a RICO defendant have specific knowledge of every member and component of the enterprise; . . . it is sufficient that the defendant know of the general nature of the enterprise and know that the enterprise extends beyond his individual role"); Cagnina, 697 F.2d at 922 ("Although the evidence did not show that every member of the enterprise participated in or knew about all of its activities, such evidence was not necessary to prove the existence of the enterprise.").

As the Supreme Court has instructed, an associated-in-fact enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Boyle, 556 U.S. at 945. Such evidence can be either direct or circumstantial. Id. at 951

244

(enterprise's existence may be inferred from "evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity"); <u>United States v. Elliott</u>, 571 F.2d 880, 903 (5th Cir. 1978) (because enterprise can be found wholly on circumstantial evidence, "[w]here, as here, the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable").

> b.  <u>Section 1962(d)</u>

Section 1962(d) (RICO conspiracy) makes it "unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section."  Although § 1962(d) incorporates the law of § 371 general conspiracies, Congress designed § 1962(d) to be broader.  <u>Salinas v. United States</u>, 522 U.S. 52, 63-65 (1997) ("The RICO conspiracy offense . . . is even more comprehensive than the general conspiracy.").

> [T]hrough RICO, Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate "wheel" and "chain" rationales with a new statutory concept: the enterprise.
>
> * * *
>
> RICO helps to eliminate this problem [diverse crimes by apparently unrelated individuals] by creating a substantive offense which ties together these diverse parties and crimes . . . The gravamen of the conspiracy charge . . . is not that each defendant agreed to

245

commit [a specific crime], it is that each agreed to
participate, directly and indirectly, in the affairs of
the enterprise.

Elliott, 571 F.2d at 902.

Congress made § 1962(d) broader than § 1962(c).  Under
§ 1962(d), the agreement to violate RICO is the crime.  It
therefore need be proved only that had the conspiratorial
agreement been reached, the enterprise would be established, the
defendant would be associated with the enterprise, and the
enterprise or its activities would affect interstate commerce.
Salinas, 522 U.S. at 65.  Additionally, unlike § 1962(c),
§ 1962(d) does not require proof that each defendant personally
committed or aided and abetted the commission of two or more
racketeering acts.  Rather, § 1962(d) simply requires that the
defendant agreed that a co-conspirator would commit at least two
racketeering acts on behalf of the enterprise.  Id.  As Salinas
observed:

> A conspiracy may exist even if a conspirator does not
> agree to commit or facilitate each and every part of
> the substantive offense.  The partners in the criminal
> plan must agree to pursue the same criminal objective
> [here the operation of the RICO enterprise] and may
> divide up the work, yet each is responsible for the
> acts of each other.  If conspirators have a plan which
> calls for some conspirators to perpetrate the crime and
> others to provide support, the supporters are as guilty
> as the perpetrators.

Id. at 63-64.

246

The agreement to participate in a RICO conspiracy can be proved through direct or circumstantial evidence establishing: (1) an agreement on an overall objective or (2) that the defendant agreed personally to commit predicate acts. United States v. Abell, 271 F.3d 1286, 1299 (11th Cir. 2001); Elliott, 572 F.2d at 904 ("[D]irect evidence of agreement is unnecessary: proof of . . . an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence, ordinarily the acts and conduct of the alleged conspirators themselves"). As with § 1962(c), a defendant need not know the conspiracy's full scope or all the conspirators' identities. Fernandez, 388 F.3d at 1230 (affirming RICO-conspiracy conviction of Mexican Mafia member's wife who collected money for her husband and facilitated mailings between enterprise associates, because evidence showed she was aware of the essential nature and scope of the enterprise and intended to participate in it). Moreover, as under general conspiracy law, once a conspiracy is established, only "slight evidence" is needed to tie co-conspirators to the RICO conspiracy. United States v. Candoli, 870 F.2d 496, 511 (9th Cir. 1989) (applying principle to § 371 conspiracy); United States v. Morrow, 914 F.2d 608, 613 (4th Cir. 1990) (applying principle to § 1962(d) conspiracy).

c.    The Enterprise Was Proved

The enterprise charged and proved at trial was a textbook associated-in-fact enterprise -- one far more structured and sophisticated than what <u>Boyle</u> found necessary under the statute. <u>Boyle</u>, 556 U.S. at 948.  It was an ongoing organization: Pellicano, Arneson, and Turner, working through PIA, associated together to commit an unbroken stream of racketeering acts from at least the mid-1990s until federal searches shuttered PIA in late 2002.[248]  It operated as a continuing unit: it was structured to allow its members to effectively and efficiently commit crimes on its behalf, with each associated party or entity having a clearly designated role.[249]  It had a common purpose of profiting

_____

[248]  Even after these searches, defendants each sought to conceal evidence relating to the enterprise: Pellicano ordered Kachikian to destroy copies of Telesleuth, and directed a threat to Virtue over her grand jury testimony (GERT 6973-76, 1219-23); Arneson lied to LAPD and the FBI regarding his knowledge of and involvement with the enterprise (GERT 5498-5500, 5508, 5661-62, 5731-32); and Turner lied to the FBI regarding his knowledge of and involvement with the enterprise (GERT 4518-19).  Turner's lie resulted in a § 1001 conviction.  (GSER 144-51).  Pellicano's spoilation contributed to an obstruction enhancement at sentencing.  (GERT 14014).  Arneson likewise received an obstruction enhancement, although it was based on his trial perjury and lies in his presentence interview.  (JER 4955-56).

[249]  Arneson and Stevens were PIA's paid sources at the LAPD and BHPD, while Turner was PIA's paid source at SBC.  Turner's additional sources at SBC met specific needs of the enterprise: Wright (confidential subscriber information and phone records), Malkin (cable-pair information necessary to implement wiretaps), and "Fannie Mae," the frame worker who could tap telephone lines on SBC's mainframe.  (JER 1913, 1963, 2351, 2355; GERT 4152-65,
                                                              (continued...)

248

through the illegal acquisition and use of confidential information.  Compare Elliott, 571 F.2d at 904 (common plan was to "associate for the purpose of making money from repeated criminal activity").

The evidence proved there was a highly profitable market for illegally obtained confidential information that could benefit interested parties -- including criminal defendants, civil litigants, or scorned spouses.  The evidence further established that Pellicano created the enterprise to meet this market. Working behind PIA's veneer of legitimacy, Pellicano, by no later than the mid-1990s, built a network of sources within police departments and the telephone company, who were paid using fees generated by PIA, and who in return gave PIA confidential information from restricted-access databases.  Phone-company sources also assisted in implementing wiretaps through which additional confidential information, including attorney-client and doctor-patient privileged communications, were illegally intercepted.  Pellicano, serving as the enterprise's public face and leader, then solicited high-paying clients willing to pay a premium for this illegally obtained confidential information -- money that was used to continue funding the enterprise's ongoing

---

[249](...continued)
6321).

efforts.[250]  And profit they did, with PIA generating over two
million dollars solely in matters resulting in charged
racketeering acts.

     To give just a snapshot, the evidence included:
(1) testimony from PIA employees that for years Arneson and
Turner were paid to steadily supply PIA with confidential
information from legally restricted law-enforcement and
telephone-company databases (GERT 968-69, 973, 2159-61, 2177-82;
2193-94, 2199, 2215, 3416-17, 3419-20, 3432, 4682-83); (2) copies
of criminal-history, DMV, and phone-company reports that PIA
employees testified to having reformatted after receipt from
Arneson and Turner to conceal the source from whom the
information was obtained (GERT 941-42, 969-75, 1428-30, 1452,
2162-67, 2175-76, 2204, 2326, 3421-22, 3434-35, 4685); (3)
scanned copies of criminal-history reports, bearing Arneson's
name, that a PIA employ had failed to reformat (GERT 975-76,
3436-38, 4845, 6083, GEX 790-800, 841-53); (4) an LAPD audit,
with accompanying victim and FBI testimony, establishing that
Arneson conducted over 2,500 law-enforcement database inquires on
over 345 PIA investigative targets (GERT 6232); (5) recorded

_____

     [250]  Evidence established that PIA charged an initial $25,000
retainer, which was often followed by hundreds of thousands of
dollars -- and in one case, one million dollars -- in fees.
(GERT 2669-70, 2694-96, 2824-26, 3637, 4362-64).

calls, between Pellicano and Arneson and Pellicano and PIA clients, discussing confidential information from Arneson's database inquiries (GERT 1009-11, 2143-45, 2778-79, 3935-36, 5220-28, GEX 1-21); (6) Arneson's admission that he "crossed the line" by accessing law-enforcement databases on PIA's behalf (GERT 5353-54);[251] (7) SBC reports proving that Wright accessed SBC databases on multiple targets whom PIA then wiretapped (GERT 973, 2159-61, 2178-82, 3432); (8) Wright's testimony that Turner paid her to illicitly access SBC databases hundreds of times to obtain both private subscriber information and toll data, including in each of the charged wiretap-related inquiries (JER 2007-12); (9) Malkin's testimony that Turner regularly used her to access cable-pair information, including after Turner retired from SBC (JER 1913, 2351, 2355); (10) a summary of phone records, accompanied by FBI testimony, documenting phone calls between Turner, Wright, and Malkin in and around dates when wiretaps were implemented (JER 2042, GEX 3010); (11) recordings in which Turner and Pellicano discussed whether a PIA employee would "rat" on them regarding the "illegal stuff" they had done, and discussed wiretaps in coded language (GERT 1635-42); (12) recordings between Turner and Wright, including one in which Turner referenced the confidential SBC database information that Wright

---

[251]    Though Arneson made this admission, he misleadingly portrayed it as a revelation based on later reflection.

251

provided Turner on Busch, discussed how to wiretap, and apologetically told Wright, who said she had been contacted by the FBI, that he did not expect the government to learn of her involvement (JER 2061-69); (13) bank records showing over $190,000 in payments from Pellicano to Arneson and $37,000 from Pellicano to Turner -- both of whom, testimony established, received large additional cash payments (GERT 982, 1719-20, 2214-15, 4679-80, 4727, 4798); (14) Arneson's admission that Pellicano advised him (a) of PIA's multiple sources in the telephone company, and (b) that Pellicano had developed a wiretapping program and rented apartments to use in wiretapping (GERT 5509-10); and (15) PIA employee testimony regarding the extensive measures Pellicano employed to conceal the information given by Arneson and Turner, as well as describing an incident in which Arneson and Turner hid together when a client was at PIA (GERT 980-81, 1002).

The evidence relating to PIA's investigation of film producer Aaron Russo exemplifies how the enterprise's members worked together to achieve a common purpose. Hedge fund manager Adam Sender lost $1.1 million in investments with Russo. (GERT 3602-06). Sender sued Russo to recoup this money, and at his attorney's recommendation, retained PIA. (GERT 3607-09, 3611, 3620, 4701).

252

A recorded call between Sender and Pellicano established that Sender retained PIA: (1) to help secure a favorable resolution of the lawsuit against Russo; and (2) "to make [Russo's] life as miserable as possible." (GERT 3619-22). Sender paid PIA approximately $500,000 to achieve these objectives. (GERT 3634-37). In return, Sender received the enterprise's services from Pellicano, PIA's employees, and its corrupt phone-company and law-enforcement contacts.

The evidence showed that almost immediately after PIA was retained, Turner, on PIA's behalf, used Wright to obtain subscriber information for Russo's companion Heidi Gregg (racketeering act 67), and shortly thereafter, a wiretap was installed (counts 67 and 73). (GERT 3324, JER 2019-20, GEX 2487).[252] Two days later, Pellicano had Stevens access law-enforcement databases to acquire NCIC reports on four members of the Russo family (racketeering acts 60-64). (GERT 4579-80). Pellicano, who had been seeking to locate Russo to execute

---

[252] Sender testified that Pellicano played him wiretapped calls involving Russo on 10 to 15 occasions. Virtue testified that she listened to over 1,000 wiretapped calls involving Russo, including attorney-client privileged calls in which Russo and his lawyer discussed their lawsuit strategy. (GERT 1080-82). Written reports reflecting Virtue's notes of wiretapped calls involving Russo, which were recovered from PIA computers, were introduced into evidence. (GERT 1086-1110, GEX 656).

service of the Sender lawsuit,[253] then intercepted a call in which
Russo discussed an upcoming haircut appointment in Beverly
Hills.[254]  (GERT 1082-83, 3617-18, 3706-07).  Using this
information, Pellicano and two PIA employees (Virtue and Denise
Ward-Harvey) executed service of the Sender lawsuit on Russo as
he left the salon.  (GERT 1082-85, 3865-67).

Russo denied being served, litigating the issue as part of
his defense to the Sender suit.  On March 14, 2002, Patrick
Theohar and Alex Green, hairstylists at the salon, submitted
declarations on Russo's behalf in which they stated that the
purported service of Russo consisted of two women (Virtue and
Ward-Harvey) identifying themselves not as process servers but
rather as fans trying to hand Russo a script which Russo declined
to accept.  (GERT 2680, 3814-16; GEX 2634).

Pellicano, upon learning of these declarations, set out to
secure retractions.  On March 15, he contacted the salon owner,
Giuseppe Corsara (a/k/a Giuseppe Franco).  In a recorded call, an
irate Pellicano: (1) confirmed that Theohar and Green were

_____

[253]  Evidence established the importance of the issue of
service.  Sender testified that Russo's success at evading
service caused him to replace his initial attorney -- leading, in
turn, to Pellicano's retention.  (GERT 3606-08).

[254]  Pellicano made specific reference to having intercepted
this call in a subsequent recorded conversation with Carradine.
(GERT 3550-51).  Virtue confirmed that the information was
obtained through the Russo wiretap.  (GERT 1082-83).

Franco's employees, (2) reminded Franco that "you know who I am,"
"who our friends are," and that he (Pellicano) "was told a long
time ago to protect you and look ov- after you," (3) told Franco
he had been trying to keep Franco's name "out of this thing . . .
out of respect for you, and caring for you as, as a member of the
family," and (4) instructed Franco that "they gotta give me a
statement that, that, [the March 14 affidavits were] not true."
(GERT 3807-12; GEX 228).

     At 12:50 p.m. that day, Arneson, who the day before had
received a $2,500 bribe from Pellicano (racketeering acts 77 and
87) (GERT 5729), conducted DMV, criminal-history, and warrant-
database inquiries on Theohar and Green (GERT 5616-20).
Arneson's inquiries revealed that Theohar had an outstanding
warrant from 1998 for failure to complete probation following a
cocaine possession conviction.  (GERT 3813).  The same day, David
Moriarty, an attorney representing Sender, faxed Theohar's
attorney, Martin Marcus, a copy of Theohar's declaration, and
followed up with a telephone call in which Moriarty advised
Marcus that Pellicano was "very upset," that Pellicano wanted
Theohar to recant, and that if he did not, "Pellicano could make
things very difficult for . . . Theohar."  (GERT 3835-38, 3850-
51).

     The next day, Arneson, using an address obtained from LAPD's
restricted law-enforcement databases, directed two LAPD officers

255

to arrest Theohar on the four-year-old warrant.[255]  The officers
attempted to do so but failed because Theohar no longer lived at
the address.  Theohar learned of LAPD's attempt to arrest him and
contacted Marcus.  Based on his conversations with Theohar and
Moriarty, Marcus prepared a new affidavit in which Theohar would
retract material portions of his March 14 declaration.  (GERT
3818-21, 3839, 3847, 3849; GEX 2636).

On March 18, Marcus spoke with Moriarty and Pellicano,
telling Pellicano to leave Theohar alone because Theohar would
resolve the matter to Sender's benefit.  (GERT 3838).  That day,
Marcus faxed Moriarty a revised declaration retracting the
majority of Theohar's March 14 declaration, including his
assertion that Russo had refused service.  (GERT 3837-39, GEX

---

[255]  At his 2003 proffer, Arneson claimed he did not
recognize Theohar's name, did not recall conducting any database
inquiries relating to Theohar, and did not recall anything
relating to Theohar's attempted arrest.  (GERT 5619-20).
Similarly, during the government's case-in-chief, Arneson's
counsel asked questions of LAPD Detective Helen Lim that called
into question whether Arneson had any involvement in Theohar's
attempted arrest.  (GERT 1919-20).  When the circumstantial
evidence of his involvement mounted, however, Arneson (in keeping
with his practice) changed course and lied to provide a quasi-
legitimate explanation for his actions.  Arneson testified that
he first learned of Theohar's outstanding warrant from Pellicano.
Arneson further testified that, once he confirmed the warrant's
existence and saw that Theohar resided within the Pacific
Division's jurisdiction, he was all but compelled to act on the
arrest warrant.  (GERT 4322-24).  But Arneson was unable to
explain why he simultaneously checked Green for warrants if his
check of Theohar was predicated on specific warrant-related
information from Pellicano.  (GERT 5616-20).

2636).  No additional efforts were made to have Theohar arrested on the outstanding warrant.  (GERT 4322-24).[256]

Similarly, after Russo's son Max berated Sender at a Beverly Hills restaurant, Pellicano advised Sender that "he was going to use his connections to get Max arrested."  (GERT 3657). Pellicano had Russo file a complaint with the BHPD, which Stevens presented for prosecution.[257]  Stevens, in return for a bribe payment, also conducted NCIC inquiries of Max Russo for PIA (racketeering act 45).  (GERT 3656-57, 4575-76, 4581-82).  In a January 30, 2002, recorded conversation, Pellicano told Sender that Max Russo would be "fingerprinted, booked, and arrested" the following day:

> Well we got him, this kid- . . . this kid has a record for doing this. . .  [I]t'll never go off his record . . . . [E]ven if he's found innocent, it's still on his record, so he still has a record of, of threat, a terrorist threat -- little cocksucker.

---

[256]  Arneson testified that the matter was no longer in his jurisdiction.  (GERT 5460-62).  However, despite knowing of an outstanding warrant that he claimed to be of a type that compelled him to act, Arneson did not send information about the warrant to other authorities who could have executed it, including the BHPD, which could have arrested Theohar at his known workplace.  Instead, Theohar remained free until officers responding to an unrelated domestic-violence incident discovered the warrant and arrested him.  (GERT 3822).

[257]  Although Sender and Stevens were cross-examined extensively, no defendant challenged the evidence that Pellicano orchestrated Max Russo's arrest.  (GERT 3665-95, 4589-4625).

(GERT 3658-60).  Sender responded approvingly, noting "the whole point of it was . . . just to be a pain in the ass."  (GERT 3660).

The trial demonstrated countless similar instances of the enterprise operating in unison to achieve its goals.  Whether it be PIA's investigation of Anita Busch,[258] its investigation of Erin Finn,[259] or any of the other PIA client representations for which evidence was presented, the totality of the evidence overwhelmingly established the enterprise.  Boyle, 556 U.S. at 945 (enterprise "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit").  Any rational juror considering this evidence would have to conclude that the enterprise element

---

[258] See Part III.A.3, supra (discussing defendants' actions against Busch).

[259] Robert Pfeifer retained PIA in July 2000 to secure a retraction from former girlfriend, Finn, who had provided accurate, but damaging, information in a civil deposition regarding Pfeifer's drug use.  Pfeifer paid PIA approximately $200,000.  (GERT 2799, 2805, 2810, GEX 2443, 2481).  The evidence established that on July 20 (racketeering acts 73 and 83), Pellicano paid Arneson a $2,500 bribe, and that on August 2, Arneson accessed restricted law-enforcement databases to acquire criminal-history and/or DMV information on Pfeifer, Finn, and Finn's friends and associates (racketeering acts 21-22), which Arneson then provided to Pellicano (GERT 2896-97, 5728, GEX 2113).  That same day, Wright, at Turner's instruction, accessed SBC's BOSS database to secure confidential subscriber information on Finn (racketeering act 65), and later that day, a wiretap was initiated (counts 67-68), as shown by Virtue's testimony and her call summaries.  (GERT 1016-32, 3320-21; GEX 2485).

was proved.  See id. at 945-48 (enterprise can be evidenced by the racketeering pattern in which it engages); Fernandez, 388 F.3d at 1226-27 (conspiratorial agreement evidenced by the generalized, coherent, and consistent scheme).

Defendants challenge this conclusion, claiming that the evidence, at most, establishes multiple separate enterprises.[260] (JOB 81, 85-86).  That argument would require this Court to suspend the standard of review, discard controlling precedent, and ignore the evidence.

As a preliminary matter, defendants effectively ask this Court to excise Pellicano and PIA from their sufficiency challenge, focusing solely on what Arneson and Turner purportedly knew and did.  (JOB 80-83).  This is a tacit acknowledgment that Pellicano lacks a legitimate sufficiency challenge to the enterprise element, as defendants do not and cannot credibly argue, that Pellicano, who directed all the enterprise's associates, did not know the enterprise's activities.  Thus, this

---

[260]  Pellicano's closing argument was that he was a "Lone Ranger" who orchestrated all the criminal conduct, that Arneson and Turner did not know of the other's activities, and that, therefore, there was no enterprise.  (GERT 7846).  In addition to being a legally incorrect argument, see Kushner Promotions v. King, 533 U.S. 158, 163 (2001), Pellicano's claim was disproven by the evidence and rejected by the jury.  Turner's claim that he never engaged in illegal conduct, and Arneson's arguments (similar to those raised in Arneson's opening brief), also were contradicted by the evidence and rejected by the jury.

Court can summarily reject Pellicano's sufficiency claim.
Kushner, 533 U.S. at 163.

While Pellicano lacks a facially viable claim, his conduct cannot be removed from consideration as to whether there was an enterprise involving Arneson and Turner, since Pellicano's and PIA's actions were the core of the criminal operation. When Pellicano's and PIA's conduct is considered alongside Arneson's and Turner's, there clearly was a single enterprise involving Pellicano, PIA, Arneson, and Turner. United States v. Tille, 729 F.2d 615, 620 (9th Cir. 1984) ("proof of a defendant's association with the illegal activities of the enterprise is all that is required" to establish association with the organization).

Arneson's and Turner's arguments do nothing to refute that a rational juror could have found a single, associated-in-fact enterprise. Instead, their claims consist of multiple recastings of the base claim that enterprise members must know all the other individuals associated with the enterprise, have full knowledge of their activities, and directly participate in all of the enterprise's activities. Well-established RICO law expressly rejects this claim. See United States v. Castro, 89 F.3d 1443, 1451 (11th Cir. 1996) (the government need not "prove that each conspirator agreed with every other conspirator, knew of his fellow conspirators, was aware of all the details of the

260

conspiracy, or contemplated participating in the same related crime"); <u>United States v. Rastelli</u>, 870 F.2d 822, 827-28 (2d Cir. 1989) ("to require each member of a RICO conspiracy to have specific knowledge of every member and component of the enterprise . . . would be unrealistic in organized crime cases"; "[a]ll . . . we require is that the defendant agree to commit the substantive racketeering offense through agreeing [that a conspiracy member would commit two racketeering acts[261]] and that he know the general nature of the conspiracy and that the conspiracy extends beyond his role").

Arneson's and Turner's claims are also factually unavailing, particularly since the evidence must be viewed in the light most favorable to the government.  Their initial claim -- that no evidence established that they were involved in or aware that "the enterprise earned income through the conduct of diverse criminal activities" (JOB 81) -- is demonstrably false.  Arneson and Turner were frequent visitors to PIA, were close with Pellicano,[262] understood that PIA was a private investigative

_____

[261]  <u>Rastelli</u> predated <u>Salinas</u>, 522 U.S. at 65, and incorrectly cited the need for each conspirator to commit two racketeering acts.  Otherwise, it is good law.

[262]  The relationship was sufficiently close that Arneson warned Pellicano when an LAPD undercover operation investigated PIA client Leo Portocarrero.  (GERT 5812-27; GEX 309).  A PIA employee who had a physical relationship with Turner testified that Turner's visits to PIA were always to see Pellicano -- not
(continued...)

agency, and knew they were being paid to illegally acquire confidential information to benefit PIA's high-paying clientele. Arneson knew the enterprise earned money through conducting criminal activities, because he knew he was receiving large bribes to conduct thousands of restricted-access law-enforcement database inquiries in violation of federal and state laws, to benefit PIA's clients. (GERT 5717, 6232, GEX 2966).[263] Turner, similarly knew about the enterprise's activities, since he was being paid to acquire SBC-customer data and assist in wiretapping (JER 2038-39; GEX 2969; GSER 144-50).[264]

Arneson and Turner next argue they were unaware of each other and the other's activities. Again, the law does not require as much. Moreover, the evidence and permissible resulting inferences refute Arneson and Turner's claim. The two

---

[262](...continued)
her. (GERT 4691).

[263] Even if Arneson's sufficiency challenges to select racketeering acts were to succeed, Arneson admitted that he knew that his conduct in accessing and disseminating confidential information from restricted law-enforcement databases violated numerous state statutes that were not charged as racketeering acts, thereby still leaving him as an enterprise member who committed several thousand criminal offenses on behalf of the enterprise. (GERT 5352-53, 5402-03, 5772-76). That alone establishes the baselessness of Arneson's challenge.

[264] Turner has not challenged the sufficiency of the evidence supporting his conspiracy-to-wiretap conviction and five substantive wiretapping convictions, nor his false statement conviction for lying that he never assisted Pellicano by providing phone-company information or by wiretapping.

were regularly at PIA, and once they were hidden together in the

same room at PIA.  (GERT 979-81, 1002).[265]  Arneson admitted that

Pellicano told him about phone-company sources who "provided him

with subscriber information," and that Pellicano showed him

Telesleuth and explained how he rented apartments to use the

program.[266]  (GERT 5509-12).  These admissions establish that

Arneson understood the broader scope of the enterprise and its

activities, regardless whether he knew Turner specifically to be

---

[265]  Virtue testified to this.  While defendants claim that
Virtue was heavily impeached (JOB 13-14), the record establishes
only that defendants sought (without meaningful success) to
impeach her for hours.  Virtue's testimony was heavily
corroborated at trial, including through other employees
confirming that Arneson was PIA's LAPD source, that Arneson
received cash from Pellicano beyond his monthly payments, that
Turner was involved in PIA's wiretapping, or that Virtue's notes
of wiretapped calls were, in fact, notes of actual calls between
the parties identified.  (GERT 2147-48, 2159-61, 2175-82, 2185,
2195-98, 2344-45, 2586-2606, 2893-2922, 3359-60, 3432-33, 3438,
3710-19, 7215).  Regardless, defendants' sweeping challenges to
Virtue's credibility must be rejected; credibility determinations
would be drawn in the government's favor even without
corroboration.  See Nevils, 598 F.3d at 1170 (courts may not
"second-guess the jury's credibility assessment").

[266]  Arneson claims that the only direct evidence of his
knowledge of the enterprise's wiretapping were his admissions.
Arneson ignores that admissions like his have been used as highly
probative evidence in support of convictions of criminal
defendants since the founding of this country.  Furthermore, to
the extent that his admissions were accompanied by a lie
regarding Pellicano's intended purpose for the wiretapping
program (which itself is not inconsistent with Arneson's
knowledge that Pellicano also used Telesleuth for his own
benefit), the jury was free to discount the non-credible portion
of the testimony.

the phone-company source and wiretap facilitator.[267]  Elliott, 571
F.2d at 903-04 ("[S]ecrecy and concealment are essential features
of a successful conspiracy . . . hence, the law gives room for
allowing the conviction of those discovered upon showing
sufficiently the essential nature of the plan and their
connections with it, without requiring evidence of knowledge of
all its details or the participation of others").  Similarly,
Turner unequivocally knew that the enterprise was broader than
just his role; he was responsible for recruiting multiple SBC
employees to join its ranks.

Moreover, the jury heard, through the testimony of multiple
PIA clients (e.g., Williams, Pfeiffer, Maguire, Kalta, and
Carradine)[268] and numerous recorded phone conversations between
Pellicano and clients (e.g., McTiernan, Cohn, Magarry, and

---

[267]  It does not matter that Ornellas testified (and the
government acknowledged) that Arneson did not personally
participate in wiretapping.  (JOB 83).  An enterprise member need
not know of or participate in every activity conducted by the
enterprise to be a part of it.
    Moreover, based on Pellicano's admission to Arneson
regarding his wiretapping capabilities and activities, the
government argued that Arneson did know about the wiretapping.
(GERT 8059).  Consistent with this argument, it was reasonable
for the jury to find that Arneson knew that the enterprise
engaged in the illegal acquisition of other types of confidential
information -- i.e., wiretapped phone calls -- beyond what he
personally provided.

[268]  GERT 627-29 (Williams); GERT 2813-24 (Pfeiffer); GERT
2670-71, 2676-80 (Maguire); GERT 4167-69 (Kalta); GERT 3553-54,
3559, 3568-69 (Carradine).

264

Rock),[269] that Pellicano was open and even boastful about his illegal acquisition and possession of confidential law-enforcement reports and his ongoing wiretapping, even though Pellicano had no prior relationship with and had just been retained by these individuals. The jury was entitled to infer that Pellicano was at least as open with Turner and Arneson, his longtime associates, as he was with clients whom he barely knew.

Finally, Arneson's and Turner's claim that they performed different tasks does not advance their cause. See United States v. Connolly, 341 F.3d 16, 28 (1st Cir. 2003) (existence of designated roles supports existence and structure of the enterprise). It is precisely because Pellicano and PIA had access to different platforms of confidential information that Arneson and Turner, and all of Turner's phone company contacts, were brought into and helped complete the enterprise. Each individual's contribution flowed together to advance the enterprise's common purpose of benefitting the enterprise's members by generating income through the illegal acquisition of confidential information. Furthermore, Arneson's and Turner's claims that their contributions did not overlap is demonstrably

---

[269] GEX 170-91 (McTiernan); GEX 255-73 (Cohn); GEX 279 (Magarry); GEX 292 (Rock). The Pellicano/Christensen calls also would qualify, although the government did not seek to admit them in the RICO trial.

false.  The Busch and Russo matters show this,[270] as did other examples of Arneson and Turner effectively being tasked by PIA in tandem.  RICO was enacted to address just this type of seemingly diverse, but actually unified, conduct.  See United States v. Knight, 659 F.3d 1285, 1290 (10th Cir. 2011) ("separately performed, functionally diverse and directly unrelated predicate acts and offenses will form a pattern [of racketeering] under RICO, as long as they all have been undertaken in furtherance of one or another varied purposes of a common organized criminal enterprise"); United States v. Bergrin, 650 F.3d 257 (3rd Cir. 2011) (as Supreme Court has recognized, "racketeering activities of criminal enterprises are often quite diverse").[271]

The evidence established that Pellicano, Arneson, and Turner, along with PIA, together were part of an associated-in-fact enterprise.  Cagnina, 697 F.2d at 922 ("A single enterprise engaged in diversified activities fits comfortably within the

---

[270]  Regarding Busch, see Part III.A.3, supra (showing Arneson and Turner gaining database information the same day, to support Pellicano's harassment and wiretap).  The Russo matter also shows close coordination, as discussed earlier in this section.

[271]  Neither severance nor limiting instructions were necessary or appropriate, given that the evidence was admissible evidence against Pellicano, Arneson, and Turner jointly as associates-in-fact.

266

proscriptions of the RICO statute.").  The sufficiency challenge

to RICO's enterprise element fails.[272]

### 3.    The Evidence Established that Pellicano Paid, and Arneson Accepted, the Charged Bribes

Pellicano challenges the court's finding that Arneson's

database inquiries properly fell within the scope of § 68.  (POB

56-57).  Pellicano further claims his payments to Arneson could

not constitute bribery because they did not relate to an "open or

ongoing police investigation."  (POB 57).  Arneson, in turn,

claims the evidence was insufficient to support a § 68 violation,

because his conduct did not constitute an act performed on "a

matter then pending, or that may be brought before him in his

official capacity," but rather was simply a "misuse of the LAPD

database for non-official purposes."  (AOB 15-17).

These challenges fail on multiple levels.  Preliminarily,

Pellicano and Arneson waived these claims when they did not

include them in their Rule 29 motions.  Graf, 610 F.3d at 1166.

(GER 1687-1705, 2141).  Even if not waived, Pellicano's

---

[272]  In explaining their multiple-enterprise theory,
defendants analogize the situation to the multiple-conspiracies
theory.  (JOB 81).  While it does not appear that they are
actually advancing a multiple-conspiracies theory, such an
argument also would fail.  Evidence sufficient to support a
single enterprise under § 1962(c) necessarily suffices to support
a similar finding under § 1962(d), as the enterprise need not be
actualized under § 1962(d).  This is particularly true given that
only a slight connection is necessary to tie either Turner or
Arneson to what unquestionably was an existing enterprise
conspiracy between Pellicano and PIA.

sufficiency challenge fails because it is premised on a factually and legally flawed analysis under § 68, when he was found to have violated § 67.  Similarly, Arneson's claim fails because the evidence establishing his acceptance of payments to access-restricted law-enforcement databases for PIA established a § 68 violation under multiple recognized theories (payment accepted in return for agreement to violate a legal duty, payment accepted in return for agreement to violate a duty of the office, payment accepted to influence an act taken in the officer's official capacity), each of which independently compels affirmance.  When the evidence is viewed in the light most favorable to the government, there is no credible dispute that a rational juror could have found that Pellicano paid, and Arneson accepted, each $2,500 bribe alleged in racketeering acts 70-89.

> a.  California Law Governs the Sufficiency
>     Determination

When assessing the sufficiency of the evidence of a jury finding regarding a racketeering act alleging a state-law violation, state law controls.  See Frega, 179 F.3d at 806 (using California law to analyze sufficiency of the evidence supporting racketeering acts alleging violations of California bribery statutes).  Racketeering acts 70-89 alleged violations of

California Penal Code §§ 67 and 68.  (GER 1492-1540).  California law applies.[273]

      b.   <u>Penal Code §§ 67 and 68</u>

Penal Code §§ 67 and 68 are complementary statutes.  <u>People v. Hallner</u>, 277 P.2d 393, 395 (Cal. 1954).  Together, they proscribe the giving of bribes to, and the solicitation, acceptance, or receipt of bribes by, executive officers, including police officers.[274]  <u>People v. Pacheco</u>, 69 Cal. Rptr. 822, 823 (Ct. App. 1968) ("executive officer," under the bribery statutes, "include[s] police officers").  A bribe is "[a]nything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity."  Cal. Pen. Code § 7(6).

Section 67 makes it a felony to "give[] or offer[] any bribe to any executive officer of this state, with intent to influence

---

[273] Arneson asserts that "the bribery predicate acts are invalid under federal and California law."  (AOB 23).  This appears to reference Arneson's <u>Skilling</u>-based claim that state-law bribery no longer falls within § 1346's scope.  Even if that argument (counterfactually) had merit for § 1346, <u>Skilling</u> did not alter § 1962 or displace precedents holding that state law controls when state offenses are charged as racketeering acts.  <u>See</u> <u>Turkette</u>, 452 U.S. at 568.

[274] Section 68 is broader than § 67, as it also applies to ministerial officers.  Cal. Penal Code § 68.

him in respect to any act, decision, vote, opinion or other proceeding as to such officer."  Its elements are that: (1) the defendant gave or offered a bribe to an executive officer; and (2) the defendant acted with the corrupt intent to unlawfully influence that officer's official act, decision, vote, opinion or conduct in another proceeding.  CALCRIM No. 2600; (GERT 7575). Section 67 focuses exclusively on the action and intent of the party offering the bribe.  Once the offer is made with the requisite intent, § 67 has been violated.  People v. Finklestein, 220 P.2d 934, 941 (Cal. Ct. App. 1950).  This is true even if payment is never made, if the executive officer refuses to accept payment, or if the executive officer is not influenced in the manner the bribing party intended.  See People v. Brigham, 163 P.2d 891, 893-94 (Cal. Ct. App. 1945) (no act or agreement by the executive officer is required because "the mere offer, with the corrupt intent," completes the offense).  As this Court explained in rejecting a sufficiency challenge to racketeering acts alleging bribery under California law, it "misapprehends the law [to focus on whether the bribed party acted based on the offered bribe]: there is no requirement under the California bribery statutes that [the party who was offered the bribe] act, let alone act improperly, in response to a bribe."  Frega, 179 F.3d at 806.

270

Section 68 makes it a felony for either an executive or ministerial officer to "ask[], receive[], or agree[] to receive, any bribe, upon any agreement or understanding that his or her vote, opinion, or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby."  Its elements are that: (1) the defendant was a ministerial or executive officer; (2) the defendant requested, took, or agreed to take a bribe; (3) the defendant expressly or impliedly represented that the bribe would influence his official act, decision, vote, or opinion; and (4) the defendant acted with the corrupt intent that his public or official duty would be unlawfully influenced.  CALCRIM No. 2603; (GERT 7577).  Similar to § 67, § 68 focuses on the actions and intent of the party receiving the bribe -- not the actions or intent of the party paying the money.  See People v. Gaio, 97 Cal. Rptr. 2d 392, 398 n.8 (Ct. App. 2000) (§ 68's reference to an agreement "connotes not the extrinsic agreement with the giver but rather the recipient's own intent").

In People v. Markham, 30 P. 620 (Cal. 1883), the California Supreme Court made clear that § 68 should be interpreted broadly. Markham held that "the scope of the definition of bribery is as broad as the duties of the officer who accepts the bribe."  Id. at 621.  Building on Markham, California courts have reinforced

271

§ 68's breadth, finding that it encompasses payments solicited or accepted in return for: (1) breaching a statutorily imposed duty, id. at 621-23; (2) breaching a duty imposed by the officer's assigned executive or ministerial office, Gaio, 97 Cal. Rptr. 2d at 401-02;[275] and/or (3) engaging in conduct in an official capacity that falls outside the office's jurisdiction, People v. Lips, 211 P. 22, 24 (Cal. Ct. App. 1922).[276]  Likewise, both this Court and the California courts have found that California bribery generally and § 68 particularly:

> do[] not require that a specific official action be pending when the bribe is given, or that there be proof that the bribe was intended to influence any particular such act.  Rather, it is sufficient that the evidence reflect that there existed subjects of potential action by the recipient, and that the bribe was given with the intent that some such action be influenced.

Gaio, 97 Cal. Rptr. 2d at 399; Markham, 30 P. at 622 ("may be brought" requires only that the act be one that the executive officer conceivably could be asked to discharge at some future point, regardless whether the act ever comes to fruition); Frega,

---

[275]  Gaio, 97 Cal. Rptr. 2d at 402, involved attempts to influence an LASD Food Services Department employee with respect to matters of bidding and purchasing that were part of his job duties.  See also People v. Megladdery, 106 P.2d 84, 102 (Cal. Ct. App. 1940) (finding that it was immaterial whether the duty breached was one imposed by statute).

[276]  In a definition akin to the concept of acting under color of law, an officer acts in his official capacity "by performing an act that properly belongs to the office and is intended by the officer to be official."  Lips, 211 P.2d at 24.

179 F.3d at 805 ("linkage between a payment and a specific
official decision is not required under California bribery law"
because a bribe can be intended to influence "future actions with
respect to matters that may, but need not, ever come before [the
bribe's recipient]").

      c.   <u>Restrictions to Protect the Confidentiality of
          Information in Law-Enforcement Databases</u>

        (1)  <u>Statutory Framework</u>

The United States and the State of California require their
respective Departments of Justice to create and maintain
databases comprised of information compiled largely through
compelled interactions with the citizenry (<u>e.g.</u>, vehicle stops,
arrests, criminal prosecutions, custodial and/or non-custodial
post-conviction proceedings).  28 U.S.C. § 534; Cal. Pen. Code
§§ 11077, 11101, 11105.  These include the FBI's NCIC database
and the California Department of Justice's California Law
Enforcement Telecommunications System ("CLETS") database.  Each
database, in turn, contains multiple subdatabases that aggregate
information relevant to varying criminal justice concerns,
including but not limited to criminal history, terrorism, wants
and warrants, and Secret Service protective services data.  As
intended, these databases provide law-enforcement officers with
access to a wide array of personal identifying information about

273

millions of people,[277] including names, aliases, addresses, dates
of birth, physical identifiers, social security numbers,
immigration status, fingerprint classification data, and a unique
numeric code that law-enforcement use to identify individuals
(e.g., CII and FBI numbers).  This information is designated
"confidential," and may not be accessed or disseminated except as
authorized by law.[278]  28 U.S.C. § 534(b); Cal. Pen. Code §§
11075-77, 11105; (GEX 2052-99).

---

[277]  In 1989, NCIC contained criminal-history information on
over 24 million people.  United States v. Reporters Comm. for
Freedom of the Press, 489 U.S. 749, 752 (1989).

[278]  A dominant, essentially nullification-based, theme
advanced by Pellicano and Arneson was that their conduct caused
no real harm because the information Arneson was paid to provide
could be acquired, at least partly, through public-source
materials.  (GERT 1889-90, 1923-24).  Pellicano and Arneson,
however, did not acquire this information from public sources;
they acquired it from restricted-access government databases that
maintained the confidentiality of this information.  As the
Supreme Court expressly found,

> the very fact that federal funds have been spent to
> prepare, index, and maintain these criminal-history
> files demonstrates that the individual items of
> information in the summaries would not otherwise be
> 'freely available' either to the individuals who have
> access to the underlying files or to the general
> public. . . . [as] plainly there is a vast difference
> between the public records that might be found after a
> diligent search of courthouse files, county archives,
> and local police stations throughout the country and a
> computerized summary located in a single clearinghouse
> of information.

Reporters Comm., 489 U.S. at 764.

Specifically, 28 U.S.C. § 534(a)(4) limits NCIC access to select statutorily designated parties solely for those parties' "official use."  Section 534(b) provides that access authorization can be revoked if the accessing party disseminates the information to third parties who are not lawfully entitled to access these records.  Accompanying regulations mandate, upon penalty of access revocation, that NCIC records be used solely for the official purpose that the user identified at the time of access.  28 C.F.R. §§ 20.33(b) & (d).  These regulations require states accessing NCIC information to enact legislative and/or regulatory security standards restricting access to "authorized organizations and personnel" and protecting against unauthorized disclosure or dissemination.  Id. § 20.21(f).

California's statutes and regulations restrict access to NCIC and CLETS and define the parameters for lawful use and dissemination of confidential information from these databases. Penal Code § 502 proscribes unauthorized access of government agency computers.  Penal Code § 15153 mandates that CLETS "be used exclusively for the official business of the state . . . [or city] agency."  Pursuant to Penal Code § 11105 and 11 C.C.R. § 703, statutorily authorized parties, including police officers, may access CLETS or NCIC for criminal-history information only if two preconditions are met: (1) the officer has a "right to know" (i.e., is a sworn law-enforcement officer who has received the

275

requisite training regarding the limited circumstances under which these databases lawfully can be accessed and has been provided with the dual passwords required to access the databases); and (2) the officer has a "need to know" the information in the course of the officer's duties (i.e., a "compelling requirement for the information [that is] directly related to the official duties and/or responsibilities of the person or agency initiating the request"). (GEX 2094-99). In addition to restricting access to these databases, Penal Code §§ 11142 and 13303 proscribe the dissemination of records obtained therefrom by a party who is in legal possession of these materials to a party not authorized to possess them, while § 11143 proscribes the purchase, receipt, or possession of such materials by a party who is not legally authorized to possess them.[279]

### (2) LAPD-imposed Restrictions

LAPD's policies and procedures complement the statutory framework. (GERT 4761-62, 4768, 4784-85). The LAPD requires officers seeking to be designated as having a "right to know" to

---

[279] DMV information is similarly protected. Vehicle Code § 1808.45 proscribes the acquisition or use of DMV information for non-law-enforcement purposes, and proscribes dissemination of such information unless the dissemination was authorized when the inquiry was made. Consistent with this requirement, all DMV-database-inquiry results bear the advisement "DMV record for law enforcement use only." (GERT 4745).

successfully complete an initial training course and thereafter
complete bi-annual training in which the restrictions on NCIC and
CLETS access and the prohibition against use and distribution of
confidential database information is addressed, including the
requirement that the officer have a "need to know" (i.e.,
official investigative need) before he is authorized to access
CLETS or NCIC.  (GERT 4758, 4768-70).  Moreover, the LAPD
requires officers accessing these databases to regularly sign
operator security statements that provide additional notification
that: (1) records and reports from these databases are
confidential; (2) the databases may be accessed only by employees
with both the "right to know" and the "need to know"; (3) all
requests to conduct database inquiries on behalf of third-parties
not authorized to receive this information must be reported to a
supervisor; and (4) unauthorized access or disclosure of
confidential information from these databases violates the LAPD
code of conduct and multiple statutes, and can result in
discipline or prosecution.  (GERT 1827; GEX 2052-93).

The LAPD Manual explains that "automated systems, and
information obtained from them, shall be used for official
purposes only," and that criminal-history information shall be
obtained only by, and provided only to, officers with the "right
to know" and the "need to know" -- that is "directly related to
official duties and/or responsibilities."  (GEX 2094-99).  The

277

Manual further instructs that improperly accessing or disclosing confidential information from these databases violates both LAPD policy and criminal law, and could result in administrative action and/or prosecution.[280]  (GERT 4765; GEX 2094-99).  Finally, to ensure that officers were reminded of these access restrictions and the limitations on dissemination, the initial screen on the LAPD's computer terminals through which both NCIC and CLETS are accessed prominently notify the accessing officer that "the use of this system for other than official police business is prohibited.  Any violation of federal, state or department policy will result in discipline up to and including discharge and/or criminal prosecution."  (GERT 4766; GEX 2100).

      d.  <u>Trial Evidence</u>

The jury received copious evidence establishing Pellicano's payment and Arneson's acceptance of bribes, including the ten charged ones.  PIA-employee testimony, physical exhibits, and Arneson's own admissions[281] established that Arneson was

---

[280]  LAPD Detective Helen Lim, who conducted the Internal Affairs investigation of Arneson, testified that an officer who properly accessed and acquired criminal-history information could not share this information with officers who did not similarly possess the right and need to know.  (GERT 1829).  Paula Weissman worked in LAPD's Security Administration Unit and testified that private citizens, including private investigators and law-enforcement sources, would not possess the requisite need or right to know this information.  (GERT 4759, 4762-63).

[281]  Given the overwhelming evidence that he accessed restricted law-enforcement databases to acquire confidential
                          (continued...)

Pellicano's source within the LAPD who routinely secured confidential information on PIA's investigative targets from restricted-access law-enforcement databases.  The evidence further established that Arneson's services were purchased at a substantial sum.  Bank records showed that, from February 1997 to May 2002,[282] Pellicano paid Arneson over $190,000, primarily through $2,500 monthly checks.[283]  (GERT 981, 2195-96; GEX 2113-91, 2966-68).  Senior PIA employees testified that these payments were supplemented by cash payments.  (GERT 941, 981-82, 1142-43, 2147-48, 2199-3000, 2344-45, 3990-91, 4033-34).

---

[281](...continued)
information on PIA's investigative targets, Arneson conceded this general proposition.  Contrary to Arneson's claims, however, he has never accepted responsibility for his conduct.  Rather, Arneson has grossly minimized his conduct, advancing lies designed to absolve him from criminal liability.  He has claimed entries on the audit were the result of others using his serial number and password, claimed PIA-directed inquiries were done as part of LAPD investigations, asserted that his were for the greater good of law enforcement, and couched his concession of having "crossed the line" as an understanding formed after the fact.  Rather than accept responsibility, Arneson, as the court found, obstructed justice by "l[ying] almost from the moment he took the stand and throughout his testimony," including about whether he was responsible for the charged NCIC and CLETS inquiries.  (JER 4955).

[282]  Pellicano's last payment to Arneson was in November 2002, just before the FBI searched PIA and Arneson's relationship with Pellicano first was identified.  (GEX 2966-68).

[283]  This included the representative sampling of $2,500 payments charged as violations of Penal Code §§ 67 and 68.  (GER 1492-1540).

279

The jury received both direct and circumstantial evidence establishing that Pellicano's payments to Arneson were made so that Arneson, in violation of the law and his professional duties, would: (1) investigate PIA's adversaries by searching restricted-access federal and state law-enforcement databases like NCIC and CLETS for information on these individuals; (2) obtain the confidential information that federal and state governments had compiled on these individuals; (3) act on existing warrants if advantageous to PIA's interests; and (4) disseminate obtained reports to Pellicano, who legally was not entitled to possess these materials, so that the confidential information therein could be used to benefit PIA's high-paying clients.[284]  Multiple PIA employees, including the bookkeeper who issued Arneson's monthly $2,500 checks, testified that these checks were payment for the criminal-history and DMV information that Arneson provided to PIA, while Stevens confirmed that his

---

[284]  Consistent with his chameleonesque practice of transforming his story to meet the present state of the charges and known facts, Arneson testified incredibly that the $2,500 monthly payments from Pellicano ensured that Arneson was available to assist Pellicano 24 hours a day, seven days a week, in whatever way was necessary to assist PIA with one claimed exception: the payments were not for the thousands of NCIC, CLETS, and DMV database inquiries that Arneson conducted on PIA investigative targets insofar as Arneson purportedly had told Pellicano that "I can't accept money for that" and "I could never be paid for running names or - - - anything through the LAPD computer base."  (GERT 5361, 5386).  Arneson's testimony that he was not paid by Pellicano to query restricted-access law-enforcement-databases was among the many aspects of Arneson's testimony that the court found perjurious.  (JER 4956).

payments from Pellicano were exclusively for restricted-access inquiries for PIA.[285]

Trial evidence also included recorded conversations between Pellicano and PIA clients in which Pellicano personally acknowledged that part of the clients' fees were being used to cover payments to the sources (Arneson and Stevens) who provided PIA with restricted-access law-enforcement information. Most notably, in a recorded conversation, Pellicano advised PIA client Mark Cohn, who was under federal fraud prosecution,[286] that: (1) Pellicano had just received criminal-history reports on Cohn's co-defendants and victims;[287] (2) Pellicano was "not supposed to have these records" so Cohn could not "mention this to a soul"; (3) the reports were "extremely expensive" and "cost a tremendous amount of money"; (4) the reports showed that Cohn's co-

---

[285] Pellicano did not challenge this assertion through cross-examination. Arneson, in an unsuccessful attempt to equate bribery with cash payments, elicited that Stevens was paid in cash. (GERT 4600, 4624, 7823, 7827, 7834). Arneson also claimed that Pellicano offered to pay him for accessing law-enforcement databases, but that Arneson declined. (GERT 5364, 5386).

[286] This prosecution was brought by the District of Maryland. (GERT 4793; GEX 2704-40). At the time of this recorded conversation, Cohn was on bond and traveling to Los Angeles to conduct business and to further discuss with Pellicano the ongoing illegal acts that PIA was conducting in Los Angeles on his behalf. (GERT 4825-27).

[287] Cohn mused that the "average background search or background search firm isn't going to pick up what you picked up." Pellicano answered "of course not," explaining that he had access to the same databases used by the government. (GERT 4573, 4834; GEX 254-68).

defendants had extensive criminal histories or used aliases;[288]
(5) the reports reflected that one co-defendant had been
"flagged" by the FBI,[289] presenting obstacles to PIA's abilities
to access information about him; and (6) while Cohn already had
"spent a tremendous amount of money,"[290] he had to "send more"
because "the thing that I'm trying to get across is, I am finding
everybody.  You understand?  All of these, these . . .
complainants and everything."[291]   (GERT 4825-44).

---

[288]  Pellicano advised Cohn that he had not confirmed the
"true identity" of one co-defendant, but that he was using the
"FBI['s]" "fingerprint classification" in the criminal-history
reports (provided by Arneson) to attempt to confirm whether this
co-defendant used an alias under which he had sustained
additional convictions.  (GERT 4846-49; GEX 269-77).  Testimony
established that such biometric information could not be obtained
through public sources.  (GERT 1946).

[289]  Pellicano explained being "flagged" meant that the FBI
wanted to be informed of all database inquiries involving this
individual and stressed that he "can't let anybody in the world
know that I am accessing this information."  (GERT 4840-41; GEX
254-68).

[290]  Cohn already had paid Pellicano $100,000, and
subsequently paid $50,000 more.  (GERT 4792-95; GEX 2455-58).

[291]  That Arneson was the source of this "tremendous[ly]"
expensive criminal-history information was documented by the LAPD
audit, which established that the day before and day of this
call, Arneson spent conducted over 200 database inquiries on
Cohn's co-defendants and victims.  (GEX 255-77, 1743-64, 2704-40;
GERT 5538-41).  In addition, scanned criminal-history reports,
bearing Arneson's name and matching several inquiries reflected
in the audit, were recovered from PIA's computers.  (GEX 786-
801).  Bank records established that Pellicano paid Arneson
$2,500 on the very day of this call (racketeering acts 78 and
88).  (GEX 2455-58, 2966-68).

In another recorded conversation, Pellicano notified "Leo" Portocarrero, a PIA client whom Arneson's squad was investigating for bookmaking, of evidence recovered during arrests of Portocarrero's associates; explained that Portocarrero's associates were cooperating with the LAPD; advised him, because he was a fugitive, to "stay where the fuck you are"; and told him he would need to pay "a hundred grand in cash, to start out with" because Pellicano had "to get into government, you know, bases and everything else . . . to find out what the whole story is here." (GEX 317-19). Pellicano explained that while his fee was high, "most of this is not going into my pocket," and it was imperative to "know who the rats are" and "what the fuck they're gonna say."[292] (GEX 317-19). The following day, Pellicano advised Portocarrero he should make an initial payment of $25,000, reiterating that "these are expenses I have to pay out, this is not going in my pocket. We'll talk about my pocket later down the line."[293] (GEX 320-21).

---

[292] Arneson conceded that he told Pellicano about the LAPD's investigation of Portocarerro and about the investigation's ongoing use of undercover officers. (GERT 5807).

[293] In another recorded call, Pellicano had Michael Sportelli, an organized crime figure targeted in a bookmaking investigation in which Arneson participated, confirm that he was speaking on a "good phone" and advised him that he needed to pay $25,000, which "doesn't go in my pocket" and is "like an insurance policy" because "anytime your name comes up, they tell me, and I can warn you." (GERT 5707-12; GEX 325-29).

PIA-employee testimony about Arneson's database inquiries
for PIA was corroborated by, inter alia, (1) reformatted
criminal-history and DMV information matching Arneson's database
inquiries; (2) copies of criminal-history and DMV reports
containing Arneson's name and serial number that a PIA employee
scanned (instead of reformatting) in violation of PIA policy; (3)
victim testimony confirming that, when Arneson conducted his
NCIC, CLETS, and/or DMV inquiries on them, they had no law-
enforcement contact but were PIA adversaries; (4) testimony that
the FBI's review of Arneson's LAPD audit resulted in the
identification of over 345 victims on whom Arneson conducted
several thousand database inquiries; and (5) recorded calls
between Pellicano and Arneson in which Pellicano instructed
Arneson to perform certain inquiries and Arneson reported inquiry
results -- including confidential information on the victim in
LAPD's manslaughter prosecution of PIA-client Kami Hoss.

Finally, PIA documents and employee testimony established
Pellicano's and Arneson's concerted efforts to conceal that
Arneson was accepting bribes.  Pellicano and Arneson cloaked
Arneson's monthly payments in a veneer of legitimacy by using
business checks and, as needed, supplementing with cash.  PIA
employees Virtue, LeMasters, Campau, and Palazzo testified that
Pellicano sought to conceal Arneson's role through tactics like
reformatting reports, hiding him when he was at PIA at the same

284

time as clients, leaving his name off PIA's phone logs, and ordering a day-long shredding of Arneson-related documents when Pellicano feared a state search warrant that might be executed at PIA would reveal Arneson's provision of criminal-history and DMV information relating to the John Gordon Jones rape prosecution. (GERT 973-75, 2159-65, 3434-36, 4673).

Arneson falsified his LAPD daily-activity reports, failed to identify the true nature of his PIA work on his work permits, concealed and/or lied to his employers about his relationship with Pellicano, and cautioned at least one PIA employee to carefully handle the faxed criminal-history reports that he sent because his name was on the documents -- all in an effort to shield his illegal work from being discovered. (GERT 1162-63, 2162-67, 3434-35).

e.    The Evidence Was Sufficient To Support
      Racketeering Acts 70-79

The evidence, when viewed in the light most favorable to the government, was sufficient for a rational juror to find that Pellicano paid Arneson over $190,000 in bribes, including the ten $2,500 payments alleged as racketeering acts 70-79, as proscribed by Penal Code § 67.

Pellicano, without any reference to California law, takes issue with the court's finding that Arneson's queries to restricted law-enforcement databases to secure information on PIA's investigative targets were "short investigations of

285

innocent individuals" done in Arneson's capacity as an executive officer. (POB 56). This claim is legally meritless, particularly as to Pellicano.[294]

---

[294] It also is factually inaccurate. The court's finding that Arneson's NCIC and CLETS inquiries were short investigations was not clearly erroneous. (JER 898). In fact, it was exactly right, and supported by overwhelming evidence. Extensive testimony established that access to CLETS and NCIC was restricted to LAPD officers with the right and need to know. LAPD Officer Hsyini Lo put the restrictions in context, explaining how the LAPD's undercover team in the Portocarrero investigation identified potential suspects by performing law-enforcement database searches for license-plate numbers observed at a known Portocarrero bookmaking location, to identify individuals with backgrounds that would support an association with the criminal operation. (GERT 6152-53).

Arneson similarly testified (albeit falsely) that it was by reviewing information he obtained from restricted-access database inquiries on the victims in the Jones rape case that he determined that the women Pellicano identified as "party girls" (i.e., escorts) were not involved in prostitution and did not need to be further investigated by his LAPD vice squad. (GERT 5386-89).

Recorded calls between Pellicano and Arneson further support the court's finding. In one, Arneson tells Pellicano that his initial database inquiries allowed him to identify the whereabouts of a PIA investigative target ("just to let you know that I did find him," "he's been booked in Vegas area for an ex-con with a firearm") but that he has to investigate the issue further ("tap into his FBI shit") to gain a more definitive understanding of the person's criminal history ("I can't figure out where the felony conviction is"). (GERT 3935-36; GEX 19-21). In another call related to Kami Hoss, Pellicano, who two weeks earlier had paid Arneson $2,500, told Arneson that he "wants everything that [he] can get on [decedent Sandra Rodriguez]." Arneson responded, while discussing the importance of the information in the CLETS report that he was reviewing, that "there's not going to be any city stuff," "county may have a little more," "I'm looking at her state thing right now," but "I'm gonna pull her, the other [federal] sheet." Pellicano then provided Arneson with the names of five women to investigate, which Arneson did by conducting NCIC/CLETS searches on them. (GERT 5208-12, 5220-28; GEX 12-18). Finally, recordings between

(continued...)

First, the finding Pellicano cites is irrelevant to the
sufficiency determination.  The finding was made when the court
denied (JER 896-99) a pre-trial motion arguing that the
government could not supersede the charges because the $2,500
payments from Pellicano to Arneson did not violate § 68 as a
matter of law (GER 253-78).  The court denied this motion,
finding that the conduct fell within § 68's scope.[295]  Most
importantly, (1) the finding solely addressed § 68, while the
racketeering acts against Pellicano alleged § 67 violations, a

---

[294](...continued)
Pellicano and several clients, such as Cohn and Magarry, are
replete with discussions regarding the essential role that this
confidential information played in PIA's investigative efforts,
including its ability to frame successful legal strategies and
undermine litigative adversaries.

[295]  To the extent that Pellicano misframed his argument and
actually intends to challenge the denial of Arneson's pre-trial
motion, his claim still fails.  Arneson's motion was filed before
the return of the Fifth Superseding Indictment -- the indictment
that first charged racketeering acts 70-89 -- such that the
court's finding on this issue effectively was an advisory
opinion.  California Banker's Ass'n v. Shultz, 416 U.S. 21, 64
(1974).  Moreover, both Arneson's motion and the court's order
were limited to the application of § 68 -- not § 67, the section
under which Pellicano was charged.  Furthermore, after the Fifth
Superseding Indictment was returned, Arneson moved to strike
these racketeering acts (a motion that Pellicano did not join)
exclusively on statute-of-limitations grounds.  (GER 963-78).
Pellicano, therefore, has waived his current claim by failing to
timely challenge the racketeering acts charging him with paying
bribes in violation of § 67.  Fed. R. Crim. P. 12(b)(3).
Regardless, Pellicano's claim fails, because the racketeering
acts in question set forth facially cognizable charges under
§ 67, leaving no basis for dismissal had he appropriately moved
pre-trial.  United States v. Boren, 278 F.3d 911, 914 (9th Cir.
2002).

287

statute focusing exclusively on the bribe giver's -- not the bribe taker's -- conduct,[296] Brigham, 163 P.2d at 894; and (2) even as to § 68, the finding never was presented to the jury[297] and could not have factored into the jury's verdicts that Pellicano violated § 67.

Regardless, the question before this Court is whether the evidence allowed any rational juror to find that Pellicano gave or offered a bribe to an executive officer (Arneson) while acting with the corrupt intent to unlawfully influence Arneson's official act, decision, vote, opinion, or conduct in another proceeding.[298]  It was uncontested that Arneson, a sworn LAPD officer from June 1974 through October 2003,[299] was an executive officer under §§ 67 and 68 and that Pellicano paid him each of the charged $2,500 payments.  (GERT 1871; GEX 2052-93).  Thus,

---

[296]  It also did so in the limited context framed by Arneson's motion and did not address all theories under which his conduct could violate § 68.  (JER 896-99).

[297]  The bribery instructions tracked California's model instructions for each offense.  (GERT 7697-7700).

[298]  Although there were no racketeering acts charged based on Pellicano's payments to Stevens, the indictment alleged, and trial evidence established, that Pellicano paid Stevens over $10,000 in bribes to access-restricted law-enforcement databases to secure confidential information on PIA's adversaries.  (GER 1492-1540; GERT 4575-77).  Both the payments and their purpose were uncontested at trial.  Standing alone, these payments are sufficient to establish that Pellicano committed bribery and uphold his RICO-conspiracy conviction.

[299]  The jury was instructed that police officers are executive officers under §§ 67 and 68.  (GERT 7708-09).

the sufficiency determination as to Pellicano is limited to the question whether Pellicano had the requisite intent.  The evidence on this element was was overwhelming.

As discussed above, the evidence established that Pellicano knew that he could not legally access or possess the criminal-history, DMV, and other confidential information compiled by the FBI in the NCIC database and the California Department of Justice in the CLETS database.  The evidence further established that this confidential information served as an integral component of PIA's representation of its clients -- so much so that Pellicano sought to acquire it on all investigative targets in all of PIA's cases.  To ensure that PIA had reliable sources for this information, Pellicano sought out senior police officers like Arneson, who could use restricted-access law-enforcement databases without meaningful oversight.  Arneson, however, faced statutory and workplace restrictions that precluded him from accessing these databases without proper legal authorization and further barred him from distributing database information to non-law-enforcement personnel, including Pellicano.  Finally, to induce Arneson to violate both the law and his sworn duties, Pellicano paid Arneson substantial money, including the ten charged payments, then implemented procedures to conceal the illegal conduct.  This was more than sufficient evidence for a

289

rational juror to find that Pellicano intended each payment to bribe Arneson within the meaning of § 67.

In a footnote, Pellicano claims that, to constitute bribes, his payments to Arneson had to result in database inquiries conducted as part of "open or ongoing police investigation[s]." (POB 57). Pellicano then claims that, since the charged payments related to PIA matters arising from civil proceedings, they could not be bribes. (Id.). The claim is nonsense.

Legally, Pellicano's claim incorrectly focuses on Arneson's behavior. This Court already has found that basing a sufficiency attack on how the bribed party acted or could have acted "misapprehends the law: there is no requirement under the California bribery statutes that [the party who was offered the bribe] act, let alone act improperly, in response to a bribe." Frega, 179 F.3d at 806. Furthermore, the statutory language requiring that a "matter" be "then pending" applies to § 68, not § 67. Section 68's plain language extends to matters that "may be brought before [the executive officer]." Indeed, the California Supreme Court has held that the matter need not be open or ongoing for a bribe to have been made under § 68 -- the matter need only be one that conceivably could be brought before the executive officer. See Markham, 30 P. at 622.

Factually, Pellicano's claim that the charged payments all related to civil matters is demonstrably false. First, the

290

evidence overwhelmingly established that the ten bribes alleged as racketeering acts 70-79 were representative payments in furtherance of an ongoing bribery scheme.  (GER 1492-1540). Under California (and federal)[300] law, there was no need to tie any particular payment to any particular instance in which Arneson accessed restricted databases on PIA's behalf, because each payment served as continued inducement to ensure that Arneson would be available to conduct any investigative inquiry requested by Pellicano, including inquiries on behalf of PIA clients in criminal proceedings.  Gaio, 97 Cal. Rptr. 2d at 399. Second, every time Arneson used LAPD's resources to investigate a PIA target, that created a matter then-pending before Arneson. Third, proof abounded that Pellicano paid Arneson to investigate individuals involved in ongoing criminal proceedings, including matters that either were LAPD-based or conceivably could be brought before Arneson in his official capacity.  For example:

• Pellicano paid and Arneson accepted $2,500 on June 29, 1999 (racketeering acts 70 and 80).  The following month, Arneson conducted a series of inquiries on PIA-investigative target Dennis Sidhoun, an informant who notified the LAPD that a hit had been put on LADA investigator George Mueller by PIA client

---

[300]  See United States v. Kincaid-Chauncey, 556 F.3d 923, 944 n.15 (9th Cir. 2009) (in ongoing bribery scheme, the quid pro quo need not be linked with a specific official act; it is sufficient if the official has been put on a retainer with the understanding that he will act when asked).

Christopher Rocancourt, the defendant in an LADA passport-fraud
case.[301] (GERT 2706-07, 2710, 2713, 2715-19, 2723-24). That same
month, Arneson conducted NCIC inquiries of PIA-investigative
target Monika Zsibrita, a model who filed a report with the BHPD
regarding a sexual encounter with comedian and PIA client Chris
Rock and who was engaged in ongoing efforts to extort Rock
through a false paternity claim;[302]

•     Pellicano paid and Arneson accepted a $2,500 bribe on
March 14, 2002 (racketeering acts 77 and 87). The next day,
Arneson conducted the previously discussed (Part IV.H.2.c, supra)
restricted-access-database inquiries on Theohar and then later
sent two LAPD officers to arrest him, which resulted in him
revising his declaration so it would be favorable to PIA client
Sender. (GERT 3815-18, 3848, 5616-20). On March 18 and 21,
2002, Arneson, again at PIA's direction, conducted criminal-
history inquiries on the minor victim (and her parents and

_____

[301] Acting on Pellicano's behalf, Arneson previously had
conducted restricted database inquiries on Mueller, two
government informants, two cooperating defendants, and a private
investigator retained by one of Rocancourt's victims. (GERT
2714-19; GEX 962-83). Mueller, who had never previously met
Arneson, testified that Arneson was not part of the Rocancourt
investigative team or the LAPD team investigating Sidhoun's
threat report. (GERT 2708, 2712, 2724).

[302] On a recorded call, Pellicano read Rock portions of
Zsibrita's police report, stressed to Rock that "I'm not supposed
to have this thing," and secured Rock's assurance that he would
not discuss this information with anyone, including Rock's
attorney. (GERT 4330-31; GEX 291-93).

boyfriend) in the LAPD/LADA sexual-assault prosecution of George Kalta.  (GERT 4335-39).

• Pellicano paid and Arneson accepted a $2,500 bribe on May 10, 2002 (racketeering acts 79 and 89).  The following week, Arneson conducted NCIC and DMV inquiries and further requested a DMV photograph of Anita Busch.  Almost exactly one month later, Busch was the subject of the Proctor threat.  (See Part III.A.3, supra).  This criminal act initially was investigated by OCVD.  During the investigation, Arneson applied to join this unit, withdrawing his application only after his contact information was discovered in Pellicano's address book during the November 2002 PIA search.[303]  (GERT 5497-98).

That some of PIA's clients were involved in civil litigation is irrelevant.  Evidence established that these civil proceedings were highly contentious, and that wiretapping, witness intimidation, threats, break-ins, and trumped-up criminal charges were strategically used by the litigants to gain tactical advantages against their adversaries.  Any of these acts could have triggered police interaction.  Thus, the matters conceivably could have been brought before Arneson in his official capacity

---

[303] Arneson falsely testified that Agent Ornellas sought Arneson's transfer to OCVD.  (GERT 5542-45).  Not only was this statement uncorroborated, it was directly undercut by Arneson's own counsel's questioning of Ornellas: "At some point did you learn as a result of that [October 2002 meeting] that Mr. Arneson was invited by LAPD . . . to go on loan to OCVD?"  (GERT 5827-29).

as a police officer.  In fact, Arneson showed just how conceivable it was that these matters could come before him when, in an attempt to create reasonable doubt as to whether he conducted particular NCIC or CLETS for a legitimate law-enforcement purpose or for PIA, he attempted to coopt several PIA-directed inquiries by claiming they were LAPD matters he personally investigated.  (<u>See</u> Part III.A.b(2).  Among the most obvious are the John Gordon Jones and Busch inquiries (<u>see</u> Parts IV.J.8.b & IV.J.5.b, <u>infra</u>), as well as the following:

- Pellicano payed and Arneson accepted a $2,500 bribe on July 20, 2000 (racketeering acts 73, 83).  Within two weeks, Arneson conducted NCIC inquiries on escort Erin Finn, who provided damaging testimony in a civil deposition regarding PIA client Robert Pfeifer's drug use.  Later that month, Arneson conducted an NCIC inquiry on Paul Rusconi, the hustler husband of PIA-client Freddy DeMann's daughter.  Arneson perjuriously testified that the Finn inquiries were for an LAPD investigation into Finn's prostitution business,[304] and that the Rusconi inquiries were made because Rusconi was an "active prostitute"

---

[304] Arneson, who the court found to have engaged in a level of perjury not previously seen in her 11 years on the bench (JER 4955-56), embellished this lie by claiming without substantiation that his investigation of Finn progressed to the point where he sought and was denied approval for a strip permit, which would allow a male undercover officer to be naked in Finn's presence before arresting her on prostitution charges.  (GERT 5457-59).

that Arneson's vice squad "would target."[305]  (GERT 5459-60; JER 1996-2003).

Pellicano's claim, therefore, fails on every level.  The evidence was sufficient for a rational juror to find that the ten $2,500 payments to Arneson charged as racketeering acts 70-79 were bribes under § 67.  Because these ten racketeering acts independently establish the requisite pattern of racketeering, Pellicano's RICO and RICO-conspiracy convictions likewise should be affirmed, as should Arneson's and Turner's RICO-conspiracy convictions.[306]

> f.   The Evidence Was Sufficient To Support
>      Racketeering Acts 80-89

Arneson's claim likewise fails on the merits.  Although the elements of §§ 67 and 68 differ, the direct and circumstantial evidence establishing that Arneson accepted bribes from Pellicano largely mirrors the evidence establishing that Pellicano paid the bribes to Arneson, and it is equally overwhelming.   Part IV.H.3.e, supra.  The evidence was so overwhelming that it established Arneson's receipt of bribes under several

---

[305]  Arneson had no explanation for the numerous database inquiries he conducted (1) on Finn's friends and associates who had no involvement in her escort business but whose relationship to Finn was known through Pellicano's wiretap, or (2) on Rusconi's parents, for whom there was no evidence of any involvement in Rusconi's prostitution business.

[306]  This obviously is dependent on a similar sufficiency finding as to the enterprise element.

independently sufficient theories of liability recognized under California law.

It cannot credibly be disputed that Arneson's conduct violated legally imposed duties.  Every time Arneson accepted a $2,500 payment from Pellicano, he did so knowing that, in return, he would be asked to violate, and would in fact violate, the most fundamental duty imposed on a police officer -- the duty to uphold the law.  Uncontradicted evidence established that multiple statutes proscribed accessing NCIC and CLETS without lawful authorization and prohibited disseminating confidential information therefrom to individuals lacking the "need" and "right" to know.

Arneson admitted knowing of these laws.[307]  When asked by his counsel whether he "kn[e]w at the time . . . that this was illegal conduct?" Arneson smugly responded, "Let me put it this way.  I knew I could be subjected to departmental administrative action and the possibility of state court."  (GERT 5352-53).

_____

[307]  Arneson asserts that he believed that his violations were misdemeanors.  (AOB 20 n.8).  This was not proven at trial, and nothing he cites establishes as much.  Rather, his testimony establishes that he knew he could be "subject" to "state level" "criminal prosecution"; it says nothing about misdemeanors versus felonies.  (GERT 5540-41).  While the 1989 operator security statement that Arneson cites describes the unauthorized access of LAPD computers as a "public offense" under Penal Code § 502 and the disclosure of "criminal history information" as a misdemeanor under §§ 11142 and 13303 (AER 178), the operator security statement that Arneson signed more recently (in August 2002) clearly says that certain subsections of Penal Code § 502(c) "are felonies."  (GERT 5436-39; GEX 2081).

Having accepted payment to violate a legal duty, Arneson's conduct is bribery in its most classic form, falling squarely within § 68's scope.    Markham, 30 P. at 621.

Separately, Arneson's conduct violates § 68 because he agreed to violate his office's duties when he accepted Pellicano's monthly § 2,500 payments.  Multiple forms of evidence, including Arneson's admissions, established that he knew of LAPD's code of conduct, including its policies prohibiting employees from accessing NCIC and CLETS for other than official investigative purposes and barring the dissemination of confidential information from these databases to members of the public, including private investigators and sources.[308]  Therefore, every one of the thousands of times Arneson investigated a PIA adversary by accessing these databases and acquiring confidential information for dissemination to Pellicano, he willfully violated for profit established LAPD policies, knowing that he "could be subjected to departmental administrative action" -- i.e., suspended and/or fired, for having done so.  Such conduct falls squarely within § 68's scope.

---

[308]  Evidence established that Arneson attended required NCIC training for over two decades, received annual copies of the LAPD Manual in each of the four years (1999 to 2002) that he conducted the database inquiries underlying the charges, and signed numerous operator security statements (including in April 1998 and August 2002, which effectively bracketed the offense conduct) expressly informing him that unauthorized access and wrongful dissemination of confidential information from law-enforcement databases could be punished as a felony.  (GEX 2081-82).

Markham, 30 P. at 621 ("The scope of the definition of 'bribery' is as broad as the duties of the officer who accepts the bribe.").

The evidence also was sufficient to support a § 68 violation because, even had Arneson's conduct not violated duties imposed by law and by his office, the evidence established that he was acting in his official capacity when he accepted Pellicano's bribes. Under California law, a party acts in his official capacity "by performing an act that properly belongs to the office and is intended by the officer to be official." Lips, 211 P.2d at 24. The evidence established that Arneson performed an act that properly belonged to the office. It was exclusively by virtue of his office that Arneson (as opposed to Pellicano or PIA) had access to, and was able to conduct inquiries on, LAPD's restricted-access law-enforcement databases. The evidence likewise established that Arneson intended that these inquiries be official. Arneson represented that he had the "right" and "need" to know the information obtained -- i.e., that he was conducting official LAPD business -- each time he entered an LAPD station, sat at a limited-access LAPD computer terminal, reviewed the initial screen reminding him that the computer was solely for "official police business," input the two unique passwords assigned for conducting official inquiries (and also input, for NCIC, an explanation of the inquiry's law-enforcement purpose),

298

accessed CLETS or NCIC to obtain confidential law-enforcement records on private citizens, and printed these records for his later possession.  Absent such a tacit representation, Arneson would have been barred from accessing these databases and possessing the confidential information contained therein.  Thus, like the law-enforcement officer in <u>Lips</u> who, while exceeding lawful authorization, used the legitimacy of his office to secure a bribe, Arneson's conduct was corrupt to the core.

Arneson nonetheless advances four challenges to the sufficiency of the jury's bribery findings.  Each argues that his conduct did not concern "a matter then pending, or that may be brought before [him] in his official capacity."  (AOB 15-17).  Each is meritless.

Arneson's principal argument is that the record lacks evidence that he was acting in his official capacity when he accepted Pellicano's monthly $2,500 payments.[309]  (AOB 15).  Arneson claims that he refused to provide Pellicano with information from LAPD cases and once instructed Pellicano to destroy information from the John Gordon Jones rape prosecution.  (<u>Id.</u>).  This argument is unfounded.

---

[309]  Arneson argued differently below, conceding that he acted within his official capacity: "Arneson's alleged use of law enforcement databases and disclosure of such information to Pellicano were acts within his 'official capacity'"; "the government fills pages . . . arguing that Arneson's use of law enforcement databases occurred 'in his official capacity' as a police officer.  Arneson does not dispute this."  (GER 522-48).

299

Preliminarily, § 68 does not require that the matter involve an ongoing LAPD proceeding; instead, it must only be one that conceivably could be brought before Arneson in his capacity as a police officer. People v. Anderson, 216 P. 401, 401-02 (Cal. Ct. App. 1923) (officer guilty of § 68 violation for accepting bribe in connection with corrupt enforcement of what he incorrectly believed to be an out-of-state warrant). Moreover, the sole basis for this claim is the uncorroborated, self-serving testimony of an inveterate liar. In any case, "viewing the evidence in the light most favorable to the government mandates that we not consider the plausibility of 'exculpatory constructions' advanced by the defendant." United States v. Lindsey, 634 F.3d 541, 552 (9th Cir. 2011); see United States v. Chase, 503 F.2d 571, 573 (9th Cir. 1974) ("[A] trier of fact is not compelled to accept and believe the self serving stories of . . . interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be drawn."). This is particularly true given the evidence that Arneson did provide Pellicano with confidential information involving parties to ongoing LAPD matters (e.g., the John Gordon Jones and Kalta sexual assault cases, the Theohar warrant, and the Mueller death-threat investigation), matters that quickly came before the LAPD (e.g., the Busch threat), matters that

300

conceivably could be brought before the LAPD (e.g., the Rock extortion), and matters Arneson claimed had come before the LAPD (e.g., Finn's and Rusconi's prostitution).

Arneson's claim that he told Pellicano to destroy the Arneson-provided confidential criminal-history reports on victims and witnesses in the Jones rape case (AOB 15) should be rejected under the standard of review, as self-serving and uncorroborated. Lindsey, 634 F.3d at 552; Chase, 503 F.2d at 573. It also is contradicted by testimony from multiple witnesses, who must be credited over Arneson under the standard of review.

Arneson next claims that his conduct could not be on an official matter because, although he "was authorized to use the LAPD database by virtue of his office," he was not required to "exercise . . . discretion" when conducting inquiries.[310] (AOB 15-16). Section 68 forecloses Arneson's claim, because it punishes the acceptance of bribes by "executive or ministerial

---

[310] Arneson claims his conduct was incapable of determining the "'outcome' of any particular 'matter.'" (AOB 15). Section 68 does not include any language that the bribe must determine an "outcome." To the extent California courts have used this terminology, it has been in the context of explaining that a matter need not be pending when a bribe is received. People v. Diedrich, 31 Cal.3d 263, 276 (1982) (interpreting Penal Code § 165); Giao, 97 Cal. Rptr. 2d at 402. Instead, the focus must be on the payment's ability to influence the receiving party (thereby determining the outcome) in the event that a matter that conceivably could come before the bribed party in fact did so. Gaio, 97 Cal. Rptr. 2d at 402. ("[I]t is the payment or the agreement to provide payment, that constitutes the criminal act [as opposed to the specific object of the bribe].").

officers." Cal. Penal Code § 68. Ministerial officers are, by definition, employed in positions in which the "duties to be performed [are defined] with such precision and certainty as to leave nothing to discretion." People v. Strohl, 129 Cal. Rptr. 224, 232 (Ct. App. 1976).[311] Because it is immaterial under § 68 whether the bribe's object involves discretionary or non-discretionary acts, whether Arneson's actions were discretionary should have no impact on this Court's sufficiency determination.

Regardless, every aspect of Arneson's corrupt behavior was infused with discretion.[312] Every time Arneson was presented with

---

[311] Arneson cites five California cases to support his claim that an act must be discretionary to qualify under § 68. (AOB 16). Of these, only one -- Markham, 30 P. at 621 -- addresses § 68, and its holding -- that "the definition of bribery is as broad as the duties of the officer who accepts the bribe" and encompassed the conduct of a police officer who accepted a regular "stipend" in return for agreeing to systematically "not arrest any one of a class of offenders" -- runs counter to Arneson's claim. The other four decisions involve not § 68, but § 67, for which California law is clear that no action by the bribed party is required. Hallner, 277 P.2d at 395-96, directly undercuts Arneson's argument by explaining that, while § 68 initially was limited to executive officers, the California Legislature in 1933 broadened § 68's scope to include ministerial officers who lacked discretion in the performance of their duties.

[312] In addition to being directly refuted by the evidence, Arneson's claim is contrary to his testimony. Arneson testified, albeit perjuriously, that he accessed restricted law-enforcement databases without legal authorization and provided the resulting confidential reports to Pellicano because the law-enforcement tips that Pellicano purportedly provided in return served LAPD's "greater good." (GERT 5496-97). While false, even that explanation reflects the central role that discretion played in his actions.

302

a $2,500 payment from Pellicano, he exercised discretion in accepting the payment knowing that, in return, he would be asked to violate established legal and professional duties imposed upon him as a sworn officer.  Every time Arneson received a request from Pellicano to investigate PIA's adversaries, Arneson exercised discretion in electing to divert his time and attention away from his assigned criminal investigations and instead use that time to investigate PIA's adversaries.  Every time Arneson sat before an LAPD terminal to conduct a Pellicano-directed inquiry on CLETS or NCIC, Arneson exercised discretion in electing to violate the law, LAPD policy, and the privacy rights of the individual he was investigating -- knowing that, in his own words, he could be "subjected to departmental administrative action and the possibility of state court."  (GERT 5352-53).  Every time Arneson conducted the illicit database inquiries Pellicano paid him to perform, he exercised discretion as to the particular database to access and whether any follow-up investigation should be conducted through additional inquiries.[313] Every time Arneson reviewed the confidential information contained in an NCIC or CLETS-generated report, he exercised discretion regarding whether and to what extent he should further act on PIA's behalf and disseminate the information to PIA.  And

---

[313]  This was plainly shown through the Pellicano/Arneson call relating to the Hoss manslaughter prosecution.  (GERT 5205, 5220-28).

303

every time Arneson concealed his activities from LAPD by misrepresenting or omitting information, he exercised discretion in violating the LAPD's code of conduct. Therefore, even if California law required that his actions be discretionary, they easily were.

Citing <u>Lips</u>, Arneson next claims that his monthly acceptance of $2,500 payments to violate LAPD policy and state law could not violate § 68 because "whether an official's conduct falls within his specific 'jurisdiction' has little bearing on whether the conduct constitutes" a bribe. (AOB 16). Arneson misreads <u>Lips</u>.[314]

<u>Lips</u> involved an officer convicted of accepting a bribe instead of conducting an arrest. He sought reversal of his § 68 conviction because, when he accepted the bribe, an warrant had not yet issued for the suspect and he therefore lacked the legal duty to conduct the arrest. <u>Lips</u>, 211 P. at 24. In rejecting that claim, <u>Lips</u> made clear that § 68's scope is not limited to when the conduct properly falls within an officer's legal duty -- <u>i.e.</u>, the officer's "jurisdiction" -- but rather extends to instances not otherwise authorized under the law but still performed by the officer acting in his official capacity. <u>Id.</u> at

---

[314] Under Arneson's theory, a cartel kingpin would not be guilty of bribery for paying a law-enforcement officer $1,000,000 for confidential information identifying the name and address of an informant against whom the kingpin has placed a hit.

25.  Lips then affirmed the bribery conviction, finding that, despite acting without legal authority, the officer's acceptance of the bribe "was corrupt in the last degree."  Id. at 26.

Lips therefore undermines, rather than aides, Arneson's sufficiency challenge.  Instead of narrowing § 68's scope, it recognized the statute's breadth and did so in a manner that encompasses the conduct here.  Arneson's actions violated multiple duties imposed by law and by his office.  Such conduct fell within Arneson's "jurisdiction," and therefore properly supports a § 68 violation.  Even if Arneson's conduct had not violated an existing legal duty and technically fell outside his "jurisdiction," it still would violate § 68; while not legally authorized, Arneson acted in his official capacity.  As with the officer in Lips, Arneson's conduct was "corrupt in the last degree," falling squarely within § 68's scope.  Lips, 211 P. at 26.

Lastly, in a claim founded on a misapplication of the D.C. Circuit's decision in Valdes v. United States, 475 F.3d 1319 (D.C. Cir. 2007), Arneson asserts that his conduct did not violate § 68 because this statute does not extend to "misuse of the LAPD database for non-official purposes."[315]  (AOB 17).  As

---

[315]  Although Arneson repeats Valdes' references to moonlighting, he wisely has not characterized his conduct as such.  Evidence established that the overwhelming majority of Arneson's thousands of restricted-access-database inquiries were

(continued...)

discussed later (Part IV.H.4.a(2), <u>infra</u>), <u>Valdes</u> is a wrongly decided, non-controlling decision involving the application of the federal anti-gratuity statute, which both this Court and California's appellate courts have found to be materially distinguishable from California bribery statutes including § 68. <u>Frega</u>, 179 F.3d at 805-06; <u>Gaio</u>, 97 Cal. Rptr. 2d at 400-01. <u>Valdes</u> has no applicability here.[316]

In addition to his misplaced reliance on <u>Valdes</u>, Arneson's premise is unfounded.  Every instance of bribery involves the misuse of government resources for technically non-official purposes for personal financial gain.  This is true whether it be a police officer who misuses his position by accepting payment to release an arrestee (<u>Lips</u>) or not to investigate certain crimes (<u>Markham</u>); the judge who, for a fee, steers cases to a particular attorney (<u>Frega</u>); or a legislative aide who accepts money to advance legislation favoring the bribing party (<u>Freeman</u>, 6 F.3d

---

[315] (...continued)
completed during his work shifts, the very time when he was being paid by the City of Los Angeles to work as a police officer. Moreover, Arneson's inquiries were conducted at an LAPD station using LAPD computers available exclusively for LAPD officers acting in their LAPD investigative duties.  Furthermore, Arneson's own (albeit perjurious) defense was that he provided the confidential, restricted-access information to Pellicano because Pellicano would provide him with law-enforcement leads -- a matter directly tied to his office.  Arneson's conduct was the antithesis of moonlighting.  (GERT 7294-7300).

[316] To the limited extent <u>Valdes</u> has any impact, it would support the jury's bribery findings, not undermine them, as discussed later (Part IV.H.4.a(2), <u>infra</u>).

at 595).  So too for Arneson.[317]  It was because of Arneson's official authority that he could conduct the inquiries for which he was bribed.  His actions were just as "corrupt in the last degree" and fell squarely within § 68's scope.

As with Pellicano, the evidence was far more than sufficient for a rational juror to find that Arneson accepted each of the $2,500 payments charged as § 68 violations in racketeering acts 80-89.  Moreover, because these racketeering acts independently establish the requisite pattern of racketeering, Arneson's RICO and RICO-conspiracy convictions should be affirmed.  This, in turn, supports affirmance of Pellicano's and Turner's RICO-conspiracy convictions.

    4.    <u>The Findings on the Racketeering Acts and Substantive Counts Alleging Honest-Services Fraud Should Be Affirmed</u>

        a.    <u>The Evidence Was Sufficient</u>

The jury found that the enterprise's pattern of racketeering included each of the honest-services fraud violations alleged against Pellicano (46) and Arneson (44).[318]  (GSER 110, 133).  The

---

[317]  Arneson emphasizes that he was not involved in threats (AOB 71), while ignoring that the confidential information he fed Pellicano allowed Pellicano to threaten and intimidate PIA's adversaries.  (<u>See</u> GERT 4237-38; GEX 146-69).

[318]  Racketeering acts 1-44 charged Pellicano and Arneson with § 1346 violations based on the NCIC inquiries that PIA paid Arneson to conduct.  Racketeering acts 45 and 46 charged Pellicano with additional violations arising from NCIC inquiries that Stevens conducted.  (GER 1492-1540).

jury also found Pellicano and Arneson guilty of the 17
substantive honest-services-fraud counts in which they jointly
were charged (counts 3-19) and Pellicano guilty of the two
additional counts in which he individually was charged.  (counts
47-48).[319]  (GSER 114-17, 122-23, 134-37).

Neither Pellicano nor Arneson challenged the sufficiency of
evidence for the honest-services findings in their Rule 29
motions.[320]  (GER 1687-1704, 2141).  Nevertheless, both now claim
the evidence was insufficient under Skilling v. United States,
130 S. Ct. 2896 (2010), which narrowed honest-services-fraud's
scope by requiring that it be founded on schemes involving
bribery and kickbacks.  (POB 52-54; AOB 10-17).

Pellicano and Arneson, who, like Skilling, could have raised
this legal challenge at trial, waived the claim by not raising it
below.  Graf, 610 F.3d at 1166.  If not waived, their sufficiency
challenges are meritless.  Pellicano claims the § 1346 offenses
were based on the undisclosed self dealing theory invalidated by
Skilling.  (POB 52-53).  This is demonstrably false, as the

---

[319]  A representative sampling of the racketeering acts,
including the two involving Stevens, were realleged as
substantive § 1346 violations.  (GER 1492-1540).

[320]  Arneson's Rule 29 motion challenged the sufficiency of
the evidence in support of select elements of the substantive
RICO count.  It did not challenge the sufficiency of the evidence
in support of any racketeering act, the pattern of racketeering,
or any of Arneson's 45 other counts of conviction, including his
17 honest-services-fraud convictions.  (GER 1687-1704).
Pellicano simply joined Arneson's motion.  (GER 2141).

indictment and trial evidence plainly establish that the honest-services fraud was founded on a bribery scheme.

Arneson does not contest that the honest-services claim was founded on the theory that he accepted payment in return for providing Pellicano with confidential law-enforcement information, conceding that it was "the lynchpin for the 'bribery' and 'honest services'-based RICO charge." (AOB 2).[321] Instead, Arneson's sufficiency challenge is premised on the singular claim that his acceptance of monthly $2,500 payments from Pellicano to access-restricted law-enforcement databases to investigate PIA's adversaries and then to provide the confidential information obtained from these inquiries to PIA, as a matter of law, did not constitute bribery as defined either (1) under federal law, which he claims provides the outer boundaries of § 1346, or (2) if _Skilling_ incorporates state-law bribery, under Penal Code § 68. (AOB 10-17).

Section 1346's scope post-_Skilling_ is not defined by the federal bribery or kickback statutes. Instead, as _Skilling_ held, it is defined by the bribery and kickback schemes that served as

---

[321] One element of an honest-services violation is a "specific intent to defraud," which is proven if "the scheme was reasonably calculated to deceive." _Kincaid-Chauncey_, 556 F.3d at 941, 945. The instructions included that element here. (GERT 7571). Because _Skilling_ does not alter that element, by acknowledging that the evidence was sufficient to support each § 1346 finding, Arneson concedes that the evidence established his intent to deceive.

the "core of the pre-McNally case law," which included state-law
bribery.  Skilling, 130 S. Ct. at 2931.  As described earlier,
the underlying conduct on which both the honest-services charges
and bribery racketeering acts were based violated Penal Code
§ 68.  These acts of bribery, which were part of an ongoing
bribery scheme that was co-extensive with the charged honest-
services scheme, satisfy Skilling's requirement that § 1346
violations be founded on bribery.  Moreover, even if this Court
were to conclude that Skilling requires the underlying conduct to
satisfy the federal definition of bribery, this would not render
the evidence insufficient because Arneson's conduct would meet
the definitions of bribery set forth in both § 201(b)(2)(A)
(acceptance of thing of value to influence official acts) and
§ 201(b)(2)(C) (acceptance of thing of value to be induced to do
or omit to do acts in violation of official duty).  As the § 1346
offenses were founded on a bribery scheme, the evidence, which
defendants conceded was sufficient pre-Skilling, remains
sufficient post-Skilling.

> (1)   *Skilling* Does Not Alter the Sufficiency
>       Determination

In Skilling, the Court rejected a request to invalidate the
honest-services statute as being unconstitutionally vague.  130
S. Ct. at 2925.  Skilling held that, properly construed, § 1346
encompassed "the paradigmatic cases of bribes and kickbacks" that

310

served as the "core of the pre-McNally case law"[322] that Congress
sought to "reinstate" when enacting § 1346, but did not extend to
undisclosed self dealing by public or private parties.  Id. at
2929, 2931, 2933.  After expressly acknowledging that § 1346 was
a RICO predicate, Skilling noted that when construed consistently
with its holding, vagueness concerns were not implicated because
"whatever the school of thought concerning the scope and meaning
of § 1346, it has always been plain . . . that bribes and
kickbacks constitute honest services fraud."  Id. at 2933.
Section 1346's scope, therefore, is set by the bribery and
kickback cases that predated its enactment.[323]  United States v.
Bahel, 662 F.3d 610, 632 (2d Cir. 2011) (Skilling holds that
"fraud actionable under Section 1346 is limited to the nature of
the offenses prosecuted in the pre-McNally cases (i.e., bribery
and kickback schemes)").

---

[322]  McNally v. United States, 483 U.S. 350, 360 (1987),
invalidated the intangible rights theory of mail and wire fraud.
Congress enacted § 1346 the following year to reinstate the
theory.  Skilling, 130 S. Ct. at 2927.

[323]  In determining which cases fell within the honest-
services doctrine's "core," Skilling looked to the substance of
the alleged conduct, not the theory of liability asserted.  Thus,
although the theory of liability in McNally was nondisclosure of
conflicting financial interests, the Court characterized McNally
as "a classic kickback scheme: A public official, in exchange for
routing Kentucky's insurance business through a middle-man
company, arranged for that company to share its commissions with
entities in which the official held an interest."  Skilling, 130
S. Ct. at 2932.

(2)  Arneson's Conduct Constitutes Bribery Within
§ 1346's Scope Post-*Skilling*

Arneson's sufficiency challenge, founded on either Skilling
or the rule of lenity, proposes that "federal law defining
bribery and kickbacks [serve as] the outer limits of the reach of
honest services wire fraud."  (AOB 10-11).  Arneson contends that
his conduct -- accepting over $190,000 from Pellicano to violate
multiple legal duties by accessing restricted law-enforcement
databases to provide PIA with confidential information on
hundreds of adversaries -- does not fall within the federal
definition of bribery and therefore cannot serve as the basis of
a § 1346 offense post-Skilling.  (AOB 10-11).  Both arguments are
based on a fundamental misreading of Skilling.

Under Skilling, § 1346's scope incorporates, rather than
excludes, bribery or kickback schemes based on state law.
Although Skilling briefly referenced federal statutes
criminalizing bribes and kickbacks -- which it identified as
"similar crimes" -- when discussing why its holding provided
sufficient clarity for enforcement, it carefully explained that,
while § 1346 partially overlapped with these statutes, its reach
extended beyond them: "the principle federal bribery statute,
§ 201, for example, generally applies only to federal public
officials, so § 1346's application to state and local corruption
and . . . private sector fraud reaches misconduct that might
otherwise go unpunished."  130 S. Ct. at 2933-34, n.45.  Skilling

312

thus rendered explicit what was implicit in its holding[324] that the core pre-McNally bribery and kickback schemes included those that were founded in state law violations.

The Fifth Circuit, in United States v. Teel, 691 F.3d 578, 583-84 (5th Cir. 2012), considered and rejected a claim, similar to Arneson's, that Skilling limited § 1346 to bribery and kickback schemes based on federal, rather than state-law, violations.[325]  In affirming honest-services convictions that were obtained in a trial in which the jury was instructed regarding bribery under Mississippi law, Teel explained "[a] fair reading of Skilling . . . reveals that the Court was establishing a uniform national standard by construing § 1346 to clearly exclude conduct outside of bribery and kickbacks, such as conflict of interest schemes, not to establish federal law as the uniform national standard for the elements of bribery and kickbacks in § 1346 prosecutions." Id. at 584.

---

[324]  For example, the case Skilling identified as the genesis of the intangible rights theory, Shushan v. United States, 117 F.2d 110, 114-15 (5th Cir. 1941), involved mail-fraud charges premised on a bribery scheme in which city government employees' actions were influenced in the lead-up to a city bond measure. Likewise, United States v. Lovett, 811 F.2d 979, 980, 984 (7th Cir. 1987), involved a mail-fraud charge based on a state-law bribery scheme in which a small-town mayor was bribed in connection with awarding a cable television contract.

[325]  The Fifth Circuit's earlier decision affirming the defendants' convictions against claims of instructional error, United States v. Whitfield, 590 F.3d 325 (5th Cir. 2009), was cited approvingly by Skilling, 130 S. Ct. at 2934.

313

The rule of lenity, which is founded in notice, does not support Arneson's claim. <u>Skilling</u> specifically considered and applied the rule of lenity when setting forth its holding that § 1346's scope was limited to the "bribe-and-kickback core of the pre-<u>McNally</u> case law." 130 S. Ct. at 2931, 2934. Where conduct falls within these parameters, there is no basis for applying the rule of lenity because, as <u>Skilling</u> concluded, individuals who engage in such conduct cannot "tenably complain about prosecution on vagueness grounds." <u>Id.</u> Just as it would be "plain as pikestaff that bribes and kickbacks constitute honest services fraud" when premised on a violation of a federal bribery or kickback statute, it would be equally so if founded on a state bribery or kickback violation.[326] <u>Id</u>. at 2933. As <u>Skilling</u> explained, "a prohibition on fraudulently depriving another of one's honest services by accepting bribes or kickbacks does not present a problem [with fair notice or arbitrary enforcement]," the two benchmarks of vagueness doctrine.[327] That is particularly

---

[326] Notably, <u>Skilling</u> did not include bribery or kickbacks of any kind. 130 S. Ct. 2934. Therefore, the Court was addressing the bribery and kickback schemes that historically had served as the basis of honest-services mail and wire fraud violations, including state bribery violations.

[327] While this Court has found the California bribery statutes to be broader than the federal bribery statutes, <u>Frega</u>, 179 F.3d 805-07, the application of § 68 in this case, which Arneson previously acknowledged to be a classic <u>quid</u> <u>pro</u> <u>quo</u> money-for-information exchange (GER 253-78), falls within the scope of federal law defining bribery.

true in this Circuit, as this Court previously upheld against a vagueness challenge honest-services convictions premised on violations of the California bribery statutes, because "it is not unreasonable to conclude that a person of reasonable intelligence would conclude that the accepting of bribes while [serving as a public official] constitutes a criminal offense."[328]  <u>Frega</u>, 179 F.3d at 803.

Section 1346's scope, as stated in <u>Skilling</u>, is limited to those violations of the intangible right of honest services that involve bribery or kickback schemes.  This includes bribery and kickback schemes founded in state law, including the bribery scheme underlying the § 1346 offenses charged here.  Therefore, once this Court finds that the evidence was sufficient for a rational juror to conclude that Arneson's conduct violated § 68, Arneson's sufficiency challenge fails and this Court can affirm the jury's findings as to each of the racketeering acts and counts of conviction that charged Arneson with having committed honest-services fraud.[329]

---

[328]  Similarly, <u>Frega</u>, 179 F.3d at 800, addressed including state-law bribery claims in RICO cases and, quoting <u>United States v. Griffith</u>, 85 F.3d 284, 288 (7th Cir. 1996), found that "bribery of local law-enforcement and government officials is just the sort of corruption connoted by the term 'racketeering' and targeted by various federal statutes."  Therefore, Arneson had ample notice that he could be prosecuted under both § 1346 and § 1962 for acts involving state-law bribery.

[329]  This finding is not dependent on this Court's
(continued...)

Should this Court conclude, as Arneson contends, that Skilling requires that the underlying bribery scheme fall within the definition of bribery under federal law, Arneson's sufficiency challenge still would fail.[330]  Section 201 establishes three paths through which a government official can be guilty of soliciting or accepting a bribe.  Two apply to Arneson's conduct and independently dispose of Arneson's sufficiency challenge.

Most directly on point is § 201(b)(2)(C), which proscribes the corrupt solicitation, receipt or acceptance of a thing of value in return for "being induced to do or omit any act in violation of the official duty" of the officer.  The elements of bribery under § 201(b)(2)(C) are: (1) the defendant was a public official;[331] (2) the defendant solicited, received, or agreed to

_____

[329] (...continued)
determining that the bribery racketeering acts were timely, since independent bribery counts need not be charged alongside § 1346 violations.  Skilling, 130 S. Ct. at 2932 (finding kickback scheme in the general allegations of the § 1346 charge).  The question is simply whether the evidence established that Arneson accepted bribes as part of the § 1346 scheme.

[330]  The federal code defines bribery differently, not only within a given statute but across statutes.  Compare, e.g., § 201 (multiple definitions discussed herein) with § 666 (corrupt solicitation or receipt of thing of value with intent to be influenced in connection with a business, transaction, or series of transactions).  This analysis is confined to § 201, as it is sufficient to dispose of Arneson's arguments.

[331]  The government recognizes, as Skilling, 130 S. Ct. 2934 & n.45, did, that § 201 extends to a statutorily defined universe
(continued...)

316

receive something of value in return for being persuaded to do or
not do an act in violation of the defendant's official duty; and
(3) the defendant acted corruptly, that is, intending to be
influenced to do or omit an act in violation of the defendant's
official duty.  United States v. Leyva, 282 F.3d 623, 625-26 (9th
Cir. 2002).  Arneson's acceptance of large bribes to access and
provide restricted law-enforcement information in violation of
state law and LAPD policies met these elements.  For the same
reasons that this conduct violates § 68, it also would violate
§ 201(b)(1)(C).  United States v. Lanci, 669 F.2d 391, 392-93
(6th Cir. 1982) (affirming § 201(b)(1)(C) conviction of FBI clerk
paid to provide confidential law-enforcement information to
private party); Parks v. United States, 355 F.2d 167, 168 (5th
Cir. 1965) (affirming bribery conviction of air force employee
who sold confidential names of new recruits to insurance
salesman, and finding that the conduct would violate both §
201(b)(1)(C) and § 201(b)(1)(A)).

Arneson's conduct also satisfies the definition of bribery
under 18 U.S.C. § 201(b)(1)(A), which proscribes the corrupt
solicitation, receipt or acceptance of a thing of value in return

---

[331](...continued)
of federal officials.  It does not appear that Arneson's
"definitional" argument properly can be read as requiring that he
satisfy this particular element; nor could it, as Skilling
explicitly stated that § 1346's scope extends beyond the limited
reach of this class of public officials.  Id.

for being influenced in the performance of an official act.  The elements for this offense are identical to those of a § 201(b)(1)(C) offense, except that § 201(b)(1)(C)'s "duty" requirement is replaced by an "official act" requirement in the second and third prongs.[332]  By accepting payment to be influenced in the performance of an official act, Arneson's conduct violated § 201(b)(1)(A).

Arneson cites one case -- Valdes, which interpreted 18 U.S.C. § 201(c), the federal gratuities statute -- to support his claim that his conduct fell outside the federal bribery statute's scope.[333]  But Valdes actually undermines Arneson's sufficiency challenge.

Valdes was a police officer and target of a sting operation who, at the urging of a confidential informant who Valdes believed to be a judge, accessed state law-enforcement databases to acquire the names and addresses of four fictitious individuals

---

[332]  Section 201 defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which by law may be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  18 U.S.C. § 201(a)(3).

[333]  Although not determinative of the actual scope of the offense, Arneson's trial testimony, if believed, shows that he subjectively understood that being paid by Pellicano to access and provide restricted law-enforcement information constituted bribery.  It was the only aspect of the work that Arneson performed for Pellicano for which Arneson purportedly insisted he could never be paid.  (GERT 5360-61).

318

for whom Valdes had been provided license-plate numbers and to check whether there was an outstanding warrant for a fifth fictitious individual.[334]  Valdes, 475 F.3d at 1321-22.  In return, Valdes received $450 and subsequently was charged with three counts of bribery under 18 U.S.C. § 201(b)(1)(A).  However, in what Valdes acknowledged to be a compromise verdict, Valdes was convicted of three counts of receiving an illegal gratuity, in violation of § 201(c), a lesser included offense to § 201(b)(1)(A).  Id. at 1330.  In reversing these convictions, Valdes split sharply (7-5) over whether such conduct constituted an "official act" under § 201(a)(3).  The majority concluded that it did not in light of both the specific facts presented and its belief that the Supreme Court's decision in United States v. Sun-Diamond Growers, 526 U.S. 398 (1999), narrowed the Supreme Court's prior ruling in United States v. Birdsall, 233 U.S. 223, 230-01 (1914), that "every action that is within the range of official duty" is "official action."  Valdes, 475 F.3d at 1323-29.

In addition to being non-controlling, Valdes' holding, which was based on an unduly restrictive assessment of the breadth of conduct constituting an "official act" under § 201, is wrongly decided.  As noted by each of the dissents and in subsequent

---

[334]  The FBI input bogus information as to each of these fictitious identities in the databases Valdes later accessed. Valdes, 475 F.3d at 1321-22.

319

decisions of the Eleventh and Fourth Circuits, the Valdes majority significantly misconstrued Sun-Diamond, as the Supreme Court did not attempt to alter Birdsall's seminal statement regarding official acts.  Id. at 1331, 1340-41.  The Eleventh Circuit expressly rejected Valdes' construction of the phrase "official act," finding that Birdsall's broader definition remained controlling precedent.  United States v. Moore, 525 F.3d 1033, 1040-42 (11th Cir. 2008) (affirming illegal gratuities convictions of corrections officers and finding that acts such as switching shifts, relaying inmates' messages and providing another officer with an office key to facilitate a sexual rendezvous fell "within the broad definition of 'official act' set forth in Birdsall").

Similarly, the Fourth Circuit, finding "simply no indication that Sun Diamond sought to undermine Birdsall's holding," stated that Valdes' foundation -- that "the Sun Diamond Court 'reached its conclusion 'through the definition of [official act]" -- was "a proposition [it was] unwilling to accept."  United States v. Jefferson, 674 F.3d 332, 354 (4th Cir. 2012).  Jefferson found that Sun Diamond "did not rely on the official act definition to the exclusion of the rest of the illegal gratuity statute" but "[r]ather, the Court merely referenced that definition to defeat any potential argument that Sun Diamond's narrowing of an illegal gratuity would be misconstrued as overly inclusive."  Id.  Simply

320

stated, <u>Valdes</u>' limited construction of the scope of official acts encompassed by § 201 is contrary to longstanding controlling precedent and should be rejected.

In addition, <u>Valdes</u> involved the federal anti-gratuities statute, not the federal anti-bribery statute -- a distinction that proved critical to its holding. The <u>Valdes</u> majority carefully and repeatedly explained that § 201's anti-gratuities provisions were narrower than its anti-bribery provisions. <u>Valdes</u>, 475 F.3d at 1322, 1327. As it noted, the federal anti-bribery provisions, unlike the anti-gratuity provisions, extend beyond payments received to influence official acts (§ 201(b)(1)(A)) to an "additional predicate class[]" of payments solicited or accepted to influence an official to violate a lawful and/or official duty (§ 201(b)(1)(C)). <u>Id.</u> at 1327. Importantly, while its holding rested on its assessment of the scope of "official acts" under § 201, the <u>Valdes</u> majority, in an effort to blunt the dissents' searing criticism, expressly acknowledged that "our decision therefore plainly continues to allow bribery prosecutions when, for example, someone offers something of value to induce an official to provide information in violation of an official duty." <u>Id.</u> Moreover, it included § 201's anti-bribery provisions among its list of statutes that were likely violated by Valdes' conduct, expressly conceding that "many such Q[uestions]-and-A[nswers], including perhaps those of

321

[the confidential informant] and Valdes, . . . might qualify as acts in 'violation of the official duty' of the official, for purposes of the bribery provision." Id. at 1324, 1329.

A two-judge concurrence (which was necessary to the Valdes majority), directly stated that Valdes' conduct would have violated § 201(b)(1)(C)'s anti-bribery provision,[335] noting that: (1) the sharp split on the en banc court was "a result of the jury's divided verdict, as well as small but key differences in the textual scope of the bribery and illegal gratuities statute"; (2) "the plain text of the bribery statute actually applies to a broader range of activities -- such as disclosing information -- than does the gratuities statute"; (3) the district court "properly found at the close of evidence that the evidence legally sufficed for the jury to find Valdes guilty of bribery" for having "disclosed information in exchange for money" in "violation of his official duty"; and (4) "after today's decision, just as before today's decision, a covered public official who in violation of an official duty corruptly provides information in return for something of value commits a federal crime: bribery." Id. at 1330-31 (Kavanaugh, J., concurring). The very case on which Arneson relies contradicts his contention

---

[335] Thus, a majority of the en banc D.C. Circuit found that the conduct at issue was bribery.

that applying the anti-bribery statute to his conduct would be an "enormous expansion" of the statute.[336]

Finally, Arneson's conduct would satisfy even <u>Valdes</u>'s erroneously restrictive construction of official acts under § 201(a)(3).  The <u>Valdes</u> majority, in seeking to define parameters between conduct that would meet its definition of official conduct and conduct that would not, made a series of factual distinctions that were the product of having a defendant whose conduct occurred in the context of a wholly orchestrated sting operation.

Principally, the <u>Valdes</u> majority found that the five database inquires conducted by Valdes did not constitute investigative action, which it acknowledged would be deemed an official act.  While it is unclear what evidence, if any, was presented on this issue in <u>Valdes</u>, here the trial evidence established that Arneson's NCIC and CLETS inquiries constituted investigative action.  <u>See</u> Part III.A.1.b, <u>supra</u>.  The <u>Valdes</u> majority also found that accepting payment to "initiate, accelerate, retard, conclude or skew an investigation is

---

[336]  Arneson cites <u>Valdes</u>' discussion regarding "moonlighting" and "misuse of government resources."  (AOB 17).  This discussion occurred in the context of its flawed analysis as to whether the conduct at issue satisfied the legal definition of an official act under § 201(a)(3).  <u>Valdes</u>, 475 F.3d at 1326.  As <u>Valdes</u> simultaneously found that the conduct either did or could fall within the scope of § 201(b)(1)(C), references to this language, at a minimum, must be confined solely to a § 201(b)(1)(A) analysis.

unquestionably conduct prohibited by § 201" but was conduct absent in that case.  Id. at 1326.  It was not absent, here, however.  Whether it was Arneson, at Pellicano's beckoning, conducting a warrant check and then directing Theohar's arrest on a four-year-old warrant,[337] or Arneson providing Pellicano with confidential information from restricted-access law-enforcement databases on witnesses, victims, and victim's family members to be used by defendants in ongoing criminal proceedings, such as the Jones rape prosecutions, the Kalta sexual assault case, the Cohn fraud case, or the Hoss manslaughter case, Arneson's conduct was designed to "initiate, accelerate, retard, conclude or skew an investigation."[338]  Id.

Furthermore, Valdes, 475 F.3d at 1326, acknowledged that conduct that caused or squelched government investigation would be sufficient to qualify as an official act under § 201(a)(3), but found such conduct not present in its manufactured sting

---

[337]  Pellicano also orchestrated a criminal threats case against PIA target Aaron Russo's son Max, by Stevens, who conducted criminal-history inquiries for Pellicano in connection with filing the complaint.  (GERT 3656-57, 4575-76, 4581-82).

[338]  Stevens testified that the database inquiries were a regular step in the investigative process that, based on the criminal-history of the complainant, sometimes was determinative of whether a case would be opened or closed.  (GERT 4614-15).  Arneson testified, albeit perjuriously, that by conducting restricted-access-database inquiries, which he claimed to have done for both law enforcement and PIA, he was able to start and finish an investigation into the "party girls" referenced by Pellicano, who really were identified victims and witnesses in the Jones rape prosecution.  (GERT 4386-89).

operation.  Again, these concerns do not exist here.  Arneson repeatedly acted in matters that were being pursued by the LAPD and other law-enforcement agencies, as well as in civil proceedings over criminal and quasi-criminal acts that certainly could have, and occasionally did, require law-enforcement intervention.  That the information that Arneson obtained from accessing these restricted law-enforcement databases could either cause or squelch a government investigation was conceded by Arneson, falsely testified that he had conducted database inquiries on individuals like Busch, Finn, Rusconi, and the Jones case victims as part of his investigative duties.  (GERT 5455-60).

In return for monthly payments of $2,500 (supplemented by cash payments), Arneson agreed to violate legal and professional duties and to conduct official acts by accessing restricted law-enforcement databases to obtain, and give PIA, confidential information on PIA's adversaries.  Arneson's conduct represents a

classic example of bribery under both federal and state law.[339]
Arneson's sufficiency challenge, therefore, fails.

### iii. Pellicano's Fictional Sufficiency Challenge[340]

If not waived, Pellicano's sufficiency challenge can be
discarded as meritless. Pellicano, in a misguided attempt to
pigeonhole the honest-services conduct into the category of
undisclosed self-dealing that Skilling considered outside
§ 1346's scope, argues the jury's § 1346 findings must be set
aside because the government's closing argument purportedly
consisted of "boundless intangible descriptions of something

---

[339] Arneson claimed he provided confidential law-enforcement
information to Pellicano not for money, but for source
information for Arneson's LAPD investigations, in what Arneson
called a "quid pro quo" exchange. (GERT 15609). This statement
-- if viewed as an admission -- likely suffices by itself to
support the finding that the honest-services violations were
founded on a bribery scheme. Given the jury's verdict as to the
bribery counts, the jury obviously discredited Arneson's
testimony on this issue. However, the jury was certainly free to
accept Arneson's admission of the quid pro quo relationship's
existence and to credit the overwhelming evidence that the scheme
involved payments, not investigative tips.

[340] Pellicano's opening brief includes a general joinder of
Arneson's RICO-based arguments. (POB 59). This joinder is
insufficient because prejudice and sufficiency arguments are
fact-specific as to each defendant. This is particularly true
here, given that Arneson's arguments focus on the interpretation
and the application of bribery statutes, whose applications
differ based on whether the defendant has given or received the
bribe.

called 'honest services'" that did not include bribery.[341]  (POB
54).  This is demonstrably false.

As acknowledged by Arneson, the "lynchpin" of the bribery
and honest-services charges always has been the theory that
Pellicano paid Arneson and Stevens to investigate PIA's
adversaries by accessing restricted law-enforcement databases to
acquire confidential information on PIA's investigative targets
for PIA's use.  The evidence established that this conduct was
bribery.  Pellicano's claim is meritless and must be rejected.

> b.  The Jury Instructions Do Not Affect the Validity
>      of the Jury's § 1346 Findings

Pellicano and Arneson failed to object to the § 1346
instructions on the grounds that they needed to advise the jury
that an honest-services violation had to be predicated on a

---

[341]  Pellicano criticizes the government's closing argument
for referencing the "intangible rights" of the LAPD and the
citizens of Los Angeles to have their police officers provide
honest services.  (POB 53-54).  It is Pellicano who is off-base,
however.  Skilling did not invalidate § 1346's intangible rights
theory; it simply limited intangible-rights violations to
instances involving bribery or kickbacks, as was the case here.
The government remains obligated to establish that the defendant
participated in a scheme to deprive a designated victim of the
right to honest services and that the defendant acted with the
intent to defraud that victim of this right.  United States v.
Rodrigues, 678 F.3d 693, 696 (9th Cir. 2012).  The government's
argument was proper pre-Skilling and remains proper post-
Skilling.  Moreover, Pellicano fundamentally misses the point.
As Skilling makes clear, whether an invalid theory was pleaded,
argued, or instructed is not the dispositive issue.  Instead, the
question is whether there was sufficient evidence of a bribery or
kickback scheme (or a money and property theory) to uphold the
§ 1346 violation.  United States v. Wilkes, 662 F.3d 524, 544
(9th Cir. 2011).  Here, there was.

bribery or kickback scheme as the Supreme Court subsequently found in Skilling. Both now claim instructional error, however, on this ground. (POB 52; AOB 17). This claim is reviewed for plain error, and fails because the error was not prejudicial. Through its findings that Pellicano paid and Arneson accepted bribes -- which were based on the same underlying conduct as its § 1346 findings -- there can be no question that the jury's findings would have been the same had it been instructed in accordance with Skilling. While the jury's findings on the bribery offenses resolves the question of prejudice, a full review of the record independently confirms this fact. Given that the Skilling error was not prejudicial, Pellicano and Arneson's substantial rights were not affected and their claims fail.

Arneson also contends that the § 1346 instructions should have included a good-faith advisement. (AOB 19). Arneson invited any such error and, thus, this claim is waived. Regardless, the court did not plainly abuse its discretion in formulating the § 1346 instructions, as this Court repeatedly has found that a good-faith instruction need not be given provided that the specific intent requirement is accurately and adequately addressed in the instructions. Such was the case here. Post-Skilling, the instruction stands on even firmer ground, since Arneson's defense to the bribery scheme (on which the § 1346

328

offenses were founded) contended not good faith but complete factual innocence: Arneson claimed never to have been paid to access-restricted law-enforcement databases for Pellicano. Thus, the court accurately and adequately instructed the jury as to the requisite intent, and no good-faith instruction was warranted.

### (1)  Standard of Review

Pellicano's and Arneson's unpreserved claim of Skilling error receives, at most, plain error review. Wilkes, 662 F.3d at 544; United States v. Pelisamen, 641 F.3d 399, 404 (9th Cir. 2011).[342] For the inclusion of a nondisclosure theory to have both affected "'affected the outcome of the [trial] court proceedings'" (prong three of plain-error), and seriously affected the fairness, integrity or public reputation of judicial proceedings (prong four of plain-error), Pelisamen, 641 F.3d at 406-07, Pellicano and Arneson must establish that "a rational jury would [not] have found [them] guilty absent the error," Neder v. United States, 527 U.S. 1, 17-18 (1999).

---

[342]  The § 1346 instructions, which Pellicano's counsel recently conceded were accurate when given (GERT 14064), did not advise the jury that § 1346 offenses must be founded on a bribery or kickback scheme because that was not the law at the time. The first two prongs of plain-error review are satisfied because the court's instruction was broad enough to encompass the nondisclosure theory invalidated by Skilling, and therefore, is plainly error at the time of appeal. Johnson v. United States, 520 U.S. 461, 467-68 (1997); Pelisamen, 641 F.3d at 405. The briefing, therefore, will be limited to an analysis of the last two prongs of plain-error review.

Arneson's challenge to the court's formulation of the honest-services instructions, including its decision not to add a good-faith instruction, ordinarily would be reviewed for abuse of discretion. United States v. Sarno, 73 F.3d 1470, 1487 (9th Cir. 1995). Arneson, however, invited the errors about which he complains; therefore, the claims are waived. Even if not waived, they would be reviewed only for whether the court plainly abused its discretion. United States v. Vincent, 758 F.2d 379, 380, 383 (9th Cir. 1985).

> (2) Pellicano's and Arneson's Substantial Rights Were Not Affected Because the *Skilling* Error Was Not Prejudicial

> (a) *Skilling* Instructional Error

The Supreme Court repeatedly has held that instructional error, including Skilling error, does not require reversal on an affected count unless the error is prejudicial.[343] Skilling, 130 S. Ct. at 2934 (remanding for harmless-error review in accordance with Hedgepeth v. Pulido, 555 U.S. 57 (2008)); Rodrigues, 678 F.3d 695-702 (applying harmless error review to Skilling claim).

---

[343] That Skilling error does not require reversal is demonstrated by Skilling itself. Even though the § 1346 evidence presented to the jury rested exclusively on the undisclosed self-dealing theory invalidated by the Supreme Court, the Fifth Circuit affirmed all of Skilling's convictions. United States v. Skilling, 638 F.3d 480, 483-87 (5th Cir. 2011). This included the conspiracy charge that alleged the § 1346 violation as part of a multi-object conspiracy because the record contained proof beyond a reasonable doubt to support the jury's verdicts and, therefore, the instructional error at trial was harmless. Id.

Pulido, 555 U.S. at 58,[344] holds that instructional error arising
in the context of multiple theories of guilt, like other
instructional errors (e.g., omitting or misstating an element of
the offense), does not vitiate all of the jury's findings and
therefore is subject to harmless-error review.[345]  Under Pulido,
"absolute certainty" is not required to uphold a general verdict
that could have been based on either a valid or invalid theory.
Id. at 59-60, 62.  Rather, the conviction "remain[s] valid if it
is 'not open to reasonable doubt that a reasonable jury would
have convicted'" the defendant on the valid theory.  Pelisamen,
641 F.3d at 406;  Neder, 527 U.S. at 19 (where instructions omit
element of offense, harmless-error test examines "whether the
jury verdict would have been the same absent the error").

This Court, in conducting harmless-error review in cases
involving Skilling error, effectively employs a two-step
approach.  The first step involves determining whether there
exist independent jury findings involving bribery or kickbacks
that establish that the Skilling error was not prejudicial.
Wilkes, 662 F.3d at 544 (verdict on independently charged § 201

---

[344]  Pulido's harmless error analysis governs cases on direct
review.  Skilling, 130 S. Ct. at 2934 n.46.

[345]  Whether Skilling error is called alternative-theory
error, misstatement of an element, or omission of an element is
immaterial because Pulido makes all three types of error subject
to the same harmlessness standard of review.  Pulido, 555 U.S. at
60-61.

offense establishes that the verdict would have remained
unchanged had the § 1346 offense limited the definition of honest
services to matters involving bribery); Pelisamen, 641 F.3d at
406-07 (noting that alternate-theory error is harmless where jury
necessarily found facts establishing guilt on a valid theory);
United States v. Harris, 488 Fed. Appx. 216, 218 (9th Cir. 2012)
(affirming honest-services counts where scheme involved bribery
and kickbacks that also were charged separately and for which the
jury returned guilty verdicts); Jefferson, 674 F.3d at 362
(freestanding bribery charges based on same underlying offense
conduct establishes harmlessness of error).  Second, if there are
no jury findings that address the underlying bribery schemes,
this Court conducts a full examination of the record to determine
whether a rational juror would have returned a guilty verdict
absent the error.  Rodrigues, 678 F.3d at 695.

      (b)   The Jury's Bribery Findings Establish
            the *Skilling* Error's Harmlessness

Here, the Skilling error was not prejudicial.  This Court
need look no further than the verdicts as to Pellicano and
Arneson to conclusively resolve this issue.  The jury expressly
found that Pellicano and Arneson engaged in an ongoing bribery
scheme involving conduct that was co-extensive with the conduct
that served as the basis of the honest-services charges.  (GSER
109-43).  It therefore is "not open to reasonable doubt that a
reasonable jury would have convicted" them of the honest-

services-fraud offenses founded on this bribery scheme had it been instructed in accordance with Skilling. Pelisamen, 641 F.3d at 406. Thus, Pellicano's and Arneson's substantial rights were not affected. Wilkes, 662 F.3d at 544.

(c)  The Record Confirms the Lack of Prejudice

While the jury's bribery findings, standing alone, dispositively establish the lack of prejudice, full consideration of the record reaffirms this fact. At every stage in the proceedings, the government pursued the theory, which it supported with overwhelming evidence, that Pellicano and Arneson engaged in a classic bribery scheme whereby Pellicano paid and Arneson accepted bribes so that Arneson, a sworn LAPD officer, would violate his duty of honest services by accessing restricted law-enforcement databases to acquire confidential information on PIA's investigative targets, in contravention of both existing law and Arneson's established duties as an LAPD officer. It was, as Arneson acknowledges, the lynchpin of both the honest-services and bribery charges.

The indictment addressed at considerable length the interwoven nature of the conduct comprising the honest-services and bribery offenses. For example, the introductory paragraphs to the RICO and RICO-conspiracy charges alleged that: (1) Arneson was a sworn officer of the LAPD who owed a duty of honest services to the LAPD, which included faithfully discharging the

333

obligations of this office and upholding the LAPD's standards of conduct; (2) LAPD had restricted access to federal and state law-enforcement databases that could be accessed by officers, such as Arneson, exclusively in furtherance of official investigative duties; (3) Pellicano "paid bribes to corrupt public officials, including defendant Arneson . . . for purposes of obtaining confidential and proprietary information regarding the Enterprise's investigative targets"; (4) Pellicano paid Arneson over $190,000 from 1997 through 2002 for obtaining and providing confidential criminal-history and other law-enforcement information on PIA's investigative targets; and (5) Arneson, in return for these bribe payments, regularly provided Pellicano with this confidential information in violation of his duty of honest services.  (GER 1493-94, 1498-1500).

When setting forth the honest-services offenses, the indictment stated that "Pellicano and Arneson . . . participated in a scheme to defraud and deprive the LAPD and the citizens of the City of Los Angeles of their right to defendant Arneson's honest services by using . . . Arneson's authority and official position as an LAPD officer to enrich themselves through payments in return for obtaining and providing criminal-history and other law-enforcement information as described [in a preceding paragraph that set forth the bribe payments Pellicano made to Arneson for this information]."  (Id.).  It then set forth 44

334

separate instances, with separate victims, in which Arneson
accessed NCIC to acquire confidential information on PIA's
investigative targets.[346]  The bribery charges also expressly tied
Pellicano's payment and Arneson's receipt of bribes to Arneson's
illicit database inquiries.  See Part IV.H.3, supra.  The
indictment therefore plainly set forth a bribery scheme that was
co-extensive with, and integrally part of, the honest-services
scheme.  United States v. Awad, 551 F.3d 930, 936 (9th Cir. 2009)
("An indictment must be read in its entirety and construed with
common sense and practicality.").

Trial evidence and argument also overwhelmingly established
that the § 1346 scheme was founded in bribery.  The government's
opening statement explained that the enterprise secured premium
profits through its illegal acquisition and use of confidential
information, including information from restricted law-
enforcement databases, and that Arneson, "Pellicano's paid source

---

[346]  The indictment alleged and the jury found two additional
racketeering acts and substantive counts against Pellicano based
on database inquiries by Stevens.  (GER 1492-1540; GSER 109-29).
It was undisputed that Pellicano bribed Stevens, paying him over
$10,000. (GERT 4571, 4575-77, 580-84, 4586, 4596, 4600, 4621-22).
The jury's findings on these § 1346 charges alone establish
beyond a reasonable doubt that the Stevens-based § 1346 offenses
were founded in bribery and must be affirmed.  They also add to
the overwhelming evidence that the Arneson-based § 1346 offenses
were founded on bribery.  Furthermore, affirmance of the Stevens-
based racketeering acts provides the requisite pattern of
racketeering as to Pellicano which, in turn, allows affirmance of
Pellicano's § 1962(c) and § 1962(d) convictions and Arneson's and
Turner's § 1962(d) convictions.

within the LAPD," received over $180,000 from Pellicano to illicitly access these databases to conduct thousands of inquiries for PIA.  (GERT 484-86, 489-91, 505-06, 515).  The government further explained that "the same conduct might violate multiple laws," one of which was bribery, which was based on the "2,500 checks" that "were paid so that defendant Arneson would be ready, willing and able to conduct those criminal history and DMV checks when defendant Pellicano needed the information."  (GERT 501).

Trial evidence conclusively proved Pellicano's and Arneson's ongoing bribery scheme.  See Part IV.H.3, supra.

The government's closing argument again emphasized that the Pellicano-Arneson bribery scheme was the foundation of the honest-services violations.[347]  When beginning its discussion of the § 1346 offenses, the government discussed that the LAPD and the citizens of Los Angeles had the right to expect police officers to act in accordance with the law "without being on the take."  (GERT 7628).  Seconds later, the government explained how "the evidence has overwhelmingly shown" that Arneson is "a corrupt cop, a dishonest cop; a man who sold his badge for $2,500 a month."  (GERT 7629).  When discussing the § 1346 offense's victims, the government said "defendant Arneson ran [them]

---

[347]  The government's argument also included references to the invalidated "conflict of interest" theory.

336

through confidential police databases -- not because they had
done anything wrong . . . . but because . . . Pellicano wanted
dirt and . . . Arneson was on the payroll." (GERT 7630).
Describing the scheme to deprive, the government explained that
to secure high-paying clients "Pellicano needed access to
information. And one of the ways he got that information was by
having dirty cops on the payroll. He knew it was illegal."
Arneson, the government notes, was "kind of like an ATM . . . you
put in [PIA's request for information] and out it spits DMV and
criminal-history information. Every once in a while I suppose
you have to make a deposit." (GERT 7631-32, 7634).

Discussing the conduct underlying the bribery offenses, the
government continued to connect the payments to Arneson's
accessing of the restricted databases. For example, the
government forcefully argued that the evidence established what

> those monthly checks to defendant were for. They were
> precisely the same thing as the cash payments to . . .
> Stevens were for. For information from confidential
> databases. You think Mark Arneson spent hours upon
> hours of his time using law enforcement databases for
> illegitimate purposes and providing the information to
> defendant Pellicano, knowingly violated the law and
> LAPD policy day after day for years, risked losing his
> job and going to prison as a freebie[?]

(GERT 7707). Arguing that "those checks, just like the large
envelopes of cash that were regularly paid on top of them, were
bribes to a corrupt police officer . . . paid for the purpose of
keeping him on call to do defendant Pellicano's bidding by

337

obtaining and turning over confidential law enforcement information on any one at any time," the government concluded by addressing specific database inquiries conducted after particular payments. (GERT 7711-13).

In sum, the evidence and argument at trial overwhelmingly demonstrated that the § 1346 offenses were founded on an ongoing bribery scheme in which Pellicano paid and Arneson accepted bribes so Arneson would violate his duty of honest services, by accessing restricted law-enforcement databases to obtain for and provide to Pellicano, confidential information on PIA's targets. As reflected by the jury's findings on bribery charges that were predicated on the same underlying conduct and a full review of the record, there is no reasonable doubt that the jury, which found Pellicano and Arneson committed each of the § 1346 offenses charged, would not have returned identical findings had the honest-services instructions been limited to bribery and kickbacks. As neither Pellicano nor Arneson can show their substantial rights have been affected, the jury's honest-services findings -- like the jury's findings in Skilling, Pelisamen, Wilkes, Rodrigues, and Jefferson, among others, must be affirmed.[348]

---

[348] United States v. Garrido, Nos. 06-50717+, 2013 WL 1501877 (9th Cir. Apr. 15, 2013), does not alter the result. There, "[t]he vast majority of the [indictment's] allegations" under § 1346 addressed "only an undisclosed conflict of interest"
(continued...)

(d)   Arneson Waived Any Claim to a Good-Faith
      Instruction, Which Was Unwarranted
      Anyway[349]

Arneson claims that the court abused its discretion by not
supplementing the honest-services fraud instructions with a good-
faith instruction.  (AOB 20).  Arneson, however, waived this
claim.  Even absent waiver, Arneson's claim fails because the
court did not plainly abuse its discretion by not giving the
instruction.

This Court's "case law is well settled that a criminal
defendant has 'no right' to any good faith instruction when the
jury has been adequately instructed with regard to the intent
required to be found guilty of the crime charged, notwithstanding
the normal rules governing 'theory of defense' requests."  E.g.,
Shipsey, 363 F.3d at 967; Frega, 179 F.3d at 804 (applying
principle to honest-services charges).  The court properly
exercised its discretion in not supplementing the § 1346
instruction with a good-faith instruction.  Considered as a

---

[348](...continued)
theory.  Id. at *7.  Here, by contrast, there were no
undisclosed-conflict allegations, and the indictment largely
addressed bribes.  Beyond that, here substantive bribery
convictions and findings were a major part of the jury's verdict,
leaving no doubt that the jury found bribery acts that would
compel a guilty verdict on the honest-services charge.

[349]   This argument applies exclusively to Arneson even if
this Court were to find Pellicano's joinder adequate because the
instruction that Arneson proposed but then affirmatively
acquiesced to the court not giving was limited to him.

339

whole, the instructions accurately and adequately defined the specific intent under § 1346.  In fact, the instructions included, almost verbatim, a significant portion of Arneson's proposed instruction, explained that he needed to possess the intent to deprive the LAPD and the citizens of Los Angeles of their right to honest services, and further specified that this required the intent to deceive.[350]  (GER 1227-52; GERT 7383, 7426-27).  No supplemental good-faith instruction was necessary.[351]  Shipsey, 363 F.3d at 967 (no good-faith instruction required where court correctly described the "intent to defraud" element of mail and wire fraud as the "intent to deceive or cheat").

Contrary to Arneson's assertion, the jury's note about this instruction changes nothing.  The note stated that there was a single juror who disagreed with the law, despite being presented with the evidence and the instructions, and asked for an additional definition of intent.  (GERT 8092-95, 8098).  This does not reflect juror confusion over the instruction but rather juror frustration with a fellow juror's recalcitrance.

---

[350]  Arneson does not challenge the accuracy of the specific intent instruction, only its adequacy.  (AOB 19-21).

[351]  Arneson forcefully emphasized good faith throughout his closing argument, including when he stated, "intent to defraud? You decide that.  If you think that Mr. Arneson had a reasonable belief that he was serving a larger law enforcement purpose, then he is not guilty of honest services wire fraud because you evaluate his state of mind."  (GERT 7823, 7834, 7837-43).

The court, upon receiving this note, requested that the parties submit proposed responses. (GERT 8098). Arneson's proposal was that the jury should be told to return to the definition of intent set forth in the instructions and to use the common meaning of any unclear term or phrase when reviewing that definition. (JER 4133). Notably, despite having initially suggested to the court that a good-faith instruction might be warranted (which was the genesis of the court's statement that a good-faith instruction "might well be at least part of the response" (GERT 8095)), Arneson's submission stated that the "concept of good faith should be included" only if the court "believes any additional instruction on intent should be given." (JER 4134).

The court did not provide any additional instruction on intent and instead effectively adopted Arneson's proposal to refer the jury back to the instructions already given. (JER 4134, 4136). Consistent with Arneson's proposal, the court did not provide a good-faith instruction. (Id.). Arneson's counsel reviewed the proposed instruction and said it was "appropriate." (JER 4134). If there was error in failing to provide a good-faith instruction at that time, Arneson invited it, which waived his present claim. United States v. Budziak, 697 F.3d 1105, 1110 (9th Cir. 2012) (instructional error is "'invited' and unreviewable" "if a defendant 'induced or caused the error,' or

341

. . . 'intentionally relinquished or abandoned a known right.'");
United States v. Laurienti, 611 F.3d 520, 543-45 (9th Cir. 2010)
(instructional error claim waived where defendant initially
objected to government's instruction, later acquiesced to it, and
then attempted to challenge it on appeal).

Arneson's claim that "the nature of his defense" mandated
inclusion of a good-faith instruction is specious.  (AOB 20).
Good-faith defenses are premised on the defendant's asserted lack
of intent to commit the offense based on an honestly held belief.
To the extent that Arneson's good-faith defense differed
materially from others, it was in its disingenuousness.  There is
a fundamental distinction between having a good-faith belief that
your conduct is lawful (e.g., based upon attorney advice) and, as
Arneson concedes (AOB 20), knowing that your conduct is unlawful
and violates your duties and engaging in it anyway based on a
purported independently formed belief that the action undertaken
advanced what Arneson professed to be "the good of a greater
cause" of law enforcement.[352]  (GERT 5492, 5496-97).  In this

---

[352] Arneson never documented Pellicano as a source, advised
anyone at LAPD that Pellicano was acting in this capacity, or
documented any of the alleged tips provided by Pellicano, even
though he would have been required to do so if the information
was relied upon for any official law-enforcement filing.  (GERT
5501-03).  Instead, when asked by an LAPD Lieutenant regarding
his relationship with Pellicano after Arneson's contact
information was discovered at PIA, Arneson wrote that "Pellicano,
at no time provided insight on any case involving criminal
activity" and that, during their "sporadic contact," "no criminal
                                                    (continued...)

342

respect, Arneson, whose defense theory was built on acknowledged criminal violations and the intent to deceive both the LAPD and the victims of his database inquiries, was not advancing a good-faith claim at all, but rather a highly imperfect justification defense. There was nothing about this claim that warranted supplementing the § 1346 instruction with a good-faith instruction.

Moreover, while the court's decision was fully appropriate when made, it is even more sound now. Arneson contends that, post-<u>Skilling</u>, the "all-important point" is whether he possessed a good-faith belief "that what he was doing was not bribery." (AOB 20). Arneson, however, never requested a good-faith instruction for the bribery charges, which would have been irreconcilable with his defense theory that he had never accepted any money whatsoever from Pellicano for accessing law-enforcement databases.[353] (GERT 5360-61, 5368-69, 5371-73, 5386). Likewise, the definition of intent in the bribery instructions -- "corrupt intent" which the instructions further defined as occurring "when he or she acts to wrongfully gain a financial or other advantage

---

[352](...continued)
cases or issues involving law enforcement were reviewed or discussed." (GERT 5496-97, 5499-5500). Conveniently, Arneson testified at trial that the lie was not to be found in his present testimony but rather his statement to the Lieutenant that Pellicano never served as a source. (GERT 5498-5500).

[353] Arneson limited the request to the honest-services and computer-fraud offenses. (GER 1227-52).

for himself or someone else" –– was wholly incompatible with good faith.  (GERT 7577).  Given that (1) there was no good-faith defense theory to the bribery offense conduct, (2) Arneson never requested a good-faith instruction on the bribery counts, and (3) the bribery instructions fully set forth the requisite intent, the court did not plainly abuse its discretion by not sua sponte supplementing its bribery instructions with a good-faith instruction.  <u>Sarno</u>, 73 F.3d at 1488 (instruction not warranted when no factual foundation supporting the theory exists within in the record).

     5.   <u>The RICO Counts Should Stand Even If Select Racketeering Acts Are Insufficient</u>

     Pellicano, Arneson, and Turner argue that their RICO and RICO-conspiracy convictions should be vacated if all the racketeering acts are dismissed on insufficiency grounds. (POB 57; TOB 27).  While the government agrees, the same would not be true if only select racketeering acts fail.  Even if this Court were to dismiss a particular class of racketeering act, defendants' RICO and RICO-conspiracy convictions should be affirmed because defendants have not carried their burden of establishing spillover prejudice.  (AOB 25).

     a.   <u>Standard of Review</u>

     Defendants bear the high burden of establishing prejudicial spillover, which will only be met upon a showing of "prejudice so pervasive that a miscarriage of justice looms."  <u>United States v.</u>

344

Lazarenko, 564 F.3d 1026, 1043 (9th Cir. 2009); accord United
States v. Vebeliunas, 76 F.3d 1283, 1293 (2d Cir. 1996) (quoted
with approval in Lazarenko; defendant must show "compelling
prejudice").

       b.   The Requisite Pattern of Racketeering Exists

           (1)   Substantive RICO charge

Under § 1962(c), two racketeering acts are necessary to
establish the requisite pattern of racketeering activity.
Fernandez, 388 F.3d at 1221 n.11.  The dismissal of racketeering
acts on sufficiency grounds does not undermine a RICO charge
unless fewer than two racketeering acts remain.  United States v.
Coonan, 938 F.2d 1553, 1565 (2d Cir. 1991) (dismissal of
racketeering act involving murder would not require RICO charge
to be set aside as six additional racketeering acts would
remain); Brennan v. United States, 867 F.2d 111, 114-15 (2d Cir.
1989) (striking § 1341 racketeering acts but affirming RICO count
because there remained sufficient racketeering acts to establish
the requisite pattern).

The jury found Pellicano committed the 46 charged honest-
services racketeering acts, 18 of the 23 charged identity-theft
racketeering acts, and each of the 10 charged bribery
racketeering acts.  (GERT 14255-72; GSER 109-29).  The jury found
Arneson committed each of the 44 charged honest-services
racketeering acts, 7 of the 12 charged identity-theft

345

racketeering acts, and each of the 10 charged bribery
racketeering acts.  (GERT 14272-85; GSER 130-43).  The jury found
Turner committed each of the 5 charged identity-theft
racketeering acts.  (GERT 14285-93; GSER 144-50).

Provided that this Court finds the evidence sufficient to
support any one of these three classes of racketeering acts,
§ 1962(c)'s requisite pattern of racketeering activity will
remain established as to both Pellicano and Arneson.  As to
Turner, the government agrees that his substantive RICO
conviction must be vacated if the identity-theft racketeering
acts are insufficiently supported.  However, for the reasons
previously stated, the evidence was sufficient as to each of the
types of racketeering activity (including identity theft) and,
thus, the requisite pattern of racketeering exists under
§ 1962(c) Pellicano, Arneson, and Turner.

(2)  RICO conspiracy

Should the Court find the requisite pattern under § 1962(c),
then it exists under § 1962(d) as well.  Tille, 729 F.2d at 619
("Proof of an agreement the objective of which is a substantive
violation of RICO (such as conducting the affairs through a
pattern of racketeering activity) is sufficient to establish a
violation of section 1962(d)").  Under § 1962(d), however, no
racketeering act need be pleaded or proved.  Salinas, 552 U.S. at
65.  Instead, to satisfy the pattern element, a defendant must

346

only have agreed that an associate would commit two racketeering acts during the course of the conspiracy.  Id.  Therefore, provided that the requisite pattern of racketeering activity has been established under § 1962(c) as to Pellicano, Arneson, or Turner, the pattern requirement would be satisfied under § 1962(d) for their co-conspirators as well.[354]

For example, even if this Court were to dismiss the § 1028 racketeering acts that are necessary to uphold Turner's § 1962(c) conviction, Turner would be liable under § 1962(d) for having conspired to commit RICO with Pellicano and Arneson, with the understanding that one of these individuals would commit two or more racketeering acts, which they did.  Id. at 63-64 (upholding RICO-conspiracy conviction of a sheriff's deputy who did not commit any racketeering acts but facilitated his boss's kickback scheme because a person may be liable for a conspiracy even though he was incapable of committing the substantive offense and).

> c.  Defendants Have Failed To Show Spillover Prejudice From Any Dismissed Racketeering Acts

Under the prejudicial-spillover doctrine, invalidated racketeering acts can require vacating a RICO conviction if the invalidated acts poisoned the jury's consideration of the

---

[354]  If the bribery racketeering acts are dismissed on statute of limitations grounds, defendants § 1962(d) convictions should stand.

remaining acts.  United States v. Delano, 55 F.3d 720, 728-29 (2d Cir. 1995) (despite having two valid racketeering acts that would establish the requisite pattern, prejudicial spillover from dismissal of seventeen extortion-based racketeering acts, which represented the core of the government's RICO case, required that conviction be vacated).  Defendants have fallen well short of their burden of establishing the pervasive compelling prejudice required to establish prejudicial spillover.  Instead, they cursorily claim that invalidation of a single class of racketeering act would render speculative how the jury would have viewed the case.  (AOB 24-25).

In Lazarenko, this Court found no abuse of discretion in denying a new-trial motion based on prejudicial spillover after dismissing all counts relating to two of the five charged schemes, as well as additional counts where the charged transfers did not represent proceeds of the remaining schemes.  564 F.3d at 1030-33, 1044.  This Court concluded that, although some of the evidence would have been inadmissible without the dismissed counts, there was strong evidence of fraud and the fact "[t]hat the government was not 100% successful does not undermine the evidence that was airtight."  Id. at 1045.  Similarly, with respect to additional counts that Lazarenko reversed on appeal, this Court found no prejudicial spillover.  Id. at 1047.

348

Lazarenko identified six factors to consider when assessing whether a defendant has carried his burden of establishing spillover prejudice: (1) how much now-inadmissible evidence was admitted at the underlying trial; (2) whether the evidence was sufficiently inflammatory to cause the jury to convict on the remaining counts; (3) the degree of overlap and similarity between the dismissed and remaining counts; (4) a general assessment of the strength of the government's case on the remaining counts; (5) whether the trial court diligently instructed the jury; and (6) whether there is an indication, like the return of selective verdicts, indicating that the jury compartmentalized the evidence. Id. at 1044-45. Defendants cite Lazarenko but they do not address its factors, all of which counsel against a finding spillover prejudice.

The first three Lazarenko factors can be considered together. As defendants have noted throughout their briefs, the racketeering acts all arise from the same basic conduct: Pellicano's payment of law-enforcement and phone-company employees in return for their agreement to access-restricted databases to acquire confidential information on PIA's adversaries. (POB 50-51; AOB 1-2, 12). Therefore, even if one class of racketeering act were stricken, the evidence still would be admissible to support the remaining classes of racketeering acts and as evidence of the enterprise, defendants' association

349

with it, the conduct of its affairs, and (at least with the NCIC runs) its interstate nexus.  <u>Connolly</u>, 341 F.3d at 27 (evidence of racketeering acts found by the jury not to have been proved still probative as to enterprise).  Thus, the dismissal of racketeering acts would not create the scenario where the jury was exposed to massive amounts of inadmissable and/or prejudicial evidence that would raise the specter of clear prejudice.

With respect to the remaining racketeering acts, the evidence was overwhelming.  Furthermore, the trial court carefully instructed the jury about its need to consider each count and each racketeering act against each defendant separately.  (GERT 8011, 8029-30).  The government likewise stressed this point with the jury.  (GERT 8073).  Finally, the jury, which had several hundred findings to make, spent two weeks weighing the evidence before returning split verdicts across charges and across defendants, which amply demonstrates that the jury carefully evaluated the evidence and conscientiously deliberated as to each individual defendant.  (GSER 109-50).  <u>United States v. Unruh</u>, 855 F.2d 1363, 1374 (9th Cir. 1987) ("The best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts.").

I.   THE RICO COUNTS WERE NOT CONSTRUCTIVELY AMENDED OR SUBJECT
     TO A FATAL VARIANCE

     1.   The RICO Charges

     Counts one and two set forth the substantive RICO and RICO-

conspiracy charges against Pellicano, Arneson, and Turner:[355]

> defendants Anthony Pellicano, Mark Arneson, and Rayford
> Earl Turner, together with other individuals known and
> unknown to the Grand Jury, and the Pellicano
> Investigative Agency, Ltd., together with other legal
> entities known and unknown to the Grand Jury,
> constituted an "enterprise," as defined by Title 18,
> United States Code, Section 1961(4), that is, a group
> of individuals associated in fact (the "Enterprise").
> The Enterprise was bound together for the common
> purpose of earning income through the conduct of
> diverse criminal activities including, but not limited
> to, illegal wiretapping, unauthorized access of
> protected computers, wire fraud, bribery, identity
> theft, and obstruction of justice.  The Enterprise
> constituted an ongoing organization whose members
> functioned as a continuing unit for a common purpose of
> achieving the objectives of the enterprise.

(GER 1497).  The indictment further alleged that the Enterprise's

"purposes . . . included" "[e]nriching the members and associates

of the Enterprise through":

> a.   . . . obtaining private, personal, and confidential
>      information regarding defendant PELLICANO's
>      investigative targets and litigative opponents through
>      illegal means, including but not limited to identity
>      theft, wire fraud, bribery, and unauthorized access of
>      protected computer databases.

---

[355]   Count two reincorporated and realleged count one's
paragraphs addressing the enterprise, its purpose, the means and
manner through which it conducted its affairs, and the acts that
contributed to the pattern of racketeering activity.  (GER 1492-
1540).

351

   b.    . . . using the illegally obtained information to
         subvert and corrupt the judicial process.

   c.    . . . using the illegally obtained information to
         strengthen and expand defendant PELLICANO's reputation
         and ongoing relationship with lucrative clients,
         including entertainment celebrities and executives,
         attorneys, and law firms.

and "[p]romoting and enhancing the Enterprise and its members'

and associates' activities."  (GER 1497-98).

     Count one then addressed the "Manner and Means of the

Enterprise," which provided a detailed description of the

members' respective roles and responsibilities.  Specifically, it

described how Pellicano was the enterprise's leader, used payoffs

to police officers and phone company employees to have an

established pipeline for obtaining confidential law-enforcement

and telephone-company information, and was responsible for

securing clients willing to pay significant money for

"confidential, embarrassing, or incriminating" information that

could be tactically used against the client's adversaries,

including in ongoing criminal and civil litigation.  (GER 1498-

1502).  Arneson specifically was identified as Pellicano's LAPD

source, seeking and accepting bribes, and, in return, provided

Pellicano with criminal-history and other confidential law-

enforcement information that could benefit PIA's clients and/or

harm its investigative targets.  (Id.).  Turner was identified as

Pellicano's primary SBC source, who Pellicano paid to obtain

confidential telephone-company information from proprietary phone

company databases through other SBC contacts, including Wright.
(Id.).  Finally, a section labeled "Conduct of the Affairs of the
Enterprise through a Pattern of Racketeering Activity" identified
89 racketeering acts committed by Pellicano, Arneson, and Turner
in furtherance of the enterprise, all of which arose directly or
indirectly from the unauthorized accessing of confidential
information from restricted access law-enforcement and telephone-
company databases.[356]  (GER 1502-40).

　　2.　Jury Instructions

　　At the time of trial, there were no Ninth Circuit Model
Criminal Jury Instructions addressing § 1962(c) and (d)'s
enterprise element.[357]  The government's proposed enterprise
instruction essentially tracked this Court's statement in Odom
that, to prove an associated-in-fact enterprise, the government
must have shown an: (1) ongoing organization, (2) operating with
a common purpose, and (3) as a continuing unit.  (JER 2712-2810).
Arneson requested an instruction that

>　　in order for the defendants to be found guilty under
> RICO, the government must prove beyond a reasonable
> doubt that an "enterprise" existed between defendants
> Pellicano, Arneson and Turner, and the Pellicano
> Investigative Agency.  In addition, the government must

----

[356]  Because § 1961(1)'s definition of racketeering activity
does not include § 2511 violations, wiretapping acts were not
charged as racketeering acts.

[357]  In 2010, Instructions 8.152 and 8.161 were added and
define "enterprise" as set forth in 18 U.S.C. §§ 1961(4) and
1962(c), (d) for use in VICAR and RICO cases.

353

> prove that this "enterprise" constituted an ongoing
> organization, and that defendants Pellicano, Arneson
> and Turner functioned as a continuing unit.

(JER 2576-2609; GER 1227-52).  Arneson argued that any

instruction that did not require the jury to find that the

enterprise consisted of Pellicano, Arneson, Turner, and PIA

together would constructively amend the indictment.  (JER 2565-

75, 3435-45; GER 1301-16).  In response, the government requested

that the instruction include an advisement that the government

need not prove the association of every charged person or entity

provided that the government met its burden as to a subset of the

defendants and entities (e.g., Pellicano, Turner, and Arneson,

but not PIA).  (GER 1253-1300).

The court found that Arneson's argument was "incorrect" and

prepared an instruction tracking Odom's requirements of ongoing

organization, common purpose, and continuity.  (JER 3585-87,

3800-02).  The court also included language that the jury need

not find that all of the charged parties/entities were

associated-in-fact with the enterprise or that all of the listed

purposes in the indictment were purposes of the enterprise.

(Id.).  To accommodate Arneson's argument that the enterprise

proved must have substantial identity with the enterprise

charged, the court included language further explaining that the

jury must find the enterprise to be "substantially similar to

that charged in the indictment and that satisfies the three

354

requirements" -- ongoing organization, common purpose, and
continuity.  With respect to this language, the court engaged
Arneson's counsel in the following colloquy:[358]

> THE COURT:              Again, I don't know whether the
>                         defense likes [the instruction] the
>                         way it is or prefers to add the
>                         concept of it being similar,
>                         recognizing that [the defense]
>                         objects to whole thing the way it
>                         is.
>
> DEFENSE COUNSEL:        Recognizing that we think it is
>                         wrong legally, I think adding the
>                         phrase "substantially similar"
>                         should, at a minimum, be [added]
>                         without waiving our objection on
>                         that point.
>
> THE COURT:              And do you have any suggestions as
>                         to how to phrase that?  "So long as
>                         the enterprise and purposes are
>                         substantially similar to that
>                         alleged"?
>
> DEFENSE COUNSEL:        Just those changes.  Your honor, I
>                         will tell the Court, I do intend to
>                         use the indictment language in my
>                         closing and to say there's nothing
>                         -- no proof that they're
>                         substantially similar.
>
> THE COURT:              You can certainly do that.
>
> DEFENSE COUNSEL:        Right.  That's what I intend to do.
>                         I intend to use the language of the
>                         indictment that [the government]
>                         wants to go to the jury.

---

[358] Turner expressly adopted Arneson's objection to the
enterprise instruction; Pellicano tacitly did so by opposing any
instruction that would not require a finding that all charged
defendants and PIA had associated-in-fact.  (GERT 7507).

355

THE COURT:                And so it's all the more important
                          to add the substantially similar
                          language in there?

DEFENSE COUNSEL:     Yes.[359]

(GERT 7464-65).

Having secured defendants' agreement to the substantially similar language, the court then instructed the jury regarding the enterprise element with the language that it had earlier drafted in response to Arneson's concerns: "the government must prove beyond a reasonable doubt an associated-in-fact enterprise that is substantially similar to that charged in the indictment and that satisfies the three requirements" -- ongoing organization, common purpose, and continuity -- enumerated and defined earlier in the instruction.  (GERT 7563-65).[360]

As to both counts one and two, the jury returned special verdicts finding that Pellicano, Arneson, Turner and PIA constituted the enterprise and finding that the government had proven racketeering acts involving honest-services fraud, identity theft, and bribery.  (GSER 109-50).

---

[359]  The substantially similar language also was added to the RICO-conspiracy instruction at the request of Arneson's counsel. (GERT 7916).

[360]  The court provided the jury with copies of the instructions and the redacted indictment during its deliberations.

356

3.   Standard of Review

    a.   Defendants' Constructive Amendment Claim Is Waived

"[A] defendant waives the right to appeal if the defendant considered the controlling law . . . and, in spite of being aware of the applicable law, . . . accepted a flawed instruction." Laurienti, 611 F.3d at 543.  That is exactly what occurred here. After the court rejected defendants' claim that the government had to prove the association of every charged person or entity, defendants argued that, "at a minimum," the enterprise instruction should include the phrase "substantially similar" and Arneson's counsel further agreed that, in light of his intended closing argument, that "it's all the more important to add the substantially similar language in there."  (GERT 7464-65). Defendants affirmatively sought inclusion of the "substantially similar" language, and, given the pretrial litigation over jury instructions, no claim can be made that defendants were simply operating under a misapprehension of the applicable law. Accordingly, the claim is waived.  Laurienti, 611 F.3d at 543-45.

    b.   If Not Waived, the Claim Is Reviewed for Plain Error Only

Although defendants objected to the portion of the instruction stating that "[i]t is not necessary that the government prove that all of the parties charged in Count One of the Indictment were members of the enterprise or that all the purposes listed in the Indictment were purposes of the

357

enterprise," they did not object to the "substantially similar"
language.  Nor did they ever claim that the "substantially
similar" language would constructively amend the indictment.
United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir. 1990)
("[A] party fails to preserve an evidentiary issue for appeal not
only by failing to make a specific objection, but also by making
the wrong specific objection.").  A claim of constructive
amendment raised for the first time on appeal is at most reviewed
for plain error.  United States v. Mohsen, 587 F.3d 1028, 1031
(9th Cir. 2009).

    4.    The Instruction Did Not Constructively Amend the
          Indictment -- Let Alone Plainly Do So

    "Constructive amendments occur when the prosecutor proves,
or the court instructs the jury to convict on, materially
different facts or substantially different crimes than those
charged in the indictment."  United States v. Driggers, 559 F.3d
1021, 1025 (9th Cir. 2009).  This Court has "found constructive
amendment of an indictment where (1) there is a complex of facts
presented at trial distinctly different from those set forth in
the charging instrument, or (2) the crime charged in the
indictment was substantially altered at trial, so that it was
impossible to know whether the grand jury would have indicted for
the crime actually proved."  United States v. Adamson, 291 F.3d
606, 615 (9th Cir. 2002).  There was no plain error here because
the instruction at most narrowed -- rather than broadened the

358

charges -- and did not permit the jury to convict based on an enterprise different from the one charged.  Nor, in light of the special verdicts, can defendants demonstrate an effect on their substantial rights or serious unfairness warranting correction under prongs three and four of plain-error review.

a.   There Was No Plain or Obvious Error

An error is "plain" under plain-error review's second prong only if it is "clear or obvious," Marcus, 130 S. Ct. at 2164, at the time of appellate consideration, Henderson v. United States, 133 S. Ct. 1121, 1130-31 (2013).  "[L]ower court decisions that are questionable but not plainly wrong . . . fall outside the Rule's scope."  Id. at 1130.  Moreover, rulings that involve "matters of degree, not kind," are not necessarily "plainly" wrong.  Id.

Here, the "substantially similar" language in the jury instruction did not amount to a clear or obvious constructive amendment.  First, defendants' claim is merely a variant of their contention that the government was required to prove every charged member and purpose of the enterprise.  However, the court's instruction accurately set forth the established law regarding the enterprise element.  The jury need not find all the parties or purposes set forth in the indictment, provided that it finds that the statutory requirements of an enterprise are met as to a subset of the parties or purposes.  United States v.

359

Bingham, 653 F.3d 983, 993 (9th Cir. 2011) (no constructive
amendment where indictment alleged enterprise that bridged an
internal schism and prosecutor argued during closing that jury
could convict solely on post-schism conduct, as the evidence
supported the finding that one enterprise existed and the
government's argument addressed a subset of the enterprise's
conduct).

Second, both the Supreme Court and this Court have held that
the constructive-amendment doctrine applies only "to the
broadening, rather than the narrowing, of indictments" because
the latter does no violence to the Grand Jury Clause.  United
States v. Miller, 471 U.S. 130, 136 (2001); United States v.
Wilbur, 674 F.3d 1160, 1178 (9th Cir. 2012).[361]  The court's
enterprise instruction, at most, narrowed the indictment, which
defendants effectively acknowledge by asserting that the
instruction could result in convictions based on a "subset" of
parties or common purposes.  (JOB 80).

Third, defendants cite no authority clearly establishing
that the challenged language is erroneous.  In fact, the D.C.
Circuit rejected a constructive-amendment claim in circumstances
similar to those here.  In United States v. Perholtz, 842 F.2d

---

[361]  Miller further noted that narrowing an indictment also
would not constitute a fatal variance because a defendant is not
deprived of notice or an opportunity to adequately prepare for
trial when the charges are narrowed.  471 U.S. at 134-35, 140.

343 (D.C. Cir. 1988),[362] the D.C. Circuit considered whether the indictment, which was structured identically to the indictment here,[363] was constructively amended by portions of a jury instruction that largely paralleled the disputed aspects of the enterprise instruction here.  As here, the enterprise in Perholtz was described as a specific set of individuals and entities:

> defendant Ronald J. Perholtz, defendant Franklin W. Johnson, [various additional individuals and entities], and Computer Contemporaries, Inc., constituted an enterprise, as that term is defined by Title 18, United States Code, Section 1961(4), to wit, a group of individuals, partnerships, and corporations associated in fact to unjustly enrich themselves from the proceeds of government contracts and subcontracts, for computer services and equipment, which had been and would be obtained by means of bribery, fraud, and circumvention of government contracting procedures designed to secure for the United States government the benefits of competition.

Id. at 351 n.12.  Like the court here, the court in Perholtz instructed the jury that it could find the existence of an

---

[362]  The court's enterprise instruction was by no means the outlier Pellicano, Arneson, and Turner claim it to be.  Not unlike Perholtz, in United States v. Cianci, 378 F.3d 71, 79, 83-84, 86 n.4 (1st Cir. 2004), the RICO indictment was structured identically to the indictment here and the court's enterprise instruction was highly similar to the court's here.  Cf. also Kincaid-Chauncey, 556 F.3d at 944 (upholding honest-services instruction stating, "what must be proved beyond a reasonable doubt is that the defendant, with the intent to defraud, knowingly and willfully devised, intended to devise or participated in a scheme to defraud substantially the same as the one alleged in the indictment" (emphasis added)).

[363]  The near-identical charging language in Perholtz, Cianci, and this case is not accidental; all RICO indictments are reviewed and approved by the Department of Justice's Organized Crime and Gang Section.  (GERT 5957).

enterprise even if it did not find beyond a reasonable doubt that
each of the charged participants was an associate-in-fact as
alleged in the indictment:

> The membership need not include every one of the
> entities I have listed as long as you find that it was
> substantially the same as the enterprise described.
> The membership of the enterprise may change over time
> but the enterprise must have a continuous organization,
> purpose, and core of personnel that remain essentially
> unchanged during the period of the indictment.

Id. at 364.  On appeal, the D.C. Circuit held that the indictment
had not been constructively amended by the instruction, finding
that the instruction had "substantial identity" with the
indictment and proof.  In doing so, Perholtz further explained
that, provided the enterprise element's three requirements --
ongoing organization, common purpose, and continuity -- were met,
it was "not essential that each and every person named in the
indictment be proven to be a part of the enterprise."  Id.  As in
Perholtz, the court's enterprise instruction here is consistent
with the law and with framing of the enterprise as set forth in
the indictment.  There was no constructive amendment.

Defendants' reliance on United States v. Weissman, 899 F.2d
1111 (11th Cir. 1990), is misplaced, as that case is easily
distinguished.  The indictment there described the enterprise as
"a group of individuals associated in fact known as the
DeCavalcante Family of La Cosa Nostra."  Id. at 1112.  Although
the initial instructions told the jury that it had to find the

362

enterprise to be the entity named in the indictment (the DeCavalcante Family), in response to a jury note, the court instructed that it was not necessary for the government to prove that the enterprise was the DeCavalcante Family if there was an enterprise proved that meets the definitions of the term. Id. at 1113. The Eleventh Circuit found that the supplemental instruction constructively amended the indictment by permitting the jury to convict the defendants of being involved with an enterprise other than the one charged in the indictment. Id. at 1113. Here, unlike in Weissman, the instruction's "substantially similar" language did not permit the jury to convict defendants based on an entirely different enterprise or purpose from that alleged in the indictment; indeed, the jury was required to find an enterprise "substantially similar" to the one charged.[364] Cf. Stirone v. United States, 361 U.S. 212, 217-19 (1960) (finding constructive amendment where the defendant was indicted only for interfering with sand imports, but the proof and jury instructions related to steel shipments); United States v. Dipentino, 242 F.3d 1090, 1094 (9th Cir. 2001) (finding constructive amendment where indictment charged violation of one work practice standard but jury instruction permitted conviction

---

[364] The court's instruction advised the jury that "it is not necessary that the government prove . . . that all the purposes listed in the indictment were purposes of the enterprise." (GERT 7564). This statement makes plain that the government was required to prove at least one of the alleged common purposes.

for violating a different work practice standard not charged in indictment); Howard v. Daggett, 526 F.2d 1388, 1390 (9th Cir. 1975) (finding constructive amendment where indictment charged travel in interstate commerce for the purpose of inducing two specific women to engage in prostitution, but supplemental instruction allowed conviction based on evidence introduced at trial regarding women other than the two named in the indictment).

### b. Defendants Have Not Shown an Effect on Substantial Rights

Nor can defendants demonstrate an effect on their substantial rights. Because the jury returned special verdicts finding that Pellicano, Arneson, Turner and PIA constituted the enterprise, and further finding that the enterprise engaged in multiple acts of honest-services fraud, identity theft and bribery, defendants cannot show that any error affected the outcome of the proceedings.

### 5. Defendants' Claim of a Fatal Variance in Closing Does Not Withstand Plain Error Review

Pellicano, Arneson, and Turner further claim that the government caused a fatal variance to the RICO charges when, in closing argument, it stated that the common purpose of the enterprise was "gathering . . . information regarding defendant Pellicano's investigative targets." (JOB 84). According to defendants, this purportedly "led the jury to wrongly believe

that it could properly convict defendants on the RICO counts if
it found the existence of an enterprise that had the common
purpose of simply accessing computer database information
illegally," without finding that wiretapping was also a purpose.
(Id.).  This appears to be another variant of their argument that
there was not a single enterprise.  Defendants did not object at
trial and now fail to meet any, much less all, of the four prongs
of plain error review.

First, defendants have not and cannot show that this
statement resulted in a clear or obvious prejudicial variance to
the indictment.  The indictment did not charge wiretapping as a
purpose of the enterprise, only as one of the means through which
the enterprise achieved its common purpose of generating income
through the commission of diverse criminal offenses.[365]  (GER

---

[365] Defendants also cite the government's acknowledgment in
closing that there were "two groups of offenses."  (JOB 84).
Defendants fail to note that the government explained that: (1)
the indictment "has a common theme, which is gathering
information through illegal means"; (2) that one set of counts
addressed "gathering information from protected computer
databases," while the other addressed illegal wiretaps; (3) that
there was a factual overlap between the two groups of counts; and
(4) that Congress decided what constitutes racketeering activity
and "for the purposes of this case and this indictment, the
crimes that Congress has chosen to include as racketeering
activity include wire fraud, identity theft, and bribery.  For
whatever reason, Congress didn't include wiretapping as [a
racketeering act] and that's why the wiretapping charges are
separate and apart from the RICO count."  (GERT 7614, 7625).
This statement, which simply provided the jury with a concise
overview of the two overarching conspiracies (RICO and
wiretapping) that together encompassed almost the entirety of the
(continued...)

365

1493-1510).  The government's statement, therefore, was consistent with the RICO enterprise set forth in the indictment.

Defendants also cannot establish an effect on their substantial rights or that the fairness of the proceedings was compromised.  The jury was instructed to resolve the case on the evidence presented at trial and the law as presented by the court, not the argument of counsel (GERT 7547-48, 7552); see United States v. Hugs, 384 F.3d 762, 768 (9th Cir. 2004), which the split verdicts returned as to each defendant shows that they did (GSER 109-50), and, in any event, the government's argument constituted, at most, a permissible narrowing of the indictment for the same reasons addressed earlier.

Furthermore, the indictment put defendants on notice that they would have to defend against RICO charges in which the enterprise included Pellicano, Arneson, Turner, and PIA, and the racketeering acts all were founded in the acquisition of confidential information through accessing restricted law-enforcement and phone-company databases.  (GER 1492-1540).  There is no question that defendants understood this to be the case. Exactly one week before the government made the argument that defendants now claim caused a variance in the indictment that

---

[365](...continued)
charged offense conduct in a 78-count indictment, was accurate and did not cause any variance, prejudicial or otherwise.

366

impeded their ability to prepare a defense (JOB 83), Arneson

filed a brief, joined by Turner and Pellicano, that stated:

> [T]he allegations in the Indictment clearly set forth
> the purpose, manner, and means of the enterprise
> centered around Arneson's ability to retrieve law
> enforcement information, Turner's access to telephone
> company information and Pellicano's ability to use this
> information for clients of the Pellicano Investigative
> Agency and against investigative targets and litigative
> opponents.

(GER 1313).  When coupled with the, at most, narrowing impact of

any variance, there was, and could be, no prejudice.  Castro, 89

F.3d at 1453 (after having reviewed the prosecutor's "single

remark, the court's instructions, and the trial in context,"

finding neither constructive amendment nor material variance in

RICO prosecution where prosecutor's closing and jury instructions

misidentified identity of the enterprise that properly was

identified through the trial evidence).

Finally, the jury would have returned the same verdicts

absent the challenged statement.  The jury found that Pellicano,

Arneson, Turner, and PIA were all associated-in-fact and engaged

in the commission of diverse criminal conduct, to include

bribery, honest-services fraud, and identity theft, as it pursued

the acquisition of confidential information on PIA's

investigative targets.  (GSER 109-50).  The jury also found that

Pellicano and Turner both conspired to wiretap and did wiretap,

again to acquire confidential communications of multiple PIA

investigative targets, including in every instance in which the

jury found that Turner had obtained for PIA confidential information from SBC databases that served as the basis of the jury's identity theft findings involving Pellicano and Turner (racketeering acts 65-69).  (GSER 109-29, 144-50).  Furthermore, given the overwhelming evidence that both the wiretapping and the racketeering acts found by the jury were committed to generate income through the acquisition of confidential information on PIA's investigative targets, that the wiretapping almost always overlapped with the charged racketeering activity, Arneson's admission that he was aware of PIA's wiretapping capabilities, and established precedent that an associate need not know of every act undertaken by the enterprise, Arneson, like Pellicano and Turner, has not and cannot establish either prejudice or a miscarriage of justice requiring this Court's intervention.

J.    THE COURT DID NOT ABUSE ITS DISCRETION OR PLAINLY ABUSE ITS DISCRETION IN ADMITTING THE EVIDENCE CHALLENGED ON APPEAL, MOST OF WHICH RECEIVED NO OBJECTION

Defendants claim the court admitted evidence in violation of Rule 403.  (JOB 56-70).  The overwhelming majority of the now-challenged testimony, however, was admitted without objection -- much less a Rule 403 objection -- and the court did not plainly abuse its discretion.  Nor did the court abuse its discretion in admitting the evidence in the rare instances when a Rule 403 objection was made.

1.  Standard of Review

Evidentiary rulings are reviewed for abuse of discretion. Whether to exclude or admit evidence under Rule 403 also is reviewed for abuse of discretion, with "considerable deference" afforded to the trial court's "wide latitude" in balancing evidence's probative value against its prejudicial effect. United States v. Hankey, 203 F.3d 1160, 1167 (9th Cir. 2000). Such rulings warrant reversal only if they more likely than not affected the verdict.  Id. at 1166.

When a defendant fails to object to evidence's admission, or objects on a ground different than that asserted on appeal, this Court reviews for plain error.  Gomez-Norena, 908 F.2d at 500. The underlying deference, plus plain error standard, raise a high burden for defendants: "[I]n view of the inherently fact-specific nature of the Rule 403 balancing inquiry, and the special deference to which district courts' decisions to admit evidence pursuant to that Rule are entitled, it is the rare exception when a district court's decision to admit evidence under Rule 403 constitutes plain error."  United States v. Rizk, 660 F.3d 1125, 1132 (9th Cir. 2011).

2.  Applicable Law

"[A]ll relevant evidence is admissible," except in specifically excepted situations.  Fed. R. Evid. 402.  "Relevant evidence" is defined expansively as evidence with "any tendency

to make the existence of any fact . . . of consequence to the determination of the action more probable than it would be without the evidence."  Fed. R. Evid. 401.  "[T]o be 'relevant' evidence need not be conclusive proof of a fact . . . or even strong evidence of the same.  All that is required is a tendency to establish a fact at issue . . . the fact to be proved may be ultimate, intermediate, or evidentiary; it matters not so long as it is of consequence in the determination of the action."  United States v. Curtin, 489 F.3d 935, 943 (9th Cir. 2007).

In limited circumstances, relevant evidence may be excluded under Rule 403 if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Courts, however, have "broad discretion to admit potentially prejudicial evidence under Rule 403."  Rizk, 660 F.3d at 1132.  Rule 403 "favors admissibility," Hankey, 203 F.3d at 1172, making exclusion under Rule 403 an "extraordinary remedy to be used sparingly," Mende, 43 F.3d at 1302.

As the Second Circuit succinctly stated in finding no abuse of discretion in allowing admission of evidence of uncharged murders by uncharged members of a RICO enterprise, "when a defendant engages in a criminal enterprise which involves very serious crimes, there is a likelihood that evidence proving the existence of its acts will involve a considerable degree of

370

prejudice." <u>Matera</u>, 489 F.3d at 121.  That does not run afoul of Rule 403, particularly when such evidence is of "important probative value in proving the enterprise."  <u>Id.</u>

### 3.  Defendants' Flawed Premise

Defendants claim the government should have been limited in its presentation of evidence to facts showing that Pellicano obtained "confidential information about [his investigative targets] by using wiretaps and accessing law enforcement databases." (JOB 56).  Defendants basically argue the government could not present anything beyond narrow direct proof of the wiretapping counts and the charged racketeering acts.

This is wrong, because the government also had to prove the enterprise and each defendant's association with it.  It was the defendants, not the government, who created the enterprise and the scope of its activities.  The enterprise here operated through a private investigator's office that serviced wealthy and desperate individuals willing to pay huge fees for the enterprise's unique illegal services.  Defendants built an enterprise that they preyed on and profited from human misfortune and from the unseemly behavior they now claim prejudiced them unfairly.

Defendants were charged with conspiring to participate and participating in a racketeering enterprise.  (GER 1492-1540). Under §§ 1962(c) and 1962(d), the enterprise element is separate and distinct from the pattern element.  <u>United States v.</u>

<u>Turkette</u>, 452 U.S. 576, 583 (1981).  While evidence of racketeering acts can establish the enterprise element, that element can be, and often is, established by evidence independent of pattern evidence.  <u>Boyle</u>, 556 U.S. at 947.  The same holds true for the association element and, for substantive RICO, the element of participating in the enterprise's conduct and affairs.[366]

The indictment defined an enterprise that exceeded the specificied racketeering acts.  The charged enterprise's activities included legal <u>and</u> illegal conduct.  (GER 1492-1540).  The indictment recognized that the enterprise was structured to generate income, and addressed the importance of client development and satisfaction.  (<u>Id.</u>).  To that end, the indictment set forth that PIA, primarily through Pellicano, worked to secure clients able to pay its premium fees, advance those clients' interests, and promote the enterprise's successes by enhancing its reputation.  (<u>Id.</u>).  With respect to the enterprise's illegal conduct, the indictment alleged the enterprise engaged in "diverse criminal activities" of which the racketeering acts were only a subset, that the information obtained through the racketeering acts was regularly used "to facilitate further criminal conduct to enrich the enterprise,

---

[366]  Though defendants do not now challenge the sufficiency of evidence as to these two elements, the government at trial had to prove each element of each crime.

including threats, blackmail, and illegal wiretapping directed against the enterprise's investigative targets," and that the enterprise often took illegal actions to "obstruct justice" and "subvert and corrupt the judicial process" in furtherance of its clients' litigative interests.  (Id.).

The government's RICO evidence included testimony, documents, and recordings establishing the alleged racketeering acts of bribery, identity theft, and honest-services-wire fraud. But just as an extortion scheme may constitute the pattern of racketeering activity but fail to fully define the La Cosa Nostra enterprise, here the conduct forming the pattern of racketeering activity evidenced, but did not define, the enterprise.  Thus, additional evidence was needed to fully portray the enterprise and its activities in a manner mirroring the indictment and consistent with established RICO law.  Fernandez, 388 F.3d at 1256 (no error in admitting evidence of uncharged murder conspiracies, because it served as proof of the enterprise); United States v. Miller, 116 F.3d 641, 648 (2d Cir. 1997) (rejecting Rule 404(b) challenge to admission of uncharged murders by other enterprise members, because it showed the enterprise's existence and acts in furtherance of the

enterprise).[367]  That presumably is why defendants did not
complain about most of this evidence at trial.[368]

---

[367]  The joint defense brief repeats Pellicano's Rule 404(b)
notice argument.  (JOB 70).  This claim misframes the issue, as
the evidence underlying defendants' Rule 403 claims is not Rule
404(b) evidence at all, but is instead direct evidence of the
enterprise, evidence that is "inextricably intertwined" with the
enterprise, and/or evidence necessary to rebut defenses.  E.g.,
United States v. Soliman, 813 F.2d 277, 279 (9th Cir. 1987)
(under "inextricably intertwined" doctrine, Rule 404(b) did not
apply to government's summary chart listing 102 fraudulent acts,
in case where defendant was indicted for only three).  The
incidents and transactions defendants object to "'constitut[ed]
. . . part[s] of the transaction[s] that serve[] as the basis for
the criminal charge,'" and were ""necessary . . . to permit the
prosecutor to offer a coherent and comprehensible story regarding
commission of the crime[s].'"  United States v. Dorsey, 677 F.3d
944, 951 (9th Cir. 2012).  They showed the relationships among
coconspirators, and between Pellicano and relevant clients.
United States v. Beckman, 298 F.3d 788, 793-94 (9th Cir. 2002)
(evidence deemed "inextricably intertwined," so "not subject to
Rule 404(b) analysis" where it established a coconspirator's
"relationship to [defendant]" and "show[ed] that the relationship
was ongoing").
    Moreover, while no Rule 404(b) notice was required,
defendants knew the government's case would involve conduct not
charged as racketeering acts; in fact, Arneson unsuccessfully
filed a motion to exclude certain uncharged conduct because he
expected the government intended to introduce the full scope of
enterprise-related conduct.  (CR 1135).

[368]  Defendants claim they withheld objections because they
did not want to appear to be aiding Pellicano.  (JOB 73).
However, at least as to the RICO defendants, the evidence was
admissible directly against them; they therefore had every reason
to object if they believed the evidence objectionable.  Moreover,
defendants' claim rings hollow insofar as the court allowed the
parties to lodge objections outside the jury's presence at any
time, including weeks after a question was asked.  The court also
repeatedly instructed the jury that lawyers are supposed to make
objections and no negative inference should be drawn from them
doing so; and the court specifically instructed that no
inferences should be drawn from attorneys' communications with
Pellicano or provision of assistance to him.

At the center of the enterprise was PIA, Pellicano's renowned private investigation firm.  It was PIA that allowed the enterprise to maintain the veneer of legitimacy that shielded its varied illegal actions from law-enforcement scrutiny.  PIA, under Pellicano's direction, provided its client base with an array of investigative options -- including access to bribed law enforcement officers and the confidential information they could provide, wiretapping, and intimidation.  The evidence showed that the enterprise's illegal conduct was the means by which the enterprise achieved success for PIA's clients -- success that enabled the enterprise to generate millions of dollars from existing clients and to enhance its reputation, which further increased its future earnings.  To show that enterprise, it was necessary to show the full scope of its activities.

In addition to being a RICO prosecution, this case involved two broad conspiracies -- RICO and wiretapping -- which ran for years.  As with RICO, conspiracy principles permit the admission of evidence reflecting the conspiracy as fully realized.  See Rizk, 660 F.3d at 1131 ("[T]he government in a conspiracy case may submit proof on the full scope of the conspiracy."); United States v. Bonanno, 467 F.2d 14, 17 (9th Cir. 1972) ("In conspiracy prosecutions, the Government has considerable leeway in offering evidence of other [uncharged] offenses . . . to show . . . the conspiracy charged. . . . [and] that [the defendants] were continuing along the same line in their [actions].").

375

### 4.  The Court Did Not Plainly Abuse Its Discretion in Admitting Photographs from the November 2002 Search

#### a.  Photograph Including Explosives Found During the November 2002 Search

The November 2002 search of PIA was interrupted by several hours when the FBI unexpectedly encountered a safe containing, among other items, two hand grenades, plastic explosives, and a detonator.[369]  (GERT 786).  The lost time caused by the resulting evacuation was among the reasons the FBI imaged PIA's computer media off-site.

Defendants refused to agree to foundational stipulations for the computer-media images and the evidence found on them, and defendants focused much of their defense on purported shortcomings in the government's investigation.  To that end, the government advised the court that it would seek to introduce a photograph that included the explosives, with accompanying testimony mentioning how the discovery of those items interrupted the search and affected the gathering of computer evidence.

---

[369]  Pellicano claims he assisted the agents in recovering the explosives.  (POB 69).  This is false.  When asked about potential dangers to the searching agents, Pellicano said he had firearms in his desk, without mentioning explosives.  (RJN 194-96).  Although Pellicano complied with an order to open the safe, he never mentioned the explosives inside.  (RJN 199-201).  Although the specific issue was not addressed in the RICO trial, FBI Agents David Freihorn and Stuart Turner testified that Pellicano had not advised them of the explosives' existence, that they were discovered by an agent with no explosives-handling experience or protective gear, and that when asked about the explosives later, Pellicano claimed he had forgotten they were there.  (RJN 180-82, 188-92).

(GERT 476, 670-71).  No defendant objected.[370]  (GERT 474-79).
Instead Kachikian (and only Kachikian) expressed "concerns" (not
an objection) that there could be prejudice from introducing
photographs of explosives in what to him (as a non-RICO
defendant) was a "wiretapping" case.  Kachikian asked whether the
government had other photographs that could achieve its intended
purpose (an impossible hope, since discovering the explosives was
what interrupted the search).[371]  (GERT 477-78).  The court
allowed evidence relating to the explosives "so long as not too
much is made of the hand grenades and guns."  (GERT 479).  The
government presented the evidence through two questions, without
objection.  (GERT 659-60).

Without singling out the explosives-photo, an FBI agent
introduced and described it as part of 24 photographs depicting
PIA before and after the search.  (GERT 547-58).  When addressing
the photo depicting the explosives, the agent concisely explained
that it showed the contents of a safe located in PIA's audio lab,
which included "about $200,000 in cash, jewelry, gold bullion,

---

[370]  Pellicano would have known the evidence well from his
2002 Explosives Case.

[371]  Kachikian's counsel likely noted "concern" instead of
objecting because the explosives' discovery was part of
Kachikian's planned defense.  Kachikian discussed the explosives
in his trial testimony; his counsel argued it was only upon
learning that explosives had been recovered from PIA that
Kachikian started worrying about the legality of PIA's
activities, including Kachikian's work on Telesleuth.  (GERT
6936-37, 6945, 7898).

377

coins, two hand grenades, plastic explosives, and a detonator."
(GERT 557-58; GEX 2908).  Later, the agent briefly explained that
the FBI was unable to image the computer media on-site both
because of the task's magnitude and because the FBI had suspended
the search for several hours while the explosives were removed.
(GERT 558-59).

The court did not plainly abuse its discretion in admitting
the photograph and brief testimony about the explosives.
Criticism of the government's investigation was a defense theme
(e.g., why there was only one wiretapped recording recovered at a
business engaged in significant wiretapping activities).  Attacks
on the overall search (Pellicano launched one that day (GERT
691)) and on the government's imaging of the computers were
constant.

The existence of the explosives was necessary to rebut these
defense themes.  The cash in the photo was also highly probative,
to corroborate clients testifying about Pellicano's preference
for cash payments, and employees' testimony that Pellicano paid
his law-enforcement and phone-company sources partly in cash.
(GERT 980, 2195-96, 2663-64, 4586; JER 2053).

The court's careful admonition that the evidence had to be
presented efficiently and the government's adherence to that
admonition minimized unfair prejudice, which was far outweighed
by the evidence's probativity.  There was no plain abuse of
discretion.

378

b.  <u>Photograph Depicting Items from Pellicano's Desk</u>

Included among the 24 PIA search photographs was a photograph of items found in Pellicano's desk-drawer, showing computer disks, various books (including Mario Puzo's <u>The Family</u> and Bernard Kerik's <u>Lost Son</u>), and a picture of PIA client Farrah Fawcett, who was scheduled to testify about wiretapping former boyfriend James Orr.  (GERT 775-76, 783; GEX 2894).  As with other photographs, the government asked brief questions to place the photograph in context, including a single question mentioning that there were "[b]ooks including Lost Son and The Family by Mario Puzo[.]"  Defendants did not object to the photograph or questions.

The court did not plainly abuse its discretion in admitting this photograph of the lead defendant's office space in the enterprise's headquarters -- a photo that also tied Pellicano to a wiretapping client and expected witness.[372]

Defendants complain because one author, Kerik, had been indicted on conspiracy and fraud charges, and because Puzo, author of <u>The Godfather</u>, implicitly "invoked the Mafia in

---

[372]  Fawcett's retention of PIA factored into both the government's and Arneson's theories of the case.  The wiretapping of Orr was alleged as an overt act to the wiretapping conspiracy. LeMasters testified that PIA also obtained Orr's criminal-history and DMV information.  (GERT 2239).  And Arneson's counsel several times elicited that Arneson bodyguarded Fawcett.  (GERT 2252, 5441-42, 6026).  Ultimately, illness prevented Fawcett from testifying, and the government (with defendants' consent) struck the corresponding overt act.  (GERT 3978, 5065-66).

connection with Pellicano."[373] (JOB 61). To the extent there was any prejudice from the reference to the two books, it was minimal and not unfair.

The government's one question referencing the books did not delve into the many levels of inference defendants assign. (JOB 69). The question did not elicit Kerik's name and nothing was said about Kerik's indictment. (GERT 653). The book cover showed Kerik's name, his "Police Commissioner" title, an innocuous subtitle ("A Life in Pursuit of Justice"), and Kerik holding a toddler's hand -- nothing that would "provoke[] an emotional response" hostile to defendants. United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir. 1982).

This case therefore is nothing like the arson case United States v. Waters, 627 F.3d 345 (9th Cir. 2010), where the government introduced 212 pages of collected articles espousing "anarchist political theory" and "violence," having a witness "read select passages for the jury." Id. at 354-55. Here, the

---

[373] This assertion is meritless. The government takes the evidence as it gets it. It was Pellicano who used the word "Omerta" in wiretapping passwords ("Lisa Bonder Omerta") and the Telesleuth Jr. password ("office322omerta"). (GERT 956, 2081; GEX 527). It was Pellicano who reminded Giuseppe Franco, in connection with the Theohar declaration, that the "family" was watching out for him. (GERT 3809; GEX 228). And it was Pellicano who had Alexander Proctor put a dead fish, a rose, and the word "stop" on Busch's car window. (GERT 4923). The court did not plainly err and abuse discretion in electing admitting the evidence as defendants created it, rather than sua sponte "scrub[bing] the trial clean." United States v. Ganoe, 538 F.3d 1117, 1123-24 (9th Cir. 2008).

books' content was not presented in any form, and the books

themselves were innocuous.[374]

> 5.   The Court Did Not Abuse Discretion or Plainly Abuse
>      Discretion in Admitting Evidence of the Enterprise's
>      Use Of Threats

The indictment charged and the evidence established that the

enterprise used threats to advance its own and its clients'

interests.  (GER 1502).  Trial evidence showed that PIA

cultivated within employees and clients the belief that Pellicano

would do anything necessary, including acts of violence, to help

PIA's clients and protect the enterprise.  Former client Susan

Maguire said Pellicano told her of "things that he had done that

were violent and frightening,"[375] which she believed Pellicano

conveyed to ensure her silence regarding wiretapping and other

crimes PIA did for her.  (GERT 2692-93).  Clients described how

threats were employed to intimidate PIA's targets.  Former client

Pfeifer and victim Erin Finn testified about PIA's successful

multi-pronged assault on Finn -- including illegal-database

---

[374]   The error requiring reversal in Waters was the court's
failure to review the material before admitting it.  Waters did
"not hold that the articles were necessarily inadmissible" on
remand.  Id. at 356.  Compare United States v. Giese, 597 F.2d
1170, 1174, 1184-93 (9th Cir. 1979) (finding no error in
admitting against a bombing defendant evidence that he possessed
the book From the Movement Toward Revolution, because "[d]uring
the government's case-in-chief not a single word was said by the
prosecutors or . . . government witness[es] regarding the book's
contents").

[375]   Neither the question, which specifically addressed
"threats," nor Maguire's answer, received an objection.  (GERT
2692).  Nor do defendants object on appeal.

inquiries, wiretaps, anonymous threats,[376] and civil lawsuits --

designed to convince her to recant her sworn statement against

Pfeifer.  Pellicano discussed his reliance on such intimidation

when he told client Kalta how Kalta's victim could be

discredited:

> What you do with a witness that you know is lying, is
> you find out something about them that they're scared
> to death that everybody's gonna find out about. . . .
> [L]et's say I found out that she had three abortions,
> right?  And that she was on LSD . . . ? . . . I[ ]start
> questioning her about that.  She gets the shit scared
> out of her, . . . [a]nd says to herself, oh my God,
> what else do they know about me. . . . [T]hen I say,
> well, you know, you're here because you're accusing
> this man of something, now isn't this true, isn't that
> true.  You know what I mean?

(GERT 4237-38; GEX 146-69).

None of the evidence of threats that defendants claim to

have "tainted" them did so improperly or unfairly prejudicially.

(JOB 56).  In context, the threat evidence probatively showed how

the enterprise served clients, made use of wiretaps and illegal

database information, and so forth.

    a.  Jude Green

Defendants complain about Jude Green's testimony that

"Pellicano threatened her, following her in his vehicle, blocking

her car, and even physically assaulting her outside a coffee

---

[376]  Finn was a high-end escort.  Pfeifer testified (without
objection) that Pellicano, using information from wiretaps,
proposed acts of intimidation -- including sending a horseshoe of
black roses during a client encounter that wiretaps revealed Finn
was planning for a resort in Big Sur.  (GERT 2817-18).

store." (JOB 63). Green, however, was involved in highly
contentious divorce and civil proceedings with her estranged
husband Leonard, who hired PIA. (GERT 2413-14, 2438-40, 2442-
43).[377] Without objection,[378] Green testified to her escalating
harassment during that period. One week after Arneson conducted
over two dozen criminal-history and DMV inquiries under Green's
name, social-security number, and license-plate numbers,
Pellicano told Green's attorney that Green had to settle the case
or deal with him. Pellicano's subsequent harassment of Greene
(GERT 2416-34, 2455-66) followed Arneson's inquiries and
Pellicano's warning. It was thus highly relevant in connecting
Arneson's actions to the enterprise's overall modus operandi for
client service. Green identified Pellicano at trial, testifying
that she was "100%" sure Pellicano was the person who attempted
to intimidate her. (GERT 2422, 2463-66).

> b. Anita Busch

One of the few Rule 403 objections defendants actually made
was to Busch's testimony about being almost run-over. (JOB 62).
There is no dispute, however, that Busch was being zealously

---

[377] Leonard sued Jude for $25 million for tortious
interference with his business. (GERT 2414). Jude thought the
lawsuit was designed to prevent her from telling authorities
about Leonard's accounting fraud. (GERT 2442-43).

[378] Arneson made a single hearsay objection to one question
relating to Pellicano's dealings with attorney Robert Naschin.
(GERT 2427-28). That objection is irrelevant here because it was
to a different portion of the testimony and otherwise unfounded.
See Gomez-Norena, 908 F.2d at 500.

pursued by PIA at the time of this incident.  After being hired
by Ovitz to respond to Busch's newspaper articles, Pellicano
secured confidential law-enforcement and phone-company reports on
Busch on May 16, 2002, leading to the fish/rose/note threat on
June 20, 2002.  Busch then left her residence for several weeks,
returning on August 9.  One week later, she was almost run over,
and two months later, SBC discovered wiretaps on her phone lines.
The near-miss with the car (like the vandalism and threats to
Busch's own car) was part of the enterprise's concerted campaign
against her.  In any case, given the enterprise's many outrageous
(and directly charged) acts against Busch, this minor additional
incident could not have affected the verdicts.

      c.  <u>Patrick Theohar (Heidi Gregg)</u>

Defendants complain about Heidi Gregg's unobjected-to
testimony that "Pellicano had police officers threaten
hairdresser Patrick Theohar."  (JOB 63).  But as already
explained (Part IV.H.2.c, <u>supra</u>), PIA's efforts to get Theohar
and Green to recant their declarations against PIA client Sender
constituted a prime example of the entire enterprise working
together to achieve its common goals.  And threats stemming from
police attempts to enforce an old warrant against Theohar were
intensely relevant, given Arneson's key role.

      d.  <u>George Mueller</u>

Defendants complain that LADA investigator George Mueller
was allowed to testify, without objection, that a state-court

384

prosecution witness (Lilian Pinho) received a threatening call in which she was called a "rat," then received a copy of a magazine article about PIA client Christopher Rocancourt (the defendant on whom she was informing) accompanied by a dead rat head. (JOB 63). Defendants further complain that Mueller was allowed to testify, also without objection, that Rocancourt "called Mueller personally, made a veiled threat against his children, and hired two people to kill him." (JOB 63-64). The threat evidence relating to Rocancourt, however, tied directly to one of Arneson's most egregious series of restricted-access database inquiries, insofar as Arneson's actions undercut an LAPD investigation and endangered a police informant.[379] The evidence undercut Arneson's claim that he foreswore such conflict of interest.

>  e.   Linda Doucett

Defendants complain that former PIA investigative target Linda Doucett was allowed to testify, without objection, that, shortly after being interviewed by FBI SA Stanley Orellas, she received an anonymous phone call in 2003 threatening that, if she

---

[379] Rocancourt retained PIA in 1998 after being charged by the LADA with passport fraud in a case that Mueller investigated. (GERT 2712-13). After PIA's retention, Arneson conducted criminal-history and DMV inquiries on Mueller, two government informants, two cooperating defendants, and a victim's private investigator. (GERT 2714-19; GEX 962-83). When another informant (Dennis Sidhoun) confirmed that Rocancourt had put a hit on Mueller, Arneson conducted a series of database inquiries on Sidhoun too. (GERT 2726-28).

talked to "Stan", "you won't be seeing your child anymore."  (JOB 62).  Doucett focused her testimony on confirming that multiple entries in the LAPD audit of Arneson's restricted-database inquiries contained her personal identifying information and that she did not have any interaction with law enforcement, much less Arneson, when the inquiries were conducted.  (GERT 2472-83).

       f.   Keith Carradine

Defendants complain that Keith Carradine was allowed to testify, without objection, that during his custody dispute with ex-wife (and PIA-client) Sandra Carradine, his girlfriend "was followed aggressively in her vehicle, her tires were slashed, and their home . . . broken into."  (JOB 63).  But this connected to and corroborated evidence that PIA wiretapped Keith Carradine and acquired confidential law enforcement information on him and his girlfriend: Sandra Carradine (who eventually became Pellicano's girlfriend) testified that Pellicano played Keith's wiretapped calls for her, including one in which the break-in was discussed. (GERT 3548-60, 3562-66, 3569, 3575-78).

       g.   Virtue

Defendants complain that Virtue said that Pellicano "threatened her life," that "she feared him," and that "her father . . . received a death threat from Pellicano."  (JOB 72.) This testimony, however, was elicited by defendants (Pellicano, Kachikian, and Turner), who then tried to impeach the genuineness of those claims of fear as part of their vicious cross-

386

examination.  (GERT 1219-23, 1380-82, 1467-81, 1489-91).  It was
not plain error to let the defendants examine Virtue as they
thought best served their case.

> 6.  <u>The Court Did Not Plainly Abuse Its Discretion in
> Admitting Evidence of Standard Client Matters</u>

> a.  <u>Taylor Thompson/Pamela Miller</u>

Defendants complain in passing about evidence that PIA
"represented a mother who was mistreating her child" with
improper medical care.  (JOB 64).  That information, however,
summarized the content of an affidavit that the child's nanny,
Pamela Miller, submitted in a child-custody dispute between PIA
client (and billionaire heiress) Taylor Thompson and the child's
father.[380]  (GERT 4373-75).  The affidavit was intensely relevant,
because it led Thompson to retain PIA in April 2002.  Within 24
hours, Arneson conducted state and federal law-enforcement
database inquiries on Miller.  (GERT 4383, 4385, 4400-07).
Pellicano then reported this information to Thompson's assistant,
Jennifer Magarry, advising her "we did a nationwide search for
any criminal records" but was not sure he was "gonna be able to
get everything by [Miller's deposition the following day]" but
would try because "you understand, we need to discredit her, is
what we need to do."  (GERT 4382-85).  The affidavit's content

---

[380]  Defendants stated that they objected to this testimony,
which is only partially accurate.  Nobody objected to Miller's
testimony regarding her concerns about the child's welfare.
Pellicano objected to the testimony about Thompson's response to
Miller's expressed concern.

thus tied the client to Arneson's inquiries, and provided a motive for the client's harassment campaign.  In any case, the alleged mistreatment of the reflected poorly on Thompson -- not on defendants.  It was PIA's and Arneson's actions that reflected poorly on defendants.

      b.  <u>Sarit Shafrir/Nicherie</u>

Defendants complain about Sarit Shafrir's testimony that Nicherie prompted her young daughter to accuse Ami Shafrir of sexual molestation.  (JOB 64-65; NOB 29-32).  That testimony, however, was elicited in response to Pellicano's cross-examination, in which <u>he</u> asked Sarit Shafrir whether she had told the Nicheries that Ami Shafrir had tried to molest her daughter (a question that Sarit Shafrir answered affirmatively).[381]  (JER 2685-86).  On redirect, the government clarified this issue by eliciting, in extremely brief questioning, that the allegation was false and had been prompted by Nicherie.[382]  (JER 2688-89).

Defendants complain that Sarit Shafrir testified about committing "fraudulent or illegal acts in connection with . . .

_____

[381]  Defendants wrongly suggest that the court sustained the government's relevance objection to Pellicano's questioning.  (JOB 65 n.13).  Tthe sustained objection was to the next question -- whether Sarit Shafrir contacted law enforcement about the allegation.  (JER 2686).

[382]  Although Nicherie objected to the question about whether the allegation was true or false, nobody objected to the question of who prompted the girl to make the allegation (which elicited the testimony that they now challenge), nor did any defendant move to strike the witness' answer.  (JER 2689).

the Nicheries with respect to [Ami Shafrir's] businesses."[383]
(JER 2556-57).  But questioning about Sarit Shafrir's involvement
in fraudulent and illegal acts was intended to minimize the
potential impeachment value of those acts by fronting them on
direct-examination and allowing her to explain her conduct.  To
the extent defendants also complain about Sarit Shafrir's
unobjected-to testimony that she witnessed the Nicherie brothers
forging Ami Shafrir's signature, Nicherie's fraudulent acts
directed against Shafrir were part of the same criminal course of
conduct[384] -- i.e., his campaign to obtain control of Shafrir's
businesses -- that led to the hiring of Pellicano and the
wiretapping of Shafrir.

      c.  Timea Zsibrita

Defendants complain that Timea Zsibrita was allowed to
testify, without objection,[385] that "Pellicano paid her $120,000
. . . to have an abortion and not to speak about it" and that
"Pellicano drove her to and from the clinic where the abortion
was performed."  (JOB 64).  Zsibrita, however, was the former

---

[383]  Nicherie's counsel objected "as to form" only, the
objection was overruled, and Sarit Shafrir answered the question
affirmatively.  (JER 2556-57).

[384]  It was therefore not improper Rule 404(b) evidence, as
Nicherie contends.  (NOB 31-32).

[385]  Rather than object to the limited questioning addressing
the nature of PIA's representation, Arneson and Pellicano
embraced it, as they sought to portray Pellicano as a talented
mediator who rescued Zsibrita from an otherwise intractable
problem.  (GERT 3937-38, 3944, 3947, 3949-50, 3952).

girlfriend of New York businessman Ivan Kauffman, who retained PIA to secure Zsibrita's abortion and a confidentiality agreement. As a PIA investigative target, Zsibrita was the subject of a series of law-enforcement database inquiries by Arneson on September 4, 2002. (GERT 3939-43). During September 9-11, 2002, Ward-Harvey surveilled Zsibrita, while Pellicano negotiated the terms of the confidentiality agreement between Zsibrita and Kauffman. (GERT 3953). Pellicano's offer to Zsibrita was part of the enterprise's overall, integrated campaign. In addition, specifying the reason for PIA's retention was necessary in all instances given Arneson's penchant for recasting his PIA-based conduct as legitimate law enforcement action (see Parts III.A.2.b, IV.W.3, supra/infra), but particularly so here, as the jury two days later would hear testimony that her sister engaged in a scheme to extort comedian Chris Rock. (GERT 4319-25).

###### 7. The Sender/Russo Matter Was Resolved by Curative Instruction

As discussed above, PIA's representation of Sender showed all aspects of the enterprise working in unison to achieve its common goals. See Part IV.H.2.c, supra. Defendants nonetheless complain about Sender's testimony that Pellicano offered to have Russo murdered, which was initially admitted without objection.[386]

---

[386] As Turner acknowledged, defendants considered filing a pre-trial motion about this testimony but chose not to. (GERT
(continued...)

(JOB 60-61).  Defendants moved to strike the testimony on Rule 403 grounds the following day; the court granted the motion.[387] (GERT 3792, 3979, 3988-89).  The court also accepted a curative instruction proposed by the defense and read it to the jury. There is no reason to believe the jury did not adhere to this instruction.  Rousseau, 257 F.3d at 932 (juries are presumed to follow their instructions).

>    8.    The Court Did Not Plainly Abuse Its Discretion in Admitting Evidence of Prosecutions Where Arneson Was Adverse to Law Enforcement

To further prove the enterprise at work, the government introduced evidence of two state criminal cases in which, following PIA's retention, the defendants were acquitted. Defendants claim unfair prejudice from this evidence, asserting that, through the evidence and the government's arguments about it, the government impermissibly encouraged the jury to "'right the wrongs' done in the past."  (JOB 68).  The government,

---

[386](...continued) 3785-86).

[387]  The government argued the testimony was relevant evidence of the enterprise insofar as it showed the enterprise's "diverse criminal activities" as described in the indictment and demonstrated by all the other illegal conduct done on Sender's behalf.  (GERT 3793-94).  The government further argued that this evidence demonstrated how the enterprise interacted with its clients and the openness with which Pellicano discussed criminal conduct with them, which in addition to being affirmative proof of the enterprise also rebutted defendants' (Arneson's, Turner's, and Kachikian's) claims that Pellicano did not discuss with them the illegal conduct that he engaged in on behalf of the enterprise.  (Id.).

however, did no such thing.[388]  Rather, the two state-court
criminal cases showed, like the other enterprise evidence, how
the enterprise acquired confidential information and used it to
gain litigative advantages for PIA clients, intimidate clients'
adversaries, and corrupt the legal process.

    a.  <u>Kami Hoss</u>

    Defendants complain, without having objected below, about
multiple aspects of the government's proof regarding PIA's
representation of state-court defendant Kami Hoss.[389]

---

[388]  Citing a portion of the government's closing to which
defendants did not object, defendants claim that, "[e]ach time
the government invoked a case where another jury had improperly
voted for acquittal, the jury here . . . was reminded of its own
obligation to convict and to 'right the wrongs' done in the past"
and "not fall for any 'shenanigans' of the defense."  (JOB 68).
The government, however, used neither the phrase "'right the
wrongs' done in the past" nor the word "shenanigans."  Moreover,
the cited excerpt from the government's closing did not even hint
at past acquittals.  (GERT 7613).  Instead, it plainly addressed
the defense's repeated implications that the jury should nullify
because some coconspirators were not charged.  (GERT 7830-34).

[389]  Defendants state that they did object and that the court
admonished the government "that it would not permit such
evidence."  (JOB 57-58).  Not so.  Defendants did not object to
the portion of the government's opening statement addressing
PIA's representation of Hoss.  Nor did they object to Ward-
Harvey's testimony, which included the first discussion of the
Hoss matter.  Defendants' first Rule 403-based objection ("ER
2990") was six weeks after opening statements and one week after
Ward-Harvey's testimony.  (GERT 4813).  Even then, the objection
was only to certain "graphic details" surrounding Rodriguez's
death.  (ER 2990; GERT 4813, 4816).

    Nor did the court admonish the government not to broach the
subject.  Rather, the court acknowledged that Rodriguez's death
and "how the investigation started" were relevant and promised to
"rule on the objections [to the actual testimony] if and when
they are made."  (GERT 4816).  But none were made, including to
                                                     (continued...)

In 2001, the LADA filed manslaughter and drug charges against Hoss, an orthodontist, stemming from the death of Sandra Rodriguez, who fell to her death from a hotel balcony following a night of partying with Hoss. Hoss retained PIA in August 2001, with Arneson shortly thereafter obtaining criminal-history and DMV information on Rodriguez and the state's witnesses. (GERT 5205, 5220-28). Hoss was acquitted.

The court did not plainly abuse its discretion in failing to sua sponte preclude the government from introducing evidence related to Hoss's acquittal.

Despite defendants' current characterization of the acquittal as devastatingly prejudicial, it was Arneson who introduced this fact into evidence, and he did so for a specific reason.[390] There was in evidence a Pellicano-Arneson recording in which Arneson discussed his knowledge of the case and made plain that he had been tasked by Pellicano with obtaining confidential law-enforcement information on the decedent and on potential witnesses. To explain the call, Arneson testified that he performed consulting work with PIA on this case because he

---

[389] (...continued)
the single question and answer that explained, in basic clinical terms, that Rodriguez died of "blunt force trauma from a fall from one of the upper floors." (GERT 5194).

[390] The government did not ask the Hoss-related witnesses about the acquittal. It referenced the acquittal in opening statement because there would evidence of it; namely, Pellicano's use of the acquittal to develop enterprise business with client George Kalta. (GERT 4224-27; GEX 146-69).

393

personally disagreed with the charges that had been filed.  (GERT
5389-90).  Consistent with that theme, Arneson elicited from
Ward-Harvey, the PIA employee who worked extensively on the case,
that PIA's objective was to get Hoss acquitted, and that Hoss <u>was</u>
acquitted.  (GERT 3898).  Indeed, Hoss' acquittal was something
Arneson returned to several times.[391]

Moreover, Hoss' acquittal was evidence regarding the
enterprise.  George Kalta, who was charged with sexual assault,
retained PIA to investigate and discredit his minor victim.
(GERT 4220, 4228, 4232-34).  In a recorded call between Kalta and
Pellicano that was introduced without objection, Pellicano sought
to allay Kalta's doubts about proceeding to trial by referencing
Hoss's acquittal, saying he "beat that case" by knowing "where to
get the information" to "beat up" the prosecution.  (GERT 4224-
27).  Pellicano also claimed to have had a source inside the Hoss
jury's deliberations -- reinforcing that he was far more than a
traditional private investigator.

---

[391]  In cross-examining Ward-Harvey, Arneson built into his
questioning that Rodriguez had fallen to her death, and asked a
series of questions eliciting that she was intoxicated when she
died.  (GERT 3897-98).  Arneson then asked Ward-Harvey to
identify the specific criminal charges that were filed against
Hoss and further was permitted to ask, over government objection,
whether Ward-Harvey believed Hoss guilty of them.  (GERT
3898-99).  Through such questioning, Arneson introduced the first
actual evidence of the charges filed against Hoss, that Rodriguez
was on drugs at the time of her death, and that Hoss was
acquitted of the charges. (GERT 3899).  Arneson's attempts to
exploit Hoss's acquittal extended to his cross-examination of
Detective Nieves (the investigating detective), when Arneson
again elicited the fact of Hoss's acquittal.  (GERT 6218-19).

Defendants, having introduced and then affirmatively mined issues related to the Hoss acquittal, cannot legitimately claim that they were prejudiced, much less unfairly prejudiced, by the introduction of this evidence.  There was no abuse of discretion, much less a plain one.

### b.  John Gordon Jones

Pellicano client John Gordon Jones was charged by the LADA with sexually assaulting nine victims, identified as Jane Does #1-9.  (GERT 1751-52, 1756).  Arneson conducted numerous database inquiries on seven of the Jane Does, their friends and relatives, and numerous corroborating witnesses.  (GERT 1761-81).  The subjects of those inquiries became targets of various threats and harassment aimed at discouraging the victims from testifying.  (GERT 1760-62).  Information obtained from Arneson's inquiries was also used to seek to influence the District Attorney's filing decision and to cross-examine a prosecution witness at trial.  (GERT 1757-59, 2403-04).  Jones was found not guilty.  (GERT 1759).

To talk about the Jones case, the government called Karla Kerlin, the Deputy District Attorney who prosecuted the case.[392]

---

[392]  Contrary to defendants' suggestion (JOB 67), there was nothing improper about a prosecutor from another criminal case testifying in this case.  United States v. Tamura, 694 F.2d 591, 601 (9th Cir. 1982) (the advocate-witness rule applies only when a prosecutor seeks to testify in an ongoing trial that he/she is conducting and, even then, such testimony is permissible if there is a compelling need).  United States v. Edwards, 154 F.3d 915,
(continued...)

395

As with the evidence related to Hoss, defendants take issue with the court's allowing evidence and argument that Jones was acquitted. (JOB 58). At trial, however, defendants did not timely object. The government addressed Jones' acquittal in a single sentence in opening statement and through a single question to Kerlin -- both without contemporaneous objection. (GERT 509, 1758). Defendants instead objected to the opening statement one week later, which the court denied as untimely. (GERT 1531-33). In any event, there was no plain abuse of discretion in permitting limited mention of Jones's acquittal.

This is particularly so in light of the very facts that defendants claim are so prejudicial. Defendants complain about Kerlin's testimony about the victims receiving "threats and harassing phone calls," the burglary of one of the witnesses' homes, the fact that the victims were "scared," "freightened," and "feeling harassed," and Kerlin's "understanding" that

---

[392] (...continued)
924 (9th Cir. 1998), does not establish otherwise. There, the trial AUSA also was a witness to the mid-trial discovery of critical evidence, and continued to try the case, despite the newly found evidence's introduction into evidence. Id. Nothing similar happened here.

Nor did the government impermissibly attempt to credential Kerlin when it asked whether being a Deputy District Attorney is "basically the equivalent in the state system of what I do in the federal?" (JOB 67; GERT 1750). Defendants did not object. The question was designed simply to put Kerlin's job function in context. And Arneson previously asked a similar question. (GERT 1315).

Pellicano was behind the intimidation.[393]  (JOB 59).  Like the
other evidence discussed in this section, Kerlin's testimony was
extremely probative, showing the enterprise's acquisition of
restricted-access information from Arneson's database runs, and
the use of that information to intimidate clients' adversaries
and subvert and corrupt judicial processes.[394]

Arneson -- not the government -- is responsible for Kerlin's
testimony that she could not say that Pellicano and Arneson "had
nothing to do with [Jones's] not guilty verdict."  (JOB 60).  On
cross-examination, Arneson asked, "can you testify . . . that
anything Mr. Pellicano or Mr. Arneson did caused the not guilty
verdicts?"  (GERT 2103-04).  With the door open, Kerlin clarified
on redirect that the opposite was true too: that she could not
say that Pellicano and Arneson "had nothing to do with the guilty
verdict."  (GERT 2126-27).

Finally, defendants meritlessly contend that the court
abused its discretion when it permitted the testimony of July
Westby, Jane Doe 8, and the father of Jane Doe 2, each of whom

---

[393]  Only the testimony about the burglary was objected to.
(ER 223).

[394]  Moreover, Kerlin's "understanding" that Pellicano was
behind it all was grounded in the record.  For example, Kerlin
testified that "Jane Doe 2 was taking an acting class," that
Pellicano contacted "her ex-boyfriend . . . who told him that
plants had been placed in her acting class," which made her "very
fearful of . . . having contact with anyone in the acting class."
(ER 1550).  Kerlin further testified that Pellicano contacted her
and told her that Jane Doe 4's boyfriend "had outstanding traffic
warrants".  (GERT 1760).

was a subject of Arneson's database inquiries and a victim to the
charged conduct in this case.[395]  Contrary to defendants'
assertion (JOB 60), the testimony of these witnesses was not
cumulative of Kerlin's.  Kerlin could simply state whether the
names of numerous individuals listed on the LAPD audit of
Arneson's database inquiries matched the names of victims and
witnesses in the Jones rape case.  The three witnesses, however,
were able to confirm the accuracy of various types of personal
identifying information in the criminal-history, DMV, and
employment data reports generated for the Jones defense by PIA.[396]
This was highly probative enterprise evidence.  There was no
abuse of discretion or plain abuse of discretion in admitting it.

    9.    None of the Evidence at Issue Affected the Trial
          Outcome

    Even assuming any error, prejudice must be assessed against
the trial evidence as a whole.  Here, each conspiracy and
substantive count of conviction was proven by copious evidence,

---

[395]  Defendants' suggestion that the anonymous witnesses were
presented that way to "emphasiz[e] that Pellicano and his
associates . . . were a dangerous group" is meritless and waived.
Penal Code § 293.5 "protects the identity of alleged victims of
sex crimes from public disclosure" and permits the individual to
use a fictitious name in related criminal proceedings.  (GERT
1752-53, 2104-05).  The government filed a pretrial government
motion seeking Jane Doe status for the victims.  (JER 5596).  No
defendant opposed, and Arneson affirmatively had "no objection."
(GERT 997-1000).

[396]  For example, Jane Doe 8 provided a past driver's license
confirming that the photo at the back of PIA's report on her was
the DMV photo from her driver's license -- not a random photo --
while Westby was able to corroborate this fact through testimony.

including employee- and client-testimony, recorded
contemporaneous calls, and contemporaneous documents -- all of
which showed the enterprise's interlocking, coordinated crimes.
Moreover, the jury's verdicts demonstrate that they were based on
its careful assessment of the evidence and not a wave of
prejudice as defendants allege.  When the jury believed a count
had not been proved, it said so (e.g., Sender-based acquittal).
Given this mountainous evidence of guilt and the jury's
demonstrated ability weigh the evidence as to each charge and
each defendant, any errors in admitting the challenged evidence
was harmless.

K.    THE COURT APPROPRIATELY DENIED PELLICANO'S REQUEST FOR
      JENCKS MATERIAL FOR A DEFENSE WITNESS

      Pellicano challenges the refusal to order the government to
turn over the grand jury testimony of a defense witness.  (POB
43-46).  Because the government never called Agent Ornellas as a
witness, the government did not turn over his grand jury
testimony during its case in chief.  When Arneson called Ornellas
as a defense witness (GERT 5814), however, Arneson's codefendants
requested Ornellas' grand jury testimony under Rule 26.2 (GERT
6068).  The court denied the request in a written order (JER 294-
95), which only Pellicano challenges.

      Jencks rulings are reviewed for abuse of discretion.  United
States v. Alvarez, 358 F.3d 1194, 1210 (9th Cir. 2004).  Here,
the court acted within its discretion, correctly finding that

399

Rule 26.2 did not entitle Pellicano to a discovery windfall from the happenstance of having codefendants. Jencks requirements stem from the theory that a party "waives any privileges it may have with respect to documents . . . by placing the [documents'] author . . . on the witness stand." Jencks v. United States, 353 U.S. 657, 675 (1957) (Burton, J., concurring). That principle has no application when one defendant asks the government for the statements of a witness whom another defendant called.

Pellicano relies on Rule 26.2's statement that a witness' prior statements are to be produced "on motion of a party who did not call the witness." Fed. R. Crim. P. 26(a). But the advisory committee made clear this was not intended to allow one defendant to force the government to turn over statements of witnesses called by a codefendant. Rather, this language "requires disclosure of statements in the possession of either party when the witness is called neither by the prosecution nor by the defense but by the court pursuant to the Federal Rules of Evidence." Fed. R. Crim. P. 26.2 adv. comm. note (1979) (emphasis added); see United States v. Duncan, 712 F. Supp. 124, 129 (S.D. Ohio 1988). That "'construction . . . by the advisory committee is "of weight,"'" although it does not totally "'foreclose judicial consideration' of [the] rule's validity and meaning." United States v. Petri, --- F.3d ---, 2013 WL 1490604, *5 (9th Cir. Apr. 12, 2013).

400

It was particularly appropriate not to apply Rule 26.2 here, where the defendants sought <u>Jencks</u> material in a cooperative attempt to expand discovery rather than to impeach one another's witnesses.  The court found persuasive the one reported case on the issue, <u>Duncan</u>.  In <u>Duncan</u>, one defendant moved to compel production of a law-enforcement official's statements after the other defendant called that official as a witness.  712 F. Supp. at 126.  As the court observed, the codefendants were using the agent collaboratively.  They did not seek statements to "challenge testimony offered in support of any defendant's case (<u>i.e.</u> to impeach)."  <u>Id.</u> at 129.  Rather, they sought to use Rule 26.2 to obtain "materials that they were unable to obtain through . . . [discovery] rules."  <u>Id.</u>  "Discovery rather than impeachment" was "the gravamen of the Defendants' requests" -- as evidenced by the fact that even the defendant who called the witness joined in the request for statements.  <u>Id.</u>

The same is true here.  Pellicano had said <u>he</u> intended to call Ornellas as a witness.  (GERT 686).  Indeed, in his purported cross-examination (GERT 6231-60), Pellicano effectively expanded the questioning's scope as if Ornellas were his own witness (GERT 6301 (court's observation that Pellicano should have been limited to the scope of others' questions, but in fact "probably went well beyond that").  If Pellicano had called Ornellas before Arneson did, there would be no argument that Rule 26.2 entitled Pellicano to Ornellas' statements.  Pellicano

401

should not enjoy a discovery windfall simply because Arneson
called the witness instead.  Moreover, as in Duncan, the
cooperative, rather than antagonistic, nature of the defendants'
requests was apparent because even the defendant who called
Ornellas requested Ornellas' statements as putative Jencks
material.  (GERT 646).  The court abused no discretion in denying
Jencks requests where "[d]iscovery rather than impeachment" was
the defendants' common plan.  Duncan, 712 F. Supp. at 129.

Affirmance is also required because Jencks errors "do not
merit reversal when more likely than not harmless."  United
States v. Pisello, 877 F.2d 762, 768 (9th Cir. 1989).  Rule 26.2
"limits production to statements that 'relate[] to the subject
matter about which the witness testified.'"  (JER 295 (quoting
Fed. R. Crim. P. 26.2(a))).  As the court observed, Arneson's
counsel primarily called Ornellas "to bolster Arneson's claims
that Arneson was a . . . knowledgeable and successful vice
detective" (JER 295), and to show that Ornellas had a high
opinion of Arneson from their past work (GERT 5822-30, 6039-47,
6051).  Arneson also sought to provide innocent explanations for
his relationship with Pellicano by eliciting that Arneson might
have declared as income the money received from Pellicano, and
that Ornellas had not disproven the possibility that some money
was paid to Arneson for bodyguarding services.  (GERT 5832, 6020-
28).  No defendant disputed these points; "nor [did] these claims
adversely impact any co-defendant."  (JER 295).  Because

402

production of statements on these subjects would have been useless to Pellicano, denying him the material did not cause prejudice.

Arneson's examination also explored areas where his interests were aligned with Pellicano's -- such as casting aspersions on government witnesses who were not charged in the case (GERT 6051-52), insinuating that the FBI was sloppy in its investigation (GERT 5837-40), and trying to imply that Steven Seagal, rather than Pellicano, was responsible for the attack on Anita Busch (GERT 6065-67). Denial of statements on these subjects could not have caused prejudice, because Arneson's examination inured to Pellicano's benefit, producing nothing for Pellicano to impeach.

Moreover, Pellicano's performance cross-examining other witnesses shows he was unlikely to have made effective use of any Jencks material. Even now, Pellicano proposes no way that further cross-examination could have cast doubt on his guilt. A mountain of evidence convicted Pellicano -- evidence so lopsided that, in his closing argument, Pellicano virtually gave up on trying to save himself, and instead argued for his codefendants' innocence. (GERT 7853 ("There was no criminal enterprise or conspiracy. . . . Pellicano alone is responsible."). Any error was therefore well beyond "more likely than not harmless." Pisello, 877 F.2d at 768.

403

The denial of Pellicano's <u>Jencks</u> request was an appropriate use of discretion that did not, in any case, affect the outcome. This Court should reject Pellicano's claim.[397]

L.  PELLICANO'S COMPLAINT THAT HE RECEIVED INADEQUATE NOTICE ABOUT OTHER-ACTS EVIDENCE IS MERITLESS

Pellicano claims the government introduced Rule 404(b) evidence on three topics without notice.[398]  (POB 38-43).  The claim is unpreserved,[399] and fails each prong of plain error.

---

[397]  Even if this Court were to find error, the remedy would be limited.  Because <u>Jencks</u> material is for cross-examining a witness in the same trial as his direct testimony, denial of statements in the first trial did not affect Pellicano's convictions in his second trial.  Moreover, because only Pellicano appeals the <u>Jencks</u> ruling, the other defendants' convictions are not at issue.  That is particularly so with respect to Arneson and Christensen.  Rule 26.2 provided no right for Arneson, who called Ornellas, to receive Ornellas' statements.  Fed. R. Crim. P. 26.2(a) (motion for statements must be made by "party who did not call the witness," and statements are delivered to "the moving party").  Nor did Rule 26.2 create a right for Christensen to receive statements by witnesses who testified at the first trial, where Christensen was not on trial.

[398]  Pellicano complains of inadequate notice only as to a threat against Kerlin, the offer to kill Russo, and the attack on Busch's car and attempt to run her over.  (POB 39-40).  Though Pellicano elsewhere argues additional evidence should have been excluded under Rule 404(b) as prejudicial (POB 40 & n.16), he does not argue notice was inadequate on the additional topics.

[399]  Pellicano cites no objection about other-acts <u>notice</u>. Though Pellicano claims "all defendants expressed their concern as to the introduction of irrelevant and powerfully prejudicial evidence such as handguns and grenades" (POB 42), that objection concerned admissibility, not notice (GERT 476-78).  It also was by Kachikian alone, and related solely to evidence of handguns and grenades -- not what Pellicano claims was inadequately noticed.  (<u>Id.</u>).

There was no error, because Rule 404 requires notice only for evidence of <u>other</u> "crime[s], wrong[s], or . . . acts." Fed. R. Evid. 404(b).  The evidence Pellicano complains about was direct evidence of and inextricably intertwined with the charged crimes.  <u>See</u> Part IV.J.3-8, <u>supra</u>.  Since the evidence was not covered by Rule 404(b), no special notice was required.

Even had the rule applied, the notice requirement would have been satisfied because related exhibits were in the government's trial-exhibit list (GER 1186-1211), and the government's pretrial discovery included reports, affidavits, and documents on each incident.  <u>United States v. Perlaza</u>, 439 F.3d 1149, 1176 n.32 (9th Cir. 2006) (evidence properly noticed under Rule 404(b) where defendant "had access to [it] months before trial and it was on the Government's trial exhibit list"); <u>United States v. Erickson</u>, 75 F.3d 470, 478 (9th Cir. 1996) (government satisfied notice requirement by providing witness statements pre-trial).[400]

Nor could any error have been plain.  The requirement of notice was not plain because the evidence was not plainly other-acts evidence.  And there was "no reason to suspect a notice problem absent an objection" because the court did not know what notice defendant received.  <u>United States v. Begay</u>, 673 F.3d

---

[400]  Pellicano complains that the government's trial memorandum did not discuss purported other-acts evidence.  (POB 38-39).  But Rule 404 does not require such notice to be contained in the trial memorandum -- indeed, the Federal Rules do not require a trial memorandum at all.

1038, 1046 (9th Cir. 2011); cf. United States v. Hieng, 679 F.3d
1131, 1137-38 (9th Cir. 2012) (no plain error where evidence
purportedly violated proffer agreement because court cannot know
what the agreement said unless parties raise the issue).

Finally, there was neither prejudice nor serious harm to the
proceeding's fairness and integrity.  The evidence was mentioned
in and before the government's opening statement.  (POB 42 n.17;
GERT 474-76).  That defeats defendants' claim.  Begay, 673 F.3d
at 1046 (rejecting forfeited challenge to lack of Rule 404(b)
notice, where, inter alia, the government "said specifically in
its opening statement that some of [the evidence] would be
introduced").  Pellicano's only claim of prejudice is that the
lack of notice affected his voir dire.  (POB 40-42).  But
Pellicano's cited cases do not show that other-acts notice is
designed to affect voir dire.[401]  Moreover, Pellicano largely
abstained from voir dire,[402] defeating any argument that he would
have asked questions about these topics in particular.

---

[401]  Rosales-Lopez v. United States, 451 U.S. 182 (1981)
(cited at POB 41), says voir dire assists in jury selection and
federal judges have discretion over voir dire procedures.  United
States v. Ledee, 549 F.2d 990, 993 (5th Cir. 1977), notes that
court's preference for attorney-conducted voir dire.  Neither
case requires prosecutors to provide information to assist
defense voir dire.

[402]  Pellicano never filed proposed voir dire questions.
(JER 5594-95, 5598, 5604) (docket).  In oral voir dire, he asked
four of the five groups no questions.  (GERT 315, 339-40, 361,
376, 399-400).

M.    THE COURT ABUSED NO DISCRETION IN REJECTING ARNESON'S
      BASELESS PROSECUTORIAL-MISCONDUCT CLAIMS OR IN DENYING HIS
      REPEATED AND UNTIMELY MISTRIAL MOTIONS

Arneson argues the government engaged in prosecutorial

misconduct in its questioning of an Internal Affairs detective,

in its cross-examination of Arneson, in failing to produce in

discovery material already in Arneson's possession and

impeachment material, and when a single juror overheard one of

the prosecutors say the word "perjury" to Arneson's counsel as

the juror left the courtroom during a recess in Arneson's cross-

examination.  (AOB 27-59).  Because Arneson fails to establish

any actual misconduct, let alone a probability that misconduct

affected the verdict, reversal is not warranted.

    1.    Standards of Review

Rulings on alleged prosecutorial misconduct are reviewed for

abuse of discretion.  United States v. Sarkisian, 197 F.3d 966,

988 (9th Cir. 1999).  To obtain relief, a defendant must show a

probability that the misconduct materially affected the verdict.

Id.  Denial of a mistrial motion is reviewed for abuse of

discretion.  Id. at 981.

A finding that a defendant's Fifth Amendment rights were not

violated is reviewed de novo.  United States v. Bushyhead, 270

F.3d 905, 911 (9th Cir. 2001).  If a violation is found, it will

be disregarded if it is harmless beyond a reasonable doubt.  Id.

Discovery rulings under Federal Rule of Criminal Procedure

16 are reviewed for abuse of discretion.  United States v.

407

Danielson, 325 F.3d 1054, 1074 (9th Cir. 2003).  To justify

reversal, the defendant must show a likelihood that the verdict

would have been different had the government complied with the

discovery rules.  United States v. de Cruz, 82 F.3d 856, 866 (9th

Cir. 1996).

> 2.   Detective Lim's Testimony Regarding Arneson's
>      Retirement Did Not Violate Arneson's Fifth Amendment
>      Rights

In response to government questioning, LAPD Detective Helen

Lim testified that Arneson filed his notice of retirement from

the LAPD on the date that he was to be interviewed by Internal

Affairs Division ("IAD"), and therefore no interview occurred.

Arneson did not object to this testimony.  (GERT 1870-71).

Instead, six days later, he filed a motion for mistrial, claiming

the government had impermissibly commented on his constitutional

right to remain silent.  (CR 1261).  The court denied Arneson's

motion.[403]  (JER 240-42).

Although the court speculated that "there may have been a

minor Fifth Amendment violation," the court actually found none.

(JER 241 (emphasis added)).  And for good reason: there was none.

The government's questioning of Detective Lim was proper.  In

Garrity v. New Jersey, 385 U.S. 493, 500 (1967), the Supreme

---

[403]  The court's order directed the government not to refer
to Arneson's failure to appear at the IAD interview in its
closing argument.  (JER 241).  The court vacated that portion of
its order after Arneson took the stand in his defense.  (GER
1226).

Court held that statements by police officers under the threat of losing their jobs were compelled and could not be "use[d] [against them] in subsequent criminal proceedings."  The following year, the Court extended Garrity to situations where public-sector employees are discharged for invoking their Fifth Amendment privilege.  Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation, 392 U.S. 280 (1968) (violation when city employees were discharged for invoking privilege); Gardner v. Broderick, 392 U.S. 273 (1968) (violation when police officer was threatened with and subsequently discharged from employment if he did not waive Fifth Amendment immunity in conjunction with grand jury investigation).  As then-retired Justice Powell later explained in summarizing the Supreme Court's Garrity jurisprudence, "the right against self-incrimination is not violated by the mere compulsion of statements, without a compelled waiver of the Fifth Amendment privilege or the use of the compelled statements against the maker in a criminal proceeding."  Wiley v. Doory, 14 F.3d 993, 996 (4th Cir. 1994) (Powell, J.).

Detective Lim's testimony did not implicate Garrity because Arneson was not compelled to waive his Fifth Amendment privilege and no compelled statements were used against him.  Instead of proceeding to the IAD interview and either making compelled statements or invoking his Fifth Amendment rights and being

fired,[404] Arneson elected to retire.[405]  That alone removes
Detective Lim's testimony from <u>Garrity</u>'s purview.[406]  <u>Contrast
Uniformed Sanitation Men</u>, 392 U.S. at 284 (Fifth Amendment right
to silence in the <u>Garrity</u> context violated where public-sector
employees "were not discharged merely for refusal to account for
their conduct as employees of the city.  They were dismissed for
invoking and refusing to waive their constitutional right against
self-incrimination").  <u>Garrity</u> simply is not implicated.

Arneson's assertion that Detective Lim's testimony
nonetheless infringed his Fifth Amendment rights "by commenting

---

[404]  There is nothing in the record to suggest that Arneson
would have been fired.  That is fatal to his claim.  <u>Chan v.
Wodnicki</u>, 123 F.3d 1005, 1009 (7th Cir. 1997) ("Not every
consequence of invoking the Fifth Amendment is . . . sufficiently
severe to amount to coercion to waive the right." (collecting
cases)).  For example, a threat to transfer or assign "desk duty"
to an officer if he refuses to answer questions is probably
insufficient for a statement to be considered "compelled."  <u>Id.</u>
at 1009-10.

[405]  Making clear that he "retired" instead "resigned" was
important to Arneson.  Arneson specifically objected to the PSR's
statement that he "resigned from the LAPD in May 2003" (APSR
¶ 11), requesting that it be amended to state "he retired in
October 2003."  (GER 2222).

[406]  For these reasons, Arneson's other cases are unhelpful
to him.  <u>United States v. Saechao</u>, 418 F.3d 1073, 1077 (9th Cir.
2005) ("If an individual's refusal to answer incriminating
questions subjects him to a penalty, then the Fifth Amendment is
self-executing and any statements made under threat of such
penalty are inadmissible."); <u>Lybarger v. City of Los Angeles</u>, 40
Cal. 3d 822, 827 (1985) ("[A] public employee has no absolute
right to refuse to answer potentially incriminating questions
posed by his employer.  Instead, his self-incrimination rights
are deemed adequately protected by precluding . . . use of his
statements at a subsequent criminal proceeding.").

on his silence" is both legally and factually unsupportable.
(AOB 28).  Legally, Arneson's decision to retire was not an
invocation of his Fifth Amendment privilege as a matter of law.
The Supreme Court has made clear that the Fifth Amendment right
to silence must be invoked "unambiguously."[407]  Berghuis v.
Thompkins, 130 S. Ct. 2250, 2260 (2010) (refusing to "[t]reat[]
an ambiguous or equivocal act, omission, or statement as an
invocation of Miranda rights").  A decision to retire, which
could be made for any number of reasons, is the type of
"equivocal act" that is insufficient to constitute an invocation
of the Fifth Amendment privilege.  Id.  Arneson's situation was
no different from that of a defendant who flees the country to
avoid trial.  Comment on such conduct as evidencing consciousness
of guilt could not be viewed as comment on the defendant's right
not to testify at the trial that would otherwise have occurred.
United States v. Mikos, 539 F.3d 706, 710 (7th Cir. 2008)
(distinguishing comment on defendant's conduct from comment on

---

[407]  In Sessoms v. Runnels, 691 F.3d 1054, 1062-63 (9th Cir.
2012), this Court recognized that the unambiguous invocation rule
may not apply to the Miranda right to counsel if the suspect had
not yet been advised completely of his rights.  Sessoms does not
aid Arneson for at least two reasons.  First, Sessoms does not
address the Fifth Amendment right to silence.  Second, Sessoms'
rationale -- that "a person not aware of his rights cannot be
expected to clearly invoke them" -- does not apply to Arneson.
Id. at 1062.  Arneson was clearly aware of his right to remain
silent both because, as he testified, he "had submitted to the
Internal Affairs" at a prior interview five months earlier at
which "[t]hey had read me my rights" and because, as a police
officer for 29 years, Arneson clearly would know of the Fifth
Amendment right to remain silent.  (GERT 5496).

defendant's silence, noting that "[n]othing in <u>Griffin</u> [<u>v. California</u>, 380 U.S. 609 (1965)] or its successors prevents a prosecutor from urging the jury to draw inferences from events that can be established by evidence independent of the accused's silence"); <u>United States ex rel. Powell v. Pennsylvania</u>, 294 F. Supp. 849, 852 (E.D. Pa. 1968) (inferring guilt from accused's flight and concealment does not implicate Fifth Amendment right). Even if Arneson subjectively intended his retirement to constitute an invocation of Fifth Amendment privilege, his claim would necessarily fail as a matter of law.

Here, moreover, the record establishes that Arneson did not have that intent. On direct-examination, Arneson characterized his decision to retire not as an invocation of his Fifth Amendment rights but instead as an act of "tak[ing] responsibility" for his having accessed restricted law-enforcement databases to acquire confidential information on PIA's investigative targets in violation of his duties. (GERT 5492-93). Cross-examination confirmed that Arneson's retirement was not because he was faced with the choice "between surrendering [his] constitutional rights or [his] job[]." <u>Uniformed Sanitation Men</u>, 392 U.S. at 284. Rather, when asked whether he retired "to avoid being interviewed by Internal Affairs about this case," Arneson responded, "No," explaining that he did not subject himself to the IAD interview because he

412

had already submitted to an FBI interview three months earlier
and "didn't feel I needed to do" another interview.  (GERT 5495-
96).  Thus, even if a decision to retire could somehow constitute
an invocation of the right to remain silent, that is not what
Arneson intended his retirement to be.

Finally, Arneson rendered the testimony about his retirement
and the aborted IAD interview harmless by taking the stand.  See
Jenkins v. Anderson, 447 U.S. 231, 235-38 (1980) (Fifth Amendment
not violated when defendant who testifies in his own defense is
impeached with his prior pre-custody, pre-warning silence).[408]
Arneson's rejoinder that he would not have testified but for
Detective Lim's testimony is disingenuous.  (AOB 32 n.11).
Arneson's opening statement included a "promise" of evidence that
could only be introduced through Arneson's own testimony —
including what Arneson allegedly "remembered," what he "thought,"
what he "believed," what his "reaction" to events was, and what
he and Pellicano discussed in private conversations.  (GERT 584-

---

[408]   Arneson inaptly relies on Fowle v. United States, 410
F.2d 48, 51-56 (9th Cir. 1969), to say that it was
"constitutionally improper" for the government to use "Detective
Lim's examination . . . to impeach Arneson's credibility."  (AOB
32 & n.11).  Fowle did not survive the Supreme Court's subsequent
decision in Jenkins, which is probably why Fowle has been cited
in only two post-Jenkins decisions, neither of which adopts the
constitutional holding on which Arneson relies.  See Campanale v.
Harris, 724 F.2d 276, 280 (2d Cir. 1983) (citing Fowle to frame
historical discussion of pre-Doyle v. Ohio, 426 U.S. 610 (1976),
circuit split); State v. McCrory, 87 P.3d 275, 278-79 (Haw. 2004)
(discussing Fowle's abrogated constitutional analysis in
construing Hawaii's rules of evidence for relevance).

96).  Thus, even if the questioning of Detective Lim was improper, Arneson cannot show that it is more probable than not that the questioning affected the jury's verdict.  See Hinton, 31 F.3d at 824.

### 3.  The Government's Brief Questioning of Arneson Regarding a Prior Internal Affairs Investigation Did Not "Use" Any Compelled Statements Against Him

During cross-examination, the government briefly questioned Arneson about a 1999 IAD complaint against him by fellow officer Kelly Shea relating to Arneson's computer inquiries.  (JER 3237-39).  Arneson testified that he did not specifically recall what he told IAD, but that he had been truthful and that the Shea complaint had not been sustained.  (Id.).  This thoroughly nonprejudicial testimony was introduced without objection, and although the parties raised other issues at the end of the court day, Arneson still failed to object.  (JER 3238-39).  Instead, three days later, Arneson filed a written "emergency" motion for a mistrial and a stay of his ongoing cross-examination.  (AER 37-79).  When the court denied Arneson's motion after a day-long evidentiary hearing, Arneson declined the court's offer to give a curative instruction.  (JER 3394-95; GERT 5571).

Arneson's claim that the government's questioning violated Garrity and constituted misconduct warranting a new trial is meritless.[409]  (AOB 34-35).  Because Arneson testified that he did

---

[409]  Arneson's claim that the government conceded a Fifth
(continued...)

not remember what he said in the interview, no compelled
statement was introduced. Moreover, the evidence at the
evidentiary hearing, which the court conducted after Arneson's
counsel refused to put him on the stand to continue what had
already proved to be a highly damaging cross-examination,
established that the government did not "use" Arneson's IAD
statement within the meaning of Garrity at all. (JER 3414-16,
3420-26). Indeed, the court found that the AUSA who conducted
the cross-examination was not even aware such a statement existed
at the time the questioning took place.[410] (JER 3389-93).
Rather, the court found that Arneson's denials of improper
conduct in the prior investigation were easily inferred from the
fact that the Shea complaint had not been sustained and from
Arneson's testimony that he had never disclosed to anyone

---

[409](...continued)
Amendment violation in connection with this questioning (AOB 35)
is false. In his testimony at the evidentiary hearing, the AUSA
who conducted the cross-examination expressly declined to accept
Arneson's contention that legal error had been committed, stating
only that he believed he had made an "error in judgment" in
asking the questions without having anticipated the potential
legal issues. (JER 3312-13).

[410]    As established at the evidentiary hearing, the most that
anyone on the prosecution team ever heard of Arneson's IAD
interview was a statement of the purpose of the interview and a
possible "Hello." (JER 3284-85). At that point the recording
was immediately sealed and delivered to a "taint" AUSA who was
not part of the prosecution team and who retained the recording
in his custody until the evidentiary hearing. (JER 3266-68,
3285-86).

Pellicano's alleged role as a law-enforcement source.[411]  (Id.).

The court's factual findings were amply supported by the record,

and Arneson does not contend that they were clearly erroneous;

indeed, Arneson does not even mention the court's findings in his

opening brief.  (JER 3284-85, 3291, 3296-98, 3307, 3309-10, 3315-

16).

　　Arneson's claim that the court failed to hold a "proper"

hearing under Kastigar v. United States, 406 U.S. 441, 460

(1972), and erroneously placed the burden on him to show that the

government used his statements is also meritless.[412]  (AOB 29-30).

The procedure that the court undertook was that proposed by

Arneson's own counsel, and neither the government nor the court

challenged counsel's position that the burden was on the

government to prove non-use of the statement.  (JER 3247-48).

Arneson fails to cite anything in the record that suggests that

the court placed the burden on him to prove the government's use

of the statements.  Rather, the court found, consistent with the

uncontradicted testimony presented by the government, that the

prosecution team was not aware of the content of Arneson's

---

　　[411]  The government was aware of the unsustained complaint
from a reference in the IAD investigative report prepared in
connection with this case, which the government had produced to
the defense in discovery.  (JER 3296-98, 3390).

　　[412]  Kastigar, 406 U.S. at 460, requires the government to
prove by a preponderance of the evidence that its evidence is
derived from a legitimate source wholly independent of any
compelled testimony.  See United States v. Rogers, 722 F.2d 557,
560 (9th Cir. 1983).

compelled statement and had not used that statement to any extent. (JER 3390). Because an investigative team cannot derive evidence from a compelled statement that it has never seen or heard, that finding in itself answered the <u>Kastigar</u> inquiry.

Moreover, even if the government's questioning regarding a statement that it had never seen or heard could constitute "use" of that statement in violation of <u>Garrity</u>, Arneson has failed to demonstrate prejudice. The entire series of questions and answers on the Shea complaint occupied less than two transcript pages in a 248-page cross-examination -- it elicited only Arneson's denial that he had lied, his statement that he did not specifically recall what he told IAD, and the fact that the complaint was not sustained (an exculpatory fact that, as the court noted, would otherwise have been inadmissible). (JER 3238-39, 3391). The IAD interview was not mentioned in the government's closing argument, and the jury was instructed at the beginning and end of the case that lawyers' questions are not evidence. (GERT 433-34, 7552). Because the evidence adduced by the questioning to which Arneson belatedly objected was in no way inculpatory, any error was harmless.

4.    <u>The Government's Failure to Produce Arneson's Recorded Statement, Which It Knew Was Already in His Counsel's Possession, Did Not Violate Rule 16</u>

Arneson's claim that the government failed to produce his statement in the Shea investigation in violation of Rule 16 is baseless. (AOB 38-39). Before trial, Arneson issued a subpoena

417

duces tecum to the LAPD and obtained from the City Attorney's
Office responsive material, including the Shea IAD file and
Arneson's recorded statement.  (GER 2023-24).  As established by
the record, the government repeatedly asked Arneson's counsel to
produce reciprocal discovery, including the materials he had
obtained by subpoena from the LAPD, but Arneson's counsel refused
to do so, telling the government to obtain "a duplicate
production set" directly from the City Attorney.  (JER 3274-76,
3280-3282, 3289, 3299-3302; GER 2025-28).  Accordingly, the
government obtained from the City Attorney's Office, on or about
the first day of trial, a subset of the documents and recordings
that the City had previously produced to Arneson.  (JER 3275,
3281-83, 3305).  In response to the court's inquiry at the close
of the day-long evidentiary hearing, Arneson's counsel grudgingly
admitted that he had in fact had possession of the recording
since before the trial started.  (JER 3367-39).

The failure to produce an item that is equally available to
the defense or, as in this case, already was in the defense's
possession does not constitute a Rule 16 violation.  United
States v. Gee, 695 F.2d 1165, 1167 (9th Cir. 1983) (no Rule 16
violation in government's failure to disclose audiotape
transcript where defendant could have produced his own transcript
from produced recording); United States v. Hernandez-Muniz, 170
F.3d 1007, 1011 (10th Cir. 1999) (no Rule 16 or Brady violation
where evidence was already known by and available to defendant

418

before trial); <u>United States v. Brown</u>, 628 F.2d 471, 473 (5th
Cir. 1980) ("In no way can information known and available to the
defendant be said to have been suppressed by the Government.").
Just as the government is not required under Rule 16 to produce
back to a defendant documents that the defendant has produced to
the government, so the government here was not required to give
Arneson copies of materials that he had already obtained from a
third party and as to which he had expressly invited the
government, in lieu of reciprocal production, to obtain "a
duplicate production set" from the third party for itself.[413]

United States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982),
on which Arneson relies, is inapposite.  In <u>Bailleaux</u>, the
government cross-examined the defendant with a tape recording of
a conversation that the defendant did not know had been recorded
and that had never been produced in discovery.  <u>Id.</u> at 1112.  The
Court held that Rule 16 had been violated.  <u>Id.</u> at 1115.  In
dicta, the Court suggested that a defendant is always aware of
the contents of his own statements since he was a party to them,
but that the "principal fact" revealed by disclosure "is that the
Government is also."  <u>Id.</u> at 1114.  <u>Bailleaux</u> found that "[i]t is

---

[413]  Arneson took the position that his invitation to the
government to view documents at the City Attorney's Office was a
substitute for reciprocal discovery.  When the court found that
Arneson had violated Rule 16 by failing to disclose to the
government before trial a document he intended to use in his
defense, Arneson's counsel sought to claim compliance with Rule
16 by stating "they could have seen it," as the document was
produced to Arneson by the City Attorney's Office.  (GERT 6261).

error to admit into evidence a statement which has been withheld from the defendant in violation of Rule 16 <u>if the defendant has not otherwise been afforded the opportunity to review the proffered evidence</u>." <u>Id.</u> at 1115 (emphasis added). Here, the defense had the recording well before trial and well before the prosecution team had anything it could turn over.

Finally, even if this could be considered a Rule 16 violation, Arneson has failed to show a likelihood that the verdict would have been different had the violation not occurred. <u>See</u> <u>United States v. Figueroa-Lopez</u>, 125 F.3d 1241, 1247 (9th Cir. 1997). Because Arneson already had the statement, he cannot show prejudice. <u>United States v. White Horse</u>, 316 F.3d 769, 773 (8th Cir. 2003) (even if government violated Rule 16, violation did not affect substantial rights where defendant obtained copy of document from another source a month before trial). Arneson's claim that the violation impacted his decision to testify and prevented him from moving to preclude mention of his IAD statement is unavailing. (AOB 39). As the court recognized, Arneson's belief that the prosecution team did not have possession of or know the contents of his compelled statement was completely accurate, and he knew long before trial that the government was aware of the Shea IAD investigation based on a reference in the separate IAD materials relating to the Pellicano investigation (which had been produced in discovery). (JER 3389-

420

90).  Arneson cannot show a likelihood that any violation materially affected the verdict.

>    5.   Questioning of Arneson Regarding a Fraudulent
>         Bankruptcy Petition Was Wholly Proper and Did Not
>         Involve Any Rule 16 Violation

Arneson's arguments regarding his cross-examination about a fraudulent bankruptcy petition, which make up a substantial part of his opening brief (AOB 40-59), are remarkable both for their misrepresentations and for their factual omissions.  The true facts, as borne out by the record, are nowhere near as nefarious as Arneson suggests -- at least, not with respect to the government -- and reveal the baselessness of Arneson's claims.

>    a.   The Bankruptcy Questioning

On direct examination, Arneson's counsel asked him about a bankruptcy petition filed in his name in July 1998.  The petition identified Arneson as a self-employed "private investor" earning $4,000 per month and failed to list his employment with the LAPD.  (JER 5416).  The petition, which was filed on July 7, 1998 -- the day Arneson's residence was due to be sold in a foreclosure sale -- included Arneson's name, Social Security number, residence address, and a mailbox address Arneson was using at the time, and correctly identified Arneson's bank account and vehicle.  (GERT 5627-30, 5737-41, 5744; JER 5377[414], 5389).  Arneson testified on

---

[414]  The copy of Government's Exhibit 629 included in defendants' JER omits the page referring to the foreclosure sale. A complete copy of the exhibit is at GER 2072-81.

direct that he did not file the fraudulent petition; that he had
no idea who had done so; that he first learned of the petition
when he received notification from the Bankruptcy Court; that he
"did nothing" after learning about the petition; and that the
petition was eventually dismissed.  (GERT 5657-58).

On cross-examination, the government introduced various
documents related to the bankruptcy filing, some of which were
self-authenticating (such as the certified bankruptcy petition
and summary of schedules), some of which Arneson authenticated
(including letters on his letterhead and bearing his signature),
and others that had been obtained from the file of Sandra Olin at
National Loan Center pertaining to a July 1998 refinance loan on
Arneson's residence and that were introduced subject to later
authentication.[415]  (E.g., GERT 5747, 5754, 5759).  One of the
documents was a letter dated August 13, 1998, from Arneson to
Vista Mortgage, which read, in part:

> A concern generated by the underwriter has mandated a
> response to address a financial position.  The recent
> filing of Chapter 13 was predicated on the adverse
> actions pursued by FATCOA.[416]  Their bid to undermine

_____

[415]  Because Arneson had raised the bankruptcy petition issue
on direct examination, the government was permitted to introduce
extrinsic evidence under Federal Rule of Evidence 607, for
impeachment by contradiction.  See United States v. Castillo, 181
F.3d 1129, 1132-33 (9th Cir. 1999).  Had Arneson not raised it,
extrinsic evidence would have been barred Rule 608(b) and the
government would have been left with Arneson's denial, as the
government anticipated before Arneson's testimony.  (GERT 7407).

[416]  "FATCOA" (or, correctly, FATCOLA) is the First American
(continued...)

422

the loan process was specifically directed to gain
control of the property through false pretext.  The
negative impact of the assault created the necessity to
protect the residence against a hostile entity. . . .
[T]heir purposeful attempt to illegally gain control of
the property forced an alternative action to protect
the property and my credit status. . . .  The Chapter
13 filing was specifically engaged to counter the
hostile takeover of FATCOA to gain control of the
residence. . . .  It was with great reluctance I
submitted to a Chapter 13 filing for protection. . . .
Advice . . . from my financial advisory team and
attorney convinced me to apply for the legal and
rightful protection afforded under Chapter 13.  The
filing negated FATCOA's hostile attempts to sell the
property and allowed a sufficient time base to
facilitate the loan. . . .  On August 7, 1998, the
Chapter 13 filing was dismissed.  Sandra Olin of
National Loan Center has provided proof of the
dismissal.  This is another illustration of my
commitment to the property and financial obligation.

(GERT 5748-51; JER 5430-31).  Arneson admitted that he "may have"

written that letter, which bore his signature and was on his

letterhead.[417]  (GERT 5747-49).  Arneson, who had previously

disavowed any knowledge of the petition, acknowledged after being

confronted with his own letter that "obviously" he "was aware of"

---

[416](...continued)
Title Company of Los Angeles, which Arneson acknowledged was
seeking to foreclose on Arneson's home and was listed as a
security holder in the July 1998 bankruptcy petition.  (GERT
5625-26, 5748).

[417]  Arneson admitted that he avoided foreclosure by
refinancing his property through Sandra Olin at National Loan
Center. (GERT 5636, 5739).  Arneson further admitted that he
wrote Olin a letter providing his correct contact information and
affirming the bankruptcy petition's dismissal (GERT 5752-54; JER
5432), and did not dispute that a September 1998 fax from him to
Olin and Phyllis Miller regarding the refinancing was genuine.
(GERT 5635-37).  Other documents in Olin's loan file also
included Arneson's telephone, pager, and facsimile numbers.
(GERT 5746-47, 5752-53, 7409-10; JER 5429, 5432).

the bankruptcy filing, although he continued to deny knowing who
had filed it or having caused the petition to be filed.  (GERT
5751-52).  Arneson offered no explanation for the correspondence
on his letterhead and bearing his signature that sought to
justify his filing of the petition.  (GERT 5792-94, 5805).

In its rebuttal case, the government called Phyllis Miller
to authenticate two exhibits from the Arneson's loan file that
had been conditionally admitted during Arneson's cross-
examination.  Miller testified that, at the request of her
husband David Miller, she had put Arneson in touch with Olin to
assist Arneson in refinancing his personal residence.  (GERT
7222-24).  On cross-examination, Miller acknowledged that the
handwriting on the summary of schedules filed with the bankruptcy
petition looked like her husband's.  (GERT 7238-40).  When
Arneson's counsel asked whether Miller and her husband had filed
the bankruptcy petition fraudulently on Arneson's behalf, the
court directed her not to answer the question and excused the
jury.  (GERT 7240).

Contrary to Arneson's false assertion that the court stopped
Miller's testimony because her "government . . . sponsored . . .
perjury . . . was so obvious" (AOB 5), the court actually did so
because, as the court told Miller, "if you were involved in some
way in the filing of a fraudulent bankruptcy petition, either
alone . . . or in connection with your husband that would subject
you potentially to criminal prosecution, [and] you have a right

424

not to testify." (GERT 7240-41). On the basis of that concern, the court appointed Miller counsel. (GERT 7245).

Although Miller's initially appointed counsel told the court that he would instruct her to invoke her right against self-incrimination (GERT 7281), Miller's subsequently appointed counsel informed the court the next court day that Miller would not assert Fifth Amendment privilege and was willing to answer all questions on cross-examination. (GERT 7396-97).

At that point, the court gave Arneson the choice either (1) to continue with Miller's cross-examination or (2) to strike Arneson's cross-examination relating to the bankruptcy and Miller's direct examination (but not Arneson's direct or Miller's cross). (GERT 7410-11, 7416). Contrary to Arneson's false assertions that the court found the bankruptcy questioning improper and struck Miller's testimony based on a finding of prosecutorial misconduct (JOB 39; AOB 43), the court expressly declined to find any error in the cross-examination of Arneson -- its proposed striking of testimony was based solely on Federal Rule of Evidence 403 and the "extraordinary amount of time" that would be needed to present evidence on the bankruptcy issue.[418] (GERT 7401-02, 7408-09, 7415-18, 7539). Arneson promptly elected to strike the government's cross-examination of him rather than

---

[418] The court had previously denied Arneson's Rule 403 objections to the bankruptcy-related questioning. (GERT 5762).

425

further cross-examine Miller.[419]  (GERT 7419-20).  Defendants'
assertion that the court found the cross-examination of Arneson
"improper" and "struck [it] from the record" on that basis is
simply false.  (JOB 39; AOB 43).

When the jury returned the following day, the court
instructed:

> Ladies and gentlemen, the Court has stricken and you
> are instructed to disregard the direct testimony of
> Phyllis Miller and the government's cross-examination
> of Mr. Arneson with regard to a bankruptcy filing made
> in Mr. Arneson's name.  Mr. Arneson's direct
> examination questioning regarding the bankruptcy and
> the cross-examination of Ms. Miller have not been
> stricken.
>
> You may not consider any of the stricken testimony or
> exhibits for any purpose.  However, of course, you may
> consider any testimony that has not been stricken by
> the Court on this subject.

(GERT 7546-47).

### b.    The Government Had a Good-faith Basis to Cross-Examine Arneson Regarding His Knowledge of the Bankruptcy Filing

Arneson's claim that the government engaged in misconduct by
cross-examining him about the bankruptcy filing without a good-
faith basis must be rejected.  (AOB 45-48).  Arneson testified
not only that he did not sign the petition, but that he had
nothing to do with it, had no idea who had filed it, and knew
nothing about it when it was filed.  (GERT 5374-75, 5735-36,
5738, 5744, 5753).  Yet the government obtained from Arneson's

---

[419]  Arneson's current suggestion that he was prevented from
completing his cross-examination of Miller is false.  (AOB 45).

loan file an August 13, 1998, letter, on his letterhead and bearing his signature, in which he discussed his reasons for filing the bankruptcy petition.  The government also obtained documents showing that Arneson's residence, which matched that on his letterhead and on the bankruptcy petition, was scheduled for a foreclosure sale on the very date that the petition was filed, as referenced in Arneson's own letter.  (GERT 5627-30, 5632-34, 5739; JER 5377, 5389).  Arneson, who did not deny writing the letter, was unable to provide any explanation.  (GERT 5747-49, 5792-94, 5805).

In light of this evidence, the government had -- and, given Arneson's failure to explain his August 13, 1998 letter, still has -- a good-faith basis to believe that Arneson's testimony that he did not authorize the petition and knew nothing about it when it was filed was knowingly false.  At most, Phyllis Miller's acknowledgment that the handwriting on the petition looked like her husband David's writing suggested that Arneson did not commit his fraud alone: Arneson had admitted on cross-examination that he knew David Miller, whom he described as "a financial consultant that went around police stations."  (GERT 5625).  At Arneson's sentencing, the court, which had the opportunity to hear all the evidence and to observe Arneson's demeanor on the stand, imposed an enhancement for obstruction of justice based in part on Arneson's testimony regarding the bankruptcy petition, stating: "the Court is certain, based on the testimony and other

427

evidence, that defendant was not a victim of identity theft and does not believe himself to be a victim in connection with the bankruptcy filing." (JER 4904-05). Given this factual finding, Arneson's contention that the government lacked even a good-faith basis to question him regarding the fraudulent petition is without merit.

Arneson's claim that the court erred in allowing the government conditionally to introduce the bankruptcy documents subject to later authentication by a rebuttal witness should also be rejected.[420] (AOB 47-48). Federal Rule of Evidence 104(b) commits the order of proof to the discretion of the trial judge and authorizes admission of evidence subject to later satisfaction of a condition to relevancy. See United States v. Black, 767 F.2d 1334, 1342 n.6 (9th Cir. 1985) (authentication requirement is governed by general approach to issues of conditional relevancy set forth in Rule 104(b)). Rule 104(b) plainly gave the court discretion to provisionally admit the bankruptcy exhibits subject to later authentication, rather than either interrupt the defense case with a government witness or require the introduction of the documents in the government's

---

[420] The government intended to call Olin in its rebuttal case to authenticate the documents as coming from her file. (GERT 7409-10). Because the court later struck Arneson's cross-examination relating to the bankruptcy, Olin was not called on rebuttal. (GERT 7416, 7419-20).

rebuttal case when Arneson could no longer be questioned about them.

    c.    The Government Did Not Violate Rule 16 by Failing
          to Disclose Documents Used Solely for Impeachment

Arneson next claims that the government violated Rule 16 by failing to produce the bankruptcy-related documents from the loan file.[421] (AOB 48-51). Although the court initially instructed the government to turn over all of Arneson's statements that it intended to use for cross-examination (JER 3395), the court later withdrew that order, stating instead that the government need not produce "statements that the government intends to use solely for the purpose of impeaching the credibility of a defendant . . . prior to introducing the material on cross-examination." (JER 3446). This order was consistent with Rule 16 and controlling precedent. United States v. Gonzalez-Rincon, 36 F.3d 859, 865 (9th Cir. 1974) (defendant's customs declaration form, offered only as impeaching evidence after defendant testified, was not "relevant statement" under Rule 16 and therefore was not discoverable); United States v. Gleason, 616 F.2d 2, 24 (2d Cir. 1979) (statements are not discoverable under Rule 16(a) if they become relevant only for impeachment after witness' direct

---

[421] The government did not obtain the loan file relating to Arneson's home refinancing (which included his signed correspondence explaining and justifying the bankruptcy filing) until the weekend following Arneson's direct examination -- after Arneson's counsel unexpectedly opened up the impeachment opportunity by raising the bankruptcy issue on direct. (GERT 7407).

testimony); <u>United States v. Skillman</u>, 442 F.2d 542, 550 (8th Cir. 1971) (Rule 16 did not require advance disclosure of tape-recorded conversation of defendant that was admitted solely for impeachment).[422]

As presented by the government on cross-examination, the relevance of Arneson's August 13, 1998, letter and the other documents from Arneson's loan file lay solely in their value for impeachment.  Requiring production of such material before cross-examination would only serve to dilute or destroy effective impeachment, allowing a defendant to commit more effective perjury by tailoring his testimony to the evidence against him -- a tactic for which Arneson had already shown a propensity.  (GERT 7640-41); <u>cf.</u> <u>Harris v. New York</u>, 401 U.S. 222, 225 (1971) (defendant's privilege to testify in own defense does not include right to commit perjury unchecked by "the traditional truth-testing devices of the adversary process").  Accordingly, the documents were not discoverable under Rule 16.

---

[422] If viewed as "documents" under Rule 16(a)(1)(E) rather than written "statements" under Rule 16(a)(1)(B), the bankruptcy documents were not discoverable because the government did not use them in its case-in-chief.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(E)(ii).  Nor were those documents "material to preparing the defense" under Rule 16(a)(1)(E)(i).  Under Rule 16, "'the defendant's defense' means the defendant's response to the Government's case in chief."  <u>United States v. Armstrong</u>, 517 U.S. 456, 462 (1996); <u>see</u> <u>United States v. Libby</u>, 429 F. Supp. 2d 1, 7 (D.D.C. 2006) ("material" under Rule 16 focuses on allegations in indictment).

Arneson argues that the loan file documents were substantive evidence relating to the charged offenses, noting that the court observed, in initially denying his motion to strike the bankruptcy-related testimony, that the bankruptcy could pertain to "a potential motive to sell information to Mr. Pellicano." (GERT 6678). It was Arneson, however, who raised the issue of a financial motive in connection with the bankruptcy issue on his direct examination. (GERT 5374-76). The government never argued or suggested such a purpose in its opening statement, its cross-examination, or its closing argument, but relied on the bankruptcy-related documents solely to impeach Arneson's direct testimony.[423] (GERT 5735-61, 5770-72). Given that motive is not an element of any offense with which Arneson was charged, the documents -- and particularly Arneson's devastatingly impeaching August 13, 1998, letter -- were not relevant statements under Rule 16(a)(1), but were rather proper impeachment material of which Arneson had no right to discovery. United States v. Disston, 612 F.2d 1035, 1037 (7th Cir. 1980) (Rule 16(a) applies only to statements relevant to the indictment); United States v. Gleason, 616 F.2d 2, 24 (2d Cir. 1979) (Rule 16(a) is intended to

---

[423] The earlier cross-examination regarding the foreclosure sale of Arneson's home and the loan he obtained through Sandra Olin and the National Loan Center was clearly intended to set up Arneson's subsequent impeachment with the related bankruptcy and loan file documents, not to suggest any financial motive for the charged criminal conduct (except insofar as it provided yet further impeachment by contradiction of Arneson's direct testimony). (GERT 5623-37).

provide defendant in advance of trial with "any of his own statements relevant to the crime charged against him").

Finally, even if there was a Rule 16 violation, reversal is not appropriate because, in light of his election to strike the bankruptcy-related testimony and exhibits, Arneson has not shown a likelihood that the verdict would have been different had the violation not occurred.  See Figueroa-Lopez, 125 F.3d at 1247. Arneson also has not shown that discovery of the documents when the government obtained them (after his cross-examination had already begun) would have affected his testimony or that he would have had any ground on which to successfully move to have the documents excluded.

6.    A Single Word Accidentally Overheard by a Single Juror Was Not Vouching

When the court recessed for an afternoon break during Arneson's cross-examination, the prosecutor told Arneson's counsel of his intention to ask the court to revoke Arneson's bail and remand him into custody at the end of that day's proceedings based on his commission of new criminal conduct - perjury - while on pretrial release.  (GERT 5762-63). Unfortunately, the prosecutor did not realize that the last of the jurors had not yet exited through the door to the jury room.[424]

_____

[424]   While the prosecutor was undeniably frustrated with the Arneson's ceaseless perjury -- the extent of which the court
(continued...)

432

The matter was called to the court's attention, and the
court immediately summonsed the jurors, asking if any heard the
prosecutor say something to Arneson's counsel as they were
leaving.  (GERT 5763-64).  Only one juror raised her hand.[425]
(GERT 5764).  When she was questioned outside the other jurors'
presence, she said that she had been the last one to leave the
courtroom and that she only heard the single word "perjury."
(Id.).  When questioned by defense counsel, the juror reaffirmed
that she heard nothing except the word "perjury," that no one had
been with her when she heard it, that she had not discussed it
with other jurors, and that she did not believe any other jurors
were in the courtroom at the time.[426]  (GERT 5765).  The court

---

[424](...continued)
recognized as virtually unprecedented in its own broad experience
(JER 4903) -- the statement was not a "threat," as defendants
claim (JOB 46-47), but appropriate notice to defense counsel of
the government's intent to make a significant motion 90 minutes
later.  The government's error was not in the substance of what
was said, but rather in the timing -- i.e., in not realizing that
the last juror had not yet left the courtroom.

[425]  The juror was misidentified by the reporter as Juror #1.
(GERT 5764).  She was Juror #7.  Although defendants refer to her
as Juror #34 in their briefs (JOB 39) -- her number during voir
dire -- the government refers to her as Juror #7 here.

[426]  After seeking out defense counsel (and the media) post-
verdict, Juror #7 submitted a declaration in support of
Pellicano's new-trial motion in which she stated -- in
contravention of what she had told the court minutes after the
incident -- that she heard the prosecutor say "him . . . perjury,
perjury" and that she understood the statement to mean that the
prosecutor would file charges against Arneson.  (JSER 572; JER
468).  Later, in connection with Pellicano's sentencing (at which
she asked the court for leniency on Pellicano), the same juror
(continued...)

433

reminded the juror that statements by lawyers are not evidence, and the juror assured the court she could disregard the comment. (GERT 5764).

After denying Arneson's mistrial motion, the court brought the other jurors back, reminding them that comments by the lawyers or that the jury might overhear could not be considered as evidence.  (GERT 5769-70).  The court similarly instructed the jury at both the beginning and end of the trial.  (GERT 433, 7552).

Arneson and Pellicano contend the prosecutor's partially overheard comment was vouching.[427]  (AOB 51-52; POB 49-50). Because Arneson did not raise this claim when he moved for a mistrial or when he moved post-verdict for a new trial (see JER 476), review is for plain error.  United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  The isolated word overheard without context by a single juror -- a word used many times in open court -- cannot reasonably be viewed as the prosecutor's personal opinion of Arneson's guilt.  See United States v.

---

[426](...continued)
sent the court a letter contradicting what she had said in her declaration.  (GERT 13974, 13991-92).  Under the circumstances, the government submits that the greatest weight among the juror's many conflicting statements should be attached to her contemporaneous statement that all she heard was the word "perjury."

[427]  The separate argument raised by all defendants that the prosecutor's comment constituted a presumptively prejudicial communication with the jury is addressed earlier.

434

<u>Williams</u>, 989 F.2d 1061, 1071 (9th Cir. 1993).  Moreover, in light of the juror's statement that she could disregard the comment, the prompt curative instruction to her and again to the entire jury,[428] and the court's instructions at the beginning and end of the trial that comments by lawyers are not evidence, there is no likelihood that the single overheard word materially affected the verdict.  <u>See</u> <u>United States v. Younger</u>, 398 F.3d 1179, 1191 (9th Cir. 2005).

      7.   <u>Even If Arneson Has Demonstrated Any Acts of Misconduct, Such Acts Were Harmless in Light of the Overwhelming Evidence of Arneson's Guilt</u>

Apart from and in addition to the issue-specific harmlessness arguments raised above, any misconduct or discovery violation raised by Arneson, even if found to have occurred, must be deemed harmless in light of the overwhelming evidence presented at trial -- evidence that resulted in Arneson's conviction on every one of the 46 counts in which he was charged.  Arneson was not convicted because of questioning about a prior unsustained IAD complaint, because of stricken testimony about a 10-year-old bankruptcy petition, or because of a prosecutor's single out-of-context word overheard out of session by a single juror, all of which constituted isolated incidents in a nine-week

---

[428]  Because the curative instruction was the one Arneson requested (GERT 5767-70), Arneson's claim that "a more specific and focused instruction" was required (AOB 57-59) is precluded as invited error.  <u>See</u> <u>United States v. Baldwin</u>, 987 F.2d 1432, 1437 (9th Cir. 1993).

trial.  See United States v. Wright, 625 F.3d 583, 613 (9th Cir. 2010).  Rather, Arneson was convicted based on overwhelming testimonial and documentary evidence of his criminal association with Pellicano and of the thousands of illegal database inquiries that he conducted on Pellicano's behalf, as well as by the fact that his self-serving and wholly unsubstantiated version of events was decimated on cross-examination in myriad ways that Arneson does not challenge on appeal.  Thus, regardless of what harmlessness standard is applied, none of the issues raised by Arneson, whether viewed individually or cumulatively, warrants reversal.

N.  THE GOVERNMENT'S CLOSING ARGUMENT WAS PROPER AND CERTAINLY NOT PLAINLY IMPROPER

Arneson and Pellicano claim that the government engaged in vouching and made other improper remarks in closing argument that require reversal.  (AOB 59-68; POB 46-50).  The challenged statements, however, nearly all of which were made without any objection, were wholly proper in the context of the entire argument and do not warrant reversal.[429]

1.  Standard of Review

The rejection of objections to closing argument is reviewed for an abuse of discretion.  United States v. Tam, 240 F.3d 797,

---

[429]  Because defendants' excerpts of record contain only portions of the government's closing and rebuttal arguments, the arguments are included in the GER in their entirety to allow this Court to view the challenged statements in their proper context. (GERT 7599-7649, 7654-7788, 8020-81).

802 (9th Cir. 2001).  Improper remarks in closing argument are
subject to harmless error analysis and will result in reversal
only if it is more probable than not that they materially
affected the verdict.  United States v. Prantil, 764 F.2d 548,
556 (9th Cir. 1985).  Absent timely objection to comments made in
closing argument, review is for plain error and will result in
reversal only if a miscarriage of justice would otherwise result.
Williams, 989 F.2d at 1071-72.

> 2.  The Government Did Not Improperly Malign Arneson's
>     Counsel or Express Personal Opinions of Arneson's
>     Credibility

Arneson claims that the following argument improperly
maligned his counsel:

> Defendant Arneson has surely been on the witness stand
> many times before in his career as an officer.  And He
> spent another few hours with Mr. Hummel with what I
> submit is a very polished, very professional, very
> well-rehearsed act, right down to his cute ad lib about
> the Minnesota Vikings.[430]

(JER 3915).  Arneson did not object to this statement.  (Id.).
In context, it is clear that the "few hours" referred to

---

[430]    The "Vikings" reference was to the following question
and answer in Arneson's direct examination while discussing the
nature of his police work:

> Q:  And just in terms of your investigation of bookmaking,
>     you are not talking about the guy that bets on the
>     Minnesota Vikings on Sunday; right?
>
> A:  You know, sir, I have never met anyone successful that
>     bets on the Vikings.

(GERT 5400).

Arneson's testimony on direct examination (i.e., "on the witness stand") and not, as Arneson contends on appeal (through use of misleading additional bracketed text), to time that he spent with his counsel "rehearsing" his testimony.[431]  (AOB 64-65).  Indeed, other than mentioning the undisputed fact that Mr. Hummel conducted that direct examination, the government's statement cannot reasonably be viewed as even referring to -- let alone maligning -- Arneson's counsel.  It was Arneson's status as a law-enforcement witness that the government properly submitted to the jury as a factor in evaluating his testimony and credibility, and the adjectives "polished," "professional," and "well-rehearsed" were clearly references to Arneson, not his attorney.[432]

Arneson also contends that the government committed prosecutorial vouching in describing his testimony as "ridiculous," "not credible," and "a story" that Arneson came up with "after the fact."  (AOB 59-60, 63-66).  None of the comments

---

[431]  Arneson's additional bracketed text replaces the government's actual words "with what I submit was."  (JER 3915).  On his brief's next page, however, he cites law holding that using "I submit" precludes a claim of impermissible vouching.  (AOB 65).

[432]  To the extent that the challenged comment suggested that Arneson's counsel played any role in planning the specific Minnesota Vikings question and answer to which the government referred, the inference was a fair one to ask the jury to draw: the exchange did come off as remarkably scripted.  Regardless, the isolated comment did not constitute plain error resulting in a miscarriage of justice.  Williams, 989 F.2d at 1071-72.

that Arneson now challenges drew an objection at trial.  (GERT 7636, 7643).

Contrary to Arneson's claim, it is neither unusual nor improper to suggest in closing argument that a defendant lied on the stand.  United States v. Birges, 723 F.2d 666, 672 (9th Cir. 1984).  Rather, "[i]n a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying."  United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991).  Counsel are allowed "reasonably wide latitude" in closing arguments and "may strike hard blows based upon the testimony and its inferences."  Birges, 723 F.2d at 671-72; Molina, 934 F.2d at 1445 (prosecution must have "reasonable latitude to fashion closing arguments," including "freedom to argue reasonable inferences based on the evidence").

In Birges, the prosecutor argued in closing that the defendant's testimony contained numerous lies and that his duress defense was a "figment[] of [the defendant's] imagination fabricated by him to escape the responsibility of his criminal actions."  934 F.2d at 671.  This Court held that there was no misconduct and that the prosecutor's dismissal of the defendant's defense as a fabrication was "well within the bounds of acceptable comment."  Id. at 672; see United States v. Moreland, 622 F.3d 1147, 1161-62 (9th Cir. 2010) (prosecutor's repeated references to defendant as "a liar" throughout closing argument

were reasonable based on the evidence); <u>United States v. Rude</u>, 88 F.3d 1538, 1548 (9th Cir. 1996) (prosecutor's use of words "lie," "lies," and "lied" over 90 times when referring to defendants was within the boundaries of proper argument); <u>Sarno</u>, 73 F.3d at 1496-97 (rejecting challenge to prosecutor's repeated characterization of defendant's statements as "lies" in closing argument); <u>Molina</u>, 934 F.2d at 1445 (no misconduct in prosecutor's closing argument that the defendant "lied to you on the stand and remember that the reason he lied to you is because he is guilty"); <u>United States v. Laurins</u>, 857 F.2d 529, 539 (9th Cir. 1988) (no misconduct in prosecutor's closing argument that "I think that after listening to all the evidence defendant has lied to you consistently throughout. His entire testimony is one big lie and falsity.").

The government did not express any personal opinions of Arneson's credibility in its closing argument. Rather, the government repeatedly made clear that it was inviting the jury to make its determination of Arneson's credibility based on evidence that the government listed in its argument. (JER 3915 ("I submit to you that the evidence in this case clearly shows that Defendant Arneson had no more compunction about lying under oath than he did about running those names through confidential police databases."); <u>id.</u> ("[T]he evidence shows you that just about everything he said related to this case was a lie.")). Such submissions to the jury of inferences from evidence in the record

440

are perfectly acceptable.  United States v. Weatherspoon, 410

F.3d 1142, 1147 n.3 (9th Cir. 2005); Necoechea, 986 F.2d at 1279.

The statements cited by Arneson, when viewed in the context

of the entire argument, were plainly comments on the evidence

rather than assertions of personal belief, and therefore were

fully appropriate.[433]  See Laurins, 857 F.2d at 539; Williams, 989

F.2d at 1072 (argument "functioned mainly as rhetorical emphasis

for the inferences the prosecutor was urging the jury to draw

rather than a meaningful personal assurance that the defendants

were guilty").  The challenged arguments bear no resemblance to

those found improper in the cases cited by Arneson.  See United

States v. Frederick, 78 F.3d 1370, 1379-80 (9th Cir. 1996)

(prosecutor allied government with the court and stated that

---

[433]  Arneson's selective and misleading editing of the cited
statements simply omits the contextual portions that disprove his
argument.  For example, the excerpt cited on page 60 of Arneson's
opening brief replaces with ellipses the following statement from
the government's closing:  "The only problem is the evidence
shows you that just about everything he said related to this case
was a lie."  (JER 3915).  Similarly, the allegedly improper
argument cited on page 60 of the brief omits the following from
the middle of the excerpt:  "It is not corroborated by a single
witness, no employee of the agency, no fellow officer, nothing.
It is not corroborated by a single document.  Nothing anywhere in
any LAPD record.  And it is directly contrary to Defendant
Arneson's own letter to Defendant - excuse me.  To Lieutenant
Hooper."  (JER 3919).  In their proper context, the statements
that Arneson challenges were clearly comments on the evidence and
inferences from the evidence, and as such were wholly proper.
(JER 476 ("There is no indication that the government was asking
the jury to disbelieve Arneson because the individual prosecutors
did not believe him.  To the contrary, the government argued that
Arneson should not be believed because of — among other things —
inconsistencies in his testimony and a failure of his testimony
to comport with other evidence in the case.")).

441

they, unlike defense counsel, wanted the jury to  the truth);
United States v. Kerr, 981 F.2d 1050, 1053 (9th Cir. 1992) ("I
think he was candid.  I think he was honest."); United States v.
McKoy, 771 F.2d 1207, 1210-11 (9th Cir. 1985) (former prosecutor,
testifying as witness, told jury that he believed the government
had "an extremely strong case against all defendants").  Arneson
has failed to demonstrate that any of the comments he cites
constituted plain error resulting in a miscarriage of justice.
See Williams, 989 F.2d at 1071-72.

Finally, Arneson challenges the following statement in the
government's rebuttal argument, which also failed to draw any
objection at trial:

> Mr. Hummel suggested to you in his closing -- or
> insinuated that the Government should have gone after
> the clients who maybe hired the Pellicano Investigative
> Agency once and ignore his client who committed at
> least 3500 separate felonies over the course of four
> years while wearing a badge.

(JER 4028).  Contrary to Arneson's claim, this statement did not
suggest that the prosecutor had information beyond what was
presented at trial.  (AOB 65).  The case agent testified that the
FBI identified from the LAPD audits of Arneson's computer
inquiries over 2,500 individual inquiries on Pellicano-related
targets, which unquestionably understated the true number as the
audit only went back to 1999.[434]  (GERT 1834-35, 6034, 6080-81,

---

[434]  The fact that unauthorized access to computer data (one
of the charged target offenses in the identity theft counts)
(continued...)

442

6204-05, 6232).  Whether the transcript is inaccurate or the
prosecutor misspoke, the argument was clearly intended to refer
to this number, which the government cited several other times
during rebuttal.  (GERT 8063, 8075-76).

The additional identified computer inquiries were not
"crimes other than those charged," as Arneson contends (AOB 65),
but were all properly subject to consideration as evidence of the
charged racketeering enterprise.  See Fernandez, 388 F.3d at 1256
(evidence of uncharged acts admissible as proof of racketeering
enterprise); United States v. Clemente, 22 F.3d 477, 483 (2d Cir.
1994) (same); Soliman, 813 F.2d at 279 (acts committed in single
criminal episode do not become "other acts" under Federal Rule of
Evidence 404(b) where defendant is indicted for less than all of
his actions).  Moreover, the rebuttal was a fair response to the
argument of Arneson's counsel, which included a list of clients
on whose behalf Pellicano conducted wiretapping but who were not
charged criminally.  (GERT 7830-33); see United States v. Lopez-
Alvarez, 970 F.2d 583, 597-98 (9th Cir. 1992) (propriety of
prosecutor's argument must be judged in relation to what
constitutes fair response to remarks of defense counsel).  The
argument did not constitute plain error.

---

[434](...continued)
constitutes a felony was itself clear from the indictment, jury
instructions and argument, as well as from LAPD personnel records
that Arneson elected not to redact before they were admitted into
evidence.  (GERT 3783-85, 3796-98, 4561, 7574-75, 7684-85; GEX
2052-93; JER 3969-71, 3979, 3983, 3985).

3.    The Government Did Not Improperly Argue "Other Acts"
      Evidence or Vouch For Its Witnesses

Pellicano also claims error in the government's closing
argument.  (POB 46-50).  As with Arneson's claims, none of the
challenged statements was the subject of an objection at trial,
and they are therefore reviewed for plain error.

Pellicano's first claim (POB 46-47) is that the government
"inflamed the jury with [] unsubstantiated claims of violence,
threats or intimidation by Pellicano," in contravention of the
court's Rule 404(b) instruction, by the following statement near
the start of its closing argument:

> You now know, ladies and gentlemen, what happens when
> the Pellicano Investigative Agency gets hired in the
> case and gets its $25,000 nonrefundable retainer.
> Witnesses start receiving threatening phone calls,
> witnesses' families get harassed, severed rat heads
> appear in informants' mailboxes, dead fish appear on
> reporters' cars, tires get slashed, computers get
> hacked, homes get broken into.  People like Jud[e]
> Green, just out trying to do their errands, get blocked
> in and harassed.

(GERT 7601-02).  These matters were hardly "unsubstantiated":
each was the subject of witness testimony presented at trial.
(GERT 1759-62, 2420-22, 2483, 2721-22, 2886-88, 3397-99, 4922-23,
4935-37).  Moreover, these matters were introduced not as "other
acts" under Rule 404(b), but as direct evidence of the
racketeering enterprise charged in the indictment.  Nor was the
government's language unduly inflammatory or prejudicial.  Rude,
88 F.3d at 1548 (prosecutor's choice of terms and phrases
including "charlatan," "scam," "outlandish," "gibberish" and

444

"falsehoods" was not overly repetitious and reasonably described practices of defendants).

Pellicano also claims that the following statement, which also appeared in the introduction to the government's closing argument, constituted prosecutorial vouching (POB 47-49):

> You have heard that this investigation took years, countless hours of work in imaging and decrypting the massive amounts of computer evidence that were seized, hundreds of witness interviews, extensive proceedings by a Federal Grand Jury. [] All so AUSA Lally and I could come into this courtroom over the last eight weeks and prove to you beyond a reasonable doubt the guilt of every one of these defendants on every one of the crimes charged in the indictment. And I submit to you that that is precisely what we have done.

(GERT 7602-03). Once again, there was no objection to this argument at trial, and there was no plain error in its admission. Contrary to Pellicano's current claim, there is absolutely nothing in this statement that expressed the prosecutors' personal belief in the guilt of the defendants. Rather, the argument was an accurate recap of the evidence presented at trial, which included testimony of numerous FBI computer personnel about the seizure, imaging, and decryption of the computer evidence[435] and cross-examination of numerous government witnesses about their testimony before the grand jury.[436]

---

[435] This parade of computer witnesses was required to authenticate the documents and recordings recovered from PIA's computers, to which defendants (other than Pellicano) declined to stipulate.

[436] (See, e.g., GERT 1133-35, 1201-02, 1246-51, 2254-55,
(continued...)

445

Moreover, unlike <u>United States v. Brooks</u>, 508 F.3d 1205, 1210-11 (9th Cir. 2007), on which Pellicano relies and in which this Court found that "extensive testimony" about the process of obtaining a wiretap authorization suggested that government attorneys and a federal judge had concluded the defendant was guilty, the statement at issue here was a brief and passing introduction to a detailed discussion of the evidence and expressly invited the jurors to draw their own conclusions as to defendants' guilt.[437]  <u>Necoechea</u>, 986 F.2d at 1279 ("I submit" statements do not constitute vouching).

Finally, Pellicano contends that the government "told the jury a well placed half-truth" and bolstered Teresa Wright's testimony by stating that she had lost her job of 23 years with Pacific Bell and suffered a felony conviction, while purportedly concealing its knowledge that Wright had obtained new employment with Verizon.  (POB 49; GERT 7604).  The argument, which (once again) drew no objection, was a fully accurate statement of Wright's testimony and in no way vouched for her credibility. (JER 2004, 2021).  Moreover, Pellicano has made no showing that the government had any knowledge of Wright's new employment at

---

[436](...continued)
3453-55).

[437]  The <u>Brooks</u> court declined to find that the vouching in that case constituted plain error.  <u>Brooks</u>, 508 F.3d at 1212.

the time of argument; nor has he explained how that fact could have changed the trial's outcome.[438]

Because nothing in the government's argument was improper, there was no error here, let alone plain error resulting in a miscarriage of justice.  See Williams, 989 F.2d at 1071-72.

O.    THE EVIDENCE WAS SUFFICIENT TO SUPPORT NICHERIE'S CONVICTION FOR AIDING AND ABETTING THE INTERCEPTION OF WIRE COMMUNICATIONS

Nicherie argues there was insufficient evidence to support his conviction of aiding and abetting Pellicano's interception of Ami Shafrir's wire communications.  Specifically, Nicherie claims that the government failed to prove that (1) Ami Shafrir's wire communications were intercepted or (2) Nicherie aided and abetted that wiretap after October 26, 2000.[439]  (NOB 23-29).  Nicherie waived the latter argument by failing to include it in his Rule 29 motions.  If not waived, there was ample evidence to support the verdict.

---

[438]  At Wright's sentencing, conducted 19 months after closing argument, the prosecutor stated only that the government was aware that Wright "was working."  (JER 4986-87).  The transcript page that Pellicano cites ("RT 4/18/08 AM: 76") has nothing to do with Wright.

[439]  Nicherie first was indicted on October 26, 2005.  (JER 535).  The jury was instructed that it had to find that the interception of Shafrir's wire communications continued after October 26, 2000.  (JER 3888-89).

447

1.    <u>Nicherie Waived His Statute-of-Limitations Argument</u>

Nicherie made several specific arguments in his two Rule 29 motions.  However, he did not allege a statute-of-limitations issue in either motion.  (JER 3140-42, 3873).

Nicherie claims that he raised the sufficiency of the evidence with regard to the statute of limitations in the Rule 29 motion he filed at the close of all evidence.  (NOB 11-12, 24-26).  Nicherie misrepresents the nature of that motion. Nicherie's motion argued that <u>the indictment</u> was invalid because it did not provide sufficient notice and particularity of the date the offense occurred and instead charged a range of dates, a portion of which fell outside the statute of limitations.  (GER 2910-15).  Nicherie also argued that the instruction requiring the jury to find that the offense continued after October 26, 2000, constructively amended the indictment.  (<u>Id.</u>)  The motion did <u>not</u> address the sufficiency of the evidence on the statute-of-limitations issue.  Indeed, after filing the motion, Nicherie's counsel orally affirmed that the motion did <u>not</u> address sufficiency of the evidence but rather "two legal arguments."[440]  (JER 3873).

---

[440]    Nicherie erroneously claims that the court denied his "Rule 29 motion" based on a finding that the sufficiency-of-the-evidence issue was untimely.  (NOB 24-26).  The court denied Nicherie's motion because his challenge to the <u>indictment</u>'s sufficiency had been waived under Federal Rule of Criminal Procedure 12(b)(3)(B).  (JER 4231-32).

448

Because Nicherie raised a number of specific grounds in his Rule 29 motions but did not challenge the sufficiency of the evidence with respect to the statute of limitations, he has waived his right to do so now.  See Graf, 610 F.3d at 1166.

> 2.    The Evidence Was Sufficient To Support Nicherie's Conviction

If not waived, there was sufficient evidence for a rational juror to conclude both that Shafrir's phone calls were intercepted and that Nicherie aided and abetted that interception after October 26, 2000.

Virtue testified Pellicano advised her that the Nicheries (Abner and Daniel)[441] retained PIA to wiretap a competitor and that she saw Nicherie listening to wiretapped conversations at PIA over a few-month period in late 2000 and early 2001.  (JER 1395-1401).  Sarit Shafrir testified that she dropped Nicherie off at PIA at least 20 times from August to December 2000 so he could listen to Ami Shafrir's intercepted telephone conversations and translate these calls from Hebrew to English and that Nicherie played these calls for her over the phone.  (JER 2564, 2610-16).  She further testified that Nicherie admitted he hired Pellicano to wiretap Shafrir, which Pellicano explained he accomplished by having a phone-company employee place a digital recorder in the telephone box outside Shafrir's house.  (JER 2558-59, 2563-64, 2611).  Nicherie similarly admitted to the FBI

---

[441]    Daniel pled guilty to this charge pre-trial.  (CR 454).

that he listened to hundreds of Ami Shafrir's intercepted
telephone conversations and began doing so no earlier than Fall
2000 (JER 2695-98, 2707) and admitted separately to the DEA that
he listened to Shafrir's telephone conversations in late 2000 and
early 2001. In the DEA interview, Nicherie identified listening
to a specific conversation between Shafrir and an individual
named "Hag," and explained that "Hag" did not visit the United
States until late 2000 or early 2001. (JER 2708). A rational
juror easily could conclude that Nicherie hired and authorized
Pellicano to wiretap Shafrir, that Pellicano wiretapped Shafrir,
and that the interception of Shafrir's communications continued
past October 26, 2000 (GERT 4421-22, 4435-36).

Nicherie's reliance on Noel v. Hall, 568 F.3d 743, 748-50
(9th Cir. 2009), in which this Court held that listening to or
copying a recording of a previously intercepted telephone
conversation does not constitute a new "interception" of that
conversation, is misplaced. There, the listening and copying
took place after the interception had terminated. Id. at 745-46.
The evidence here, by contrast, supported finding that Nicherie's
review and translation of the recordings occurred while the
wiretap remained ongoing.[442] Given that Pellicano was
intercepting time-sensitive discussions between Shafrir and his
attorneys about their strategies in the ongoing litigation

---

[442]   The government so argued in closing. (GERT 7779; JSER
3952).

450

against the Nicheries (GERT 4439-40), as well as the abundant evidence of Pellicano's established practice of promptly reviewing and discussing with his clients the results of ongoing wiretaps (see, e.g., GERT 3555-59, 3647-49, 4011-13, 4135-37), a rational juror easily could infer that Nicherie was not engaging in a pointless exercise of listening to and translating conversations that had been intercepted months earlier. Indeed, Nicherie's admission to having listened to Shafrir's conversation with Hag in late 2000 or early 2001 alone was sufficient to allow a rational juror to find that the wiretap was ongoing within the statutory period. (JER 2708).

Because the evidence further established that Pellicano initiated and conducted the Shafrir wiretap at the behest of Nicherie and his brother, evidence that the wiretap continued past October 26, 2000, also constituted evidence that Nicherie continued to command, induce, or procure Pellicano to commit that uncompleted crime after October 26, 2000. (GERT 1072-78, 4421-22, 4435-36, 7560-61). Moreover, evidence that Nicherie translated the intercepted recordings on an ongoing basis throughout late 2000 and early 2001 to accomplish the wiretap's objective -- securing a real-time window into Shafrir's conversations, activities, and strategies -- established that Nicherie aided Pellicano in committing this crime. (GERT 7560-61). The evidence was therefore sufficient to support Nicherie's conviction.

451

P.   THE JURY INSTRUCTIONS WERE NOT ERRONEOUS, AND ANY ERROR WAS
     HARMLESS

     1.   <u>Standard of Review</u>

"In reviewing jury instructions, the relevant inquiry is
whether the instructions as a whole are misleading or inadequate
to guide the jury's deliberation.  A single instruction to a jury
may not be judged in artificial isolation, but must be viewed in
the context of the overall charge."  <u>United States v. Dixon</u>, 201
F.3d 1223, 1230 (9th Cir. 2000).  The formulation of jury
instructions is reviewed for abuse of discretion, <u>United States
v. Stapleton</u>, 293 F.3d 1111, 1114 (9th Cir. 2002), and "'[t]he
trial court has substantial latitude so long as its instructions
fairly and adequately cover the issues presented,'" <u>United States
v. Hicks</u>, 217 F.3d 1038, 1045 (9th Cir. 2000).  Whether an
instruction misstates elements of a crime is reviewed <u>de novo</u>.
<u>Id.</u>  Failure to instruct on an element is harmless if it is clear
beyond a reasonable doubt that a rational jury would have found
the defendant guilty absent the error.  <u>Neder</u>, 527 U.S. at 18.
When there was no objection to the instructions at trial, plain
error review applies.  <u>Pelisamen</u>, 641 F.3d at 404.

     2.   <u>The Computer-Fraud Instructions Were Not Plainly
          Erroneous, And the Evidence Was Sufficient for
          Conviction</u>

Turner (joined by Arneson and Pellicano) claims his
convictions for Computer Fraud, under 18 U.S.C. § 1030(a)(4),
should be reversed because the jury instructions did not include

452

the definition of "exceed[ing] authorized access" that was later developed in LVRC Holdings LLC v. Brekka, 581 F.3d 1127 (9th Cir. 2009); _also United States v. Nosal, 676 F.3d 854 (9th Cir. 2012). (TOB 22-38). Turner also argues the evidence was insufficient to convict him under his new view of § 1030. Turner further argues this also requires reversal of his identity theft, RICO, and RICO-conspiracy convictions. And he claims his identity theft convictions rested on faulty instructions on California Penal Code § 502.[443]

### a. Background

Counts 63-66 charged Pellicano and Turner with Computer Fraud under § 1030(a)(4), for aiding and abetting SBC employee Teresa Wright in accessing a protected SBC computer, without authorization and in excess of authorized access, to obtain

---

[443] Pellicano (POB 58-59) and Arneson (AOB 21-23) join Turner's arguments. In addition to failing for the reasons given here, Pellicano's and Arneson's claims are also waived. For defendants to establish plain instructional error, they must prove prejudice by analyzing the specific evidence regarding, and arguments by, each defendant. Pellicano's and Arneson's abbreviated adoptions of Turner's briefing is insufficient. Evidentiary-insufficiency arguments similarly depend on the specific evidence against each defendant -- a discussion that is omitted from Arneson's and Pellicano's cursory adoptions of Turner's argument. United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 237 (3d Cir. 1998) (fact-specific arguments may not be adopted under Fed. R. App. P. 28(i)); United States v. Isabel, 945 F.2d 1193, 1200 (1st Cir. 1991); United States v. Harris, 932 F.2d 1529, 1533 (5th Cir. 1991). By "argu[ing] for adoption by reference in a perfunctory manner" in a "complex case involving numerous issues of both fact and law," Pellicano and Arneson "waived" their arguments. United States v. Casas, 425 F.3d 23, 30 n.1 (1st Cir. 2005).

confidential information on four of Pellicano's victims -- Bo
Zenga, Heidi Gregg, "Johnny Friendly," and Anita Busch.  (JER
3986).  Counts 42-46 charged Pellicano and Arneson with computer
fraud for accessing LAPD systems, and counts 49-50 charged
Pellicano with using Stevens to illegally access FBI systems (JER
3980, 3982).

The evidence established that Wright, an SBC sales support
manager, had limited and restricted access to SBC databases.
(JER 2004-06).  In return for payment, Wright gave Turner
confidential system records of telephone numbers, addresses, and
local calls he requested.  (JER 2008-13, 2046-53).  Turner's
requests numbered in the hundreds, and did not correspond to
maintenance tickets or service orders to which Turner was
assigned.  (JER 2009-10).  Indeed, Turner's requests continued
after he retired from SBC.  (JER 2008).  Turner paid Wright for
the information.  (JER 2046-54).

SBC's system was a restricted-access database, which kept a
"trail" of each user's inquiries to prevent improper access.
(JER 2050, 2064).  As Wright told Turner, the system required
employees to state the reasons for their queries.  (JER 2064).
When entering Turner's inquiries, Wright misrepresented the
reason for her access by entering the codes "ERR" (for "error")

454

or "CHK" (for "checking the account").  (JER 2014, 2019, 2064, 2073-74).[445]

Wright's purpose in inputting false codes was to cover her tracks in case her database use was audited.  (JER 2014, 2064). At trial, recognizing her user identification, the use of the ERR code, and the empty "notations" field on her BOSS query logs, Wright established that, at Turner's request, she had accessed BOSS database information on numerous PIA investigative targets. (JER 2014-21, 2089).

Records of Arneson's computer use, in turn, showed him repeatedly querying restricted-access law-enforcement databases for personal information, criminal histories, and DMV records on hundreds of Pellicano's targets.  For this, he received at least $190,000.  See Part III.A.1.b, supra.  Arneson's access to NCIC required him, too, to state the reason for his access.  (GERT 1901-02).

Section 1030(a)(4) punishes anyone who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value."  To "'exceed[] authorized access,'" means "to access a computer with authorization and to use such access to obtain or

---

[445]  When making BOSS inquiries for legitimate work purposes, Wright would make "notation[s]" explaining her activities in the account.  (JER 2088-89).  When exploring accounts for Turner, however, Wright left that field empty.  Id.

alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).

The government proposed an instruction on "exceeds authorized access" that closely tracked the statutory definition. (JER 2801 ("a defendant exceeds authorized access to a computer when the defendant accesses a computer with authorization but uses such access to obtain information in the computer that the defendant is not entitled to obtain"); GER 2889 (identical proposal in revised proposed instructions)).  Turner's objections to the government's instruction and proposed instructions of his own took no issue with the government's.  (GER 2785-99).

The court issued its proposed instructions and ordered that objections "should be submitted in writing . . . and should provide a proposed revised or additional instruction."  (GER 2901).  Turner's objections addressed computer fraud only by joining Arneson's filing.  (GER 2903-04).  Arneson did not challenge the court's definition of exceeding authorized access, (JER 3703-25), but only asked for additional language on good faith and intent to defraud:

> [F]or a defendant to be found guilty of . . . computer fraud, the government must prove each of the following elements . . . :
>
> First, the defendant knowingly accessed without authorization or exceeded authorized access of a computer that was used in interstate or foreign commerce or communication;
>
> Second, the defendant did so with the intent to defraud, that is, an intent to deceive or cheat.  Good

faith is a complete defense to these charges because
good faith is inconsistent with an intent to defraud;

     Third, by accessing the computer without
authorization or exceeding authorized access to the
computer, the defendant furthered the intended fraud;
and

     Fourth, the defendant, by accessing the computer
without authorization or by exceeding authorized access
to the computer, obtained anything of value.

(JER 3720-24).

The court's final instructions rejected Arneson's and

Turner's suggestions as to good faith and intent to defraud, but

tracked the rest of their proposal verbatim.  (GER 1622-23).[446]

The court further said:

     [A] defendant exceeds authorized access to a
computer when the defendant accesses a computer with
authorization but uses such access to obtain
information in the computer that the defendant is not
entitled to obtain.

(GER 1624; GERT 7592-93).  No defendant objected.

     b.  <u>Any Errors Were Invited and Waived by Defendants</u>

The instructional challenges are waived because defendants

invited the instruction they now complain about.  For invited

error to apply to a jury instruction, this Court requires that

the party "'induced or caused the error,' <u>or</u> . . . 'intentionally

relinquished or abandoned a known right.'"  <u>Budziak</u>, 697 F.3d at

1110 (emphasis added).  Where defense counsel signs a written

_____

    [446]  Turner's counsel proposed (and the court gave) a
separate instruction on the Turner-Pellicano counts, copying
Arneson's proposal.  (GERT 7483-84).

instruction request, he "represent[s] . . . that he . . .studied [the instructions], and that, to the best of his knowledge, they represent[] the current state of the law." United States v. Cain, 130 F.3d 381, 383 (9th Cir. 1997).  By proposing their instruction in writing, Turner and Arneson waived any challenge to the court's adoption of that instruction.  Id.; United States v. Mendoza, 473 Fed. Appx. 765 (9th Cir. 2012) (following Cain).

### c.    It Was Not Plain Error To Use Congress' Definition of "Exceeds Authorized Access"

Defendants contend that plain error applies.  (TOB 22). Even under that standard, however, defendants' challenges fail all four prongs of the plain-error test.

There was no error in the court's instructions.  Defendants do not claim the instructions misstated the law or omitted an element.  Rather, they claim the instructions should have further defined the term "exceeds unauthorized access" to account for this Court's later rulings in Nosal and Brekka.  But just because instructions could have further defined a term does not mean they were erroneous not to do so.  The "precise formulation of jury instructions lies within the discretion of the district court." United States v. Sarno, 73 F.3d 1470, 1486 (9th Cir. 1995).  Even if a further explanation could have been given, the court acted within its discretion by giving the jury a definition that repeated Congress' language virtually verbatim.  United States v. McNeal, 77 F.3d 938, 944 (7th Cir. 1996) (no error in instruction

458

that "was largely a direct quote from the . . . statute and thus [was] accurate").[447]

Nor was any error plain. The Supreme Court has now clarified that plain error is measured as of "the time of [appellate] review." Henderson v. United States, 133 S. Ct. 1121, 1127 (2013). As a result, defendants' plain error claim takes into consideration Brekka and Nosal,[448] even though those decisions did not exist when the court formulated its instructions.

But Turner's asserted error is not plain even under current law. Turner's plain-error burden exists on top of the considerable discretion judges have when devising jury instructions. United States v. Harris, 185 F.3d 999, 1007 (9th

---

[447] The decision to stick with Congress' definition also was not error because "it expresse[d] a concept within the jury's ordinary experience. No prejudice results from . . . failure to define a concept 'within the comprehension of the average juror.'" United States v. Tirouda, 394 F.3d 683, 688-89 (9th Cir. 2005). Because the term "exceeds authorized access" is within an ordinary juror's understanding, no further definition was required -- as the Second Circuit found with respect to the same statute in United States v. Morris, 928 F.2d 504, 511 (2d Cir. 1991) (because "authorization" is a word "of common usage, without any technical or ambiguous meaning," court "was not obliged to instruct the jury on its meaning"). This Court cited Morris for this point in Brekka, 581 F.3d at 1133.

[448] While the government does not concede Nosal's correctness and preserves the point for further review, it acknowledges Nosal as binding in this Circuit. United States v. Williams, 504 U.S. 36, 45 (1992) (failure to make futile objection to then-binding precedent does not foreclose further review).

Cir. 1999).  Turner therefore must show that the court not only abused its discretion, but did so plainly.

Under Henderson, "a new rule of law, set forth by an appellate court, cannot automatically lead that court to consider all contrary decisions by trial courts plainly erroneous."  133 S. Ct. at 1130.  Particularly where a decision "concern[s] matters of degree, not kind," a lower court's ruling "even if now wrong (in light of the new appellate holding), is not necessarily plainly wrong."  Id.  Such is the case here.  In formulating instructions, trial courts have "'substantial latitude so long as [the] instructions fairly and adequately cover the issues presented.'"  Hicks, 217 F.3d at 1045.  Whether to further define a term beyond the statutory definition is the sort of "matter[] of degree" for which, under Henderson, the lower court ruling, "even if now wrong (in light of the new appellate holding), is not necessarily plainly wrong."  133 S. Ct. at 1130.

Brekka and Nosal did not rule that defendants are entitled to particular instructions defining "exceeds authorized access." Neither the Ninth Circuit Model Jury Instructions nor the leading treatise recommend such instructions.  See Ninth Circuit Model Instruction 8.99; 2A O'Malley, Grenig & Lee, Federal Jury Practice and Instructions § 42:19, at 248 (6th ed. 2009).  That the instruction Turner belatedly advocates still has not been incorporated into the model instructions underscores how far from a plain abuse of discretion Turner's assertion of error is.

460

United States v. Still, 857 F.2d 671, 672 (9th Cir. 1988)
(finding no plain error from omitted definition where, inter
alia, "the court's instructions conformed almost entirely with
federal model jury instructions").  Defendants' entitlement to
further instruction also was not plain because defendants have a
right to particular instructions only for issues that are
"presented," Hicks, 217 F.3d at 1045, and defendants' argument
and evidence did not contest that the actions alleged by the
government, if proven, constituted unauthorized access.

Defendants also cannot show error affecting substantial
rights.  Two factors increase defendants' burden on this prong.
First, defendants' burden to prove prejudice "is especially heavy
because no erroneous instruction was given; [their] claim of
prejudice is based on the failure to give any explanation beyond
the reading of the statutory [definition] itself." Henderson v.
Kibbe, 431 U.S. 145, 155 (1977).  Such "[a]n omission, or an
incomplete instruction, is less likely to be prejudicial than a
misstatement of the law." Id.  Second, the Supreme Court
recently emphasized that prong three of plain error is a
"screening criteri[on]," in which "the fact that a defendant did
not object . . . may well count against [granting plain error]
relief." Henderson, 133 S. Ct. at 1130.

Defendants would have been convicted even with an
instruction incorporating all of Nosal and Brekka, because those
cases did not eliminate liability for employees who circumvent

461

computer tracking measures by entering false information.
Acknowledging that the statute defines "exceeds authorized
access" as "to access a computer with authorization and to use
such access to obtain or alter information in the computer that
the accesser is not entitled so to obtain or alter," 18 U.S.C.
1030(e)(6) (emphasis added), Nosal hypothesized an application of
the statute giving effect to the word "so," imagining "an
employee . . . given full access to the information, provided he
logs in with his username and password," but who "uses another
employee's login to copy information from the database" in "an
effort to cover his tracks": "[T]his would be an employee who is
authorized to access the information but does so in a manner he
was not authorized 'so to obtain.'"  Nosal, 676 F.3d at 858.
Nosal therefore does not forbid penalizing authorized users who
disguise their access by entering false information.[449]

        That is what happened here.  SBC's system required employees
to enter a code showing "why they entered [each customer]
account."  (GERT 3317).  Wright knew the database "left a trail
showing [who] had accessed the database on which numbers on which
dates."  (JER 2014).  When accessing SBC databases for Turner,

---

        [449]  While Nosal also left open the possibility that the word
"so" was mere surplusage, courts "must give effect to every word
of a statute wherever possible."  Leocal v. Ashcroft, 543 U.S. 1,
12 (2004).  Moreover, Turner's prejudice is measured by
considering the result that would have followed an instruction
that is not plainly erroneous -- not by de novo determining
optimal instructions and applying them post hoc.

Wright entered the code "ERR" – to meet the system's code-based requirement, while misrepresenting how she had accessed the number "[s]o I wouldn't leave a trail." (JER 2073-74). This uncontradicted testimony was corroborated by SBC records confirming Wright's repeated use of the "ERR" code "to indicate the account was accessed in error" when she accessed information on Pellicano's targets. (GERT 3317-27; GEX 2484-91).

Turner knew Wright was doing this to circumvent SBC's access-controls, as a recorded call showed:

> TURNER: [W]hen you pull an account . . . I remember, you told me, you had to have a reason for doing it.
>
> WRIGHT: Right, and I always put error in the account.

(JER 2064).

Turner's new proposal thus would not have altered the result, since Wright entered false codes to defeat the BOSS system's auditing system and access the information in a way she was not entitled <u>so</u> to obtain. The evidence on Arneson was similar.[451] This means both that the lack of a <u>Nosal</u> instruction was not prejudicial, and that defendants' sufficiency arguments fail, since the evidence, construed in favor of the government, allowed a reasonable jury to convict.

Moreover, for both Wright and Arneson, access to records in the relevant computer systems was not authorized at all unless

---

[451] NCIC required Arneson to enter a code designating each search's purpose. (GERT 1901-02).

certain conditions precedent were met.  In each case, one of the conditions precedent was a legitimate work-reason for access.  In Arneson's case, police employees were not authorized to access criminal offender information unless they had a "need-to-know" -- i.e., "an official purpose" constituting a "compelling requirement for the information . . . directly related to official duties and/or responsibilities."  (GEX 2096; GEX 2082 (Arneson's acknowledgment that "all access to California Law Enforcement Telecommunications System (CLETS) related information is based on the 'need to know'" principle); GERT 1828 ("in order to access . . . the databases," officers "have to have the need to know" -- i.e., "assignments over [the] particular investigation[]"); GERT 4770 (for CORI database, "there must be an official business need before [the] request can even be initiated")).  Wright's access to SBC systems was similarly conditioned: "when you pull an account . . . you have to have a reason for doing it."  (JER 2064).  Under Brekka, 581 F.3d at 1135, "'authorization' depends on action taken by the employer."  Here, both employers enforced policies that denied authorization to access the systems without these conditions being met.  The jury thus had more than sufficient evidence to convict on the CFAA counts.[452]  Nor can defendants show that it was plain error

---

[452]  Indeed, it seems the jury did convict on this theory. The ultimate jury instructions inadvertently left the word "so" out of the jury instructions, stating only that a "defendant
(continued...)

for the court not to have <u>sua sponte</u> deemed the evidence insufficient, given the defense's failure to raise their current objection in a motion for judgment of acquittal.  <u>United States v. Phillips</u>, 704 F.3d 754, 762 (9th Cir. 2012).[453]

Furthermore, while <u>Nosal</u> stated that the "general purpose" of the CFAA was "to punish hacking -- the circumvention of technological access barriers," 676 F.3d at 863, <u>Nosal</u> did not limit the sorts of circumvention that qualify.  <u>Nosal</u> does not immunize unauthorized users who bribe or extort authorized users into sharing their access.  The intrusive effect on the protected system is the same, whether the defendant circumvents access barriers by cracking a password, or circumvents them by bribing the password-holder.  Wright and Arneson were essentially bribed by Turner and Pellicano into giving Turner and Pellicano unauthorized access.  Any error is not prejudicial, and the convictions cannot be reversed.

Finally, this Court should not exercise its fourth-prong discretion.  "[F]ailure to give a jury instruction, even if in error, does not seriously affect the fairness and integrity of

---

[452](...continued)
exceeds authorized access to a computer when the defendant accesses a computer with authorization but uses such access to obtain information in the computer that the defendant is not entitled to obtain."  (GER 1624; GERT 7592-93).

[453]  Given defendants' failure to preserve this issue, their insufficiency argument requires them to show that it was plain error for the court not to have found that no reasonable jury could have found the elements met.

judicial proceedings if the defense at trial made no argument relevant to the omitted instruction." United States v. Anderson, 201 F.3d 1145, 1152 (9th Cir. 2000); United States v. Buckland, 289 F.3d 558, 572 (9th Cir. 2002) (plain-error fourth prong not met where uncontested element not submitted to the jury). Furthermore, "where the evidence against the defendant on the issue erroneously explained to the jury is 'overwhelming,'" plain error reversal is inappropriate, because "[a]llowing the conviction to stand" does not "'seriously affect[] the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Bear, 439 F.3d 565, 570 (9th Cir. 2006); United States v. Lacy, 119 F.3d 742, 749 (9th Cir. 1997).[454]

In Johnson, 520 U.S. at 467-69, the Supreme Court denied plain error relief under this fourth prong, despite a plain instructional mistake and presumed prejudice. Although jury

---

[454] Turner claims that a conviction based on a legally invalid theory automatically affects the integrity of the courts. (TOB 26-27). But the Supreme Court prohibits such a per-se rule. Puckett v. United States, 556 U.S. 129, 142-43 (2009) ("The fourth prong is . . . applied on a case-specific and fact-intensive basis. . . . [A] 'per se approach to plain error review is flawed.'"). Nor do Turner's citations support his claim. Olano v. United States, 507 U.S. 725, 739 (1993)), leaves open the possibility of presuming prejudice under prong three of the plain error test. United States v. Cruz, 554 F.3d 840 (9th Cir. 2009), says only that prong four can be met where there was a complete lack of "jurisdiction," or where someone is "sent to jail for a crime that, as a matter of law, he did not commit." Id. at 845. Turner raises no question of jurisdiction, and his complaint about the jury instruction does not make him innocent as a matter of law. Regardless, Puckett overrules Cruz's per-se rules.

instructions omitted a required element, the Court found the fourth prong unmet because the element was "essentially uncontroverted" and supported by "overwhelming" evidence.  <u>Id.</u> at 470; <u>United States v. Keys</u>, 133 F.3d 1282, 1287 (9th Cir. 1998) (withholding relief where "[t]he record . . . and the nature of [the] defense demonstrate without a doubt" that the omitted element was met).

This Court should act similarly here.  Wright's testimony that she entered the "ERR" code to cover her tracks was completely uncontested.  (JER 2071-85).[455]  Turner's closing argument -- which argued that Wright's computer inquiries were not taken at Turner's behest and that they did not assist wiretaps -- never contested that Wright's actions, if proven, constituted computer fraud.  (GERT 7945. (Turner's counsel: "if you believe [Ms. Wright], then convict Mr. Turner of aiding and abetting her computer fraud")).  Any instructional error thus does not "'seriously affect[] the fairness, integrity or public reputation of judicial proceedings.'"  <u>Johnson</u>, 520 U.S. at 469.

---

[455]  That Turner did not contest these points distinguishes this case from <u>Bear</u>, 439 F.3d at 570-71, where the defendant both established a factual controversy through her testimony, and raised the issue as "her sole theory of defense."  <u>Bear</u> holds that "[w]hen a defendant <u>actually presents and relies upon</u> a theory of defense at trial, the judge must instruct the jury on that theory even where such an instruction was not requested."  <u>Id.</u> at 568 (emphasis added).  Because Turner did not actually present and rely upon his current theory, <u>Johnson</u> controls, not <u>Bear</u>.

467

Instead, "the reversal of [the] conviction . . . would have that effect."[456]

The importance of these fourth-prong limits have only increased after the Supreme Court's recent Henderson decision. Like the third prong, the fourth prong is a "screening criteri[a]" to keep the plain-error "floodgates" from opening, and "the fact that a defendant did not object, despite unsettled law, may well count against the grant of Rule 52(b) relief." Henderson, 133 S. Ct. at 1130. If mere failure to object "count[s] against" plain-error relief, then a fortiori a defendant's proposal of the very instructions complained of counts against such relief. At the time of trial, case law did not cast doubt on the instructions or the sufficiency of

---

[456] The inappropriateness of discretionary relief is even more striking here than in Johnson and Keys. In those cases, the trial court failed entirely to submit an element to the jury. Here, all elements were submitted to the jury; defendants simply claim one element should have been further defined. Case of Tweed, 83 U.S. 504, 515-16 (1872) ("the party aggrieved, if he supposes the instructions given are either indefinite or not sufficiently comprehensive," may "ask that further and more explicit instructions . . . be given, and if he does not do so he is not entitled to claim . . . reversal . . . for any such supposed error"). Moreover, defendants actually asked for the instruction they now challenge. In addition to resulting in waiver under the invited error doctrine, Turner's and Arneson's role in drafting the instruction is relevant to whether they should receive discretionary and extraordinary relief under plain error. Otherwise, the law would incentivize purposeful laying of errors in the trial record, since "[m]any a defendant would like to plant an error and grow a risk-free trial," with "an acquittal . . . irrevocable under the double jeopardy clause, and a conviction [later] set aside" because of the planted error. United States v. Boyd, 86 F.3d 719, 721 (7th Cir. 1996).

evidence,[457] and there was ample precedent for this prosecution.[458] Unlike in Henderson, the new rule defendants seek to apply still is not settled by the Supreme Court, but rather represents the minority view in a recent circuit split.[459]  The court could not have predicted the Nosal and Brekka decisions.  Giving defendants the instructions they ask for, which accord with precedent, does not "seriously affect[] the fairness, integrity, or public reputation" of the proceedings.  Id.  Under this fourth prong, defendants' claim fail.

> i.  Arneson's Claim Further Fails Because State and Federal Law Made His Access Illegal

In addition to the points above, one more factor about Arneson's case requires rejecting his challenge.  Nosal addressed the fear that broad application of § 1030 would "allow[] private parties to manipulate their computer-use and personnel policies

---

[457] United States v. Slaughter, 248 Fed. Appx. 313 (3d Cir. 2007); International Airport Ctrs., LLC v. Citrin, 440 F.3d 418 (7th Cir. 2006); United States v. Czubinski, 106 F.3d 1069, 1071, 1078 (1st Cir. 1997).  This Court had affirmed the conviction of an ex-employee who used her still-active password to access and damage her employer's files.  United States v. Sablan, 92 F.3d 865 (9th Cir. 1996).

[458] E.g., United States v. Butler, 16 Fed. Appx. 99 (4th Cir. 2001); United States v. Bae, 250 F.3d 774 (D.C. Cir. 2001); United States v. Sadolsky, 234 F.3d 938 (6th Cir. 2000).  Such prosecutions were supported by legislative history.  See Beryl Howell, Real World Problems of Virtual Crime, 7 Yale J.L. & Tech. 103, 109-10 (2004-2005) (discussing H.R. Rep. No. 98-894, at 21 (1984)).

[459] See 4 Raymond Nimmer, The Law of Computer Technology § 18:31, at 18-73 (4th ed. & Supp. 2012).

so as to turn these relationships into ones policed by the criminal law." Nosal, 676 F.3d at 860. But the access policies Arneson violated were enacted by law -- making it far from plain that Brekka and Nosal control.

By California law, the state "furnished" Arneson access to confidential database records only "if needed in the course of [his] duties," Cal. Penal Code § 11105(b), and CLETS could be "used exclusively for the official business of the . . . public agency," Cal. Gov't Code § 15153;[460] Cal. Code Regs. tit. 11, § 703(b) ("Criminal offender record information" may be released only "on a need-to-know basis, only to persons or agencies authorized by court order, statute, or decisional law to receive criminal offender record information"). California's legislature made Arneson's unauthorized access to and dissemination of the information into crimes under Penal Code §§ 11142, 1303, and 11143, and under California Vehicle Code § 1808.45. Arneson's actions were also felonies under Penal Code § 502. Arneson was informed of and acknowledged these statutory restrictions on his access. (GERT 4765; GEX 2094-99; GEX 2082).

Federal regulations, too, prohibited accessing the records for any purpose other than the purpose noted in the request -- as

---

[460] In this context "us[ing]" CLETS means accessing it -- just as the term "computer user" means one who accesses and uses the computer, not one who uses information derived from the computer.

evidenced by the requirement that previously obtained records be re-requested "for any subsequent authorized use."  28 C.F.R. § 20.33(d).[461]  Arneson violated these regulations repeatedly when he requested law-enforcement records under pretense of legitimate use but in fact was feeding them to Pellicano.

Nosal's concern over criminal liability stemming from employment agreements and private contracts does not plainly apply where the policies are set by state and federal statutes and regulations carrying the force of law.  Thus, the lack of justification for plain error relief is even stronger with respect to Arneson, since he was even less plainly entitled to a different instruction, and since his conduct would still have been illegal under a post-Nosal instruction.

"'Rarely will an improper jury instruction justify a finding of plain error.'"  United States v. Musacchio, 968 F.2d 782, 789 n.12 (9th Cir. 1991).  To the contrary, "[o]rderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error."  Henderson, 431 U.S. at

---

[461]  See also id. § 20.33(a)(1) (releasing records to state authorities only "for criminal justice purposes").  If the state distributes the records for other than "official use," the federal government will stop providing that agency with the information.  28 U.S.C. § 534(a)(4), (b); 28 C.F.R. §§ 20.33(b), 20.38.

471

154.  This is not the "rare case" justifying reversal.  Id.  The convictions must be affirmed.

        d.   Error in the Computer-Fraud Instruction Would Not Require Reversal of Other Convictions

    Turner next argues that the alleged infirmity in the § 1030 instructions requires reversing his convictions for identity theft, RICO, and RICO conspiracy.  (TOB 27).  Because there was no plain error in the § 1030 instructions, this attack on the other counts fails.  Even if there were plain error, however, the other convictions would survive based on the jury's independent basis for its convictions: the violation of California's computer-fraud statute, Penal Code § 502(c).  Additionally, a particular defendant's RICO-conspiracy conviction is not dependent on that defendant's committing a racketeering act.  See Part IV.H.5.b(2), supra.

        (1)  Background

    Counts 59-62 (JER 3985) charged Pellicano and Turner with committing identity theft under 18 U.S.C. § 1028(a)(7), (2), by transferring, possessing, and using various means of identification with the intent to aid and abet Wright's violations of 18 U.S.C. § 1030 and Penal Code 502.  Counts 37-41 charged Pellicano and Arneson with similar violations.  (JER 3979).  Counts 51-54 charged Pellicano with further such violations relating to Stevens.  (JER 3983).  Count 1, the substantive Racketeering count, accused Pellicano, Arneson, and

472

Turner of committing, as overt acts 47-69, those and other acts of identity theft.  (JER 3969-72).  Count 2, the Racketeering Conspiracy count, charged Pellicano, Arneson, and Turner with conspiring to commit Racketeering.  (JER 3974).

The Penal Code § 502 instruction defendants now attack is one defendants themselves proposed.  When discussing how the identity-theft instruction should cross-reference § 502, the court said that it "wanted to give the jury a head's up, but maybe it's not worth doing if it's going to be confusing" and asked for defendants' views.  (GERT 7382).  With Turner's counsel and Pellicano standing by, Arneson's counsel said the Court should give a general description of § 502, but should not give the elements:

| | |
|---|---|
| [ARNESON'S] COUNSEL: | I certainly believe the jury should be instructed on what 502 is if it's going to be a basis for [the government's] argument as to why identity theft has been proved. |
| THE PROSECUTOR: | But not specific elements, because those elements don't need to be proved.  I think Mr. Hummel agrees with that. |
| [ARNESON'S] COUNSEL: | I do. |

(Id.).  Arneson's counsel asked instead for an instruction giving his own description of § 502 in lieu of the statutory elements:

| | |
|---|---|
| THE COURT: | What are we going to do about . . . unauthorized access to computers? |

473

[ARNESON'S] COUNSEL:         [W]e have a proposal.  I
                             think, given the fact that the
                             Government has agreed that
                             they're proceeding under
                             [§ 502], that we would just
                             simply have the Court instruct
                             that unauthorized access of
                             computers is the knowing
                             access and taking, copying, or
                             making use of data or
                             supporting documentation from
                             a computer, a computer system,
                             or computer network without
                             permission to do so.

                                 *   *   *

[ARNESON'S] COUNSEL:         I think it's a quote from the
                             statute . . . .  Not quite.

                                 *   *   *

[ARNESON'S] COUNSEL:         It's [my associate's]
                             compilation.

(GERT 7496-97).

The court's identity-theft instruction used Arneson's exact

words:

    when possessing, transferring, or using the means of
    identification or causing it to be transferred,
    possessed, or used, the defendant acted with the intent
    to commit or aid or abet the commission of computer
    fraud in violation [of 18 U.S.C. § 1030(a)(4)], or
    unauthorized access to computers in violation of [Cal.
    Penal Code §] 502(c)(2).

    Unauthorized access of computers is the knowing
    access and taking, copying, or making use of data or
    supporting documentation from a computer, computer
    system, or computer network without permission to do
    so.

(GERT 7573; GER 1592-93).  No party objected.

474

(2)  <u>Any Error Was Invited and Waived</u>

Any error in the § 502 instruction was invited under

<u>Laurienti</u>.  Defendants complain about failure to instruct the

jury as to certain elements of § 502 -- namely, requirements of

hacking, loss amount, and the definition of "access."  But when

the parties were asked whether the court should instruct the jury

as to <u>any</u> element of § 502, Arneson declined an instruction on

the elements, proposing instead a more basic instruction he

drafted.  (GERT 7382, 7496).[462]  By rejecting instruction on the

elements of the crime as a whole, defendants necessarily

considered and declined instructions on the particular elements

they now say should have been covered.  As in <u>Laurienti</u>, 611 F.3d

at 543, this Court should hold that by rejecting an offer to

instruct on an element, defendants waived any right to complain.

(3)  <u>The § 502 Instructions Were Not Plainly
         Erroneous</u>

Even under plain error review, the challenges fail.  Turner

does not specify how he believes the instructions should have

been altered or supplemented.  Perhaps he believes he was

entitled to an instruction implementing his belief, not found in

---

[462]  Arneson was presenting his proposal on behalf of all the
defendants affected.  Arneson's proposal came in a discussion in
which multiple defense lawyers were presenting their requests.
Arneson took the lead in presenting defendants' computer-fraud-
related requests, as evidenced by Turner's earlier written
joinder of Arneson's computer-fraud objections.  As a result,
Turner invited error as much as Arneson.

the California statute, that the term "accesses" is "'redolent of hacking.'" (TOB 32). Elsewhere (TOB 31) he hints that the instructions should have defined "access" in the precise language of the statute[463] -- the very approach he deems insufficient in the court's § 1030 instruction. Lastly (TOB 34-35), he says he was entitled to an instruction that the information obtained had to be worth over $250. Whichever complaint is at the heart of Turner's challenge, the claims fail plain-error review.

Steps one and two are not met, because there was no error -- let alone plain error -- in the instructions. The jury did not need to be instructed on the precise content of § 502 because, under United States v. Sutcliffe, 505 F.3d 944, 959-60 (9th Cir. 2007), identity theft under § 1028(a)(7) does not require that the § 502 violation occurred; what matters is that the defendant's unlawful transfer, possession, or use of identification occurred "with the requisite criminal intent" to aid or abet a violation of the specified statutes. Id. Turner cites no case plainly establishing that a jury need be informed of the elements of the associated crime in order to decide whether the defendants intended to aid and abet it. (That doubtlessly is why Arneson's experienced counsel, who litigated

---

[463] "'Access' means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

476

with extraordinary vigor and whose instructional arguments bore
Turner's counsel's approval, rejected the judge's offer to
instruct on the § 502 elements.)  That shows that there was no
error, and certainly no error "so clear-cut, so obvious, a
competent district judge should be able to avoid it without
benefit of objection," as plain error requires.  United States v.
Hayat, 710 F.3d 875, 896 (9th Cir. 2013).

     Even assuming that some definition of some elements was
required, Turner's newly proposed glosses were not.  Vague
complaints that the instructions should have required the
government to prove something "'redolent of hacking or breaking
into a computer'" (TOB 33, 32) cannot establish plain error.
Both in 2008 and now, there was substantial disagreement about
how to interpret § 502 -- with one authority (which Turner cites)
applying restrictive reasoning, and other authorities (which
Turner ignores) holding the opposite.

     Turner relies (TOB 32-33) on a California intermediate
appellate decision in Chrisman v. Los Angeles, 65 Cal. Rptr. 3d
701 (Ct. App. 2007), which construed a different section of the
statute, § 502(c)(7), in setting the statute of limitations for
an administrative action firing a police officer for unauthorized

477

computer snooping.  Id. at 704.  But Chrisman cannot establish plain error, because it did not discuss jury instructions.[464]

Moreover, Chrisman comes from an intermediate appellate court rather than the California Supreme Court.  Such opinions do not even bind subsequent panels of any California Court of Appeals.  McGlothen v. DMV, 140 Cal. Rptr. 168, 176 (Ct. App. 1977).  Chrisman thus does not settle the interpretation of § 502.  See 19 Wright, Miller & Cooper, Federal Practice & Procedure § 4507 (2d ed. & 2012 Supp.) (nonsensical "to give state court decisions more binding effect than they would have in the state court system").[465]  For plain error, defendants must point to binding law that the instructions contravened -- something Chrisman cannot establish.  In re Watts, 298 F.3d 1077, 1084-85 (9th Cir. 2002) (O'Scannlian, J., concurring) ("We can be certain that state case law is an authoritative expression of state law only when it comes from the state's [supreme court]";

---

[464]  Turner does not argue Wright's conduct was exempt under § 502(h)(1)'s provision for acts in the scope of lawful employment.  That provision could not apply anyway, since feeding Turner the information was not "reasonably necessary to the performance of [Wright's] work assignment."  Indeed, Turner's argument (TOB 34) about § 502(h)(2), which applies to "a person acting outside of his or her lawful employment," shows Turner does not claim Wright was acting in her lawful employment.

[465]  This Court has rejected California Court of Appeals decisions on state law, e.g., Dimidowich v. Bell & Howell, 803 F.2d 1473, 1482 (9th Cir. 1986), even when applying the highly deferential AEDPA standard, e.g., Briceno v. Scribner, 555 F.3d 1069, 1079-80 (9th Cir. 2009).

decisions by intermediate state appellate courts leave "room for doubt"); <u>Hagan v. Caspari</u>, 50 F.3d 542, 547 (8th Cir. 1995) ("until the state's highest court has spoken on a particular point of state law the law of the state necessarily must be regarded as unsettled").

That <u>Chrisman</u> has not settled the debate on § 502 is evidenced by later cases finding likely violations of § 502 where users accessed a computer with permission but in violation of terms of access,[466] or where employees used passwords to access computers for illegitimate purposes, <u>Gilbert v. Sunnyvale</u>, 31 Cal. Rptr. 3d 297, 309 (Ct. App. 2006) (citing § 502(c)(2) to support denying appeal of police officer's firing for accessing CLETS records for improper purposes).[467] <u>Sunnyvale</u> specifically says that a police officer who misuses CLETS data (as Arneson did here) violates § 502.  <u>Id.</u> at 309; <u>Perry v. County of Fresno</u>, 155

---

[466]  <u>E.g.</u>, <u>Craigslist v. Naturemarket, Inc.</u>, 694 F. Supp. 2d 1039, 1057-58 (N.D. Cal. 2010) (website stated claim under § 502(c)(1)-(3) where user accessed with permission, but violated terms of use); <u>Facebook, Inc. v. ConnectU LLC</u>, 489 F. Supp. 2d 1087, 1090-91 (N.D. Cal. 2007) (approving § 502 claim where users accessed with permission but used data "in a manner not authorized").

[467]  <u>See also</u> <u>Lynn v. Gateway Unified Sch. Dist.</u>, 2011 WL 6260362, at *1-2, 6 (E.D. Cal. 2011) (attorney who used emails that client had copied from adversary's computer "possibly violated [§] 502, making it a felony to use information from a computer database without permission"); <u>Han v. Futurewei Tech., Inc.</u>, 2011 WL 5118748, at *3-4 (S.D. Cal. 2011) (cross-complaint "likely stated a claim under [§] 502" where employee "illegally copied and deleted . . . files from her company-issued laptop").

Cal. Rptr. 3d 219, 223 (Ct. App. 2013) (noting § 502(c)
conviction of prison guard who used computer access to steal
inmate personal information).[468]  Other California cases, and the
legislative history, undercut Chrisman's reasoning.[469]  And
Chrisman may not apply even on its own terms where access to the
computer included "enter[ing] false information" to further a
larger fraudulent scheme, People v. Laiwala, 2012 WL 3834895
(Cal. Ct. App. Sept. 5, 2012) (unpublished), as Wright and
Arneson did here.  In short, Chrisman cannot establish plain
error on unauthorized access.

---

[468]  See also People v. Oliveira, 2006 WL 775645, *1-2, *4
(Cal Ct. App. Mar. 28, 2006) (unpublished) (prosecution under
§ 502(c)(1) for access with intent to defraud where employees
used passwords to make false accounting entries).

[469]  Though Turner relies on Chrisman's belief that "access"
is "redolent of 'hacking' or breaking into a computer," 65 Cal.
Rptr. 3d at 704, that statement rested on a snippet of
legislative history rejected by a separate California Court of
Appeal decision.  Mahru v. Superior Court, 237 Cal. Rptr. 298,
300 (Ct. App. 1987) ("[w]e cannot be confident . . . that this
brief declaration of purpose was intended to summarize every act
covered by the statute").  Actually, legislative history supports
the government.  Legislative reports reveal an expectation that
the bill would criminalize employees for misusing their
employers' computers.  Assembly Comm. on Pub. Safety Rpt. on SB
255, at 3 (June 1, 1987) ("This bill would make it a crime to
knowingly and without permission use a computer, including, for
example, an employee who uses his or her computer or a
colleague's computer to write a term paper."); Sen. Comm. on
Judiciary Rpt. on SB 255, at 7 ("One effect of this change would
be to make such acts as unintentional and inadvertent alteration
of data by an employee using a computer for a personal project
without permission[] subject to a state prison term.").

480

Nor is there anything plain about Turner's claim to be entitled to an instruction on the injury and loss requirements of § 502(h)(2). That section describes an affirmative defense -- something that need not receive an instruction unless the defense places it in issue, which defendants did not do here. See Dixon v. United States, 548 U.S. 1, 13-14 (2006); United States v. Pearson, 274 F.3d 1225, 1232 (9th Cir. 2001).

Neither did prejudice stem from omitting § 502's definition of "access." Section 502(b)(1) defines "access" as "to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." That is what Turner and Wright did with the SBC system, and what Arneson did with law-enforcement databases. Computers operate through their logical, arithmetical, and memory functions. When users enter commands or queries, they communicate with, instruct, and acquire information from those functions.[470] Because there is no way a jury could have found this definition of access not met, failure to instruct

---

[470] That does not render the definition of "access" surplusage. The definition limits § 502 to cases where defendants take, alter, or destroy data using computers qua computers, rather than as physical objects. The statutory definition of "access" means the statute does not apply to those who physically destroy data by dropping the computer rather than accessing its logical and memory functions, or who take data by stealing the computer rather than executing a command.

could not have changed the outcome or undercut the proceeding's integrity.

There was likewise no prejudice in not instructing as to § 502(h)(2), which exempts a defendant from prosecution "provided that the employee's activities do not cause an injury, as defined in [§ 502(b)(8)], to the employer, or another, or provided that the value of supplies or computer services . . . does not exceed . . . [$250]." That exception applies only where there is no "injury." Here, Wright's and Arneson's entry of false codes were themselves defined as "injur[ies]," because they involved the "alteration" of "data," Cal. Penal Code § 502(b)(8), making the subsection (h)(2) carve-out inapplicable. Moreover, the amounts Wright and Arneson were paid establish that the information taken was worth thousands of dollars -- far more than the $250 Turner says should have been specified,[471] or the $100 the statute actually specified at the time of the offense.[472] Even with the additional instruction, defendants would have been convicted. The prejudice requirement is not met.

Regardless, on the fourth prong of plain error, this Court should not exercise its discretion to reverse. The government's

---

[471] In convicting defendants of the federal § 1030 charge, the jury necessarily found that defendants' computer intrusion resulted in their gaining something "of value." (GER 1622).

[472] The requirement was raised from $100 to $250 after the trial. See West's Ann. Cal. Penal Code § 502 (2011).

482

evidence on the alteration of data and the money paid was uncontested.  To make the government and court bear the costs of defendants' mistake on an element that was "essentially uncontroverted" and supported by "overwhelming" evidence would not serve the purposes of the plain-error rule.  <u>Johnson</u>, 520 U.S. at 470.

Turner also argues (TOB 35) that § 502 cannot support the identity-theft and RICO charges, because it is a "wobbler" chargeable as either a felony or a misdemeanor.  Because no case says that wobblers cannot serve as felony prerequisites for § 1028(a)(7), the claim fails plain error review.  Moreover, a California wobbler "is presumptively a felony and 'remains a felony except when the discretion [of the trial court] is actually exercised' to make the crime a misdemeanor."  <u>United States v. Salazar-Mojica</u>, 634 F.3d 1070, 1073 (9th Cir. 2011).  Since no state court ever converted Wright's § 502 violation into a misdemeanor, it remained a felony.  The claim was unpreserved, and no plain error occurred.

Turner also claims (TOB 36) § 502 could not support the federal conviction because the statute of limitations had run to prosecute him on state charges.  Again, because no authority says state statutes of limitations govern such federal prosecutions, the plain error standard dooms his claim.  Even reviewed <u>de novo</u>,

his claim would fail under the Supremacy Clause, since it is Congress that sets the statute of limitations for federal crimes.

Turner's claim (TOB 37) that § 502 is void for vagueness cannot prevail on plain error review, since no existing case declares it so or leads ineluctably to that result.  Section 502 does not plainly fail to "define the conduct it prohibits with sufficient definiteness and . . . establish minimal guidelines to govern law enforcement."  Rodriguez, 360 F.3d at 953.  Turner's claim is also waived because it is inadequately argued: He never explains why the statute is vague; his real complaint is just that it sweeps more broadly than he would like.  See United States v. Williamson, 439 F.3d 1125, 1138 (9th Cir. 2006) (failure to present "cogent argument[s] for [the court's] consideration'" results in waiver).

Turner does not argue -- or exceptionally briefly argues (TOB 26, 30) -- that an infirmity in either the CFAA instruction or the § 502 instructions would require reversal of the pendant counts, even if the instructions on the other associated offense were valid.  To the extent the argument is made, it is waived for being inadequately detailed.  To the extent it is not waived, it fails on the merits.  Turner is wrong to assert that instructions that "allow[] a jury to convict . . . based on a legally invalid theory and on legally insufficient evidence" are prejudicial and "require" reversal for plain error.  (TOB 26-27).  Where jury

484

instructions gave the jury two routes to conviction -- one via proper instructions and one via improper ones -- reversal is not required "if it is 'not open to reasonable doubt that a reasonable jury would have convicted'" the defendant on the valid theory.  Pelisamen, 641 F.3d at 406.[473]  As long as the § 1030 instructions were not plain error, there will be a valid and conclusive jury finding that defendants committed the CFAA violation -- making any infirmity in the § 502 instructions irrelevant.  Conversely, if the instructions were plain error for § 1030 but not for § 502, the identity-theft, RICO, and RICO-conspiracy convictions still survive: the facts that the jury necessarily found under the § 1030 instructions as given were themselves sufficient to satisfy the § 502 predicate, leaving it not open to reasonable doubt: different instructions would not have altered the outcome on the pendant convictions.  And the RICO-conspiracy convictions are completely unaffected, since a defendant's RICO-conspiracy conviction does not require guilt on the underlying offense.  See Part III.H.5.b(2), supra.

---

[473]  With respect to the sufficiency-of-evidence arguments, the existence of any evidentiarily sufficient count suffices to protect the overall verdict.  Griffin v. United States, 502 U.S. 46, 56-57 (1991) ("'[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'").

3. <u>Kachikian's Challenges to the Wiretapping Instructions Fail</u>

Kachikian challenges the jury instructions on wiretapping, claiming that the court wrongfully rejected his proposed good-faith instruction, understated the <u>mens rea</u> element for his crimes, and erred in not <u>sua sponte</u> instructing that single-consenting-party recording is not wiretapping. The claims all fail.

a. <u>Trial Evidence</u>

Although Kachikian argued he was unaware of Pellicano's illegal use of his software and hardware, the evidence proved that Kachikian -- who received over $370,000 from Pellicano from 1998 to 2001 (GEX 2971-73); GERT 7016-17) -- was a knowing participant in Pellicano's scheme.

Former Pellicano employee Tarita Virtue testified that Telesleuth Player, which she used to listen to and transcribe wiretapped calls, was created and maintained by Kachikian at Pellicano's direction. (GERT 956, 965, 1186, 1240, 1248, 1342, 1685). The instructions for building or assembling the Telesleuth recording software and Telesleuth Player instructed users to call Kachikian with any problems. (GEX 2920-25). Kachikian met with Virtue to troubleshoot the program while she was listening to wiretapped calls. (GERT 966).

Former employees testified that Kachikian worked in the "war room," where Pellicano kept his wiretapping computers plugged

into phone lines. (GERT 3430-31, 3994-98). The computers were each connected to a separate phone line through a separate "small box" (GERT 3996-98), assembled from components that Kachikian and Pellicano had ordered. GERT 4001-08, 7002-06). At trial, Kachikian said he built just three to four boxes. (GERT 7005-06). But in grand jury testimony, he admitted to building "[w]ay more than ten," (GERT 2957), reinforcing that he was building them for PIA's wiretapping uses, not as prototypes. Wayne Reynolds, Pellicano's chief laboratory technician, testified that the boxes were appropriate to use in wiretapping, but would not have worked for legitimate forensic audio restoration work. (GERT 3991, 4006-08).

Reynolds also gave other evidence of Kachikian's knowing involvement with Pellicano's illegal use of Telesleuth. (GERT 3994-95). Kachikian knew about and expressed concern when Pellicano allowed the Nicherie brothers into the war-room. (GERT 4013-14, 4094). Once, Reynolds and Pellicano went to an apartment that had been rented to support the wiretapping in the Maguire case. (GERT 4016-20). Pellicano came out of the apartment with equipment that Reynolds recognized as identical to that used in the war-room. (GERT 4021-22). When driving away, Pellicano called Kachikian to instruct him to correct bugs within the software, then called Turner to "take . . . down" the Maguire wiretap. (GERT 4018-21, 4140-41).

487

Kachikian's design for Telesleuth also proved his knowing wrongdoing. Kachikian built in "self-defense" mechanisms to destroy the program and remove all evidence if an unauthorized user stumbled upon it. (GERT 3029). If incorrect key-presses or mouse commands were entered by a user unfamiliar with the program, the audiorecordings and Telesleuth program would be erased and overwritten with random data, to be unrecoverable in forensic searches. (GERT 3030-34). Telesleuth would also self-destruct if it was restarted after premature shut-down -- for instance, if a power cord was pulled, as when law enforcement seizes computers. (GERT 3034-37).

Although Kachikian claimed he expected Pellicano to sell Telesleuth to law enforcement, that claim was proved false at trial. PIA employee LeMasters, who oversaw Pellicano's appointments and scheduling, knew of no meetings to demonstrate Telesleuth to law enforcement. (GERT 2224-25). Nor did she ever see such marketing literature. (Id.). Virtue, during her two years of employment, likewise learned of no sales presentations, marketing efforts, or materials directed to law enforcement. (GERT 1258-59, 1265 ("never in my time . . . did they . . . discuss who they were going to sell it to as being law enforcement. That never, ever occurred."); GERT 1683-84). While Virtue knew of one possible sale of a "scaled-down version," that

488

sale was not to law enforcement.  (GERT 1258-60).[474]  Although Kachikian called as a witness a former prosecutor who dealt with Pellicano on forensic audio restoration, that witness denied that Pellicano ever discussed selling wiretapping equipment.  (GERT 6812, 6817-18).

Even if Kachikian's purported evidence of efforts to sell to law enforcement were credited despite these problems, Kachikian pointed to efforts so sporadic and dated as to defeat any claim that law enforcement was intended as a primary user of the products.  PIA employee Ricardo Cestero, called by Kachikian, recalled exactly two sales pitches -- one each to the Ventura and Orange County Sheriffs' Offices.  (GERT 6501, 6519-21).  Both would have occurred in 1995 or 1996, the only years Cestero worked at PIA (id.), whereas PIA wiretapped continuously through 2002.  Although Cestero testified about working on a sales brochure for Pellicano, that brochure promoted only the audioprocessing capabilities of Forensic Audio Lab, (GERT 6509, 6529-30), not the wiretapping capabilities Kachikian worked on (GERT 6525-26).

---

[474]  Virtue testified as to exactly one conversation where the question of selling some software to law enforcement came up; when she expressed concern over "glitches," Kachikian and Pellicano made clear that any sold versions of the product would be inferior to those Pellicano retained for his own use.  (GERT 967).  In fact, in light of Virtue's later testimony, this possible sale most likely involved the Forensic Audio Sleuth sound-processing software, rather than the Telesleuth wiretapping software.  (GERT 1334-35).

When cross-examined, Kachikian admitted that he knew of no law-enforcement purchaser of Telesleuth during Kachikian's seven years working on the product.  (GERT 7041-42).  He admitted that the features he built into Telesleuth made the program impractical for law-enforcement agencies.  (GERT 7054-56). Indeed, the program could not even be used for cell-phone surveillance.  (GERT 7048).

Kachikian's testimony was further undercut by other points. The jury learned of Kachikian's evasiveness in his interviews and grand jury testimony.  (GERT 6964-71, 7021).  After Pellicano's arrest, Kachikian sent an email saying, "I expect to be called on to the stand, and I need to be able to testify that I don't remember much about what was done."  (GERT 6972).  After Pellicano's arrest and at Pellicano's request, the jury learned that Kachikian permanently deleted from his computer all of Pellicano's computer programs, and physically destroyed the backup disk.  (GERT 6973-74, 6982-85).

> b.   The Statute and Jury Instructions

Section 2511(1)(a) & (d) punishes anyone who:

> (a) intentionally intercepts, endeavors to
> intercept, or procures any other person to intercept or
> endeavor to intercept, any wire, oral, or electronic
> communication; [or]
>
> * * *
>
> (d) intentionally uses, or endeavors to use, the
> contents of any wire, oral, or electronic
> communication, knowing or having reason to know that

490

the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

Section 2512(1)(b) punishes anyone who intentionally:

manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce.

Section 2512(2)(b), however, provides that it "shall not be unlawful under this section" for a person to manufacture, possesses, ship or sell such a device where the person is "an officer, agent, or employee of, or a person under contract with, the United States, a State, or a political subdivision thereof, in the normal course of the activities of the United States, a State, or a political subdivision thereof."

Kachikian submitted a proposed jury instruction on "mistake of fact regarding Pellicano's intent to market to law enforcement," proposing:

That Defendant Kevin Kachikian actually believed, even if mistakenly, that Defendant Pellicano intended to market the Telesleuth software and related hardware components to law enforcement is a complete defense [to the Conspiracy, Wiretapping, and Possession of Wiretapping Device counts] because Mr. Kachikian would not possess the requisite "knowledge" and "intent" to be convicted of these offenses.

491

(JER 244).  Aside from this good-faith instruction, Kachikian did

not propose any specific definition of the words "intent" or

"intentional."  (JER 243-44).

The court denied Kachikian's request.  With respect to the

§ 2511 charges, the court found Kachikian's proffered instruction

superfluous because mistake of fact was not "separate from the

intent element of the crimes that the government must prove

beyond a reasonable doubt."  (JER 304).  "If Kachikian did not

know or understand that individuals were being wiretapped and had

no plan or intent to wiretap or agree to wiretap, then he would

not have the intent necessary to be found guilty of those

counts."  (Id.).  With respect to the § 2512 count, the court

found Kachikian's proposed instruction contrary to the statute,

because, under § 2512(2)(b), the mere hope for a governmental

customer was insufficient -- "an actual contract with a

governmental agency is required to escape liability."  (Id.).

The court's instruction (No. 60) on the § 2511 counts

therefore required the government to prove:

> First, the defendant intercepted, endeavored to
> intercept or procured another person to intercept or
> endeavor to intercept a wire, oral or electronic
> communication; and

> Second, the defendant acted intentionally, that
> is, purposefully and deliberately and not as a result
> of an accident or mistake.

(GER 1615).  The instruction (No. 63) on the § 2512 count

required the government to prove:

492

First, the defendant manufactured, assembled, possessed, or sold an electronic, mechanical, or other device;

Second, the defendant knew or had reason to know that the design of such device rendered it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications; and

Third, the defendant knew or had reason to know that such device or any component thereof had been or would be sent through the mail or transported in interstate or foreign commerce.

(GER 1618).

### c.  The Court's Instructions Were Correct

#### (1)  The Court Correctly Refused Kachikian's Legally Erroneous Good-Faith Instruction

Defendants are "not entitled to an instruction that misstates the law." United States v. George, 420 F.3d 991, 1000 (9th Cir. 2005).  The court thus properly refused to give Kachikian's proposed good-faith instruction.

Kachikian's proposal termed it a "complete defense" if Kachikian had any belief that Pellicano intended to market any of the wiretapping devices to law enforcement.  (JER 244 (emphasis added)).  Such an instruction would have contradicted the statute twice over.  First, the instruction was grossly overbroad even on Kachikian's interpretation of the law: If Kachikian believed that Pellicano intended to sell some of the devices to law enforcement, that could not insulate him from liability on the conspiracy and wiretapping counts if he also knowingly and

493

intentionally aided Pellicano's wiretapping.  To state the contrary, as Kachikian's proposal did, is like saying a getaway driver cannot be liable where his intent in driving was both to help the bank robber flee the scene and to pick up groceries on the way home.

Second, with respect to the § 2512 offense, Kachikian's proffered instruction far exceeded the express statutory carve-out for sales to law-enforcement.  Section 2512(2)(b) makes it permissible for "a person under contract with, the United States, a State, or a political subdivision thereof" to possess and deal in wiretapping equipment.  As the court found, that provision, by its plain language, applies only to those who are actually "under contract" with a governmental agency -- not to those merely hoping for a contract.  (JER 303).  The section "forbids speculative development of a wiretapping device in the hopes of selling to law enforcement," as Kachikian claimed he had done.  (Id.).  The express mention of those under actual contract, and omission of those anticipating or believing in a contract, shows that Congress did not intend mistaken belief in a possible contract to be a defense.  United States v. Gamboa-Cardenas, 508 F.3d 491, 497 (9th Cir. 2007) ("'The doctrine of expressio unius est exclusio alterius . . . creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be

494

understood as exclusions.'"). Moreover, Kachikian's instruction would have improperly converted an affirmative defense on which he bore the burden into a matter for the government to disprove. United States v. Pearson, 274 F.3d 1225, 1232 (9th Cir. 2001) ("When a statutory prohibition is broad and a defendant seeks to apply a narrow exception . . . , it is more likely than not that the exception is an affirmative defense."); Dixon, 548 U.S. at 13-14 ("where Congress . . . enact[s] an affirmative defense in the proviso of a statute" "'it is incumbent on one who relies on [that] exception to set it up and establish it.'").[475]

Indeed, Kachikian's proposed instruction went far beyond what even a true mistake-of-fact instruction would have provided for this exception. Kachikian's proposal did not just require acquittal if he mistakenly believed Pellicano had a contract to sell his devices to governmental agencies. Kachikian's proposal required acquittal if Kachikian believed Pellicano had any intent

---

[475] Kachikian's wording was also improper. "[A] district court may 'refuse an instruction if its language gives undue emphasis to defendant's version of the facts . . . or . . . would tend to influence the jury toward accepting the defendant's version of the facts.'" United States v. Keiser, 57 F.3d 847, 851 (9th Cir. 1995). Kachikian's proposal began by stating, "That Defendant Kevin Kachikian actually believed, even if mistakenly, that Defendant Pellicano intended to market the Telesleuth software and related hardware components to law enforcement is a complete defense." (JER 244 (emphasis added)). By beginning with "that" instead of "if," and using the word "is" rather than "would be," Kachikian's proposal had the court suggesting that Kachikian's version of the facts was true, thus improperly influencing the jury. The court therefore had discretion to refuse the instruction under Keiser.

-- however speculative -- to attempt to "market" even a single copy of Telesleuth to law enforcement, even if Kachikian knew the marketing effort would be unsuccessful and knew Pellicano's purpose for most of the devices was nefarious.

Congress had good reason not to enact such an overbroad safe-harbor.  Determining whether a wiretapping device manufacturer has a contract with a governmental entity is simple; determining whether the manufacturer hoped to market to governmental entities, whether that prospect was reasonable or speculative, and what proportion of the devices those efforts might cover, would create endless confusion.  Similarly, where a manufacturer has a contract with a governmental entity, there is reasonable assurance that the eavesdropping devices will be used for lawful purposes.  But where there is only a speculative hope of selling to a governmental entity, the devices may well be diverted to illegal use if the governmental sales do not pan out. Congress avoided these problems by requiring actual contracts to qualify for the § (2)(b) safe harbor.

Because Kachikian's proffered instructions were legally incorrect, the court rightly refused them.  George, 420 F.3d at 1000;  Febres v. Challenger, 214 F.3d 57, 63 (1st Cir. 2000) (court "does not commit error when it instructs generally about a legal principle and . . . declines a party's request for a further instruction that is misleading, legally incorrect, or

incomplete"). Moreover, because Kachikian did not (and does not) maintain that he or Pellicano had a contract to sell to law enforcement, the court abused no discretion in concluding there was no factual basis for a § 2512(2)(b) instruction. United States v. Perdomo-Espana, 522 F.3d 983, 986 (9th Cir. 2008).

To the extent Kachikian's proffered instruction contained any legally permissible content, the court correctly found that substance already was in the § 2511 instruction's requirement that the defendant acted "intentionally, that is, purposefully and deliberately and not as a result of an accident or mistake." (GER 1615). "A defendant is not entitled to any particular form of instruction, nor is he entitled to an instruction that merely duplicates what the jury has already been told." United States v. Lopez-Alvarez, 970 F.2d 583, 597 (9th Cir. 1992). That does not change just because Kachikian now terms his proposal a theory-of-the-case instruction. "'It is not reversible error . . . to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory.'" United States v. Duran, 59 F.3d 938, 941 (9th Cir. 1995). The court further "did not abuse its discretion in declining to give" a theory-of-case instruction that "was not grounded in the law[]

and was not supported by the evidence." <u>United States v. Blixt</u>, 548 F.3d 882, 889 (9th Cir. 2008).[476]

> (2) <u>Kachikian's Other *Mens Rea* Arguments Are Reviewed for Plain Error, and Fail</u>

Kachikian also claims the jury instructions understated the mental state required for violations of §§ 2511 and 2512. (KOB 5-23). In Kachikian's view, those statutes require proof of the defendant's specific "intent to violate the law." (KOB 17).

Although Kachikian tries to portray this as a preserved issue (KOB 10), that is incorrect. Kachikian never requested an instruction requiring him to know he was violating the law. (JER 243-44, 3435-45). His proposed mistake-of-fact instruction did not cover the issue. (JER 244).[477] Kachikian raised specific intent only with respect to conspiracy (GER 1215-16), where the

---

[476] Kachikian's proposed instruction, moreover, does not read like a theory-of-defense instruction. As the leading treatise's example makes clear, a theory-of-defense instruction, classically, explains that "Defendant _____ . . . <u>contends</u> that [he] . . . is not guilty of the crime charged because (detail law or alleged facts)." 1A O'Malley, Grenig & Lee, <u>Federal Jury Practice & Instructions</u> § 19:01, at 701 (6th ed. 2008) (emphasis added). A true theory-of-defense instruction thus makes plain that the theory stated is the defendant's -- not the court's. Because Kachikian's proposal did the opposite, his arguments under the theory-of-defense rubric are inapt.

[477] Discussing § 2512, Kachikian cited out-of-circuit cases requiring "proof that a defendant had knowledge of the 'illegality' of the conduct." (GER 1220). But he never requested such an instruction or stated that such an instruction was required; his proposed instructions included no such instruction; and he never argued that similar concerns applied to § 2511.

498

term has a special meaning.[478]  Kashikian's oral objections only
mentioned "specific intent" to request a "mistake of fact"
instruction (GERT 5919-23) -- not a mistake-of-law instruction
requiring knowledge of illegality.

Rule 30 "'prohibits a party from assigning error unless that
party objects . . . stating <u>distinctly</u> the matter to which that
party objects and the grounds of that objection.'"  <u>United States
v. Elias</u>, 269 F.3d 1003, 1017 (9th Cir. 2001).  Kachikian's
objections, which stated specific intent as an element of
conspiracy but of nothing else, and which mentioned cases
involving specific intent but did not ask for any instruction
apart from his defective proposed good-faith instruction, did not
distinctly raise the issue he now presents.  As a result, his
<u>mens rea</u> claim is reviewed for plain error.

The claim fails.  Section 2511 punishes one who
"intentionally intercepts, endeavors to intercept, or procures
[another] to intercept . . . any wire, oral, or electronic

---

[478]   The specific intent in a conspiracy is "the intent to
commit the substantive crime."  <u>United States v. Montgomery</u>, 384
F.3d 1050, 1062 (9th Cir. 2004).  That means that the
conspirators must have intended for the conspiracy to accomplish
the acts constituting the crime -- not that the conspirators had
to know the acts were illegal.  <u>Id.</u> (finding conspiracy where
conspirators agreed to conceal rental income from owners; no
mention of need to show they knew it was illegal); <u>See generally
United States v. Delgado</u>, 357 F.3d 1061, 1067-68 (9th Cir. 2004)
(for conspiracy conviction, defendant need not know that the
making of the agreement is illegal).

communication." 18 U.S.C. § 2511(1)(a). The statute thus provides the mens rea: the act must be done "intentionally."

This Court has not interpreted the meaning of "intentionally" under § 2511. The Second Circuit has, however, defining it as meaning that "the defendant acted deliberately and purposefully; that is, defendant's act must have been the product of defendant's conscious objective rather than the product of a mistake or an accident." United States v. Townsend, 987 F.2d 927, 930 (2d Cir. 1993). The one model instruction known to the government follows Townsend's definition.[479] Multiple circuits have rejected the argument that § 2511 requires proof the defendant knew his actions were illegal. United States v. Dossey, 66 Fed. Appx. 528, 532 (6th Cir. 2003) (rejecting claim defendant could not be convicted under § 2511 where "he was unaware that he was committing an illegal act"); Peavy v. WFAA-TV, Inc., 221 F.3d 158, 179 (5th Cir. 2000) (rejecting "an ignorance or mistake of law defense" under § 2511(1)(c), (d)); Williams v. Poulos, 11 F.3d 271, 285 (1st Cir. 1993) (no good-faith defense for mistaken belief in statutory authorization for wiretapping). Given this authority rejecting Kachikian's claim, there was no error -- and certainly no plain error -- in the court's instruction.

---

[479] Eric Ruschky, Pattern Jury Instructions for Federal Criminal Cases: District of South Carolina 494 (2011).

Kachikian's argument is not helped by his discussion (KOB 10-14) of cases interpreting the pre-1986 version of the statute, which used the term "willfully" instead of "intentionally." United States v. McIntyre, 582 F.2d 1221 (9th Cir. 1978), confirms the government's interpretation of the statute. McIntyre interpreted the prior version of § 2511(1)(a), which contained the mens rea requirement of willfulness. Id. at 1224. The defendants in McIntyre argued what Kachikian argues here –- that "their action was not 'willful' because they believed in good faith that their conduct was legitimate." Id. McIntyre rejected the argument as "amount[ing] only to a defense of 'ignorance of the law', which . . . is no defense." Id. at 1224-25 (approvingly citing United States v. Schilleci, 545 F.2d 519 (5th Cir. 1977), for proposition that "a mistaken belief that the eavesdropping was legal is no defense"). Because, "[t]he question for the trier of fact" in a wiretapping case "is not whether the defendant thought his conduct was legal," id.,[480] Kachikian was not entitled to an instruction defining "intentionally" as requiring "the intent to violate the law" (KOB 17).[481] Nor, given McIntyre's interpretation of the prior statute

---

[480] Because McIntyre's interpretation of the pre-1986 version of the statute controls in this Circuit, Kachikian's reliance (KOB 11-12) on out-of circuit cases interpreting that statute is misplaced.

[481] The portion of McIntyre stating that willfulness
(continued...)

501

and <u>Townsend</u>'s interpretation of the current statute, was any error plain.[482]  Even reviewed <u>de novo</u>, Kachikian's claim would fail: This panel cannot overrule <u>McIntyre</u>'s interpretation of the prior statute, and should not create a needless circuit split on the current statute.

Kachikian's reliance on the 1986 amendments' legislative history is unavailing.  That history shows that "intentionally" was meant "to underscore that the inadvertent reception of a protected communication is not a crime," addressing a specific concern about "radio scanners that in the course of scanning

_____

[481](...continued)
required a showing of "'bad purpose' or 'evil motive'", 582 F.2d at 1225, is not at issue, because the statute no longer requires willfulness; nor does Kachikian claim he should have received such an instruction.

[482]  Kachikian correctly notes (KOB 21-22) that the court failed to mention the intent requirement in its § 2512 instruction -- an omission to which Kachikian did not object. The omission is not reversible, however, because Kachikian cannot meet his burdens on the third and fourth prongs of plain error. The word "intentionally" in § 2512 modifies the verbs "manufactures, assembles, possesses, or sells."  Kachikian did not deny intentionally assembling and possessing the items at issue.  (This was not a case where someone picked up a bag of wiretapping equipment without knowing the contents.)  Moreover, the court correctly instructed that the government had to prove that Kachikian "knew or had reason to know that the design of [the] device rendered it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications."  (GER 1618).  In finding that element met, the jury necessarily found that Kachikian's possession of the device was intentional.  Plain error reversal for the omitted element would be inappropriate, because the omission was harmless and did not seriously affect the reputation, fairness, or integrity of the proceedings.  <u>Johnson</u>, 520 U.S. at 469-70; <u>Keys</u>, 133 F.3d at 1287.

502

radio frequencies in order to receive public communications . . . could inadvertently tune through a protected communication." Sen. Rep. 99-541, at 6 (1986).  Consistent with <u>Townsend</u>, "[t]he word 'intentional' describes the mental attitude associated with an act that is being done on purpose," but does not require "that the act was committed for a particular evil purpose."  <u>Id.</u> at 24.[483]

Kachikian's other arguments likewise fall short.  <u>United States v. Flores</u>, 753 F.2d 1499 (9th Cir. 1985), was decided before the 1986 amendments.  But <u>Flores</u> interpreted a wholly unrelated statute, and there is no evidence that Congress was aware of <u>Flores</u> or chose language in the 1986 amendments because of it.[484]

Kachikian's reliance (KOB 15-16) on <u>Liparota v. United States</u>, 471 U.S. 419 (1985), also fails.  <u>Liparota</u> concerned a statute criminalizing to "'knowingly use[], transfer[],

---

[483]  Kachikian incorrectly argues that the 1986 change from "willfully" to "intentionally" was intended to increase the <u>mens rea</u> required.  In fact, Congress considered the two words interchangeable.  H.R. Rep. 99-647, at 48 (1986) (advocating retention of "willful," but saying it has "the same meaning as the term intentional").

[484]  Moreover, even as a general comment on interpreting statutory <u>mens rea</u>, <u>Flores</u> does not say that words like "intent" and "willfully" are sufficient to make a specific intent crime.  Rather, in holding that the word "knowingly" in a statute does not require "specific intent to violate the statute," <u>id.</u> at 1505, <u>Flores</u> implies that Congress' use of the words intentionally or willfully is necessary (not sufficient) to infer such a requirement.

acquire[], alter[], or possess[] [federal food stamps] in any manner not authorized by [the statute] or . . . regulations.'" Id. at 421 n.1.  The Court held that, for that statute to be violated, there had to be proof the defendant "knew his conduct to be unauthorized by statute or regulations." Id. at 425.  The Court did so partly because the complex statutory and regulatory requirements for handling foodstamps covered "a broad range of" conduct that would appear "innocent" to one unfamiliar with the regulations.  Id. at 426.  No such concern appears here. Kachikian does not claim he was unaware that wiretapping is illegal.  Unlike purchasing food at a discount, wiretapping phones is inherently suspect, putting potential offenders on notice of the need to conform their conduct to legal norms.

Moreover, this Court has made plain that Liparota does not require knowledge of illegality for convictions under other statutes.  In United States v. Moncini, 882 F.2d 401, 405 (9th Cir. 1989), this Court reasoned that Liparota's holding thus depended on the existence of "a genuine problem of grammatical scope: the adverb 'knowingly' . . . could conceivably modify 'acquire' alone, or 'acquire' in conjunction with 'in any manner not authorized." Id.  Moncini found Liparota's reasoning inapplicable when construing a statute containing "no reference to illegality . . . which the word 'knowingly' could be similarly construed to modify." Id.  Moncini controls here, since

504

§ 2511(a) makes no reference to violations of other statutes or regulations which the word "intentionally" could be held to modify.[485]

Finally, Kachikian's attempt to require proof that he knew his actions were illegal violates a basic precept of criminal law. "Just as 'ignorance of the law or a mistake of law is no defense to criminal prosecution,' knowledge of the law is almost never an element of a crime." United States v. Torres-Flores, 502 F.3d 885, 888 n.4 (9th Cir. 2007).[486] Even reviewed de novo, this Court must reject Kachikian's claim.

### (3) The § 2512 Instructions Were Proper

On appeal, Kachikian (KOB 27-29) for the first time argues that the term "intentionally" in § 2512 applies not only to the verbs following it ("manufacturers, assembles, possesses, or sells") but also to the objects of those verbs ("any electronic, mechanical, or other device"). Because § 2510(5)(a)(ii)'s definition of "electronic, mechanical, or other device" contains

---

[485]    There is no merit to Kachikian's appeal to the rule of lenity. (KOB 19). "[L]enity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute,' such that the Court must simply 'guess as to what Congress intended.'" Barber v. Thomas, 130 S. Ct. 2499, 2508-09 (2010). Given McIntyre and Townsend, this Court can do far more than just guess at Congress' interpretation.

[486]    Therefore, Kachikian's complaint (KOB 21) about the court's general instruction regarding the inapplicability of mistake-of-law defenses is meritless.

an exception for equipment "being used . . . by an investigative
or law-enforcement officer in the ordinary course of his duties,"
Kachikian apparently claims there should have been an instruction
requiring the government to prove Kachikian did not intend for
law enforcement to possess the device.  Since he did not raise
this argument below, plain error review governs.

The argument fails, because of the verb-tense in the
§ 2510(5)(a)(ii) exception.  The exception applies to devices
that are "being used by . . . [a] law enforcement officer"
(emphasis added).  It does not, therefore, apply to hoped-for
future use.[487]  Since there was no evidence or argument that
Kachikian thought the devices he made were being presently used
by law enforcement, there was no basis for further instruction.
Any omission therefore was not erroneous, and could not have been
prejudicial.  Moreover, the specific safe-harbor for governmental
use in § 2512(2)(b) displaces the more general exception in
§ 2510(5)(a)(ii).  Morales v. TWA, Inc., 504 U.S. 374, 384 (1992)
(in statutory construction, "the specific governs the general").
At minimum, any error was not plain.

Kachikian also argues (KOB 31) that the court misconstrued
the word "surreptitious" in § 2512, because law-enforcement

---

[487] Ignoring the verb tense would prohibit prosecution under
§§ 2511 or 2512 of defendants who purposefully sell to illegal
wiretappers equipment that had belonged to police previously.
Congress cannot have intended that absurd result.

506

wiretaps, if legally authorized, cannot be surreptitious.  But if
that were so, then there would be no need for the § 2512(2)(b)
safe-harbor.  Kachikian's argument, which renders that part of
the statute superfluous, violates the requirement to "'give
effect, if possible, to every word Congress used.'"  Roth v.
Reyes, 567 F.3d 1077, 1083 (9th Cir. 2009).  The argument that a
recording cannot be surreptitious if it is legally authorized
also contradicts the meaning this Court gave the term when
construing § 2512 in United States v. Lande, 968 F.2d 907 (9th
Cir. 1992).  In Lande, which involved equipment manufactured to
intercept and descramble satellite television programming, this
Court held that the "surreptitious" element was met because the
producers of satellite programming were unable to detect the
interception equipment.  Id. at 910; United States v. Bast, 495
F.2d 138, 143 (D.C. Cir. 1974) ("'[S]urreptitious interception'
connotes . . . 'secret listening.'  The mere fact that a device
may be used for interceptions that do not violate
§ 2511 does not mean that its manufacture and advertising are
compatible with § 2512.").  Kachikian's equipment was designed to
intercept calls secretly -- making arguments about hypothetical
future authority for hypothetical future law-enforcement uses

irrelevant.[488]  The court rightly rejected Kachikian's argument.
(JER 302-03).

          (4)  <u>Kachikian's Miscellaneous Arguments Fail</u>

    Kachikian's Rule 30 argument (KOB 33-35) is meritless.  In
his closing argument, Kachikian argued that recordings by law
enforcement are never surreptitious, because Title III requires
law enforcement to give eventual notification to the wiretapped
person.  (GERT 7874).

    That assertion -- that law-enforcement wiretaps are not
surreptitious -- was a misstatement of law that the court had
correctly foreclosed after briefing and argument.[489]  Indeed, the

---

   [488]  <u>United States v. Biro</u>, 143 F.3d 1421 (11th Cir. 1998)
(cited at KOB 31-32), is not to the contrary.  <u>Biro</u> found the
requirements for § 2512 prosecution met where a defendant sold
surveillance devices "disguised as pens, calculators, and wall
plugs."  <u>Id.</u> at 1424.  Although these devices could conceivably
have been used for authorized purposes -- for law enforcement, or
as baby monitors, or as novelty items with all parties aware of
their function -- <u>Biro</u> did not require the government to disprove
those possible uses.  Whether something is "primarily useful for
the purpose of . . . surreptitious interception" depends on the
product's "objective characteristics."  <u>Id.</u> at 1427.  Because
"[t]he statute makes no reference to the customer's intended use
of the product," <u>id.</u> at 1428, Kachikian's purported belief in
Pellicano's customers' uses was irrelevant.  Law-enforcement
sales must be handled not by stretching the meaning of
"surreptitious," but rather by the express safe-harbor provision
for actual contracts with governmental entities under
§ 2512(2)(b).  Regardless, Telesleuth's objective characteristics
-- such as its encryption, and self-destruction features --
proved non-law-enforcement use.

   [489]  Kachikian had argued for an instruction on
"surreptitious" that would have made all government wiretaps
non-surreptitious because government wiretaps are "authorized."
                                    (continued...)

contention that a recording is not surreptitious if the eavesdropped party later gets some notification that she was listened-in-on is so farfetched that Kachikian does not attempt to press it as a valid interpretation of the statute on appeal.[490] Kachikian's counsel flouted the court's ruling by improperly arguing that government wiretaps could not be surreptitious because "[s]urreptitious is secret" and "those who have their calls intercepted in a law enforcement wiretap are notified at the end of the wiretap." (GERT 4874). The court sustained the government's objection. (GERT 4874-75).

The court heard argument about corrective action for Kachikian's improper argument. (GERT 7925-28, 7970-73, 8015-19). The court's supplemental instruction said simply that, "with regard to Count 77, in determining the meaning of 'surreptitious,' it is not relevant that notification of the interception may later be given." (GERT 8020). That did not "undermin[e] defense counsel's credibility in the eyes of the jury" as Kachikian hyperbolically claims. (KOB 35). The instruction never mentioned Kachikian or his attorney, and did

---

[489](...continued)
(GERT 5903-25). The court rejected this instruction. (JER 302-03).

[490] Kachikian's argument would lead to absurd results: A defendant who knowingly possessed wiretapping equipment to gain blackmail material would be immunized if the plan was to disclose the recording to the victim as a way to persuade him to pay up.

509

not portray itself as correcting closing arguments.  Instead, it was one of two instructions that the court said "we didn't include in what I read to you earlier."  (GERT 8019).

Although Kachikian objected to the supplemental instruction, he did so citing only the Due Process Clause -- not Rule 30. (GERT 8018).  His Rule 30 argument is therefore reviewed for plain error, and fails.

Kachikian's timing argument is meritless.  Rule 30 provides that, "at the close of the evidence or . . . earlier," Fed. R. Crim. P. 30(a), "[t]he court must inform the parties before closing arguments how it intends to rule on the [parties'] requested instructions," Fed. R. Crim. P. 30(b).  But no court can, by the close of evidence, predict issues that arise late, in closing arguments.  Under the rule, therefore, the court "retains power . . . to add instructions necessitated by the arguments." Fed. R. Crim. P. 30 advisory comm. notes (1987).  When Kachikian's attorney misstated the law, the court rightly corrected that misinformation.  Blixt, 548 F.3d at 889-90 (court "did not err in properly instructing the jury on the actual law . . . after [defense] counsel misstated what the government was required to prove").  The alternative, which would leave the court and opposing counsel no recourse when a lawyer's argument misstated the law, would effectively invite the jury to decide the case on improper grounds.  United States v. Pena, 897 F.2d

510

1075, 1084-85 (11th Cir. 1990) ("We do not believe that the requirements of Rule 30 function as a limitation on the district court's obligation to inform the jury of the law which properly governs a case.  Nor do we believe that . . . Rule 30 operate[s] to empower counsel, through . . . closing argument, either to dictate the law by which a verdict is reached or to create a mistrial by erroneously stating the legal principles applicable to a given situation.").  Given the Rule's language and the advisory committee notes, there was neither plain error, nor error at all.

Nor was there prejudice.  Kachikian was not "'unfairly prevented from arguing [his] defense to the jury or substantially misled in formulating and presenting arguments.'"  United States v. Tham, 960 F.2d 1391, 1399 (9th Cir. 1991).  Kachikian's legitimate defenses were argued at length; the court merely prevented an illegitimate defense Kachikian had been previously warned against advancing.  The supplemental instruction neither singled out Kachikian's counsel nor asserted he had done anything improper.  Instead, the instruction was portrayed as just something the court accidentally omitted earlier -- on par with the accompanying supplemental instruction correcting a mix-up between two cities' names.  (GERT 8019-20).  In Blixt, this Court affirmed supplemental instructions that far more pointedly criticized a defense lawyer's closing.  548 F.3d at 886 (refusing

511

to reverse where supplemental instruction told jury to "disregard 'the erroneous statement of the law by defense counsel'").  If the instruction in <u>Blixt</u> was proper, then this one was <u>a fortiori</u>.

Avoiding <u>Blixt</u>, Kachikian (KOB 34-35) cites grossly inapposite cases.  Although Kachikian relies on <u>United States v. Harvill</u>, 501 F.2d 295 (9th Cir. 1974), more recent cases show that prejudice cannot be established simply by asserting that counsel lost credibility when he argued a legal point that the supplemental instruction made irrelevant.  In <u>United States v. Foppe</u>, 993 F.2d 1444, 1451-52 (9th Cir. 1993), this Court found no prejudice where defense counsel, relying on the court's instructional rulings, read to jurors a particular instruction that he told them the judge would give.  Even if counsel lost credibility when the court did not give the predicted instruction, this Court held, "whatever loss of credibility . . . counsel may have suffered [was] not sufficient prejudice to merit reversal."  <u>Id.</u>  The same is true here.

Kachikian's reliance on <u>United States v. Gaskins</u>, 849 F.2d 454 (9th Cir. 1988), is also off-point.  <u>Gaskins</u> found Rule 30 error where a supplemental instruction added a whole new theory of liability -- aiding and abetting -- which the court had previously ruled out.  <u>Id.</u> at 456.  <u>Gaskins</u> does not apply where, as here, "the judge did not introduce a new theory by means of an

512

alternative instruction." United States v. Pemberton, 853 F.2d 730, 735 (9th Cir. 1988). Accomplice liability is such a central issue that defense arguments are entirely altered by the presence or absence of such liability. Id. (in Gaskins, "the judge gave a new instruction on aiding and abetting after defense counsel had tailored closing argument to the theory that defendant was not a principal participant"). Kachikian's discussion of surreptitiousness, in contrast, was just four lines (GERT 7874) of his 50-page argument (GERT 7860-7910), and the supplemental instruction was but a small change in the court's lengthy instructions. Pemberton, 853 F.2d at 730 (finding no prejudice under Rule 30 where judge "added one short phrase" that, "[i]n the context of the entire instruction given, . . . did not render the instruction misleading or inadequate"). Given holdings that "a defendant was not prejudiced [by a Rule 30 violation] in more egregious cases," United States v. Scott, 642 F.3d 791, 798 (9th Cir. 2011), the outcome here is clear: Kachikian's claim should be denied for lack of plain error and lack of prejudice.

Kachikian finally claims the court committed plain error by not sua sponte instructing jurors that § 2511(2)(d) permits a party to a telephone call to record that call. (KOB 35-42). Kachikian argues that the omission of a specific instruction on the § 2511(2)(d) exception allowed the jury to convict him of conspiracy for helping Pellicano to record his own calls even if

513

jurors did not believe that Kachikian intended to help Pellicano wiretap others.

But the actual instructions disprove Kachikian's claim.  The court instructed that conviction for conspiracy required proof beyond a reasonable doubt that "beginning on a date unknown and ending on or about November 21, 2002, there was an agreement between two or more persons to commit the crime of interception of wire communications as charged in Counts 68 through 76 of the indictment."  (GER 1606; GERT 7844).  Those cross-referenced counts each concerned the wiretapping not of Pellicano's own calls, but of calls by named third parties.  (JER 3993-4001). The jury was told that the conspiracy count required that "the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it."  (GERT 7583; GER 1606).  Kachikian's conviction thus required a jury finding that he intended to join a conspiracy to wiretap other people's private calls, and Kachikian cannot show plain error, prejudice, or a substantial injury to the reputation, integrity, or fairness of the proceeding.[491]

---

[491]  Kachikian argues (KOB 40-41) that his acquittal on the substantive § 2511 counts means the jury must have believed he conspired to help Pellicano record Pellicano's own calls.  But that misunderstands the difference between what is needed for a conspiracy conviction (the agreement to accomplish the object), and what is needed for aiding and abetting (aiding the principal to accomplish the crime).  Juries often find guilt on a conspiracy charge while acquitting on substantive charges.  E.g.,
(continued...)

Q.   THE COURT ABUSED NO DISCRETION IN DENYING A NEW TRIAL BASED
     ON ALLEGATIONS OF JUROR MISCONDUCT OR IN DECLINING TO HOLD
     AN EVIDENTIARY HEARING ON THOSE ALLEGATIONS

After the verdicts in the RICO trial, Pellicano and Arneson moved for a new trial based on alleged juror misconduct. The motions were based on a declaration from one former juror[492] and a declaration from Pellicano's defense investigator about her interviews of other jurors. The court denied the motions and defendants' evidentiary-hearing request, finding that parts of the declarations were inadmissible under Federal Rule of Evidence 606(b) and that the remainder demonstrated no misconduct that possibly could have affected the verdict.[493] Defendants challenge this ruling. (JOB 38-55).

1.   Standard of Review

Both the denial of a new-trial motion based on alleged juror misconduct and the decision whether to hold an evidentiary hearing about it are reviewed for abuse of discretion. United

---

[491] (...continued)
United States v. Fiander, 547 F.3d 1036, 1040-41 (9th Cir. 2008). Regardless, the third and fourth prongs of plain error are not met, since Kachikian never argued that he built the devices to help Pellicano record Pellicano's own calls. Johnson, 520 U.S. at 470.

[492]  Juror #7, who submitted the declaration, is the juror who reported hearing the prosecutor say the word "perjury" during the recess in Arneson's cross-examination.

[493]  The investigator's declaration also was inadmissible hearsay. Walton v. Wild Goose Mining & Trading Co., 123 F. 209, 221 (9th Cir. 1903) ("Statements made by jurors not under oath, after the trial is over, are not competent evidence.").

States v. Bussell, 483 F.3d 639, 642 (9th Cir. 2005). "Because
of the trial judge's unique opportunity to observe the jurors
during trial, to hear the defenses asserted, and to hear the
evidence, the judge's conclusion about the effect of the alleged
misconduct deserves substantial weight." Smith, 424 F.3d at
1011.

Where extrinsic information is introduced into the jury
room, a new trial is warranted only if there is a reasonable
possibility that the information could have affected the verdict.
United States v. Vasquez, 597 F.2d 192, 193 (9th Cir. 1979).

> 2. Several of Defendants' Challenges to the Jury's Conduct
>    and Deliberations Are Prohibited by Federal Rule of
>    Evidence 606(b)

Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict or
> indictment, a juror may not testify as to any matter or
> statement occurring during the course of the jury's
> deliberations or to the effect of anything upon his or
> any other juror's mind or emotions as influencing him
> to assent to or dissent from the verdict or indictment
> or concerning his mental processes in connection
> therewith, except that a juror may testify on the
> question whether extraneous prejudicial information was
> improperly brought to the jury's attention or whether
> any outside influence was improperly brought to bear
> upon any juror.  Nor may his affidavit or evidence of
> any statement by him concerning a matter about which he
> would be precluded from testifying be received for
> these purposes.

This rule serves the important policy interests of
discouraging harassment of jurors after a guilty verdict,
encouraging free discussion in the jury room, reducing incentives

for jury tampering, promoting finality, and respecting the institution of the jury as a fact-finding body.  United States v. Bagnariol, 665 F.2d 877, 884 n.4 (9th Cir. 1981) (collecting cases).  Thus, only evidence that falls within Rule 606(b)'s strictures may be used in considering jury-misconduct allegations.  Bagnariol, 665 F.2d at 884.

Recognizing the broad scope of Rule 606(b)'s absolute bar, this Court consistently has upheld courts' refusals to consider juror declarations or testimony regarding alleged misconduct and has narrowly interpreted what falls within the "extraneous prejudicial information" exception.  In United States v. Pimentel, 654 F.2d 538, 542 (9th Cir. 1981), for example, the defendants claimed that post-trial conversations with several jurors indicated that some had prejudged the defendants' guilt before jury instructions.  The defendants submitted a declaration from one juror and an affidavit of defense counsel recounting his conversations with other jurors.  This Court held that the district court properly refused to consider this evidence under Rule 606(b) and Supreme Court precedent.  Id.; United States v. Davis, 960 F.2d 820, 828 (9th Cir. 1992) (post-trial statement that "from the first day I knew [the defendant] was guilty" insufficient to set aside verdict under Rule 606(b) because statement reflected juror's personal beliefs); Hernandez-Escarsega, 886 F.2d at 1579 (affirming denial of evidentiary

517

hearing based on post-verdict declaration that a juror had relied on a "sign from God" in deliberations); United States v. Rohrer, 708 F.2d 429, 434 (9th Cir. 1983) (affirming refusal to consider affidavits of two jurors and two private investigators who conducted post-trial interviews with other jurors); Bagnariol, 665 F.2d at 883-89 ("[I]ntrinsic jury processes will not be examined on appeal and cannot support reversal."); United States v. Weiner, 578 F.2d 757, 764 (9th Cir. 1978) (affirming refusal to consider juror affidavits that one juror had voted "guilty with reservation").[494]

Defendants' claim that jurors engaged in premature deliberations rests exclusively on inadmissible portions of the juror declaration. (JOB 50-51). Post-verdict claims that jurors expressed their views of the evidence during trial and deliberated outside the presence of other jurors do not involve "extraneous prejudicial information" or "outside influence" and thus are impermissible under Rule 606(b).[495]   United States v.

---

[494]  Although Rule 606(b)'s language addresses matters and statements occurring during deliberations, the Supreme Court and this Court have applied the rule to prohibit post-verdict claims of misconduct occurring during trial.  Tanner v. United States, 483 U.S. 107, 117-27 (1987) (juror testimony regarding alleged alcohol and drug use by jurors during trial inadmissible under Rule 606(b)); Pimentel, 654 F.2d at 542.

[495]  Although the jury deliberated for two weeks and submitted numerous notes, no claim of improper or premature deliberations was brought to the Court's attention before the verdict.  Tanner, 483 U.S. at 127 (Sixth Amendment interest in
(continued...)

Logan, 250 F.3d 350, 381 (6th Cir. 2001) (post-verdict claims of premature deliberations precluded by Rule 606(b)).  The court therefore abused no discretion in rejecting these claims.  (JER 470).

Nor did the court abuse its discretion in finding that the allegation that the foreperson was sleeping during trial fell outside Rule 606(b)'s limited exceptions.  (JOB 49; JER 476). Tanner, 483 U.S. at 125-26 (post-verdict claims of sleeping jurors inadmissible); cf. United States v. Springfield, 829 F.2d 860, 864 (9th Cir. 1987) (affirming denial of mistrial after court discovered that juror slept through certain testimony). Defendants' reliance on United States v. Barrett, 703 F.2d 1076, 1083 (9th Cir. 1982), is misplaced.  (JOB 49).  There, a juror came forward before deliberations and volunteered that he had slept during trial.  The judge declined to interview or excuse him and instead stated, "there was no juror asleep during this trial."  Id. at 1082.  This Court held that "under the particular circumstances of [that] case" -- specifically, "[i]n view of the juror's own statement" -- failing to conduct further inquiry was an abuse of discretion.  Id. at 1083.  Here, unlike in Barrett,

---

[495](...continued)
unimpaired jury is protected by several aspects of the trial process, including jurors' ability to "report inappropriate juror behavior to the court before they render a verdict" (emphasis in original)).

519

the issue was raised post-verdict by a juror declaration falling squarely within Rule 606(b)'s prohibition.[496]

>   3.   The Court Abused No Discretion in Finding That Defendants' Remaining Claims Did Not Warrant a New Trial

Defendants claim that a juror was exposed to trial information on an internet blog.  (JOB 51-52).  The record does not support this claim.  Juror #7's declaration stated only that another juror told her (1) that her husband read that a juror fell asleep during trial, (2) that her husband knew who the upcoming witnesses were before they testified (the declaration did <u>not</u> state that the identity of any witness was communicated to the juror), and (3) "another piece of information" her husband read about that struck Juror #7 as significant but she could not recall what it was.  The first two matters involved in-court proceedings and were not "extraneous" information that could influence a verdict,[497] and the court abused no discretion in

---

[496]   In the trial's fourth week, the court alerted the parties that the foreperson told the clerk that she was not feeling well and that the court had observed her with her eyes closed.  The court asked if any party wanted the court to do anything, and all defendants answered in the negative.  (GERT 3214-15).  Apart from Rule 606(b), the court properly rejected the "sleeping juror" claim as a basis for a new trial in light of defendants' decision not to seek further inquiry when the issue was raised during trial.  (JER 476).

[497]   With respect to the "sleeping juror" blog report, Juror #7 declared that she observed the foreperson sleeping during trial, thereby negating the claim that the blog contained information jurors did not already know.  (JER 471).

finding that the third was far too vague to necessitate a new trial (or even for an evidentiary hearing).  (JER 471); <u>see</u> <u>United States v. Packwood</u>, 848 F.2d 1009, 1010 (9th Cir. 1988) (allegations must be "sufficiently definite, specific, detailed, and nonconjectural" to warrant evidentiary hearing).  Nor did defendants demonstrate any exposure to extraneous information from one juror's use of a personal computer to type notes during deliberations, who stopped when told he could not use it because there was no evidence that the juror used the computer beyond as a proxy for handwritten notes.  (JOB 51; JER 471-72).

Defendants also contend (JOB 43-47) that the prosecutor's comment to Arneson's counsel during a recess regarding his intent to seek Arneson's remand -- of which, based on the court's contemporaneous inquiry, one juror heard one word -- constituted a presumptively prejudicial improper communication with the jury. See Part IV.M.6, <u>supra</u> (discussing underlying facts).  The facts do not support this characterization.  See <u>Mattox v. United States</u>, 146 U.S. 140, 150 (1892) (presumption of prejudice attaches to "private communications . . . between jurors and third persons").  Moreover, even if this could be considered a communication with a juror, its <u>de minimis</u> nature requires defendants to show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution.

521

<u>Caliendo v. Warden of California Men's Colony</u>, 365 F.3d 691, 696 (9th Cir. 2004).

As the court recognized, the government's position that Arneson perjured himself "cannot be considered 'extraneous prejudicial information' or an 'outside influence' in any meaningful way" because it was oft-stated before the jury[498] and therefore "could not have changed the outcome of the verdict." (JER 470).  The court further obtained an assurance from the juror who heard the word "perjury" that she could disregard the comment and gave a curative instruction to all jurors immediately upon their return to the courtroom.  (GERT 5764, 5767-70).  Thus, even if the word "perjury" could constitute "extraneous" information under Rule 606(b), defendants failed to justify invoking <u>Mattox</u>'s presumption; moreover, even if that presumption were to apply, it has been rebutted because there is no reasonable possibility that the "communication" influenced the verdict.  <u>Caliendo</u>, 365 F.2d at 697; <u>compare, e.g.</u>, <u>United States v. Rosenthal</u>, 454 F.3d 943, 949-50 (9th Cir. 2006) (new trial ordered where juror, during deliberations, had "a substantive legal discussion" with attorney-friend about the jury instructions); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1490 (9th Cir.

---

[498]  The government used the word "perjury" seven times in cross-examining Arneson.  (GERT 5738, 5743-44, 5756).

1997) (juror's communication of the defendant's criminal record based on extraneous facts was presumptively prejudicial).

Finally, the court abused no discretion in finding that, even assuming the truth of Juror #7's claims that the foreperson (1) stated she also heard the prosecutor's comment and (2) did not disclose it to the court, no new trial or presumption of bias was warranted.[499] (JER 470-71).  In Dyer v. Calderon, 151 F.3d 970 (9th Cir. 1998), on which defendants rely (JOB 47-48), this Court made clear that the issue is not simply whether a juror lied, but whether the falsehood revealed a lack of partiality and undermined the jury's impartiality.  Id. at 973.  There, the court concluded that a juror, whose brother was murdered execution-style and whose husband shared a jail cell with the defendant after an arrest for rape, lied "materially and repeatedly" to secure a seat on the jury in her husband's cell-mate's capital murder case, resulting in the "extraordinary" and "rare" case in which bias could be implied.  Id. at 981-84; Green v. White, 232 F.3d 671, 677-78 (9th Cir. 2000) (implying bias from juror's repeated lies during voir dire and other conduct that brought impartiality into "serious question").  Here, in

---

[499]  Given Juror #7's prior contemporaneous testimony that the other jurors were already out the door, that she was the last one through the door, and that nobody was standing with her, it is implausible that the foreperson could have heard anything more than what Juror #7 heard, which at the time she said was only the word "perjury."  (GERT 5764).

stark contrast, the allegation involved the foreperson purportedly failing to raise her hand in response to the court's inquiry because, according to defendants' own evidence, she did not want to have attention on her.  (See JER 4253).  The court properly found this allegation -- in a declaration that was inconsistent with the declarant's prior in-court representations -- was insufficient to raise a "colorable claim" that the foreperson was biased (for one side or another) -- as opposed to shy, unassertive, or simply uncertain as to what, if anything, she had heard -- and did not support the "extraordinary" step of implying bias.  (JER 470-71); see Dyer, 151 F.3d at 974 (court confronted with "a colorable claim of juror bias" must undertake investigation of relevant facts and circumstances).

   4.   The Court Abused No Discretion in Denying an
        Evidentiary Hearing

   Even where claims of jury misconduct or bias properly are raised, courts have considerable discretion regarding whether to hold an evidentiary hearing.  United States v. Olano, 62 F.3d 1180, 1192 (9th Cir. 1995); United States v. Romero-Avila, 210 F.3d 1017, 1024 (9th Cir. 2000) (courts need not hold evidentiary hearings whenever there is an allegation of jury misconduct or bias).  In determining whether to hold an hearing, courts must consider the content of the allegations, the seriousness of the alleged misconduct or bias and the credibility of the source.  Smith, 424 F.3d at 1011.  No hearing is necessary where the court

knows the exact scope and nature of the bias allegation.  Id.
Moreover, if the court can determine that the allegations, if
true, would not warrant a new trial, no evidentiary hearing is
required.  United States v. Navarro-Garcia, 926 F.2d 818, 822
(9th Cir. 1991).

Even if the admissible portions of the declarations were
accepted as true (and even if the prosecutor's partially
overheard comment were considered extrinsic evidence under Rule
606(b)), no evidentiary hearing was needed.  The submitted
declarations fully addressed whether extrinsic information was
brought before the jury, and the court was precluded from
questioning jurors about the subjective effects of such
information.  United States v. Montes, 628 F.3d 1183, 1188
(9th Cir. 2011) (recognizing Rule 606(b)'s restrictions "can
severely limit the utility of holding an evidentiary hearing at
which jurors may testify").  Moreover, the court was able
conclusively to find from the nature of the alleged extrinsic
material that it could not have prejudiced defendants, given the
issues and overwhelming evidence in the case.  See id.  The court
did not exceed its discretion in declining to hold an evidentiary
hearing.

R.  THE COURT ABUSED NO DISCRETION IN ADMITTING WIRETAPPING-
    RELATED EVIDENCE IN THE CHRISTENSEN-PELLICANO WIRETAPPING
    TRIAL

Christensen claims that the court abused its discretion
under Rules 404(b) and 403 by jointly admitting against him and
Pellicano evidence of wiretaps conducted by Pellicano before and
contemporaneously with the Spring 2002 Bonder-Kerkorian wiretap.
(COB 55-64).  Christensen further claims that the court abused
its discretion under Rules 901 and 403 when it admitted without
proper authentication a document (GEX 333-34) seized from a
computer in Pellicano's personal office within PIA and then
permitted unfairly prejudicial evidence that the document
contained passwords that Pellicano used to access wiretapped
calls.  (COB 60-61).

The court abused no discretion in finding that evidence of
Pellicano's prior and contemporaneous wiretapping was not "other
acts" evidence subject to Rule 404(b) but instead evidence
directed to rebut two cornerstones of Christensen's defense --
namely, that Pellicano lacked the capacity to wiretap in 2002,
and that Pellicano altered the 34 Christensen-Pellicano
recordings to make it appear that they were discussing
wiretapping, when they were not.  (JER 4275-76; GER 2916-19).
Similarly well-grounded was the court's independent finding that
this evidence was not 404(b)-evidence because it was inextricably
intertwined with the charged conduct, providing necessary context

526

to other evidence that was central to the charged wiretapping conspiracy and, therefore, was admissible to allow the government to provide a coherent presentation.  (Id.).

While the court abused no discretion in concluding that this evidence fell outside the scope of Rule 404(b), even if considered within the rule's context, the evidence would be admissible because it was not introduced to establish propensity but rather for reasons consistent with several recognized bases under Rule 404(b), including opportunity (i.e., the capability to conduct the wiretap).  Regardless the theory of admissibility, the court abused no discretion in finding the admission of prior and contemporaneous wiretapping evidence appropriate under Rule 403 as the probative value of the evidence was high, any unfair prejudice was low, and the court carefully acted as gatekeeper throughout trial to ensure that this balance remained well-below Rule 403's threshold for exclusion.  The court, likewise, abused no discretion in admitting Exhibit 101 against Christensen's Rule 901 and Rule 403 objections.  Finally, even if the court had abused its discretion in admitting either Exhibit 101 or the evidence of prior and contemporaneous wiretapping, any error would be harmless because the evidence establishing Christensen's guilt was overwhelming, as evidenced most prominently by the 6 1/2 hours of the Christensen-Pellicano recordings, which are laden with admission-upon-admission of wiretapping, and

527

Christensen's failure to mount a sufficiency challenge to these convictions.

1.    Facts

The wiretap that served as the basis of the wiretapping charges against Christensen and Pellicano (counts 106-07) was implemented on approximately March 15, 2002, and continued for almost exactly two months, extending one day past as Christensen decided to keep it ongoing to expressly intercept attorney-client communications following a May 14, 2002, court hearing.  The wiretap concluded on May 16, 2002, with Christensen and Pellicano agreeing that "the switch gets shut." (GEX 3382).

In addition to the foundational evidence addressing Telesleuth's use and functionality, the centerpiece of the government's case-in-chief was the approximately 6 1/2 hours of recorded conversations between Christensen and Pellicano, as documented on 34 separate calls they had throughout the wiretapping conspiracy's lifespan.[500]  This evidence was supplemented by a variety of other evidence, including: (1) testimony from attorneys Steven Kolodny, Kelli Sager, Jeff Sturman, Harlee Gasmer, Robert Rein, and Debra Simon, who each testified that information discussed on the Christensen-Pellicano recordings included attorney-client communications that each had by phone with Bonder-Kerkorian (GERT 9567, 9966, 10278, 10579,

---

[500]    These calls were played in their entirety at trial.

528

10886, 12039); (2) testimony from physician Gary Chase, who testified that the Christensen-Pellicano recordings included privileged doctor-patient communications with Bonder-Kerkorian (GERT 10805);[501] (3) testimony from associates of Bonder-Kerkorian, who likewise confirmed that the Christensen-Pellicano recordings referenced their conversations with her (GERT 10735, 10108); (4) payment information showing that Christensen paid Pellicano $100,000 under an agreed-upon assumed name (GERT 9929, 11792; GEX 3014, 3662); (5) materials seized from PIA that both reflected this retention and the wiretapping, including a list of Telesleuth passwords recovered from a computer in Pellicano's private office that included Bonder-Kerkorian's name and the names of several additional individuals who Pellicano had wiretapped (GERT 9315; GEX 3445); and (6) testimony and other evidence, including evidence of past and contemporaneous wiretapping, that provided necessary context to other items of evidence and/or rebutted Christensen's defenses (GERT 11095, 11133, 11339, 11364, 11389, 11398, 11671, 11679, 11721, 11829, 11926; GEX 3394, 3389).

---

[501]  These calls also include Pellicano admitting to Christensen that Pellicano broke into a medical facility to steal Bonder-Kerkorian's confidential file. (GERT 9658, 10537; GEX 3209).

Although Christensen's trial defenses were many and often contradictory,[502] several predominated.  First, Christensen zealously attacked the Bonder-Kerkorian wiretap by attempting to establish that Pellicano lacked the capacity to wiretap in 2002 and, therefore, could not have wiretapped Bonder-Kerkorian. Exploiting Telesleuth's limitations (e.g., it required a geographic proximity to either the central office or the tap's location), the fact that residential phone lines in Bonder-Kerkorian's Beverly Hills neighborhood were underground, and the exclusivity of the neighborhood, Christensen argued and presented evidence that Pellicano would have had to dig a two-mile trench from PIA to Bonder-Kerkorian's residence to tap her phone line at the street-level.  (GERT 8582-83, 12296-98).  Christensen further sought to exploit Turner's December 2001 retirement from SBC, when his opening statement claimed that Turner was Pellicano's "inside man" at the phone company who would "set up either a frame tap or direct tap" on Pellicano's behalf:  Turner's retirement, thus, deprived Pellicano of access to the phone

---

[502] In closing, Christensen presented a flow-chart of defenses that included: (1) Pellicano altered the substance of the recordings through selective use of the pause feature (GERT 13441-43, 13458); (2) Pellicano edited the conversations to make them appear criminal (GERT 13446, 13448, 13483-84); (3) Pellicano obtained information not from wiretaps but public or internal sources (GERT 13481, 13532-34, 13537); (4) Pellicano fabricated information (GERT 13525-27); (5) if there was a wiretap, Christensen did not know about it (GERT 13427); and (6) if Christensen knew, there should be nullification because the wiretap was directed at Bonder-Kerkorian (GERT 13429-13431).

company's facilities needed to implement a wiretap, thereby, placing a bright-line termination point to Pellicano's ability to wiretap.  (GERT 8676).

Second, Christensen (unsuccessfully) both argued and sought to show, that Pellicano was serving as a double-agent for Steve Bing in connection with the Bonder-Kerkorian matter.[503]  Under this theory, Pellicano secured Christensen's retention, engaged in a series of recorded conversations with Christensen, and -- using his computer-based expertise and his "motive to deceive" -- altered the recordings to make it appear that he and Christensen were discussing wiretaps, when their conversations involved nothing of the sort (GERT 13434).[504]  Relatedly, Christensen argued that, even if Pellicano was speaking to him about wiretapping, he did not know it, positing that the confidential

---

[503]  While Christensen was permitted to introduce Bing's payments to Pellicano to show that Bing retained Pellicano, Christensen was not permitted to argue the reason for the retention absent actual evidence supporting his claim.  (GERT 11787).  Christensen elected not to call Bing, who was on his witness list, as to the true purpose of the retention.  The Christensen-Pellicano recordings, however, contain multiple lengthy discussions regarding the assistance that Pellicano was providing Bing during a contemporaneously unfolding paternity dispute between Bing and actress Elizabeth Hurley (GEX 3039-41, 3049-50, 3141-43).

[504]  Christensen's counsel went so far as to argue both in opening statements and closing argument that, given Pellicano's prodigious forensic capabilities, the possibility existed that Pellicano had deleted recorded instructions from Christensen that he was not to wiretap.  (GERT 8554, 13512-15).

information provided by Pellicano either was fabricated or from human sources.

            2.    The Evidentiary Rulings Abused No Discretion

                a.    The Evidence Was Admissible to Rebut
                      Christensen's Defenses

Christensen made whether Pellicano possessed the capacity to wiretap in 2002 a central issue at trial.[505]  The evidence of Pellicano's prior wiretapping that the government presented to rebut this claim was properly admitted.  United States v. Kearns, 61 F.3d 1422, 1427 (9th Cir. 1995) (prior acts admissible without regard to Rule 404(b) to show involvement with conspirators and to rebut defense that defendant was not active participant in conspiracy).

Preliminarily, Christensen's claim that the court abused its discretion by permitting the government to introduce evidence of Pellicano's wiretapping capabilities before Turner's December 2001 retirement from SBC is meritless.  (COB 61-62).  There was no evidence that Turner's retirement had any affect on Pellicano's ability to successfully conduct wiretaps.  Trial evidence from the RICO case, including testimony from Wright and Malkin, established that Turner continued to utilize his SBC

---

[505]  The government had offered to stipulate that Pellicano possessed the capacity to wiretap in 2002, which would have obviated the need for much of the testimony to which Christensen now objects.  (GERT 9275).  Christensen declined the stipulation and continued to press his demonstrably false defense.

contacts for subscriber and cable-pair information and that Pellicano continued to wiretap PIA investigative targets (<u>e.g.</u>, Stallone and Busch) past Turner's December 2001 retirement. (GERT 11721, 11829, 11927).[506]

Christensen's decision to forcefully advance a demonstrably false defense based upon an artificially constructed premise did not bind the court or the government.  Instead, because Christensen placed Pellicano's wiretapping capabilities directly at issue, the government was entitled to establish what those capabilities were and how they remained unchanged by Turner's retirement.[507]  Conduct predating Turner's December 2001 retirement establishing both that Pellicano could wiretap and the means and manner by which he did so was highly probative of these facts.

The government presented several witness to rebut Christensen's "lack of capability" defense, each of whom provided discrete information, which when pieced together proved that the

---

[506]  Neither Pellicano nor Turner has challenged the sufficiency of the evidence in support of the convictions for having wiretapped Stallone and Busch.  (GSER 109-29, 144-49).

[507]  This evidence also was relevant to rebut Christensen's claim that Turner was the SBC employee who in all instances implemented the wiretap.  While Turner's job duties provided him access and the ability to implement wiretaps in the field, phone records between Pellicano and Turner showed that Turner had another SBC contact, frame technician Joann Wiggan, who he regularly contacted along with Wright and Malkin at times when wiretaps were implemented and who had access to multiple central offices, including the Beverly Hills Office.  (GERT 13245-49).

defense was unfounded.[508]  Virtue personally listened to
wiretapped calls involving several PIA investigative targets and
provided percipient witness testimony that Pellicano wiretapped
through her departure from PIA in mid-February 2002, which was
two months after Turner's retirement and just one month before
the Bonder-Kerkorian wiretap's initiation.  (GERT 9328, 9505).
Wright similarly testified that Turner continued to contact her
to obtain confidential SBC subscriber information past his
retirement, including information on Busch in May 2002.  (GERT
11097-99, 11103, 11105-06, 11110-11111).  Attorney Lawrence
Nagler testified that in mid-February 2002, he filed suit on
behalf of Stallone against financier Ken Starr, who then retained
Pellicano.  (GERT 11927-31).  Listening to a February 20, 2002,
call between Pellicano and Starr, Nagler confirmed that Pellicano
was advising Starr of the contents of attorney-client privileged
communications that Nagler had by phone with Stallone and
Stallone's representatives at Stallone's residence in the days
immediately preceding this call, which postdated Turner's
retirement and predated Christensen's retention of Pellicano by
just one month.  (GERT 11937-82; GEX 3421).  Turner's April 11,
2002, call with Pellicano, in which they discussed whether a PIA

---

[508]  Given the purposes for which the evidence was admitted,
the government employed far fewer wiretap-based witnesses and
presented testimony in a far more truncated manner than had been
done at the RICO trial.

employee would "rat" on them for the "illegal stuff" that they did together and the steps they would take to prevent discovery, was made in the midst of the Bonder-Kerkorian wiretap and evidenced an ongoing conspiratorial relationship between Pellicano and Turner following Turner's SBC retirement.  (GERT 11671-11676; GEX 3384).  Testimony relating to the two undocumented Busch wiretaps discovered on the SBC central office frame in November 2002 showed that Pellicano retained the ability to execute wiretaps at SBC central offices well past Turner's December 2001 retirement, including the entirety of the March-to-May Bonder-Kerkorian wiretap.[509]

> b.   The Evidence Was Inextricably Intertwined with Direct Evidence of the Wiretapping Conspiracy

Testimony regarding Pellicano's dealings with prior clients and evidence of select past wiretaps also did not fall within Rule 404(b)'s scope because the evidence was necessary to properly present the means and manner by which Christensen and Pellicano intended to and did carry out the charged wiretapping. United States v. Vizcarra-Martinez, 66 F.3d 1006, 1012-13 (9th Cir. 1995) ("other act" evidence may be admitted without regard for Rule 404(b) where it is "necessary to do so in order to allow

---

[509]   Several witnesses were required to address discrete aspects of the tap's discovery, i.e., the house call, the discovery of the undocumented tap on the frame, and the discovery of a second tap.  (GERT 11679, 11694, 11721, 11728, 11839-42).

the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.").

Two items of evidence central to the government's case-in-chief were the Christensen-Pellicano recordings and Exhibit 101, which was a listing of Telesleuth-related passwords recovered from a computer in Pellicano's private office at PIA. Particularly given that Christensen structured a considerable portion of his defense around his claims that Pellicano had altered the 34 Christensen-Pellicano recordings such that their substance could not be trusted and that the information Pellicano provided actually was obtained through other sources,[510] it was within the court's discretion to allow the admission of evidence placing these recordings and Exhibit 101 in their proper context. Dorsey, 677 F.3d at 951 (testimony about past use of particular firearm not Rule 404(b) evidence because prosecution was entitled

---

[510]  Forensic examiner, Bruce Koenig, testified that the Christensen-Pellicano recordings were digitally captured and could be edited without detection at gap points caused by brief moments of silence or other pauses within the conversation (GERT 12498-12500).  Koenig then testified to the number of gap points in the recordings, effectively equating them with the number of potential editing points at which Pellicano could have altered the Christensen-Pellicano calls (GERT 12524-25).  Ultimately, however, Koenig conceded that there were points in the conversation with no breaks (where Christensen and Pellicano openly discussed their ongoing wiretap) and that he could not say whether these recordings had been altered in any way or were the actual conversations between Christensen and Pellicano (GERT 12537-38, 12546, 12564, 12583-84).

to provide a "coherent and comprehensible" presentation of the evidence).

LeMasters' testimony regarding Pellicano's use of offsite listening posts provided proper context to Pellicano's statements on the recordings that he has to go "all the way over there and all the way back" (GEX 3097; GERT 10101), "I've been there every fucking night and am going to be there again over the weekend" (GEX 3103; GERT 10107), that he needed one day's notice if Christensen wanted information because he did not "keep things" at his office (GERT 11337; GEX 3375), and Christensen's statements such as "you're like over there on like Sunday nights, for Pete's sake," (GERT 10731; GEX 3254), and that Pellicano had to engage in "one more adventure" the night before the wiretap was taken down (GEX 3354; GERT 11328).

Similarly, Pfeifer's testimony regarding Pellicano's openness in discussing wiretapping with a new client, his use of phrases such as "there is only one way you know I could be getting this information," and code words such as "special techniques" to describe his wiretapping, and "read," as in "I have to go read tonight," and "I read something" to describe needing to listen to or having obtained information from wiretapped communications all provided context to and rebutted claims of alteration involving the numerous near identical

537

statements on the Christensen-Pellicano recordings.  (GERT 9217; 9237).

For example, in describing that Kolodny was in e-mail communication with a DNA laboratory and researching whether his communications were subject to the attorney-client privilege, Pellicano advised Christensen "so be very careful about this because there's only one way for me to know this."  (GERT 10015; GEX 3046).  When discussing a call that Bonder-Kerkorian had with her father, Pellicano advised Christensen, "her lies are overwhelming . . . and there's no way, except with my unique techniques, that you would know this" to which Christensen responded, "yeah," and then followed-up on the substance of the information just provided by Pellicano.[511]  (Id.).  Pellicano, as he did with Pfeifer, repeatedly referred to listening to wiretaps as having to "read," including when, referencing Kirk Kerkorian, Pellicano stated, "it may be helpful for our client to read things, so he has a better feel."  (GERT 10515; GEX 3190).

The court, likewise, abused no discretion in admitting evidence necessary to fully and properly assess Exhibit 101, a

---

[511] Christensen cites the government's statement in closing that he initially seemed confused when Pellicano first spoke in code (COB 59) but ignores the very next line of argument noting that Christensen's confusion was short-lived, as the Christensen-Pellicano recordings showed that Christensen understood future uses of this code, including when Pellicano suggested having Kerkorian "read things" rather than get the information "third-hand" (i.e., from Christensen through Pellicano) (JER 4375-76).

538

one-page document recovered from a computer in Pellicano's
private office that included abbreviated or coded listings of
investigative targets followed by a password that, in all but one
instance ("AB Catholic Girl Reporter"), included the word
"Omerta" (e.g., "Kwacker Lisa Bonder Omerta," "Gores Main Lisa
Gores Omerta," "Laviolette Omerta," "Vincent Bo Zenga Omerta
Final").[512]

Virtue testified that each time she listened to wiretapped
calls in the Zenga matter, Pellicano gave her the calls and typed
"Vincent Bo Zenga Omerta," as the second part of a two-part

---

[512] Christensen claims the court erred when it admitted
Exhibit 101 "based on" Virtue's testimony insofar as she could
not properly authenticate the document.  (COB 60).  The record is
clear, however, that the court did not admit the document on this
basis, expressly stating so.  (GERT 9314-15).  Before the
exhibit's admission, the court had before it the testimony of the
FBI agent who seized the computer containing Exhibit 101, the FBI
computer specialist who imaged the computer evidence and who
testified that the images, and the evidence recovered from them
were identical reproductions of the original computer evidence,
and a summary chart showing where each item of computer evidence
came from.  (GERT 8845-47).  Moreover, the face of Exhibit 101
reflected numerous known PIA matters, including the Bonder-
Kerkorian matter.  The document, as the court noted, was properly
authenticated.  See United States v. Chu Kong Yin, 935 F.2d 990,
996 (9th Cir. 1991) (Rule 901(a) only requires prima facie
showing of authenticity or identification "so that a reasonable
[trier of fact] could find in favor of authenticity or
identification"); United States v. Salcido, 506 F.3d 729, 733
(9th Cir. 2007) (physical evidence properly authenticated through
testimony describing how images were retrieved from a particular
computer); Black, 767 F.2d at 1342 (once the proponent of
evidence meets this burden, "the credibility or probative force
of the evidence offered is, ultimately, an issue for the [trier
of fact]").

password required to access the files.[513]  (GERT 9313-14).  Virtue

further testified that the passwords for three other wiretaps

also included the word Omerta and that it was only in the context

of wiretaps that Pellicano used this word.  (GERT 9313-14, 9438,

9528-29).  FBI forensic testimony established that Pellicano used

Omerta as part of the hard-coded password needed to access

encrypted audio recordings on the Telesleuth Jr. recording

program.  (GERT 8879).  Testimony established that, in addition

to Zenga, wiretapping had been conducted on several of the

investigative targets listed on Exhibit 101, including Busch,

Laviolette, and Gores.[514]  (GERT 9316, 9386, 11364-68, 11833).

---

[513]  Virtue did not recall the word "final" but testified
that it was otherwise identical to what was listed on Exhibit
101.  (GERT 9313).

[514]  Christensen incorrectly states that Virtue failed to
identify wiretapping in the LaViolette matter.  (COB 60).  On
cross-examination, Virtue testified that while she did not listen
to wiretaps in that case, Pellicano had.  (GERT 9386).
Christensen distorts the record by claiming that the court
impermissibly admitted evidence of wiretaps involving individuals
not listed on Exhibit 101.  (COB 61).  Preliminarily, Christensen
is wrong that the wiretaps of Gores and Busch are not referenced
in Exhibit 101.  Busch, whose DMV information found at PIA
referenced an account at the United Catholic Credit Union,
expressly testified that the "AB Catholic Girl Reporter" referred
to her.  (GERT 11831-32; GEX 3655-57).  Gores was the participant
on the other end of the wiretapped phone call involving Lisa
Gores, who was directly identified on Exhibit 101.  (GERT 9315-
16, 11348-49, 11363, 11365-66, 11388-89; GEX 3445).  Regardless,
appearing on Exhibit 101 was not a condition precedent for
relevance; the evidence relating to each of the wiretaps that
Christensen cites was properly admitted for the independent
reasons discussed throughout this part of the government's brief.

The mere fact that Exhibit 101, a document found on Pellicano's office computer, referenced Bonder-Kerkorian made it relevant to proceedings in which Christensen and Pellicano were charged with having wiretapped her.  Insofar as (1) Bonder-Kerkorian's name was accompanied by the word Omerta, (2) forensic evidence established that Omerta was part of the embedded password necessary to circumvent Telesleuth Jr.'s sophisticated encryption program, and (3) at least 1/3 of the investigative targets listed on the document were known to have been wiretapped, Exhibit 101 was probative of the Bonder-Kerkorian wiretap and highly probative to rebut Christensen's defense that there was no wiretap and that the Christensen-Pellicano calls had been altered to make it appear that there had been.

      c.   <u>The Evidence Would Be Admissible under Rule 404(b)</u>

Even if the evidence of Pellicano's prior and contemporaneous wiretaps were analyzed under Rule 404(b), it still would be admissible.  Rule 404(b) permits the introduction of evidence of other crimes, wrongs or acts for <u>any purpose</u> other than to show "action in conformity therewith," including as "proof of motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake or accident."  Rule 404(b) is "an inclusionary rule," which admits evidence of other acts unless it

541

tends only to prove criminal disposition.[515] <u>Curtin</u>, 489 F.3d at 944-45. So "inclusionary" is the rule that "evidence of other crimes may be probative on issues that are not listed specifically in Rule 404." <u>United States v. McKoy</u>, 771 F.2d 1207, 1213-14 (9th Cir. 1985).

Evidence of Pellicano's prior and contemporaneous wiretapping was relevant to a number of issues wholly unrelated to criminal propensity. First, as discussed earlier, the evidence was directly relevant to show Pellicano's capability to achieve the object of the charged conspiracy -- to successfully implement a wiretap, an issue Christensen repeatedly challenged throughout the trial. It was thus an issue of unquestionable relevance and one for which Rule 404(b) expressly authorizes admission. <u>See</u> <u>United States v. Green</u>, 648 F.2d 587, 592 (9th Cir. 1981) ("opportunity" exception under Rule 404(b) refers to defendant's capacity to accomplish the charged acts). Second, the evidence was relevant for the same reasons that it was not Rule 404(b) evidence in the first place. Third, the evidence established Pellicano's modus operandi when implementing

---

[515] This Court has held that, under Rule 404(b), "evidence of prior criminal conduct may be admitted if (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." <u>United States v. Mayans</u>, 17 F.3d 1174, 1181 (9th Cir. 1994). All conditions are satisfied here.

542

wiretaps, including the openness with which he shared the wiretaps' fruits with his clients, thereby undercutting Christensen's claims that the Christensen-Pellicano recordings were altered while bolstering the inference that Christensen fully was aware of Pellicano's actions on his behalf.  Under this Circuit's precedent, once one exception has been satisfied -- the "opportunity" exception unquestionably had been -- Rule 404(b)'s inquiry is over and all that remains is whether the evidence was admissible under Rule 403.[516]  Curtin, 489 F.3d at 944.

### d.    The Evidence Was Admissible under Rule 403

The court abused no discretion under Rule 403 by admitting evidence of Pellicano's past and contemporaneous wiretapping. Any prejudice that may have resulted from the admission of such evidence was not unfair prejudice.  Bailleaux, 685 F.2d at 1111. This is particularly true given that Christensen's defense that Pellicano could not successfully wiretap after December 2001[517] necessarily implied that Pellicano had, at least at some point,

---

[516]  As the evidence was admitted jointly against Christensen and Pellicano, no limiting instruction was necessary or appropriate.  United States v. Boone, 951 F.2d 1526, 1540 (9th Cir. 1991) (recording of one conspirator's conversations with undercover agent held "clearly admissible" against all conspirators under Rule 404(b) "as proof of a plan or scheme or to show modus operandi").

[517]  Christensen's defense was not in any way premised on the court's decision to admit this evidence, as he made known his intent to pursue this defense in a severance motion before the court's ruling on the evidence's admissibility.

successfully done so -- a matter Christensen's opening statement made explicit.[518] <u>Bailleaux</u>, 685 F.2d at 1105. Moreover, Christensen well knew from the RICO trial that the artificial defense he created around Turner's retirement would be met with rebuttal evidence proving its falsity, which he invited by pursuing this manufactured defense.

Preliminarily, Christensen's unfair-prejudice claim distorts the record when he asserts that "the court permitted the jury to hear over objection extensive recordings . . . -- <u>ironic in a case where no recordings of Bonder existed</u>." (COB 64). Because Pellicano kept some wiretapped recordings offsite (GEX 3097; GERT 10101) and because the initial search of PIA related to only the Busch threat (GERT 8610-11), only a single wiretapped recording (the Gores recording) was recovered. All other wiretapping evidence involved witness testimony and/or recorded calls between Pellicano and the client discussing wiretapping, which is exactly like the Christensen-Pellicano recordings establishing Christensen's guilt.

---

[518] Christensen cites to alleged prejudice in Pellicano's questioning of Virtue and LeMasters regarding past wiretapping at PIA. (COB 64). The wiretaps at issue occurred before December 2001, and therefore came at a time when even Christensen conceded that Pellicano was wiretapping. Moreover, Christensen sought to exploit the existence of the past wiretaps through affirmative questioning designed to show how these wiretaps involved evidence trails that did not exist in his case. (GERT 9383-84, 9391, 9397, 11191-92, 11199). There was no unfair prejudice to Christensen from this questioning.

Christensen's only prejudice argument -- based on the "personal nature" of the wiretapped conversations being discussed or the status of the participants and/or subjects -- is no prejudice argument at all.  (COB 64).  Christensen does not explain how either the "personal" subject matter or status of the involved individuals "provokes an emotional response" or affects "the jury's attitude" toward <u>him</u>.  <u>Bailleaux</u>, 685 F.2d at 1111.  Moreover, Christensen ignores that the Christensen-Pellicano recordings contained approximately 6 1/2 hours of discussion in which Christensen and Pellicano revel in the interception of their adversary's privileged attorney-client and doctor-patient communications involving issues such as sterility, parentage, fraudulent DNA tests, and the mental stability of several prominent individuals, including Kerkorian (a prominent billionaire).  (GERT 9947, 9951-52, 10016, 10029-30, 10551, 11316; GEX 3035, 3046, 3209, 3354).  At bottom, Christensen has done nothing to show that the court abused its broad discretion when it found "the challenged evidence . . . key to the government's case," "nothing linking [Christensen] to any of the other acts of wiretapping that are to be admitted," "the evidence does not bear on Christensen's propensity to wiretap," and "the probative value of the challenged evidence outweighs any unfair prejudice."  (GER 2919).

      e.   <u>Any Error in Admitting this Evidence Was Harmless</u>

Even had the court abused its discretion in admitting this evidence, such error was harmless.  Christensen's knowing participation in both the wiretapping conspiracy and the substantive wiretapping of Bonder-Kerkorian was proved through overwhelming evidence -- most notably the approximately 6 1/2 hours of conversations in which Pellicano and Christensen repeatedly admit this wiretapping (<u>e.g.</u>, TC: "so Harlee told her that the judge was questioning her credibility" (GERT 9958; GEX 3035); TC: "So what did you hear on your end? . . . Oh I see, you've been waiting to see if you had a fraud count to talk about.  Or to listen about." (GERT 10099; GEX 3094);  AP: "You know she talks to him and . . . the first thing that comes out of her mouth, is will you come with me tomorrow" (GERT 10178; GEX 3108); AP: "She speaks in parables" (GERT 12011; GEX 3130); TC: "I'm telling you what you're gonna find.  Okay?  That's what you're gonna find.  Discussions about Steve Bing." (GERT 10223; GEX 3140)).  So strong is this evidence that Christensen has not challenged its sufficiency.  When the Christensen-Pellicano recordings are considered in their totality, it is plain that the admission of evidence relating to past or contemporaneous wiretapping conducted by Pellicano did not impact the verdict.

Furthermore, while the government's case-in-chief satisfied its burden and successfully defeated Christensen's defenses, Christensen's defense failed spectacularly, reflecting its lack of legitimacy.  For example, Christensen's forensic expert, Bruce Koenig, whose responses on cross-examination were so evasive that Christensen's counsel apologized to the jury in closing,[519] conceded that he could not tell whether the Christensen-Pellicano calls had been altered in any way and further that his "critical listening" skills did not reveal any particular location in any of the 34 Christensen-Pellicano calls where he definitively could say that there had been an alteration.  (GERT 12642-44).  He ultimately concluded by noting that his opinion was that he had no opinion on the recordings' authenticity and accuracy.  (GERT 12537-38, 12713).

Michael Ashman, the technician who installed the phones at Bonder-Kerkorian's residence, testified unequivocally on direct examination that Bonder-Kerkorian's phone could not be tapped because it was digital (GERT 12280, 12283-84), but readily conceded on cross-examination that the signal switched to analog upon leaving the house, such that it could be "tapped and intercepted just like any other analog signal" (GERT 12312).  Ashman further acknowledged on cross-examination that (1) it

---

[519]  Counsel stated, "I actually was watching some of your faces and some of you were frustrated that he gave what you perceived perhaps to be equivocal answers."  (GERT 13441).

547

would be simple for a phone-company employee with access to cable-pair information and the mainframe or B-Box to implement a wiretap, (2) if the tap was not logged into the phone-company database and "you weren't looking for it specifically, you'd never find it"[520] (GERT 12314-15, 12317), and (3) if the person who placed the undocumented tap were to remove it before discovery, nobody would ever know the line had been tapped. (GERT 12317-18).  In doing so, Ashman effectively adopted the government's wiretapping theory.

There was no was abuse of discretion.  There was no prejudice.  Christensen's challenges to the admission of this evidence fails.

S.    THE COURT ABUSED NO DISCRETION IN DENYING CHRISTENSEN'S SEVERANCE MOTION

Christensen claims that the court abused its discretion by trying him jointly with Pellicano and that Christensen suffered prejudice because: (1) evidence of Pellicano's prior and contemporaneous wiretapping would not have been introduced against Christensen in a severed trial; and (2) Pellicano wore prison attire and made admissions when questioning witnesses. (COB 64-65).  Christensen falls woefully short of his burden to prove that the prejudice from the joint trial was "so clear,

---

[520]    In addressing the Busch scenario of two undocumented half-taps in short succession, Ashman testified "it would definitely alert someone to look into it."  (GERT 12317).

548

manifest, or undue" that he was denied a fair trial.
Throckmorton, 87 F.3d at 1071-72.

Based on Christensen's defenses and the inextricably
intertwined nature of the evidence (see Parts IV.R.2.a-b, supra),
the court properly exercised its discretion when it concluded
that the evidence of Pellicano's past and contemporaneous
wiretapping was admissible against Christensen individually and
jointly with Pellicano, such that it would have been admitted in
a severed trial.  (JER 411-12).  Therefore, the joinder did not
result in prejudice warranting severance.  United States v.
Crespo de Llano, 838 F.2d 1006, 1020 (9th Cir. 1987) (denial of
severance motion was not abuse of discretion where purportedly
prejudicial evidence would have been admissible to prove
conspiracy in a separate trial).

Christensen also was not unduly prejudiced by Pellicano's
decision to wear jail-issued clothes at trial.  Among the
numerous instructions that directly or indirectly addressed
Pellicano's pro se status[521] was one telling the jury that
Pellicano's custodial status, including his election to wear

---

[521] As in the RICO trial, the court repeatedly admonished
Pellicano about how he would be expected to conduct himself as
pro se counsel (GERT 8259-60, 8267); advised the jury before the
start of trial that statements or arguments by Pellicano as pro
se counsel were not evidence (GERT 8485, 8515); and instructed
the jury that any statements that the attorneys, including
Pellicano, made in closing argument were not evidence (GERT
13348).

jail-issued clothes, should not influence the jury in any way. (GERT 8309). The jury is presumed to have followed this instruction, <u>United States v. Rousseau</u>, 257 F.3d 925, 932 (9th Cir. 2001), so there is no reason to believe that the jury drew any negative inferences toward Pellicano, much less Christensen, based on this fact.

Christensen also was not unduly prejudiced by Pellicano's conduct during trial.[522] Pellicano, who had two months before been convicted of more than six dozen felonies (GSER 109-29), largely stood by and allowed Christensen to control the defense message. Pellicano did not open (GERT 8654), did not close (GERT 13555), and his questions of witnesses, to the extent that he asked any at all, were typically brief.[523] Moreover, while Christensen cites select instances in which Pellicano acknowledged that Telesleuth was a wiretapping program and/or that he may have wiretapped previously (COB 64), that was

---

[522] Christensen ignores that it was <u>his</u> counsel, not Pellicano, who was rebuked by the court for merging two audiofiles and playing them as one, and who, was separately admonished again regarding the misleading use of audiofiles in cross-examination. (GERT 9788-97, 10995-97).

[523] The joint brief acknowledges that Pellicano spent two days on a defense case in which he questioned government computer experts. (JOB 116). Christensen's counsel made clear to the jury that Pellicano had significant technological expertise. (GERT 8543, 8551, 8554, 8556). Moreover, Christensen does not explain how he was prejudiced through the questioning of these witnesses.

consistent with Christensen's trial defense as set forth in
Christensen's opening statement.  (GERT 8580).

As Christensen failed to establish the manifest and unfair
prejudice necessary for severance, the court properly exercised
its discretion and found that the compelling considerations in
favor of joint trials in conspiracy cases should control.
Patterson, 819 F.2d at 1502-03.

T.  THE GOVERNMENT DID NOT COMMIT MISCONDUCT AT THE CHRISTENSEN-
    PELLICANO TRIAL BY POINTING OUT IN REBUTTAL CHRISTENSEN'S
    FAILURE TO PRESENT EVIDENCE HE PROMISED IN HIS OPENING

    1.  Standard of Review

The denial of objections to closing argument is reviewed for
an abuse of discretion.  Tam, 240 F.3d at 802.  Improper remarks
in closing argument are reviewed for harmless error and require
reversal only if it is more probable than not that they
materially affected the verdict.  Prantil, 764 F.2d at 556.

    2.  The Government's Argument Was Wholly Proper

Christensen claims the government knowingly misrepresented
in its rebuttal argument the "facts" relating to Steve Bing's
payment of $310,000 to Pellicano in the summer of 2002.  (COB 66-
70).  The government's argument was proper.

In his opening statement, Christensen told the jury:

On June 25 and August 5, 2002, between that time
period, Mr. Bing pays Mr. Pellicano $300,000 or -- and
more for the Kerkorian matter.  Not the Elizabeth
Hurley matter.  There will be evidence to the contrary.
It's in connection with the Lisa Bonder matter.

551

(GERT 8573).[524]  In opposing Christensen's request to admit the
two Bing checks into evidence, the government noted that no
foundation had been laid for the checks' purpose:  "We don't know
whether it dealt with the Hurley matter.  We don't know whether
it dealt with this matter.  And Mr. Bing has made statements
previously, but he is not on the stand, he is not under oath or
subject to cross-examination."  (GERT 11783-84).

    The checks were admitted over the government's objection for
a limited purpose -- to establish that Bing was Pellicano's
client during the relevant time period.  (GERT 11787-88).
Although Bing appeared on Christensen's witness list (GER 1723-
25), Christensen failed to call him and thereby failed to
introduce any evidence regarding the purpose of Bing's checks.

    After Christensen repeatedly suggested in his closing
argument that the Bing checks had something to do with
Pellicano's motive for recording Christensen and/or altering the
recordings (GERT 13433-35, 13481-84), the government properly
pointed out in its rebuttal Christensen's failure to deliver on
the promises he made in his opening:

> [Defense counsel] told you that the evidence would show
> that the $300,000 Bing paid defendant Pellicano was for
> the Bonder Kerkorian matter.  Where was that evidence?
> You have checks that they submitted from Steve Bing to

---

[524]  In their recorded conversations, Pellicano repeatedly
told Christensen that he represented Bing in connection with a
paternity claim by Elizabeth Hurley.  (GERT 10219, 10517, 11233-
36).

> defendant Pellicano in June and August, 2002.  So what?
> You don't have any testimony about those, and you heard
> on the recordings that defendant Pellicano was
> representing Bing on a completely different matter
> involving Elizabeth Hurley. . . .  [T]here is
> absolutely no evidence that defendant Pellicano having
> Steve Bing for a client has anything whatsoever to do
> with what happened in this case.

(GERT 13603);[525] see United States v. Ziesman, 409 F.3d 941, 954-

55 (8th Cir. 2005) (government's closing may properly note

evidence that defense promised but failed to produce); United

States v. Zanabria, 74 F.3d 590, 592-93 (5th Cir. 1996) (same).

The court abused no discretion in overruling Christensen's

objection to this argument.  (GERT 13604).

Christensen's related claim that the government engaged in

misconduct by asking the jury to find facts it "knew" were false

is groundless.  Although Bing told the FBI in an unsworn

interview that the payments were, at least in part, a "thank you"

to Pellicano for his assistance in the Kerkorian matter,[526] the

government was not required to accept that statement as fact

(particularly in an investigation in which numerous people were

successfully prosecuted for lying to the FBI) or to refrain from

noting Christensen's failure to deliver the evidence he promised

---

[525] Christensen's selective editing in his opening brief
deletes the opening two sentences above and thereby misleadingly
removes the government's statement from its context.  (COB 67).

[526] Bing stated in the same interview that the check's
purpose was "to stay on Pellicano's good side" and also was a
"thank you" for Pellicano's assistance in a matter with Ron
Burkle.  (JSER 599).

in opening.  In <u>United States v. Reyes</u>, 577 F.3d 1069, 1074, 1076-78 (9th Cir. 2009) (cited by Christensen (COB 69)), the prosecutor in closing argument affirmatively asserted that the entire Finance Department of the defendant's company was unaware options backdating was occurring, when in fact he knew that officers of the Finance Department had admitted their knowledge to the FBI, that the company's controller had resigned as a result, and that SEC complaints had been filed against Finance Department employees alleging that they knew about the scheme. Here, in contrast, the government did not make any assertion of fact as to the Bing checks' purpose, but simply (and properly) pointed out the absence of evidence to support Christensen's factual assertions.

Finally, any error in the government's argument is harmless. As discussed earlier (Part IV.R.2.b, <u>supra</u>), Christensen failed to present any evidence supporting his theory that the Christensen-Pellicano recordings were altered, and the prosecutor's accurate statement about the absence of evidence regarding Bing did not aggravate that failure.[527]  (GERT 13598-13602).  Moreover, the entire defense theory involving Bing was speculative, vague, and generally incomprehensible -- and, as

_____

[527]  Indeed, in arguing for admission of the Bing checks, Christensen assured the court that he did not intend to argue to the jury that Bing paid Pellicano to alter the tapes.  (GERT 11787).

554

noted by the government, was one of at least six wholly
inconsistent defense theories presented in the case. (GERT
13594-97, 13602-06). Christensen was convicted based on his own
devastatingly incriminating recorded words in 34 separate
conversations -- culminating in him asking Pellicano to keep the
wiretap going one more day so that he could find out what Bonder-
Kerkorian's lawyers said to her about a court hearing -- not
Bing's two checks pertained to Bonder-Kerkorian or Elizabeth
Hurley.

U.    THE COURT ABUSED NO DISCRETION IN DISMISSING A JUROR DURING
      DELIBERATIONS AFTER THE JUROR REPEATEDLY LIED TO THE COURT

      During deliberations in the Christensen-Pellicano trial, the
court dismissed a juror after it concluded, based on an inquiry
responding to several jurors' notes, that the juror repeatedly
lied to the court. (JOB 119-32). The court acted within its
discretion in dismissing the juror and denying defendants' new-
trial motion.

      1.    Standard of Review

      The excuse of a juror under Rule 23(b) is reviewed for abuse
of discretion and must be affirmed unless this Court is left with
the definite and firm conviction that the court committed a clear
error of judgment. United States v. Beard, 161 F.3d 1190, 1193-
94 (9th Cir. 1998). Underlying factual findings are reviewed for
clear error. United States v. Vartanian, 476 F.3d 1095, 1098
(9th Cir. 2007). A defendant carries a "significant burden" to

555

show that the court abused its discretion in denying a new-trial motion.  United States v. Shaffer, 789 F.2d 682, 687 (9th Cir. 1986).

   2.  Factual Background

   Shortly after deliberations began in the Christensen-Pellicano trial, the court received two notes from separate jurors reporting Juror #7's stated disagreement with the law regarding wiretapping and his position that if it was acceptable for the government to wiretap, then it "should be OK for him." (GERT 13668-69; JSER 587, 589).  At the bottom of one note, the foreperson wrote, "We are unable to move forward we need assistance."  (JSER 587).  In response, the court summoned the jury and re-read Instruction No. 1, which stated the jurors' duty to follow the law as the court stated it, whether they agreed with it or not.  (GERT 13681; JER 4377).  Minutes later, the court received another note stating that Juror #7, when asked whether he believed wiretapping is illegal, had responded, "In the law we don't have to pay federal taxes, just state taxes."[528] (GERT 13682-83; JSER 591).  Remarking that Juror #7 "will not talk about evidence or the law," "will not participate in

---

   [528]  The same note revealed that Juror #7 told other jurors that Turner was in prison, which he knew from "papers."  (GERT 13682; JSER 591).  (In fact, Turner had not yet been sentenced and was not in prison.  (GERT 13687)).  Defendants declined to ask the jury about this potential exposure to extrinsic information.  (GERT 13768-71, 13774-76).

deliberations," and was "ANTI Government," the foreperson requested an alternate juror. (GERT 13683; JSER 591).

The court recognized that it could not dismiss a juror merely because other jurors claimed he was unwilling to deliberate. (GERT 13683). The court asked the parties to research the appropriate colloquy and stated that it would focus on whether Juror #7 was willing to deliberate and follow the law. (GERT 13684-85). The court sent the jurors home, but before they left, another note was received: this note listed "quotes" of Juror #7, including "this case is a joke case, no one died," "She (LISA [Bonder-Kerkorian]) demanded too much," and "I don't treat this case seriously." (GERT 13687-89; JSER 593).

The next morning, the court again acknowledged its inability to inquire into jurors' views on the merits of the case and stated that it would not inquire into whether Juror #7 was "anti-government" or whether he viewed the case as "a joke" (which could have reflected on his view of the evidence). (GERT 13694-95, 13717, 13722-23). Having brought Juror #7 into the courtroom, the court first admonished him not to volunteer information beyond what the court asked, not to discuss the jury's deliberations, the case's evidence or merits, or any juror's views on the case or the evidence. (GERT 13732-33). Although Juror #7 denied knowing that the Court had received notes from the jury, the record reflects that upon being called

557

into the courtroom, he had blurted out "First of all, the notes -
-." (GERT 13732-33, 13745). Juror #7 denied having said
anything like "If it's okay for the government to wiretap, it's
okay for him," denied saying he disagreed with the law about
wiretapping, and insisted that he "didn't say anything about
taxes." (GERT 13734-35). The court again asked, "You didn't say
anything at all about taxes?," and Juror #7 responded, "No."
(GERT 13736). He said that when a fellow juror asked if he
believed wiretapping was illegal, he agreed that "it's illegal to
wiretap." (GERT 13736).

Following this brief and focused questioning, the court sent
Juror #7 back to the jury room and decided to question the jurors
who had signed the notes. (GERT 13736-37). One by one, the
court called into the courtroom and questioned Jurors #1, 9, 3,
and 2. At Christensen's request, the court also then questioned
Juror #11. (GERT 13756). Before any questioning, each juror was
given cautionary instructions like what the court had told Juror
#7. (GERT 13738, 13747, 13750, 13753-54, 13757-58).

Juror No. 1, the foreperson, said that he heard Juror #7
say, "If it's okay for the Government to wiretap and not get
caught, then it's okay for him"; that he heard Juror #7 say, "If
it's okay for the Government to do it and not get caught, then it
should be okay for him"; that he heard Juror #7 say, "If the
federal government charges someone, they're innocent"; and that

558

after being reinstructed by the court on the jury's duty to follow the law, Juror #7 had stated "a bunch of babble" about "we don't have to pay federal taxes." (GERT 13738-45).

Juror #9 said she heard Juror #7 say, "If it's okay for the Government to wiretap and not get caught, then it's okay for him"; that she heard Juror #7 say, "If it's okay for the Government to do it and not get caught, then it should be okay for him"; and that after being reinstructed by the court, she asked Juror #7, "If you knew someone was wiretapping and the law said it was illegal, do you believe it's illegal?," to which Juror #7 replied, "In the law, we don't have to pay federal taxes, just state taxes." (GERT 13747-49).

Juror #3 said he heard Juror #7 say, "If it's okay for the Government to do it and not get caught, then it should be okay for him." Juror #3 also stated that, after being reinstructed by the court, he heard a juror ask Juror #7, "If you knew someone was wiretapping and the law said it was illegal, do you believe it's illegal?," to which Juror #7 replied, "In the law, we don't have to pay federal taxes, just state taxes." (GERT 13750-52).

Juror #2, who the foreperson stated had written down Juror #7's comments "every word verbatim" (GERT 13741), said he heard Juror #7 say, "If the federal government can do it and not be found guilty, then a private citizen shouldn't be." Juror #2 stated that, after being reinstructed by the Court, he heard a

559

juror ask Juror #7, "If you knew someone was wiretapping and the law said it was illegal, do you believe it's illegal?," to which Juror #7 replied that people "shouldn't pay federal taxes," that he was "very much against that," and that "we don't have to pay them." (GERT 13754-56).

Juror #11, whom the court questioned at Christensen's request, stated that the notes regarding it being okay for "him" to wiretap if it was okay for the government were "pretty close" to what Juror #7 said and that after being reinstructed by the Court, she heard a juror ask Juror #7, "If you knew someone was wiretapping and the law said it was illegal, do you believe it's illegal?," in response to which Juror #7 "said something about the federal taxes, that maybe it's not important." (GERT 13756-60).

Following the questioning of Juror #11, the court asked whether anyone wanted the court to question any other jurors. No party requested further questioning. (GERT 13761-62).

The court found it had just cause to excuse Juror #7. (GERT 13763). The court first found that Juror #7 was refusing to follow the law and would not follow the law in the case. (GERT 13764). The court based its finding on the notes, on its questioning of the jurors, and on its finding that Juror #7 was not credible and the other five jurors were. (GERT 13764-65). The court found no reasonable possibility that the impetus for

560

the jurors' notes or their request for an alternate stemmed from Juror #7's views on the merits of the case. (GERT 13765). The court further found that Juror #7 had "lied to the Court" and that those lies constituted "an independent grounds for removing him." (GERT 13765). The court found that Juror #7 was deceitful not only in response to its inquiries that day, but also during voir dire, when numerous questions were asked that should have elicited Juror #7's views. (GERT 13718-20, 13765-66).

The court dismissed Juror #7, seated an alternate, and instructed the jury to begin its deliberations anew. (GERT 13772-73, 13778-80).

Following the guilty verdicts, Christensen moved for a new trial based on Juror #7's dismissal. (JER 4486-97). The motion was supported by declarations from Juror #7 and Juror #8, who had not been questioned by the court. (JER 4487-97). The court denied the motion, again finding that Juror #7 had repeatedly lied during the court's examination, as well as most likely during voir dire. (JER 473). The court found that defendants' juror declarations were barred by Federal Rule of Evidence 606(b), but that even if they were not, they did not undermine the court's previous credibility findings or its conclusions as to Juror #7's veracity and willingness to follow the law. (JER 474).

561

3.    Defendants' Juror Declarations Were Barred by Rule
      606(b)

The declarations of Jurors #7 and #8 addressed exclusively
"matter[s] or statement[s] occurring during the course of the
jury's deliberations," without addressing whether "extraneous
prejudicial information" was brought to the jury's attention or
whether any "outside influence" was brought to bear on a juror.
Fed. R. Evid. 606(b).  As such, they were inadmissible under the
plain language of Rule 606(b).  See Rohrer, 708 F.2d at 434;
Pimentel, 654 F.2d at 542; Marques, 600 F.2d at 746-47; Weiner,
578 F.2d at 764; United States v. Tallman, 952 F.2d 164, 167 (8th
Cir. 1991) ("To admit proof of contentiousness and conflict to
impeach a verdict under Rule 606(b) would be to eviscerate the
rule."); United States v. Norton, 867 F.2d 1354, 1366 (11th Cir.
1989) ("alleged harassment or intimidation of one juror by
another would not be competent evidence to impeach the guilty
verdict").

In United States v. Decoud, 456 F.3d 996, 1003-05 (9th Cir.
2006), the court dismissed a juror during deliberations after the
juror told the court her religious convictions rendered her
unable to carry out her duties.  After the verdict, defendants
moved to further examine the dismissed juror, based on the
defendant's sister's declaration that the juror had said she was
subjected to severe pressure from other jurors because she was a
"holdout for acquittal."  Id. at 1005.  The court denied the

562

motion, finding that the declaration contradicted the juror's testimony before the court and that any evidence concerning pressure allegedly brought to bear on the juror was inadmissible under Rule 606(b). Id. at 1005-06. This Court affirmed, finding that Rule 606(b) "clearly" barred consideration of the declaration's allegation that the juror was subjected to pressure for being a "holdout for acquittal."[529] Id. at 1016-19 & n.11 (citing cases). Decoud controls, precluding consideration of the declarations.

Defendants attempt to evade Rule 606(b) by claiming that the declarations were not submitted to challenge the verdict, but rather to demonstrate an error before the verdict. (JOB 131-32). But as the court recognized, the declarations were submitted with a motion to set aside the verdict and grant a new trial, and therefore clearly involved "an inquiry into the validity of a verdict." (JER 474 n.1). Indeed, all cases in which post-verdict juror declarations are set aside under Rule 606(b)

---

[529] The Decoud declaration said the excused juror "implied" to the declarant that there may have been racial pressure to remove her because she, like the defendants, was African-American. 456 F.3d at 1005. Decoud noted that the Ninth Circuit had previously "implied in dictum that evidence of racial prejudice might be exempt from Rule 606(b)'s restriction." Id. at 1018. This dictum is not implicated here by the foreperson's alleged remark to the court clerk that Juror #7 (who claimed the federal government had no power to collect income taxes) was a "commie." (JOB 128-29). Decoud's dictum related to evidence of racial bias against the defendants, id. at 1018-19, not non-racial dislike of a juror.

necessarily involve claims of error, misconduct, or other activity occurring pre-verdict.  E.g., Pimentel, 654 F.2d at 542; Hernandez-Escarsega, 886 F.2d at 1579; Bagnariol, 665 F.2d at 883-89.

Defendants wrongly claim Rule 606(b) does not apply to Juror #7's declaration because he was dismissed before a verdict was reached.  (JOB 132).  But the rule's text applies to any "juror," precluding testimony about "any matter or statement occurring during the course of the jury's deliberations."  Fed. R. Evid. 606(b).  Because Juror #7 was a juror (albeit a dismissed one) and his declaration addressed matters occurring during jury deliberations, the declaration was inadmissible.  United States v. Acker, 52 F.3d 509, 515-16 (4th Cir. 1995) ("clear language" of Rule 606(b) precluded court from considering post-verdict affidavit of juror dismissed during deliberations that claimed juror would have held out for acquittal).[530]

---

[530]  The court further found that defendants waived any right to introduce Juror #8's testimony when they failed to request questioning of further jurors in response to the court's invitation.  (GERT 13761); see United States v. Kelm, 827 F.2d 1319, 1323 (9th Cir. 1987) (court may refuse to permit defendant to reopen case and present additional evidence where there is insufficient reason for his failure to offer evidence at the proper time); United States v. Haynes, 398 F.2d 980, 984 (2d Cir. 1968) (defendant could not claim actual bias of jurors who had participated in related cases when his counsel was given opportunity during voir dire to propound additional questions and declined to do so).

Accordingly, defendants' claim that the court abused its discretion in dismissing Juror #7 must be based on the record before the court at the time it made its decision.  See Bagnariol, 665 F.2d at 884.[531]

### 4. The Court Appropriately Questioned Jurors in Response to the Notes

The court acted within its discretion in questioning Juror #7 and others in response to the flurry of jury notes received shortly after deliberations began.  See United States v. Boone, 458 F.3d 321, 329 (3d Cir. 2006) (where credible allegations of jury nullification or refusal to deliberate arise during deliberations, court may, within its discretion, investigate through questioning or other appropriate means); Dyer, 151 F.3d at 974 ("A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and

---

[531]  As the court recognized, even if the declarations are considered, they do not undermine the court's earlier findings. Juror #7's declaration, with its post hoc recharacterizations and strained interpretations, attempted to reconcile his prior false statements with other evidence, but only impeached him further. Juror #7's declaration said his discussion of federal taxes in the jury room was not an anti-government diatribe, but a historical meditation on evolving law and the fact that "before World War I, except for a period around the Civil War, Americans did not pay federal taxes until about 1913."  (JER 461).  When originally questioned by the Court, however, Juror No. 7 had adamantly denied saying "anything at all" about taxes.  (GERT 13735-36).  Juror #8's declaration provides no basis to question the testimony of the five other jurors (including one the defense chose) who consistently reported that Juror #7 made the statements: indeed, Juror #8's declaration agreed that Juror #7 said "something about taxes."  (JSER 570-85).

circumstances."). The notes raised legitimate concerns that Juror #7 was failing or refusing to deliberate ("[Juror #7] will not talk about evidence or the law. . . . He will not participate in deliberations") and was unwilling or unable to participate in rational discussions regarding the evidence and legal standard ("In the law we don't have to pay federal taxes, just state taxes"). Contrary to defendants' position (JOB 126), the notes did not indicate that Juror #7 was deliberating: "witness[es] never tell the truth" is not a case-specific analysis of the evidence, nor does "She (LISA) demanded too much" reflect a proper discussion of matters before the jury (particularly as the court had instructed the jury that Bonder-Kerkorian's conduct did not constitute a defense and could not be considered for that purpose).[532] (GERT 13284). Even if the notes provided conflicting evidence, the court had discretion to further investigate whether the reports of Juror #7's refusal to "participate in deliberations" and "talk about evidence or the law" were accurate.

---

[532] Additionally, Juror #7's statement that he knew from "papers" that Turner was in prison, while ultimately not a subject of the court's inquiry, suggested that he either lied during voir dire about his knowledge of the case or ignored the Court's instruction to avoid news accounts during trial -- either way, he was violating the integrity of the deliberations by bringing extraneous, inflammatory and prejudicial information into the jury room.

Defendants complain that the court did not ask Juror #7 if he was unwilling or unable to deliberate or to follow the law. (JOB 127). But the court was not obligated to ask those questions, nor would it have been required to accept Juror #7's answers as determinative. In <u>United States v. Egbuniwe</u>, 969 F.2d 757 (9th Cir. 1992), the court excused a juror based on its determination that the juror could not be fair or impartial after being informed during deliberations of alleged police misconduct involving his girlfriend. This Court held it was not error to fail to ask the juror if he could be fair and impartial: because "[a] trial judge is required to make an independent assessment of a juror's ability to render a fair and impartial verdict," "[a] juror's assurance that he or she can render a fair and impartial verdict is not dispositive." <u>Id.</u> at 762. The court further held that findings of the juror's "defensive demeanor and failure to be forthcoming" in response to the court's inquiries constituted just cause to remove the juror. <u>Id.</u> at 763; <u>see Beard</u>, 161 F.3d at 1193-94 (affirming dismissal of two jurors due to their inability to properly deliberate after they got into disputes with each other, even though jurors said they could deliberate). For the same reasons, the court was not required to credit Juror #7's claim that his disputes with fellow jurors stemmed from differing views of the "circumstantial evidence." (GERT 13734-

567

35).  The court was entitled to probe Juror #7's credibility by questioning other jurors.[533]

> 5.  <u>The Court's Finding That Juror #7 Lied to the Court Was Not Clearly Erroneous, and Dismissal of the Juror Was No Abuse of Discretion</u>

Federal Rule of Criminal Procedure 23(b) provides that courts may excuse jurors "for just cause" after the jury begins deliberations.  A juror may not be dismissed "if the record evidence discloses any <u>reasonable</u> possibility that the impetus for [the] juror's dismissal stems from the juror's views on the merits of the case."  <u>United States v. Symington</u>, 195 F.3d 1080, 1087 (9th Cir. 1999) (emphasis in original).[534]

Here, the court found just cause to dismiss Juror #7 because (1) he lied to the Court (both by omission during voir dire and

---

[533]  Because the notes reported statements evidencing Juror #7's unwillingness or inability to follow the law, the court properly focused its inquiry on determining whether the notes accurately reflected what Juror #7 had said in the jury room (and had denied saying to the court).  Contrary to defendants' claim, the court did not "elicit testimony from Juror #7 regarding his views of the "circumstantial evidence" or his disagreement with other jurors.  (JOB 125-26).  Instead, the court instructed Juror #7 <u>not</u> to disclose such matters, and the juror disregarded the court's instructions.

[534]  The "record evidence" referenced in the <u>Symington</u> test is that properly before the court when it decides to dismiss the juror, unsupplemented by inadmissible post-verdict declarations. 195 F.3d at 1087 (stating that if the "record evidence" does disclose a reasonable possibility that the impetus for dismissal stems from the juror's views on the merits, "the trial judge has only two options: send the jury back to continue deliberating or declare a mistrial"); <u>id.</u> at 1088 (analyzing evidence that was before the court when it dismissed the juror); <u>see Decoud</u>, 456 F.3d at 1016-19.

affirmatively during the court's inquiry regarding the jury notes), and (2) he would not follow the law.  (GERT 13763-66). Both grounds are amply supported by the record.  Either independently sustains the court's action.

    a.   <u>The Finding That Juror #7 Lied Is Not Clearly Erroneous</u>

    Defendants apparently do not dispute that lying to the court constitutes "just cause" under Rule 23(b) to dismiss a deliberating juror.  <u>Vartanian</u>, 476 F.3d at 1096-99 (affirming dismissal of juror during deliberations based on findings, following interviews of jurors, that juror "was not forthcoming," had been "deceitful and untruthful with the Court," and was "untrustworthy"); <u>United States v. Webster</u>, 162 F.3d 308, 348 (5th Cir. 1998); <u>United States v. Zambito</u>, 315 F.2d 266, 269 (9th Cir. 1963).[535]  Rather defendants claim that the record does not support the court's finding that Juror #7 was untruthful.  (JOB

---

[535]  Apart from the simple fact of untruthfulness, courts have held that juror falsehoods can support a finding of implied bias, which provides a separate basis for dismissal.  <u>Green</u>, 232 F.3d at 677-78; <u>Dyer</u>, 151 F.3d at 981-84.  Unlike the situation in the first trial in which a juror allegedly failed to acknowledge having heard the prosecutor's off-the-record remark, Juror #7's repeated lies were unquestionably material, in that they related to the fundamental question of his willingness and ability to discharge his duty as a juror and follow the law. More importantly, the respective post-verdict and pre-verdict contexts in which the juror credibility issues came to the court's attention provide vastly different frameworks for analysis (including with respect to Rule 606(b)).

129-30).  Defendants' argument is misleadingly selective in its analysis and certainly does not demonstrate clear error.

In direct and irreconcilable conflict with the consistent testimony of five jurors, each of whom the court found to be credible, Juror #7 denied making the statements attributed to him and denied saying "anything about taxes."  (GERT 13734-36).  Juror #7 also denied knowing that the court had received notes from the jury, despite his spontaneous statement about "the notes" when brought into the courtroom.  (GERT 13732-33).

With respect to voir dire, the court correctly noted that a number of questions had been asked that, had Juror #7 responded honestly, should have elicited his biases and views regarding the government's prosecution of individuals for illegal wiretapping (as well as other anti-federal government views such as the right to collect taxes).  During voir dire, the court asked: "Will anyone have any difficulty following my instructions and applying the law to this case whether you approve or disapprove of the law as I state it to you?"; "Other than what you have heard already, do you have any feelings about the particular charges against these defendants that would make it difficult for you to be a fair and impartial juror in the case?"; and "If you were sitting at those tables trying to pick a fair and impartial jury, is there anything about yourself that you would want to know to help you do that, even if I hadn't been smart enough to ask you a

570

question to bring it out?"[536]  (GERT 8361, 8382).  Pellicano posed
a more direct question about wiretapping:  "Have any of you
formed any opinion about the term 'wiretapping' from reading the
newspapers and the government's new litigation -- new legislation
regarding wiretapping?  Anybody have any knowledge of that or
. . . any opinions on it?"  (GERT 8415).  Juror #7 failed to
respond affirmatively to any of these questions.[537]

     Having observed Juror #7's demeanor in responding to the
court's questions, the court found that Juror #7 was not credible
and that he had lied to the court, both by omission in voir dire
and affirmatively during the inquiry into the jury notes.  (GERT
13764-66).  Those findings are amply supported by the record and
are virtually unreviewable by this Court.  See Patton v. Yount,
467 U.S. 1025, 1038 (1984) (trial court's determination of
prospective juror's credibility is largely based on demeanor and
is entitled to special deference); Ristaino v. Ross, 424 U.S.
589, 595 (1976) (the "determination of impartiality, in which

_____

     [536]  The jurors to which the court posed these questions
included Juror #7, who was then identified as Juror #18.  (GERT
8360).  The court had previously informed the entire venire that
the case involved charges of wiretapping.  (GERT 8308-09).

     [537]  Defendants' attempt to blame Juror #7's lies on language
problems should be rejected.  (JOB 124, 131).  Juror #7 never
claimed language difficulties in voir dire, during the court's
inquiry, or at any other time during the trial.  His declaration
indicates he had lived in the United States for 11 years, and the
court noted that he did not appear to have any problem with
language and worked in the 401(k) department of AIG.  (GERT
13716; JER 4487).

demeanor plays such an important part, is particularly within the [trial judge's] province"); United States v. Ruggiero, 928 F.2d 1289, 1300 (2d Cir. 1991) (affirming dismissal of deliberating juror following questioning: it "would be rash . . . to second guess the [experienced trial judge's] conclusion, based in large measure upon personal observations that cannot be captured on a paper record").

Although defendants claim Symington is "dispositive" (JOB 125), that case has no application to dismissal of a juror for lying to the court.  See Vartanian, 476 F.3d at 1096-99.  As the court found, Juror #7's views of the merits of the case did not ultimately matter "because he lied over and over again."  (GERT 13762).  That constituted just cause to remove him from the jury.

> b.    The Court's Finding That Juror #7 Was Unwilling to and Would Not Follow the Law Is Not Clearly Erroneous

"Just cause" exists for dismissing a juror under Rule 23(b) when the court determines the juror is unable to deliberate impartially.  Symington, 195 F.3d at 1085.  The record amply supported that factual finding as to Juror #7, providing an independent basis for the juror's dismissal.

Unlike Symington, this was not a situation where the jury had deliberated for several days and the other jurors were possibly trying to pressure the dissenting juror into submission. Id. at 1083-85.  Here, multiple jurors asked the court for help

572

about an hour after the jury retired to deliberate. (GERT 13763-64). The notes stated that Juror #7 was unwilling to deliberate, that he understood but disagreed with the law, and that he believed that a private citizen should be allowed to wiretap to the same extent as the government. After the jury was brought back into court and reinstructed on their duty to follow the law, the court received a further note stating that Juror #7 had responded to deliberating jurors' questions about the evidence by ranting that the federal government is not allowed to collect income taxes. Those notes did not reflect a reasonable possibility that Juror #7 was rationally disagreeing with the other jurors based on a differing view of the evidence: rather, they suggested a rogue juror refusing to deliberate and improperly pursuing an agenda of nullification. Juror #7 responded to a fellow juror's thoughtful and deliberative questioning regarding wiretapping with a non sequitur rant on taxes -- minutes after being reminded by the court of his duty to follow the law regardless of personal views -- suggesting either a conscious refusal to follow the court's instructions or an inability to rationally discuss the evidence and law.

Based on the court's questioning of five jurors, each of whom the court found to be credible and two of whom had no involvement with the jury notes, the court concluded that the jury's problems with Juror #7 had nothing to do with his views on

573

the merits; instead, he was unable or unwilling to deliberate and perform his duties.[538]  Those findings are not clearly erroneous. The dismissal of Juror #7 must be affirmed.

V.   THE COURT PROPERLY FOUND NO <u>BRADY</u> VIOLATIONS

After all defendants were convicted and sentenced, the government became aware of, and disclosed to defendants, a portion of Wright's presentence report ("PSR") prepared in connection with her then-upcoming sentencing for computer

---

[538]  Once Juror #7 was dismissed, the jury quickly got to work.  The newly reconstituted jury was charged and sent out to begin deliberations anew at 10:07 a.m.  (GERT  13780).  At 10:55, they sent a note:

> May we review witness transcripts?  If we may, we would like to see, Mr. Kolodny's testimony, also Mr. Castelluccio; Also Mr. Negler and Ms. Debra Simon.  We also want to here Audio's #1 - #5 - #8 - #9 - #10 - #11 - #12 - #15 - #22 - #25 - #28 and #33.  Not all at once please.  We want to use our Audio transcript Books.

(GSER 152).  The contrast to the previous day's notes indicates that Juror #7 had been an obstacle not to the other jurors reaching a verdict, but rather to their beginning to deliberate and review evidence -- a process which the reconstituted jury could promptly begin.

fraud.[539]  Although certain defendants[540] sought to use this disclosure as a basis for a new trial under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), the court found that the material's impeachment value was minimal, the unaffected evidence of guilt was "overwhelming," and there was no reasonable probability that the trials' outcome would have been different had the PSR been earlier disclosed. (JER 529-30).  These decisions were correct.

### 1.  Standard of Review

Brady claims are reviewed de novo.  United States v. Amlani, 111 F.3d 705, 712 (9th Cir. 1997).  If the court correctly decided the Brady issue, its denial of a new trial is reviewed for abuse of discretion.  United States v. Endicott, 803 F.2d 506, 514 (9th Cir. 1986).

---

[539]  Wright's presentence report was disclosed in September 2006.  The government knew that Wright's sentencing would be continued for a lengthy period, until after the trials in this case and the related Wiggan case.  The government therefore did not read the report immediately, but placed it in Wright's case file for later review before her sentencing.  (JER 5313).  The government reviewed the report for the first time shortly before Wright's December 7, 2009, sentencing hearing, and once aware of its contents, sought leave from the court to disclose it to defendants.  (Id.).

[540]  Turner's new-trial motion was joined by Pellicano, Arneson, and Christensen.  (JER 529).  Kachikian and Nicherie are unaffected by this issue.

575

2.   <u>Factual Background</u>

    a.   <u>Wright's Trial Testimony</u>

As a government witness at the first trial, Wright testified that she accessed proprietary SBC databases without authorization hundreds of times to provide customer information to Turner, both before and after Turner's retirement. (JER 2004-21, 2088-89). Turner paid her for the information in checks and cash. (JER 2046-53).

Wright testified that she lied to SBC and the FBI when initially interviewed. (JER 2054-55). Among other things, she admitted telling the FBI that she had never received any money from Turner for the information she gave him. (JER 2055).

On cross-examination by Turner's counsel, Wright acknowledged that she had no knowledge of Turner engaging in wiretapping, never saw Turner conduct wiretaps, and never gave Turner cable-pair data that one would need to wiretap. (JER 2072). Wright agreed she went to Turner's house for parties, but denied Turner's allegation that the hundreds of dollars Turner gave in checks were payment for chicken. (JER 2074-75). Wright testified that she never saw Turner use or redistribute the addresses and telephone numbers she gave him, never saw him use them for anything relating to wiretapping, never saw Turner do anything wrong with telephone bill or subscriber information, never saw Turner at or around a "B box" or central office frame,

and never saw Turner listening to conversations on a "butt set."[541]  (JER 2076-77).

On cross-examination regarding her plea agreement, Wright admitted that she hoped to receive a benefit from her testimony, wanted not to be imprisoned and was hoping for probation.  (JER 2078-79).  Wright again acknowledged noticing nothing about illegal wiretapping.  (JER 2084).

Turner's counsel did not cross-examine Wright about her having initially told the FBI that she was never paid by Turner for any information.  Besides Turner, no other defendant in the first trial elected to cross-examine Wright.  (JER 2085).

At the second trial, Wright's testimony was shorter. Because Turner was not on trial, Wright's testimony centered on (1) refuting Christensen's claim that Pellicano's wiretapping capability ended with Turner's retirement from SBC in December 2001, and (2) refuting Christensen's claim that Pellicano and Turner lacked access to the SBC frame (and therefore could not have implemented the Bonder-Kerkorian wiretap).

Wright testified that, in return for payment, she provided Turner with information from SBC databases both before and after his retirement, including information on Busch in May 2002.

---

[541]  Hand-held telephone testers or "butt sets," several of which were found in Pellicano's storage locker, can be used to clip onto telephone lines and eavesdrop on conversations.  (GERT 3297-3300).

(GERT 11097-11111).  Wright again testified that she lied to SBC and the FBI about the nature of her activities and about whether Turner paid her for information.  (GERT 11107).  Wright acknowledged that she had no personal knowledge of whether Turner was involved in illegal wiretapping and that she was hoping for a sentence reduction for her cooperation.  (GERT 11106, 11109).

On cross-examination, Wright testified that she had no accounting system to determine what Turner owed her, but that he paid her $100 for phone bills and $25 for addresses.  (GERT 11114-16).  Wright did not know what specific checks to her were for, but they were "most likely" payment for information she gave Turner.  (GERT 11116-17).  Wright said that she did not know whether she accessed information on Bonder-Kerkorian, that she had never seen documents suggesting she accessed such information, and that she had never heard of Christensen or Bonder-Kerkorian.  (GERT 11120-22, 11127, 11129).

Neither Christensen nor Pellicano cross-examined Wright about her having initially told the FBI that Turner never paid her for information.

      b.   <u>Wright's PSR</u>

Paragraph 20 of Wright's PSR, which purported to summarize her presentence interview with the Probation Officer, states:

> Wright further explained that Turner gave her money after her mother died.  Later, the money from Turner seemed "more like his appreciation" for her help.  She

578

said it was not a quid pro quo where she was given
money each time she helped Turner.

(JER 5331).

In a declaration submitted in connection with Turner's new-
trial motion, Wright stated she was certain she never told the
Probation Officer that Turner did not pay her for the information
she provided.  (JER 5312).  Wright said she did not know what
"quid pro quo" meant, never used that phrase, and never recalled
hearing it until her attorney asked her about it around the time
of her sentencing.  (Id.).  Wright's counsel, who was present at
the presentence interview, submitted a declaration stating the
Probation Officer's characterization of Wright's statement
differed from her own recollection.  (JER 5311).  Wright's
counsel said, based on her custom and practice in her two-decade
criminal-defense career, that she would immediately have taken
steps to clarify the statement or otherwise address the matter if
she heard her client say something so different from the client's
proffer to the government or from the factual basis admission at
the plea hearing.  (Id.).

The Probation Officer submitted a declaration acknowledging
that the statement in the last sentence of paragraph 20 was not a
verbatim quote, that the phrase "quid pro quo" was probably his
terminology rather than Wright's, and that the phrase likely
either appeared in his question or was used in his report to

579

reflect his understanding, interpretation, or characterization of Wright's statement.  (JER 5308-09).  The Probation Officer acknowledged that any discrepancy between the PSR and Wright's other statements regarding payment by Turner could easily be the result of a misunderstanding on either side -- Wright's misunderstanding his question or him misunderstanding and misparaphrasing her answer.  (JER 5314).

    3.   The Court Properly Found No *Brady* Violation

To prove a Brady violation, a defendant must show that: "(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to [the defendant's] guilt or punishment." Paradis v. Arave, 130 F.3d 385, 392 (9th Cir. 1997).  Evidence (including impeachment evidence) is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682.  Thus, a defendant must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995).

In assessing materiality, courts must "'undertake a careful, balanced evaluation of the nature and strength of both the

580

evidence the defense was prevented from presenting and the
evidence each side presented at trial.'" Bailey v. Rae, 339 F.3d
1107, 1119 (9th Cir. 2003). Withheld evidence must be analyzed
"in the context of the entire record." United States v. Agurs,
427 U.S. 97, 112 (1976). A Brady violation does not exist when
the withheld evidence was cumulative or peripheral and the
defendant extensively cross-examined the witness at trial.
United States v. Tekle, 329 F.3d 1108, 1114-15 (9th Cir. 2003)
(withheld statement of government witness not Brady violation
where it related to a peripheral point in witness' direct
testimony); Taylor v. Kincheloe, 920 F.2d 599, 610 (9th Cir.
1990) (withheld finding of fingerprint expert that print evidence
was too tenuous to support match held immaterial where defendant
admitted being at crime-scene); United States v. Marashi, 913
F.2d 724, 732 (9th Cir. 1990) (withheld impeachment evidence was
"merely cumulative"). "[N]ewly discovered evidence to impeach a
government witness does not warrant a new trial when the evidence
would not have affected the jury's assessment of the witness'
credibility and . . . the witness was subjected to vigorous
cross-examination." Endicott, 869 F.2d at 456.

Defendants did not even meet the first element of a Brady
violation -- showing that the withheld evidence was impeaching --
because, as the court found, the declarations created "serious
doubt as to whether the [impeaching] statements were ever made."

581

(JER 530).  If cross-examined about whether she told the
Probation Officer that the payments from Turner were not a quid
pro quo for information, Wright would doubtless have responded
that she never made such a statement.[542]  The government would
have called Wright's counsel and the Probation Officer, who,
based on their declarations, would have confirmed that the
statement was never made or was the apparent result of a
misunderstanding between Wright and the Probation Officer.  The
impeachment value would have been nonexistent.

Wright's purported statement also was not material, because
it went solely to the collateral matter of whether Turner paid
Wright "each time" she helped him.  Whether Turner paid Wright
every time she gave him information, some of the time, or not at
all (as was the case with Michele Malkin, another Turner source)
does not affect the gravamen of Wright's testimony that she
conducted her unlawful queries at Turner's direction and provided
him with information from confidential SBC databases.  Payment to
Wright was not an element of any crime.  Turner's payments to
Wright was mentioned only passing in the government's closing
argument at the first trial, and not at all in closing or
rebuttal at the second trial.  (GERT 7694, 7696, 7700, 7727-28).
What was important and incriminating about Wright's testimony --

---

[542]  Because Wright's presentence interview was not under
oath at a proceeding, it would not have been admissible for the
truth of the matter under Rule 801(d)(1).

that she performed computer database inquiries at Turner's behest
and gave him the protected information -- would not have been
impeached by Wright's purported statement to the Probation
Officer.[543]

The court found "ample other evidence in the record" tying
Wright's database inquiries to Pellicano's pending
investigations, and "overwhelming evidence" tying Turner to
Pellicano.  (JER 530).  That evidence included, but was not
limited to: (1) database printouts showing Wright accessing
accounts on dates when other evidence showed Pellicano was
investigating the accountholders; (2) the linking of such
inquiries by Wright's consistent entry of the "Error" code; (3)
evidence matching the dates and subjects of Wright's SBC
inquiries with Arneson's LAPD inquiries;[544] (4) Turner's recorded
statements to Wright that she accessed the Anita Busch account
"close to two years ago," that he believed the FBI investigation
would not get to her and that she was "safe," and that he knew if

---

[543]  Turner's claim that Wright's testimony also supported
the wiretapping charges against him is meritless.  (JOB 90).
Wright specifically acknowledged in both trials that she had no
knowledge of Turner's involvement in wiretapping.  (JER 2084;
GERT 11106).  The fact that Turner was acquitted of certain
wiretapping counts (JOB 90) is therefore irrelevant in assessing
prejudice from the belated production of Wright's PSR.

[544]  For example, on the same date (May 16, 2002) when Wright
accessed Busch's SBC accounts, Arneson conducted numerous
dabatase inquiries on Busch and ordered a copy of her DMV photo.
(GERT 1862-68, 1939-43, 3325-27, 4909-16, 5023-25, 6088-90; JER
2020-21; GEX 743-47, 2038).

he still worked for SBC he "would've been fired, too"; (5)
Turner's and Pellicano's recorded conversation expressing concern
that a PIA employee would "rat [them] out" for all the "illegal
stuff" they did (GERT 1757-63); (6) PIA ex-employee Wayne
Reynolds' testimony that Wright was PIA's telephone-company
source (GERT 4090); and (7) other ex-employees' testimony that
Turner gave Pellicano telephone-company information regularly
(e.g., GERT 968-71, 2175-76, 2198-2201, 3421-22, 4673-74, 4682-
85).  Bank records and testimony by PIA employees established
that Pellicano paid Turner in checks and cash for this
information.  (E.g., GERT 982, 2214, 4679-81).

Finally, the evidence at issue was wholly cumulative.
Wright admitted that in her initial interview she lied about
whether Turner ever gave her money for information.  Defendants
possessed that admittedly false statement (as well as numerous
other false statements contained in the same report) for
approximately two years pre-trial.  (JER 5314; GSER 186-89).
Nevertheless, no defendant in either trial asked Wright about
that inconsistency.  Having chosen not to cross-examine Wright on
that, defendants cannot plausibly argue that a second
inconsistent statement by the same witness on the same subject
would have changed the trial's outcome.[545]

---

[545]  Similarly, defendants claim that Wright's statement to
the Probation Officer that Turner gave her money after her mother
                                                  (continued...)

584

Given the ambiguity about what Wright said, the negligible impeachment value of the alleged statement, the collateral nature of the payment issue, the cumulative effect with other prior inconsistent statements, and the wealth of independent evidence corroborating the most significant parts of Wright's trial testimony, the court had "no question that the outcome of the trial would have been the same had the evidence . . . been disclosed by the government."  (JER 530).  There is no <u>Brady</u> violation, because the PSR could not reasonably have "put the whole case in such a different light as to undermine confidence in the verdict."  <u>Kyles</u>, 514 U.S. at 435.

4.   <u>The Claim That the Government Failed To Disclose Wright's Employment Was Not Properly Preserved and Is Not Properly Raised Now</u>

Defendants also argue the government violated <u>Brady</u> and <u>Giglio</u> by failing to disclose that Wright secured employment with Verizon after being terminated from SBC.  (JOB 87, 92-95). Defendants are wrong to say the government admitted being aware of Wright's employment at Verizon.  (JOB 87).  The record reflects only that the government was aware at some point that Wright "was working."  (JER 4987).

---

[545] (...continued)
died had impeachment value.  (JOB 92).  That fact, however, was also in the report of Wright's proffer interview.  (GSER 190-93). Defendants did not cross-examine Wright on that statement despite knowing about it for two years before trial.  (JER 5314).

That the record is undeveloped as to this claim is unsurprising because defendants failed to preserve it. The issue was not raised in Turner's new-trial motion. (GER 2984-93). Nor was it raised in the one-sentence joinders filed by Christensen, Arneson, and Pellicano (GER 2994-96, 2999-3002).[546] The claim that the government committed a <u>Brady</u> violation by failing to disclose Wright's employment was raised for the first and only time in Pellicano's reply brief.[547] (JER 5316-18). The government never had an opportunity to respond to the claim, and the court did not address it in its ruling on Turner's motion. (JER 529-30). Courts need not consider arguments first raised in a reply brief. <u>Zamani v. Carnes</u>, 491 F.3d 990, 997 (9th Cir. 2007). Accordingly, defendants have failed to preserve this claim for appeal, and it should be rejected.

If the claim was considered, it would be reviewed for plain error. Defendants cannot demonstrate a clear or obvious probability that cross-examining Wright about her employment with

---

[546]  The claim that the Verizon issue was raised by the joining defendants (JOB 87 n.17) is false. Defendants' attempted excuse for the issue not being raised in Turner's motion -- that the transcript of Wright's sentencing hearing was not available until July 13, 2010 (<u>id.</u>) -- is also unavailing, as Arneson's and Pellicano's joinders (both of which failed to raise the issue) were filed on July 27-28, 2010.

[547]  Christensen's reply brief included a footnote claiming that Wright's counsel failed to inform the court about Wright's Verizon employment, but did not raise a <u>Brady</u> claim. (GER 2515 n.3).

another phone company would have changed the outcome of the trials. The evidence of Turner's use of Wright -- both before and after his retirement -- was overwhelming. Nor was it plain that working for a telephone company would be impeaching information -- that relies on a chain of inferences (that Verizon asked about her departure from SBC; that they would not have hired her knowing the true circumstances; and that she therefore must have lied) which defendants still have not proven and which would have been even less obvious to prosecutors at the time looking at isolated offender information in the PSR. (Indeed, the non-obviousness of those inferences is presumably why Christensen's new-trial reply brief did not press this as a <u>Brady</u> claim.) Since the information was not plainly impeachment information and would not have affected trial, this claim provides no basis to disturb the verdict.

     5.  <u>Proctor's Grand Jury Testimony Was Not Brady Material</u>

     Pellicano (POB 36) fails to show a <u>Brady</u> violation based on Ornellas' purported knowledge that Busch's car window was destroyed by means other than a bullet. Pellicano asserts such information conflicted with Proctor's telling the CW that he "put a bullet hole" in Busch's car. (JSER 409). But as explained in Part IV.A.2.c(2)(b)(iii), <u>supra</u>, the lack of a bullet contradicts nothing, because Proctor could have meant that he threatened Busch by putting what <u>looked</u> like a bullet hole in her window.

587

Ornellas set forth Proctor's actual words, as confirmed in the grand jury testimony defendants cite. (JER 5005 "He said . . . I put a bullet hole in the front window . . . ."). Though the CW, like defendants, interpreted Proctor's statements as meaning Proctor shot the car (id.), that simply shows the statement's ambiguity -- reinforcing Ornellas' decision to report the actual words rather than pretending to divine their meaning.

What mattered is that Busch's car was attacked. (Just as a real-looking fake pistol can fulfill a robber's needs, a simulated bullet hole with a dead fish and rose could sufficiently threaten Busch.) The CW's grand jury testimony could not have been used for impeachment, because neither Proctor nor the CW testified as trial. (Though Ornellas testified, he was called by a defendant, on only limited matters, and impeaching him on another's statement would have had little value.)

As the court's Fourth Amendment analysis found, the question of what caused Busch's damage was also immaterial to Pellicano's and Christensen's Fourth Amendment arguments. See Part IV.A.2.c(2)(b)(i), supra. That decision was not clear error. Pellicano's claim fails.

588

W.    PELLICANO'S, ARNESON'S, TURNER'S, AND CHRISTENSEN'S
      SENTENCES SHOULD BE AFFIRMED[548]

      1.    <u>Standards of Review</u>

      A sentence may be reversed only for significant procedural

error or substantive unreasonableness.  <u>United States v. Carty</u>,

520 F.3d 984, 993 (9th Cir. 2008).  Procedural error occurs when

a court incorrectly calculates the Guidelines, applies the

Guidelines as if they were mandatory, fails to consider the

§ 3553(a) factors, bases the sentence on clearly erroneous facts,

or otherwise inadequately explains the sentence.  <u>Id.</u>  Procedural

error does not warrant resentencing unless the error was

significant and prejudicial.  <u>United States v. Ali</u>, 620 F.3d

1062, 1074 (9th Cir. 2010) (denying resentencing where "there is

no evidence . . . these alleged errors, if changed, would result

in a shorter sentence").

      Where procedural-error claims are preserved, this Court

reviews "[the Guidelines] interpretation <u>de novo</u>, the . . .

application of the Guidelines to the [case's] facts for abuse of

discretion, and the . . . factual findings for clear error."

<u>United States v. Treadwell</u>, 593 F.3d 990, 999 (9th Cir. 2010).

Under the deferential abuse-of-discretion and clear-error

standards, a sentence must be affirmed unless it was "illogical,

implausible, or without 'support in inferences that may be drawn

---

      [548]    Kachikian and Nicherie do not appeal their sentences.

from . . . the record."'  Id. at 1011 (abuse of discretion);
Pineda-Doval, 692 F.3d at 944 (clear error).

Unpreserved procedural-error claims are reviewed for plain
error.  United States v. Valencia-Barragan, 608 F.3d 1103, 1108
(9th Cir. 2010).  Where the court "sentence[d] within the
Guidelines range," there will be no plain procedural sentencing
error, provided the court "listened to [defendant's] arguments
[and] stated that it had reviewed the criteria set forth in
§ 3553(a)."  Id.

For forfeited procedural-error claims -- whether the
sentence was within or outside the Guidelines -- the defendant
must "demonstrat[e] a reasonable probability that he would have
received a different sentence" absent the purported errors.
United States v. Waknine, 543 F.3d 546, 554 (9th Cir. 2008).
Only a "complete failure to abide by . . . required sentencing
procedures," coupled with a total lack of analysis of the
§ 3553(a) factors and explanation of the sentence, can
demonstrate prejudice -- and even then, "it is a close question."
Id. 554-55.

If there are no significant and prejudicial procedural
errors, this Court reviews the ultimate sentence for substantive
reasonableness.  United States v. Edwards, 595 F.3d 1004, 1014-15
(9th Cir. 2010).  This includes the judgment about whether

590

§ 3553(a) warrants a variance.  <u>United States v. Autery</u>, 555
F.3d. 864, 872 (9th Cir. 2009).

"[S]ignificant deference" is owed the district court's
§ 3553(a) determinations because:

> [t]he sentencing judge is . . . superior[ly]
> position[ed] to find facts and judge their import under
> § 3553(a) in the individual case.  The judge sees and
> hears the evidence, makes credibility determinations,
> has full knowledge of the facts and gains insights not
> conveyed by the record.  The sentencing judge has . . .
> greater familiarity with[] the individual case and
> . . . defendant . . . than the [Sentencing] Commission
> or . . . appeals court.

<u>Gall</u>, 552 U.S. at 51.  This deference persists "[e]ven if we are
certain that we would have imposed a different sentence had we
worn the district judge's robe."  <u>United States v. Whitehead</u>, 532
F.3d 991, 993 (9th Cir. 2008).

> 2.    <u>Pellicano's Within-Guidelines Sentence Was Procedurally
>       Proper and Substantively Reasonable</u>

The court calculated Pellicano's total offense level at 33,
which, with his category II criminal history, yielded a
Guidelines range of 151-188 months.  (GERT 14017).  The court
sentenced Pellicano to a within-Guidelines term of 180 months.
(GERT 14023).  Pellicano challenges the court's application of
(1) USSG § 3B1.1(a)'s four-level role enhancement to his RICO
calculations (POB 67-68), (2) USSG § 3C1.1's two-level
obstruction enhancement to his RICO and wiretapping calculations
(POB 68-70), and (3) USSG § 3B1.3's two-level special-skill
enhancement to his wiretapping calculations (POB 71).  Pellicano

591

also argues for the first time on appeal that the court "failed
to consider the statutory factors mandated in 18 U.S.C. 3553(a)."
(POB 59).  Finally, Pellicano challenges the sentence's
substantive reasonableness, claiming the court (1) failed to
credit him for time served on his 2003 explosives convictions
(POB 71-73), (2) "disregarded" the USPO's 70-month recommendation
(POB 62), and (3) created an unwarranted disparity vis-à-vis
other selected RICO, bribery, and computer-fraud offenders (POB
62-64).

> a.   <u>USSG § 3B1.1's Four-Level Role Enhancement
>       Properly Applied to Pellicano's RICO Convictions</u>
>
> i.   <u>The Court Correctly Applied § 3B1.1 Based on
>       Pellicano's Role in the Enterprise</u>

For RICO convictions, § 2E1.1(a) provides that the base
offense level is the greater of either 19 or the offense level
applicable to the underlying racketeering activity.[549]  USSG
§ 2E1.1(a)(1)-(2).  Application Note 1 elaborates:

> Where there is more than one underlying offense, treat
> each underlying offense as if contained in a separate
> count of conviction for . . . purposes of subsection
> (a)(2).  To determine whether (a)(1) or (a)(2) results
> in the greater offense level, apply Chapter Three, Part
> A . . . [to] (a)(1) and (a)(2).  Use whichever
> subsection results in the greater offense level.

USSG § 2E1.1, comment. (n.1).

---

[549]  The parties agreed that the bribery and honest-services
racketeering acts provided offense levels over 19, and therefore
controlled the calculations for Pellicano's RICO convictions.
(GER 1878; JER 4642-43; PPSR ¶¶ 72, 89.)

Every circuit that has interpreted this comment has held that role enhancements apply based on the defendant's role in the overarching enterprise, not his role in specific racketeering acts.[550] United States v. Ivezaj, 568 F.3d 88, 99-110 (2d Cir. 2009); United States v. Yeager, 210 F.3d 1315, 1316 (11th Cir. 2000); United States v. Coon, 187 F.3d 888, 899 (8th Cir. 1999); United States v. Damico, 99 F.3d 1431, 1435-38 (7th Cir. 1996).[551] The Guideline "is clear that the requirement to look at each individual act in the RICO offense is only for the purpose of establishing the base offense level, not for applying Chapter Three adjustments." Ivezaj, 568 F.3d at 99. Indeed, applying role enhancements on a predicate-by-predicate basis could lead to perversity:

> a defendant convicted of organizing a far-reaching RICO enterprise could avoid the adjustment so long as [the predicate act used under USSG 2E1.1(a)(2)] involved fewer than five participants and was not otherwise

---

[550] Even this Court focuses on the defendant's role in the overarching enterprise when determining the appropriateness of role enhancements in RICO cases. See, e.g., Frega, 179 F.3d at 811 (court abused no discretion in assessing role enhancement based on defendant's comparative role in the enterprise).

[551] Pellicano cites United States v. Nguyen, 255 F.3d 1355 (11th Cir. 2001), as saying that individual racketeering acts should be grouped after the base offense level for each racketeering act is calculated. (POB 66.) This is not inconsistent with the uniform interpretation of Application Note 1 referenced above, including the same circuit's Yeager decision. More importantly, Nguyen resolved the question of role-enhancement by analyzing the defendant's role in the overarching enterprise, not in particular racketeering acts. 255 F.3d at 1345.

> extensive.  No account would be taken . . . of the fact
> that those participating in the isolated predicate act
> . . . were acting in connection with a larger criminal
> enterprise.

Damico, 99 F.3d at 1437.

The court correctly interpreted Application Note 1 when, consistent with other circuits' uniform holdings, it found § 3B1.1's role enhancements applied to RICO counts based on Pellicano's role in the overarching enterprise.  (GERT 14012). That interpretation also was consistent with (1) § 3B1.1's introductory commentary, which states that relevant conduct, not just the count of conviction, is incorporated into the role-enhancement assessment, and (2) this Court's non-RICO precedent, e.g., United States v. Tankersley, 537 F.3d 1100, 1106-07 (9th Cir. 2008); United States v. Ortiz, 362 F.3d 1274, 1278 (9th Cir. 2004).

> ii.  The Court Did Not Clearly Err in Applying
>      § 3B1.1(a) to Pellicano's RICO Calculations

Section 3B1.1(a) establishes two paths by which a four-level role enhancement may be imposed.  A defendant is subject to the enhancement if he "was an organizer or leader of a criminal activity [involving] five or more participants."  USSG § 3B1.1(a).  Application Note 1 defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  USSG § 3B1.1, comment. (n.1). Alternatively, a defendant is subject to the enhancement if he

"was an organizer or leader of a criminal activity that . . . was otherwise extensive." USSG § 3B1.1(a). Application Note 3 states that, "in assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." In addition, when assessing whether criminal conduct was "otherwise extensive," this Court has considered additional factors like the number of victims, the profitability of the illegal acts, and the duration, scope, and sophistication of the conduct. United States v. Booth, 309 F.3d 566, 577 (9th Cir. 2002) (wire-fraud scheme was otherwise extensive given "the involvement, albeit unknowing, of more than ten employees and the [scheme's] geographical reach"); United States v. Kubick, 205 F.3d 1117, 1126-27 (9th Cir. 1999) (enhancement properly applied where defendant orchestrated criminal activity over several years that involved multiple parties, sham businesses, and millions of dollars); United States v. Govan, 152 F.3d 1088, 1096 (9th Cir. 1998) (enhancement properly applied to leader of robbery crew that traveled across state lines and conducted multiple dry runs before robbing casino and victimizing numerous patrons); United States v. Rose, 20 F.3d 367, 374 (9th Cir. 1994) (enhancement properly applied where fraud scheme involved approximately $3 million, multiple

unknowing employees, and numerous investors); United States v.
Mullins, 922 F.2d 1472, 1479 (9th Cir. 1993) (enhancement
properly applied to leader of wire-fraud scheme who oversaw at
least three participants and used the unknowing services of
outsiders).

Pellicano's leadership of the enterprise cannot be
legitimately disputed.  Pellicano was PIA's both titular and
actual head, and the person who coordinated the activities of
enterprise associates Arneson, Stevens, Turner, Wright, Bill
Parker (black-market trader of confidential information), and
others.  Pellicano acknowledged as much in his closing
argument,[552] then adopted the PSR's findings at sentencing,
including its finding that he was the leader of the charged
enterprise.  (PPSR ¶¶ 23-27. 32-34, 74, 82, 91 & n.5).  Thus, the
issue was never whether a leadership enhancement should be
applied, but whether to apply the two-level enhancement
recommended by the USPO and Pellicano, or the four-level
enhancement recommended by the government.

The court properly found that Pellicano qualified for the
four-level enhancement.[553]  (GERT 14011-13).  The court found both

---

[552]  Pellicano disputed the existence of an enterprise while
simultaneously acknowledging that everyone implicated worked at
his direction.  (GERT 7846-50).

[553]  Factual determinations relating to role enhancements are
reviewed for clear error.  United States v. Salcido-Corrales, 249
F.3d 1151, 1154 (9th Cir. 2001).

that Pellicano was "the organizer and leader" of a racketeering enterprise involving "five or more participants," and that the enterprise was "otherwise extensive." (GERT 14012). The court based these determinations on its findings that at least twelve individuals participated in the enterprise and that the enterprise's activities were otherwise extensive. (GERT 14012-13). These findings were well supported by the record and certainly not clearly erroneous.[554]

Pellicano claims the government improperly relied on his leadership role in the wiretapping conspiracy to bolster its request for a similar enhancement on the RICO charges. (POB 67). Pellicano cites United States v. Ramos-Paulino, 488 F.3d 459 (1st Cir. 2007), a non-RICO case, for the proposition that § 3B1.1 role enhancements only apply to defendants managing criminal actors rather than those managing criminal activities. (POB 68). Both arguments are meritless.

---

[554] Should this Court rule that role enhancements are applied based on the defendant's role in individual racketeering acts, there still was no reversible error, because the court correctly concluded alternatively that § 3B1.1(a)'s enhancement applied even under that theory. (GERT 14013). With respect to the bribery racketeering acts, which group under USSG §§ 2E1.1(a) and 2C1.1(b)(2), the jury found that Pellicano and Arneson gave and received bribes. Stevens admitted receiving bribes from Pellicano. (GERT 4576, 4596). LeMasters and Palazzo testified to issuing checks to Arneson as payment for confidential law-enforcement information. (GERT 2196, 2342-43, 4675-78). Bribery-related conduct therefore involved at least five participants and was otherwise extensive, qualifying under § 3B1.1(a). Similar considerations supported applying this enhancement to the honest-services-fraud racketeering acts. (GER 1882-87).

The PSR Pellicano adopted noted that, should role enhancements be determined based on the defendant's role in the overarching enterprise, the four-level enhancement likely would be appropriate as "Pellicano was the organizer of the RICO conspiracy, which was otherwise extensive."  (PPSR ¶ 96 n.5; JER 4642-43; GERT 13961).  The government's sentencing memorandum and arguments based the application of USSG § 3B1.1(a) to Pellicano's RICO convictions on his role in the enterprise, not the wiretapping conspiracy.  (GERT 13980-82; GER 1877-87).  The government focused exclusively on the racketeering activity's participants and its extensive nature.[555]  (Id.)

More importantly, it is the court's findings, not the government's arguments, that matter.  The court's findings were based on the enterprise's number of participants and otherwise extensive nature.  (GERT 14012-13).  A dozen individuals cited by the court were direct participants in the enterprise or aided in

---

[555]  Even had the court used Pellicano's role in conducting wiretaps, which he concedes supported § 3B1.1(a)'s four-level enhancement, to buttress its finding that he qualified for a similar four-level enhancement on the RICO counts, that would not be procedural error.  "The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), i.e., all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction."  USSG Ch. 3, Pt. B, intro. comment.  PIA's wiretapping, while not a racketeering act, was relevant conduct committed in furtherance of the enterprise's common purpose.

racketeering conduct.[556]  (Id.; GER 1880-81).  The court's
findings regarding the enterprise's "otherwise extensive" nature
also were premised on the enterprise's broad and longlasting
activities, not Pellicano's role in wiretapping.  (GER 1881).

Equally unfounded is Pellicano's apparent premise that the
four-level enhancement should not apply because he did not
"supervise" the other enterprise participants.  Such an argument
is inconsistent with Pellicano's adoption of the two-level
enhancement for his RICO charges and with uncontested evidence
establishing his leadership over the enterprise's actors and
activities.

     b.   <u>The Court Did Not Clearly Err in Applying
§ 3C1.1's Obstruction Enhancement</u>

Section 3C1.1 provides a two-point offense-level
enhancement:

> [i]f (A) the defendant willfully obstructed or impeded,
> or attempted to obstruct or impede, the administration
> of justice during the course of the investigation,
> prosecution, or sentencing of the instant offense of
> conviction, and (B) the obstructive conduct related to
> (i) the defendant's offense of conviction and any
> relevant conduct; or (ii) a closely related offense.

Application Note 4 provides examples: "destroying or concealing
or directing or procuring another person to destroy or conceal
evidence that is material to an official investigation or

---

[556]  That some of these individuals also participated in the
wiretapping conspiracy is irrelevant.  The common thread in the
court's finding was participation in racketeering activity.
(GERT 14012-13).

599

judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so." USSG § 3C1.1, comment. (n.4(d)).  Application Note 9 explains that § 3C1.1 is not limited to acts directly committed by a defendant, but rather holds him "accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured or willfully caused."  USSG § 3C1.1, comment. (n.9).

The court did not clearly err in finding that, after the November 2002 search of PIA, Pellicano, to impede the government's investigation, willfully ordered Kachikian to destroy his Telesleuth copy, and engaged in the mass destruction of computer and documentary evidence.[557]  Kachikian testified before the grand jury in April 2003 that Pellicano contacted him the previous December or January and ordered him to destroy Kachikian's copy of Telesleuth.  (GER 1890).  Kachikian understood Pellicano's order to be related to the government's ongoing investigation.  (Id.)  Kachikian complied with Pellicano's order, using a code-wipe program to ensure his Telesleuth copy could not be recovered, and breaking and discarding his backup CD.  (Id.).

---

[557]  Whether a defendant obstructed justice under § 3C1.1 is reviewed for clear error.  United States v. Jimenez, 300 F.3d 1166, 1170 (9th Cir. 2002).

This left Kachikian unable to comply with a grand jury subpoena requesting those materials, thus depriving the investigation of one of the only copies of Telesleuth in existence.  Later, Kachikian cited his lack of access to the program as a reason why he could not give complete testimony about the program's capabilities during his April 2003 grand jury appearance.[558]

Having found that this act of spoilation was intended to impede the government's ongoing investigation, the court did not clearly err in applying § 3C1.1.[559]  Indeed, Application Note 4

---

[558] Kachikian's inability to provide specifics before the grand jury contrasted sharply with his trial testimony, where he displayed comprehensive knowledge of Telesleuth.  (GERT 6970-71, 6890-93).  Although the government did eventually obtain usable versions of Telesleuth through forensic examination of the computer evidence seized from PIA, the investigation would have been greatly facilitated had Kachikian been able to provide copies of the program in April 2003.  Instead, the FBI could not determine the password for Telesleuth's ultra-sophisticated encryption program and code-wipe feature until October 2003.

In closing argument, Pellicano said the government should not have been able to recover the Telesleuth-related materials, lamenting that only luck and Kachikian's coding misstep allowed the government to circumvent his security measures:

> had they not enlisted the aid of a brand new FBI employee . . . who knew how to read code[,] and found in simple English [the password] Mr. Kachikian wrote down as a comment, . . . they would have never heard . . . these conversations . . . . Those conversations were never intended to be heard by anyone.  Ever.  Except Mr. Pellicano.

(GERT 7851).

[559] Kachikian's sentence also included a two-level obstruction enhancement premised partly on these acts.  (GERT
(continued...)

601

all but mandated this result.  See United States v. Pizzichiello, 272 F.3d 1232, 1237 (9th Cir. 2002).

Nor did the court clearly err in finding that Pellicano intentionally destroyed evidence at PIA once the November 2002 search revealed that the FBI was investigating Pellicano for the threat against Busch.  (GERT 14014).  Due to the November warrant's limited scope, the FBI seized a relatively small set of records and only a subset of PIA's computer media.  (GERT 6106, 6314-16, 6342).  To not interfere with PIA's facially legitimate investigative work, the FBI did not seize computers in PIA's "war room," which testimony identified as the computers used in wiretapping.  Thus, as Pellicano well knew, he narrowly dodged a bullet when the government's search left unseized documents and computer media related to the enterprise's exponentially more extensive criminal activities.  (GERT 12809, 13356).

Between that November search and the government's return in January with a more expansive warrant, Pellicano completely disassembled the computers in his "war room" and conducted a mass shredding of client files.  (GERT 746-50, 756-58).  As a result, the January 2003 search was fruitless and did not contribute evidence to either trial.  (GER 1860-1959).[560]

---

[559](...continued)
14040-41).

[560]  Should this Court find that neither of these instances of spoilation qualifies for the obstruction enhancement, it still
(continued...)

The loss of physical and electronic evidence resulting from Pellicano's destruction of PIA records was exploited by defendants at trial. A common theme in both trials was the purported lack of conclusive evidence of wiretapping[561] and lack of evidence documenting the enterprise's inner-workings.

Pellicano also claims there was no evidence of him knowing about the government's investigation when he destroyed evidence at PIA and ordered Kachikian to destroy Telesleuth. (POB 68-69). But the November 2002 search and warrant told Pellicano that the government was investigating his involvement in the Busch threat. Pellicano also knew the computer media seized in that search contained materials relating to PIA's investigation of Busch, including criminal-history and DMV information provided by Arneson, as well as evidence of the enterprise's additional crimes. Trial evidence proved Pellicano knew the government was interviewing employees and clients about PIA's broad array of

---

[560] (...continued)
can uphold its application based on the two acts of witness intimidation the government documented in its sentencing memorandum. Attempted witness intimidation, even if unsuccessful, warrants the enhancement. USSG § 3C1.1, comment. (n.4(a)); United States v. Collins, 90 F.3d 1420, 1430 (9th Cir. 1996).

[561] For instance, Christensen and Nicherie stressed that the government's multi-year investigation resulted in recovery of only one actual intercepted call, which they attempted to portray as having been consensually recorded. (GERT 13479-80, 8008).

criminal conduct.[562]  Kachikian specifically testified he
understood that Pellicano's order to destroy Telesleuth was
premised on the government's broader investigation.  In light of
such evidence, the court did not clearly err in finding that
Pellicano's evidence destruction was intended to impede the
government's investigation.

Pellicano claims he could not have intended to destroy
evidence, since some evidence remained and was used to convict
him.[563]  (POB 70).  But the physical evidence used to convict
Pellicano largely[564] was acquired during the November 2002,
search.  Before then, Pellicano did not know he was under federal
investigation.  After the search, Pellicano swiftly moved to
destroy what evidence he could.  This was consistent with
Pellicano's history of destroying evidence in anticipation of
potential search warrants -- as evidenced by the mass document

---

[562]  Pellicano was so attuned to the government's
investigation that he knew within days of Virtue's testimony that
she had participated in secret grand-jury proceedings.  (GERT
1219-23, 1467-81, 1489-90, 7253-54).  Pellicano then sought to
intimidate Virtue in yet another act of obstructive conduct.

[563]  Pellicano ludicrously claims he assisted the
government's investigation.  (POB 69).  Pellicano's claim to have
directed agents to the explosives in PIA's safe is false.  (RJN
180-82, 188-92; PPSR ¶¶ 138-39; GERT 795-97, 800-02).  And
whatever Pellicano's reason for deciding to begin serving his
explosives sentence before his self-surrender date, that did not
assist the government's investigation or any other federal
agency.  Regardless, acts that assist the government can coincide
with obstruction.

[564]  Select evidentiary items subsequently were obtained from
the LAPD, SBC, and Pellicano's offsite storage facility.

604

destruction Pellicano ordered after learning that state law enforcement on the John Gordon Jones rape case might search PIA. (GERT 2188, 2329-32, 3440, 3455-56, 4034-35).

Pellicano claims the court failed to find that the destruction of Kachikian's copy of Telesleuth and the destruction of PIA files were material to the government's investigation. This is false. Both parties' sentencing memoranda expressly addressed materiality. (GER 1889-92; JER 4645-46). In finding that the obstructive acts "cited by the government had been proved" and that such conduct "fit within USSG § 3C1.1," the court directly referenced the briefing's explanation of materiality. (GERT 14013-14). This was sufficient. See United States v. Cordova-Barajas, 360 F.3d 1037, 1043 (9th Cir. 2004); United States v. Hernandez-Ramirez, 254 F.3d 841, 844 (9th Cir. 2001) (to be material, act need not affect the outcome but rather be of a type that would tend to influence or affect a fact at issue). The war-room computers were the ones used for wiretapping. The court's findings are not clearly erroneous.

Pellicano frivolously argues the § 3C1.1 enhancement should be set aside because he was not indicted for obstruction.[565] (POB 68). But § 3C1.1 and this Court's precedent favor the

---

[565] Kachikian was charged in the Fifth Superseding Indictment with violating 18 U.S.C. § 1512(c)(1) by destroying Telesleuth. (JER 983). Hearsay considerations kept Pellicano from being charged similarly; Bruton considerations caused Kachikian's charge to be dismissed before trial.

enhancement's application to uncharged obstruction. E.g., United States v. Garro, 517 F.3d 1163, 1171 (9th Cir. 2008).

Equally frivolous is Pellicano's claim that the enhancement should not apply because efforts to silence Proctor were "lacking in evidentiary support."[566] (POB 68, 70). The court based its obstruction findings on the spoliation described above, not witness intimidation. (GERT 14014). Nor is there any requirement that evidence supporting a sentencing enhancement be presented at trial. United States v. Fitch, 659 F.3d 788, 795 (9th Cir. 2011).

      c.   USSG § 3B1.3's Special-Skill Enhancement Applied to Pellicano's Wiretapping Convictions

Section 3B1.3 provides a two-level enhancement for a defendant who "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." The skill must be a pre-existing, otherwise legitimate skill, not possessed by the general public, that "a criminal has perverted to uncivilized and illegal ends." United States v. Liang, 362 F.3d 1200, 1202 (9th Cir. 2004). The term

---

[566] This is yet another inconsistent argument raised by Pellicano, whose Rule 403 argument is premised partly on trial evidence regarding the threat against Virtue. (JOB 73). Regardless, the letter from convicted Chicago Outfit member Jerry Scalise to Carradine regarding Pellicano's efforts to secure Proctor's silence is self-explanatory: it discusses how Robert Salerno, another Chicago Outfit member, was serving a RICO murder sentence at the same federal prison as Proctor; how Scalise was attempting to get the message to Salerno; and how Scalise and Carradine needed to finalize the plan through communications that would evade government detection. (GSER 310-13).

606

"facilitated" simply means that "the special skill made it significantly easier for the defendant to commit or conceal the crime." United States v. Peterson, 98 F.3d 502, 506 (9th Cir. 1996). Peterson affirmed the enhancement for a defendant convicted of computer fraud and wiretapping in connection with a series of computer-hacking schemes, including one in which the defendant manipulated a computer program to intercept calls to faciliate being the "winning caller" in prize sweepstakes. This Court explained that Application Note 3's reference to substantial education, training and licensing did not establish "an absolute prerequisite for a special skill adjustment" -- although the defendant lacked formal computer training, his "sophisticated computer skills reasonably can be equated to the skills possessed by pilots, lawyers, chemists, and demolition experts for purposes of § 3B1.3." Id.

Here, the court abused no discretion in concluding that Pellicano possessed pre-existing, otherwise legitimate, and not generally possessed, computer, audio, and encryption skills that he exploited to facilitate his wiretapping.[567]  (GERT 14014-15). Indeed, Pellicano's opening statement admitted he was an expert whose specialized skills were instrumental to the creation, development, and use of his wiretapping program:

---

[567]  This Court reviews whether a defendant's particular abilities constitute a "special skill" for abuse of discretion. United States v. Kimbrew, 406 F.3d 1149, 1151 (9th Cir. 2005).

607

I'm . . . going to make a couple more comments about –-
Telesleuth[,] . . . the program . . . Mr. Pellicano
developed, along with Mr. Kachikian.

Mr. Pellicano was the sole creator of all of these
programs, based on his knowledge of law enforcement and
audio recordings going back into the . . . 70's. As a
matter of fact, Mr. Pellicano coined the term "forensic
audio," and it was then and is now used by law
enforcement and the private sector.

As a result of . . . [that] span of [almost] 40 years,
he became very familiar with all aspects of audio
surveillance counter measures, . . . the location of
audio surveillance devices, and the audio surveillance
devices . . . available to law enforcement.

* * *

As a result of that, Mr. Pellicano sought to develop
the ultimate program, and that's what Mr. Pellicano and
Mr. Kachikian sought to do.  That program is
Telesleuth.

(GERT 608-09).[568]

Kachikian testified that: (1) Pellicano approached him in

1995 with plans to create the program that became Telesleuth; (2)

Kachikian had no prior experience with or knowledge of

wiretapping mechanics; (3) Pellicano, who was well-versed in

these issues, educated Kachikian; (4) Pellicano told Kachikian

the specific features to include in the program, including call

---

[568]  Pellicano elsewhere said he possessed "the following
special skills and training: forensic audio, investigations,
cryptography, photography, handwriting and document analysis,
voice identification, computer graphics, and computer analysis."
(PPSR ¶ 182).  The PSR noted that Pellicano handled "highly
technical cases involving electronics," claims to have performed
"a lot of 'pioneering forensic audio work,'" received military
training in cryptography, and "had excellent forensic audio-
capabilities."  (PPSR ¶ 189; USPO Rec. 3).

608

interception, identification, and preservation components; (5) Pellicano demanded numerous security features to limit access to the program and intercepted calls, including sophisticated encryption, a code-wipe program to automatically delete wiretapped calls and the Telesleuth program if specific use protocols were not followed, and the lack of any "backdoor" that would allow forensic examiners to bypass encryption; (6) Pellicano helped test each feature and instructed Kachikian regarding desired modifications; and (7) Telesleuth, under Pellicano's direction, was repeatedly upgraded from its creation through Pellicano's November 2002 arrest. (GERT 6737-42, 6765-66, 6772-73, 6776-77). The court's finding that Pellicano used special skills to facilitate wiretapping was founded on uncontested, overwhelming evidence.

Contrary to Pellicano's claim, application of § 3B1.3's special-skill enhancement is not double counting. (POB 71). The Guideline for wiretapping, § 2H3.1, does not inherently incorporate into its offense level the special skills that Pellicano used to wiretap. See United States v. Williams, 693 F.3d 1067, 1074 (9th Cir. 2012); United States v. Reese, 2 F.3d 870, 895-96 (9th Cir. 1993) ("The use of a single aspect of conduct both to determine the applicable offense guideline and to increase the base offense level mandated thereby will constitute impermissible double counting only where, absent such conduct, it

609

is impossible to come within that guideline."). Pellicano admits a defendant can commit wiretapping without personally possessing special skills by employing others who possess such skills. (POB 71). Moreover, rudimentary devices can be cheaply purchased to conduct rudimentary encryption and wiretapping. (GERT 6747-51). In such cases, no enhancement would apply. Pellicano's wiretapping, however, succeeded on a grand scale precisely because of its sophistication, including operational, security, and encryption features that Pellicano devised, maintained, and refined based on his pre-existing skill in computers, audio analysis, and encryption.[569] Pellicano's use of these special skills was not previously incorporated into his § 2H3.1 offense level. The court correctly found the § 3B1.3 enhancement applied.

### d. The Court Did Not Fail To Consider the § 3553(a) Factors

Pellicano, who did not object below to the adequacy of the court's consideration of the § 3553(a) factors, asserts on appeal that the court "failed to consider th[ose] statutory factors." (POB 59). There was no error, much less plain error, because Pellicano's claim is false. (GERT 14015-22).

The court stated at Pellicano's sentencing hearing that its "task in sentencing is to determine the sentence that is

---

[569] Christensen presented expert testimony designed to show how sophisticated Pellicano's wiretapping program must have been to wiretap as he did. (COB 115).

reasonable but no greater than necessary to comply with the purposes stated in Section 3553(a)." (GERT 1408). It explained that it considered each § 3553(a) factor and cited each factor. (GERT 14017-18). The court discussed its discretion to sentence outside the applicable Guidelines range, and spoke at length about how Pellicano's offense conduct and the parties' sentencing arguments affected its sentencing determination in light of the § 3553(a) factors. (GERT 14015, 14018-22). This satisfied the requirements for a procedurally sound sentence. See Valencia-Barragan, 608 F.3d at 1108 (forfeited claims challenging consideration of § 3553(a) factors will be rejected if the court "listened to [the defendant's] arguments, stated that it had reviewed the criteria set forth in § 3553(a), and imposed a sentence within the Guidelines range").

    e.    Any Procedural Error Was Not Prejudicial

    Even if this Court were to find procedural error, there was no prejudice.[570]  The court unequivocally stated that, if Pellicano's calculations had "result[ed] in a lower guidelines range," "unquestionably, an upward departure of five levels or more would be appropriate" and that the court would have "departed upward to reach at least the higher range on which it

---

[570]  On Pellicano's preserved procedural claims, the government would have the burden to show harmlessness. United States v. Vonn, 535 U.S. 55, 62 (2002). On Pellicano's forfeited claims, Pellicano would have to demonstrate prejudice. Id. at 63.

bases its sentence today" -- even "a sentence of approximately 20 years [was] well within the range of reasonableness for [Pellicano's] collective crimes":

> [Pellicano] engaged in reprehensible conduct for many years, dragging friends and employees into his schemes and convincing people in whom the public placed its trust to betray their oaths and obligations.  He did this eagerly, usually maliciously, and with extreme pride in his ability to violate the law with impunity as evidenced by his demeanor on the recordings.  The Guidelines range for these crimes and the method of grouping failed to take into account the true nature, circumstances and extent of his crimes, nor does the range even begin to address the number of victims whose lives have been damaged and whose privacy has been violated.
>
> The range also fails to address the serious collateral damage this conduct . . . had on the civil and criminal justice systems.  That such . . . damage would occur if the crimes were discovered was completely foreseeable.  Defendant's aim . . . was to destroy [his clients'] perceived enemies . . . by any means.  The message was that justice or, more accurately, a perversion of justice could be bought.

(GERT 14016, 14019-21).  Elaborating, the court said:

> the nature and scope of Mr. Pellicano's criminal activity is completely unaccounted for by the Guideline calculations.  The Court finds that [Pellicano's] conduct was part of a systematic and pervasive corruption of a government function, process or office that has . . . caused . . . loss of confidence in certain aspects of government, including police agencies and the courts. . . . [A] primary objective . . . was an aggravating, non-monetary objective, . . . the infliction of emotional distress, and [defendant's] conduct clearly has caused such harm.  His offenses caused physical, emotional and psychological harm to a significant number of victims and resulted in the most egregious . . . invasion of privacy imaginable.  It is impossible to quantify the harm to the victims . . . .

(GERT 14015).  Because there is "no evidence" that Pellicano's
alleged procedural errors, "if changed, would result in a shorter
sentence," Ali, 620 F.3d at 1074, there is no basis for vacatur
and remand.  See United States v. Munoz-Camarena, 631 F.3d 1028,
1031 (9th Cir. 2011) (miscalculation is harmless where the court
explained "the reason for the extent of a variance" that it would
have otherwise imposed).

> f.   Pellicano's Within-Guidelines Sentence Was
>      Substantively Reasonable

A sentence is substantively reasonable when it is
"sufficient, but not greater than necessary" to accomplish
§ 3553(a)'s sentencing goals.  Carty, 520 F.3d at 989-90).
"Reasonableness" is reflected in a record that, under the
"totality of the circumstances," shows a "rational and meaningful
consideration of the [§ 3553(a)] factors." United States v.
Ressam, 679 F.3d 1069, 1080 (9th Cir. 2012).  Where, as here, a
within-Guidelines sentence was imposed, this Court will reverse
only if the court's decision not to go lower was "illogical,
implausible, or without support." Treadwell, 593 F.3d at 1011.

Pellicano claims the court abused its discretion by
rejecting a downward variance for time served on his explosives
convictions (POB 71),[571] by sentencing him above the USPO's below-

---

[571]  Pellicano claims his sentence should have been
calculated as starting in November 2003, when he began serving
the 30-month sentence for his explosives conviction.  (POB 73).
That is cognizable only as a request for a downward variance,
(continued...)

613

Guidelines 70-month recommendation (POB 61-62, 73), and by failing to properly account for sentencing disparities.[572] (POB 62-64). These arguments fail. Pellicano's within-Guidelines sentence was substantively reasonable, and the court's decision not to go lower was not "illogical, implausible, or without support." Treadwell, 593 F.3d at 1011.

> ### (1) Pellicano Was Not Entitled to a Downward Variance Based on His Explosives Sentence

The USPO recommended a 30-month downward variance to credit Pellicano for time served on his explosives convictions, because "all these charges [could have] been brought around the same time" (USPO Rec. 3), an argument the court analyzed and rejected. (GERT 14016).

---

[571](...continued)
which is how the government addresses it.

[572] Pellicano, citing to sentences imposed in other cases that he claims involved similar conduct, claims the court incorrectly calculated his Guidelines and failed to properly assess the nature and circumstances of the offense conduct. (POB 62-64). Sentences imposed by other courts in other cases, however, have nothing to do with calculating Pellicano's Guidelines range or with this case's offense characteristics. Properly framed, Pellicano is claiming the court failed to account for sentencing disparities between similarly situated defendants as required by § 3553(a)(6).

Citing the government's briefing,[573] the court found it
"incorrect" to assume the government could have proceeded with
the RICO/wiretapping indictment while the explosives charges were
still pending.  (Id.)[574]  Moreover, the court, which heard
testimony on Telesleuth's encryption and booby-trap features and
the time-consuming forensic examination required to secure this
evidence, found that Pellicano was partly responsible for any
delay. (GERT 14018).

Consistent with Pellicano's longstanding position that the
explosives in his office safe were not for use by the enterprise
but rather had been obtained from a client for subsequent
disposal, the court found no evidence that Pellicano's possession

---

[573]  The government noted that the RICO/wiretapping charges
were the result of a multi-year investigation extending through
2006.  (GER 1913-14).  This investigation included, but was not
limited to: (1) hundreds of witness interviews; (2) dozens of
grand-jury subpoenas; (3) acquisition and analysis of years of
bank and toll records; (4) reviewing the LAPD audit of Arneson's
database inquiries; (6) reviewing phone company records relating
to Turner and Wright; (7) extensive use of several grand juries;
(8) using multiple computer experts to image, analyze, and
decrypt PIA computer evidence; (9) a "taint team" to conduct
privilege reviews; (10) multiple crime-fraud motions to obtain
court permission before reviewing documents and recordings
subject to potential privilege claims; (11) reviewing and
analyzing tens of thousands of pages of documents and hundreds of
hours of audio recordings; and (12) negotiating plea agreements
with cooperating defendants.  (Id.).

[574]  Though the government could document payments between
Pellicano and Arneson in early 2003, the USPO was incorrect to
assume the government could have brought the 112-count
RICO/wiretapping indictment then.  (PPSR ¶ 227).

of the explosives was connected to the offense conduct in this case. (Id.).

"[M]ost importantly," the court found, "the Probation Officer's conclusion that consideration of the explosives charges at the same time as the present charges would not have increased defendant's sentence is simply wrong." (Id.).  While the explosives calculations would not have increased Pellicano's total offense level had the charges been brought together, the court would have "departed upward" and sentenced Pellicano above 180 months "based on . . . the fact that [the] explosives charge wasn't adequately accounted for in the Guidelines." (GERT 14018-19).

None of these findings was "illogical, implausible, or without support." Treadwell, 593 F.3d at 1011.  Before Booker, USSG § 5K2.0 provided for upward departures, and after Booker, the § 3553(a) factors provide for upward variances, when the Guidelines fail to fully account for offense conduct. E.g., Tankersley, 537 F.3d at 1113 (upholding as reasonable a 12-level upward departure under § 5K2.0).  Had Pellicano's explosives charges been brought in this case, the Guidelines would not have accounted for that conduct "because the behavior involving the weapons would not group with the instant offense and the maximum multiple count adjustment ha[d] already been applied." (USPO

616

Rec. 3).  Thus, an upward variance would have been the only way to account for the explosives.

Moreover, if Pellicano possessed the C-4 explosive, blasting cap, and grenades in furtherance of the enterprise's activities, as he now claims (POB 72),[575] a reasonable inference is that they were to be used to destroy Busch's car, as Proctor stated was Pellicano's initial intent.  (JSER 495).  At a minimum, given information on the explosives' destructive power,[576] one could infer Pellicano possessed the explosives to kill or injure PIA's adversaries or destroy their property.  If the explosives charges had been brought with the RICO/wiretapping charges, therefore, the court would have reasonably varied upward by an amount matching or exceeding Pellicano's 30-month explosives sentence.[577] It was thus reasonable not to grant a downward variance for time served on the explosives conviction.[578]

---

[575]  This is another inconsistent argument -- Pellicano elsewhere argues the jury should not have been shown a photograph including the explosives or heard testimony about them because such evidence was unrelated to charged conduct.  (JOB 61, 69).

[576]  Expert testimony in the 2002 Explosives Case established that the C-4 explosive could have destroyed PIA and everyone inside, taken down a plane, or destroyed a car.  (PPSR ¶ 143).

[577]  The court previously stated an upward departure of at least five levels was appropriate even without taking into account Pellicano's possession of these explosives.  (GERT 14016).  A departure of this amount would have set the low-end of Pellicano's Guidelines range at 262 months -- 82 months above Pellicano's final sentence.

[578]  Pellicano's accompanying arguments also fail.  There is
(continued...)

(2)  The Court Was Not Required To Accept the
USPO's Sentence Recommendation

Pellicano maintains the court "nearly tripled" the USPO's 70-month sentence recommendation, and that the rejection of the USPO's recommendation proves his sentence's unreasonableness. (POB 62).  This claim fails.

First, Pellicano overstates the import of the USPO's sentencing recommendation.  Under Federal Rule of Criminal Procedure 32, the purpose of the PSR and sentencing recommendation is not to set a benchmark for assessing the reasonableness of a sentence, but rather to provide the court with potentially useful information to "meaningfully exercise

---

[578](...continued)
no merit to Pellicano's claim that his criminal-history category should have been I instead of II because his explosives convictions were "part of the instant offense" rather than a "prior sentence" under § 4A1.2.  Pellicano previously asserted that the explosives belonged to someone else (and thus were unrelated to his criminal conduct at PIA).  (2003 PSR ¶ 22). Therefore, possession of the explosives was neither part of a "common scheme or plan," nor part of the "same course of conduct."  USSG § 4A1.2, comment. (n.1).

The record also disproves any claim that Pellicano would have received a concurrent sentence if not for delay in bringing the RICO/wiretapping indictment.  (POB 72-73).  The Guidelines require concurrent sentences only when the underlying count of conviction is fully accounted for in the offense level determination for the instant offense.  USSG § 5G1.3(b).  Had the RICO/wiretapping indictment been brought earlier, the court would have had discretion to impose concurrent or consecutive sentences.  USSG § 5G1.3(c).  In denying Pellicano a downward variance, the court effectively concluded that Pellicano's two sentences should be consecutive.

. . . sentencing authority under [§ 3553]."[579]  Therefore, even
when based on a fully and correctly calculated Guidelines range,
the recommendation is simply an aid the court may consider in
exercising its statutory sentencing duties.

Second, the USPO's sentencing recommendation in this case
was not based on a fully calculated Guidelines range.  Because
§ 3C1.1's two-level obstruction enhancement depended on evidence
from the trial, the USPO took no position on the enhancement's
applicability but instead expressly "defer[red]" to the court.
(PPSR ¶¶ 53, 76, 84, 94, 105, 111).  The PSR addendum did the
same with respect to § 3B1.3's special-skill enhancement to
Pellicano's wiretapping calculations.  (PPSR Add. ¶ 2).  Although
the USPO's calculations included only a two-level enhancement
under § 3B1.1, the PSR addendum deferred to the court on whether
to impose a higher enhancement.  (Compare GER 1918 and GERT
14012-13, with PPSR ¶¶ 74, 82, 91, 105, and PPSR Add. ¶ 1
("stand[ing] by" its § 3B1.1 calculations "but ultimately
defer[ring] to the Court")).  The USPO's recommendation letter
stating an "advisory guideline range [of] 97 to 121 months based
upon an offense level of 29" was therefore based on an incomplete

_____

[579]  A PSR need not even be generated if the court can
meaningfully exercise its sentencing authority based on
information in the record and explains its findings.  Fed. R.
Crim. P. 32(c)(A)(ii).  Likewise, the USPO's sentence
recommendation need not be disclosed to defendants, provided the
facts relied upon by the court are disclosed.  United States v.
Baldrich, 471 F.3d 1110, 1114-15 (9th Cir. 2006).

calculation which took no position on two enhancements and miscalculated a third.  (USPO Rec. 1).

The USPO left it for the court to complete the calculations. The court did so by finding that the obstruction, special-skill, and four-level leadership enhancements applied -- which, as the court noted, brought the USPO's and the government's Guidelines calculations into alignment.  (GERT 14016-17).  The resulting calculations included a total offense level of 33, a criminal-history category of II, and an applicable Guidelines range of 151-188 months.  (GERT 14017).  Because the USPO's lower recommendation was based on an inaccurate Guidelines calculation, and (as discussed earlier) included an erroneous downward-variance recommendation, it is not useful in assessing the reasonableness of the Court's sentence.[580]

Third, Pellicano's argument asks this Court to defer to a Probation Officer assigned to the case post-trial, rather than to the judge who heard the trial testimony, viewed and listened to the exhibits, observed the witnesses, and presided over two years of pre-trial litigation and five months of trial.  The law gives

---

[580]  The USPO also cited as justification for a downward variance its erroneous belief that Pellicano could have been charged with the Busch threat federally and that he was therefore unnecessarily exposed to a possible additional prison term in his state case.  (USPO Rec. 3).  The court correctly rejected this position as unduly speculative -- a conclusion borne out when the state court ordered Pellicano's state sentence to run concurrent with this case's sentence.  (GER 2523; GSER 212; GERT 14019).

broad sentencing discretion to the sentencing judge -- not the USPO.

The court's superior knowledge was recognized by the USPO, which "deferred" several sentencing determinations to the court based on the court's thorough knowledge of the record. (PPSR ¶¶ 53, 74, 76, 82, 84, 91, 94, 103, 105, 111; PPSR Add. ¶¶ 1, 2). It was recognized by Pellicano's counsel, who admitted there was not "much I can say that you don't already know about this case or about Mr. Pellicano after these years of litigation and the two trials." (GERT 13974). And it was recognized by the court, which responded to Pellicano's assertion that "the Probation Office [has] a good handle on this case" by noting, "I have a better handle." (GERT 14005).

### (3) Pellicano Shows No Unwarranted Sentencing Disparity

Section 3553(a)(6) requires courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Although this provision is intended to promote sentencing equality among similarly situated defendants, United States v. Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007), the existence of a sentencing disparity does not alone render a sentence unreasonable: "the need to avoid unwarranted disparities is only one factor [courts must] consider in imposing . . . sentence." United States v. Marcial-Santiago, 447 F.3d 715, 719 (9th Cir.

2006); see Pepper v. United States, 131 S. Ct. 1229, 1249 (2011)
(rejecting invitation "to elevate" § 3553(a)(6) above other
sentencing considerations).

Moreover, § 3553(a)(6) was intended to reduce only
unwarranted disparities among defendants who truly are similarly
situated.  United States v. Labonte, 520 U.S. 751, 761-62 (1997)
(disparities arising from properly exercised prosecutorial
charging discretion are not unwarranted).  Defendants who proceed
to trial are not similarly situated to those who plead guilty,
cooperate with the government, occupy a different role in the
offense, or are convicted of lesser offenses.  For example, in
Ressam, 679 F.3d at 1095, the en banc Court vacated the
defendant's too-lenient sentence because the court erroneously
considered the defendant, who was convicted at trial of a terror
plot, to be similarly situated to other high-profile terrorists
who pleaded guilty and to co-defendants convicted of lesser
offenses.

Because "[a]voidance of unwarranted disparities was clearly
considered by the Sentencing Commission when setting the
Sentencing Guidelines ranges," when a court "correctly
calculate[s] and carefully review[s] the Guidelines range, [it]
necessarily [gives] significant weight and consideration to the
need to avoid unwarranted disparities."  Gall, 552 U.S. at 54;
Treadwell, 593 F.3d at 1011 (court "was entitled to rely on the

622

Guidelines range in determining that there was no unwarranted disparity" with others convicted of similar offenses).

Consistent with this guidance, this Court has eschewed the practice whereby a defendant alleges a sentencing disparity by citing to specific sentences imposed in other cases. Treadwell, 593 F.3d at 1012 ("[T]he mere fact that [the defendant] can point to a defendant convicted at a different time of a different [offense] and sentenced to a [shorter] term of imprisonment . . . does not create an 'unwarranted' sentencing disparity," particularly where such cites are not accompanied by the "the records in the cases."). "[A] court need not, and, as a practical matter, cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before. Too many factors dictate the exercise of . . . sentencing discretion in a particular case to make [such an inquiry] helpful or even feasible." Id.

The court here stated that it considered § 3553(a)(6) and concluded that it was "totally unaware of any circumstance that is similar to this one." (GERT 14017-18); see Autery, 555 F.3d at 876 (finding of dissimilarity between defendants, unless clearly erroneous, will not cause sentencing disparity to be unwarranted). Moreover, as already discussed, the court correctly calculated Pellicano's Guidelines range and sentenced

623

him within that range.  Nothing more is required.  <u>Treadwell</u>, 593
F.3d at 1011.

Pellicano's citation to five sentences in other cases does
not establish otherwise.  (POB 62-64).  This is particularly true
given both the court's finding that Pellicano was not similarly
situated to other parties and that these cases involve
disparities in charges, case resolutions, and/or jurisdictional
considerations that this Court previously has found to make
sentences unsuitable for comparison under § 3553(a)(6).[581]

### (4)  Pellicano's Within-Guidelines Sentence Was Reasonable

"[W]hen the judge's discretionary decision accords with the
[Sentencing] Commission's view of the appropriate application of
§ 3553(a) in the mine run of cases, it is probable that the
sentence is reasonable."  <u>Rita v. United States</u>, 551 U.S. 338,
350 (2008).  Thus, "'in the overwhelming majority of cases, a
Guidelines sentence will fall comfortably within the broad range

_____

[581]  Pellicano cites a state case (<u>Chrisman</u>); a federal case
that did not include RICO, bribery, or wiretapping charges in
which the defendant pleaded guilty (<u>Rossini</u>); a federal case
whose defendant pleaded guilty to a single-count information that
did not include RICO, bribery, or wiretapping charges (<u>Norell</u>); a
federal RICO case that did not involve wiretapping and whose
defendants did not receive role or obstruction enhancements
(<u>Frega</u>); and a federal RICO case involving a defendant who
pleaded guilty and whose charges did not include wiretapping
(<u>Damico</u>).  (POB 62-64).  These defendants are not similarly
situated.  Nor does Pellicano provide sufficient information
regarding them to allow for meaningful consideration.  <u>See</u>
<u>Treadwell</u>, 593 F.3d at 1012.  And Pellicano mentioned only two of
the five cases during his sentencing.

of sentences that would be reasonable in the particular circumstances.'"  Treadwell, 593 F.3d at 1015.

The record reflects that the court, after correctly calculating an applicable Guidelines range of 151-188 months, carefully and thoroughly analyzed each of the § 3553(a) factors before determining that a 180-month term represented a sentence that was sufficient, but no greater than necessary, to achieve § 3553(a)'s objectives.  (GERT 14017-22).  The court considered relevant aggravating and mitigating factors, concluding that the "aggravating factors are so substantial as to outweigh any arguable mitigating factors."  (GERT 14020).  Among these aggravating factors were: (1) Pellicano's interception of his adversaries' confidential attorney-client communications; (2) Pellicano's corruption of law-enforcement and public agencies; (3) the significant collateral damage Pellicano's actions caused these institutions;[582] (4) the "extreme pride [Pellicano demonstrated] in his ability to violate the law with impunity"; and (5) the significant "number of victims whose lives have been damaged and whose privacy has been violated."  (GERT 14011, 14017-22).  Though Pellicano claims the impact of his criminal conduct was overstated, that argument was debunked by trial testimony, by Pellicano's admissions on recorded calls, and by

---

[582]  Both Pellicano and the government cited the extensive civil litigation that resulted when the enterprise's victims sought redress from, among others, the City of Los Angeles and AT&T (SBC's corporate successor).  (GER 1871; GERT 13975).

625

victim impact statements.  (GER 1819-59; GERT 1551-52, 1567, 1759-62, 1789, 2372-83, 2396-2401, 2404, 2406-11, 2419-22, 2458-61, 2464-78, 2496, 2510, 2586-2601, 2644-45, 2721-27, 3359-67, 3371, 3710-19, 3754-55, 4400-07, 4414-15, 4946, 4976-87, 5126-49, 9856-58, 12249).  For example, Anita Busch explained how the fear caused by Pellicano's relentless targeting of her privacy undermined her ability to maintain her journalism career and profoundly impacted her daily life.  (GERT 13957-58).  Pellicano, of course, bragged about how it was his mission to destroy his adversaries.  (GERT 14021; GEX 3378).

In sentencing Pellicano, the court sentenced the architect of an unprecedented criminal enterprise that had, for a decade, criminally victimized hundreds of people, corrupted longstanding public institutions, and subverted the judicial process.  The court acted within its broad sentencing discretion when it imposed a reasonable, within-Guidelines 180-month sentence.

      g.   <u>No Resentencing Is Required if the RICO Conviction and Bribery Racketeering Act Verdicts Are Upheld</u>

When this Court reverses some counts and affirms others, it generally remands for resentencing on the affirmed counts.  <u>E.g.</u>, <u>Lazarenko</u>, 564 F.3d at 1047.  This is because, "[w]hen a defendant is sentenced on multiple counts and one . . . is later vacated on appeal, the sentencing package comes 'unbundled.'  The district court then has the authority 'to put together a new package reflecting its considered judgment as to the punishment

the defendant deserve[d] for the crimes of which he [wa]s still convicted.'" United States v. Bennett, 363 F.3d 947, 955 (9th Cir. 2004). "However, this rule is . . . permissive; it is not a requirement that [this Court] vacate all of the sentences imposed." United States v. Evans-Martinez, 611 F.3d 635, 645 (9th Cir. 2010) (declining to vacate and remand sentence on affirmed count, despite vacating and remanding sentence on two other counts, because statements at the sentencing hearing made "clear [the court] would impose the same sentence [on the count unaffected by error] on remand").

Provided that this Court affirms Pellicano's RICO convictions and does not vacate the jury's findings as to the bribery racketeering acts, remand is unnecessary. Because Pellicano's Guidelines calculations were driven exclusively by the wiretapping offenses and bribery racketeering acts,[583] Pellicano's Guidelines range would remain unchanged at 151 to 188 months so long this Court upholds the jury findings that he committed that conduct.

Moreover, Pellicano's sufficiency challenges to the honest-services-fraud, identity-theft, and computer-fraud charges are based not on the underlying conduct not having occurred but instead on the contention that recent legal changes have decriminalized his conduct. (POB 53-57). The court therefore

---

[583]  Pellicano does not challenge the sufficiency of the evidence in support of the wiretapping charges.

627

would remain free to consider such conduct (e.g., Pellicano's use of corrupt police and phone company employees to acquire confidential information) when assessing an appropriate sentence under § 3553(a) even if this Court vacated those convictions. The court clearly stated that a 180-month sentence was the minimum that would reasonably satisfy § 3553(a), and the information considered when assessing those § 3553(a) factors would remain unchanged on resentencing.  There would be no need to resentence.

> h.   No Basis Exists To Assign Resentencing to a
>      Different Judge

Acknowledging that Judge Fischer remains the appropriate judge to preside over any future trial should one be necessary, Pellicano nonetheless requests reassignment for resentencing. (POB 60, 73).  No other defendant seeks reassignment for any purpose.  Absent personal bias, a case is reassigned on remand in only unusual circumstances.  United States v. Arnett, 628 F.2d 1162, 1165 (9th Cir. 1979).  Here, nothing suggests the district judge was biased or would be unable to set aside a reversed ruling.  Reassignment is not justified, particularly given the substantial waste and duplication of effort reassignment would entail given the enormous record of prior proceedings in this case.  Id.

3.    Arneson's Sentence Was Substantively Reasonable

The court calculated Arneson's total offense level on the RICO counts at 24,[584] based on an offense level of 22 and on a 2-level obstruction enhancement under USSG § 3C1.1.  The court made detailed findings on Arneson's trial perjury (e.g., "as much testimony as I have seen from witnesses on the stand [during eleven years service as a state and federal trial judge], Mr. Arneson really took me aback in the nature and scope of his perjurious testimony") and on his "continued" obstruction through false statements to the USPO pending sentencing.  (JER 4882, 4902-04; GER 7929).  The court found that a six-level upward departure, resulting in a sentencing range of 121-151 months,[585] was warranted, because the Guidelines failed to account for the full scope of Arneson's conduct and the extensive harm he caused to his victims and to public institutions.[586]  (JER 4905).  The

---

[584]  Although convicted of almost four dozen felonies, Arneson's Guidelines calculations were driven exclusively by the RICO counts -- more specifically, the bribery racketeering acts -- as those were the counts of conviction (and racketeering acts within those counts) resulting in the highest offense level. USSG §§ 2E1.1(a), 3D1.3.  Under merger principles, all other offense conduct went completely uncounted.  (APSR ¶¶ 45-92).

[585]  As would be expected of a police officer defendant, Arneson was in criminal history category I.  (APSR ¶ 96).

[586]  The court further found that, had there not been recognized departure grounds, it would have issued an equivalent upward variance to achieve an appropriate sentence under § 3553(a).  (JER 4911).  Regardless of how the issue was framed below, it is deemed a variance before this Court.

court imposed concurrent 121-month terms on the RICO counts,[587] explaining an above-Guidelines sentence was justified because Arneson's obstruction enhancement did "not begin to account for [Arneson's] repeated attempts to obstruct justice" and because it applied the lowest upward departure supported by the record.[588] (JER 4913-15).

Although Arneson claimed before trial he faced "over twelve years" if convicted of the bribery-based substantive RICO count[589] (GER 262), Arneson now labels his ten-year sentence on this charge "extreme." (AOB 69-76). In fact, Arneson's sentence does not create an unwarranted sentence disparity, the court did not abuse its discretion, and the sentence imposed is reasonable.

---

[587] Arneson was sentenced to the statutory maximum penalties of 60 and 36 months on the remaining counts. (JER 4915).

[588] The government recommended an eight-level departure (which the court noted to be reasonable) and a sentence of 144 months. (GER 2325-26; JER 4906-07).

[589] Arneson's assessment was premised not on the potential statutory maximum sentence for all charges, which exceeded 200 years, or for the RICO charges, which was 20 years, but rather on his belief that his Guidelines offense level would be 32. (GER 262; APSR ¶ 146). Arneson presumably utilized a Guidelines manual that incorporated the 2004 amendments to USSG § 2C1.1. Through these amendments, the Sentencing Commission increased the base offense level and expanded the applicability of certain enhancements for bribery and honest services offenses based on the "Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses" and to ensure that "punishment levels for public corruption offenses remain proportionate to those for closely analogous offenses under § 2B1.1." The 2001 Guidelines were used to avoid ex post facto considerations and resulted in a § 2C1.1 offense level calculation of 22, not 32. (APSR ¶ 41).

630

a.  Arneson's Sentence Was Reasonable[590]

    i.  There Is No Unwarranted Disparity

Arneson claims his 121-month sentence created unwarranted disparities under § 3553(a)(6).  (AOB 69-74).  He is wrong.

Arneson was a defendant who (1) was convicted of several dozen counts, including RICO offenses involving bribery, honest services fraud, and identity theft based upon his multi-year participation in a criminal enterprise that corrupted the LAPD (as well as other law-enforcement and public agencies) and attempted to subvert the judicial process; and (2) despite being an LAPD Sergeant sworn to uphold the law, demonstrated unyielding contempt for the law and the judicial process through his criminal conduct and the lies he repeatedly advanced to shield himself.[591]  The court, in considering § 3553(a)(6), found that "the circumstances of this case are unique and attempts to compare it with other RICO cases, other wiretap cases, other bribery or honest services cases, are misguided."  (JER 4913).  That finding was not clearly erroneous, and defeats Arneson's

---

[590]  Only substantive reasonableness will be addressed, as Arneson does not contest the procedural correctness of the court's sentencing determinations.  Ressam, 679 F.3d at 1085.

[591]  While noting that Arneson "has never, up to and including this moment, accepted responsibility for the crimes he committed and of which he was convicted", the court stated that, had Arneson accepted responsibility in the investigation's early stages as he contended, such acceptance would have been undone by "his conduct in repeatedly committing perjury at trial and lying to the Probation Officer."  (JER 4907-08).

claim.[592]  Autery, 555 F.3d at 876 (unless clearly erroneous,
court's finding of dissimilarity between defendant being
sentenced and defendants in other cases will not cause sentence
disparities to be deemed unwarranted).

Arneson simply ignores the court's finding.  Instead, he
cites (for the first time) sentences received by various
purportedly similar defendants, and Sentencing Commission
statistics on median sentences in fiscal year 2008.  (AOB 71-74).
But Arneson's newfound comparisons do not turn the court's
finding of Arneson's uniqueness into clear error or plain error.
See Treadwell, 593 F.3d at 1012 (courts "need not, and, as a
practical matter, cannot compare a proposed sentence to . . .
every . . . defendant who has ever been sentenced before").

Moreover, Arneson has not shown that he is similarly
situated to the other defendants.[593]  See United States v. Dewey,

_____

    [592]  Arneson's § 3553(a)(6) claim at sentencing was limited
to comparing Arneson with Stevens and FBI agent Mark Rossini.
Arneson has abandoned his claim that he was similarly situated to
Rossini, who accessed Pellicano-related materials for a Pellicano
associate who in-turn funneled the materials to Pellicano's
counsel during these proceedings.  (GER 2220-21, 2224).  The
court's findings as to the dissimilarity between Arneson and
Stevens makes sense: defendants who accept responsibility,
cooperate, are less involved, and plead guilty to lesser offenses
are not similarly situated to those who proceed to trial and
commit perjury.  See Labonte, 520 U.S. at 761-62; Ressam, 679
F.3d at 1094-95.

    [593]  The Norell case, where an FBI agent accepted
responsibility and pled guilty to a one-count § 1030 information,
involved a sentence imposed after the court sentenced Arneson.
Under Arneson's view of § 3553(a)(6), the Norell court would have
                                              (continued...)

599 F.3d 1010, 1017 (9th Cir. 2010) (rejecting as "meritless" a § 3553(a)(6) claim unaccompanied by evidence establishing that the other defendant truly was similarly situated); <u>Treadwell</u>, 593 F.3d at 1012 (case cites, unaccompanied by the "records in the cases" are insufficient to establish unwarranted disparity). Only one of Arneson's cases even involved RICO.[594]  Arneson has not produced even a single case that aligns with his case in terms of actual similarity of the charges, scope of criminal conduct, and conduct of the defendant throughout the proceedings. Therefore, the court's finding of dissimilarity cannot be deemed clearly erroneous, and its finding of no unwarranted sentence disparity cannot be considered illogical, implausible or without support.

Equally meritless is the implication that median sentences for select offenses, including RICO, could render the court's

---

[593] (...continued)
been required to account for Arneson's 121-month sentence when addressing § 3553(a)(6) in that case.  Presumably, the <u>Norell</u> court either failed to do so, or concluded that Norell was not similar to Arneson -- not surprising given Arneson's different charges and nonacceptance of responsibility.

[594]  Moreover, many of the sentences Arneson references (<u>e.g.</u>, <u>Hill</u>, <u>Paradies</u>, <u>Sarault</u>, <u>Pascucci</u>, <u>Hatch</u> and <u>Paulus</u>) pre-dated the Supreme Court's <u>Booker</u> ruling.  They therefore are poor comparisons for a post-<u>Booker</u> sentence that varied from the Guidelines.

§ 3553(a)(6) finding an abuse of discretion.[595]  (AOB 74).  While
Arneson does not identify the RICO case or defendant connected to
the median sentence he cites, the median defendant is not
similarly situated to Arneson.  Since the Sentencing Commission
2008 statistical report Arneson cites shows that 92.2% of RICO
defendants pled guilty (Table 3), the median individual
necessarily pled guilty, making him different from Arneson.[596]
Ressam, 679 F.3d at 1095.  Furthermore, the mean sentence for
RICO defendants during that time was 91.6 months nationally and
120.1 months in this Circuit.  (Table 7).  Arneson's 121-month
sentence therefore matched the average RICO sentence in this
Circuit, and was within the general range nationally.  United
States v. Mohammed, 459 F.3d 979, 989 (9th Cir. 2006)
("reasonableness is a range, not a point").  However much
relevance the statistical report has, it shows no disparity here.

---

[595]  It is the RICO charge, not the honest services fraud,
identity theft, or computer fraud charges that resulted in the
sentence Arneson contests.  While the Guidelines tie a RICO
defendant's calculations to the offense levels assigned to
discrete racketeering acts, USSG § 2E1.1(a)(2), the offense of
conviction remains RICO, which is recognized as the more serious
offense by both its higher statutory maximum sentence and
longstanding precedent.  18 U.S.C. § 1963; see Damico, 99 F.3d at
1439 (recognizing appropriateness of upward departure as
§ 2E1.1(a)(2) fails to account for fact that conduct furthered
the operations of a criminal organization).

[596]  Tying § 3553(a) reasonableness to median sentences would
improperly limit the court's discretion even more than the pre-
Booker regime, transforming sentencing from an individualized
assessment to the mechanistic application of statistical
findings.  That would elevate § 3553(a)(6) above other § 3553(a)
factors, contravening Pepper, 131 S. Ct. at 1249.

Finally, § 3553(a)(6) is only one of several statutory factors a sentencing court must consider.  Saeteurn, 504 F.3d at 1181.  Here, the court carefully considered all § 3553(a) factors to create an appropriate individualized sentence, resulting in a sentence that is reasonable overall notwithstanding Arneson's (baseless) disparity claim.

> ii.  The Upward Variance Does Not Render the Sentence Unreasonable

Arneson's attacks the court's three justifications for its upward variance.  (AOB 74-75).  But that takes the wrong approach.[597]  United States v. Ellis, 641 F.3d 411, 421-23 (9th Cir. 2011), makes clear that "point-by-point objections to the reasons the district court gave for 'departing' upward" are "beside the point" because "[t]he question" is whether the defendant's "ultimate sentence" "is reasonable under the broad discretion afforded the district court."  Here it was.

The court made extensive findings about why Arneson's Guidelines calculations were inadequate and why a 121-month sentence was the minimum that would satisfy § 3553(a).  (JER 4905-15).  For example, "the crimes committed by [Arneson] and the other members of the enterprise caused widespread victimization, and . . . [Arneson's] conduct undermined the

---

[597]  Arneson's claim that he was sentenced "in the same range as Pellicano" and treated "as if he were the heart of the enterprise" (AOB 71), is specious.  Arneson's RICO calculations did not include Pellicano's leadership enhancement, and Arenson's sentence was 5 years less than Pellicano's.

635

[LAPD's] internal integrity . . . , diminished public confidence in the institution, deprived [Los Angeles'] citizens of their rights to honest services [by] public servants, and attempted to subvert the legal system by providing clients, including criminal defendants, with illegally-obtained information." (JER 4910). The court found that "the collateral damage that occurs when a police officer is discovered to have committed criminal acts is a natural and well-known consequence,"[598] and that Arneson's conduct resulted in "unique harm." (Id.)

The court acted within its discretion when finding that factors such as loss of public confidence in government, substantial non-monetary harm, and the sheer magnitude of Arneson's criminal conduct justified an upward variance. (JER 4905-06). Indeed, the Commission recognizes each of these as a basis for departure. USSG §§ 2C1.1 & 2C1.7, comment. (n.5); USSG § 5K2.0. Arneson was a law-enforcement supervisor who for seven years accepted bribes, conducted illegal database inquiries, assisted in subverting judicial processes (including disclosing the existence of an undercover operation directed at a PIA client), and lied at every turn to protect the enterprise and himself. The 121-month sentence, which was half the statutory

---

[598] In addition to undercutting public confidence in law enforcement, Arneson's conduct resulted in numerous civil suits against the LAPD. (JER 4910; GER 2302).

maximum applicable for a single RICO count, was reasonable and within the court's discretion.

The sentence's reasonableness also is reflected in the fact that it would have fallen (as Arneson conceded) at the low-end of the applicable range had Arneson's calculations incorporated the post-2004 amendments to § 2C1.1 (before accounting for the obstruction and variance grounds that the court also found to apply).  See United States v. Rodriquez, 630 F.3d 39, 42 (9th Cir. 2010) (although ex post facto principles preclude applying post-offense Guidelines amendments that disadvantage a defendant, such amendments may be considered during reasonableness review). In 2004, the Commission, recognizing that the existing version of § 2C1.1 resulted in offense-level calculations that were disproportionately low when compared to analogous offenses, amended this section to ensure that public-corruption offenses received "punishment commensurate with the gravity of the offenses."  The court reasonably employed similar reasoning about the gravity of the offense when varying upward as to Arneson.

Arneson claims that his position as an LAPD officer was properly accounted for in § 2C1.1's offense-level calculation and that the scope of criminal conduct was accounted for by the Guidelines' merger principles (AOB 75-76).  But that argument would incorrectly limit judicial discretion to those factors set forth in the Guidelines.  Moreover, even the Guidelines recognize

637

the appropriateness of such departures. USSG §§ 2C1.1 & 2C1.7 comment. (n.5) (upward departure possible for pervasive corruption causing loss of confidence in government), 5K2.0 (acknowledging appropriateness of departure when aggravating circumstances exist, either in degree or kind, such that the Guidelines fail to fully account for the conduct and result in an unreasonably lenient sentence).

Equally meritless is Arneson's claim that he should not have been held accountable for harm the enterprise caused. Arneson's claim that he was unaware of Pellicano's reasons for seeking confidential information (AOB 75) is based solely on Arneson's perjurious testimony, which is belied by the record. Arneson knew Pellicano was a private investigator who used Arneson-provided materials to advance his clients' interests in criminal and civil matters, including the John Gordon Jones rape prosecution (for which Arneson admitted providing Pellicano rap sheets on multiple victims and witnesses) and the Kami Hoss prosecution (for which Arneson was recorded discussing charges and providing confidential criminal history information for use in Hoss' defense). See Part IV.J.8, supra. The court did not clearly err in concluding that the nature of Arneson's acts and PIA's business made the likelihood of harm to PIA's targets "obvious." (JER 4906); see United States v. Ortiz, 362 F.3d 1274, 1278 (9th Cir. 2004) (conduct that was reasonably

foreseeable and in furtherance of the conspiracy is relevant
conduct under § 1B1.3); United States v. Tocco, 306 F.3d 279,
285-92 (6th Cir. 2002) (vacating RICO-conspiracy sentence where
court failed to include predicate acts committed by others that
constituted relevant conduct).  Even had Arneson's testimony been
true, willful blindness would not make the harm caused by Arneson
and his co-conspirators any less reasonably foreseeable.  Arneson
claims that some of the information he provided could have been
obtained independently from public sources.  But the information
was not obtained from public sources -- under statutes and case
law, it was confidential information whose dissemination was
restricted, see Part IV.P.2.c.i, supra, so Pellicano got it from
Arneson.

Arneson's sentence falls within "the broad range of
sentences that would be reasonable in the particular
circumstances."  Treadwell, 593 F.3d at 1015.  It should be
affirmed.

b.    This Court Need Not Remand for Resentencing

There is no need to remand for resentencing provided that
this Court affirms Arneson's RICO convictions and the jury's
findings as to the bribery racketeering acts.  In such a
circumstance, the offense level calculations would remain
unchanged, as would the essential underlying conduct that the
court could consider under § 3553(a)(6) on remand.  Given the

639

court's full consideration of all relevant facts, and its
unequivocal statement that a sentence of 121-months was the
minimum reasonable sentence that would satisfy § 3553(a), the
record is clear that remand would result in imposition of the
same sentence. <u>Evans-Martinez</u>, 611 F.3d at 645; <u>see</u> Part
IV.W.2.g, <u>supra</u>.

### 4. <u>Turner's Sentence Was Procedurally Sound and Substantively Reasonable</u>

The court calculated Turner's total offense level at 27
which, with his category II criminal history, yielded a
Guidelines range of 78-97 months. (JER 509, 516). After finding
that the "nature and scope of the criminal activity in which
[Turner] participated is completely unaccounted for by the
Guidelines calculations," among other things that the court
"adopte[d] and incorporate[d]" from the government's sentencing
papers, the court "departed" upward 3 levels to level 30.[599] (JER
516-17). The court also departed upward from criminal-history
category II to III under USSG § 4A1.3(a)(1) because, (1) but for
a nunc pro tunc modification to one of Turner's prior sentences,
he would have been in category III, and (2) category II
"substantially under-represents the seriousness of [his] criminal
history or the likelihood that he will commit additional crimes."
(JER 509-12). Those two departures resulted in a Guidelines

---

[599] Both the court and the government used the term
"departure" instead of variance. (GER 2167-70).

range of 121-151 months, from which the court selected the 121-month low end.  (JER 517, 525).  Turner challenges the two departures, arguing that the court committed "procedural error, requiring reversal."  (TOB 57).

        a.   Turner's "Procedural Error" Claims Are Properly Evaluated for Substantive Reasonableness

In framing his challenges as claims of "procedural error," Turner misframes the issues.  Mohamed, 459 F.3d at 986, recognized that Booker effectively required appellate courts to "replace[]" "the scheme of downward and upward 'departures'" in Chapter 5 with "the requirement that judges impose a reasonable sentence."  This was because, the Court explained, even if a court procedurally erred in applying a departure, the court "would be free on remand to impose exactly the same sentence," which this Court would then review for reasonableness.  Id. at 987.  Ellis, 641 F.3d at 421, found "[t]he same reasoning . . . equally applicable to criminal history category departures under USSG § 4A1.3."[600]  Thus, the questions here are not whether the court misapplied § 5K2.0 in departing upward from Turner's offense level or misapplied § 4A1.3 in departing upward from his criminal-history category.  Those questions are "beside the

---

[600]   United States v. Higuera-Llamos, 574 F.3d 1206, 1212 (9th Cir. 2009), cited by Turner (TOB 60), is not to the contrary because, even there, this Court held that the decision to increase the defendant's sentence "from a Criminal History Category IV to a Category VI and to sentence him to thirty months' imprisonment was substantively reasonable."

point" because "[t]he question," id. at 423, is whether Turner's sentence falls within "the broad range of sentences that would be reasonable," Treadwell, 593 F.3d at 1015.  It does.

      b.  Turner's Sentence Was Reasonable

Regardless whether this Court evaluates the reasonableness of Turner's "ultimate sentence," as Ellis requires, or evaluates Turner's "point-by-point objections to the reasons the court gave for 'departing' upward," as Ellis forbids, the court abused no discretion here.  641 F.3d at 421-23.  This is because the same aggravating factors that inspired the court to "depart" and would establish the reasonableness of the court's departures if evaluated serially also easily establish the reasonableness of the sentence.

As established by the evidence, Turner participated in Pellicano's racketeering enterprise for at least six years, playing an integral part in the enterprise's ability to acquire confidential phone-company information and then, as part of the separate wiretapping conspiracy, wiretap PIA's unsuspecting targets.  Without Turner's critical contributions, the enterprise and Pellicano would have been far less effective at prying into innocent civilians' lives.

Turner contends that the court abused its discretion by basing its offense-level departure on "the number of victims, the years of violations of phone company policy, and 'completely

642

outrageous intrusions into customers' privacy." (TOB 63-64).
That the court based its departure on those considerations and
the Guidelines' failure to capture them is unassailable. Equally
unassailable, however, is that the court was well within its
discretion to account for the Guidelines' shortfall by departing
upward.

As the government explained in its sentencing position,
neither the wiretapping Guideline (§ 2H3.1) nor the RICO
Guideline (§ 2E1.1) that trumped the wiretapping Guideline
"account[s] for the duration of the wiretaps implemented by
[Turner] and Pellicano, the number of intercepted calls, or the
substantial non-monetary harm caused by [Turner's] criminal
acts." (GER 2175). Although Turner was convicted of wiretapping
five victims and running illegal database inquiries on four of
them, the evidence presented at trial made clear that his victims
numbered in the hundreds -- if not thousands. LeMasters
testified that she began working at PIA in Summer 1996 and
learned within approximately six months that Turner was
Pellicano's source for phone-company information, meaning that
Turner was Pellicano's source for at least six years. (GERT
2147, 2199). Wright testified that Turner made "hundreds" of
requests for illegal computer inquiries, which sometimes included
multiple phone numbers in the same request. (JER 2010-11).
Virtue testified that PIA's war room, which had between five and

643

seven iMacs wiretapping separate phone lines, was at times operating at full capacity, with additional wiretaps running offsite. (GERT 959-60).

Turner appears to suggest that these aggravating factors were already captured by the 10-level difference between the RICO Guideline that drove his Guidelines calculations and the wiretapping Guideline that effectively dropped out. (TOB 65). Not so. Putting aside whether a 10-level swing would sufficiently account for the number of Turner's <u>wiretapping</u> victims, it cannot possibly account for his hundreds -- if not thousands -- of identity-theft victims for which "[n]o attempt was made to calculate [an] offense level[]" (TOB 65 n.15) or his key role in helping the enterprise achieve its multi-faceted objectives. (Nor would it take into account his lie to the FBI about his knowledge of and involvement in the enterprise). Regardless, such issues are uniquely commended to the court's broad discretion, which was not abused none here.

The court's imposition of a sentence "more than double that recommended by the probation officer" does not establish otherwise. (TOB 66). As already explained (Part IV.W.3.f(2), <u>supra</u>), such assertions overstate the import of the USPO's recommendation because such recommendations, which courts need not even order, simply serve as a non-binding aid when a court exercises its sentencing duties.

644

Nor does the fact that the court may have viewed the "culpability between Arneson and Turner" equally evince an abuse of discretion. (TOB 65). Both served important roles in the enterprise, and both committed similar conduct of receiving money from Pellicano in exchange for unlawfully accessing confidential restricted-access information from their respective employers. To the extent Turner argues that Arneson may be more culpable because he was "a police officer, who was both entrusted by the public and had received training as to what behavior was legal and illegal," Turner ignores his own direct role in the wiretapping and his criminal history (Arneson had none), which, contrary to Turner's protestations, the court properly found to "substantially under-represent[] the seriousness of [his] criminal history or the likelihood that he will commit additional crimes." (JER 509-10, 4950-51).

In resisting this conclusion, Turner asserts that the court's criminal-history departure was unreasonable because the three prior offenses on which the court relied on to depart (one of which technically did not score criminal-history points and another of which was too old) were minor and dissimilar to his offenses here.[601] (TOB 57-58, 60-61, 63). Turner misses the

---

[601] After Turner's initial PSR placed him in criminal-history category III, Turner obtained a <u>nunc pro tunc</u> order that changed the probationary sentence issued 12 years earlier to a fine, effectively wiping out three points from his criminal-history calculation and reducing his category from III to II.
(continued...)

point.  Although Turner largely is correct in his descriptions of
the priors, he is wrong with respect to their purported
dissimilarity; they were all crimes, like his crimes here, of
greed and "[dis]regard for the rights or property of others."
(JER 512).  "None" of Turner's priors was a "youthful
indiscretion" and none "even arguably resulted from financial
need."  (Id.).  His first -- a 1986 theft of batteries from a K-
Mart -- occurred when he "already had established a successful
career at AT&T . . . for 12 years" where he had "a steady salary
plus significant overtime" and "had already purchased two income-

---

[601](...continued)
(Compare OTPSR ¶¶ 94-103 with RTPSR ¶¶ 94-101).  Turner's alchemy
was not lost on the court:

> While the minutes of the February 5th proceeding
> suggest the nunc pro tunc order is being made to
> correct a clerical error, the court reporter's
> transcript makes clear that such is not the case.  The
> transcript shows that the defendant was, indeed, on
> probation and successfully completed probation.  The
> Superior Court judge, who is not the judge who
> originally sentenced Defendant Turner, indicates that
> he is satisfied that this trespass conviction is not
> something that should be considered for purposes of the
> federal sentencing.
>
> The Court first made an order concerning the
> termination of the probationary period, and when he was
> advised that this would not accomplish all that defense
> counsel wanted, the Superior Court instead ordered the
> original sentence modified to reflect only a
> fine. . . .  [W]hile the sentence no longer impacts the
> Criminal History Category, the fact of the crime
> remains, as does the fact that defendant committed new
> crimes while actually on probation.

(JER 512).

producing properties." (JER 510). They were also similar in that regard to additional criminal conduct that the government brought to the court's attention at sentencing.

The government submitted evidence from a then-pending mortgage-fraud investigation showing that in 2005 and 2006 -- when Turner was on pretrial release in this case -- he reported to the IRS total income of between only 5% and 6% of what he declared on a series of residential-loan applications. (GER 2206-13). The court correctly noted that these "documents signed by [Turner] under penalty of perjury contain financial information that appears irreconcilable" and, because they were "uncontested" by Turner, show that he "continues to engage in fraudulent or criminal conduct with regard to residential loan applications or personal tax returns." (JER 519; GER 2966). Just as current events can make long-forgotten historical episodes relevant again, Turner's crimes of greed and "[dis]regard for the rights or property of others" in this case and apparent more recent mortgage or tax fraud made his prior crimes -- however minor -- relevant to the court's selection of an appropriate sentence. The court was not unreasonable in departing upward.

    5.    Christensen's Sentence Was Procedurally Sound and
          Substantively Reasonable

Christensen's offense level was 16, which, with his criminal-history category of I, yielded a Guidelines range of 21-

647

27 months.  The court found that the offense level understated Christensen's offense and varied upwards pursuant to its Booker discretion, imposing a sentence of 36 months.  Christensen challenges the procedural and substantive reasonableness of the sentence.  Procedurally, he argues that the court clearly erred by imposing (1) USSG § 3B1.1(c)'s two-level enhancement for managing Pellicano; (2) USSG § 3B1.3's two-level enhancement for abusing his position of trust as a member of the bar and officer of the court; and (3) USSG § 2H3.1's three-level increase for seeking economic gain.  (COB 71-75).  Substantively, or quasi-substantively, Christensen argues that the court lacked discretion to impose an above-Guidelines sentence, incorrectly weighed the aggravating and mitigating factors, and imposed a substantively unreasonable sentence.  (COB 75-80).

> a.  USSG § 3B1.1(c)'s Two-Level Role Enhancement Properly Applied to Christensen's Wiretapping Convictions

Christensen argues that the court erroneously applied USSG § 3B1.1(c)'s two-level enhancement based on its finding that Christensen directed Pellicano.[602]  (COB 71-73).  Christensen argues that he could not have had a managerial role with respect to Pellicano because the latter was engaged in his criminal enterprise before being hired by Christensen.  (COB 72).

---

[602]  Whether a defendant was "an organizer, leader, manager, or supervisor" is reviewed for clear error.  United States v. Hoac, 990 F.2d 1099, 1110 (9th Cir. 1993).

648

Christensen's arguments are unavailing; he has not established that the court's application of the enhancement was "illogical, implausible, or without 'support in inferences that may be drawn from the facts in the record.'" Treadwell, 593 F.3d at 999.

From the outset, Pellicano described himself to Christensen, in recorded calls, as "working directly for [Christensen]." (GEX 3016). Pellicano made clear -- "I work for you, you don't . . . work for me" (GERT 9964) -- that Christensen was "the boss" (GEX 3136, 3185, 3305), while Pellicano was "just a soldier" (GEX 3302, 3363, 3374). Pellicano therefore recognized that it was Christensen who had "the all-encompassing plan," which Christensen did not need to reveal -- it was sufficient to direct Pellicano to "fight the battle that [Christensen was] asking [him] to fight." (GEX 3302). Christensen never suggested that the relationship was anything other than one in which he was the general to Pellicano's soldier. To the contrary, Christensen agreed with Pellicano's characterizations and told Pellicano to do "[his] assignments" (GEX 3201-02) and to go on "one more adventure" (GEX 3374). Moreover, at critical junctures, it was Christensen who would tell Pellicano to continue with the illegal enterprise. (GEX 3305-06, 3332-33, 3374).

These conversations -- in which both Pellicano and Christensen recognized that Pellicano was Christensen's subordinate acting at the latter's direction -- are just a

649

sampling of the voluminous evidence before the court.  (GERT
14328) ("[B]ecause I have presided over Mr. Christensen's trial,
I am able to evaluate the relevant facts and circumstances to a
far greater degree than when I am sentencing defendants who have
entered into plea agreements.")).  In finding that the
enhancement applied, the court explained that it was Christensen
who made the decision to employ wiretapping; in other instances,
Christensen hired Pellicano but told him not to wiretap.  (JER
4578).  Christensen "gave Mr. Pellicano his assignments and told
Mr. Pellicano when to cease his activities," overriding
Pellicano's preferences.  (Id.).  The court recognized that
Pellicano "repeatedly confirmed that Mr. Christensen was the
boss" and that Pellicano was merely his "solider" following
orders.  (Id.).

Christensen argues that the court "impermissibly reached
outside the record" to rely on the way in which attorneys
normally handle paralegals.  (COB 72).  But that is simply
inaccurate.  Christensen's attorney argued that Christensen's
conversations with Pellicano were "a typical type of exchange
between a customer and someone who has been employed."  (GERT
14329).  It was thus Christensen who argued about business
relationships; the court, expressly responding to that extra-
record argument, merely noted that "the way attorneys deal with
paralegals, experts, contract lawyers, investigators and others"

650

was different from that of a mere customer.  (JER 4579).
Moreover, this was not a comment untethered from the record.  The
court explained the way in which Christensen directed and dug
into Pellicano's illegal wiretapping, behavior consistent with
how an attorney employs assistance.  (JER 4594-95).

The cases Christensen cites are inapposite.  (COB 72-73).
Hoac, 990 F.2d at 1111, held that one defendant's statement that
he was "partners" with another defendant could not establish that
the first defendant had "control over others."  But being a
"partner" is not a position that entails "control over others";
being "the boss" is.  Moreover, unlike Hoac, there was not a
single statement from a single individual; both Christensen and
Pellicano repeatedly recognized and acknowledged the boss/soldier
relationship.  Moreover, as the court found, this was not a
matter of mere titles: Christensen actually did direct Pellicano
as to whether to engage in wiretapping, when to continue doing
so, and when to stop.  Moreover, in Hoac, the defendant was
getting paid by his "partner"; here, Christensen was the one
paying Pellicano, a further factor demonstrating who was in
control.[603]  Christensen cites Varela -- which affirmed the

---

[603]  Hoac's import was simply that a defendant who manages
logistics, rather than people, should not receive a leadership
enhancement.  United States v. Varela, 993 F.2d 686, 691 (9th
Cir. 1993) ("We followed [United States v.] Mares-Molina[, 913
F.2d 770, 773 (9th Cir. 1990) (requiring that a defendant manage
people)] in Hoac, in which the defendant was active in the
commission of the offense, but to the extent he managed anything,
                                              (continued...)

enhancement's application -- and merely stands for the
boilerplate notion that a defendant "must have exercised some
control over others involved in the commission of the offense"
for the enhancement to apply.  993 F.2d 691.  Given that
Christensen indisputably exercised "<u>some</u> control" -- at a
minimum, the power of the purse -- <u>Varela</u> cannot show clear error
here.  Finally, Christensen cites <u>United States Ramos-Paulino</u>,
488 F.3d 459, 464 (1st Cir. 2007).  There, "the district court
did not base the enhancement on specific findings as to whom the
defendant may have organized, led, managed, or supervised" and
the First Circuit, after "search[ing] the record (including the
PSI Report) in an endeavor to identify any such underlings,"
"c[a]me up dry."  <u>Id.</u>  The only possible person supervised by the
<u>Ramos-Paulino</u> defendant was a government agent.  <u>Id.</u>  Here, the
court expressly based the enhancement on Christensen's
supervision of Pellicano, who was not a government agent.

     In short, none of the authority cited by Christensen
establishes clear error, and the record has more than enough in
it for the court's finding not to be "illogical" or
"implausible."

---

     [603](...continued)
he managed a business, not people.").

b. <u>USSG § 3B1.3's Two-level Enhancement for Occupying a Position of Trust Properly Applied</u>

Guidelines § 3B1.3 provides for a two-level enhancement "[i]f the defendant abused a position or public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  The Guidelines contemplate that individuals who abuse their positions of trust to facilitate the commission or concealment of a crime "generally are viewed as more culpable."  USSG § 3B1.3, comment. (backg'd.).

The court found that Christensen "acting in his capacity as an attorney and especially an attorney involved in litigation . . . occupie[d] a position of public trust."  (JER 4580).  That conclusion is unassailable.  <u>United States v. Goldman</u>, 447 F.3d 1094, 1095 (8th Cir. 2006) ("A defendant acting in his capacity as an attorney occupies a position of public trust."); <u>United States v. Hemmingson</u>, 157 F.3d 347, 360 (5th Cir. 1998) ("[A]ttorneys by definition occupy a position of public trust."); <u>United States v. Harrington</u>, 114 F.3d 517, 519 (5th Cir. 1997) ("[I]t cannot be gainsaid that lawyers occupy a position of public trust.  It would be rank folly to suggest otherwise.").

Relying on <u>United States v. Trice</u>, 245 F.3d 1041, 1042 (8th Cir. 2001), Christensen argues the position must be one of public trust <u>relative to the victim</u>.  (COB 74).  Christensen reads too much into <u>Trice</u>.  That thin, two-page, out-of-circuit <u>per curiam</u>

653

does not concern someone occupying a <u>public</u> trust.  Rather, it
involved a board member who defrauded the government by
fraudulently obtaining money through HUD.  <u>Id.</u>  Without
indicating whether it was analyzing the public or private trust
prong of § 3B1.3, the Eighth Circuit viewed the defendant as
merely engaging in an arm's-length transaction with the
government, who had reposed no trust in the defendant.  <u>Id.</u>  As
the court recognized here, however, the public as a whole reposes
trust in attorneys as "officers of the Court"; "our entire
justice system is based on theory that attorneys can be trusted
to act ethically" and honor the principles "that members of the
Bar [have] swor[n] to uphold."  (JER 4581).  Lawyer jokes
notwithstanding, the court's analysis was correct.  As a matter
of law and practice, the public places great trust in attorneys.
Cal. Bus. & Prof. Code § 6001.1. ("Protection of the public shall
be the highest priority for the State Bar of California.");
<u>United States v. Franklin</u>, 837 F. Supp. 916, 920 (N.D. Ill. 1993)
("By conspiring to obstruct the very judicial process that he had
sworn to defend, [the attorney-defendant] abused his position of
public trust."); <u>cf.</u> <u>Damron v. Herzog</u>, 67 F.3d 211, 214 (9th Cir.
1995) (noting "the historical importance of the public trust in
the attorney-client relationship").  Indeed, this Court approved
the same form of reasoning in <u>United States v. Foreman</u>, 926 F.2d
792, 796 (9th Cir. 1990): "[P]olice officers are accorded public

654

trust to enforce the law.  The public, including fellow law-
enforcement agents, expect that police officers will not violate
the laws they are charged with enforcing."  Christensen occupied
a position of trust, and Bonder-Kerkorian had the right to
believe that a lawyer representing her adverse party would not
violate the law to gain litigative advantage.

The only issue, therefore, is whether Christensen abused
that position in a manner that significantly facilitated <u>either</u>
the commission <u>or</u> the concealment of his offense.  As the court
recognized, it was precisely in his capacity as an attorney that
Christensen was able to leverage funds -- first his firm's, then
his client's -- to pay Pellicano to illegally wiretap Bonder-
Kerkorian.  (JER 4582).  As part of that representation,
Christensen knew what information Pellicano should seek and how
to employ it.  (JER 4582-83).  Additionally, Christensen
attempted to conceal the offense by consistently asserting
attorney-client privilege to thwart the government's
investigation.  (JER 4583).

Given these circumstances, it was not illogical or
implausible to conclude that Christensen used his position as an
attorney to facilitate and to conceal the offense.

c.   <u>USSG § 2H3.1's Three-level Enhancement for Seeking
     Financial Gain Properly Applied</u>

Christensen contends that the court clearly erred in
applying USSG § 2H3.1's three-level enhancement -- which applies

655

if the offense was committed for direct or indirect economic gain -- because he supposedly acted only to help Kerkorian prove that Kira was not Kerkorian's child independent of any effort to terminate child-support to Kira's mother, Bonder-Kerkorian. (COB 74-75). Christensen's argument is flawed in numerous respects.

First, it focuses on the wrong party's intent. Regardless whether Kerkorian was seeking "economic gain," Christensen clearly was: he was an attorney paid by Kerkorian, and directed Pellicano to wiretap Bonder-Kerkorian as part of Christensen's servicing of Kerkorian. As the court found, "Christensen's conduct produced otherwise unobtainable information, which, as Mr. Christensen acknowledged on May 14th, made Mr. Kerkorian very happy. It's always to an attorneys's economic benefit to keep a client happy." (JER 4575). Christensen fails to respond to this finding or the court's resulting conclusion that the enhancement would be appropriate even if the wiretapping were aimed purely at discovering Kira's parentage for its own sake. (See COB 74-75). Christensen's failure to challenge this independent basis for the court's holding in his voluminous opening brief constitutes waiver, and is fatal to this claim. See Wahchumwah, 710 F.3d at 868 n.2.

Second, Christensen's argument is logically and factually unavailing. As the court found, Christensen sought and received information that was "very helpful" to the overall litigation

656

between Kerkorian and Bonder-Kerkorian, which had significant financial significance.  (JER 4572-77; GEX 3020-21, 3061, 3148). There was no error at all, let alone clear error, in the court's finding.

      d.  <u>The Court Had Discretion to Vary Upward</u>

Christensen contends that the court lacked discretion to vary above the Guidelines range on account of the non-monetary harm he caused to his victim's attorney-client privilege and privacy interests.  (COB 75-76).  Christensen rests this argument on the theory that 18 U.S.C. § 3553(b) permits a "departure" from the Guidelines only when they have not taken a factor into account.  (COB 75).  Christensen is simply mistaken on the law. "As the Supreme Court through <u>Booker</u>, <u>Kimbrough</u>, and <u>Spears</u> has instructed, . . . sentencing judges can reject any Sentencing Guideline, provided that the sentence imposed is reasonable." <u>United States v. Mitchell</u>, 624 F.3d 1023, 1030 (9th Cir. 2010). Accordingly, "[i]n analyzing challenges to a court's upward and downward departures . . . we do not evaluate them for procedural correctness, but rather, as part of a sentence's substantive reasonableness."  <u>Ellis</u>, 641 F.3d at 421.  Thus, § 3553(b)(1)'s requirement that courts "impose a sentence within the Sentencing Guidelines range unless it found that [the] Sentencing Commission had not accounted for relevant mitigating or aggravating factors" was "invalidated by [<u>Booker</u>]."  <u>United States v. Sykes</u>, 648 F.3d

657

1140, 1146 (9th Cir. 2011). Christensen's arguments about the court's power to impose an above-Guidelines sentence are thus simply part of the substantive-reasonableness analysis below.

      e.   <u>Christensen's Sentence Was Substantively Reasonable</u>

Christensen argues that his three-year sentence for directing an extensive, illegal wiretapping scheme was substantively unreasonable. Although this argument comes in various forms -- that there was no basis for an above-Guidelines sentence; that the court overvalued certain § 3553(a) factors and undervalued others; and that the sentence was greater than necessary -- ultimately, the question is simply whether the sentence was reasonable. (COB 75-80) It was.

At the offense level and criminal-history category calculated by the court -- before the upward variance -- the high end of Christensen's Guidelines range was 27 months.[604] Christensen received a 36-month sentence -- in effect, 9 months above the Guidelines range. As this Court has recognized, a minor variance from the Guidelines -- such as the nine-month variance here -- needs relatively little justification. <u>Carty</u>,

_____

[604] Christensen asserts that "[t]he guidelines prescribe a baseline prison term of 4-10 months." (COB 79). This presumes that each enhancement contested by Christensen was clearly erroneous. If this Court were to find all of those enhancements clearly erroneous, there would be no reason to perform the substantive reasonableness analysis because the sentence would obviously be procedurally unreasonable. The substantive reasonableness analysis must begin from the Guidelines range as determined by the district court.

658

520 F.3d at 991-92.  Here, the nine-month variance and three-year sentence was adequately justified by the court's extensive reasoning, which spanned almost 20 pages of transcript.  (JER 4584-4601).

The court's reasoning comprised too many examples and details to repeat here in full, but it contained three main strands.  First, the court recognized the outrageous nature of a successful member of the bar and officer of the court employing illegal methods to violate the attorney-client privilege and privacy of his opponents in litigation.  (E.g., JER 4596).  "It is almost unimaginable that an attorney of such stature and ability could violate his sacred oath as an attorney and commit crimes such as these.  It defies explanation."  (Id.).  This is not mere duplication of the abuse of public trust; rather, it was the particular nature of the wrongdoing -- invading the attorney-client privilege for tactical advantage -- coupled with Christensen's stature and experience as an attorney that so offended the court.  (E.g., JER 4585-86, 4589, 4592, 4598).  "Christensen swore to uphold the law and presented himself to others, opposing counsel, partners and associates who viewed him as a mentor as someone who could be relied on to treat our system of justice and his ethical obligations with respect.  Yet he showed disrespect for the system and the law on a grand scale.

659

If he is not punished for this egregious conduct, then others will lose respect for the justice system as well."  (JER 4598).

Next, the court considered the remorselessness and even glee with which Christensen committed his offense.  Christensen "laugh[ed]" when receiving attorney-client privileged information (JER 4572), declared that wiretapping was "fun to do," (JER 4594), or was "exceedingly pleased with himself when he heard that [the opposing attorneys and Bonder-Kerkorian] considered him public enemy number one" (JER 4593).  As the court explained, "[n]ot for one moment on any of those recordings does he express the slightest regret or remorse for his illegal, unethical, and unprofessional actions."  (Id.).

Finally, the court recognized the impact Christensen's offense had on his victims, many of whom had testified at trial or submitted letters.  (GERT 14327-28).  As the court explained, Christensen not only had Pellicano intercept a large number of calls ("in the hundreds"), but also calls involving a large number of people -- Bonder-Kerkorian herself, her lawyers, her family, and her friends.[605]  (JER 4586).  Early in the hearing, an attorney for Kira addressed the court, explaining how the campaign to disprove her paternity -- orchestrated through

---

[605]  Subsequent editions of the Guidelines expressly endorse an above-Guidelines sentence where "the offense . . . resulted in a substantial invasion of privacy interest."  E.g., USSG § 2H3.1, comment. (n.5(B)) (2013).  This Court may consider that endorsement in evaluating the reasonableness of Christensen's sentence.  See Rodriguez, 630 F.3d at 42.

660

Christensen and Pellicano's wiretapping -- "destroyed who she was and . . . subjected her to a life of possible shame for no reason other than to achieve Mr. Christensen's desire . . . to satisfy Mr. Kerkorian." (GERT 14330-31). The court noted how Christensen's "invasion of their personal privacy" harmed the victims, recalling the victims' testimony at trial that the crime would have a "lifelong impact" upon them. (JER 4588-89). The court further explained that the crime did not merely deprive the victims of their privacy, but also deeply harmed their trust of the legal system. (JER 4589).

The court ultimately wove these three strands together into a single concise statement of why a three-year sentence was appropriate: "Mr. Christensen deliberately, repeatedly, and happily violated the most fundamental canon of the legal profession, the attorney-client privilege. The invasion of privacy perpetrated at his direction was enormous." (JER 4598). Moreover, the crime "marred the legal profession in the eyes of the public." (JER 4588). "There is no question that the [Guidelines range] does not begin to account for the scope of this particular crime, the invasion of the attorney-client privilege, and the direct and collateral damage to the justice system, as well as the massive invasion of privacy it represents." (JER 4586).

661

Christensen complains that the court failed to "credit" him
for his "public service" as a prominent attorney and instead
"used his status as a successful attorney against him in a manner
not contemplated by section 3553(a)." (COB 79). But Christensen
fails to explain how § 3553(a) forbids consideration of personal
characteristics as aggravating, rather than mitigating, factors.
Indeed, 18 U.S.C. § 3661 makes clear that "[n]o limitation shall
be placed on the information concerning the background,
character, and conduct of a person convicted of an offense which
a court of the United States may receive and consider for the
purpose of imposing an appropriate sentence."

The district court did not "ignore Christensen's personal
history" (COB 77; JER 4592); it simply did not find his personal
history sufficient to mitigate his offense. The court explained
why Christensen's prominence, his legal experience, and
leadership position in the legal community made his crime worse;
while Christensen may feel otherwise, it is the court's
prerogative to weigh the sentencing factors. Towery v. Ryan, 673
F.3d 933, 945 (9th Cir. 2012) ("How much weight should be given
proffered mitigating factors is a matter within the sound
discretion of the sentencing judge."). Christensen similarly
asserts that the court held his financial success against him
(COB 79), but that is simply not so -- the court noted
Christensen's wealth in rejecting his argument that his

662

dependents would be left devastated were he to go to prison (JER 4593-94) and, passingly, to explain why Christensen's request for home detention was inadequate (JER 4600 ("Home detention in an 8000-square foot home is not punishment. In fact, I wouldn't consider it just punishment no matter where the defendant lived.")). Such consideration is entirely appropriate, especially where, as here, it has de minimis weight.[606] Christensen's notion that his professional success requires a court to show leniency when he commits a crime is mistaken; that is especially so since he was using the crime to advance his professional career.

Christensen likewise quarrels with the court's consideration of the character he showed in the recorded calls and asserts that the court improperly considered his aspersions on other members of the bar and on Bonder-Kerkorian. (COB 77). It is unclear what weight, if any, these factors had, but they were appropriately considered to rebut Christensen's self-characterization as a kind man and pillar of the legal community: "The manner in which Mr. Christensen referred to other respected members of the California Bar and the complete disdain that he

---

[606] Christensen misunderstands the court when he argues that it somehow gave presumptive weight to the Sentencing Guidelines -- from which it varied -- because it indicated that his background was insufficiently "extraordinary" to merit a sentencing reduction. (COB 78). The court's point was that Christensen's positive personal characteristics were not very mitigating in light of the serious nature of his offense. (JER 4593, 4599-4600).

had for them and for the law was shocking and outrageous. It shows that there is another side to Mr. Christensen than the one shown in the letters I received." (JER 4588). This conduct also revealed his moral blindness, in criticizing the tactics of others even while employing the illegal wiretaps. (JER 4594).

Ultimately, there was ample support for a mildly above-Guidelines, three-year sentence.

X.    THE COURT'S FORFEITURE ORDER WAS PROPER

Arneson's and Turner's sentences included a joint and several $2,008,250 personal money judgment of forfeiture, which represented the proceeds they obtained through their racketeering activity. (JER 489). Arneson argues that the court erroneously refused to allow the jury to determine "the nexus between the money judgment issued against [him] and his alleged RICO violations" and erroneously applied the preponderance of the evidence standard to the criminal forfeiture issues. (AOB 77-78). Arneson and Turner both argue that the money judgment is improperly joint and several. (AOB 78; TOB 56). Finally, Arneson and Turner argue that the court erroneously calculated the money judgment's amount by basing it on the enterprise's gross receipts instead of its net profits. (AOB 77; TOB 54). Each argument fails.

664

1.   <u>Standard of Review</u>

This Court "review[s] de novo the district court's interpretation of federal forfeiture law." <u>United States v. Newman</u>, 659 F.3d 1235, 1242-43 (9th Cir. 2011).

2.   <u>Defendants Were Not Entitled to Have a Jury Determine the Amount of the Money Judgment</u>

In a RICO prosecution, the procedural rules governing criminal forfeiture proceedings are set out in 18 U.S.C. § 1963 (which applies specifically to criminal forfeiture sought for violation of § 1962) and Federal Rule of Criminal Procedure 32.2 (which governs criminal forfeiture proceedings generally, including those under § 1963).  Several clarifying amendments to Rule 32.2 took effect on December 1, 2009, including a restructuring of the rule and a re-drafting of certain provisions, including the one relating to a defendant's right to have a jury determine the nexus between an offense and specific property sought for forfeiture.  These amendments applied to cases pending at the time of the amendment, and therefore should apply here.[607]

---

[607]   When procedural rules are amended,

the Supreme Court may fix the extent such rule shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.
(continued...)

665

Rule 32.2 allows the government to seek either or both of two distinct types of criminal forfeiture: forfeiture of specific property and entry of a personal money judgment of forfeiture. Compare Rule 32.2(b)(1) (2008) with Rule 32.2(b)(1)(A) (2010);[608] see also United States v. Casey, 444 F.3d 1071, 1076 (9th Cir. 2006) (describing two types of criminal forfeiture orders). Here, the government sought only a personal money judgment of forfeiture.  While there is no Constitutional right to have a jury determine any issue in the forfeiture phase of a criminal prosecution (United States v. Libretti, 516 U.S. 29, 49 (1995) ("right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection")), where the

---

[607](...continued)

28 U.S.C. § 2074(a).  In its March 26, 2009, order amending Rule 32.2, the Supreme Court stated that the amendments should be applied "in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending."  Order Amending Federal Rules of Criminal Procedure (Mar. 26, 2009), available at <http://www.supremecourt.gov/orders/courtorders/ frcr09.pdf>.  As explained below, application of the changes to the Rule implicated here were not of the type that would result in infeasibility or injustice.

[608] The relevant language of the Rule was unchanged by the 2009 revisions, and provides:

If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

government seeks the forfeiture of specific property, a defendant has a limited right under Rule 32.2 to a jury determination of certain factual issues. Compare Rule 32.2(b)(4) (2008)[609] with Rule 32.2(b)(5)(A) (2010).[610]  The re-drafting of this particular provision in 2009 was intended to clarify the procedure for requesting a jury determination and avoid an inadvertent waiver of the right to a jury in the forfeiture phase.  Rule 32.2 advisory committee notes (2009 amend.).  The idea was to encourage parties and courts to make the decision early in a case, so the jury could be warned that it might have additional tasks to perform after returning a verdict.  Id.

However, both the former and current versions of the Rule limit the right to a jury determination to the nexus between the underlying offense and specific property sought for forfeiture. This is clear from the Rule's plain language: the former Rule

---

[609] The cited portion of the former Rule provided:

Upon a party's request in a case in which a jury returns a verdict of guilty, the jury must determine whether the government has established the requisite nexus between the property and the offense committed by the defendant.

[610] The revised portion of the Rule provides:

In any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict.

667

refers to the "requisite nexus between the property and the offense"; the revised Rule refers to the "forfeitability of specific property."[611]  The government did not seek the forfeiture of specific property here.[612]  It sought only a personal money judgment, and there is no right to a jury determination of the amount of a personal money judgment under either the former version of Rule 32.2 (see United States v. Tedder, 403 F.3d 836, 841 (7th Cir. 2005) ("Rule 32.2 does not entitle the accused to a jury's decision on the amount of the forfeiture")), or the current version (see Phillips, 704 F.3d at 771).  Because a defendant is not entitled to a jury determination of the amount

---

[611]  The Advisory Committee explicitly noted the two types of forfeiture orders in its notes concerning the 2009 amendments, pointing out that one of the reasons for the amendments was to clarify those differences.  Rule 32.2 advisory committee notes (2009 amend.) ("Subdivision (b)(1) recognizes that there are different kinds of forfeiture judgments in criminal cases.  One type is a personal money judgment for a sum of money; another is a judgment forfeiting a specific asset.").

[612]  An order forfeiting specific property requires the government to demonstrate that the property sought for forfeiture (seized currency or bank funds, for example, or a car) had a certain connection to the underlying offense (e.g., the property constituted or was traceable to proceeds of the offense, was used to facilitate the offense or, in the RICO context, was acquired or maintained in violation of § 1962, or afforded a source of influence over the RICO enterprise).  A money judgment of forfeiture does not refer to any particular asset.  It is an order requiring the defendant to pay to the government an amount equal to "how much he received in connection with the commission of the crime."  Casey, 444 F.3d at 1077.  The money judgment permits the court to order the forfeiture of property where the defendant has disposed of the specific assets subject to forfeiture, or otherwise made them unavailable for forfeiture. Id.

of a personal money judgment he will need to pay, the court
properly determined the amount of the money judgment here.

### 3.    Preponderance of the Evidence Is the Proper Standard for Forfeiture Determinations

Criminal forfeiture is an element of a convicted defendant's
sentence, not a substantive element of a criminal offense.
Libretti, 516 U.S. at 39.  In support of his argument that the
standard of proof in criminal forfeiture proceedings is beyond a
reasonable doubt, Arneson cites United States v. Pelullo, 14 F.3d
881, 906 (3d Cir. 1994); United States v. Cauble, 706 F.2d 1322,
1348 (5th Cir. 1983); and United States v. Spilotro, 680 F.2d
612, 618 (9th Cir. 1982).  Each of those cases was decided
before, and was subsequently overruled by, the Supreme Court in
Libretti, which established that, because criminal forfeiture is
an element of sentencing, the proper standard is the
preponderance of the evidence.  See Phillips, 704 F.3d at 770
n.14 (reaffirming that "Apprendi v. New Jersey, 530 U.S. 466
(2000), did not change the rule that forfeiture need only be
proven by a preponderance of the evidence, thus implying that
Apprendi did not upset the rule of Libretti.").  The standard is
the same in all criminal cases, including RICO cases.  United
States v. Najjar, 300 F.3d 466, 485-86 (4th Cir. 2002); United
States v. DeFries, 129 F.3d 1293, 1312 (D.C. Cir. 1997).

4.    The Forfeiture Money Judgments Were Properly Ordered
Joint-and-Several

Defendants who are jointly convicted of a conspiracy offense
are jointly and severally liable for a personal money judgment
entered following that conviction.  United States v. Roberts, 660
F.3d 149, 165 (2d Cir. 2011) (conspiracy conviction triggers
mandatory forfeiture liability that is joint-and-several among
all conspirators).  This is particularly true in the racketeering
context.  United States v. Fruchter, 411 F.3d 377, 384 (2d Cir.
2005) (applying joint-and-several liability for criminal
forfeiture of proceeds from racketeering enterprise, and holding
that criminal forfeiture can reach even proceeds derived from
conduct forming the basis for a charge of which the defendant was
acquitted if the conduct fell within the affairs of the
racketeering enterprise).  "So long as the sentencing court finds
by a preponderance of the evidence that the criminal conduct
through which the proceeds were made was foreseeable to the
defendant, the proceeds should form part of the forfeiture
judgment."  Id. (citing United States v. Edwards, 303 F.3d 606,
643 (5th Cir. 2002)).  Where a defendant is "aware of the scope
of the racketeering enterprise, its proceeds were necessarily
foreseeable to him."  Id. at 385.

Fruchter is one in a long line of cases imposing joint-and-
several forfeiture liability on defendants convicted of a RICO
conspiracy and requiring forfeiture of all proceeds of the

670

enterprise: United States v. Browne, 505 F.3d 1229, 1278 (11th Cir. 2007); United States v. Corrado, 227 F.3d 543, 553 (6th Cir. 2000); United States v. Simmons, 154 F.3d 765, 769-70 (8th Cir. 1998); Fleischauer v. Feltner, 879 F.2d 1290, 1301 (6th Cir. 1989) (collecting cases); United States v. Caporale, 806 F.2d 1487, 1507 (11th Cir. 1986) ("joint and several liability is not only consistent with the [RICO] statutory scheme, but in some cases will be necessary to achieve the aims of the legislation."). The common thread in these opinions is recognition of the expansive scope of the RICO statute, particularly the forfeiture provisions.[613] In Corrado, 227 F.3d at 554, the court noted the Supreme Court's holding that "the supporters [of a RICO conspiracy] are as guilty as the perpetrators," and "so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators." It further noted that a RICO conspirator's liability is based not just on his own commission of the underlying racketeering acts, but on his knowledge and agreement that one or more of his co-conspirators will engage in racketeering activity. Id.

The only question, then, is whether the amount of the forfeiture money judgment here, representing the proceeds of the enterprise as determined by the court, was foreseeable by Arneson

---

[613] See also United States v. Busher, 817 F.2d 1409, 1413 (9th Cir. 1987) (§ 1963's forfeiture provisions are "purposely broad," "designed to totally separate a racketeer from the enterprise he operates").

and Turner, and that question turns on whether they were, in
Fruchter's words, "aware of the scope of the racketeering
enterprise."  411 F.3d at 385.  The evidence demonstrates that
they were.

Arneson's argument that the proper standard is what
"percentage of the proceeds were reasonably foreseeable to [him]"
(AOB 78) is too limited, and the authorities on which he relies,
including Fruchter, Edwards, and Corrado, do not support this
contention.  Those cases focused on the defendant's knowledge of
the enterprise's activities -- not on the amount of proceeds the
defendant reasonably expected the activities to generate.  Nor
does Arneson's argument find support in the other cases he cites.
In United States v. McHan, 101 F.3d 1027, 1042-43 (4th Cir.
1996), the court, applying the criminal-forfeiture statute
governing drug cases, ordered forfeiture of all property used to
facilitate the defendant's drug operations.  In United States v.
Hurley, 63 F.3d 1, 22 (1st Cir. 1995), the court noted the
statutory "narrow safe harbor" in the criminal-forfeiture statute
governing money laundering and other financial crimes (18 U.S.C.
§ 982(b)(2)) that was available to a "mere[] . . . intermediary
who handled but did not retain the property [subject to
forfeiture]," but found that "there is no counterpart safe harbor
provision in RICO."  As the 11th Circuit pointed out in Browne,
505 F.3d at 1278, "to saddle the Government with a requirement to

672

determine the precise allocation of racketeering proceeds between
defendants would substantially impair the effectiveness of the
[forfeiture] remedy, as offenders would simply have to mask the
allocation of the proceeds to avoid forfeiting them altogether."
Even where similar issues may be resolved differently under other
statutory schemes -- joint-and-several liability for conspiracy
convictions is <u>not</u> among them -- those do not necessarily apply
in the RICO context.  <u>Caporale</u>, 806 F.2d at 1508 (RICO
"represents a radical departure from common law notions of
liability and punishment in criminal law in a number of
respects").  The imposition of joint-and-several forfeiture
liability on convicted RICO conspirators is proper, and was
properly ordered here.

> 5.  <u>The District Court's Calculation of the Money Judgment
>     Was Proper</u>

Finally, Arneson and Turner argue that the court erroneously
calculated the money judgment of forfeiture's amount by
determining the enterprise's gross receipts instead of its net
profits.  (AOB 77; TOB 55).  As indicated by the discussion
above, the RICO-forfeiture provisions are among the broadest in
the United States Code, intended, in this Court's words, to
"totally separate a racketeer from the enterprise he operates."
<u>Busher</u>, 817 F.2d at 1413.  Section 1963's plain language
demonstrates that those provisions are intended to reach all of
the assets acquired by a convicted defendant as a result of his

673

underlying involvement in the enterprise, not just the profit realized.  See §§ 1963(a)(1) (authorizing forfeiture of any interest acquired or maintained in violation of § 1962); 1963(a)(2) (authorizing forfeiture of any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over the enterprise); and 1963(a)(3) (authorizing forfeiture of any property constituting, or derived from, any proceeds which the defendant obtained, directly or indirectly, as a result of racketeering activity). Moreover, forfeiture under § 1963 is mandatory.  Alexander v. United States, 509 U.S. 544, 562 (1993) ("[A] RICO conviction subjects the violator not only to traditional, thought stringent, criminal fines and prison terms, but also mandatory forfeiture under § 1963.").

In support of his argument that "proceeds" in § 1963 means "net profits," Turner mistakenly relies on United States v. Santos, 553 U.S. 507 (2008).  In Santos, the Court addressed whether the term "proceeds" in 18 U.S.C. § 1956(a)(1) meant "gross receipts" or "profits."  A plurality concluded that using the term without defining it in the statute rendered the meaning ambiguous, leading the plurality to conclude that "there is no more reason to think that 'proceeds' means 'receipts' than there is to think that 'proceeds' means 'profits."  Id. at 514. Applying the rule that ambiguous criminal laws must be

674

interpreted in favor of defendants, and concluding that "the 'profits' definition of 'proceeds' is always more defendant-friendly than the 'receipts' definition," the plurality held that "proceeds" in § 1956(a)(1) meant "profits." Id.  Turner argues that "proceeds" in § 1963 is used "in the same manner" as in § 1956 and that the term, therefore, is "equally ambiguous." (TOB 55).

Not so.  The only similarity between the money-laundering statute considered in Santos and § 1963 is that neither contains an explicit definition of the term "proceeds."  However, unlike the money-laundering statute, § 1963 cannot reasonably be characterized as ambiguous in its description of the scope of the forfeiture authority Congress intended to provide.  As demonstrated above, the statute, especially paragraph (a)(3), contains numerous expansive terms ("any property constituting, or derived from, any proceeds . . . obtained, directly or indirectly, from racketeering activity"), and no limiting terms. See United States v. Monsanto, 491 U.S. 600, 609 (1989) (characterizing statutory reference in forfeiture statute to "any property" as "comprehensive," "broad," and "unambiguous").  The statute has been interpreted for decades as having been intended to reach any and all property acquired or maintained as a result of the underlying activity, whether as proceeds or otherwise. Busher, 817 F.3d at 1413 (forfeiture under § 1963 "extends to the

675

convicted person's entire interest in the enterprise"); United States v. Segal, 495 F.3d 826, 838-39 (7th Cir. 2007) (defendant's entire interest in the enterprise forfeitable under § 1963(a)); Angiulo, 897 F.2d at 1211 ("any interest in an enterprise, including the enterprise itself, are subject to forfeiture in their entirety, regardless of whether some portions of the enterprise are not tainted by the racketeering activity"); United States v. Porcelli, 865 F.2d 1352, 1364 (2d Cir. 1989) ("a RICO enterprise found in violation of section 1962 is indivisible and is forfeitable in its entirety"); United States v. Anderson, 782 F.2d 908, 918 (11th Cir. 1986) (all of a convicted RICO defendant's interest in the enterprise is forfeitable, "regardless of whether those assets were themselves 'tainted' by use in connection with the racketeering activity").  Under the circumstances, there is no support for Turner's argument that the interpretation of § 1963 should be guided by Santos.[614]  Nor does Turner cite any authority for his argument that the government was required to prove the "profits" of the RICO enterprise.  (TOB 56).

---

[614]  Turner also relies on United States v. Van Alstyne, 584 F.3d 803 (9th Cir. 2009), another money-laundering case, and seeks to limit § 1963 through Van Alstyne's merger analysis. (TOB 55-56).  Turner, however, provides no explanation why Van Alstyne's fact-based merger analysis under the money-laundering statute has any bearing on the meaning of the term "proceeds" in the RICO-forfeiture statute.

Arneson, in arguing the money judgment should have been calculated based on the enterprise's "net income," offers a list of cases, but none supports his argument for limiting the money judgment's amount. In <u>United States v. Genova</u>, 333 F.3d 750 (7th Cir. 2003), the court excluded a specific category of payments from forfeiture in a bribery scheme case on the ground the payments were neither gross nor net proceeds. <u>Id.</u> at 761. In <u>United States v. Scialabba</u>, 282 F.3d 475 (7th Cir. 2002), the court, interpreting 18 U.S.C. § 1956(a)(1), reached the same conclusion later reached by the <u>Santos</u> plurality, but that conclusion does nothing to inform the inquiry under § 1963, as already explained. Both § 1963(a)'s plain language and the overwhelming weight of the authority interpreting it compel the conclusion the statute was intended to require the forfeiture of the gross proceeds obtained as a result of the underlying racketeering activity. The money judgment of forfeiture was proper.

677

# IV

## CONCLUSION

For the foregoing reasons, defendants' convictions and sentences should be affirmed.

Dated: May 22, 2013     Respectfully submitted,

             ANDRÉ BIROTTE JR.
             United States Attorney

             ROBERT E. DUGDALE
             Assistant United States Attorney
             Chief, Criminal Division


                /s/ Kevin M. Lally
             KEVIN M. LALLY
             JOSHUA A. KLEIN
             Assistant United States Attorneys

             Attorneys for Plaintiff-Appellee
             UNITED STATES OF AMERICA

**STATEMENT OF RELATED CASES**

The government is not aware of any pending related cases.

**Form 8.**   **Certificate of Compliance Pursuant to 9th Circuit Rules 28-4, 29-2(c)(2) and (3), 32-2 or 32-4[1] for Case Number** <u>08-50531++</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (check appropriate option):

☐ This brief complies with the enlargement of brief size permitted by Ninth Circuit Rule 28-4.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).  This brief is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☒ This brief complies with the enlargement of brief size granted by court order dated <u>March 21, 2013</u>.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).  This brief is <u>159,956</u> words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief is accompanied by a motion for leave to file an oversize brief pursuant to Circuit Rule 32-2 and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief is accompanied by a motion for leave to file an oversize brief pursuant to Circuit Rule 29-2(c)(2) or (3) and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

| Signature of Attorney or Unrepresented Litigant | /s/ KEVIN M. LALLY |
| --- | --- |

("s/" plus typed name is acceptable for electronically-filed documents)

| Date | May 22, 2013 |
| --- | --- |

[1] If filing a brief that falls within the length limitations set forth at Fed. R. App. P. 32(a)(7)(B), use Form 6, Federal Rules of Appellate Procedure.

| 9th Circuit Case Number(s) | 08-50531++ |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)  May 22, 2013 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)   /s/ KEVIN M. LALLY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)