Nos. 08-50531, 08-50570, 09-50115, 09-50125, 09-50128, 09-50159, 10-50434, 10-50462

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

TERRY CHRISTENSEN; ANTHONY PELLICANO; MARK ARNESON; RAYFORD EARL TURNER; ABNER NICHERIE; KEVIN KACHIKIAN,

*Defendant-Appellant.*

———————————————

On Appeal from the United States District Court
for the Central District Of California
Honorable Dale S. Fischer, United States District Court Judge

———————————————

DEFENDANT-APPELLANT ANTHONY PELLICANO'S INDIVIDUAL REPLY BRIEF

Steven F. Gruel
Attorney at Law
315 Montgomery Street
9th Floor
San Francisco, CA

Attorney for Defendant-Appellant
ANTHONY PELLICANO

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................1

I.    THE RICO CONVICTIONS MUST BE REVERSED.................................3

    A.    The Evidence Was Insufficient to Support the State-Law
          Bribery Racketeering Acts ......................................................3

          1.    Bribery Requires Some Connection to a Governmental
               Proceeding, Which Is Absent Here............................5

          2.    Bribery Requires Payment in Exchange for Official
               Action, Which Is Absent Here.................................13

          3.    Mr. Pellicano Did Not Waive His State-Law Bribery
               Argument .................................................................18

    B.    Under *Skilling*, the Racketeering Acts Based on Federal
          Honest-Services Fraud Cannot Be Sustained....................20

          1.    Honest-Services Bribery Requires Payment in Exchange
               for Official Action, Which Is Absent Here..............21

          2.    The Mistaken Jury Instruction Was Not Harmless Error ........32

          3.    Mr. Pellicano Did Not Waive His *Skilling* Argument .............33

    C.    The Racketeering Acts Alleging Identity Theft Must Fall ...............34

          1.    After *Nosal*, The Evidence Regarding the Racketeering
               Acts Based on the CFAA Is Insufficient As a Matter of
               Law...........................................................................34

          2.    The "Identity Theft" Racketeering Acts Similarly Fail
               Under California Law ..............................................41

II.   THE GOVERNMENT FAILS TO JUSTIFY ITS SEARCH BASED
     ON A WARRANT ISSUED DUE TO LIES AND OMISSIONS...............45

    A.    Collateral Estoppel Does Not Preclude This Court From
          Holding the Government Accountable for Willfully Violating
          Pellicano's Fourth Amendment Rights .............................45

    B.    The Government Fails to Justify Its Procurement of a Search
          Warrant Based on Knowingly False Accusations and
          Concealment of Material Facts .........................................47

# TABLE OF CONTENTS
(continued)

**Page**

III. UPON REVERSAL OF HIS RICO CONVICTIONS, PELLICANO
SHOULD BE IMMEDIATELY RELEASED FROM CUSTODY OR,
AT A MINIMUM, HAVE HIS CASE REASSIGNED ON REMAND......49

    A.    Because Mr. Pellicano Has Already Served More Than His Full
Sentence for All Non-RICO Offenses, He Should Be
Immediately Released ......................................................................49

    B.    At the Very Least, Pellicano's Sentence Should be Vacated and
Remanded for Resentencing Before a Different Judge......................50

    CONCLUSION..........................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Chrisman v. City of Los Angeles*,
    155 Cal. App. 4th 29 (2007) ...................................................34, 42, 44

*City of Alhambra v. Los Angeles*,
    55 Cal. 4th 707 (2012) .......................................................................6

*Craigslist, Inc. v. 3Taps, Inc.*,
    2013 BL 116811 (N.D. Cal. Apr. 30, 2013)....................................38

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.Supp.2d 1025 (N.D. Cal. 2012)...................................37, 41, 43

*Harbeson v. Parke Davis, Inc.*,
    746 F.2d 517 (9th Cir. 1984) ..........................................................46

*Hat World, Inc. v. Kelley*, 2012 BL 204726
    (E.D. Cal. Aug. 10, 2012) ...............................................................36

*In re Ellis*,
    356 F.3d 1198 (9th Cir. 2004) (en banc) ........................................51

*In re Jang*,
    25 Cal. App. 2d 529 (1938) ...............................................................8

*Knai Oil & Gas, Inc. v. Dept. of Interior*,
    671 F.2d 383 (10th Cir. 1982) ........................................................46

*Lee v. Lampert*,
    653 F.3d 929 (9th Cir. 2011) ..........................................................19

*Mahru v. Superior Court of Los Angeles County*,
    191 Cal. App. 3d 545 (1987) ..........................................................44

*Metabyte, Inc. v. NVIDIA Corp.*,
    2013 BL 108327 (N.D. Cal. Apr. 22, 2013)....................................36

*Neder v. United States*,
    527 U.S. 1 (1999)........................................................................20, 32

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nix v. Williams*,
   467 U.S. 431 (1984) (Stevens, J., concurring) ..................................................48

*Oracle America, Inc. v. Serv. Key, LLC*,
   2012 BL 318289 (N.D. Cal. Dec. 3, 2012) ......................................................37

*People v. Eads*,
   124 Cal. App. 2d 393 (1954) ................................................................................8

*People v. Finkelstin*,
   98 Cal. App. 2d 545 (1950) ..................................................................................8

*People v. Fook*,
   62 Cal. 493 (1881) ................................................................................................8

*People v. Gaio*,
   81 Cal. App. 4th 919 (2000) ........................................................................passim

*People v. Gentry*,
   234 Cal. App. 3d 131 (App. 4th Dist. 1991) ......................................................42

*People v. Guillory*,
   178 Cal. App. 2d 854 (1960) ................................................................................8

*People v. Hallner*,
   43 Cal. 2d 715 (1954) ..........................................................................................8

*People v. Jackson*,
   42 Cal. 2d 540 (1954) ..........................................................................................7

*People v. Lips*,
   59 Cal. App. 381 (1922) ..............................................................................8, 13

*People v. Longo*,
   119 Cal. App. 2d 416 (1953) ........................................................................8, 13

*People v. Markham*,
   64 Cal. 157 (1883) ..................................................................................8, 9, 14

*People v. Mathews*,
   124 Cal. App. 2d 67 (1954) ................................................................................8

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*People v. Powell*,
  50 Cal. App. 436 (1920) .......................................................................8

*People v. Silver*,
  75 Cal. App. 2d 1 (1946) .....................................................................8

*People v. Strohl*,
  57 Cal. App. 3d 347 (1976) .................................................................8

*Shushan v. United States*,
  117 F. 2d 110 (5th Cir. 1941) ............................................................26

*Skilling v. United States*,
  130 S. Ct. 2896 (2010)................................................................passim

*Stern v. Weinstein*,
  2013 BL 75043 (9th Cir. Mar. 20, 2013)...........................................42

*United States v. Atkinson*,
  297 U.S. 157 (1936).............................................................................20

*United States v. Avila-Anguiano*,
  609 F.3d 1046 (9th Cir. 2010) ...........................................................50

*United States v. Bohonus*,
  628 F.2d 1167 (9th Cir. 1980) ...........................................................24

*United States v. Brown*,
  540 F.2d 364 (8th Cir. 1976) .............................................................27

*United States v. Czubinski*,
  106 F.3d 1069 (1997).............................................................28, 31, 33

*United States v. de Vegter*,
  198 F.3d 1324 (11th Cir. 1999) .........................................................25

*United States v. Eatinger*,
  902 F.2d 1383 (9th Cir. 1990) ...........................................................18

*United States v. Gallardo-Mendez*,
  150 F.3d 1240 (10th Cir. 1998) .........................................................46

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Ganim*,
510 F.3d 134 (2d Cir. 2007) ...............................................................24

*United States v. Garrido*,
2013 BL 101463 (9th Cir. 2013) .......................................................30

*United States v. Graf*,
610 F.3d 1148 (9th Cir. 2010) ...........................................................18

*United States v. Harnage*,
976 F.2d 633 (11th Cir. 1992) ..........................................................46

*United States v. Hernandez-Meza*,
720 F.3d 760 (9th Cir. 2013) .............................................................51

*United States v. Jain*,
93 F.3d 436 (8th Cir. 1996) ...............................................................24

*United States v. Jaramillo*,
413 Fed. Appx. 979 (9th Cir. 2011)...................................................33

*United States v. Johnson*,
457 U.S. 537 (1982).............................................................................33

*United States v. Kemp*,
500 F.3d 257 (3d Cir. 2007) .......................................................24, 27

*United States v. Kincaid-Chauncey*,
556 F.3d 923 (9th Cir. 2009) ....................................................passim

*United States v. Kohl*,
972 F.2d 294 (9th Cir. 1992) .............................................................18

*United States v. Kulczyk*,
931 F.2d 542 (9th Cir. 1991) ...............................................................3

*United States v. Mandel*,
591 F.2d 1347 (4th Cir. 1979) ..........................................................24

*United States v. Milovanovic*,
678 F.3d 713 (9th Cir. 2012) (en banc) ...........................................26

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Nosal*,
676 F.3d 854 (9th Cir. 2012) (en banc) ......................................................passim

*United States v. Paradies*,
98 F.3d 1266 (11th Cir. 1996) ..............................................................25

*United States v. Pelullo*,
14 F.3d 881 (3d Cir. 1994) ..................................................................46

*United States v. Procter & Gamble Co.*,
47 F. Supp. 676 (D. Mass. 1942)............................................................27

*United States v. Sawyer*,
85 F.3d 713 (1st Cir. 1996)..................................................................28

*United States v. Smith-Baltiher*,
424 F.3d 913 (9th Cir. 2005) ...............................................................47

*United States v. Sood*,
969 F.2d 774 (9th Cir. 1992) .............................................................33, 41

*United States v. Sorich*,
523 F.3d 702 (7th Cir. 2008) ...............................................................27

*United States v. Ullah*,
976 F.2d 509 (9th Cir. 1992) ...........................................................20, 33

*United States v. Urciuoli*,
513 F.3d 290 (1st Cir. 2008)...........................................................29, 33

*United States v. Weyhrauch*,
556 F.3d 1237 (2008)........................................................................26

*United States v. Whitfield*,
590 F.3d 325 (5th Cir. 2009) ...............................................................27

*United States v. Wilkes*,
662 F.3d 524 (9th Cir. 2011) ...............................................................26

*United States v. Zhang*,
2012 BL 130953 at *17 (N.D. Cal. May 29, 2012)...........................................37

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

STATUTES

18 U.S.C. § 201 ..................................................................................29

18 U.S.C. § 666 ..................................................................................30

18 U.S.C. § 1030 ....................................................................34, 35, 37

Cal. Gov. Code § 1126 ..........................................................................4

Cal. Penal Code § 7(6) ........................................................................13

Cal. Penal Code § 67 ....................................................................passim

Cal. Penal Code § 68 ............................................................................7

Cal. Penal Code § 502 ..................................................................passim

RICO ............................................................................................passim

OTHER AUTHORITIES

*Black's Law Dictionary* 186 (7th ed. 1999)..................................22, 31

Fourth Amendment ..............................................................................45

LAPD Manual § 270.30 .......................................................................16

Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and
   "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. REV. 1596,
   1650-51 (2003)..................................................................................43

## INTRODUCTION

Appellant Anthony Pellicano has been in federal custody since November 17, 2003. He has now served almost two-thirds of his total sentence, due in large part to the two-and-a-half-year delay in the government's filing of its Answering Brief. Because he has served more than enough time for his lesser offenses, the sole remaining basis for Mr. Pellicano's continued incarceration is the 15-year sentence for his two RICO convictions. Accordingly, while the arguments advanced in Mr. Pellicano's Opening Brief demonstrate that all of his convictions should be reversed and his sentences vacated, this Reply focuses primarily on the RICO counts.

The government has implicitly acknowledged both the significance and the weakness of the RICO convictions by devoting the bulk of its Answering Brief to them. Despite the government's best efforts, however, these convictions cannot be sustained. In light of the jury instructions and the evidence introduced at trial, none of the three categories of racketeering acts alleged by the government holds up under scrutiny. First, Mr. Pellicano did not commit bribery under California law because he did not make any payment in exchange for official action to influence the outcome of a governmental proceeding. Second, Mr. Pellicano did not commit "honest services fraud" under federal law because he did not engage in any "bribery or kickback scheme" as required by *Skilling v. United States*, 130 S.

1

Ct. 2896 (2010). And third, Mr. Pellicano did not aid or abet identity theft because, as in the recent case of *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (en banc), his associates did not engage in unauthorized access to computer information, but instead merely misused information that they were authorized to access. Because none of the racketeering acts charged against Mr. Pellicano survives, his substantive RICO conviction must be overturned. And because the same logic demonstrates that no defendant engaged in any pattern of racketeering, Mr. Pellicano's conviction for RICO conspiracy must also fall.

Additionally, Mr. Pellicano will briefly reply to the government's efforts to save the evidence that was illegally seized in the November 21, 2002, search of Pellicano Investigative Services (PIA). Although the government now asserts for the first time on appeal that collateral estoppel prohibits this Court from addressing this issue, the government clearly waived its collateral-estoppel argument by failing to assert it in the district court.

Finally, the government fails to rebut Mr. Pellicano's argument that his sentence of 180 months, for illegally gathering information, was excessive and improper, particularly in light of the probation department's firm recommendation of only 70 months in custody. Because he has already served more than the full term of his non-RICO sentences, he should be immediately released. At the very least, however, he should be resentenced before a new and impartial judge.

**I.      THE RICO CONVICTIONS MUST BE REVERSED**

**A.      The Evidence Was Insufficient to Support the State-Law Bribery Racketeering Acts**

As a basis for convicting Mr. Pellicano under RICO, the jury found that he committed ten predicate acts of bribery under California law, all for allegedly paying Officer Arneson to run searches through police databases.[1] But the evidence of these payments and searches, even when construed in the government's favor, is insufficient to establish those predicate acts as a matter of law. *See* Pellicano Op. Br. 4, 12, 57. That is because bribery is limited to payments made to influence an officer's *official actions* to alter the outcome of a governmental *proceeding*, as even the government's brief recognizes when it actually addresses the elements of California Penal Code § 67. *See* Resp. Br. at 270 (acknowledging that bribery requires "intent to unlawfully influence [an] officer's *official* act, decision, vote, opinion, or conduct *in another proceeding*") (emphasis added); *id.* at 288 (similar). And the evidence is insufficient if a statutory provision, properly interpreted, does not prohibit the conduct that the government proved at trial. *E.g.*, *United States v. Kulczyk*, 931 F.2d 542, 543-48 (9th Cir. 1991). Because Pellicano's payments were not intended to influence Arneson's official actions in connection with any

---

[1]      *See* Fifth Superseding Indictment, ¶ 32, Racketeering Acts 93-102.

3

governmental proceeding, no amount of evidence of those payments would be sufficient to sustain these predicate acts.

Arneson and Pellicano may well have acted in a way that was "inimical to [Arneson's] duties as a local agency officer" and "involve[d] the use for private gain or advantage of [Arneson's] local agency time, facilities, equipment and supplies." Cal. Gov. Code § 1126; *see* Appellants' Jt. Op. Br. 16-18. Indeed, Arneson admits that he engaged in "misuse of law-enforcement information," thus both violating LAPD policy and perhaps committing a misdemeanor. *See* Arneson Op. Br. 20 n.8. It may even be that, as the government contends repeatedly and at length, Arneson ran afoul of some other state or federal statutes governing the disclosure of confidential information—crimes that the government did not charge. *See, e.g.,* Resp. Br. at 273-78, 296-97 & n.307.

But none of that makes Arneson's or Pellicano's actions bribery, which is the crime at issue here. The government's expansive contrary theory is at odds not only with the statutory text and California decisions applying it, as discussed below, but also with common sense. In the government's world, police officers engaged in outside employment would be guilty of bribery whenever they violated the law or department policy, no matter how minor the transgression. Bribery law would ensnare officers being paid to jay-walk, or to give unauthorized rides in their police cruisers, or running businesses from their office computers. This

dragnet reading of the statute is astonishingly overbroad, sweeping in a swath of minor misconduct while ignoring the unique evil of bribery, which occurs when an officer is paid to act in his official capacity to sway the outcome of a governmental proceeding.

Much as this Court did in interpreting the federal Computer Fraud and Abuse Act in *Nosal*, it should here refuse to transform the California bribery statute into an all-purpose sanction for any official misconduct done for consideration. *Cf. Nosal*, 676 F.3d at 858-60. The law against bribery is intended to protect the integrity of official acts of government, not to serve as a "draconian personnel regulation." *United States v. Kincaid-Chauncey*, 556 F.3d 923, 940 (9th Cir. 2009) (citation omitted). The government in its obsession with the law and regulations regarding disclosure of confidential information, *e.g.,* Resp. Br. at 273-78, seeks to expand bribery law to compensate for the failure of its identity-theft predicate acts in light of *Nosal*. Particularly given the clarity of the California law, this Court should not allow such an end-run.

1. **Bribery Requires Some Connection to a Governmental Proceeding, Which Is Absent Here**

a. The relevant bribery statute makes it a crime to "give[] or offer[] any bribe to any executive officer in this state, with intent to influence him in respect to any act, decision, vote, opinion, *or other proceeding* as such officer." Cal. Penal Code § 67 (emphasis added). Thus, a bribe must be intended to

influence an officer in respect to some sort of "proceeding"; that term, as the accompanying word "other" indicates, signifies the general type of thing at issue, which can include an "act, decision, vote, [or] opinion." The specific examples— "act, decision, vote, opinion"—must be interpreted in light of the catch-all phrase, "or *other* proceeding." *Id.* (emphasis added). Any alternative reading would make the word "other" superfluous, contrary to hornbook rules of statutory interpretation. *See City of Alhambra v. Los Angeles*, 55 Cal. 4th 707, 719 (2012) ("Where reasonably possible, we avoid statutory constructions that render particular provisions superfluous or unnecessary."). Thus, the statute does not refer to *any* sort of act, vote, decision, or opinion. It refers only to an act, decision, vote, or opinion that is a type of "proceeding."

Because it would make no sense to think that every "act, decision, vote, [or] opinion" of an officer could by itself qualify as a "proceeding," the statutory text must be read to apply only to conduct regarding acts, decisions, votes, or opinions that would qualify as official acts of government. The only way that an "opinion" or a "decision" could be a type of "proceeding" is if those words refer to an official decision or opinion of a government agency. Similarly, it would be unnatural to think that every "act" of an officer is a "proceeding"; but the term applies readily to an official act of government. Likewise, the casting of a single vote by itself is not necessarily a "proceeding," but an official vote held by a governmental body is.

The California courts have followed the statutory text, observing that a bribe requires not just an attempt to influence an officer's behavior, but also an attempt "to alter *the outcome of any matter* that could conceivably come before the official." *People v. Gaio*, 81 Cal. App. 4th 919, 929 (2000) (emphasis added). The court's reference to a "matter"—something that might "come before" an official, resulting in a particular "outcome" that might be "alter[ed]"—reflects the statutory text's indication that a bribe must relate to an official governmental proceeding. The corollary section of the California Penal Code, § 68, which prohibits officers from *receiving* bribes, confirms this understanding. Under that section, an officer is prohibited from taking a bribe to influence his action "*upon any matter* then pending, or that may be brought before him or her in his or her official capacity." *Id.* § 68 (emphasis added); *see also Gaio*, 81 Cal. App. 4th, at 929 n.9 (stating that, due to their similarities, the various California bribery statutes "merit a like construction").

California bribery cases involving police officers confirm more specifically the requirement that a payment be made in connection with some official "proceeding." Most of the cases involve payments to influence an officer *in his enforcement (or not) of the law*, such as his conduct in connection with an arrest, criminal trial, or imprisonment. *See, e.g., People v. Jackson*, 42 Cal. 2d 540, 543 (1954) (payment to allow illegal gambling at a private club, with the agreement

7

that "if any complaints were received a raid could be arranged with 'fall guys' (not the real operators) set up to stand arrest and undergo prosecution"); *People v. Markham*, 64 Cal. 157 (1883) (forgoing arrest, to facilitate illegal gambling operations); *People v. Fook*, 62 Cal. 493 (1881) (payment offered to release arrestee).[2] A few cases involve bribes to procure contracts with law-enforcement agencies. *See Gaio*, 81 Cal. App. 4th 919 (payment to obtain food-service contracts at jail overseen by officer); *People v. Strohl*, 57 Cal. App. 3d 347 (1976) (payment to obtain an exclusive contract for cremating and disposing of the unclaimed bodies of indigents). And a few other cases involve bribes in exchange for licenses or permits. *See People v. Hallner*, 43 Cal. 2d 715 (1954) (payment for approval of gaming permit); *People v. Silver*, 75 Cal. App. 2d 1 (1946) (payment to obtain confidential exam questions so as to pass state architectural exam and procure license to practice as an architect).

---

[2] The decisions of the California Courts of Appeal are in accord. *See People v. Guillory*, 178 Cal. App. 2d 854 (1960) (payment offered to release arrestee who had been detained on heroin charges); *People v. Eads*, 124 Cal. App. 2d 393 (1954) (payment to sheriff to forgo arrest, facilitating operation of illegal gambling establishment); *People v. Mathews*, 124 Cal. App. 2d 67 (1954) (payment to avoid arrest on charges of illegal sale of whisky); *People v. Longo*, 119 Cal. App. 2d 416 (1953) (offer of payment to avoid arrest on heroin charges); *People v. Finkelstin*, 98 Cal. App. 2d 545, 554 (1950) (payment to "desist from enforcing the laws against prostitution and gambling"); *In re Jang*, 25 Cal. App. 2d 529 (1938) (payment to influence the testimony of a state narcotics officer at trial); *People v. Lips*, 59 Cal. App. 381 (1922) (payment to forgo arrest); *People v. Powell*, 50 Cal. App. 436 (1920) (payment for release from imprisonment).

*All* of these cases involve some identifiable governmental proceeding, broadly understood as an official act of government with the potential to produce some legal consequence. In an arrest, trial, or imprisonment, a person is detained, adjudicated guilty or innocent of a charged crime, or ordered confined, thereby changing his liberty and legal status. In procuring a contract, likewise, a governmental agency binds itself to pay for services. And in granting or denying a permit or license, a governmental agency decides whether to authorize certain conduct by the applicant.

           b.     The government in assailing Mr. Pellicano's position largely ignores this uniform case law, except to purport to summarize the holdings of two of these cases, *Markham* and *Gaio*, as indicating that any violation of an officer's duty for consideration is bribery. *See* Resp. Br. 272. But, as noted above, neither so holds or indicates. *Markham* involved a payment *to prevent an arrest*, and *Gaio* involved a payment *to obtain a government contract*. Of course, as discussed further below, bribery may occur in connection with any matter over which the bribed officer has official authority, and thus has duties, but it is the resulting official act corrupting a governmental "proceeding" that the statute reaches, not simply any violation of an agency regulation.

Having misunderstood the law, the government fails to demonstrate how Mr. Pellicano's payments were intended to influence the outcome of any proceeding

that was then pending or that conceivably could have come before Arneson in his official capacity. Nor could the government so demonstrate with the evidence presented to the jury.

Mr. Pellicano simply paid a police officer to assist him in his private investigative work, and as part of that work (on the government's theory) the officer used police resources to run unauthorized database searches. These mere searches were not themselves "proceedings," because they did not have, or even contemplate, any legal consequence (*i.e.*, "outcome") that the payment could have altered.

The government appears to argue that each database search was a short investigation, which could be understood as its very own "matter" or "proceeding." *See* Resp. Br. 291 (claiming that "every time Arneson used LAPD's resources to investigate a PIA target, that created a matter then-pending before Arneson"). But even if an *official* police investigation could be considered a "proceeding" in its own right, *Arneson's* searches were not proceedings in the relevant sense because they were not (nor did Pellicano intend them to be) official police investigations that might have led to authorization of an arrest or some other legal "outcome."

Nor were Arneson's database searches intended to alter the outcome of some *other* "proceeding," such as an arrest, trial, or imprisonment, government contracting, or the obtaining of a license or permit. Indeed, no official

10

investigation was ever compromised as a result of Arneson's provision of data to Pellicano, as the government's lead FBI investigator confirmed at trial. *See* Arneson Op. Br. 2; Appellants' Jt. Op. Br. 15; Pellicano Op. Br. 57 n.24. The Government contends that Arneson's database searches were focused on individuals engaged in various proceedings, including criminal and civil trials. *See* Resp. Br. at 291-94. But at best, the connection between Arneson's searches and these other proceedings was highly attenuated and indirect. The government never demonstrated that Arneson's database searches were intended to alter the outcome of these trials, instead basing its bribery allegations on the mere fact that Mr. Pellicano was paying Arneson in exchange for the searches. As a result, there was no evidence that the searches were intended to sway the outcome of any trial or other official proceeding.

The government makes much of the fact—which Mr. Pellicano never has disputed—that the bribery statute does not require a specific nexus between a payment and a particular proceeding, as long as the payment is intended to alter the outcome of some matter that could conceivably come before an official. *See* Resp. Br. at 271-73; *Gaio*, 81 Cal. App. 4th, at 929-31. On this basis, the government contends that Mr. Pellicano's regular payments effectively kept Arneson on retainer, where he was ready to take corrupt official action on any "proceeding" that might come before him. Resp. Br. at 272-73. But once again, the jury never

11

heard this theory, and there was no evidence at trial to support it. Instead, the government's theory at trial was that Arneson was taking "bribes" simply because he was being paid to conduct regular database searches—there was no evidence that Arneson was ever expected to engage in some *other* conduct with the purpose of altering the outcome of an actual government "proceeding." It thus could hardly be said that the payments were made "with intent to influence" Arneson to alter the outcome of any "matter" that could even "conceivably" come before him.Cal. Penal Code § 67; *Gaio*, 81 Cal. App. 4th, at 929-31.

Finally, there is no merit to the government's contention that "Pellicano's claim . . . incorrectly focuses on Arneson's behavior" by focusing "on how the bribed party acted." Resp. Br. at 290. The point is not how Arneson acted, but rather how Mr. Pellicano *intended* for Arneson to act in exchange for the payments he received. Because a "bribe" must be intended to influence an official act in a proceeding, it is not only appropriate but necessary to analyze whether the evidence was sufficient to show that Mr. Pellicano thought he was paying Arneson to influence his official actions in connection with a governmental proceeding. It was not. Mr. Pellicano was simply paying Arneson to assist in Pellicano's own investigations. Whatever that may be, it was not bribery.

2.    **Bribery Requires Payment in Exchange for Official Action, Which Is Absent Here**

a.    In much the same way, the Government also gives short shrift to the final three words of the California bribery statute, which require that payments be made with intent to influence an officer "as such officer."  Cal. Penal Code § 67.  This phrase means that the purpose of a bribe must be to influence an officer's official actions, not merely to influence his conduct in general.[3]  So, for example, it is not bribery to pay an officer to appear at a public hearing and offer his personal opinion.  Even though the payment might influence an officer in respect to a government "proceeding," it does not influence him "as such officer" because it does not prompt him to take any *official* action in respect to any matter that is or might come before him.

The California courts have confirmed this requirement as well.  They recognize that a bribe must relate to matters that would involve "one or more instances, types or courses of *official action*."  *Gaio*, 81 Cal. App. at 931 (emphasis added); *see also Longo*, 119 Cal. App. 2d 416 (bribery occurs when it influences an officer's action that "falls within the general scope of his duties and he is purporting to act in his official capacity"); *Lips*, 59 Cal. App. at 389 (describing

---

[3]    Moreover, a "bribe" is defined as "anything of value . . . asked, given, or accepted with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, *in any public or official capacity*."  Cal. Penal Code § 7(6) (emphasis added).

"acts" done in officer's "official capacity" as those that "properly belong to the office and are intended by the officer to be official").

b.     The government seems to acknowledge this requirement at times, *see* Resp. Br. at 288, but then stumbles by asserting an untenably broad definition of what it means for an action to be "official." The government's argument oscillates between two basic theories, neither of which can possibly be correct.

First, the government contends that an officer's action is "official" whenever it involves a violation of a statutory duty, or a duty of office. *See id.* at 297. According to the government, "Arneson . . . faced statutory and workplace restrictions that precluded him from accessing [police] databases without proper legal authorization and further barred him from distributing database information to non-law enforcement personnel." *Id.* at 289. To prove that the violation of these duties constitutes "official action," the government quotes the California Supreme Court to the effect that "the scope of the definition of bribery is as broad as the duties of the officer who accepts the bribe." *Id.* at 298 (quoting *Markham*, 30 P. at 621).

This understanding of official action is far too broad.  In context, it is clear that the quoted language from *Markham* is, again, using the phrase "the duties of the officer" to refer only to the official functions that the officer carries out, and

not to include every technical duty imposed by law or internal personnel regulations. This much is obvious upon a moment's reflection, as one might imagine paying a police officer to engage in minor infractions such as jay-walking, littering, or giving rides in his police cruiser. None of this would constitute bribery, regardless of the fact it would induce the officer to "violate both the law and his sworn duties." *Id.* at 289.

Second, as an alternative theory, the government contends that Arneson's database searches constituted official action because in running the searches he exploited his position as a police officer, which gave him the unique ability to "use restricted-access law-enforcement databases." Resp. Br. at 289; *see also id.* at 298 ("It was exclusively by virtue of his office that Arneson . . . had access to, and was able to conduct inquiries on, the LAPD's restricted-access databases."). Thus, the government argues, because Arneson knew the police databases were available only for official police business, he implicitly "represented . . . that he was conducting official police business" each time he searched the databases. *Id.* at 298.

This argument is superficially plausible, but in the end it proves too much, ending up in the same place as the first argument. *All* police resources are supposed to be used solely for official purposes, and so an officer could be said to make an implicit representation of official authority *whenever* he makes improper

15

use of *any* police resources for private gain. *See* LAPD Manual § 270.30 (noting that "outside employment" may  not "involve, for private gain or advantage, the use of City time, facilities, equipment or supplies."). The crucial distinction is that while Arneson was exploiting his *practical ability* to access police resources to run impermissible database searches, he was not exercising *legal authority* in the same sense as a police officer who makes an arrest or issues a traffic citation, thereby exercising a special law-enforcement power to bring about some legal consequence.

In this respect he was acting akin to a police officer misusing his work computer in behalf of an outside employer, or renting out his squad car to give taxi rides.  In both cases, the officer is authorized to use the computer or the police car solely by virtue of his status as a police officer, and he is forbidden from using these resources for private gain, but it would clearly not constitute bribery simply to misuse these resources in exchange for payment from an outside employer.  So too with Arneson: He was not abusing the legal powers of his office, but was rather making impermissible use of the resources that he was able to access by virtue of his employment.  This distinction, which the government in its contempt for Pellicano and Arneson fails to see, is vital for the bribery statute. There is a world of difference between a payment that leverages the official legal power of the

police department and one that merely induces the improper use of police resources.

*          *          *

In sum, Mr. Pellicano's actions involved no bribery because they were not intended to alter the outcome of any governmental proceeding, nor even any official action on the part of Officer Arneson. Either one of these reasons would suffice to make the evidence insufficient. The two combined make the invalidity of the jury findings inescapable.

As noted above, any unlawfulness in Mr. Pellicano's payments to Officer Arneson was not bribery but rather, at most, the solicitation of unauthorized and undisclosed use of police resources for private gain, contrary to department policy and possibly other state or federal law, which neither Arneson nor Mr. Pellicano was charged with violating. That is a far cry from the offense of bribery under the California Penal Code—tampering with arrests and criminal trials, rigging governmental contracts, or corrupting the process of public licensure and permitting. Such actions are uniquely harmful and corrosive because they abuse the legal authority of public officers and undermine confidence in "the outcome" of official proceedings, directly impairing the functioning of the state. Mr. Pellicano's actions did not rise to that level. If one keeps this crucial distinction

17

clear, the insufficiency of the evidence is manifest, and the predicate acts of bribery must fall.

### 3.   **Mr. Pellicano Did Not Waive His State-Law Bribery Argument**

The government argues that Pellicano waived his sufficiency-of-the-evidence argument because he did not state the argument with sufficient specificity when he joined Arneson's Rule 29 motion for acquittal before the trial court. *See* Resp. Br. at 240, 267. This is incorrect. As the government acknowledges, "[a] defendant need not state specific grounds to support a Rule 29 motion," and "grounds not raised are waived" only "when a Rule 29 motion is made on a specific ground." *Id.* at 240 (quoting *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010)). Pellicano did not make his Rule 29 motion "on a specific ground," but simply made a general request for acquittal by joining the Rule 29 motion filed by Arneson.

The specific grounds for acquittal raised by Arneson should not be imputed to Pellicano, whose motion should be construed liberally because he was not represented by counsel at trial. *See United States v. Kohl*, 972 F.2d 294 (9th Cir. 1992) (noting that "motions by pro se defendants are to be liberally construed," and finding that defendant's motion for correction of sentence improperly made under Rule 35 should be construed liberally as one properly made pursuant to section 2255); *see also United States v. Eatinger*, 902 F.2d 1383 (9th Cir. 1990)

(on motion for reconsideration of sentence, "revers[ing] on the basis of the [district] court's failure to liberally construe [pro se petitoner's] motion"). Pellicano obviously did not intend to incorporate the specific grounds for acquittal in Arenson's Rule 29 motion, some of which were specific to Arneson and could not have served as grounds for acquitting Pellicano. On the contrary, Pellicano's joining Arneson's Rule 29 motion without adding any specific grounds for relief is best understood as a general request to be acquitted as a matter of law. And the nature of Pellicano's argument—that his conduct did not constitute bribery because there was no evidence of influencing an official act—was an obvious ground for acquittal, and thus fairly contained in his general Rule 29 request.

Even if Pellicano's Rule 29 motion was not sufficiently specific to comply with the court's technical procedural requirements, this Court must nonetheless consider his insufficiency-of-the evidence argument to prevent the manifest miscarriage of justice that would result from affirming his conviction for a crime he did not commit. *See Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011) (noting "the inherent injustice that results from the conviction of an innocent person," and stating that "[c]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system"). A plain reading of the California bribery statute and accompanying case law makes clear that Pellicano did not commit bribery. Thus, it would be manifestly unjust to keep

19

him in prison based on a conviction for that crime. *See United States v. Atkinson*, 297 U.S. 157, 160 (1936) ("In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings."); *cf. United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (finding manifest injustice despite defendant's raising claim only in reply brief).

### B.    Under *Skilling*, the Racketeering Acts Based on Federal Honest-Services Fraud Cannot Be Sustained

The jury's finding that Mr. Pellicano committed racketeering acts based on the federal wire-fraud statute[4] cannot be sustained, because the jury instructions failed to limit the definition of "honest services fraud" to its traditional core of "bribery and kickback schemes" as required under *Skilling v. United States*, 130 S. Ct. 2896, 2907 (2010). The government does not dispute that the honest-services-fraud instructions were incorrect in light of *Skilling*, but nonetheless argues that the error was harmless.  *See* Resp. Br. at 330-31.  In order for an erroneous jury instruction to be harmless, it must be "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty" under the appropriate instructions. *Neder v. United States*, 527 U.S. 1, 18 (1999). The government maintains that Pellicano clearly would have been convicted under a "bribery"

---

[4]        *See* Fifth Superseding Indictment, ¶¶ 27-28, Racketeering Acts 1-67.

theory of honest-services fraud based on the payments he made to Arneson. Resp. Br. at 330-38.[5] This is incorrect, because the government misunderstands "bribery" under *Skilling*, just as it does under California law.

1. **Honest-Services Bribery Requires Payment in Exchange for Official Action, Which Is Absent Here**

a. "Bribery" under the federal honest-services statute, just like "bribery" under California law, must involve a payment to influence an officer in his *official capacity*. In the words of this Court, the essence of honest-services bribery is "a link between the item of value received and an understanding that the public official receiving it is to perform *official acts* on behalf of the payor when called upon." *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009) (emphasis added) (county commissioner paid to cast favorable votes). Thus, "[o]nly individuals who can be shown to have had the specific intent to trade *official actions* for items of value are subject to criminal punishment on this theory of honest services fraud." *Id.* at 943 n.15 (emphasis added). This understanding comports not only with the California law just discussed but also, more broadly, with the general definition of bribery as as "[t]he corrupt payment, receipt, or solicitation of a private favor for official action." *Black's Law Dictionary* 186 (7th ed. 1999).

---

[5]    The same analysis applies to the two "honest services" fraud counts based on payments made by Pellicano to Stevens. *See* Resp. Br. at 335 n.346.

This traditional "official action" element of bribery is necessary to impose a clear limiting principle on the crime of honest-services fraud. As the Supreme Court observed in *Skilling*, the honest-services theory of wire fraud presents a serious danger of unconstitutional vagueness because it turns on the deprivation of "the intangible right to honest services." 130 S. Ct. at 2927-28. In the absence of some clear limitation, this expansive and ill-defined category would threaten to sweep in every instance of employee dishonesty, including even borderline cases of unethical behavior. To avoid this vagueness problem, the Court held that the honest-services doctrine must be "pared[] . . . down to its core," to provide a relatively bright line  between criminal and non-criminal behavior. *Id.* at 2928. To identify this traditional "core" of criminal conduct, the Court surveyed the relevant case law and held that honest-services fraud must be limited to cases involving "bribery or kickback schemes." *Id.* at 2930.

The government's effort to instead define bribery to encompass all quid-pro-quo payments to officers, rather than just payments with a view to official actions, would not solve the *Skilling* vagueness problem because it would not address the crucial question: payment for *what*? Many police officers are paid to engage in private investigative or security work, just as many other government employees engage in some form of outside employment. Sometimes these activities run afoul of workplace rules, or even criminal laws, because they exceed the maximum

22

number of outside-employment hours, or they misappropriate governmental time or resources. But surely not all such technical transgressions performed in exchange for payment qualify as "bribery" that would violate the wire-fraud statute. Such a broad definition would turn the wire-fraud statute into a "draconian personnel regulation," *Kincaid-Chauncey*, 556 F.3d at 940 (citation omitted), making every technical limit on officers' outside employment a potential basis for federal prosecution. Without the requirement of payment in exchange for *official* action, there would be no clear line between payments that were criminal and those that were unethical or simply questionable: Would it be a federal felony, as honest-services fraud, if an officer were paid to design a website on his work computer during regular employment hours, in violation of office policy? What if he improperly used the office photocopier for the benefit of his outside employer? Or what if he used his police car as a taxi, charging fares in exchange for rides?

To avoid such sprawling vagueness, this Court should adhere to the simple bright-line rule that has been applied in the "vast majority"[6] of honest-services bribery cases throughout the country: Unless a payment is offered to influence

---

[6]     Although *Skilling* did not precisely define the "bribery and kickback schemes" lying at the "solid core" of the honest-services doctrine, it did indicate that this "core" could be found in the common elements of the "vast majority" of honest-services cases. 130 S. Ct. at 2930.  The government appears to agree. *E.g.*, Resp. Br. 466.

some *official action*, there can be no "bribery" within the meaning of the federal wire-fraud statute.

As the Fourth Circuit put it (in a case favorably cited in *Skilling*), "the fraud involved in the bribery of a public official lies in the fact that the public official is not exercising his independent judgment in passing on *official matters*." *United States v. Mandel*, 591 F.2d 1347, 1362 (4th Cir. 1979) (emphasis added). The Third Circuit has agreed, noting that "bribery requires a specific intent to give or receive something of value in exchange for an official act." *United States v. Kemp*, 500 F.3d 257, 284 (3d Cir. 2007) (favorably cited by *Skilling*). The Second Circuit reached the same conclusion in yet another case that *Skilling* cited, *United States v. Ganim*, 510 F.3d 134, 149 (2d Cir. 2007), which observed that bribery occurs where some payment is made "in exchange for a pattern of official actions favorable to the donor" (internal quotation marks omitted). This formulation tracks the language in *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980) (also favorably cited in *Skilling*), where this Court stated that "[w]hen a public official is bribed, he is paid for making a decision while purporting to be exercising his independent discretion." The Eighth Circuit has explained in similar terms that, "[w]hen official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated." *United States v. Jain*, 93 F.3d 436, 442 (8th Cir. 1996). And the Eleventh Circuit has held that bribery is an "official act in

exchange for a specific corrupt payment." *United States v. Paradies*, 98 F.3d 1266, 1289 (11th Cir. 1996).

In the past, even the government appears to have acknowledged that official action is required. In *Skilling*, for example, the government took the position that *payment* was not a necessary element of honest-services fraud, but it did not go so far as to deny that official action was required. The government argued that honest-services fraud should include "the taking of *official action* by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." 130 S. Ct. at 2932 (emphasis added).[7] The Court rejected the government's position as overly broad and found that payment *was* required; but in doing so it did not repudiate the element of "official action" that the government itself had recognized. *See id.* (noting that the

---

[7]    In the private sector, "official action" occurs where an officer in a private company receives outside payment to influence his conduct in carrying out an official task on behalf of the company. For example, in *United States v. de Vegter*, 198 F.3d 1324 (11th Cir. 1999) (favorably cited in *Skilling*), honest-services charges were upheld where a private company was hired to recommend an underwriter for municipal bonds, and an officer of the company officially recommended the services of a particular underwriter who paid a kickback. Similarly, the Court emphasized in *Skilling* that the defendant was not alleged to have been paid to make the alleged misrepresentations of his company's financial health. *See* 130 S. Ct. at 2934. If he had been paid, he would have been guilty on a bribery theory of honest-services fraud because making official financial statements on behalf of the company was a type of official action assigned to him as an executive officer of the company.

"classic kickback scheme" involved payment in exchange for the official allocation of government contracts).

      b.    The meaning of "official action" is evident from cases of this Court such as *United States v. Weyhrauch*, 556 F.3d 1237, 1239 (2008), and *Kincaid-Chauncey*, 548 F.3d at 927-28, where public officials were paid to exercise the legal authority of their offices by casting official votes favorable to the payors. Crucially, they were engaged in "official" action because their votes were exercises of legal authority affecting the outcome of *official government action* that would have some legal consequence. The same was true in *United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012) (en banc), where a government contractor accepted bribes to help applicants cheat and falsify test results to obtain state-issued commercial driver's licenses. He was engaged in "official" action because he took steps to corrupt the process of issuing government licenses—in other words, swaying the outcome of an official act of government. *See also United States v. Wilkes*, 662 F.3d 524, 530 (9th Cir. 2011) (bribery of congressman in exchange for the official issuance of "lucrative government defense contracts").

    This Court's understanding of "official action" is confirmed by the honest-services cases favorably cited in *Skilling*.  For example, *Skilling* noted that the first case to introduce the "honest services" theory of wire fraud was *Shushan v. United States*, 117 F. 2d 110, 115 (5th Cir. 1941), which involved "[a] scheme to get a

26

public contract on more favorable terms than would likely be got otherwise by bribing a public official." The awarding of a contract is a quintessential act of government with a concrete legal consequence. Similarly, in *United States v. Kemp*, 500 F.3d 257, 264 (3d Cir. 2007), payments were made to the city Treasurer "to direct city contracts to companies" favored by the payor. And in *United States v. Brown*, 540 F.2d 364 (8th Cir. 1976), the court upheld the honest-services conviction of a city "building commissioner," who awarded demolition contracts in exchange for kickbacks in the form of rental payments for his mistress's apartment. This was honest-services fraud because the commissioner was accepting payments in exchange for exercising the legal authority of his office. *See id.* at 374. Likewise, in *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), the Seventh Circuit upheld the conviction of city officials for fraudulently giving out civil-service jobs based on political patronage and nepotism. And in *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), honest-services charges were sustained where judges were bribed in exchange for favorable rulings—that is, official government decisions with direct legal consequences.[8]

---

[8] Of the cases favorably cited in *Skilling*, the sole arguable exception to the above understanding of "official action" is *United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942), an early district-court case that did not involve bribery of a *public* official. In that case, executives of a private company were paid to divulge their company's trade secrets to a competitor. But the elements of traditional wire fraud were easily satisfied, apart from any concept of

Correspondingly, in the *absence* of such "official action," courts have *declined* to uphold charges of honest-services fraud. Two decisions of the First Circuit, both favorably cited in *Skilling*—and neither discussed by the government—demonstrate this. First is *United States v. Czubinski*, 106 F.3d 1069 (1997), where an IRS agent was charged with honest-services fraud for accessing confidential taxpayer information in an IRS database for his own personal use, in direct violation of IRS rules. The court overturned his conviction, holding that "the government must not merely indicate wrongdoing by a public official, but must also demonstrate that the wrongdoing at issue is intended to prevent or call into question the proper or impartial performance of that public servant's official duties." *Id*. at 1076. The case fell "outside of the core of honest services fraud precedents" because the defendant "was not bribed or otherwise influenced in any public decisionmaking capacity." *Id*. at 1077. Reversal of the conviction was required because "precedent . . . demonstrate[d] that even where public officials violated state laws, their actions were not found to defraud citizens of their right to honest services, because the officials did not actually fail to perform their official duties properly." *Id.* at 1076-77 (citing *United States v. Sawyer*, 85 F.3d 713, 725 (1st Cir. 1996)).

---

honest services, because the employees in depriving the company of its "confidential information and other property" caused a tangible economic loss.

The circuit court held to the same effect in *United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008), overturning the honest-services conviction of a state senator who had been paid by a hospital to facilitate meetings with insurance-company executives and to lobby city mayors to send more patients to the hospital. The court held that these payments were not "inherently improper" because they did not "bias[] his judgment in making *an official decision* on a matter before him." *Id.* at 295 (emphasis added). The court appropriately clarified, however, that a conviction might be sustained on remand if the prosecution could show that the senator had been paid in exchange for a favorable vote or some other exercise of the official authority of his elected office. *See id.* at 297-98.

      c.      Finally, there is no merit to the government's suggestion that Pellicano's conviction for honest-services fraud should be upheld on the basis of the federal bribery statute, 18 U.S.C. § 201(b), which applies a unique definition of bribery to payments involving *federal* officials. *See* Resp. Br. 316-18. Section 201(b) defines three separate forms of bribery involving quid pro quo payments to federal officers. The first covers the traditional definition of bribery that has been applied in the "core" of honest-services fraud cases, discussed above, where a federal officer is "influenced in the performance of any official act." § 201(b)(1)(A). But the statute then adds two other prohibited types of payments, where federal officials are "influenced to commit or aid in committing, or to

collude in, or allow, any fraud, or make opportunity for the commission of any fraud on the United States," or "induced to do or omit to do any act in violation of the official duty of such official or person."  § 201(b)(1)(B) & (C).

The government suggests that, if this full, separate federal statute were applied here, Pellicano's payments to Arneson would violate the last quoted clause (subsection (C)), by seeking to induce Arneson to violate his "official duty" to respect laws and regulations regarding confidential databases.  *See* Resp. Br. 321. But this argument is beside the point, because Section 201(b)(1) does not define "bribery" for honest-services fraud.  Indeed, this Court in 2013 made clear that a federal bribery-statute conviction will not sustain an honest-services conviction on a bribery theory—unless the independent bribery conviction involves payment in exchange for official action.  In *United States v. Garrido*, 2013 BL 101463 (9th Cir. 2013), the Court affirmed a defendant's bribery convictions under 18 U.S.C. § 666 "because such convictions do not require the defendant to be engaged in an official act."  *Id*. at *1. But the Court unanimously *reversed* the same defendant's honest-services conviction, because "Section 1346 honest-services convictions on a bribery theory . . . require at least an implied quid pro quo," which is an exchange of something of value "for an official act." *Id.* at *9.  Similarly, if the government were correct that bribery for purposes of honest-services fraud includes everything that any subsection of § 201(b)(1) prohibits, then the First Circuit's decision in

30

*Czubinski*, discussed above and favorably cited in *Skilling*, should have come out differently, as the IRS agent who misused the IRS database no doubt violated his official duty. *See* 106 F.3d at 1076-77.

The government itself admits that it is impossible to rely on any federal statutory definition of bribery for purposes of the honest-services statute, because "the federal code defines bribery differently not only within a given statute but across statutes." Resp. Br. at 316 n.330. For that reason, the government's citations of *United States v. Parks* and *United States v. Lanci*, both of which involved 201(b)(1)(C) convictions, are irrelevant to the contours of "bribery" as contemplated by *Skilling*. *See* Resp. Br. at 317.

As the Supreme Court itself made clear in *Skilling*, the proper way to determine the "core" of "bribery and kickback schemes" covered by the honest-services statute is to survey the field of previous honest-services cases and identify the elements that appeared in the "vast majority" of them. *See* 130 S. Ct. at 2930. That method yields the law as documented above, because the vast majority of honest-services bribery cases involved the traditional form of bribery—"[t]he corrupt payment, receipt, or solicitation of a private favor for *official action*." *Black's* at 186 (emphasis added). By contrast, the government does not cite a single case where a conviction for honest-services fraud was upheld based on a form of bribery involving a payment that merely induced a violation of some

31

official duty, rather than influencing some official action. Importing Section 201(b)(1)(C) into the honest-services statute would not only contravene *Skilling*'s instructions but also produce an anomalous result, dramatically expanding the honest-services statute and strangely federalizing the crime of bribery by applying one (but not the only) federal definition of bribery to every state and local government official. There is no warrant for this Court to take that step.

### 2. The Mistaken Jury Instruction Was Not Harmless Error

Under the proper legal standard, the jury instruction based on a pre-*Skilling* view of honest-services fraud was far from harmless because there would have been no basis to convict him on a proper instruction. It thus could hardly be clear beyond a reasonable doubt that a rational jury would have found him guilty. *See Neder*, 527 U.S. at 18.

Mr. Pellicano's convictions cannot be sustained on a bribery theory of honest-services fraud because he did not pay Arneson in exchange for any *official* action, and thus did not "trade official actions for items of value." *Kincaid-Chauncey*, 556 F.3d at 943 n.15. Unlike an officer being bribed to award contracts, issue licenses, hire employees, decide cases, or vote for legislation, Arneson was not paid to exercise the legal powers of his office to bring about some *official government action* with a legal consequence favorable to Pellicano. Pellicano did not pay Arneson to "bias[] his judgment in making an official

decision on a matter before him," *Urcuioli*, 513 F.3d at 295, nor was Arneson "bribed or otherwise influenced in any public decisionmaking capacity," *Czubinski*, 106 F.3d at 1077. To the contrary, Arneson was engaged in outside employment as a private investigator for Mr. Pellicano, and in furtherance of that employment he simply used police resources to run computer background checks. Although this may have been an improper use of agency resources—perhaps even a criminal misuse—it was not bribery and thus was not federal wire fraud.

3.     **Mr. Pellicano Did Not Waive His *Skilling* Argument**

The government claims that Pellicano waived his *Skilling* argument by failing to raise it at trial. *See* Resp. Br. at 308. But as this court has already recognized, there is no waiver in this situation "because the opening brief was filed prior to the *Skilling* opinion." *United States v. Jaramillo*, 413 Fed. Appx. 979 (9th Cir. 2011) (citing *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992)). In short, because *Skilling* changed the law on honest-services fraud after Pellicano's trial, Pellicano is entitled to the benefit of that change while his case is still pending on direct appeal. *United States v. Johnson*, 457 U.S. 537, 545 (1982) ("[A]ll defendants whose cases [are] still pending on direct appeal at the time of the law-changing decision [are] entitled to invoke the new rule."). *See also United States v. Sood*, 969 F.2d 774, 776 (9th Cir. 1992) (concluding that manifest injustice is present where petitioner can demonstrate that, pursuant to a change in

the law, he could not have been properly convicted under the applicable criminal statute).

### C.    The Racketeering Acts Alleging Identity Theft Must Fall

Finally, the evidence at trial did not support the "identity theft" racketeering acts, which were based on violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)(4), and California Penal Code § 502.[9]  Both statutes prohibit "unauthorized access" in the form of computer hacking, i.e., breaking in to a computer system and thereby gaining access that one is not supposed to have. But neither statute applies in the present case, where (according to the government's own theory) employees had unrestricted physical access to databases through their own login credentials, but used such access to obtain information for an unauthorized purpose.  *See United State v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (en banc); *Chrisman v. City of Los Angeles*, 155 Cal. App. 4th 29 (2007).

### 1.    After *Nosal*, The Evidence Regarding the Racketeering Acts Based on the CFAA Is Insufficient As a Matter of Law

a.    The CFAA racketeering acts alleged against Mr. Pellicano were based on the payments he made to Stevens, Arneson, and Wright in exchange for information that they obtained from computer databases that they were authorized to access by virtue of their employment.  Resp. Br. 453-54.  The government argues that this conduct amounted to "unauthorized access" under the CFAA

---

[9]    *See* Fifth Superseding Indictment, ¶¶ 29-31, Racketeering Acts 81-92.

because, while these employees were authorized to access the databases in question, they were permitted to do so only for lawful work purposes, and not for the prohibited purpose of disclosing the information to Mr. Pellicano. *Id.* at 463-64. That is incorrect. By adopting such a sweeping construction of "unauthorized access," the government is simply repackaging the argument that this Court rejected in *Nosal*. Indeed, the government's entire argument is based on a stubborn refusal to accept this Court's holding in *Nosal*, which rejected the notion that prosecutors can wield the CFAA as an all-purpose statute for policing computer-related misconduct.

In *Nosal*, an en banc panel of this court confronted a CFAA conviction based on facts that are strikingly similar to those here. The defendant had induced employees of the Korn/Ferry company to "use[] their log-in credentials to download source lists, names and contact information from a confidential database on the company's computer, and then transfer[] that information to [him]." 676 F.3d at 856. At the database login screen, the employees were warned that the database was "intended to be used by Korn/Ferry employees for work on Korn/Ferry business only." *Id.* at 856 n.1. The government indicted the defendant "for aiding and abetting the Korn/Ferry employees in 'exceed[ing their] authorized access' with intent to defraud," in violation of § 1030(a)(4) of the CFAA. Even though the employees had "unrestricted physical access" to the database, the

35

government argued that they violated the statute because they were not authorized to use their access for the illegitimate purpose of stealing "customer lists" and "send[ing] them to a competitor." *Id.* at 857.

This Court rejected that argument, finding that it "would transform the CFAA from an anti-hacking statute into an expansive misappropriation statute." *Id.* Contrary to the government's "broad interpretation," the Court explained, "Congress enacted the CFAA in 1984 primarily to address the growing problem of computer hacking, recognizing that, '[i]n intentionally trespassing into someone else's computer files, the offender obtains at the very least information as to how to break into that computer system.'" *Id.* at 858 (quoting S. Rep. No. 99-432, at 9 (1986) (Conf. Rep.)). Thus, the Court held, the reach of the CFAA is limited to "computer hacking" in the sense of "breaking into a computer." *Id.* at 858. The statute does not "apply to people who are authorized to use the computer, but do so for an unauthorized purpose." *Id.* District courts within this Circuit have repeatedly recognized and applied this holding. *See Metabyte, Inc. v. NVIDIA Corp.*, 2013 BL 108327 (N.D. Cal. Apr. 22, 2013) (finding no "unauthorized access" under CFAA where employees, "hired to work on the very information presently at issue," copied without permission confidential source code from employer database); *Hat World, Inc. v. Kelley*, 2012 BL 204726, at *5 (E.D. Cal. Aug. 10, 2012) ("In short, the CFAA is an 'anti-hacking' statute and not a

misappropriation statute." (citing *Nosal*, 676 F.3d at 860)); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.Supp.2d 1025, 1038-39 (N.D. Cal. 2012) (explaining that "unauthorized access" under the CFAA involves "circumvent[ing] technical barriers").

        b.     In light of *Nosal*, Mr. Pellicano and his associates clearly did not violate the CFAA. Stevens, Arneson, and Wright did not "hack" or "break into" any computer system. Rather, they simply used their own credentials to log into databases to which they had "unrestricted physical access." 676 F.3d at 857. Although they may have misused their access by wrongfully obtaining and disclosing information, this is precisely the type of misconduct that *Nosal* held is *not* prohibited under the CFAA. In short, "[b]ecause [Mr. Pellicano's] accomplices had permission to access the [respective] database[s] and obtain the information contained within, the government's charges fail to meet the element of 'without authorization, or exceeds authorized access' under 18 U.S.C. § 1030(a)(4)." *Id.* at 864. Again, courts have recognized the applicability of the rule of *Nosal* in similar circumstances. *See United States v. Zhang*, 2012 BL 130953 at *17 (N.D. Cal. May 29, 2012) (technology worker who misappropriated trade secrets by copying them from his employer's computer system did not violate the CFAA "because he had active log-in credentials at that time"); *Oracle America, Inc. v. Serv. Key, LLC*, 2012 BL 318289 (N.D. Cal. Dec. 3, 2012) ("[T]he sharing

of confidential information by employees, even if obtained and distributed in violation of company policy, [is] not actionable under the CFAA." (citing *Nosal*)).

      c.    The government is clearly mistaken to argue that Mr. Pellicano's associates violated the CFAA based on the *purpose* of their behavior, by accessing the databases without "a legitimate work-reason." Resp. Br. at 463-64. If this Court were to accept the government's argument, it would eviscerate the holding of *Nosal*, because improper computer "use" can always be recharacterized as "unauthorized access," simply by recasting the "terms of use" as "conditions precedent" to access. *Id.* at 464. If such creative argumentation by prosecutors were enough to win the day, then *Nosal* would have come out differently because the employees in that case were "authorized" to access their employer database "for work on [employer] business only." 676 F.3d at 856 n.1. Such "use" restrictions are entirely different from the "access" restrictions contemplated by the CFAA. In *Craigslist, Inc. v. 3Taps, Inc.*, 2013 BL 116811 (N.D. Cal. Apr. 30, 2013), for example, where a website's "terms of use" stated that users were not allowed to access site for an improper purpose, the court rejected a CFAA claim because, even though the terms of use were "framed in terms of 'access,'" the "restrictions depend[ed] entirely on the accessor's purpose." *Id.* at *4. It makes no difference that the "use" restrictions relied on by the government were "enacted by law." *See* Resp. Br. at 470. Although the

38

government gives a list of California laws and federal regulations that may have been violated, *id.* at 470-71, none of those violations was charged—and, in any event, none bears on the critical CFAA question of whether Mr. Pellicano's associates were authorized to *access* the databases, as opposed to whether they were permitted to *use* the databases for a certain purpose.

There is also no merit to the government's argument that Wright and Arneson engaged in "unauthorized access" under the CFAA by entering false "tracking" information when they ran their database searches. *See* Resp. Br. 461-63. As the government explains, the databases "required employees to enter a code showing why the entered each [database search]." *Id.* at 462-63 & n.451. Unsurprisingly, to "cover their tracks," Wright and Arenson entered false information regarding the purpose of their searches.  Thus, the government concludes, they engaged in "unauthorized access" under the CFAA, just as if they had "use[d] another employee's login to copy information from the database." *Id.* at 462 (quoting *Nosal* 676 F.3d at 858).

d.    The government's argument is a spectacular non-sequitur, once again evincing a fundamental confusion between unauthorized *use* and unauthorized *access*.  Under the CFAA's definition of "unauthorized access," there is a world of difference between using false login information to *unlawfully gain access to a database*, as opposed  to using one's own credentials to log in to the

database, and then *using that access* in an improper manner—such as running searches for an improper purpose, or entering false tracking information. The government's argument boils down to a refusal to accept that this Court meant what it said in *Nosal*—namely, that the CFAA's prohibition of "unauthorized access" is about "breaking into" computer systems, not misusing them.

Because the government did not even allege the essential element of breaking into a computer system, much less prove it at trial, the evidence was plainly insufficient to convict Mr. Pellicano under the CFAA as interpreted by *Nosal*. For that reason, the government's arguments about jury instructions are largely beside the point. *See* Resp. Br. at 451, 465-69, 471-72. Regardless of how the jury was instructed, it was plainly incorrect as a matter of law to find that Mr. Pellicano violated the CFAA. The only way the conviction could have been obtained was based on a flat misunderstanding of the statute.

Finally, there is no merit to the government's argument that Mr. Pellicano waived his CFAA arguments. The government admits that Mr. Pellicano raised the CFAA issue in his opening brief by incorporating the arguments made in Turner's brief. Resp. Br. 453 n.443. Nonetheless, the government insists that there was a waiver because Mr. Pellicano failed to make "fact-specific arguments" as to why the evidence was insufficient. *Id.* That is entirely incorrect. Mr. Pellicano's CFAA conviction was not defective because of any mistaken factual

40

inferences, but rather because both the government and the jury misunderstood the elements of the offense as a matter of law. There is nothing fact-specific about this argument, other than the simple point that the government failed to allege (much less prove) the factual elements necessary to sustain a conviction under the CFAA. *See United States v. Sood*, 969 F.2d 774, 776 (9th Cir. 1992) (considering issue to avoid manifest injustice where prisoner could not have been properly convicted under the applicable criminal statute).

### 2.    The "Identity Theft" Racketeering Acts Similarly Fail Under California Law

For the same reason that Mr. Pellicano's convictions are invalid under the CFAA, they are also invalid under § 502 of the California Penal Code. *See* Pellicano Op. Br. at 54-56. "Although cases interpreting the scope of liability under the CFAA do not govern [this] Court's analysis of the scope of liability under Section 502, CFAA cases can be instructive." *Facebook, Inc. v. Power Ventures, Inc.*, 2010 BL 318442, at *10 (N.D. Cal. July 20, 2010). And especially after *Nosal*, "the more recent CFAA cases militate for an interpretation of Section 502 that does not premise permission to access or use a computer or computer network on a violation of terms of use." *Id*.

Like its federal counterpart, § 502 of the California Penal Code distinguishes "between access that violates a term of use and access that circumvents technical or code-based barriers that a computer network or website administrator erects to

restrict the user's privileges within the system, or to bar the user from the system altogether." *Id.* at *12. *See also Stern v. Weinstein*, 2013 BL 75043, at *1 (9th Cir. Mar. 20, 2013) (unpublished) (suggesting that same construction should be given to CFAA and Cal. Penal Code § 502(c)(3)). "Section 502 defines 'access' in terms redolent of 'hacking' or breaking into a computer." *Chrisman v. City of Los Angeles*, 155 Cal. App. 4th 29, 34 (App. 2d Dist. 2007). Thus, §502 is not about unauthorized computer *use*, but rather about "outsiders who break into a computer system to obtain or alter the information contained there." *Id.* (quoting *People v. Gentry*, 234 Cal. App. 3d 131 (App. 4th Dist. 1991)).

As explained above, nothing of the sort happened here. The government's arguments to the contrary ring hollow, especially in light of *Nosal*'s specific reliance on the rule of lenity to "construe [computer-access] statutes narrowly" to avoid criminalizing the mere unauthorized *use* of computer systems. 676 F.3d at 863. This Court should follow the same rule of construction in interpreting California law. As in *Chrisman*, any ambiguity in the statute should be construed to avoid criminalizing unauthorized use, which would sweep in millions of ordinary activities.

To try to limit the damage from *Nosal* and *Chrisman*, the government points to a few pre-*Nosal* cases of intermediate appellate courts finding "possible" or "likely" violations of § 502 "where users accessed a computer with permission but

42

in violation of terms of access, or where employees used passwords to access computers for illegitimate purposes." Resp. Br. at 479-80 & n.467. None of these cases held that the statute should be interpreted as broadly as the government prefers, and in any event none of these cases is binding on this Court. At best, the government establishes that there may be some ambiguity as to the breadth of § 502 under California law, thus raising the same question that was present in *Nosal*—i.e., whether any such ambiguity should be resolved in favor of extraordinarily broad criminal liability.

That interpretive question should be influenced not only by the reasoning of *Nosal*, but also by the canon of constitutional avoidance. As one court has noted, "interpreting [§ 502] in a manner that imposes liability for a violation of a term of use . . . would create a constitutionally untenable situation in which criminal penalties could be meted out on the basis of violating vague or ambiguous terms of use. . . . 'By granting the computer owner essentially unlimited authority to define authorization, the contract standard delegates the scope of criminality to every computer owner.'" *Facebook, Inc. v. Power Ventures, Inc.*, 2010 BL 318442, at *12 (N.D. Cal. July 20, 2010) (quoting Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. REV. 1596, 1650-51 (2003)).

In one stunning passage, the government argues that the legislative history of § 502 *supports* the government's interpretation by "reveal[ing] an expectation that the bill would criminalize employees for misusing their employers' computers." *Id.* at 480 n.469. To support that contention, the government quotes two legislative reports that *criticized* the bill. One report stated that the bill would "make it a crime" for an employee to "use[] his or her computer or a colleague's computer to write a term paper." *Id.* (quoting Assembly Comm. On Pub. Safety Rpt. On SB 255, at 3 (June 1, 1987)). Another report stated that "One effect of this change would be to make such acts as unintentional and inadvertent alteration of data by an employee using a computer for a personal project without permission[] subject to a state prison term." *Id.* (quoting Sen. Comm. On Judiciary Rpt. On SB 255, at 7).

In essence, the government's position seems to be that the law should be interpreted in the same absurd and outlandish way that its harshest critics feared. That is truly remarkable. A far more sensible conclusion is that lawmakers ultimately passed the law because they believed it could be read in a more limited and reasonable manner, as illustrated in *Chrisman* and *Nosal*. This Court should follow suit, and decline to read the law to make criminals out of term-paper writers and computer novices who "inadvertent[ly]" alter data without permission. *See Mahru v. Superior Court of Los Angeles County,* 191 Cal. App. 3d 545 (1987)

("The Legislature could not have meant, by enacting section 502, to bring the Penal Code into the computer age by making annoying or spiteful acts criminal offenses whenever a computer is used to accomplish them. Individuals and organizations use computers for typing and other routine tasks in the conduct of their affairs, and sometimes in the course of these affairs they do vexing, annoying, and injurious things. Such acts cannot all be criminal.").

## II.    THE GOVERNMENT CANNOT JUSTIFY ITS SEARCH BASED ON A WARRANT THAT WAS ISSUED DUE TO LIES AND OMISSIONS

As explained in Mr. Pellicano's opening brief, the evidence supporting Mr. Pellicano's conviction stemmed from an unlawful search that was not supported by probable cause. It is telling that the Government first seeks to bury this issue by relying on collateral estoppel, and then deploys post-hoc rationalizations to supply probable cause that was not present at the time the warrant was issued.

### A.    Collateral Estoppel Does Not Preclude This Court From Holding the Government Accountable for Willfully Violating Pellicano's Fourth Amendment Rights

For the first time on appeal, the government argues that Pellicano's Fourth Amendment argument regarding the November 2002 search warrant is barred by collateral estoppel, because the validity of the search warrant was upheld in his prior conviction. *See* Resp. Br. at 52. Because the government failed to raise this argument before the trial court, however, the argument is waived. *See Harbeson v.*

45

*Parke Davis, Inc.*, 746 F.2d 517, 521 (9th Cir. 1984) (holding that "the United States waived its right to assert the doctrine of collateral estoppel by failing to raise it before the district court"); *Knai Oil & Gas, Inc. v. Dept. of Interior*, 671 F.2d 383, 388 (10th Cir. 1982) (collateral-estoppel argument "need not be considered" when it is "raised for the first time on appeal").

Nor is there any reason to excuse the waiver, given that the government's offensive use of collateral estoppel in criminal cases is heavily disfavored. "The doctrine's use in the criminal arena, . . . has traditionally been limited to only one party—the defendant." *United States v. Harnage*, 976 F.2d 633, 634 (11th Cir. 1992) (rejecting "the government's use of the doctrine of collateral estoppel to preclude a criminal defendant from raising an issue adjudicated in a prior proceeding"). *See also United States v. Gallardo-Mendez*, 150 F.3d 1240, 1244 (10th Cir. 1998) ("[W]hile wise public policy and judicial efficiency may be sufficient reasons to apply collateral estoppel in civil cases, they do not have the same weight and value in criminal cases.") (citation omitted); *United States v. Pelullo*, 14 F.3d 881, 897 (3d Cir. 1994) (holding that defendant's prior conviction following jury trial for wire fraud did not prevent re-litigation of the same crime as predicate offense in later RICO trial). Indeed, the government itself has conceded in this Court that, "[i]n federal criminal trials, the United States may not use collateral estoppel to establish, as a matter of law, an element of an offense or to

46

conclusively rebut an affirmative defense on which the Government bears the burden of proof beyond a reasonable doubt." *United States v. Smith-Baltiher*, 424 F.3d 913, 919-920 (9th Cir. 2005).

Finally, the government cannot somehow excuse its waiver claiming the prosecutors were unaware of the first Pellicano case. The same prosecutors who handled the first prosecution and appeal of Mr. Pellicano likewise were fully involved in this case.

**B.     The Government Fails to Justify Its Procurement of a Search Warrant Based on Knowingly False Accusations and Concealment of Material Facts**

From the defense investigation of the four corners of the November 19, 2002 search warrant declaration, Mr. Pellicano established that the affiant, agent Ornellas, intentionally made material misrepresentations and omissions which directly undercut any probable cause to search PIA.  Even if some of these omissions and misstatements seem unimportant in isolation, taken together they have a significant effect.  They call into question the credibility of both (a) the informant (who would have seemed less credible if the magistrate knew all the facts about him) and (b) the affiant (whose other representations in the warrant might have been viewed with suspicion if the magistrate knew that he was withholding some information and making some misstatements).  Affiant Ornellas

never submitted a declaration contesting or explaining the numerous misrepresentation and material omissions in his search warrant declaration.

However, after this federal case concluded, previously withheld evidence was provided to Mr. Pellicano from state prosecutors in the Anita Busch state case. Federal grand jury transcripts of the CW's testimony was first provided to Mr. Pellicano by these state prosecutors. Also, a state preliminary hearing occurred in February 2009, where agent Ornellas testified about his investigation which culminated in his search warrant declaration. All of this new evidence further supported the Ornellas' lack of good faith and intentional misrepresentations in securing his search warrant.

Rather than address the damaging content of the both the CW's and Ornellas testimony, the government attempts to sidestep the issue by claiming the record is devoid of these salient materials. This is not true. Both the CW and Ornellas testimony are included and cited in the Excerpt of Record.

The government claims that "if a federal warrant had been denied, there would have been a state warrant permitting the same search and leading to the same results—meaning that the evidence would inevitably have been found." Resp. Br. at 165. This type of speculation is insufficient to overcome the government's deliberate use of misinformation to obtain an unlawful warrant. *See Nix v. Williams*, 467 U.S. 431, 457 (1984) (Stevens, J., concurring) (in the

"inevitable discovery" context, the government cannot "escape responsibility for a constitutional violation through speculation").

## III.  UPON REVERSAL OF HIS RICO CONVICTIONS, PELLICANO SHOULD BE IMMEDIATELY RELEASED FROM CUSTODY OR, AT A MINIMUM, HAVE HIS CASE REASSIGNED ON REMAND.

If Mr. Pellicano's RICO convictions are vacated, his extreme sentence should be reduced.

### A.  Because Mr. Pellicano Has Already Served More Than His Full Sentence for All Non-RICO Offenses, He Should Be Immediately Released

The Government concedes that "Pellicano's Guidelines calculations were driven exclusively by the bribery racketeering acts and the wiretapping offenses." Resp. Br. at 627.  He was sentenced to serve 180 months (15 years) for his RICO offenses, compared to only 60 or 36 months (5 or 3 years) for his non-RICO offenses, all to be served concurrently.  Thanks in large part to the government's delay of this appeal, he has been imprisoned for these convictions for over 100 months—more than *three years* beyond the sentence for the non-RICO convictions.  As a result, once his RICO convictions are overturned, he should be ordered immediately released.

As a general matter, to be sure, "When a defendant is sentenced to multiple counts and one of them is later vacated on appeal, the sentencing package becomes

49

'unbundled.' The district court then has the authority to put together a new package reflecting its considered judgment as to the punishment the defendant deserve[d] for the crimes of which he [wa]s still convicted." *United States v. Avila-Anguiano*, 609 F.3d 1046, 1049 (9th Cir. 2010). As far as Appellant is aware, however, this Court has not confronted the situation that will arise here once the RICO convictions are reversed: (a) The Appellant has already served more than the time allotted for his only remaining valid sentences, and (b) the only way to keep him imprisoned would be to change some of those already-served sentences from concurrent to consecutive status (because changing any one of his non-RICO sentences to exceed the over 100 months he has already served would be blatantly excessive). In such an extreme and unusual situation, where Mr. Pellicano's RICO convictions were the main driver of his sentence and are the only reason he remains in prison, it would be an abuse of discretion for any resentencing court to refuse to order his immediate release. For that reason, there is no need for any remand.

## B.     At the Very Least, Pellicano's Sentence Should be Vacated and Remanded for Resentencing Before a Different Judge

If the Court nevertheless remands the case for re-sentencing, it should, for the reasons Mr. Pellicano explained in his opening brief, reassign his case to a new judge. *See* Pellicano Op. Br. 9-10, 12, 59-60, 73. Reassignment is appropriate if "the original judge would reasonably be expected upon remand to have substantial

50

difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous" or if it "is advisable to preserve the appearance of justice." *In re Ellis*, 356 F.3d 1198, 1211 (9th Cir. 2004) (en banc); *see United States v. Hernandez-Meza*, 720 F.3d 760, 769-70 (9th Cir. 2013) (applying this rule and reassigning).

In addition to the simple magnitude of the District Court's error in setting Mr. Pellicano's sentence initially, *see* Pellicano Op. Br. at 60-73, two specific reasons further establish the need for reassignment here. First is the vast gulf between the sentence the District Court imposed and the carefully reasoned, consistent recommendations of the United States Probation Office. *See id.* at 60-62. The PSR identified a guidelines range of 97-121 months and recommended a downward departure to a sentence of 70 months.[10] The court instead imposed a sentence of 180 months. This was (1) more than *two-and-a-half times* (and 9 years) greater than the PSR's recommendation; (2) almost *five years* (59 months) greater than the high end of the guidelines range that the PSR calculated; and (3)

---

[10]     A significant factor in the PSR's recommendation of a downward departure was the close relationship between the convictions in the present case and those on the explosives charges. *See* Pellicano Op. Br. 61-62, 71-73. On appeal, the government's newly minted collateral-estoppel argument regarding the search in connection with the explosives charges, discussed above in Part II—an argument depending on an identity of issues in the two cases—effectively concedes the correctness of the PSR's approach.

effectively the *high end* of even the government's extreme proposed guidelines sentencing range (151-188 months).

The District Court's hostility to the PSR, and to the defense of it by Mr. Pellicano's counsel, was evident at sentencing: The court confidently brushed aside counsel with the comment that it had "a better handle" on the case than did the Probation Office, [ER 4758]; remarked that a sentence of even 20 years (240 months) would be appropriate, [ER 4774]; and repeatedly stated its willingness to employ an upward departure had that been needed [ER 4777].

Second, the District Court's comments four years later, at the hearing denying Mr. Pellicano's motion for bail pending appeal in August 2012, confirm that, notwithstanding the passage of time and its learning of the possible reversal of Mr. Pellicano's RICO counts due to *Skilling* and *Nosal*, the District Court remains devoted to its original sentence: In response to Mr. Pellicano's counsel's pointing out that Pellicano had served all of the time to which the District Court had sentenced him on the non-RICO counts, the court was quick to inquire of the government: "I assume he hasn't served all the time I could have given him on those counts." SERII at 24. The government readily agreed with this statement, pointing out that, "if nothing else," the court "could have stacked those convictions," and reminding the court of its prior openness to a 20-year sentence. *Id.*

52

In these circumstances, it is unlikely that the District Court could put out of its mind its prior focus on harshly sentencing Mr. Pellicano for conduct that was not criminal.  At the very least, a reassignment on remand would be appropriate to preserve the appearance of justice in such a charged case.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Pellicano's convictions should be vacated, and he should be ordered immediately released from custody or, at the very least, remanded for resentencing before a new and impartial judge.

## <u>STATEMENT OF DETENTION STATUS</u>

Counsel respectfully advises the Court that the Appellant, Anthony J. Pellicano, is 69 years of age and in the custody of the Bureau of Prisons (BOP). He has been in BOP custody since November 17, 2003 and his projected release date is March 23, 2019. He is detained at the Federal Correctional Institution in Big Spring, Texas.

/S/ Steven F. Gruel

_____

STEVEN F. GRUEL

## CERTIFICATE OF SERVICE

I, Steven F. Gruel, hereby certify that on the 13th day of September 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Steven F. Gruel

_____

STEVEN F. GRUEL

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached Opening Brief is proportionately spaced, has a typeface of 14 points or more, and contains 9,574 words.

Date:  September 13, 2013          s/ Steven F. Gruel
                                          STEVEN F. GRUEL